**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ANAHEIM GARDENS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 93-655C |
| v. | ) | (Judge Robert H. Hodges, Jr.) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| ALGONQUIN HEIGHTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 97-582C |
| v. | ) | (Judge Robert H. Hodges, Jr.) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM CONCERNING RIPENESS**

The United States respectfully submits this memorandum concerning the issue of ripeness to facilitate discussions and clarify the United States' position in advance of the July 20, 2007, status conference in Anaheim Gardens v. United States, No. 93-655 (Fed. Cl.), and Algonquin Heights v. United States, No. 97-582 (Fed. Cl.). This memorandum is divided into two sections The first section gives a general overview of the two statutes (collectively, the "Preservation Statutes") that are at issue in these actions. The second section describes the steps necessary for the owner of a section 221(d)(3) or 236 project to establish a ripe as-applied taking claim. A chart providing a summary of the administrative process and potential outcomes is attached as Exhibit A.

## I. General Background

In the late 1980s, Congress became concerned that many owners of section 221(d)(3) and 236 properties would prepay their mortgages, triggering a substantial drop in the nation's supply of low-income housing. See, e.g., H.R. Conf. Rep. No. 100-426, at 192 (1987) (estimating that almost 950,000 low-income housing units could be lost through mortgage prepayments). Consequently, in 1988 and 1990, Congress enacted and funded the Preservation Statutes to preserve low-income housing while safeguarding the interests of property owners.

### A. ELIHPA

In 1988, as a temporary measure, Congress enacted the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877-86 (1988) ("ELIHPA" or "Title II"). The statute instituted a complex permitting process under which owners interested in prepaying their mortgage were required to apply to HUD for approval. ELIHPA §§ 221-23. This enabled HUD, using the agency's knowledge and expertise, to assess whether a project warranted preservation as low-income housing. ELIHPA § 225(a).

As an alternative to prepayment, Congress authorized HUD to alter the project's regulatory structure "to provide a fair return [to] the owner." Id. §§ 224-25. Under ELIHPA, owners could obtain a Government-insured equity take out loan funded by increased rents, increased annual cash distributions, Section 8 housing assistance contracts, and financing for capital improvements. Id. §§ 224(b), 231. These benefits would be incorporated into a use agreement that amended the project's original regulatory agreement and provided a new regulatory regimen for operating the project. Id. § 225(b). Congress also authorized HUD to provide assistance to facilitate a project's sale to a qualified nonprofit organization, tenant

cooperative or public agency. Id. § 224(b). Under ELIHPA, owners "seeking to initiate prepayment or other changes in [their] regulatory agreement" were required to submit a "notice of intent," obtain an appraisal, and provide HUD a "plan of action" requesting either prepayment, sale, or incentives. Id. §§ 221-23.

Finally, to prevent prejudice to owners that chose to proceed under ELIHPA, Congress provided that owners could to switch to benefits authorized by any successor statute. ELIHPA § 230 (allowing owners to opt for a different course even after incentives under ELIHPA had been accepted).

**B. LIHPRHA**

In 1990, Congress replaced ELIHPA with the Low-Income Housing Preservation and Resident Homeownership Act, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (codified at 12 U.S.C. § 4101 et seq.) ("LIHPRHA" or "Title VI"). Like its predecessor, LIHPRHA asserted HUD's regulatory jurisdiction over prepayment, required owners to seek approval to prepay their HUD-insured mortgage, and provided opportunities to exit the program or alter the project's regulatory regimen in the event of a denial. 12 U.S.C. §§ 4101(a), 4108-10, 4114. An owner interested in pursuing the options provided by LIHPRHA was first required to file a notice of intent. See, e.g., Initial Notice of Intent for Anaheim Gardens (July 20, 1992) (requesting incentives) (attached as Exhibit B); Initial Notice of Intent for Cedar Gardens (Oct. 20, 1992) (requesting to sell) (attached as Exhibit C). The owner would then conduct an appraisal of the project, the project's market value would be determined, and the owner would submit a plan of action to HUD. 12 U.S.C. § 4102(a); see also Letter from HUD to Anaheim Gardens (Aug. 27, 1993) (attached as Exhibit D). Owners who were proceeding under ELIHPA were allowed to

continue under that statute or switch to LIHPRHA. 12 U.S.C. § 4101 note; see also ELIHPA § 230.

Under LIHPRHA, prepayment could occur under two distinct avenues. 12 U.S.C. § 4101(a). First, HUD could approve an owner's request to prepay if prepayment would not cause a material hardship for current tenants or materially affect the availability of low-income housing in the area. 12 U.S.C. § 4108. As with ELIHPA, this provided HUD discretion to determine whether the project's preservation as low income housing was warranted. Id. (directing HUD to assess whether prepayment would "materially increase economic hardship for current tenants" or "materially affect . . . the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families"). Second, HUD allowed prepayment if, within a fixed period, use agreement incentives were not available, or a sale was not consummated. 12 U.S.C. § 4114; see also Letter from HUD to Anaheim Gardens at 1 (June 29, 1995) (explaining that funding for incentives was unavailable and prepayment could occur on July 31, 1995) (attached as Exhibit E); Letter from HUD to Cedar Gardens at 1 (explaining that funding to facilitate sale was unavailable and prepayment could occur on November 12, 1995) (attached as Exhibit F).

