EXHIBIT G





IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - x

ANAHEIM GARDENS, et al., :

Plaintiffs, :

V. : No. 93-655 C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - x

ALGONQUIN HEIGHTS, et al.,:

Plaintiffs, :

V. : No. 97-582 C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - x

Deposition of MAURICE BARRY

Washington, D.C.

Wednesday, November 14, 2007

9:46 a.m.

Volume II

Reported by: TRISTAN-JOSEPH, RPR

EXHIBIT G





asking my question completely before you start to answer so that we end up with a clear record at the end of the day.

And then the second is that, as I know Mr. Harrington has probably told you, that when he makes an objection, unless you're instructed not to answer a question, you need to just go ahead and answer the question that I've posed, regardless of the fact that there's an objection on the record. Okay?

A. Okay.

Q. Do you recall the various statutes that we discussed last Friday during your deposition?

A. I do.

Q. Okay. And you also recall the abbreviations that we talked about that I would be using throughout the course of the deposition?

A. I do.

Q. So I don't need to repeat those here today?

A. You do not.

Q. Okay. Has your testimony, since last

Friday, changed on any of the subject matters which -- about which you intend to testify here today in the 30(b)6 Notices?

A. No.

Q. Okay. Did you meet with your attorneys, again, in preparation for today's testimony?

A. Briefly.

Q. For how long?

A. A half-hour, 45 minutes.

Q. Did you review any additional documents?

A. No.

Q. Did you ever review any of the Plaintiffs' responses that were provided in response to discovery requests from the Government?

A. I'm not -- I don't understand the question.

Q. The Government served several written discovery requests on the Plaintiffs asking for specific information, and we completed those requests, including numerous variations and iterations of charts that outlined the various processing steps that the Plaintiffs, in this case,

**EXHIBIT G**





specifically have a question about.

MR. HARRINGTON: I think she's referring to --

THE WITNESS: Oh, okay.

MR. HARRINGTON: -- Paragraph 3.

BY MS. ZIARNO:

Q. Yeah, I'm sorry.

A. I thought you were --

Q. Subject Matter 3.

A. Yeah, okay.

(Witness reviews document.)

A. Okay.

Q. Okay. Now my recollection of your testimony was that you would not be able to testify regarding any of the properties that were permitted to prepay under ELIHPA or LIHPRHA; is that correct?

A. I -- I think that's correct.

Q. Okay. And last Friday, when you testified, you stated that it was because you did not know anything about these properties since it was based -- the properties that we believe were permitted to prepay were based on a declaration

EXHIBIT G





that was provided by Mr. Malloy; is that correct?

MR. HARRINGTON: Now let's be clear here.

Go ahead and answer the question, and then I want to address something.

THE WITNESS: I did mention the declaration from Mr. Malloy that there were approximately eight projects that had requested to prepay and that, I believe, three of them actually prepaid, but I had no personal knowledge about those prepayments.

BY MS. ZIARNO:

Q. Okay. My specific --

MR. HARRINGTON: Now --

Q. -- question --

MR. HARRINGTON: Ms. Ziarno?

Q. -- is --

MS. ZIARNO: Can I ask my specific question and then you can pose an objection to that?

MR. HARRINGTON: Ask your specific question.

BY MS. ZIARNO:

Q. Will you be able to testify today about Parc Chateau West, which is a property that the government recently identified as being one of those three that were identified in the Malloy Declaration?

MR. HARRINGTON: I'm going to object to that because the testimony about Parc Chateau West is outside the scope of the Deposition Notice and it's outside the scope of Paragraph 3, which refers to the criteria used by HUD to determine whether each of the Plaintiffs in the subject properties listed in Exhibits A and B would have been eligible to prepay.

MS. ZIARNO: I'm sorry --

MR. HARRINGTON: And that's not listed --

MS. ZIARNO: -- you must be looking at the wrong Deposition Notice.

Here, let's switch.

BY MS. ZIARNO:

Q. Exhibit 1, from your previous

EXHIBIT G





deposition, please look at Subject Matter No. 3.

(Witness reviews document.)

A. Okay.

Q. Okay. Are you prepared to testify today about that subject matter?

MR. HARRINGTON: Now Mr. Barry is being identified on this subject matter. However, he's being identified subject to the objection that was submitted with respect to this particular paragraph.

