IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - x

ANAHEIM GARDENS, et al., :

Plaintiffs, :

V. : No. 93-655 C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - x

ALGONQUIN HEIGHTS, et al.,:

Plaintiffs, :

V. : No. 97-582 C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - x

Deposition of THOMAS VITEK

Washington, D.C.

Thursday, November 15, 2007

9:42 a.m.

Reported by: TRISTAN-JOSEPH, RPR

A. We looked until we didn't find anything.
Q. Of the floppy disks, in other words?
A. No. Of the hard copies.
Q. Okay.
A. We looked for hard copies.
Q. Now what makes you believe that the floppy disks were tossed away?
A. They're obsolete. They have no utility in the modern world.
Q. Unless you're trying get a copy of the database. Yes?
A. Yes.
Q. Well, do you remember receiving any notice or request to preserve documents or computer files or any other materials in connection with this litigation?
A. No, I received no notice.
Q. Did you have any occasion to produce any materials from your files or from the San Francisco office files in connection with this litigation?
A. No, I didn't have any opportunity to do that.

Q. When you say an opportunity, can you be more specific?

Did you get a request to produce any materials from your files through any connection with this litigation?

A. No, I did not get a request.

Q. Do you have any other materials pertaining to any of the specific properties that were listed in Exhibit A or Exhibit B to Exhibit 2 that would be in your personal files at this point?

A. I have nothing in my personal files. If there was, indeed, a prepayment at Napa Park Apartments and funding was provided in the Housing Choice Voucher Program, in the files that I maintained, as a part of the financial Management Center, I would be able to find a contract document that would provide some information about the voucher funding for that particular property. That would be the only thing that I would have access to that involves these particular ownership entities on Exhibit B.

Q. What about other records that would have

A. I'm not even sure who that ownership entity is.
Q. That was one of Mr. Spieker's apartments.
A. Oh, okay.
Q. But --
A. I never had a conversation with Mr. Spieker about prepaying his mortgage.
Q. And again, 5234 Foothill Apartments, any discussion with the owner of that entity or their representatives about prepaying?
A. No, I had no such discussion.
Q. Okay. Did you attend any meeting, any internal HUD meeting or seminar at which the subject of an Owner who wanted to prepare its mortgage was discussed?
A. Yes.
Q. What was the nature of that meeting?
A. There were a series of training seminars that were held on the subject of Title II and Title VI processing. And at each one of these seminars, there was a segment devoted to

prepayments.

Q. Was that -- sorry.

Was that a section actually devoted to the topic of an owner who wanted to prepay or to the general topic of preservation under Title II or Title VI?

A. The subject matter of the week-long seminar was processing under Title II and Title VI. Then one segment dealt with dealing with notices of intent to prepay, and Plans of Action to prepay.

Q. Do you recall the specific date of this meeting or the approximate date of this meeting?

A. There were several. September of '93 in Sherman Oaks, California; August of '94 in Alexandria, Virginia; summertime of '92 in Arlington, Virginia. I think that's it.

Q. Okay. Were these national meetings or were these meetings for specific regional persons?

A. They -- the '92 and '93 meetings were head HUD staff from all around the country at them.

The '94 meeting was the trainees were people from Regions 9 and 10.

Q. Okay. Did you make any presentation or provide or make a speech at any of these sessions yourself?

A. No, I did not.

Q. Were you one of the trainees?

A. I was one of the trainees.

Q. Okay. Did you prepare any materials for someone else in connection with these --

A. No, I did not. No, I did not.

Q. Okay. Were there any written materials prepared in connection with these seminars for the people who were attending them?

A. Yes, there were.

Q. In addition to the guidance and handbooks and so forth that we've seen today were there other materials that were prepared by the staff?

A. Yes, there were.

Q. Okay. Did you keep copies of any of these materials?

A. No, I did not.

Q. Do you know if any of those materials

are still available anywhere?
A. I have no idea.
Q. Okay. Did you -- well, did you bring them back with you to your office at the conclusion of the seminar?
A. Yes, I did.
Q. Do you know what happened to them?
A. Excuse me?
Q. Do you know what happened to the materials?
A. One of two things: Either I threw them away or somebody else through them away.
Q. What leads you to the conclusion of those two options?
A. When I was reassigned to the Office of Public Housing, I threw away a lot of my own internal files that weren't specific to any particular project. And then I remember there were a couple of points in time when filing space was needed, and people in the Asset Management Division asked me if it was okay to throw away materials that they didn't have any use for that they found

in the space that I used to work in.

Q. Approximately when would -- you said that you threw away some materials when you went back to the office of --

A. Public Housing.

Q. Public Housing.

That would have been in October of '95?

A. That is correct.

Q. So that was the time that you purged your own files --

A. Yes.

Q. -- is that correct?

Okay. And was it subsequently that other people asked about the right to --

A. Yes.

Q. Okay. And again, I thin you said never received any notice or request to preserve any materials in connection with this litigation; is that right?

A. I never received a notice.

Q. Okay. Going back to these meetings, I think you said that some portion of them dealt with