Nos. 93-655C & 97-582
(Judge Margaret M. Sweeney)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ANAHEIM GARDENS, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO ANSWER QUESTIONS AND PRODUCE DOCUMENTS

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

DAVID A. HARRINGTON
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0465

Dated: December 28, 2007

Attorneys for Defendant

## TABLE OF CONTENTS


INTRODUCTION . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . 3

I. Procedural History . . . . . . . . . . 3

II. Current Status . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . 9

I. This Motion Should Be Denied Because Plaintiffs Made No Good Faith Attempt To Resolve This Dispute Before Resorting To Court Action . . . . . . . . . . 9

II. Plaintiffs' Motion To Compel Fails On The Merits . . . . . . . . . . 10

A. Plaintiffs' Motion To Compel The Production Of Documents Should Be Denied . . . . . . . . . . 10

1. The United States Has Produced Documents Relating To Prepayment By The Parc Chateau West Project . . . . . . . . . . 10

2. Plaintiffs' Motion To Compel The Production Of Documents About Unidentified Projects In Madison, Wisconsin, And St. Louis, Missouri, Should Be Denied . . . . . . . . . . 10

B. The United States Does Not Object To Plaintiffs' Request That A Rule 30(b)(6) Witness Be Made Available To Answer Questions About Recently-Produced Chateau Parc West Documents . . . . . . . . . . 13

1. The United States Will Make Mr. Barry – Or Another Witness – Available To Testify About The Recently-Produced Parc Chateau West Documents . . . . . . . . . . 14

2. Plaintiffs Objection About The Specificity Of Rule 30(b)(6) Testimony On Preservation Processing Is Without Merit . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . 18

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**


Anaheim Gardens v. United States,
33 Fed. Cl. 24 (1995) . . . . . . . . . . passim

Anaheim Gardens v. United States,
444 F.3d 1309 (Fed. Cir. 2006) . . . . . . . . . . 8

Cannon v. Cherry Hill Toyota, Inc.,
190 F.R.D. 147 (D.N.J. 1999) . . . . . . . . . . 2, 9

Cienega Gardens v. United States,
194 F.3d 1231 (Fed. Cir. 1998) . . . . . . . . . . 6, 7

Cienega Gardens v. United States,
46 Fed. Cl. 506 (2000),
rev'd in part, 265 F.3d 1237 (Fed. Cir. 2001) . . . . . . . . . . 7

Cienega Gardens v. United States,
503 F.3d 1266 (Fed. Cir. 2007) . . . . . . . . . . 5

Greenbrier v. United States,
193 F.3d 1348 (Fed. Cir. 1999) . . . . . . . . . . 6, 7, 11

Howard W. Heck & Associates v. United States,
134 F.3d 1468 (Fed. Cir. 1998) . . . . . . . . . . 11

Navigant Mktg. Solutions, Inc. v. Larry Tucker, Inc.,
339 F.3d 180 (3d Cir. 2003) . . . . . . . . . . 2, 9

Reed v. Bennett,
193 F.R.D. 689 (D. Kan. 2000) . . . . . . . . . . 13

Robinson v. Potter,
453 F.3d 990 (8th Cir. 2006) . . . . . . . . . . 9

Shuffle Master, Inc. v Progressive Games, Inc.,
170 F.R.D. 166 (D. Nev. 1996) . . . . . . . . . . 2, 9

Southern Pac. Transp. Co. v. City of Los Angeles,
922 F.2d 498 (9th Cir. 1990) . . . . . . . . . . 11

Steil v. Humana Kansas City, Inc.,
197 F.R.D. 442 (D. Kan. 2000) . . . . . . . . . . 13

Thetford Properties IV, LP v. United States,
907 F.2d 445 (4th Cir. 1990) . . . . . . . . . . 11, 12

United States v. Riverside Bayview Homes,
474 U.S. 121 (1985) . . . . . . . . . . 11

**Statutes:**

12 U.S.C. § 4101 . . . . . . . . . . 4

12 U.S.C. § 4108 . . . . . . . . . . 4

12 U.S.C. § 4109 . . . . . . . . . . 4

12 U.S.C. § 4110 . . . . . . . . . . 4

12 U.S.C. § 4114 . . . . . . . . . . 4, 5

12 U.S.C. § 4119 . . . . . . . . . . 17

ELIHPA § 221(a) . . . . . . . . . . 4

ELIHPA § 225(a) . . . . . . . . . . 4

ELIHPA § 233(1) . . . . . . . . . . 17

Emergency Low Income Housing Preservation Act of 1987,
Pub. L. No. 100-242, 101 Stat. 1877 (1987) . . . . . . . . . . 4

Low Income Housing Preservation and Residential Homeownership Act of 1990,
Pub. L. No. 101-625, 104 Stat. 4249 (1990) . . . . . . . . . . 4

Housing Opportunity Program Extension Act of 1996,
Pub. L. No. 104-120, 110 Stat. 834 (1996) . . . . . . . . . . 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ANAHEIM GARDENS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 93-655C |
| v. | ) | (Judge Margaret M. Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| ALGONQUIN HEIGHTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 97-582C |
| v. | ) | (Judge Margaret M. Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL DEFENDANT TO ANSWER QUESTIONS AND PRODUCE DOCUMENTS**

**INTRODUCTION**

On December 5, 2007, near the end of the business day, plaintiffs' attorney, Harry Kelly, sent an e-mail raising several issues about the plaintiffs' Rule 30(b)(6) deposition of Maurice Barry. The e-mail, which demanded a response within 24 hours, stated flatly: "For the record, under Rule 30 of the RCFC, we have an obligation to confer with you in good faith prior to moving to compel answers. This is our attempt to do so." E-mail from Harry Kelly to David A. Harrington at 1 (Dec. 5, 2007) (attached as Exhibit A). A second e-mail, which supposedly attached a letter about "document matters," was sent after the close of business. The omitted letter was not received until the afternoon of December 6, 2007, raised numerous additional issues, and likewise demanded an almost immediate response. E-mail from Harry Kelly to

David Harrington (Dec. 6, 2007) (with attachment) (providing less than 24 hours to respond) (attached as Exhibit B). On December 7, 2007, without awaiting a response or making any effort to speak to an attorney for the United States, plaintiffs filed this motion.[1]

Plaintiffs perfunctory e-mails fail to satisfy the well-established requirement that a party make a meaningful, good faith effort to resolve discovery issues before involving the Court. E.g., Navigant Mktg. Solutions, Inc. v. Larry Tucker, Inc., 339 F.3d 180, 186-87 (3d Cir. 2003) (counsel did not engage in a "good faith" attempt to confer with opposing party when counsel faxed a letter outlining alleged deficiencies in answers and threatened to file a motion to compel if deficiencies were not rectified within three days); Cannon v. Cherry Hill Toyota, Inc., 190 F.R.D. 147, 153 (D.N.J. 1999) (counsel's fax to opposing counsel in which he demanded a certified response to interrogatories and requests for admission by close of business on the following day was a "token effort" that does not satisfy the obligation to make a good faith effort to confer before resorting to court action); Shuffle Master, Inc. v Progressive Games, Inc., 170 F.R.D. 166, 170-73 (D. Nev. 1996) (series of facsimiles set by counsel demanding compliance with discovery request did not meet the requirement that the parties confer or attempt to confer in good faith). Plaintiffs here are more interested in casting aspersions than in obtaining discovery. Indeed, plaintiffs' motion seeks to "compel" the production of documents about the Parc Chateau West project that the United States had already agreed to provide.[2] Had plaintiffs

---

[1] At the time, undersigned counsel was preparing a merits brief in a bid protest that this Court had ordered filed on December 6, 2007. On December 7, 2007, counsel turned to plaintiffs' correspondence. While working on a response to the issues raised in plaintiffs e-mails and letter, electronic notice of the filing of this motion was received.

[2] The Parc Chateau West project is not a plaintiff in any takings litigation against HUD.
(continued...)

made a meaningful attempt to confer, they would have learned not only that these documents had been compiled and were being copied, but also that the United States was willing to make Mr. Barry available to respond to questions about these documents.[3]

Plaintiffs failure to make a meaningful attempt to first resolve these issues with the United States, by itself, warrants the denial this motion to compel. Furthermore, as explained below, plaintiffs' motion to compel is either moot or without merit.

## BACKGROUND

### I. Procedural History

The claimants in these actions are owners of moderate- or low-income housing projects developed during the late 1960s and early 1970s pursuant to section 221(d)(3) or section 236 of the National Housing Act. The projects were funded by 40-year mortgage notes between the project owner and a private lender. Mortgage insurance was provided by the Government in exchange for use restrictions contained in a "regulatory agreement" executed by the project owner. The regulatory agreement required the project owner to, among other things, rent to low- or moderate-income tenants at rates established by the Department of Housing and Urban Development ("HUD"). The regulatory agreement terminated upon payment of the insured debt.

---

[2](...continued)
HUD authorized this project to prepay its Government-insured mortgage pursuant to section 225(a) of the Emergency Low-Income Housing Preservation Act ("ELIHPA"), which it did in mid-1995.

[3] Plaintiffs also would have learned that names of projects that apparently prepaid in Madison, Wisconsin and St. Louis, Missouri have not been ascertained. Plaintiffs had already been informed that the United States "possesses no database or unified source from which it can be determined which of these projects sought to prepay under the Preservation Statutes and what outcome resulted from the project owner's request to prepay." Def.'s Supp. Response to Pls.' 2d Set of Interrogatories at 1 (served Nov. 2, 2007) (attached as Exhibit C).

Loan documents typically prohibited prepayment of the insured debt during the project's first 20 years of operation.

During the late 1980s and early 1990s, in response to a perceived threat to the supply of public housing, Congress enacted the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1877 (1987) ("ELIHPA"), and the Low Income Housing Preservation and Residential Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990) ("LIHPRHA") (collectively, the "Preservation Statutes"). The Preservation Statutes regulated the ability of project owners to prepay their mortgages after 20 years and, consequently, to terminate the low-income use restrictions imposed on their properties. See ELIHPA § 221(a); 12 U.S.C. § 4101.