LIHPRHA also allowed owners to sell their property to a "qualified purchaser" at the "fair market value of the housing based on the highest and best use of the property," i.e., the project's market value without HUD restrictions. 12 U.S.C. §§ 4103(b), 4110(b). To facilitate sales, which enabled the owner to realize equity and exit the program, HUD funded virtually all transaction costs, provided mortgage insurance, and paid consultants to assist the parties. 12 U.S.C. § 4110(d). HUD provided loans and grants that enabled non-profit organizations to

acquire the projects. Id. Further, as noted above, if an owner seeking to sell did not receive a bona fide offer within a specified time frame, did not receive financial assistance from HUD to facilitate the sale, or was unable to consummate the transaction for another reason, the owner would be allowed to prepay and exit the program. 12 U.S.C. § 4114(1)(B); Ex. F.

As under ELIHPA, LIHPRHA also permitted the owner to request changes to the regulatory structure in exchange for remaining in the program. 12 U.S.C. § 4109. HUD could authorize rent increases, an increased rate of return based upon the property's market value as conventional rental housing, access to project equity through a Government-insured loan, and financing for capital improvements. Id. The agreed changes would be formalized in a use agreement that amended the project's original regulatory agreement. Id. Further, if incentives were not provided within a fixed period, the owner was allowed to prepay the original mortgage and leave the program. 12 U.S.C. § 4114; Ex. E.

Finally, LIHPRHA sought to ensure that owners were not disadvantaged by delays in processing applications and providing funds. Thus, LIHPRHA permitted owners to submit a notice of intent two years before their original prepayment date to minimize any administrative delays after prepayment eligibility. 12 U.S.C. §§ 4102, 4119(1)(B). Additionally, Congress ordered HUD to review applications within 180 days and, if the review extended beyond that, to provide retroactive incentives and assistance to owners. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce these provisions. Id.

**C. Additional Legislation**

The Preservation Statutes were subject to frequent criticism due to their generous provisions and excessive cost to the Government. In the mid-1990s, Congress commenced hearings to consider alternatives. HUD's Inspector General recommended, among other measures, that Congress "[d]iscontinue paying owners windfall profits for projects that threaten to prepay their mortgages and remove the low income character of the units." Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995). These concerns resulted in passage of the Housing Opportunity Program Extension Act of 1996 ("HOPE Act"), Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996). Although the HOPE Act did not expressly repeal LIHPRHA, it "restored the prepayment rights to owners" of moderate- and low-income housing. Chancellor Manor v. United States, 331 F.3d 891, 896 (Fed. Cir. 2003).

**II. Plaintiffs' As-Applied, Regulatory Taking Claims Are Not Ripe Unless HUD Reached A "Final Decision" With Respect To The Plaintiffs' Properties**

The aim of Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978), is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005). To establish a taking under Penn Central, a property owner must establish that the regulation at issue "has in substance 'taken' their property by going 'too far.'" Greenbrier v. United States, 193 F.3d 1348, 1357 (Fed. Cir. 1999).

**A. As-Applied Taking Claims Do Not Ripen Until The Responsible Government Entity Makes A Final Decision Applying The Regulation At Issue To The Property**

An "as-applied," regulatory taking claim under Penn Central does not ripen "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001); Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985). This is because "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 350 (1986). Plaintiffs bear the burden of establishing that their as-applied, regulatory taking claims are ripe. E.g., Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006).

Ripeness is a well-established prerequisite to judicial relief. E.g., Williamson, 473 U.S. at 186 (dismissing plaintiff's unripe regulatory takings claim); Greenbrier, 193 F.3d at 1356-60 (same). For as-applied, regulatory taking claims, the "final decision" requirement ensures that a live controversy exists, provides certainty about how the property is affected by the challenged governmental regulation, fixes the start of the alleged taking, and establishes when the statute of limitations begins to run. See MacDonald, 477 U.S. at 350; Boise Cascade v. United States, 296 F.3d 1339, 1347-48 (Fed. Cir. 2002); Bayou des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1038 (Fed. Cir. 1997). Significantly, where a challenged regulatory restriction can be modified or eliminated by more than one avenue, an "as applied" taking claim does not ripen until every available avenue has been exhausted. Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir. 2005); see also Williamson, 473 U.S. at 186 (requiring the property owner to

apply for a variance in order to ripen its claim); Whitney Benefits v. United States, 752 F.2d 1554, 1559 (Fed. Cir. 1985) (aggrieved property owners "must show that they have done everything they reasonably could to take advantage of any hardship exceptions or other escape hatches that the regulations under attack allow").