And so with respect to projects that we have been unable to identify, he's not going to be prepared to testify to those.

BY MS. ZIARNO:

Q. Are you prepared to testify about Parc Chateau West?

A. Well, as I read this, it's talking about the identity of many properties. I'm assuming, then, that Parc Chateau West was one of those properties that was permitted to prepay.

Is that --

Q. According to the Government's discovery

EXHIBIT G



responses, that is correct.

A. Okay. Now with respect to all facts and circumstances relating to that property, I could not.

Q. Why not?

A. Because I personally did not handle Parc Chateau West.

Q. Well, you're here today to testify on behalf of the Government not necessarily just in your personal capacity.

MR. HARRINGTON: Ms. Ziarno, these sorts of issues need to be raised with me not with the witness.

MS. ZIARNO: Mr. --

MR. HARRINGTON: Now --

MS. ZIARNO: -- Harrington, I will respectively disagree with you.

We previously have exchanged extensive letters regarding your objections on all of our subject matters.

We also had a court hearing on those issues. We told the Government that if the

Government did not file for a protective order that we fully intended to proceed with the subject matters as they were outlined.

Judge Hodges' order also told you directly, as the Government, to produce knowledgeable witnesses capable of testifying.

So --

MR. HARRINGTON: And we --

MS. ZIARNO: -- your objections are noted, but they do not preclude Mr. Barry from having to testify about the matters here today.

If he's not able to, because he's not prepared to because he's not been prepared to do so, that is fine. The record will so reflect that.

And we will deal with that with Judge Sweeney, as we need to, after the deposition is concluded.

MR. HARRINGTON: That is fine.

Mr. Barry is being produced to testify on these subject matters in accordance with the Deposition Notice.

Subject to our objections, the Parc

EXHIBIT G





Chateau West property is a property that did prepay, as we noted in our Interrogatory Answers. All facts and circumstances relating to that prepayment are not available through documents available with respect to the Parc Chateau West property.

MS. ZIARNO: How about --

MR. HARRINGTON: And consequently --

MS. ZIARNO: -- if we let the witness testify today instead of you.

MR. HARRINGTON: And --

MS. ZIARNO: The question was for Mr. Barry.

MR. HARRINGTON: I want to make my statement for the record.

And consequently --

MS. ZIARNO: You're not supposed to --

MR. HARRINGTON: -- Mr. Barry --

MS. ZIARNO: -- make statements on the record. You're supposed to make an objection and let's move on.

MR. HARRINGTON: I'm going to say what I

EXHIBIT G



want to say, Ms. Ziarno.

MS. ZIARNO: That's fine. But you're coaching your client, and I don't think that is permitted under the Rules.

MR. HARRINGTON: I am not coaching my client.

Now the records, there are not full records with respect to the Parc Chateau West project.

Mr. Barry can testify about information that was made available to him based on the scanty records that were available for the project, and he has looked at that, and he will testify and answer any questions that he can based on the few records that are available with respect to that project.

BY MS. ZIARNO:

Q. Mr. Barry, notwithstanding your attorney's speech, are you prepared to testify today about Parc Chateau West?

A. If you could show me some documents relating to Parc Chateau West and information relating to its request for prepayment, I could,

you know, in accordance with the instructions under -- and I believe is it Title II or Title VI was that -- was it under Title II or Title VI?

Q. You're here on behalf of the Government. I can't testify as to what it was under.

A. Okay. Well, I'd have to use the guidance under that particular statute, whether it be ELIHPA or LIHPRHA, whether it be the 91-29 or the 4350.6, to make any determinations with respect to Parc Chateau's prepayment.

Q. Did you review any records for Parc Chateau West before coming here today?

A. I've seen some documents.

Q. What have you seen?

A. I saw, I believe, an approval letter on Parc Chateau West.

Q. What else did you see?

A. That's all I remember seeing.

Q. Were those documents produced to the Plaintiffs in this case?

A. I believe so.

MS. ZIARNO: David, do you have Bates

numbers for those documents?

MR. HARRINGTON: I don't know if they have been produced or not. I'll look for them but I'm not sure.

MS. ZIARNO: Okay. Then we need to go off the record here for a minute.

Mr. Barry, can you step out of the room for a minute.