The legislation did not flatly prohibit prepayment. Rather, the Preservation Statutes allowed owners to prepay and exit the program under two procedures. First, prepayment could be allowed immediately if the owner demonstrated to HUD that the termination of use restrictions on a particular project would not have a material affect upon current tenants or the relevant low-income housing market. ELIHPA § 225(a) (requiring that the owner submit a "plan of action"); 12 U.S.C. § 4108 (same). Second, prepayment could be allowed under 12 U.S.C. § 4114. Specifically, irrespective of section 4108, the project owner was permitted to (1) exit the low-income housing program by selling to a "qualified purchaser" at the project's fair market value as a unrestricted property, or (2) agree to remain in the low-income housing program subject to a modified regulatory agreement that provided substantial financial incentives paid by HUD. 12 U.S.C. §§ 4109-10. In the event that a sale could not be consummated, or incentives

were not funded within statutory timeframes, the owner was allowed to prepay the mortgage. 12 U.S.C. § 4114.[4]

Following enactment of the Preservation Statutes, in 1993, the Anaheim Gardens action was filed in the United States Court of Federal Claims upon behalf of more than 30 claimants. The claimants' first amended complaint sought compensation under the Fifth Amendment for (1) an alleged "regulatory taking" of the owners' right to prepay their HUD-insured mortgages, terminate use restrictions, and realize appreciation of the property, and (2) an alleged "temporary taking" for administrative delays in promulgating implementing regulations, assessing plans of action, and providing financial information to project owners. Anaheim Gardens v. United States, 33 Fed. Cl. 24, 29-30 (1995).

The United States filed a motion to dismiss the first amended complaint for failure to state a claim. See Def.'s Motion to Dismiss (filed Mar. 29, 1994) (docket no. 17). In March 1995, the Court dismissed "all counts" except for the claimants' regulatory taking claim. Anaheim Gardens, 33 Fed. Cl. at 38. The Court noted that the claimants were asserting two distinct taking claims. Id. at 30. With respect to the claimants' "temporary taking" claim, the Court held that administrative delays in implementing LIHPRHA did not effect a taking within the meaning of the Fifth Amendment. Id. at 36-38. Additionally, the Court explained that the claimants' had dropped all allegations about administrative delays in processing applications and providing the financial information required by LIHPRHA:

---

[4] On March 28, 1996, Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 (1996) ("HOPE"), which allowed owners to prepay without first securing HUD approval. E.g., Cienega Gardens v. United States, 503 F.3d 1266, 1274 (Fed. Cir. 2007).

> In their first amended complaint, at paragraphs 30-34, plaintiffs complain of several alleged delays by HUD in processing their applications for incentives, apparently in violation of the deadlines established by LIHPRHA. At oral argument, however, plaintiffs' counsel dropped these contentions, saying, "[t]he processing is going pretty well. HUD has its act in order by and large, and they are meeting the six-month schedule or coming close. And that is not what we are here to complain about."

Id. at 30 n.10. The Court denied the Government's motion to dismiss the claimants' "regulatory taking" claim, which "is based not on HUD's delays, but rather the legislation itself." Id. at 38. It is only this latter count that remains at issue in these actions.

Following this Court's ruling, the Anaheim Gardens claimants filed a second amended complaint. Pls.' Second Am. Compl. (filed Aug. 18, 1995) (docket no. 58). The second amended complaint added two plaintiffs, dropped the counts dismissed by the March 1995 ruling, and added a count for breach of contract. Id.[5] Shortly thereafter, the Algonquin Heights action, which reiterates the factual allegations and legal claims in Anaheim Gardens, was filed upon behalf of an additional 26 claimants. See Pls.' Compl. (filed Aug. 25, 1997) (docket no. 1).[6]

Subsequently, at the request of the parties, the Court stayed these actions to await decisions in Cienega Gardens v. United States, 194 F.3d 1231 (Fed. Cir. 1998) ("Cienega I"), and Greenbrier v. United States, 193 F.3d 1348 (Fed. Cir. 1999). After the Federal Circuit

---

[5] The operative complaint in Anaheim Gardens is Plaintiffs' Fourth Amended Complaint, which asserts the same counts as the Second Amended Complaint and seeks compensation for an alleged regulatory taking with respect to 51 different moderate- or low-income housing projects. Pls.' Fourth Am. Compl. (filed Sept. 16, 1997) (docket no. 113); see also Order of Judge Hodges at 1-2 (Aug. 24, 2007) (ruling that plaintiffs could assert claims with respect to 23 projects not identified in the complaint).

[6] The operative complaint in Algonquin Heights is Plaintiffs' Second Amended Complaint, which seeks compensation for an alleged regulatory taking with respect to an additional 47 projects. Pls.' Second Am. Compl. (filed Sept. 24, 2007) (docket no. 54).

issued the Cienega I and Greenbrier decisions, the Court of Federal Claims issued a decision in Cienega Gardens that dismissed the plaintiffs' contract claims for lack of privity pursuant to Cienega I and dismissed the plaintiffs' remaining taking claim on ripeness grounds pursuant to Greenbrier. See 46 Fed. Cl. 506 (2000), rev'd in part, 265 F.3d 1237 (Fed. Cir. 2001). The Court thereafter issued orders in these cases directing the claimants to state whether they were distinguishable from the Cienega Gardens decision – i.e., the new decision applying the Federal Circuit's decisions in Cienega I (contract) and Greenbrier (taking) – and if so, how to proceed. Order of Judge Hodges at 1 (May 18, 2000) (docket no. 119 in Anaheim; docket no. 12 in Algonquin).

On July 21, 2000, the claimants responded to the Court's orders, submitting identical filings in both Anaheim Gardens and Algonquin Heights. Pls.' Response to Order (filed July 21, 2000) (docket no. 125 in Anaheim; docket no. 18 in Algonquin). The claimants' responses did not address, and thus abandoned, their breach of contract claims.[7] With respect to their taking claims, the claimants conceded that they had not obtained a final decision from HUD regarding the application of the Preservation Statutes to their respective properties, but maintained that their failure to obtain a final agency decision should be excused by the doctrine of futility. Id. (stating also that they were unable to identify facts distinguishing their cases from the holding in Greenbrier). Relying upon this filing, the Court dismissed the Anaheim Gardens and Algonquin Heights actions without further explanation. Judge Hodges at 1 (Aug. 16, 2000) (docket no. 127 in Anaheim; docket no. 20 in Algonquin).

---

[7] Additionally, plaintiffs subsequent appeal did not allege any error with respect to the Court's dismissal of their breach of contract claims and the resulting Federal Circuit mandate remanded for further proceedings only with respect to plaintiffs' regulatory takings claim.

The Anaheim Gardens and Algonquin Heights claimants appealed. On March 24, 2006, noting that no discovery in these actions had occurred, the Federal Circuit concluded that it was reviewing a motion to dismiss. Anaheim Gardens v. United States, 444 F.3d 1309, 1315 (Fed. Cir. 2006). As a result, the court held that the trial court's dismissal was inappropriate "if, as pled, there is any relief that could be granted under any set of facts that could be proven consistent with appellants' allegations." Id. Upon independently reviewing the plaintiffs' complaints, the court reversed and remanded these actions "for the development of facts on whether appellants taking claims are ripe." Id. at 1316.

In accordance with the Federal Circuit mandate, this Court directed the parties to conduct discovery on ripeness. Order of Judge Hodges at 1 (Aug. 14, 2006) (docket no. 138 in Anaheim; docket no. 29 in Algonquin). Ripeness discovery is scheduled to close January 10, 2008. Order of Judge Sweeney at 1 (Nov. 29, 2007) (docket no. 176 in Anaheim; docket no. 64 in Algonquin).

## II. Current Status

These actions currently concern 98 moderate- and low-income housing projects developed pursuant to the section 221(d)(3) and section 236 programs from the mid-1960's to the mid-1970's. Ripeness discovery is now nearly complete. During the course of discovery, the United States and plaintiffs together have produced nearly one million pages of material. Document production by the United States alone has substantially exceeded 250,000 pages.

During November 2007, plaintiffs took a Rule 30(b)(6) deposition of HUD over four days. Three different witnesses were designated to testify upon behalf of HUD. Plaintiffs also took depositions of six different HUD employees, including two employees from HUD's Indianapolis field office and two other employees from HUD headquarters in Washington, D.C.

Plaintiffs chose to voluntary cancel the deposition of an additional HUD employee who handled preservation processing in the Midwest and turned down the United States' offer to continue for an additional day the Rule 30(b)(6) deposition on HUD's document retention policy.

In their motion to compel, plaintiffs seek an order compelling the United States to produce documents relating to prepayment by the Parc Chateau West product and additional documents about prepayment by unidentified projects in St. Louis, Missouri, and Madison, Wisconsin. In addition, plaintiffs seek to reopen their Rule 30(b)(6) deposition to obtain additional testimony about projects that were allowed to prepay under the Preservation Statutes and purported processing delays under ELIHPA. As explained below, plaintiffs' motion should be denied.

## ARGUMENT

### I. This Motion Should Be Denied Because Plaintiffs Made No Good Faith Attempt To Resolve This Dispute Before Resorting To Court Action

RCFC 37(a) requires that a party engage in a good faith attempt to resolve discovery disputes before bringing the issue before the Court. Plaintiffs did not comply with this prerequisite. See, e.g., Navigant, 339 F.3d at 186-87; Cannon, 190 F.R.D. at 153; Shuffle Master, 170 F.R.D. at 170-73. Accordingly, plaintiffs' motion should be denied. See Robinson v. Potter, 453 F.3d 990, 995 (8th Cir. 2006) (affirming denial of a motion to compel because the movant "did not appear to have made an effort to resolve the issue informally prior to asking the court's assistance"); Navigant, 339 F.3d at 186 (explaining the difference between "an attempt to confer" and a "good faith attempt to confer").

## II. Plaintiffs' Motion To Compel Fails On The Merits

### A. Plaintiffs' Motion To Compel The Production Of Documents Should Be Denied

#### 1. The United States Has Produced Documents Relating To Prepayment By The Parc Chateau West Project

Plaintiffs ask the Court to order the production of documents relating to the Parc Chateau West project. Pls.' Mot. at 13. The United States identified Parc Chateau West as one of several projects that prepaid pursuant to the Preservation Statutes in a supplemental interrogatory answer served November 2, 2007. Ex. C. The United States informed plaintiffs on November 14, 2007, and again on December 7, 2007, that responsive documents relating to prepayment by the Parc Chateau West project would be produced. Pls.' Mot., Ex. G (Barry Dep. at 222); Letter from David A. Harrington to Harry Kelly at 1 (Dec. 7, 2007) (attached as Exhibit D). The Parc Chateau West documents were provided to plaintiffs on December 20, 2007. See Letter from David A. Harrington to Harry Kelly at 1 (Dec. 20, 2007) (attached as Exhibit E). Accordingly, plaintiffs' motion is moot and should be denied.