The Preservation Statutes established a complex administrative process by which a project owner could (1) prepay and exit the HUD program, (2) sell at fair market value and exit the HUD program, or (3) alter the project's existing regulatory regimen. See Ex. A (showing the regulatory process under LIHPRHA); Chancellor Manor v. United States, 331 F.3d 891, 905 (Fed. Cir. 2003); 12 U.S.C. §§ 4108-10, 4114. The process had two basic components. First, HUD evaluated whether the project's preservation as low-income housing was necessary. See ELIHPA § 225(a); 12 U.S.C. § 4108. If HUD concluded that prepayment would not have a material effect upon current tenants and the supply of low income housing, the agency allowed owners to prepay and exit the program. Id. Second, if a project's use as low-income housing was to be preserved, the owner chose between (1) selling at the project's fair market value without HUD-restrictions, and (2) remaining in the program in exchange for relaxed regulations and valuable monetary incentives provided in a new regulatory agreement (a "use agreement"). ELIHPA §§ 225(b), 230; 12 U.S.C. §§ 4109-10, 4114; see also Ex. A. If the owner's chosen option did not come to fruition within a fixed period, the owner was allowed to prepay. 12 U.S.C. § 4114; Greenbrier, 193 F.3d at 1358 (noting that an owner could prepay under either section 4108 or section 4114); Chancellor Manor, 331 F.3d at 905 (directing the trial court to consider plaintiffs' use agreements in evaluating their as applied regulatory taking claims); see also Exs. A, E & F.

It is undisputed that no plaintiff in these actions applied to prepay. The plaintiffs maintain that it would have been futile to seek HUD's permission to prepay under the Preservation Statutes. We respectfully disagree. Indeed, the doctrine of futility serves only to "protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." Howard W. Heck & Associates v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998) (emphasis in original). Because the plaintiffs never submitted a single request to prepay to HUD, the doctrine of futility is unavailable.

The plaintiffs apparently also maintain that pursuing the sale option, the use agreement option, and the possibility of prepayment under section 4114, are irrelevant to the question of ripeness. The plaintiffs are mistaken. It is well-established that aggrieved property owners "must show that they have done everything they reasonably could to take advantage of any hardship exceptions or other escape hatches that the regulations under attack allow." Whitney Benefits v. United States, 752 F.2d 1554, 1559 (Fed. Cir. 1985) (emphasis added); see also Stearns, 396 F.3d at 1358. The use agreement and sale options are such "escape hatches." Through these avenues, the owner could exit the HUD program by prepayment, exit the program with a cash payment of the project's fair market value, or alter the regulatory restrictions on their project. 12 U.S.C. §§ 4109, 4110, 4114.

Plaintiffs who failed to obtain a "final decision" from HUD concerning the sale or incentive options do not have a ripe claim. Only a "final decision" from HUD can establish (1) that prepayment would not occur under either of the available avenues, see 12 U.S.C. §§ 4108, 4114, and (2) even assuming prepayment was not available, "the extent of the

governmental restriction" on the property's use. See Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 746 (1997) (Scalia, J., concurring) ("The focus of the 'final decision' inquiry is on ascertaining the extent of the governmental restriction on land use."). Consequently, even if submitting a plan of action to prepay under section 4108 would have been futile, an owner that failed to obtain a "final decision" from HUD with respect to either the use agreement option or the sale option would not have a ripe as-applied taking claim.[1] See Stearns, 396 F.3d at 1358.

In sum, an as-applied taking claim concerning the Preservation Statutes does not ripen until (1) HUD denies prepayment (or the owner's failure to seek prepayment is excused by the doctrine of futility), and (2) the administrative sale or use agreement process reaches a final conclusion (i.e., HUD approves and funds the project's sale to a purchaser, HUD offers the owner a funded use agreement, or prepayment is allowed under 12 U.S.C. § 4114). See Stearns, 396 F.3d at 1358.

### B. The United States Seeks Discovery To Ascertain Whether The As-Applied, Regulatory Taking Claims Asserted By Plaintiffs Are Ripe

The United States seeks discovery in this action to determine which plaintiffs, if any, have ripe as-applied taking claims. The United States has served discovery seeking to ascertain

[1] The Federal Circuit has recognized that, in rare circumstances, an "extraordinary administrative delay" can effect a regulatory taking. See, e.g., Seiber v. United States, 364 F.3d 1356 (Fed. Cir. 2004). This Court previously rejected plaintiffs' claims of administrative delay, Anaheim Gardens v. United States, 33 Fed. Cl. 24, 36-38 (1995), plaintiffs did not appeal the Court's decision in this regard, plaintiffs do not assert administrative delay in the their respective complaints, see Fourth Amended Complaint in Anaheim at 32-34 (showing plaintiffs' "extraordinary delay" claim as dismissed by court order); First Amended Complaint in Algonquin (containing no administrative delay count), and plaintiffs' counsel recently sent a letter confirming that no claims regarding administrative delay are asserted in these actions, see Letter from Harry Kelly to David Harrington (June 22, 2007) (attached as Exhibit G). Thus, plaintiffs assert no claim that the period of administrative processing needed to obtain a final decision from HUD constituted a compensable taking.

the basis for the owners' contention that their failure to apply to HUD to prepay is excused by the doctrine of futility. See Def.'s Motion to Compel at 6-8 (filed Feb. 26, 2007) (discussing interrogatory 7). The plaintiffs have refused to provide the bases for their contentions in response to the United States' discovery requests.