Mr. Harrington, you've told us that Mr. Barry can only testify based on the information that he's had a chance to review.

I've asked him a question about testifying on that. He tells me, unless I show him a document that you've not produced in discovery, he can't answer any questions.

Exactly how is that preparing and producing a witness capable of responding to the 30(b)(6) Notice.

MR. HARRINGTON: Mr. Barry -- let me take a step back.

There are very few documents relating to the Parc Chateau West property.

EXHIBIT G



MS. ZIARNO: That's a whole other issue about spoliation.

Let's just focus on what --

MR. HARRINGTON: It has nothing to do --

MS. ZIARNO: -- he used to prepare today --

MR. HARRINGTON: -- with spoliation.

MS. ZIARNO: -- and why those have not been produced to the Plaintiffs in this case.

MR. HARRINGTON: We don't have to produce every document that Mr. Barry looked at as part of your discovery requests.

MS. ZIARNO: Those documents are responsive to a document request that we propounded to the Government.

MR. HARRINGTON: If there are any documents that we have that have not been produced that are responsive to a discovery request, we will look into it, and we will make sure they are produced.

MS. ZIARNO: And then we will recall Mr. Barry to have him testify about that at that

EXHIBIT G



time --

MR. HARRINGTON: If --

MS. ZIARNO: -- at the Government's expense.

MR. HARRINGTON: We will deal with that as it happens. You can make all the statements you want on the record as to what you will do.

MS. ZIARNO: You know for somebody who states that he's trying to play fair, this really is blindsided.

You knew what we were asking for. You gave us the response in your discovery responses about this property and now you are doing everything you can to block us from obtaining the information that we're entitled to get.

We'll bring Mr. Barry back in here. I will ask him questions about it. I obviously have no documents to show him because you never produced any to us. And at that point in time, we will recall Mr. Barry, subject to whatever motion to compel that will follow with the Court.

MR. HARRINGTON: You're free to do what

you want to do.

MS. ZIARNO: Mr. Barry, we're ready for you.

MR. HARRINGTON: Mr. Barry, will be happy to talk to you about the documents that he saw about Parc Chateau West.

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
(Continued)

BY MS. ZIARNO:

Q. Mr. Barry, you stated that you saw an approval letter for Parc Chateau West.

What did that approval letter state?

A. I believe it spelled out the approval conditions for Parc Chateau West.

Q. And what were those?

A. I believe it spoke to the protections for tenants. I believe it mentioned something about a Use Agreement. And I believe that's all I can remember about the letter.

Q. So the property was being permitted to prepay but had to continue a Use Agreement on the property?

A. That's what I recall. I'd have to -- I'd have to see the letter again too.

Q. So this was not a prepayment with a termination of affordability restrictions?

A. It was a prepayment. That's all I remember.

Q. Well, if it had a Use Agreement still on the property, then it wasn't a termination of the affordability restrictions. Correct?

MR. HARRINGTON: Object to form.

THE WITNESS: I'd have to see the letter again to specifically say all of the conditions that were outlined in that letter.

BY MS. ZIARNO:

Q. Well, here's the problem. I can't show you that letter because the Government hasn't produced it to us.

So I need you tell me what you can recall about this letter. Explain to me how, based on your knowledge, of how -- is this under Title VI or Title II, by the way?

A. I don't remember.

Q. Okay. Based on your knowledge of Title II and Title VI, how is it that a property would be permitted to prepay and terminate affordability restrictions on the property but have to keep -- has a Use Agreement on the property?

A. See, I don't know that. Like I said, I'd have to see the letter again. That was my recollection but I could be wrong.

Q. When did you see this letter?

A. Last week.

Q. And what was the date of the letter?

A. Hmm. I'd have to see the letter again.

Q. Do you know --

A. I can't --

Q. -- the year?

A. I just don't know. I don't.

Q. Do you know who signed it?

A. I believe it was the Field Office.

Q. Do you know which Field Office?

A. I don't.

Q. Do you know where the property was located?

A. I do not.
MR. HARRINGTON: I'll tell you that it's in Indianapolis.
MS. ZIARNO: I don't need your testimony, David. I need your witness, who is binding on the Agency, to testify.
BY MS. ZIARNO:
Q. Do you know where this property was located?
A. I do not.
Q. Thank you.
What other documents related to Parc Chateau West did you review?
A. That's the only one I remember.
Q. Do you think it's the only document you reviewed or is it the only one that you remember?
A. It's the only one I remember. I don't believe it's the only document. That's --
Q. So it's possible you reviewed additional documents related to Parc Chateau West?
A. Not many, but, yes.
Q. Did you review any information or

EXHIBIT G





documents related to a property in Madison, Wisconsin, that was permitted to prepay under Title II or Title VI?