#### 2. Plaintiffs' Motion To Compel The Production Of Documents About Unidentified Projects In Madison, Wisconsin, And St. Louis, Missouri, Should Be Denied

Plaintiffs ask the Court to compel the production of documents relating to prepayment by unidentified projects in Madison, Wisconsin, and St. Louis, Missouri. See Pls.' Mot. at 13. Plaintiffs apparently seek these documents to provide a basis for predicting what decision HUD would have reached if plaintiffs had submitted their own plans of action to prepay. Plaintiffs' request reflects a fundamental misunderstanding of the ripeness inquiry and is unduly burdensome. It should, therefore, be denied.

It is well-established that requiring an owner to seek approval for a given use of its property "does not itself 'take' the property in any sense." United States v. Riverside Bayview Homes, 474 U.S. 121, 128 (1985). After all, the very existence of a process to seek approval "implies that permission may be granted, leaving the [owner] free to use the property as desired." Id. "Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the [property] in question can it be said that a taking has occurred." Id. at 127; see also Greenbrier v. United States, 193 F.3d 1348, 1357-58 (Fed. Cir. 1998). Consequently, property owners must exhaust the administrative process in order to ripen an as-applied, regulatory taking claim. Greenbrier v. United States, 193 F.3d at 1357-58; Howard W. Heck & Associates v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998).

Plaintiffs here seek to invoke the futility exception to exhaustion. However, "[a]bsent a clear showing that an administrative agency has taken a hard and fast position that makes an adverse ruling a certainty, a litigant's prognostication that he is likely to fail before an agency is not a sufficient reason to excuse the lack of exhaustion." Thetford Properties IV, LP v. United States, 907 F.2d 445, 450 (4th Cir. 1990); see also Anaheim Gardens, 33 Fed. Cl. at 31 (stating that "the court in Thetford Properties identified . . . administrative procedures which must be exhausted if the plaintiffs . . . wished to prepay"). The futility exception to the exhaustion of administrative remedies merely serves to "'protect property owners from being required to submit multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved.'" Heck, 134 F.3d at 1472 (emphasis in original) (quoting Southern Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 504 (9th Cir. 1990)).

Here, statutes, regulations, HUD guidance, previously-produced documents and deposition testimony confirm that HUD had discretion to approve requests to prepay from owners that submitted plans of action. See, e.g., Letter from HUD to Southgate Apartments (Oct. 5, 1989) ("HUD will approve any and all Plans of Action where an Owner meets the criteria and, where all standards and criteria cannot be met, to negotiate in good faith efforts to accommodate our mutual needs and considerations.") (attached as Exhibit F). The requested documents concerning projects in St. Louis and Madison have no significance other than to confirm deposition testimony from multiple witnesses that prepayment could and did occur under the Preservation Statutes – something these plaintiffs have been aware of since at least 1990.[8] Thetford IV, 907 F.2d at 450 (plaintiffs' "own evidence shows that HUD has approved at least three plans of action and one prepayment").

Nevertheless, diligent efforts have been made to identify the specific projects that prepaid pursuant to the Preservation Statutes. The United States has no database or other unified source from which the names of particular projects that received approval of plans of action to prepay can be ascertained. See Ex. C (Def.'s Supp. Answer to Pl.'s First Set of Interrogatories (served Nov. 2, 2007)) (reiterating the answer given in May 2007). In addition, the processing of plans of action under the Preservation Statutes occurred 12 to 20 years ago. As a result, few current HUD employees were involved in preservation processing and still fewer recall specific details about projects they handled. Inquiries have been made to attempt to identify specific projects that received HUD approval to prepay and, in this way, the Parc Chateau West project was

---

[8] On October 25, 1988, Thetford IV filed suit against HUD challenging aspects of the Preservation Statutes. Thetford III LP and Thetford IV LP are related entities that own 30 of the 98 projects at issue in Anaheim Gardens and Algonquin Heights.

identified. However, the United States has not ascertained the names of those other projects that received HUD approval to prepay pursuant to the Preservation Statutes.[9]

**B. The United States Does Not Object To Plaintiffs' Request That A Rule 30(b)(6) Witness Be Made Available To Answer Questions About Recently-Produced Chateau Parc West Documents**

Under RCFC 30(b)(6), a party may notice the deposition of a "government agency" to provide testimony regarding specific subject matters. The subject matter of the deposition must be described with particularity so that witnesses can be identified and prepared. See, e.g., Steil v. Humana Kansas City, Inc., 197 F.R.D. 442, 444 (D. Kan. 2000) ("An overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task" and is improper.); Reed v. Bennett, 193 F.R.D. 689, 692 (D. Kan. 2000) (same). In addition, the deposition's scope is limited to "matters known or reasonably available to the organization." RCFC 30(b)(6).

In these actions, plaintiffs served three Rule 30(b)(6) deposition notices seeking testimony from "the United States" concerning 17 broad, ill-defined subject areas. See Pls.' Mot. at 2. Plaintiffs assert generally that the United States did not properly prepare a witness regarding (1) "the identity of any properties that were permitted to prepay under ELIHPA or LIHPRHA, and all facts and circumstances related to those properties and the prepayment," and (2) HUD's "processing of prepayment and other requests under ELIHPA and/or LIHPRHA for the [98] subject properties listed in Exhibits A and B." See Pls.' Mot. at 4. Plaintiffs would have the Court disregard difficulties created by the ill-defined subjects in plaintiffs' deposition

[9] It is unclear that responsive documents would be available even if the names of prepaying projects could be ascertained. The projects are not at issue in this litigation and, accordingly, HUD policy provides that most documents should be discarded after six years. Projects that prepaid pursuant to the Preservation Statutes left the HUD inventory before March 1996, i.e., at least 12 years ago.

notices and, moreover, the challenges of preparing any witness to testify about events that occurred between 12 and 20 years ago. Indeed, the detailed testimony given by Mr. Barry compares favorably to plaintiffs' own Rule 30(b)(6) witnesses, who testified about far fewer projects.

### 1. The United States Will Make Mr. Barry – Or Another Witness – Available To Testify About The Recently-Produced Parc Chateau West Documents

On December 20, 2007, the United States produced a small volume of material (approximately 20 pages) relating to prepayment by the Parc Chateau West project. These documents were not available at the time plaintiffs conducted the Rule 30(b)(6) deposition of Mr. Barry on November 14, 2007. Consequently, the United States will make a witness available to testify about recently-produced Parc Chateau West documents.

The identity of other projects that prepaid pursuant to the Preservation Statutes is not reasonably available. Plaintiffs served an interrogatory seeking this very information. The United States responded as follows:

> Defendant objects that this interrogatory is overly broad and unduly burdensome as it seeks information about thousands of HUD-insured and state-insured projects that are not at issue in this litigation. Defendant possesses no database or unified source from which it can be determined which of these projects sought to prepay under the Preservation Statutes and what outcome resulted from the project owner's request to prepay. Subject to and without waiving these objections, defendant responds that on May 3, 1997, in connection with other litigation, the United States filed a declaration that addresses, among other things, prepayment under the Preservation Statutes. This declaration was executed by Joseph Malloy, the then-Deputy Director of the Existing Products/Preservation Division, Office of Multi-Family Housing Development, United States Department of Housing and Urban Development. In his declaration, Mr. Malloy explains that eight projects sought to prepay under ELIHPA and LIHPRHA and that

> of these eight projects, three were permitted to prepay by HUD. Malloy Decl. ¶ 6. One of the three projects permitted to prepay was the Parc Chateau West project, which submitted a plan of action that satisfied the statutory criteria for prepayment under the Preservation Statutes. A true and correct copy of the Malloy Declaration is attached as Exhibit A.

Ex. C (Def.'s Supp. Answer to Pls.' Second Set of Interrogatories (served Nov. 2, 2007)). As discussed above, the United States has taken reasonable steps to identify the names of projects that were permitted to prepay pursuant to the Preservation Statutes. Through these actions, the Parc Chateau West project was identified. The United States has not identified the names of those additional projects that were permitted to prepay. Consequently, Mr. Barry could not and did not testify about such additional projects.

In sum, the United States will provide a witness to answer questions about recently-produced documents concerning the Parc Chateau West project. However, information about other prepaying projects is not reasonably available. Accordingly, because the scope of a Rule 30(b)(6) deposition is limited to "matters known or reasonably available to the organization," the Court should deny plaintiffs' motion to compel testimony about other projects that prepaid pursuant to the Preservation Statutes.

**2. Plaintiffs' Objection About The Specificity Of Rule 30(b)(6) Testimony On Preservation Processing Is Without Merit**

Plaintiffs also argue that the United States' Rule 30(b)(6) witness – Mr. Barry – was not properly prepared to testify about the "processing of ELIPHA and LIHPRHA applications." Pls.' Mot. at 7, 11. However, Mr. Barry gave literally hours of testimony on this very subject. Pointing to instances when Mr. Barry "suggested" there could be additional sources for the information being sought, plaintiffs argue that Mr. Barry was not prepared to testify about delays

associated with processing under ELIHPA. Pls.' Mot. at 7. Notably absent from plaintiffs' motion is a description of specific information that was not obtained from the Rule 30(b)(6) deposition, which properties the information concerned, how the specific information pertains to ripeness, and why more detailed information sought 12 years after preservation processing ended should be considered "reasonably available" to HUD. Indeed, plaintiffs are hardly in a position to complain as the testimony of their own Rule 30(b)(6) witnesses provided substantially less detail than did Mr. Barry. See, e.g., Testimony of Dean Donnelson at 75-79 (testifying that as plaintiffs' Rule 30(b)(6) witness he did not know if Carriage House West I ever analyzed the possibility of prepayment, discussed prepayment with HUD, or would have been allowed to prepay by HUD) (attached as Exhibit G).

Discovery in this action is being conducted upon the issue of ripeness. Order of Judge Hodges at 1 (Aug. 14, 2006). Plaintiffs' complaint contains no claim that administrative delay under ELIHPA – the supposed shortcoming in Mr. Barry's testimony – constituted a taking. See Fourth Am. Compl. in Anaheim (filed Sept. 16, 1997); Second Am. Compl. in Algonquin (filed Sept. 24, 2007). The only administrative delay claim asserted by the plaintiffs concerned LIHPRHA, and that claim was dismissed by Judge Robinson on March 27, 1995 and omitted from plaintiffs subsequent amended complaints. Anaheim Gardens, 33 Fed. Cl. at 36-38 (rejecting plaintiffs claim "that HUD's delay in implementing the LIHPRHA regulations amounted to a taking"); Fourth Am. Compl. at 32-34 (deleting count counts one, two and four "pursuant to March 27, 1995 order"). Purported processing delays under ELIHPA are simply not at issue in this action.