The United States has also served discovery seeking to ascertain whether the sale or use agreement process reached a final conclusion before passage of the HOPE Act in March 1996. In this regard, the United States has inquired when the plaintiffs contend that HUD rendered a "final decision" applying the Preservation Statutes to their respective properties. See Def.'s Motion to Compel at 4-6 (filed Feb. 26, 2007) (discussing interrogatories 5 and 6). Again, the plaintiffs have not provided this information.

Because of the plaintiffs' resistance to the United States' written discovery requests, the United States has sought to take depositions with respect to approximately 50 of the 71 projects at issue. Despite the fact that these actions concern 71 different HUD projects, the plaintiffs have refused to consent to taking more than 10 depositions in the respective actions.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0277
Fax: (202) 307-0972

July 17, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 17th day of July 2007, a copy of "DEFENDANT'S MEMORANDUM CONCERNING RIPENESS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington

# SUMMARY: TITLE VI ADMINISTRATIVE PROCESSING AND RESULTS



# Initial Notice of Intent
To Terminate or Extend Low -Income Affordability Restrictions
(Pursuant to Section 212 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990)

U. S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0459

**Public reporting burden** for this collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0459), Washington, D.C. 20503. Do not send this completed form to either of these addressees.

This Notice must be filed simultaneously with (1) the local HUD Field Office, (2) the chief executive officer of the appropriate State or local government, (3) the mortgagee, (4) tenants of the property, and (5) all known representatives of the tenants.

1. Date of this Notice July 20, 1992
2. Purpose of this Notice (Check one):
   - [X] Extend the low income affordability restrictions by requesting incentives: or
   - [ ] **Offer to Sell** the housing to a qualified purchaser.
   - [ ] **Terminate** the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance;
3. Borrower and Project Information:
   a. Borrower Entity Anaheim Gardens, a Limited Partnership
   b. FHA Project Number 122-44178-LDP
   c. State Agency Project Number (If project is Section 236 non-insured.) n/a
   d. Project Name Anaheim Gardens
   e. Project Address (Include City, State, and Zip Code) 1535 West Anaheim St., Los Angeles, CA 90710
   f. Date of Final Endorsement August 24, 1973
4. Name of Mortgagee Federal National Mortgage Association
5. Name of State or local Agency Receiving this Notice Of Intent Housing Preservation and Production Department City of Los Angeles, Gary Squier, General Manager
6. Owner's Certification

I, the undersigned, certify that this Notice of Intent has been submitted and distributed in accordance with the requirements of the statute as specified above.

[X] I certify that I know of no tenant representative.

Under the penalties and provision of Title 18, United States Code, Section 1001, the statements contained in the request and its attachments have been examined by me and, to the best of my knowledge and belief are true, correct, and complete.

Signature (Owner) [signature] Date July 13, 1992

Name (Owner) L. S. Ames, general partner

Address (Include City, State, and Zip Code) 25332 Narbonne Avenue, Lomita, CA 90717

## Residents

Important Information about this Notice of Intent is on the back of this form.

# Initial Notice of Intent
To Terminate or Extend Low -Income Affordability Restrictions

(Pursuant to Section 212 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990)

U. S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

OMB Approval No. 2502-0459

Public reporting burden for this collection of information is estimated to average 2.0 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Reports Management Officer, Office of Information Policies and Systems, U.S. Department of Housing and Urban Development, Washington, D.C. 20410-3600 and to the Office of Management and Budget, Paperwork Reduction Project (2502-0459), Washington, D.C. 20503. Do not send this completed form to either of these addresses.

This Notice must be filed simultaneously with (1) the local HUD Field Office, (2) the chief executive officer of the appropriate State or local government, (3) the mortgagee, (4) tenants of the property, and (5) all known representatives of the tenants.

1. Date of this Notice October 20, 1992
2. Purpose of this Notice (Check one):
   - ☐ Extend the low income affordability restrictions by requesting incentives; or
   - ☒ Offer to Sell the housing to a qualified purchaser.
   - ☐ Terminate the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance:
3. Borrower and Project Information:
   - a. Borrower Entity Cedar Gardens Associates, a partnership
   - b. FHA Project Number 121-55062
   - c. State Agency Project Number (If project is Section 236 non-insured.) N/A
   - d. Project Name Cedar Gardens
   - e. Project Address(Include City, State, and Zip Code) 4327 N. Cedar Ave. Fresno, CA 93726-3799
   - f. Date of Final Endorsement 4/22/71
4. Name of Mortgagee FNMA
Timothy Coyle, Dept Housing & Commun. Devel. 1800 3rd St., Sacto., CA 94252
5. Name of State or local Agency Receiving this Notice Of Intent ~~Robt. Wilson, Housing Author./City,County of~~ Fresno, 1833 "E" St., Fresno, CA 93776
6. Owner's Certification

I, the undersigned, certify that this Notice of Intent has been submitted and distributed in accordance with the requirements of the statute as specified above.

☐ I certify that I know of no tenant representative.

Under the penalties and provision of Title 18, United States Code, Section 1001, the statements contained in the request and its attachments have been examined by me and, to the best of my knowledge and belief are true, correct, and complete.