A. Not that I'm aware of.

Q. Is there anything else that you can tell me about Parc Chateau West today?

A. At this time, no.

Q. Okay. In that case, we will move on to a question that was pending during last week's deposition.

Your counsel instructed you not to answer the question pending resolution from the Court.

Last night counsel withdrew that instruction and has indicated that you will now be permitted to answer the question.

So we will go back to that question and ask it again.

MS. ZIARNO: Let's go off the record for a second.

(Discussion held off the record.)

EXHIBIT G





may have been required to then file an appropriate Initial Notice of Intent.

Q. If that were true, why would they, then, have distributed the Initial Notice of Intent because that was distributed on June 15th, according to the log, this letter is not until July 17, a month later?

A. Yeah, I'm just making reference to this 1990. Maybe I'm not lining up the dates appropriately. I'm just following this December 26, 1990, date.

Q. Right. And then, my question was: In July of 1992, after the Initial Notice of Intent that was filed in December of '90 has been distributed to EMAS and the other branches, why would they then, after that, be asked to submit another Initial Notice of Intent form?

MR. HARRINGTON: Objection.

Asked and answered.

Go ahead and answer.

THE WITNESS: Yeah, that, I don't know that.

BY MS. ZIARNO:

Q. How would we find that out?

A. All I can say is I don't know the records of -- what is this? -- North Carolina's office. I'm not sure what -- I don't know, other than having to go back to the North Carolina office and whoever processed it.

Q. That would be the only place that we could figure out why this was done this way?

A. From looking at this, I can't tell why they were being asked to issue a Notice of Intent.

Q. Does it make sense to you that they were if the Initial Notice of Intent filed in 1990 was the one that was already distributed to EMAS and the other branches?

A. Without knowing the particulars, you know, I can't -- I couldn't answer that. I don't know the reason why.

Q. Well, knowing the processing procedures and guidance that HUD issued and testified on behalf of HUD, does it make sense, from that perspective, that a second Initial Notice of Intent

would have been required after the Initial Notice of Intent from 1990 was already distributed to the various branches?

MR. HARRINGTON: Objection.

Lack of foundation.

You can go ahead and answer it.

THE WITNESS: No.

BY MS. ZIARNO:

Q. So as the Government's 30(b)(6) witness on the subject matter of processing of the various properties that are the subject matter of this lawsuit, you can't answer questions about how this property is processed; is that correct?

MR. HARRINGTON: Objection.

The witness has been answering questions about how this property has been processed.

You can answer, if you have an answer.

BY MS. ZIARNO:

Q. You cannot substantively answer any questions about the processing of this project?

MR. HARRINGTON: Again, I object.

The witness has been substantively

answering questions about how this property was processed based on the limited information that's been put in front of him.

MS. ZIARNO: The record speaks for itself.

I'm not going to debate this with you, David.

BY MS. ZIARNO:

Q. Mr. Barry --

MS. ZIARNO: Could you read back my question for Mr. Barry, and please have him answer it.

(Whereupon, the Court Reporter read back the pending question.)

MR. HARRINGTON: I'll repeat my objection as argumentative.

BY MS. ZIARNO:

Q. And you can answer.

MR. HARRINGTON: You can answer it.

You can answer, Mr. Barry.

THE WITNESS: I cannot answer.

BY MS. ZIARNO:

Q. Who would we go to, to get an answer?

MR. HARRINGTON: Objection.

Asked and answered.

THE WITNESS: I would advise the Field Office.

MS. ZIARNO: Mark this as Exhibit 25.

(Barry Deposition Exhibit No. 25 was marked for Identification.)

(Witness reviews document.)