In any event, Mr. Barry did answer plaintiffs' questions. With respect to projects handled by HUD's North Carolina field office, plaintiffs inquired why HUD directed the owner to file a second initial notice of intent for the Coleridge Road project. Mr. Barry explained that the project was not eligible to submit the original notice of intent on December 26, 1990. Barry Dep. at 316-20 (attached as Exhibit H). Plaintiffs asked why the December 1990 notice of intent was not circulated to the Economic and Marketing Analysis Staff ("EMAS") until June 1992. Mr. Barry explained that preservation processing began when the owner submitted a notice of election to proceed in June 1992, which was the first form that HUD received from the owner after the project became eligible to begin preservation processing.[10] Ex. H (Barry Dep. at 318-19, 322-23). Only when counsel turned to the Southgate project and declined to provide Mr. Barry documents that he requested – as well as other significant documents relating to the project – was Mr. Barry unable to provide an answer. Ex. H (Barry Dep. at 329) (stating counsel could not provide the project's initial notice of intent form); see also Ex. H (Barry Dep. at 331) (objecting that counsel had not provided Mr. Barry certain documents about Southgate). This does not reflect a lack of witness preparation, but rather, poor deposition preparation and practices by plaintiffs' attorney.

With respect to "Indiana based properties," see Pls.' Mot. at 7 (citing testimony concerning only the Carriage House of Mishawaka project), plaintiffs asked why HUD asked the owner to submit an initial notice of intent form in 1995. See Pls.' Mot., Ex. G (Barry Dep.

[10] Under ELIHPA, an owner was eligible to being preservation processing one year before the project's 20 year anniversary date. ELIHPA § 233(1). Under LIHPHRA, an owner was eligible to begin preservation processing two years before the project's 20 year anniversary date. 12 U.S.C. § 4119(1).

at 416). The reason that HUD requested the owner to complete an initial notice of intent in 1995 is neither relevant, nor calculated to lead to the discovery of admissible evidence on ripeness. Further, Franca Hetue – the individual Mr. Barry suggested might be able to answer this question – did not remember why the owner was asked to complete an initial notice of intent form in 1995. Hetue Dep. at 174-76 (attached as Exhibit I). Plaintiffs have failed to establish, therefore, that this is a matter known or reasonably available to HUD such that Mr. Barry should have been prepared to answer this particular question.[11]

## CONCLUSION

For these reasons, the United States respectfully requests that the Court to deny plaintiff's motion to compel.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

[11] Even if the Court were to grant plaintiffs' motion, because plaintiffs failed to consult in good faith with the United States before filing this motion, and because the United States' properly provided a witness to testify regarding matters known or reasonably available to the United States, the Government should not be required to pay any costs incurred by plaintiffs in connection with this motion. See RCFC 37(a)(4)(A).

s/ David A. Harrington

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0277
Fax: (202) 307-0972

December 28, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 28th day of December 2007, a copy of “DEFENDANT’S RESPONSE TO PLAINTIFF’S MOTION TO COMPEL DEFENDANT TO ANSWER QUESTIONS AND PRODUCE DOCUMENTS” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court’s electronic filing system. Parties may access this filing through the Court’s system.

s/ David A. Harrington

**From:** Kelly, Harry [HKELLY@nixonpeabody.com]
**Sent:** Wednesday, December 05, 2007 4:48 PM
**To:** Harrington, David (CIV)
**Subject:** Follow-Up Re Parc Chateau Etc

David --

As you might recall, during Maurice Barry's deposition on November 16th, Mr. Barry was unable to answer questions about Parc Chateau West. In addition, he testified that he had reviewed documents related to Parc Chateau West in preparation for his deposition that were not produced to us as part of the Government's production (so far as we are aware, and if we are incorrect on that point, please advise). As the Government's 30(b)(6) witness regarding "[t]he identity of any properties that were permitted to prepay under ELIHPA and LIHPRHA, and all facts and circumstances related to those properties and the prepayment," Mr. Barry should have been able to answer question about Parc Chateau West. In addition, he should have been prepared to testify about the other two properties that have been identified on the record as properties allegedly permitted to prepay under ELIHPA and LIHPRHA - one in Madison, Wisconsin (raised by Michael WIniarski) and one in St. Louis, Missouri (raised by Kerry Mulholland). Please let us know no later than 5 p.m. tomorrow if you are willing to tender a witness or witnesses to testify as to the subject matter above, including specifically, Parc Chateau West, the property in Madison, Wisconsin and the property in St. Louis, Missouri. In addition, please let us know if you intend to produce the documents related to Parc Chateau West and, to the extent they exist, for the other properties in Wisconsin and St. Louis. I hope we can reach agreement on this matter. For the record, under Rule 30 of the RCFC, we have an obligation to confer with you in good faith prior to moving to compel answers. This is our attempt to do so.

Mr. Barry was also unable to testify substantively about several of the Thetford properties that were processed in North Carolina. Indeed, during his deposition, on four separate occasions, he testified that someone in the North Carolina Field Office, not him, would be the person to ask about the processing of the properties. Similarly, Mr. Barry was unable to fully testify about the the processing of several Indiana properties and he directed us to speak to someone in the Indiana Field Office. Again, this is our attempt to confer in good faith to see if the Government will agree to produce a witness or witnesses to address these subject matters which were plainly part of the 30(b)(6) notices served on the Government.

Please let me know no later than 5 p.m. tomorrow how you intend to proceed with regard to these subject matters. HJK

**Harry J. Kelly**
Partner

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
P (202) 585-8712
F (202) 585-8080
hkelly@nixonpeabody.com
www.nixonpeabody.com

To ensure compliance with IRS requirements, we inform you that any federal tax advice contained in this communication (including any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (including any attachment).

This email message and any attachments are confidential. If you are not the intended recipient, please immediately reply to the sender and delete the message from your email system. Thank you.

**From:** Kelly, Harry [HKELLY@nixonpeabody.com]
**Sent:** Thursday, December 06, 2007 12:09 PM
**To:** Harrington, David (CIV)
**Subject:** David Harrington

**Attachments:** David Harrington Letter Dated December 5, 2007.PDF
David --

This is the letter that should have accompanied the email message I sent you last night. I had asked for a response about the documents discussed in this letter by 5 p.m. tonight. Under the circumstances, if you could let me know by noontime tomorrow how you intend to proceed, I would appreciate it. Thanks! HJK

**Harry J. Kelly**
Partner

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
P (202) 585-8712
F (202) 585-8080
hkelly@nixonpeabody.com
www.nixonpeabody.com

To ensure compliance with IRS requirements, we inform you that any federal tax advice contained in this communication (including any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (including any attachment).

This email message and any attachments are confidential. If you are not the intended recipient, please immediately reply to the sender and delete the message from your email system. Thank you.

NIXON PEABODY LLP
ATTORNEYS AT LAW

401 9th Street N.W.
Suite 900
Washington, DC 20004-2128
(202) 585-8000
Fax: (202) 585-8080

Harry J. Kelly
Direct Dial: (202) 585-8712
E-Mail: hkelly@nixonpeabody.com

December 5, 2007

**VIA ELECTRONIC MAIL/U.S. POSTAL SERVICE**

Mr. David Harrington
Commercial Litigation Branch, Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, Room 12136
Washington, DC 20530

**Re: Anaheim/Algonquin Litigation**
**-- Document Exceptions**

Dear David:

In your letter to me dated November 15, 2007, you asked me to provide you with a list of the documents that we believe were omitted from the Government's document production, in light of the testimony of the Government's ripeness witnesses in the weeks before Thanksgiving. Before I could do so, I needed to obtain the relevant deposition transcripts, to assist in identifying the documents. The following documents were identified during the depositions I took and should be produced by the Government, if they have not already been produced:

1. **Documents relating of impact of NYC rent stabilization law.** According to Kevin McNeely, he produced two documents that analyzed the impact of certain New York City rent stabilization laws for purposes of performing valuations of properties under the Preservation Statutes. *See* McNeely Transcript at 15 *et seq*. We have not been able to locate Mr. McNeely's documents in the materials produced to us (at least, we have not been able to locate any such documents bearing Mr. McNeely's name). To the extent that the government has not done so, please provide a copy of those documents to us.

2. **Region 9 processing database.** Mr. Vitek described a database that he maintained in his position as Program Analyst in the Region 9 Regional office from 1990 until the regional office was eliminated in May 1995. *See* Vitek Transcript at 47 et seq.

10829060.1

Mr. Vitek claimed that the actual computerized database does not exist, but it appeared that hard copies may be available. Please confirm whether the databases and any other documents related to the database are available.

3. **Materials relating to HUD training sessions.** Mr. Vitek described a number of ELIHPA and LIHPRHA training sessions for HUD employees that took place between the summer of 1992 and August 1994. *See* Vitek Transcript at 191 – 193. Mr. Vitek stated that, although he did not retain them, there were written materials prepared for those sessions. Please confirm whether these materials are available from another source, and if so, provide them to us.

4. **Preservation Division database/Winiarksi documents.** Mr. Winiarski described a database apparently containing records of the processing status of all properties processing under the Preservation Statutes. *See* Winiarski Transcript at 29. Mr. Winiarski stated that he turned over that database when he left the Preservation Division. *Id.* at 34. Please confirm whether this database exists in hard copy or digital form, and if so, provide a copy of the database to us and any other relevant documents. Mr. Winiarski indicated that he did not receive any request to preserve documents but passed all of his documents along to the Multifamily Housing staff when he left the Preservation Division. *Id.* at 61-62. Again, please confirm that responsive documents from these files were provided to us, and if not, please do so.

5. **Franca Hetue documents.** Ms. Hetue indicated that she had also kept a timeline for processing properties at her office and said that she produced that to attorneys in connection with the litigation. *See* Transcript at 89-90. We have been unable to locate that timeline in our files. She also indicated that she received a request to produce files related to the Parc Chateau West property. Although such documents should have been in the office files, they were no longer there. As requested in my prior email to you, please provide copies of responsive materials relating to Parc Chateau West, as well as those relating to the properties that prepaid in Madison, Wisconsin (according to Mr. Winiarski) and St. Louis, Missouri (according to Mr. Mulholland).

It is possible that some of these materials may have been produced but we have been unable to locate them in our files. If you believe they were produced, please provide the Bates ranges to locate them. To the extent that the documents have not been produced, please let us know by 5 p.m. on Thursday, December 6, 2007 whether you intent to supplement your production to provide them to us. In addition to the materials requested here, there were a number of occasions during depositions taken by Ms. Ziarno that you stated on the record that you would provide Plaintiffs with documents and/or information about documents. Please let me know by 5 p.m. on Thursday, December 6, 2007 when you intend to produce those materials.