Signature (Owner) [signature] [signature] Date Oct. 29, 1992

Name (Owner) James H. McAlister, partner, James R. Bancroft, partner

Address (Include City, State, and Zip Code) 601 Montgomery St., Ste. 900 San Francisco, CA 94111

## Residents

Important Information about this Notice of Intent is on the back of this form.

U.S. Department of Housing and Urban Development
Los Angeles Office, Region IX
1615 West Olympic Boulevard
Los Angeles, California 90015-3801

August 27, 1993

L. S. Ames, General Partner
Anaheim Gardens, a Limited Partnership
25332 Narbonne Street
Lomita, CA 90717

RECEIVED 8/31/93

Dear Mr. Ames:

SUBJECT: Information for Extending Affordability Restrictions Through Retention or Sale
Project Name: Anaheim Gardens
Project No. : 122-44378

We have completed our review of the appraisal information you submitted on January 26, 1993, in order to extend the affordability of Anaheim Gardens. You should use the following information as a guide to develop a Plan of Action (POA) to carry out your intentions:

I. Extension Preservation Value .... $5,145,000.

II. Transfer Preservation Value ..... $5,145,000.

III. Extension Preservation Equity ... $4,031,103.

IV. Transfer Preservation Equity .... $4,031,103.

V. Annual Authorized Return to Owner $ 322,488.

If you are retaining ownership of the project, the annual authorized return is the maximum amount you may take as an annual distribution. A portion of this distribution may be used to pay debt service on an incentive equity loan. However, there are two conditions:

(1) The debt service payment may not exceed 90 percent of the authorized return; and

(2) The equity loan may not exceed 70 percent of the extension preservation equity shown in Paragraph III above plus 100 percent of any required repairs. Ten percent of any equity loan will be escrowed in an interest bearing account for a five-year period until a history of proper project maintenance is established.

VI. Federal Cost Limit .............. $967,939.

The Federal Cost Limit (FCL) is based on:

[ X ] 1. Fair Market Rents (FMR)

[ ] 2. Prevailing Market Rents (PMR)

VII. Extension Preservation Rent ..... $728,404.

Extension Preservation Rent (EPR) includes debt service and debt service coverage on the underlying mortgage and on any required loan(s) for 100 percent of rehabilitation costs as determined by the Capital Needs Assessment, the annual authorized return to owner, estimated operating expenses, required deposits to the reserve account, and a three percent vacancy allowance.

The values of these component factors are shown on Form HUD-9607, Calculation of Information to be Returned to Owner, which is appended to this letter.

Attachment B to this letter, Required Repairs and Estimated Costs, describes any rehabilitation that HUD has identified as necessary. You will have to obtain actual costs for these repairs when submitting your POA.

VIII. Transfer Preservation Rent ...... $816,036.

Transfer preservation rent (TPR) includes debt service and debt service coverage on the underlying mortgage, acquisition loan, and any required loan(s) for 100 percent of rehabilitation costs as determined by the Capital Needs Assessment, estimated operating expenses, required deposits to the reserve account, and a three percent vacancy allowance.

The values of these component factors are shown on Form HUD-9607 which is appended to this letter.

Attachment B to this letter describes any rehabilitation that HUD has identified as necessary. You will have to obtain actual costs for these repairs when submitting your POA. We will evaluate any additional rehabilitation items and costs you wish to include in your POA.

The maximum acquisition loan HUD will insure is 95 percent of the transfer preservation equity shown in Paragraph IV above or 95 percent of the purchase price minus the unpaid balance of all federally-assisted mortgages, whichever is lower.

IX. Federal Cost Limit Compared with Preservation Rents

All the conditions checked below apply to your options. You may choose to follow whichever course you like.

[ ] HUD records show that you have an open audit finding or other finding of non-compliance which prevents approval of a POA until it is resolved.

[ X ] 1. EPR is less than or equal to the FCL:

a. Within six months of receipt of this letter, you may submit a POA to extend affordability. This Plan should reflect the information included in Paragraphs V and VII above about annual return to owner/equity loan and rehabilitation loans. The approvable annual gross rent for the project may not exceed the FCL, which will be 120 percent of FMRs or PMRs in your area.

b. Section 8 rental assistance is available for all current very low and low-income tenants who need it. However, current moderate-income tenants may only pay the lower of 30 percent of adjusted income or FMR.

c. The POA should include all incentives requested, cash flow projections to show how physical and financial requirements for the project will be met, a current tenant income profile as well as the earliest one available for January 1987, 1988 or 1989 along with a certification that the earlier profile is no longer available if the one for January 1987 is not used, a description of all other assistance to be received including tax credits, and any other information

deemed necessary to make the POA approvable. For more information, see HUD Handbook 4350.6, Chapter 8.

d. All POAs should also include:

i. An agreement to extend affordability restrictions for the remaining useful life of the project. A petition to HUD for a hearing to determine that the useful life has expired may not be filed for 50 years from the date of Plan of Action approval.

ii. An agreement to maintain the same proportion of very low-, low- or moderate-income tenants at the project as prevailed at whichever of the following times yields the highest proportion of very low-income tenants: (1) The time the Plan is submitted; or (2) January 1987, or if the January 1987 profile is not available, the earliest profile available after that date. This requirement does not mean that a larger proportion of very low-income tenants cannot be served.