BY MS. ZIARNO:

Q. Do you recognize this document?

A. No, I do not. Well, I think you showed me something like this previously, but other than that, no.

Q. Do you recognize that this is a July 2, 1992, memoranda?

A. Yes.

Q. And it appears to be Valuation Branch's response to Ms. Briscoe's request for information regarding the listed properties, including Coleridge Road; is that correct?

A. I would agree.

Q. -- past its eligibility date for filing.

A. But I think then the letter talks about the lack of a -- possibly a proper Notice of Intent, this July 17, '92, letter to Richard Urban, at Thetford Properties, indicating that they need -- even though the process was begun under an Election to Proceed, that they still needed a Notice of Intent to properly, you know, have a proper record of a Plan of Action process for this particular property Coleridge Road.

Q. Well, if the December 1990 Notice of Intent wasn't proper, why was that distributed in 1992?

Why wouldn't they have asked for a proper Notice of Intent prior to that?

MR. HARRINGTON: Objection.

Lack of foundation.

THE WITNESS: That, I don't know.

BY MS. ZIARNO:

Q. And so we still don't know why between July 25th of 1991 and June 15th of 1992 the Notice of Intent was not distributed to EMAS.

EXHIBIT G





MR. HARRINGTON: Objection.
Lack of foundation.
Mischaracterizes the documents.
You can answer.
THE WITNESS: I guess I'd have to go back to this letter that, even though the processing appeared to take place under the Election to Proceed, there was still a requirement for a submission of a proper Notice of Intent.
BY MS. ZIARNO:
Q. Again, I'm confused.
You wanted to know the eligibility date for this property thinking that may have had an impact on why --
A. Delayed processing.
Q. -- this was delayed.
MR. HARRINGTON: Go ahead and wait until there's question --
THE WITNESS: Okay. I'm sorry.
MR. HARRINGTON: -- Mr. Barry.
THE WITNESS: I'm sorry.
BY MS. ZIARNO:

EXHIBIT G



Q. And so we've determined that they were eligible to file a Notice of Intent based on your calculation as of July 25, 1991. Right?

A. That's correct.

Q. Okay. So when they filed in December of 1990, arguably, they filed early that Notice of Intent. Correct?

A. Correct.

Q. Okay. So then, why on July 26, 1991, after they were eligible, was that Notice of Intent not circulated to the different branches?

A. Because it was -- I believe it was dated December 26th of 1990. It wasn't a proper Notice of Intent.

Q. But they then distributed it in June of '92. Why not ask for a proper Notice of Intent in July of '91?

We still have a year lag here.

MR. HARRINGTON: Objection.

Lack of foundation.

Mischaracterizes the documents.

You can go ahead and answer the

question, if you can, Mr. Barry.

THE WITNESS: I guess what I'm -- what I'm assuming is that they proceeded under the Notice of Election to proceed and sent that document around as the Initial Notice of Intent.

And then, when this July 17th, '92, letter goes out, they're acknowledging receipt of the Notice of Election to Proceed but then they ask for a copy of a Notice of Intent.

BY MS. ZIARNO:

Q. Why would HUD have not asked for a different Notice of Intent in July of 1991?

A. That, I don't know.

Q. And to find that out, we would have to -- I think you've testified, find somebody in the North Carolina Field Office who could testify about this property?

A. I would say so, yes.

Q. Is there anything further you can tell me about the processing of Coleridge Road Apartments?

MR. HARRINGTON: Objection. Vague.

EXHIBIT G





BY MS. ZIARNO:
Q. You can answer.
A. I'm not a hundred percent sure I know what you're asking.
Q. Is there anything else you can tell me, other than what we've discussed so far today, about the processing of Coleridge Road Apartments?
A. No.
Q. And I just want to clarify something too that you just said.
You stated that you're assuming they distributed the Notice of Election to Proceed on June 15, 1992.
According to this prepayment log, Exhibit 16, it doesn't say that it distributed a Notice of Election to Proceed. Correct?
It states that it distributed a Notice of Intent?
A. But I'm just looking at the receipt date of the Election to Proceed and then when the documents are submitted to EMAS, FH&EO, Val., and A&E.

Notice of Election to Proceed rather than a Notice to Intent to Proceed?

MR. HARRINGTON: Objection. Mischaracterizes the name of the documents.