Please call me if you have any questions.

Very truly yours,

Harry J. Kelly

cc: Alycia A. Ziarno, Esq.

10829060.1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ALGONQUIN HEIGHTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 97-582C |
| v. | ) | Judge Margaret M. Sweeney |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SUPPLEMENTAL RESPONSE TO**
**PLAINTIFFS' SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, provides the following response to plaintiffs' second set of interrogatories. The defendant's response is based upon its current knowledge, information, and belief after making a reasonable inquiry. In responding to plaintiffs' interrogatories, we reserve the right to raise objections at trial or in any subsequent proceeding, including but not limited to objections as to admissibility, authenticity, accuracy, relevance and foundation.

**OBJECTIONS**

Defendant asserts and incorporates by reference the following objections to plaintiffs' interrogatories as though they were set forth in full in each response to each interrogatory:

1. Defendant objects to each interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the work product immunity, the deliberative process privilege, or any other privilege or immunity, including the Privacy Act of 1974, 5 U.S.C. § 552a.

2. Defendant objects to each interrogatory to the extent that it seeks information prepared or developed in anticipation of litigation or for trial when plaintiffs have not shown that

they have substantial need of such materials in the preparation of their case in that plaintiffs are unable, without undue hardship, to obtain the substantial equivalent of such information by other means.

3. Defendant objects to each interrogatory to the extent that it seeks information irrelevant to the issues being litigated in this case and not reasonably calculated to lead to the discovery of admissible evidence.

4. Defendant objects to those interrogatories that in whole or in part seek expert opinions.

5. Defendant objects to each interrogatory that seeks the disclosure of information previously provided by plaintiff to the defendant or to any Government agency.

6. Defendant objects to plaintiffs' interrogatories as beyond the scope of RCFC 33 to the extent that they purport to direct defendant to divulge information beyond what is known by current officers or employees of the Department of Housing and Urban Development ("HUD") or obtainable from documents in the custody or control of HUD.

7. Defendant objects that plaintiffs' interrogatories are vague, overly broad and unduly burdensome in that they fail to specify any particular time or time period.

8. Defendant's objections, stated above, are hereby incorporated by reference to each interrogatory, and shall not be repeated as objections to each definition, instruction and request to which they are applicable. In addition, defendant asserts certain specific objections set forth below. By stating specific objections, defendant does not waive any of the objections incorporated herein.

## INTERROGATORIES

**Interrogatory No. 11:**

For request for admission No. 11 if you respond with anything other than an unqualified admission, describe in detail the basis for your answer, including the name of the property or properties and the reasons supporting the approval.

**Response:**

Defendant objects that this interrogatory is overly broad and unduly burdensome as it seeks information about thousands of HUD-insured and state-insured projects that are not at issue in this litigation. Defendant possesses no database or unified source from which it can be determined which of these projects sought to prepay under the Preservation Statutes and what outcome resulted from the project owner's request to prepay. Subject to and without waiving these objections, defendant responds that on May 3, 1997, in connection with other litigation, the United States filed a declaration that addresses, among other things, prepayment under the Preservation Statutes. This declaration was executed by Joseph Malloy, the then-Deputy Director of the Existing Products/Preservation Division, Office of Multi-Family Housing Development, United States Department of Housing and Urban Development. In his declaration, Mr. Malloy explains that eight projects sought to prepay under ELIHPA and LIHPRHA and that of these eight projects, three were permitted to prepay by HUD. Malloy Decl. ¶ 6. One of the three projects permitted to prepay was the Parc Chateau West project, which submitted a plan of action that satisfied the statutory criteria for prepayment under the Preservation Statutes. A true and correct copy of the Malloy Declaration is attached as Exhibit A.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

DAVID A. HARRINGTON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0465
Fax: (202) 307-0972

November 2, 2007

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 29th day of November 2007, I caused to be delivered by U.S. mail (first class, postage prepaid), Defendant's Supplemental Response to Plaintiffs' Second Set of Interrogatories to:

Harry J. Kelly
Nixon Peabody, LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C. 20004

David Wyatt

**U.S. Department of Justice**

Civil Division

JED:BMS:DHarrington
DJ No. 154-93-655 & 154-97-582

Telephone: (202) 616-0465
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

December 7, 2007

*Via Electronic Mail and U.S. Mail*

Harry J. Kelly, Esq.
Nixon Peabody LLP
401 Ninth St., N.W.
Suite 900
Washington, D.C. 20004

Re: *Anaheim Gardens, et al. v. United States*, No. 93-655C (Fed. Cl.);
*Algonquin Heights, et al. v. United States*, No. 97-582C (Fed. Cl.).

Dear Mr. Kelly:

I received on December 6, 2007, a letter identifying a number of documents that you "believe were omitted from the Government's document production." Letter from Harry Kelly to David A. Harrington at 1 (Dec. 5, 2007). We are looking into this issue. If it is determined that HUD possesses the documents identified in your letter, that the documents were not previously produced and that the documents are responsive to plaintiffs' document requests, the documents will be produced.

Your letter also makes reference to unspecified documents that your colleague, Alycia Ziarno, purportedly requested during plaintiffs' depositions. Id. As you note at the outset of your letter, on November 15, 2007, we requested that you identify all specific document production issues to which you would like a response. See Letter from David A. Harrington to Harry Kelly at 1 (Nov. 15, 2007). To the extent there are any documents in addition to those identified in your December 5, 2007 letter that you believe were omitted from the Government's document production, please identify the documents as soon as possible. Upon receipt of a letter identifying such documents, we will look into the issues that you raise.

Lastly, you inquire about the production of documents relating to the Parc Chateau West project. As you are aware, Parc Chateau West is not one of the plaintiffs in these actions and left the HUD inventory in the mid-1990s. As a result, few documents concerning Parc Chateau West are available. We nevertheless anticipate producing in the near future those available documents that concern the project's prepayment.

Very truly yours,

David A. Harrington
Trial Attorney
Commercial Litigation Branch

**U.S. Department of Justice**

Civil Division

JED:BMS:DHarrington
DJ No. 154-93-655 & 154-97-582

Telephone: (202) 616-0465
Facsimile: (202) 307-0972

*Washington, D.C. 20530*

December 20, 2007

Harry J. Kelly, Esq.
Nixon Peabody LLP
401 Ninth St., N.W.
Suite 900
Washington, D.C. 20004

Re: *Anaheim Gardens, et al. v. United States*, No. 93-655C (Fed. Cl.);
*Algonquin Heights, et al. v. United States*, No. 97-582C (Fed. Cl.).

Dear Mr. Kelly:

During the course of depositions last month, you and your colleague, Alycia Ziarno, raised a number of issues about the production of documents in these matters. To avoid confusion, I requested that you set forth in writing each of issues to which you would like a response.[1] See Letter from David A. Harrington to Harry Kelly at 1 (Nov. 15, 2007).

In letters dated December 5, 2007, and December 13, 2007, you requested that the United States (1) produce two documents relating to the application of New York rent stabilization laws, (2) produce hard copies of a particular Region 9 database, (3) produce materials used for HUD training sessions between 1992 and 1994, (4) confirm that responsive documents were produced from the files of the Multifamily Housing staff, including any material from a database on Mike Winiarski's personal computer, (5) produce a processing timeline used by Franca Hetue, (6) produce documents concerning prepayment by Parc Chateau West, an unidentified property in Madison, Wisconsin and an unidentified property in St. Louis, Missouri, and (7) provide a Bates-stamped copy of May 1988 memorandum from Thomas Demery that was produced at the deposition of Maurice Barry.

We have reviewed your requests and are producing various documents that were located without regard to arguments concerning the limited scope of ripeness discovery and the timeliness of your requests. Previous production has included responsive material from the files

[1] You had already been informed that the United States would be producing responsive documents relating to the Chateau Parc West project to the extent those documents had not been previously produced. Deposition of Maurice Barry at 222 (Nov. 14, 2007). This was subsequently reiterated in writing. Letter from David A. Harrington to Harry Kelly at 1 (Dec. 7, 2007).

of the Multifamily Housing staff. Renewed attempts to find material from the personal computer used by Mr. Winiarski during the 1990s and the database referenced by Mr. Vitek have proved unsuccessful. With respect to your inquiry about projects that prepaid in Madison, Wisconsin and St. Louis, Missouri, we have thus far been unable to identify particular project names. While this is hardly surprising given that the projects would have left the HUD inventory roughly 15 years ago, and that HUD has no database from which this information can be obtained, our efforts are nevertheless continuing. To the extent that plaintiffs possess information that would further these efforts, it should be supplied promptly.

Very truly yours,

David A. Harrington
Trial Attorney
Commercial Litigation Branch

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410-8000

October 5, 1988

OFFICE OF THE ASSISTANT SECRETARY FOR HOUSING-FEDERAL HOUSING COMMISSIONER

Subject: 053-55010-LDP
Southgate Apartments
Raleigh, NC

Dear Owner:

Re: Owners Plan of Action -- Information For Preparation And Submission

Pursuant to your Notice of Intent to Prepay, this will provide further guidance and information that HUD requires to evaluate your proposed Plan of Action.

Preparation and Submission. An original and 3 copies of your Plan of Action is required to be submitted to your local HUD Field Office as follows:

U.S. Department of Housing and Urban Development

Attention: Loan Management Branch Chief

415 North Edgeworth Street

Greensboro, NC 27401

You may also submit the Plan of Action simultaneously to the appropriate State or local government. If you do, please be advised that it is incumbent upon such State or local government to consult with representatives of the tenants of the housing in its review of the Plan of Action.

Contents. Your Plan of Action must include certain descriptions, data, and information to meet statutory and regulatory mandates and to help facilitate HUD's review and approval of an acceptable Plan.

Based on the contents of your Plan, HUD will make a finding(s) that certain conditions are met, agreements made, and situations are considered, evaluated and sufficient in meeting the standards and criteria for prepayment.

The standards and criteria HUD will use to evaluate particular findings for the approval of a prepayment involving termination of all low-income affordability restrictions are enclosed.

In addition, included is a list of various Federal incentives that HUD is authorized to negotiate for those projects where 1) the Owner's Plan of Action involving termination of the low-income affordability restrictions would not be approvable, or 2) the Owner wishes to reconsider prepayment, involving termination, for incentives to maintain the low income nature of the project. Such incentives will be offered only if a) the property has a higher and better use, as determined and shown in the Plan of Action, and b) low-income affordability restrictions are locked-in for the remaining term of the mortgage.