iii. An agreement to rehabilitate the project to its conditions at original rent-up including required repairs identified in the Capital Needs Assessment and any additional repairs relating to Housing Quality Standards (HQS) and Minimum Property Standards (MPS) including any lead-based paint and asbestos abatement requirements, and to provide a 10 percent commitment of equity for the rehabilitation loan.

iv. An agreement that 10 percent of any incentive equity loan will be escrowed for a minimum of five years to assure project rehabilitation and maintenance.

v. An agreement to accept Section 8 or other rental assistance, if needed.

e. Simultaneously with submitting a POA to HUD, you must submit it to the same official of the State or local government to whom you submitted your NOI. In addition, you must notify the tenants about the plan by posting a summary of the POA in each occupied building. This summary must state that the tenants have 60 days to comment on the POA. You must also give a copy of the POA to any tenant representative(s). The summary must indicate that a copy of the POA is available for inspection and copying, at a reasonable cost during normal business hours from:

i. The tenant representatives, whose names, addresses and telephone numbers are listed on the summary;

ii. The local HUD Field Office; and

iii. The on-site office for the project or in the location where rents are collected. If you know of no tenant representative, this statement must be certified to the Department when the POA is submitted.

[ ] 2. EPR exceeds FCL: Within six months of receipt of this letter, you may submit a POA to extend affordability. All conditions in Paragraph 1 above apply. Since the other expense components that must be covered by project income are likely to be fixed, choosing this option may entail accepting a cash return and/or equity loan lower than that calculated as the annual authorized return shown in Paragraph V above.

[ X] 3. TPR is less than or equal to FCL:

a. Within 30 days of receipt of this letter, you may submit Form HUD-9609, Second Notice of Intent (NOI) (enclosed), for a voluntary sale of the project. When you have a purchaser, you

and the purchaser will prepare a POA to transfer and repair the project. (See Paragraphs 1c through e above for further direction). The purchaser may also request eight percent of the equity paid as an annual return. If the purchaser is a nonprofit organization, the return must be deposited in the project's residual receipts account. The approvable annual gross rent for the project may not exceed the FCL, which will be 120 percent of FMRs or PMRs in your area. A priority purchaser may be eligible to receive a grant to pay any portion of the costs which will not be paid by rents. It may also apply for a loan or grant to cover acquisition costs.

b. Section 8 rental assistance is available for all current very low- and low-income tenants who need it. However, current moderate-income tenants may only pay the lower of 30 percent of adjusted income or FMR.

c. Attachment A to this letter, Instructions for Sales of Projects: Voluntary or Mandatory Sales, describes requirements for sales to priority and qualified purchasers.

[ ] 4. TPR exceeds the FCL:

a. Within 30 days you may submit one of the following:

i. Form HUD-9609, Second NOI (enclosed) to prepay your loan by first trying to sell the project through a mandatory sale;

ii. Form HUD-9609 for a voluntary sale conditioned on an annual gross rent that does not exceed the FCL. Since the other expense components that must be covered by project income are likely to be fixed, choosing this option may entail accepting a sales price lower than the Transfer

Preservation Value (TPV) shown in Paragraph II above. To bring current TPR to the FCL, your acquisition loan would have to be reduced to $_________, which, at current rates and terms, can support a sales price of $_________;

b. When you have a purchaser, you and the purchaser will prepare a POA to acquire and repair the project. (See Paragraphs 1c through e above for further direction.) The purchaser may also request eight percent of the equity paid as an annual return. If the purchaser is a nonprofit organization, the return must be deposited in the project's residual receipts account. If this is a mandatory sale, any qualified purchaser may qualify for a grant to reduce the approvable annual gross rent for the project to the FCL. A priority purchaser may be eligible to receive a grant to pay acquisition costs.

c. If this project is sold through a transfer of physical assets (TPA), Section 8 rental assistance is available for all current very low- and low-income tenants who need it. However, current moderate-income tenants may only pay the lower of 30 percent of adjusted income or FMR.

d. Attachment A to this letter, Instructions for Sales of Projects: Voluntary or Mandatory Sales, which is attached, describes requirements for sales to priority and qualified purchasers.

Attachments to this letter, Required Repairs and Estimated Costs, Notice to Tenants, and Form HUD-9607, Calculation of Information to be Returned to Owner, along with this letter must be posted at each affected building. The Notice to Tenants, should be placed on top.