MS. ZIARNO: I'm just reading what she has in her documents, asking if this is, in fact, what he's referring to. That's what she called it.

THE WITNESS: Well, she's calling it a Notice of Intent to Proceed.

BY MS. ZIARNO:

Q. Right. So is that why you think that maybe she was distributing the Notice of Election to Proceed and not the Notice of Intent?

A. That's -- that's -- that's right.

Q. Okay. That's why we're asking you these questions, to figure this stuff out.

A. Okay.

Q. And we still don't know why in July of '91 HUD would not have asked for a, as you put it, proper Notice of Intent on this property. Right?

A. Yeah, we still don't know that.

EXHIBIT G



Q. Okay. Under the guidelines that are published, was it proper for the North Carolina office to not do anything with the Initial Notice of Intent upon receipt?

MR. HARRINGTON: Objection.

Assumes facts not in evidence.

You can go ahead and answer it.

THE WITNESS: I can't tell from those documents what was done and what wasn't done. I don't know.

BY MS. ZIARNO:

Q. What documents would you need to be able to answer that question?

A. I'm not sure unless somebody kept, you know, a more in-depth log than this log here. I don't know what else you could use.

Q. Let's try it this way.

Based on your knowledge of the processing guidelines for Title II, if you received a Notice of Intent in 1990, what should have happened with that Notice of Intent upon receipt?

A. You would have had to have become the

process for, you know, dealing with Notices of Intent.
Q. And what was that process?
A. The guidelines as, you know, as outlined in 90-88 and 91 -- well, 91-29 didn't exist at that point in time, but you would have to follow the procedures as outlined in the Notices.
Q. And what did you do with the Notice under those procedures?
A. The Notice would be transmitted to each of the appropriate divisions.
Q. What happened if you received a Notice of Intent that you thought was filed prematurely?
A. Well, you'd notify the Owner of a premature submission of a Notice of Intent.
Q. And give him or her instructions as to what you do next. Correct?
A. That's correct.
Q. Did that happen with respect to Coleridge based on the documents you reviewed here today?
A. I don't know that it didn't. But based

EXHIBIT G





on the documents, I would say no.
Q. Is there any guidance that you're aware of under Title II that permitted HUD to do nothing within Notice of Intent to Proceed that was filed?
MR. HARRINGTON: Objection. It's vague.
THE WITNESS: I'm not aware of any.
BY MS. ZIARNO:
Q. Okay. Let's go back to Exhibit 19, which is Southgate Apartments.
MS. ZIARNO: Let's mark Exhibit 28.
(Barry Deposition Exhibit No. 28 was marked for Identification.)
(Witness reviews document.)
BY MS. ZIARNO:
Q. Is there anything in this document that helps you know what the date of eligibility for this project would be or date of final endorsement, I'm sorry?
A. I don't see it, no.
Q. Okay.
MR. HARRINGTON: Do we have the Deed Of Trust Note for Southgate?

mortgage form, but it's dated September 26th, and I can't tell the year.

Q. Who would be able to explain the processing of this particular project?

A. Other than the Field, I don't know.

Q. So even with these documents that we've given you today, you cannot explain, on behalf of the Agency, the processing for this property?

MR. HARRINGTON: I object that this is a selected portion of the documents relating to Southgate. And I object on that basis.

Now you can answer the question.

THE WITNESS: I can't answer the question.

BY MS. ZIARNO:

Q. So would we have to go to somebody in the North Carolina Field Office to be able to answer that question?

A. If someone was still there who could answer it, yeah, yes.

Q. What about the files?

Shouldn't those still be in North

Carolina?

MR. HARRINGTON: Objection.

The files from North Carolina have been produced in this action.

You can answer the question, Mr. Barry.

THE WITNESS: If -- you know, you could look at the file.

BY MS. ZIARNO:

Q. If this were all that was in the file with respect to the Intent to Prepay or the Notice of Intent, how we would figure out what HUD did with the processing of this project?

MR. HARRINGTON: Object to the foundation of the question.

This is not all that was in the file.

BY MS. ZIARNO:

Q. I said with respect to the Notice of Intent or an Intent to Prepay.

A. I'm not sure.

Q. Looking at the January 20, 1991, letter, marked as Exhibit 29, do you see anywhere in there where it suggests to Mr. Urban that there was

anything deficient with the Intent to Prepay the subject mortgage form that's the subject of this letter?