HUD will approve any and all Plans of Action where an Owner meets the criteria and, where all standards and criteria cannot be met, to negotiate in good faith efforts to accommodate our mutual needs and considerations.

I look forward to working with you in a positive and creative partnership to meet the challenges addressing today's housing issues.

Sincerely,

Thomas T. Demery
Assistant Secretary

Enclosures

PLAN OF ACTION

Standards and Criteria

A. Contents: The Plan of Action must include:

1) Descriptions of proposed changes in the status or terms of the mortgage or the regulatory agreement which may include a request for incentives to extend the low income use of the housing;

2) Description of any assistance that could be provided by State or local government agencies, as determined by prior consultation between the owner and the agencies;

3) Description of any proposed changes in the low-income affordability restrictions;

4) Description of any proposed change in ownership related to the Plan of Action or prepayment;

5) An assessment of the effect of the proposed changes on existing tenants, i.e, rent increases, relocation, etc.

If an Owner plans to prepay, the Owner must protect the existing very low, low, and moderate income tenants [in-place] by either:

a) relocating all such tenants to comparable and affordable replacement housing with similar rent structures within the nousing market area; or

b) protecting the low-income affordability of all such tenants by maintaining their current rent structures, as determined by the program economic criteria, for as long as such tenant(s) qualifies under such economic criteria.

The Plan of Action must, therefore, describe the type of protection the Owner plans to provide the tenants, how he/she plans to go about it, where the replacement housing would be, contracts, agreements, etc.

6) A statement of the effect of the proposed changes on the supply of housing affordable to low and very low-income families in the community within which the housing is located and in the housing market area that the housing could reasonably be expected to serve, i.e., pecentage of assisted housing the project represents to the total assisted housing in the market area and/or percentage of housing stock of similar rental structure this housing represents in the market area.

7) An independent market analysis or appraisal, providing unsubsidized market information sufficient in scope to allow HUD to determine market rents and value and market needs in the area for both market and below market tenants and equity of property. Such appraisal shall include, as a minimum, the following:

a) Project identification and information [Complete attached Form HUD-92013, page 1.];

b) A map showing the location of the project and accompanying demographic data, including:

o racial composition of the census tract in which project is located;

o income composition of the census tract in which project is located;

o employment and employment opportunities in the neighborhood, community and market area,

o neighborhood condition and characteristics, including type (residential, commercial, industrial, etc.);

c) Description of the current condition in the overall market for <u>unassisted rental housing</u> in the community and the market area, including:

o types of other rental housing available;

o description and number of units and current vacancy rates;

o size and description of waiting lists; and

o description of comparable rents;

d) Description of the current condition of <u>assisted rental housing</u> in the community and the market area, including:

o description and number of units and current vacancy rates (Section 8, Public Housing, etc.);

o size and description of waiting list; and

o description of comparable rents.

e) Description and data of project tenancy, including:

- o race/ethnicity and gender of household head composition of the project, as of the date of the prepayment request;
- o designation of the project (elderly or nonelderly);
- o income composition of project tenants as of the date of the prepayment request, broken down as follows:

  Very low (50% or below of median)
  Low (50/80% of median)
  Moderate (80/95% of median)
  Market (95% or above median)

- o place/location of employment of project tenants;
- o occupancy rate of the project <u>as of January 1, 1987</u>, broken down as follows:

  Very low (50% or below of median)
  Low (50/80% of median)
  Moderate (80/95% of median)
  Market (95% or above median)

- o Rent roll, unit-by-unit (Complete Format attached)

f) Description and physical condition of the Property;

g) Description and financial condition of the Property:

- o Existing First Mortgage Information

  -Mortgage Balance
  -Interest Rate
  -Monthly Mortgage Payments to Principal and Interest
  -Monthly Payment to MIP
  -Maturity date of the Mortgage

- o Existing second mortgages, subsidy, Flexible Subsidy, Grants, or financial loans/contracts or other financial liens/encumbrances-

  -Outstanding Balance(s)
  -Interest Rate(s)
  -Monthly Payments to Principal and Interest
  -Maturity or Expiration date of loan/grant/contract term

h) the estimated fair market value, based on the project being maintained as residential rental housing, as of the date of the prepayment request.

i) the estimated fair market value, based on the property's highest and best use.

Important --

The independent market analysis or appraisal, incorporating the information requested under 7) above, is to be conducted and provided by an independent, qualified professional, recognized by the real estate appraisal industry. It is to be included in the Owner's Plan of Action, but packaged separately and discretely from the other requested contents, and signed, certified and dated by the Appraiser.

The Owner should also make the Appraiser aware that, in the case of litigation involving the information contained in the market analysis or appraisal, the Appraiser may be called upon as an expert witness on behalf of the Department in any such litigation or court action emanating from any of the information supplied in the market analysis/appraisal.

The cost of the appraisal will be approved by HUD as a project expense if the ultimate result of the Plan of Action extends the low-income character of the project for the remaining term of the mortgage.

8) Copies of Project Operating Statements (Forms HUD-92410) for last three (3) years;

9) Description of any outstanding findings of noncompliance with Title VIII of the Civil Rights Act of 1968; Title VI of the Civil Rights Act of 1964; Executive Order 11063; or with respect to the project Regulatory Agreement.

10) Any other information which would enable the Owner to show and demonstrate that the legislatively mandated criteria can be met.

B. Approval of a Plan of Action that involves termination of low-income affordability restrictions.

Based on the content of the Plan of Action, HUD must make findings that certain conditions and situations are considered and evaluated. A Plan of Action involving termination of low-income affordability restrictions must meet the following

tests before prepayment can be approved:

that-

(a) Implementation of the Plan of Action will not materially increase economic hardship for current very low-income, low-income and moderate income tenants or involuntarily displace current very low-income, low-income and moderate income tenants (except for good cause) where comparable and affordable housing is not readily available. The owner will agree to execute and allow the recordation of use agreements to safeguard current tenants against such adverse effects. The Plan of Action generally will not be considered materially to increase economic hardship for current tenants if:

(1) In the case of a project that is to be converted to cooperative or condominium ownership, very low-income, low-income and moderate income tenants who are unable or unwilling to purchase cooperative shares or condominium units:

- are provided relocation assistance sufficient to secure adequate, comparable replacement housing at rentals not exceeding the levels set forth in paragraph(a)(2) of this section, or
- are allowed to remain as tenants, paying rents not exceeding such levels; and

(2) In the case of a project which will continue as rental housing, the Commissioner determines that comparable and affordable replacement housing is available in the community and that tenants will be provided reasonable relocation assistance.

If the Commissioner determines that comparable and affordable replacement housing is not available, a material increase in economic hardship will not occur when rent contributions for current tenants do not exceed the following percentages:

- 30 percent of 50 percent of median area income, adjusted by family size, for tenants who are very low income tenants at the time of the increase.
- 30 percent of 80 percent of median area income, adjusted by family size, by tenants who are low income tenants at the time of the increase, and
- 30 percent of 95 percent of median area income, adjusted by family size, for tenants who are moderate income tenants at the time of the increase.

The Commissioner may require that increases in rents for some or all of the such current tenants (except for increases made necessary by increased operating costs) allowed under this paragraph be phased in gradually; and

(b)(1) The supply of vacant, comparable housing is sufficient to ensure that the prepayment will not materially affect:

(i) The availability of decent, safe and sanitary housing affordable to low-income and very low-income families in the area that the housing could reasonably be expected to serve;

(ii) The ability of lower income and very low-income families to find decent, safe and sanitary housing near employment opportunities; or

(iii) The housing opportunities of minorities in the community within which the housing is located; or

(2) The Plan of Action has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction in which the housing is located as being in accordance with a State strategy approved by the Commissioner.

It is incumbent upon the Owner to prepare the Plan of Action in such manner as to show and demonstrate that these findings are met.

C. Plan of Action involving prepayment with Restrictions.

Plans of Action not meeting the standards and findings under B., involving termination of low-income affordability restrictions, may be considered for prepayment with restrictions. Each such Plan will be evaluated on its own merits and on a case-by-case basis, through negotiations between the Owner and HUD.

An example of such a situation might be where, through restrictive, binding agreements, such housing would be maintained as housing for the very low-income, low-income, and moderate income tenants for a designated time into the future, notwithstanding a prepayment of the current, existing mortgage. In this case, all low-income affordability restrictions would not be terminated, tenants (current and future) would be protected, and such a prepayment would not materially affect the supply of decent, safe and sanitary housing available to such tenants.

Plans of Actions involving prepayment with restrictions shall clearly and definitively describe and demonstrate the manner and wherewithall to accommodate the legislative mandates, i.e., conventional financing, State or local agency financial intervention, the Low-income Tax Credit Program, etc.

Use Restrictions would be set forth in a document that would (1) be recorded in the appropriate land records, (2) have priority over all mortgage liens, and (3) be enforceable by HUD [and existing and, if applicable, potential tenants].

D. Incentives to Extend Low-Income Use.

Where Plans of Action providing for prepayment of the mortgage cannot be approved, or where an Owner might be induced to extend the low-income use of the project, (within certain market areas) HUD may agree to provide one or more Federal incentives, IF such incentive(s) are determined to be warranted in order to achieve the purposes of the legislation.

<u>Note</u>: such incentives will be offered only if a) the property has a higher and better use, as determined and shown in the Plan of Action, and b) low-income affordability restrictions are locked-in for the remaining term of the mortgage.

<u>Incentives to Extend Low-Income Use</u>, the specific incentives available, and individual procedures and step-by-step instructions for processing, are covered and detailed in Exhibit 6, published under separate cover. The incentives and the probable order in which HUD will consider such incentives are briefly set forth here, as follows:

1) Increased access to residual receipts funds;

For those projects in good physical condition, HUD will consider releasing all or a portion of the project's residual receipts funds.

Access to the Reserve for Replacement funds will not be entertained as a possible inducement given that the General Accounting Office, the Office of Inspector General and HUD audits and reviews all have consistently found that the Reserve for Replacement funds do not have excessive balances to cover project needs.

2) Revisions to the method of calculating equity;

HUD may consider revising the method of calculating equity based on the new appraised value as residential rental housing, minus the total outstanding financial debt and encumbrances, to arrive at a new equity base on which the six percent rate of return on equity is applied.

3) Provision of insurance for an equity loan;

HUD may approve and insure an Equity Loan under Section 241(f). The Owner would be required to seek out a mortgagee to submit an application for processing, and such processing and loan approval would be carried out in a pro forma manner.