Very sincerely yours,

Malcolm Findley
Acting Director
Housing Management Division

ENCLOSURE: Form HUD 9609, Second Notice of Intent

ATTACHMENTS: A, B, C, and Form 9607

cc: Sally Richman, Analyst
City of Los Angeles
Housing Preservation and Production Department
Attention: Prepayment Team
400 S. Main Street, 8th Floor
Los Angeles, CA 90013

Timothy L. Coyle, Director
Department of Housing and
Community Development
State of California
1800 3rd Street, Suite 450
Sacramento, CA 95814

Copies for posting

U.S. De; ... of Housing and Urban Development
Pacific/Hawaii
Los Angeles Area Office
1615 West Olympic Boulevard
Los Angeles, California 90015-3801

June 29, 1995

| Post-it® Fax Note 7671 | Date 7/11/95 # of pages ▶ 2 |
|---|---|
| To ALAN ROSS | From L.S. AMES |
| Co./Dept. | Co. ANAHEIM GARDENS |
| Phone # | Phone # |
| Fax # | Fax # |

Larry Ames
Ames Development Corp.
Anaheim Gardens, A LTD. Partner
25332 Narbonne Avenue
Suite 200
Lomita, CA 90717

Dear Mr. Ames:

SUBJECT: Title VI - No Funding Available
Anaheim Garden Apartments
122-44378-LDP
Harbor City, CA

The Department currently does not have funds available to fund incentives for your Plan of Action for Anaheim Garden Apartments, 122-44378-LDP, which was approved January 31, 1995 under the Low Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA). The LIHPRHA statute provides that if we do not provide funding for these incentives within certain timeframes you may prepay without the Secretary's consent.

You may prepay your mortgage if the Department is unable to provide incentives before the earlier of the expiration of the 6 month period beginning after final approval of the Plan of Action or the expiration of the 2 month period after the beginning of the first fiscal year after final approval. In your case, you may prepay your mortgage if the Department does not provide incentives by July 31, 1995.

Be advised that if we are unable to fund your incentives within the statutory timeframes and you decide to prepay your mortgage and terminate the low-income use restrictions for your property, you will be responsible for providing relocation assistance to any tenants displaced as a result of such prepayment. You shall pay fifty percent of the relocation expenses of each family relocated, except that the percentage may be higher depending on State or local laws.

You may also be required to allow current tenants who resided in the property on the date you filed your Initial Notice of Intent to remain in the property for a period of

three years, commencing on the date of prepayment. These tenants will pay the same rents existing at the time of prepayment, except for rent increases made necessary due to increased operating costs. The continued occupancy provision applies to all elderly and disabled tenants and to all other tenants if the project is located in a low-vacancy area, as determined by HUD.

The Department will work with the Los Angeles public housing agency to find suitable units for each displaced family. Further, to the extent funds are available, eligible low and very-low income families displaced as the result of a prepayment shall receive Section 8 Certificates.

If you have any questions on this matter please contact Loretta Gillett at (213) 251-7291.

Sincerely,

Michael P. Kulick
Acting Director
Office of Housing

cc: Matthews, 9DHMV
Biase, 9DHM
Kulick, 9DH

U.S.Department of Housing and Urban Development
Pacific/Hawaii Office
450 Golden Gate Avenue
San Francisco, California 94102-3448

JUN 1 5 1995

Mr. James H. McAllister
Mr. James R. Bancroft
Partners
Cedar Gardens Associates,
a Partnership
601 Montgomery St., Suite 900
San Francisco, CA 94111

Gentlemen:

SUBJECT: Cedar Gardens
Project Number 121-55062
Fresno, California

The Department currently does not have funds available to fund incentives for your Plan of Action for Cedar Gardens (Project Number 121-55062), which was approved on May 12, 1995 under the Low Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA). The LIHPRHA statute provides that if we do not provide funding for these incentives within certain timeframes, you may prepay without the Secretary's consent.

You may prepay your mortgage if the Department is unable to provide incentives before the earlier of the expiration of the 6 month period beginning after final approval of the Plan of Action or the expiration of the 2 month period after the beginning of the first fiscal year after final approval. In your case, you may prepay your mortgage if the Department does not provide incentives by November 12, 1995.

Be advised that if we are unable to fund your incentives within the statutory timeframes and you decide to prepay your mortgage and terminate the low-income use restrictions for your property, you will be responsible for providing relocation assistance to any tenants displaced as a result of such prepayment. You shall pay fifty percent of the relocation expenses of each family relocated, except that the percentage may be higher depending on State or local laws.

You may also be required to allow current tenants who resided in the property on the date you filed your Initial Notice of Intent to remain in the property for a period of three years, commencing on the date of prepayment. These tenants will pay the same rents existing at the time of prepayment, except for rent increases made necessary due to increased operating costs. This continued occupancy provision applies to all elderly and disabled tenants and to all other tenants if the project is located in a low-vacancy area, as determined by HUD.

The Department will work with the Fresno Housing Authority to find suitable units for each displaced family. Further, to the extent funds are available, eligible low and very-low income families displaced as the result of a prepayment shall receive Section 8 Certificates.

If you have any questions on this matter, please contact Tom Vitek, Preservation Coordinator, at (415) 556-0796.