A. No.

Q. And what does this letter tell Mr. Urban to do in January 28th of 1991?

A. Well, it's notifying them of the receipt, and it's telling him that he should prepare a Plan of Action in accordance with the regulations.

Q. And if that was being done in January 28th of 1991, why was the information necessary that requested from EMAS, FH&EO, Valuation, or A&E, until June 15th of 1992?

A. I don't know.

Q. And just so that we have it in the record, do you know who would know?

A. I don't.

MR. HARRINGTON: Just for the record, this is not all the documents relating to the Initial Notice to (sic) Intent on Southgate. I want to state that for the record right here and

A. It would bring you to 1991 and, certainly, within the time frames.

Q. So that wouldn't be the same type of situation where the Initial Intent to Prepay was filed prior to --

A. No.

Q. -- their ability to file such a form? Correct?

A. Correct.

Q. So any other explanation of why if an Intent to Prepay was filed in 1990, acknowledged by HUD, this additional form was required in 1995?

A. The Initial Notice of Intent includes two parts. One part being a prepayment and conversion to condominiums or cooperatives or if we alternatively agree. And "we," I mean the Department and the Owner agree, on more favorable terms, to retain the project as rental housing, it's possible that the requirement was to get a more definitive agreement with the Owner to proceed in requesting incentives under Title II.

Q. Where in the guidance or notices would

we find that?

A. Well, this form, and I think I referenced this before in my previous testimony, was it makes reference to a Handbook 4350.7, which I don't believe ever was issued. I know there was a plan for the 4350.7 to be issued but it never was.

So I don't believe it has any -- that it's included in the 4350.6 at all. So I don't know where that specific instruction would be.

Q. And based on Ms. Hetue's memo, she's indicating that this instruction came from headquarters. Correct?

A. That's correct.

Q. So if Mr. Winiarski wasn't able to answer questions about it, is there anybody else you can think of who would be able to?

A. No.

Q. Do you have any reason to believe that his instruction to Ms. Hetue, in this case, was wrong?

A. No.

EXHIBIT G





Q. Okay. What would have been done with this form upon receipt by HUD?

A. Is there is a prepayment?

There was a log that you gave me.

Was this one of the ones that was on that log?

Q. No.

A. Oh, it wasn't?

Q. No. We've not received, to our knowledge, a log with respect to this property.

A. Okay. Other than keeping a record that the Owner intends to request incentives, I'm not really sure what else would have been done with this form?

Q. I'm showing you Exhibit 41.

(Barry Deposition Exhibit No. 41 was marked for Identification.)

THE WITNESS: Thanks.

(Witness reviews document.)

BY MS. ZIARNO:

Q. You can see that this a memo from a Shirley Carr to Mary Jewell, and it includes

several properties.

The one we're interested in talking about is the Carriage House of Mishawaka I property.

You see that this is enclosing three copies of the Notice of Intent package to Ms. Jewell at the Chief Housing Programs office, and it's dated March 13, '95.

Do you believe this was the memoranda transmitting Exhibit 40 that we just looked at?

A. It could be.

Q. And why would she have been transmitting this memo to Ms. Jewell?

Strike that. I said memo.

Why would she have been transmitting the Notice of Intent form to Ms. Jewell at this point in the process?

A. I don't know.

Q. Who would know?

A. Other than Franca, I guess you'd have to ask Franca.

Q. Just to summarize, using Exhibits 36

EXHIBIT G





through Exhibit 41, can you explain for us why the processing of this project started in April of 1990 with the Intent to Prepay the mortgage, and that by March of 1995, almost five years later, they were still at the point where they were just distributing the Notice of Intent form?

MR. HARRINGTON: Objection.

It's vague and ambiguous because there are multiple Notice of Intent forms.

BY MS. ZIARNO:

Q. You can answer.

A. I don't know. I don't know.

Q. Who would know?

A. I would have to say the Field Office.

(Barry Deposition Exhibit No. 42 was marked for Identification.)

BY MS. ZIARNO:

Q. Showing you what is marked as Exhibit 42, and when you receive it, you'll see that it's a letter with a 9607 form attached to it.

And my questions are going to generally be about the 9607 form itself, as opposed to the