4) Provision of Flexible Subsidy assistance;

To provide financial assistance under the Flexible Subsidy Program in order to cure financial difficulties and/or to fund deferred maintenance needs or the provision of capital improvements for the project.

Though the legislative and regulation provisions covering prepayment include capital improvement loans as a possible incentive, the Department does not plan to implement the Capital Improvements Loan Program at this time. However, the need for capital improvements can be met through the Flexible Subsidy Program as stated above.

5) An increase in the allowable distributions, or other measures to increase the rate of return;

Increasing the allowable distribution by increasing the current six percent rate to some higher agreed upon amount.

6) An increase in the rents permitted under an existing Section 8 Contract.

Section 8, in and of itself, is not a real inducement not to prepay, but a funding mechanism to make it possible for the Owner to collect rents from those tenants whose 30 percent of income would not meet the approved rent. Therefore, on a case-by-case basis, subject to Appropriations Act funding, the Department would consider providing some form of Section 8 assistance for those particular tenants.

E. Submission of the Plan of Action.

The Plan of Action should be submitted to HUD only upon completion of all required information. It should meet the requirements in such a manner as to show and demonstrate, as thoroughly and accurately as possible, how the legislative and regulatory mandates are met. Any and all portions of the Plan involving participation or involvement by third parties shall be endorsed, certified or otherwise verified or signed, as appropriate. Specifically, the market analysis or appraisal must be signed and dated by a recognized Appraiser.

Finally, the completed package must be dated and signed by the Project Owner of Record (General Partner) and submitted in triplicate to the HUD Office in the jurisdiction of the subject housing project.

Attachments

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

ALGONQUIN HEIGHTS, ET AL., :

Plaintiffs, :

v. : No. 97-582 C

THE UNITED STATES, : (Judge Robert H. Hodges, Jr.)

Defendant. :

\- - - - - - - - - - - - - - - x

30(b)6 DEPOSITION OF

CARRIAGE HOUSE WEST ASSOCIATES I, LP

BY AND THROUGH ITS DESIGNEE

DEAN DONNELSON

Washington, D.C.

Wednesday, August 15, 2007

9:45 a.m.

Reported by: TRISTAN-JOSEPH, RPR



a5495961-661e-42dc-811a-a660b4479b18

Q. At your time at Eugene B. Glick, did you analyze prepayment by Carriage House West I under the Preservation Statutes?

MS. ZIARNO: Objection.

THE WITNESS: I did not. I don't know what "analyze" means.

BY MS. ELEY:

Q. Did you research the possibility -- did you take any steps to research the possibility of prepayment under the Preservation Statutes on behalf of Carriage House West I Associates?

A. Did I personally look at whether a prepayment mortgage would be permitted?

Q. Did you know whether such research was ever conducted?

A. I do not know whether the research was conducted. If it was done, that would have been done prior to my arrival.

Q. And you, yourself, did not conduct any research?

A. I did not.

Q. Are you aware of -- what conclusions

were reached by Carriage House West I Associates as to the possibility of prepaying the mortgage on Carriage House West I Apartments?

A. I think I already answered that: I don't know.

Q. Okay. Are you aware of any internal discussions at Carriage West I Associates where prepayment as an option was evaluated?

MS. ZIARNO: Objection.

Asked and answered.

You can answer again.

THE WITNESS: I don't know.

BY MS. ELEY:

Q. And are you aware of any such evaluations or considerations having taken place before you began your relationship with Carriage House West I Associates?

MS. ZIARNO: Objection.

Asked and answered.

You may answer.

THE WITNESS: I don't know.

BY MS. ELEY:

Q. Did you ever discuss prepaying the mortgage on Carriage House West I with anyone at HUD?

A. I don't recall.

Q. Let me put that a different way.

Did anyone on behalf of Carriage House West I Associates discuss prepaying the mortgage on Carriage House West I Apartments with anyone at HUD?

MS. ZIARNO: Objection.

When?

BY MS. ELEY:

Q. In any time frame.

A. How would I know?

Q. Okay. And did you ever have any general discussions with anyone at HUD at any time about the possibility of prepayment under the Preservation Statutes?

A. I did not.

Q. Do you know of anyone who had such discussions with HUD who was conducted in any way at Carriage House West I Associates?

MS. ZIARNO: Objection.
BY MS. ELEY:
Q. You may answer.
A. I don't have any personal knowledge, no.
Q. Okay. Did you ever conclude that it would be futile to prepay the HUD-insured mortgage on Carriage House West I Apartments?
MS. ZIARNO: Objection.
THE WITNESS: The conclusion that prepayment was not going to be allowed had been reached prior to the time I got there. So from the time I arrived, the focus was on going after those benefits which were left, which were incentives.
BY MS. ELEY:
Q. Do you know whether Carriage House West I could have prepaid its mortgage under Title II if it had applied to do so?
MS. ZIARNO: Objection.
THE WITNESS: Not my standard.
How would I know?
BY MS. ELEY:
Q. Okay. Do you know whether Carriage

House West I could have prepared its mortgage under Title VI if it applied to do so?

A. The same answer.

MS. ZIARNO: Objection.

THE WITNESS: The same answer.

BY MS. ELEY:

Q. You do not know; is that correct?

A. That's correct.

Q. Okay.

MS. ELEY: I'd like to take a quick break and go off the record, but we may be done.

(Whereupon, at 11:05 a.m., a recess was taken, and the proceedings resumed at 11:18 a.m., this same day.)

MS. ELEY: No further questions.

(Whereupon, at 11:18 a.m., the deposition was concluded.)

(Signature not waived.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

ANAHEIM GARDENS, et al., :

Plaintiffs, :

V. : No. 93-655 C

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - x

ALGONQUIN HEIGHTS, et al.,:

Plaintiffs, :

V. : No. 97-582 C

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - x

Deposition of MAURICE BARRY

Washington, D.C.

Wednesday, November 14, 2007

9:46 a.m.

Volume II

Reported by: TRISTAN-JOSEPH, RPR



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

being Exhibit 27.

(Witness reviews document.)

BY MS. ZIARNO:

Q. I think I have a pending question which is --

A. Oh, I'm sorry.

Q. -- do either of these refresh your recollection as to the final endorsement date for Coleridge Road Apartments?

A. From this circle date at the bottom, it appears that it's finally been endorsed in July 25th of 1972.

Q. And that's Exhibit 27 you're pointing to?

A. I'm sorry. Hold on a minute.

Exhibit 27.

Q. And so that final endorsement date was July 25, 1972?

A. July 25, 1972.

Q. I'm sorry. Correct.

Does that help you analyze or figure out or explain the delays --

A. Well --

Q. -- that we've been talking about between the receipt of the initial NOI for Coleridge Road and its distribution?

A. -- if you add twenty years to that, you would get to July of 1992. And then, under Title II, they would be eligible to submit their Notice of Intent one year prior, which would be in July of '91. So it appears that their Initial Notice of Intent that was submitted was submitted too early.

Q. That still doesn't, for me, though explain -- maybe I'm missing something.

If the Initial Notice of Intent was dated 12/26/90, and they were eligible, and that's when HUD received that Notice, and they were eligible to proceed on July 25th of 1991, this still sat in the file somewhere until June 15th of 1992 --

A. But --

Q. -- passed its eligibility date for filing.

A. But I think then the letter talks about the lack of a -- possibly a proper Notice of Intent, this July 17, '92, letter to Richard Urban at Thetford Properties indicating that they need -- even though the process was begun under an Election to Proceed, that they still needed a Notice of Intent to properly, you know, have a proper record of a Plan of Action process for this particular property Coleridge Road.

Q. Well, if the December 1990 Notice of Intent was wasn't proper, why was that distributed in 1992?

Why wouldn't they have asked for a proper Notice of Intent prior to that?

MR. HARRINGTON: Objection.

Lack of foundation.

THE WITNESS: That, I don't know.

BY MS. ZIARNO:

Q. And so we still don't know why between July 25th of 1991 and June 15th of 1992 the Notice of Intent was not distributed to EMAS.

MR. HARRINGTON: Objection.



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

Lack of foundation.

Mischaracterizes the documents.

You can answer.

THE WITNESS: I guess I'd have to go back to this letter that, even though the processing appeared to take place under the Election to Proceed, there was still a requirement for a submission of a proper Notice of Intent.

BY MS. ZIARNO:

Q. Again, I'm confused.

You wanted to know the eligibility date for this property thinking that may have had an impact on why --

A. Delayed processing.

Q. -- this was delayed.

MR. HARRINGTON: Go ahead and wait until their a question --

THE WITNESS: Okay. I'm sorry.

MR. HARRINGTON: -- Mr. Barry.

THE WITNESS: I'm sorry.

BY MS. ZIARNO:

Q. And so we've determined that they were



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

eligible to file a Notice of Intent based on your calculation as of July 25, 1991. Right?

A. That's correct.

Q. Okay. So when they filed in December of 1990, arguably they filed early that Notice of Intent. Correct?

A. Correct.

Q. Okay. So then why on July 26, 1991, after they were eligible, was that Notice of Intent not circulated to the different branches?

A. Because it was -- I believe it was dated December 26th of 1990. It wasn't a proper Notice of Intent.

Q. But they then distributed it in June of '92. Why not ask for a proper Notice of Intent in July of '91?

We still have a year lag here.

MR. HARRINGTON: Objection.

Lack of foundation.

Mischaracterizes the documents.

You can go ahead and answer the question, if you can, Mr. Barry?



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

THE WITNESS: I guess what I'm -- what I'm assuming is that they proceeded under the Notice of Election to proceed and sent that document around as the Initial Notice of Intent.

And then, when this July 17th, '92, letter goes out, there's acknowledging receipt of the Notice of Election to Proceed but then they ask for a copy of a Notice of Intent.

BY MS. ZIARNO:

Q. Why would HUD have not asked for a different Notice of Intent in July of 1991?

A. That, I don't know.

Q. And to find that out we would have to -- I think you've testified, find somebody in the North Carolina Field Office who could testify about this property?

A. I would say so, yes.

Q. Is there anything further you can tell me about the processing of Coleridge Road Apartments?

MR. HARRINGTON: Objection. Vague.

BY MS. ZIARNO:



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

Q. You can answer.

A. I'm not a hundred percent sure I know what you're asking.

Q. Is there anything else you can tell me, other than what we've discussed so far today, about the processing of Coleridge Road Apartments?