Sincerely yours,

Janet Browder
Director
Multifamily Housing
Division

cc:
Ms. Carol J. Ornelas
Chief Executive Officer
ACLC, Inc.
42 North Sutter St., Suite 206
Stockton, CA 95202

Mr. Richard Mandel
Senior Program Manager
California Housing Partnership Corp.
2201 Broadway, Suite 823
Oakland, CA 94612

Mr. William Michaud
Michaud and Hoshiyama
414 Jackson St., Suite 202
San Francisco, CA 94111

Mr. Lawrence S. Levy
Levy, Levy & Levy
595 Market St., Suite 2400
San Francisco, CA 94105

NIXON PEABODY LLP
ATTORNEYS AT LAW

Suite 900
401 9th Street, N.W.
Washington, D.C. 20004-2128
(202) 585-8000
Fax: (202) 585-8080

Harry J. Kelly
Direct Dial: (202) 585-8712
E-Mail: hkelly@nixonpeabody.com

June 22, 2007

**VIA ELECTRONIC MAIL/U.S. MAIL**

David Harrington, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW
Room 12136
Washington, DC 20530

**Re: Anaheim Gardens/Algonquin Heights Litigation**
**--Status of Takings Claim Concerning Administrative Delay**

Dear David:

During our telephone conversation earlier this week when we discussed the schedule for depositions in these cases, you indicated that the length of the depositions could be significantly shortened if the Plaintiffs confirmed that they are no longer asserting claims that delays in HUD processing of plans of actions under ELIHPA and/or LIHPRHA constituted a compensable taking. In the letter you sent me yesterday, you stated the question in somewhat more detail:

> [Your understanding] based upon the complaints, the plaintiffs' representations to the Court, and prior rulings by the Court, is that the plaintiffs no longer contend that Government administrative delay affected a taking. The plaintiffs' regulatory taking claims are based upon the effect of the Preservation Statutes as applied to their respective low-income housing projects.

Letter to Harry J. Kelly from David A. Harrington dated June 21, 2007 at 2. It is my understanding that the focus of your concern is the status of the Plaintiffs' original claims concerning whether processing delays in the administration of the programs developed through ELIHPA and LIHPRHA (the "Preservation Statutes") constituted a separate taking, and that, by including the second sentence in the quote above, you are seeking to provide context and contrast, rather than to obtain a specific statement concerning the actual nature of the Plaintiffs'

remaining claims, which would be the proper subject of written discovery requests. In any event, the status of the administrative delay claim was the specific subject we discussed on Wednesday and to which I promised a response, and this response is limited to that topic.

**1. Anaheim Gardens.** In the original Anaheim Gardens complaint, the Plaintiffs asserted a number of claims relating to the failure of the government to promptly pay compensation that they claimed was owed to them pursuant to the Preservation Statutes. Specifically, Count IV asserted that HUD's administrative delays in processing applications filed under the Preservation Statutes themselves constituted a taking. *Id.* at 39. There was a separate count for taking arising from the prepayment prohibitions contained in the Preservation Statutes (Count III) in that original complaint. Strictly speaking, only Count IV constituted a claim for a taking resulting from HUD's delays in administering the Preservation Statutes programs.

On March 27, 1995, the Court issued an order dismissing several of the counts of the Plaintiffs' original complaint. Anaheim Gardens v. United States, 33 Fed. Cl. 24 (1995) (the "March Order"). Without extensively recapitulating the analysis of the March Order, it essentially concluded that the Plaintiffs' administrative takings claim asserted in Count IV – referred to in the March Opinion as their "temporary taking" claim – was dismissed along with several of the Plaintiffs' other claims. 33 Fed. Cl. at 31 – 41. The Court preserved the regulatory taking claim in Count III. *Id.* at 41. Pursuant to a subsequent motion filed by the Plaintiffs, the Court permitted them to add a new count for breach of contract. 33 Fed. Cl. 773 (1995). On August 27, 1997, the Plaintiffs filed a motion seeking leave to file their Fourth Amended Complaint, pursuant to which Counts IV and several other counts were deleted, and asserting their regulatory taking claim (Count III) and breach of contract claim (Count V). The Court granted that motion on September 16, 1997.

As a result of the March Order, dismissing the administrative delay takings claim and the subsequent amendments to their complaint, the Anaheim Gardens Plaintiffs are no longer asserting the claim, referred to as the administrative takings claim or temporary takings claim, contained in their original Count IV, that the failure to promptly process the Plaintiffs' applications constituted a taking. This is consistent with the statements contained in the Plaintiffs' Answer to Petition For Panel Rehearing, filed June 1, 2006 (the "Answer"), in which the Plaintiffs explained that while their complaints continued to discuss examples of administrative delay "to explain the full nature of the taking that ensued from the Preservation Statutes," they "are no longer asserting separate claims arising from those delays." Answer at 2.

**2. Algonquin Heights.** Although the original Algonquin Heights complaint, filed in August 1997, contained, among other things, counts for a regulatory taking (Count I) and for breach of contract (Counts II and III), it did not include a count for the "administrative takings" or "temporary takings" that was found in Count IV of the original Anaheim Gardens complaint. Consequently, the Algonquin Heights plaintiffs have not asserted, and are not now asserting, a takings claim with respect to administrative delay. Again, the Answer filed last year stated that "the Algonquin Appellants never made a separate claim that they suffered a taking as a result of HUD's administrative delay." Answer at 8.

I believe that this letter responds to the questions you raised during our conference call on Wednesday. Please call me if you have any questions.

Very truly yours,

Harry J. Kelly

cc: Alycia A. Ziarno, Esq.

10629229.1