A. No.

Q. And I just want to clarify something too that you just said.

You stated that you're assuming they distributed the Notice of Election to Proceed on June 15, 1992.

According to this prepayment log, Exhibit 16, it doesn't say that it distributed a Notice of Election to Proceed, correct?

It stated that distributed a Notice of Intent?

A. But I'm just looking at the receipt date of the Election to Proceed and then when the documents are submitted to EMAS, FH&EO, Val., and A&E.

I'm assuming that there was possibly a



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

mistake in sending those documents and assuming that that was the Initial Notice of Intent, and what they were supposed to do at that point in time.

Q. So that -- am I understanding you to say then that where this states that the date Initial NOI distributed it to EMAS, you're reading that to mean that it was the date that the NOE, the Notice of Election to Proceed was distributed to EMAS?

A. Just based on the dates. I'm looking at the date of the Election to Proceed, in which that was received on June 11th of '92. And, you know, on June 15th, you know, a request is made from EMAS, FH&EO, Val., and A&E to perform their functions under the Notice of Intent at that time.

Q. Okay. I refer you back to Exhibit 23.

This is Ms. Briscoe's memo dated 6/15/92, which we've already established was tied to the prepayment log.

Where in that memoranda to EMAS and FH&EO does it state that she's distributing a Notice of Election to proceed rather than a Notice



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

to Intent to Proceed?

MR. HARRINGTON: Objection. Mischaracterizes the name of the documents.

MS. ZIARNO: I'm just reading what she has in her documents, asking if this is, in fact, what he's referring to. That's what she called it.

THE WITNESS: Well, she's calling it a Notice of Intent to Proceed.

BY MS. ZIARNO:

Q. Right. So is that why you think that maybe she was distributing the Notice of Election to Proceed and not the Notice of Intent?

A. That's -- that's -- that's right.

Q. That's why we're asking you these questions, to figure this stuff out.

A. Okay.

Q. We still don't know why in July of '91 HUD would not have asked for a, as you put it, proper Notice of Intent on this property. Right?

A. Yeah, we still don't know that.

Q. Okay. Under the guidelines that are

published, was it proper for the North Carolina office to not do anything with the Initial Notice of Intent upon receipt?

MR. HARRINGTON: Objection.
Assumes facts not in evidence.
You can go ahead and answer it.

THE WITNESS: I can't tell from those documents what was done and what wasn't done. I don't know.

BY MS. ZIARNO:

Q. What documents would you need to be able to answer that question?

A. I'm not sure unless somebody kept, you know, a more in-depth log than this log here. I don't know what else you could use.

Q. Let's try it this way.
Based on your knowledge of the processing guidelines for Title II, if you received a Notice of Intent in 1990, what should have happened with that Notice of Intent upon receipt?

A. You would have had to become the process for, you know, dealing with Notices of Intent.



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

Q. And what was that process?

A. The guidelines as, you know, as outlined in 90-98 and 91 -- well, 91-29 didn't exist at that point in time, but you would have to follow the procedures as outlined in the Notices.

Q. And what did you do with the Notice under those procedures?

A. The Notice would be transmitted to each of the appropriate divisions.

Q. What happened if you received a Notice of Intent that you thought was filed prematurely?

A. Well, you'd notify the Owner of a premature submission of a Notice of Intent.

Q. Give him or her instructions as to what you do next. Correct?

A. That's correct.

Q. Did that happen with respect to Coleridge based on the documents that you reviewed here today?

A. I don't know that it didn't. But based on the documents, I would say no.

Q. Is there any guidance that you're aware

of under Title II that permitted HUD to do nothing within Notice of Intent to proceed that was filed?

MR. HARRINGTON: Objection. It's vague.

THE WITNESS: I'm not aware of any.

BY MS. ZIARNO:

Q. Let's go back to Exhibit 19, which is Southgate Apartments.

MS. ZIARNO: Let's mark Exhibit 28.

(Barry Deposition Exhibit No. 28 was marked for Identification.)

(Witness reviews document.)

BY MS. ZIARNO:

Q. Is there anything in this document that helps you know what the date of eligibility for this project would be or date of final endorsement, I'm sorry?

A. I don't see it, no.

Q. Okay.

MR. HARRINGTON: Do we have the Deed Of Trust Note for Southgate?

Exhibit 28 is the Deed Of Trust.

MS. ZIARNO: Yeah, apparently not right

handy. And, frankly --

MR. HARRINGTON: Okay.

MS. ZIARNO: -- we made to headway with it the last time, so I'm not prepared to break to go look for it again.

We'll move --

MR. HARRINGTON: That's fine.

MS. ZIARNO: -- to another exhibit.

Twenty-nine.

(Barry Deposition Exhibit No. 29 was marked for Identification.)

(Witness reviews document.)

BY MS. ZIARNO:

Q. Have you had a chance to review Exhibit 29?

A. Yes.

Q. Do you recognize that's it's a letter dated January 28, 1991, from the Greensboro, North Carolina Field Office to Mr. Richard A. Urban?

A. Yes.

Q. And it addresses Southgate Apartments. Correct?



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

A. Correct.
Q. When we were looking at Exhibit 19 earlier, that was the Southgate Apartments Prepayment Log. It indicated the receipt of the date of the Initial NOI was 12/26/90. Correct?
A. Correct.
Q. Is this letter in response to the receipt of that NOI?
A. Do you also have a copy of the NOI?
Q. I don't.
I've asked you, If this Exhibit 29 is a response to the receipt of the 12/26/1990 NOI?
A. I guess I'm confused in the sense that the first -- the first sentence says, We've received your notification of Intent to Prepay the subject mortgage."
And here it says, Receipt date of Initial Notice of Intent," which I believe is your question.
Q. If you refer back to Exhibit 20, it is the Intent to Prepay mortgage form for Southgate Apartments, which I showed you earlier.



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

A. Okay, here it is here.

(Witness reviews document.)

A. I still don't know that for sure because the date stamped here is September 26th and it looks like 1995 but I can't be sure. I don't know exactly what that says.

Q. This form was not used in 1995, was it --

A. No, I know.

Q. -- Exhibit 20?

A. I'm just saying that that's what it's dated.

Q. You don't agree that --

A. You're trying to match -- you're trying to match -- you're trying to get me to match these up, and I'm not a hundred percent sure that I can do that, because they make reference to different things.

This makes reference to an Initial Notice of Intent; this makes notice to an Intent to prepay. This is called an Intent to Prepay the mortgage form, but it's dated September 26th, and I



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

can't tell the year.

Q. Who would be able to explain the processing of this particular project?

A. Other than the Field, I don't know.

Q. So even with these documents that we've given you today, you cannot explain, on behalf of the Agency, the processing for this property?

MR. HARRINGTON: I object that this is a selected portion of the documents relating to Southgate. And I object on that basis.

Now can you answer the question.

THE WITNESS: I can't answer the question.

BY MS. ZIARNO:

Q. So we would have to go to somebody in the North Carolina Field Office to be able to answer that question?

A. If someone was still there who could answer it, yeah, yes.

Q. What about the files?

Shouldn't those still be in North Carolina?

MR. HARRINGTON: Objection.

The files from North Carolina have been produced in this action.

You can answer the question, Mr. Barry.

THE WITNESS: If -- you know, you could look at the file.

BY MS. ZIARNO:

Q. If this were all that was in the file with respect to the Intent to Prepay or the Notice of Intent, how we would figure out what HUD did with the processing of this project?

MR. HARRINGTON: Object to the foundation of the question.

This is not all that was in the file.

BY MS. ZIARNO:

Q. I said with respect to the Notice of Intent or an Intent to Prepay.

A. I'm not sure.

Q. Looking at the January 20, 1991, letter, marked as Exhibit 29, do you see anywhere in there where it suggest to Mr. Urban that there was anything deficient with the Intent to Prepay the



3bd498e0-10ba-49cd-bc2b-3fedd7ae0afe

UNITED STATES COURT OF FEDERAL CLAIMS

ANAHEIM GARDENS, et al., )
Plaintiffs, )
v. ) No. 93-655C
THE UNITED STATES, )
Defendant. )
ALGONQUIN HEIGHTS, et al., )
Plaintiffs, )
v. ) No. 97-582C
THE UNITED STATES, )
Defendant. )

\- - - - - - - - - - -

DEPOSITION OF FRANCA GUIDA HETUE

Wednesday, November 14, 2007

Washington, D.C.

Reported by: Cheryl A. Lord, RPR, CRR



2b32cb86-35c1-4f28-8b97-57fbceb64358

A. Right.
Q. And why would that be relevant for purposes of their ability to proceed with Title II processing?
A. See, I don't recall. That's part of the process, and I just don't remember at this point.
Q. Do you remember taking any action as a result of receiving this letter?
A. No, I don't.
MR. KELLY: Exhibit 20.
\- - -
(Exhibit Hetue 20 was marked for identification.)
\- - -
(Pause.)
BY MR. KELLY:
Q. Have you had an opportunity to look at the memorandum?
(Pause.)
A. Yes.
BY MR. KELLY:
Q. This is a memorandum for file from Franca Hetue, subject, need of 9607.

Is this something that would have been typed, or was this an email?
Do you know?
A. It would have been typed.
Q. Did you prepare this document?
A. Yes.
Q. Do you remember preparing this memorandum in February of 1995?
A. No.
Q. It indicates that you spoke with Dean Donnelson from Gene Glick Management Company in reference to Carriage House of Elkhart, Carriage House of Mishawaka 1 and 2 on February 14, 1995. Expressed acknowledgement of the letter regarding starting Title II processing on the above properties.
Was this conversation that you had with Mr. Donnelson as a result of the receipt of the letter from Beverly Jackson that was marked as exhibit 19?
A. Appears to be, yes.
Q. It says: Also informed him that we would need a 9607 B notice of intent to elect Title II.
What is that referring to?

A. It is another title of -- another notice of intent apparently. I don't recall.
Q. Why would a 9607 B notice of intent to elect Title II be required from the owner at this point?
A. I don't remember.
Q. It says in the next paragraph: This information was obtained per Mike Winiarski at HQ preservation.
Is this the Mike Winiarski that we referred to earlier?
A. Yes.
Q. Why did you call Mr. Winiarski on this question?
What prompted you to make a call to him?
A. I don't remember.
Q. If you could look back at exhibit 18, the second page. This is not for -- this is a notice of election to proceed, Title II or Title VI, and it was filed on behalf of Carriage House North Associates, not Carriage House of Elkhart or Carriage House of Mishawaka. But it is a form 9610, as I understand it.


2b32cb86-35c1-4f28-8b97-57fbceb64358