053-3561
Market North II
analysis #20

PURCHASE AGREEMENT

THIS AGREEMENT, made this 15th day of June, 1983, by each of the undersigned Sellers, hereinafter sometimes collectively referred to as "Seller" solely for the convenience of this Purchase Agreement, with THETFORD PROPERTIES III, a Virginia limited partnership, hereinafter referred to as "Buyer".

W I T N E S S E T H :

For and in consideration of the mutual covenants contained herein and other good and valuable consideration, each Seller hereby agrees to sell and Buyer hereby agrees to buy, upon the terms and subject to the conditions herein provided, all those certain tracts and parcels of real estate located in the State of North Carolina, more particularly described on Exhibit A attached hereto and made a part hereof, which are owned respectively by each Seller.

Together with all buildings and improvements thereon all rights, ways, tenements, hereditaments, riparian rights, fixtures, equipment and appurtenances thereunto belonging or in anywise appertaining; all rights of Seller in and to any public or private streets, ways or thoroughfares abutting the land described above; all heating, plumbing appliances and equipment, and all refrigerators, ranges, ovens, signs, supplies, maintenance equipment and inventories or replacement parts, which together with the land described above are collectively referred to hereafter with respect to the property owned by each Seller as "the Property".

This Purchase Agreement is made by and between each respective Seller, independently with Buyer upon the following terms and conditions:

1. Purchase Price. The aggregate purchase price for the Property shall be comprised of cash of not less than Five Million

Five Hundred Thousand Dollars ($5,500,000.00) and the Seller taking title to the Property subject to the mortgages and/or deeds of trust securing the Mortgage Notes, as hereinafter defined and described in Paragraph 4(f) hereof. (The aggregate purchase price is allocated among the various projects constituting the Property in accordance with the allocation set forth in Exhibit B). The aggregate purchase price shall therefore be a function of the exact principal balance of the Mortgage Notes, which as of July 1, 1983 is anticipated to have an aggregate principal balance of approximately Fifteen Million Six Hundred Thousand Dollars ($15,600,000.00). Accordingly if the aggregate principal balance of the Mortgage Notes is $15,600,000.00 at settlement, the purchase price shall be $21,100,000.00. The purchase price shall be determined and payable as follows:

(a) Five Thousand Dollars ($5,000.00) has been paid as a deposit as of this date to be held pursuant to Paragraph 9 hereof and applied to the purchase price at settlement.

(b) Five Million Four Hundred Ninety-Five Thousand Dollars ($5,495,000.00), shall be paid to Seller at settlement in cash or by cashier's or certified check.

(c) The balance of the purchase price shall be paid by Buyer's taking title to the Property subject to the mortgages and/or deeds of trust securing the Mortgage Notes.

2. <u>Survey</u>. Seller shall deliver to Buyer within ten (10) days hereof "as built" metes and bounds surveys of the Property which have previously been accepted by the mortgagees of the Property.

3. <u>Settlement</u>. Settlement shall be made at the offices of Seller's attorney on the later of (a) July 1, 1983 or (b) thirty (30) days after Seller has delivered to Buyer all the TPA Approvals, as hereinafter defined, required to be delivered pursuant to Paragraph 4(g) but in no event later than January 10,

1984. [illegible] Real estate taxes for the current period shall be prorated at settlement, and if such taxes are not ascertainable on the date of settlement, such proration shall be based on the taxes for the last ascertainable year. Water, sewer and other utility charges, rents, interest payable on the Mortgage Notes and all other apportionable cash expense or revenue items which are attributable to ownership of the Property shall be prorated as of the date of settlement. Seller shall pay all transfer taxes and preparation expenses for the deeds. All other closing and recording expenses shall be paid by Buyer including any transfer fees and all other costs of securing any approvals from FHA, as hereinafter defined, or from any holder of any Mortgage Note. Any counsel retained to secure such approvals shall be retained and paid by Buyer. The balance in any replacement reserve account required by FHA or any holder of any Mortgage Note shall be transferred to Buyer upon payment of the purchase price at settlement at no additional cost to Buyer. Full possession of the Property, except as herein otherwise provided, is to be delivered at settlement. Any and all escrow accounts for taxes, casualty insurance and mortgage insurance shall be transferred to Buyer at settlement but Buyer shall pay Seller the exact dollar equivalent of the balance thereof.

At settlement, the Seller shall convey to the Buyer marketable title in fee simple to the Property by good and sufficient deeds with General Warranty and English covenants of Title and with release of dower, homestead, curtesy and other rights of spouses, if any (and, if the grantor is a corporation, trust or partnership, with all necessary corporate, trust or partnership authority), subject only to the deeds of trust and/or mortgages securing the Mortgage Notes and to utility easements and restrictions, leases or other encumbrances and matters of

record or reflected in an owner's policy of title insurance and subject to general real estate taxes not yet due and payable. Seller shall at settlement assign to Buyer the names of the several apartment projects constituting the Property.

4. Conditions Precedent to Settlement/Warranties of Seller. The obligations of Buyer under this Purchase Agreement are subject to satisfaction (or waiver) of the following conditions or actions on or before the settlement date, or Buyer at its option may elect to terminate this Purchase Agreement, whereupon Buyer shall be entitled to the immediate return of all monies paid to Seller toward the purchase of the Property under or by virtue of this Purchase Agreement. Except as otherwise expressly stated, each such condition or action is intended to benefit or protect Buyer and satisfaction or waiver thereof shall be at the insistence or option of Buyer with settlement and closing constituting acknowledgment or waiver (as the case may be) of satisfaction of all such conditions. Provisions contained in this Paragraph 4 shall constitute representations and warranties solely to the extent expressly stated and identified to be representations or warranties by use of the term "represent" and/or "warrant" in the subparagraphs hereof and such provisions shall survive settlement according to the terms of such representations and/or warranties.

(a) Governmental Regulations. All governmental regulations affecting and/or relating to construction and/or the present use of the Property imposed by any governmental body, government or agency having jurisdiction (including without limitation, local zoning ordinances, subdivision regulations, health and environmental regulations and building codes, and all such laws and regulations of the State of North Carolina) all such governmental regulations being in this paragraph collectively called ("the regulations") finally in effect on the date of settlement shall permit Seller's present use and

occupancy of the improvements and the continuation of such use and occupancy by Buyer after settlement.

Neither Seller nor, to Seller's knowledge any predecessor in title has received from any authority any notices or complaints of non-compliance that have not been remedied or otherwise resolved.

Seller shall deliver to Buyer any occupancy or other permits in Seller's possession which may be required by virtue of any applicable legal requirements for Seller's present occupancy and use of the Property and the continuation of such use and occupancy by Buyer after settlement.

(b) Utilities. There shall be available at the Property, of sufficient capacity to serve the improvements located thereon, (i) public water supply and (ii) public sanitary and storm sewer service. Such utilities shall currently serve the improvements on the Property by virtue of utility connections that are completely installed and paid for, and Buyer shall be entitled to use such utilities subject only to the usual usage charges and regulations imposed by governmental authorities.

(c) Litigation. There shall be no judicial, quasi-judicial, administrative or other orders, injunctions or pending proceedings which preclude or interfere or would preclude or interfere with the furnishing of water, sewer or other utility service to the Property or which would otherwise interfere with the present use of the Property by Seller and the continuation of such use by Buyer after settlement.

(d) Access. There shall be adequate direct access from the Property to all roads adjoining the Property which roads shall be dedicated public roads maintained by the state, cities or counties. There shall be no regulations, ruling or restriction of the highway commission or other governmental agency which would prevent such adequate direct access from the Property.

(e) Title. Buyer shall obtain at its cost from Lawyers Title Insurance Corporation or other title insurance company acceptable to Buyer a commitment for title insurance in the amount of the purchase price with respect to the tracts, parcels or lots comprising the Property. Such commitment and the survey referred to above shall reveal no restrictive covenants, easements, limitations of access or state of facts that would materially impair marketability or the full use and occupancy of the Property for Seller's present purposes and the continuation of such purposes by Buyer after settlement. If the commitment reveals defects which materially impairs marketability of title, Seller shall exercise reasonable efforts to cause such defects to be cured, provided however if Seller shall be unable to cause such defects to be cured despite the use of reasonable efforts, then at Buyer's option any payments toward the purchase of the Property made under this Purchase Agreement shall be forthwith refunded and all other obligations of all parties hereto shall cease and this Purchase Agreement shall be void without recourse to the parties hereto. Buyer shall have the election to accept such title as Seller can deliver to the Property and to pay therefor the purchase price without deduction, in which case Seller shall convey such title.

(f) Mortgage Notes. The notes secured by the first mortgages and/or deeds of trust on the Property (the "Mortgage Notes") are direct reduction notes payable and presently held by the parties substantially as specified on Exhibit C. The dates, terms, original principal balances, current principal balances, interest rates and monthly payment amounts are specified on Exhibit C. The obligations of Buyer hereunder are further conditioned upon the information on Exhibit C being substantially true and upon all the following conditions and warranties (where expressly so stated), with respect to the Mortgage Notes existing and being true at the time of settlement:

(i) Buyer being able to take title to the Property subject to the mortgages and/or deeds of trust securing said Mortgage Notes without payment of any penalty, premium or assumption fee;

(ii) The transfer of the Property to Buyer not giving rise to a right on the part of any of the holders of the Mortgage Notes to call the Mortgage Notes or raise the interest rates of any of the Mortgage Notes;

(iii) There being an aggregate balance due on the Mortgage Notes of not more than $15,700,000.00 and not less than $15,500,000 as of July 1, 1983; and

(iv) Seller expressly warrants that the Mortgage Notes and mortgages and/or deeds of trust securing them will not be in default at settlement and that the principal balances and accrued interest owed under the Mortgage Notes as reflected in the settlement statement to be executed by Seller at settlement will be true and correct statements of such principal balances and accrued interest.

(v) Seller expressly warrants that the copies of the Mortgage Notes and mortgages and/or deeds of trust securing Mortgage Notes previously delivered to Buyer by Seller are complete and accurate copies of the originals and that there have been no material changes, deletions or additions to said documents. The warranties set forth in subparagraphs (iv) and (v) shall survive settlement hereunder. Any damages owed to Buyer by Seller by virtue of the breach of any warranty contained in subparagraphs (iv) and (v) shall in no event exceed the amount of the purchase price allocable to the project(s) (as set forth on Exhibit B) as to which the warranty was breached. The warranties contained in subparagraph (iv) shall expire in respect to specific Mortgage Notes and mortgages and/or deeds of trust securing Mortgage Notes simultaneously with the delivery of an estoppel letter from the holders of such specific Mortgage Notes

stating the information set forth in subparagraph (vii) below. In addition, Seller shall not be liable for the breach of any warranty contained in subparagraphs (iv) and (v) unless Buyer sends to Seller written notice of such breach no later than one (1) year after settlement hereunder.

(vi) Prompt payment by Seller of all regular payments of the Mortgage Notes (including any tax escrow or other charges regularly paid with regard to the Mortgage Notes) during the period from this date until date of settlement hereunder.

(vii) Acquisition by Buyer at Buyer's expense of estoppel letters from the holders of the Mortgage Notes dated as of a date not more than fifteen (15) days prior to settlement, and in form and content reasonably satisfactory to Buyer, including without limitation the following information:

(aa) The unpaid principal balances;

(bb) The last dates to which interest has been paid;

(cc) The amounts, if any, held on deposit toward real estate taxes;

(dd) The maturity dates of the Mortgage Notes, and the current rates of interest;

(ee) Statements that, to the knowledge of the holders of the Mortgage Notes, no default exists under the Mortgage Notes or the mortgages and/or the deeds of trust securing them;

(ff) A waiver by the holders of the Mortgage Notes of rights, if any, to accelerate the debts because of the sale and transfer contemplated herein

(g) Regulatory Agreement/TPA Approvals. The Property is subject to the regulatory agreements with the Federal Housing Administration of the U.S. Department of Housing and Urban Development ("FHA") described on Exhibit D attached hereto and

made a part hereof (the "Regulatory Agreements"). The obligations of Buyer hereunder are conditioned upon the information on Exhibit D being substantially true and upon all the following conditions and warranties (where expressly stated), with respect to FHA and the Regulatory Agreements being fulfilled and true:

(i) Seller expressly warrants that Seller is not now and as of settlement will not be in material default under any agreements with FHA relating to the Property, including without limitation the Regulatory Agreements. This warranty shall survive settlement hereunder. Any damages owed to Buyer by Seller by virtue of the breach of this warranty shall in no event exceed the amount of the purchase price allocable to the project(s) (as set forth on Exhibit B) as to which the warranty is breached; and

(ii) Acquisition by Buyer of all the Approvals of Transfer of Physical Assets ("TPA Approvals") required for approval of the transactions contemplated herein by virtue of the Regulatory Agreements and FHA regulation of the Property and any necessary approvals for the assignment of the Residual Receipts Notes pertaining to the Property held by Seller or principals of Seller, as set forth on Exhibit E (the "Residual Receipts Notes"). Seller and Buyer agree that the foregoing condition of this subparagraph (ii) shall also be a condition precedent to the obligations of Seller to sell the Property. Seller warrants (which warranty shall survive settlement) that the information set forth in Exhibit E is accurate and complete. The Residual Receipts Notes shall be assigned to Buyer or the nominee of Buyer at settlement in consideration for the payment to the holders of the Residual Receipts Notes of an amount mutually agreed upon by Buyer and Seller, which shall not exceed $750,000. The cash portion of the purchase price payable to Seller from the Property

shall be reduced by the amount of consideration paid for the assignment of the Residual Receipts Notes; and

(h) Condition of Property. The Property shall be in substantially the same condition as it is now, reasonable use and wear excepted and shall be in material compliance with all instruments of record. Actions by Buyer taken under paragraph 10 below shall be an exception to this condition.

(i) Leases and Tenancies. (i) Except for the tenancies created by the leases referenced in Paragraph 5 below, there are not now and will not be at settlement any tenancies or rights to tenancies affecting or relating to any part of the Property;

(ii) At settlement, Seller will deliver to Buyer a correct rent roll for the Property which specifies all leases affecting the Property by unit, the terms of the leases, the rent payable thereunder and whether there is any default in the payment of rent thereunder. At settlement, Seller will warrant the information in such rent roll to be accurate and complete in all material respects.

(iii) As of the time of settlement there will not be any assignment, mortgage or pledge of or other encumbrance upon the landlord's interest in or under any of the leases or tenancies concerning the Property except an assignment, mortgage or pledge or any other encumbrance to secure the Mortgage Notes;

(iv) From the date hereof up to and including the time of settlement, Seller shall not have taken any action with respect to such leases except in the ordinary course of business without written approval of Buyer. In the event Seller shall desire to take action other than in the ordinary course of business, Seller shall give written notice to Buyer concerning the need for such action. Buyer shall respond to Seller within seven days after receipt of such notice with instructions to

Seller as to the course of action which Buyer wants Seller to follow.

(v) Seller shall have substantially performed and observed, all obligations covenants and conditions as to such leases and tenancies to be performed and observed by the Seller thereunder to and including settlement which would be effective after settlement and Seller shall have granted no concessions with respect to payment of rent which would be effective after settlement which have not been disclosed to and approved by Buyer; and

(vi) At the time of settlement Seller will deliver to Buyer:

(aa) The cash equivalent to all security deposits, key deposits or other deposits of a similar nature held or required to be held by Seller, together with a schedule of the same by tenant.

(bb) An assignment of all current leases, such assignment to be in a form which is reasonably satisfactory to counsel for Buyer and Seller.

(cc) Original copies of all executed leases covering all or any part of the Property.

(j) No Outstanding Contracts. Seller hereby expressly warrants and represents to Buyer and will represent and warrant to Buyer at settlement that it has no knowledge or reason to know of any outstanding contracts affecting any of the Property or any use of the Property to which Buyer must take subject at settlement, except for (a) the current management agreement with North Hills, Inc., a copy of which is attached as Exhibit D to which Buyer covenants to take subject and (b) the leases and tenancies and Regulatory Agreements deeds of trust, mortgages and other contracts as may be expressly referred to herein. This warranty and representation shall survive settlement hereunder. Any damages owed to Seller by virtue of

the inaccuracy or breach of any representation or warranty under this subparagraph shall in no event exceed the purchase price allocable to the project in respect to the representation and warranty as to which the representation and/or warranty was inaccurate or breached.

(k) Mechanic's Liens. At settlement, no work shall have been done on the Property which could give rise to any mechanic's or materialmen's liens, and no contracts shall be outstanding or in effect with respect to the doing of such work. Seller agrees to discharge any such obligations prior to settlement and to execute an affidavit as to the facts stated in this paragraph to the title insurance company issuing the owner's title insurance policy to Buyer.

5. Financial Statements. Seller has furnished to Buyer (i) unaudited financial statements as of April 30, 1983 with respect to the rent receipts and operating expenses of the Property and (ii) a current rent roll from the Property which accurately sets forth the current tenancies at the Property, giving for each lease the apartment unit, expiration date of the lease, the rent payable and now being collected under the lease, and any security deposit now being held pursuant to the lease. Seller will also make available to Buyer, at Buyer's request, true, accurate and complete copies of all outstanding leases relating to the Property or any part thereof. All books, records, journals, accounts and other documents relating directly to the Property of every nature whatsoever to the extent held by Seller shall be made available to Buyer promptly upon execution of this Agreement for inspection prior to settlement and shall be delivered to Buyer on or at settlement. Buyer shall have fifteen (15) days from the date hereof to inspect such documents. If the results of such inspection shall be such that the Property is unacceptable to Buyer, in Buyer's sole discretion then Buyer may elect to cancel this Purchase Agreement by notice in writing to

Seller provided such notice is sent no later than fifteen (15) days from the execution by all parties of this Purchase Agreement. If Buyer elects to cancel this Purchase Agreement pursuant to the provisions of this paragraph, then all payments made by Buyer toward the purchase price of the Property hereunder shall be refunded promptly and all other obligations of the parties hereto shall cease and this Purchase Agreement thereupon shall be void and without further recourse to the parties hereto. The financial statements to be furnished to Buyer by Seller pursuant hereto, with respect to the rent receipts and operating expenses of the Property are now and will be at settlement true, correct, and complete in all material respects.

6. (INTENTIONALLY OMITTED)

7. Assignment of Guaranties, Etc. At settlement (and thereafter if requested by Buyer) Seller shall deliver to Buyer one or more instruments of assignment, in a form which is reasonably satisfactory to counsel for Buyer, assigning transferring and setting over to Buyer (without recourse, however, to Seller) all rights against, or guaranties or warranties by, third parties with respect to the construction of the buildings or improvements on the Property or the furnishing installation or servicing of equipment or machinery therein, including but not limited to heating plants, air conditioning units, elevators, hot water heaters, sprinkler systems, alarm systems, windows, doors, roofs or other items of the same or different nature.

8. Personal Property Included in Sale. At settlement Seller shall deliver a warranty Bill of Sale, in a form which is reasonably satisfactory to Buyer's counsel, conveying to the grantee good and clear marketable title, free from all encumbrances except security instruments securing the Mortgage Notes, to the personal property referred to herein which is to be conveyed to Buyer under this Purchase Agreement as part of the

consideration for the purchase price as allocated in Exhibit __ attached hereto and incorporated herein.

9. Deposit in Escrow. All deposits made hereunder shall be held in escrow by counsel of Buyer, McGuire, Woods & Battle, 1400 Ross Building, Richmond, Virginia, subject to the terms of this Purchase Agreement and shall be duly accounted for at settlement. If Buyer shall fail to fulfill Buyer's obligations hereunder, all deposits made hereunder by Buyer shall be immediately paid to Seller without prejudice to other remedies at law and in equity.

10. Right of Entry. During the period of this Purchase Agreement, Buyer shall have the right at its own cost, peril and risk with no liability to be incurred by Seller, to enter upon the Property for purposes of surveying, of making such soil bearing or other tests and/or engineering studies, and the collection of architectural data; provided (i) Buyer will not take any action whatsoever which may materially interfere with the continued present use and occupancy of the Property by Seller or its tenants or adversely affect the Property and Buyer will restore the Property to substantially the same condition as exists on the date hereof, and (ii) Buyer shall indemnify and hold Seller harmless from any and all claims, costs, demands or expenses resulting in any way from any such entry upon the Property by Buyer.

11. Conditions, Representations and Warranties. Seller agrees to give its full and complete cooperation, at no expense to Buyer, in effecting the satisfaction of the conditions and express representations and warranties stated in this agreement, including, without limitation, the execution of such applications and documents as may be necessary or appropriate to Buyer's use and occupancy of the Property. In the event of the failure of any condition herein contained or the breach of any representation or warranty by Seller, in addition to any other

remedies available to it by law, Buyer may declare this Purchase Agreement null and void, in which event all obligations of Buyer hereunder shall cease and all deposits made hereunder shall be returned to Buyer within five (5) days after such declaration by Buyer.

12. Miscellaneous.

(a) Until settlement hereunder, the risk of loss, damage or taking by eminent domain and all ownership rights and revenue with respect thereto shall be borne and inure to Seller. If any portion of the Property shall be substantially damaged by fire or other casualty, shall be taken by eminent domain or shall be the subject of condemnation proceedings, then, unless otherwise agreed, Buyer at its option may either (i) terminate this Purchase Agreement in which event Buyer shall receive back all sums paid hereunder; or (ii) take the conveyance of the Property or so much thereof as shall remain, in which event Buyer shall receive all amounts recovered or recoverable on account of insurance with respect to such fire or other casualty, or all awards paid or payable with respect to such taking or condemnation.

(b) All provisions of this Purchase Agreement shall survive settlement hereunder unless waived in writing by the party in whose favor such provisions run. All provisions of this Purchase Agreement shall inure to the benefit of and bind the parties hereto, their successors, personal representatives, heirs and assigns.

(c) All notices hereunder shall be given only in writing and shall be deemed to be properly served if delivered personally or sent by U. S. Mail, postage prepaid, registered or certified with return receipt requested or telegram addressed (i) if the Seller, to E. N. Richards, 2414 Wycliff Road, Raleigh, NC 27616, or such other place as Seller may designate by notice to Buyer, and (ii) if to Buyer, to Thetford Properties III, 1011

East Main Street, Suite 313, Richmond, Virginia 23219, or such other place as Buyer may designate by notice to Seller. All notices given by mail or telegram shall be deemed given on the date on which such notice is deposited in the U. S. Mail or in an office of the Western Union Telegraph Company. If any time period hereunder is due to expire on a Saturday, Sunday, national or Virginia holiday or holiday of the state or locality in which the Property lies, such time period shall be deemed automatically extended until the business day next ensuing.

13. Brokers. Seller and Buyer each represent to the other that neither has consulted or dealt with or used the services of a real estate agent or broker in connection with this Purchase Agreement, and each agrees to indemnify and hold the other harmless from and against any and all claims, suits, costs and expenses made or incurred in the event this warranty is breached.

14. Applicable Law. This Purchase Agreement shall in all respects be governed by, and construed in accordance with, the substantive federal laws of the United States and the laws of the State of North Carolina.

15. Entire Agreement; Amendment and Waiver. This Purchase Agreement contains the entire Purchase Agreement between the parties relating to the subject matter hereof. This Purchase Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which shall constitute but one instrument. This Purchase Agreement may be amended or changed only by written instrument duly executed by Buyer and Seller, and any alleged amendment or change which is not so documented shall not be affective as to either party. Except as otherwise expressly stated herein, provisions of this Purchase Agreement may be waived by the party hereto which is entitled to the benefit thereof by evidencing such waiver in writing, executed by such party.

16. Indemnification of Seller Under FHA Regulations. Buyer shall indemnify and hold harmless Seller (and its principals) from and against any and all liabilities, claims, damages, loss, costs and expenses, including reasonable attorney's fees, which may accrue or arise from the breach by Buyer after settlement of any FHA regulations relating to the Property and result in personal liability damages, loss, costs, or expenses to Seller or its principals.

17. Independent Agreements by Selling Parties with Buyer. This Purchase Agreement shall constitute an independent purchase agreement between each selling party and the Buyer with respect to the portion of the Property owned by each selling party and the selling parties shall not be jointly and severally liable under this Agreement. However, it is expressly agreed by all parties that Buyer shall purchase all of the tracts, lots, and parcels comprising the Property from each of the selling parties and performance of such agreement by Buyer shall be a condition precedent to the obligation of each selling party hereunder and that performance of this Purchase Agreement by each and every selling party hereunder shall be a condition precedent to the obligations of Buyer hereunder.

WITNESS the following signatures and seals.

SELLER:

RIVER FALLS APARTMENTS

By: [signature]

HOLIDAY TOWN APARTMENTS

By: [signature]

JOHNSON COURT APARTMENTS
By: [signature]

ICEMORLEE STREET APARTMENTS
By: [signature]

YOUNG AVENUE APARTMENTS
By: [signature]

HENRY STREET APARTMENTS
By: [signature]

MILLBANK COURT APARTMENTS
By: [signature]

HARDEE STREET APARTMENTS
By: [signature]

OAKWOOD AVENUE APARTMENTS
By: [signature]

RALEIGH NORTH APARTMENTS
By: [signature]

COLERIDGE ROAD APARTMENTS
By: [signature]

WASHINGTON STREET APARTMENTS
By: [signature]

HOLLOWAY COURT APARTMENTS
By: [signature]

BEAUMONT AVENUE APARTMENTS
By: [signature]

PERSON COURT APARTMENTS
By: [signature]

TUCKER STREET APARTMENTS

By: [signature]

MARKET NORTH APARTMENTS #2

By: [signature]

BUYER:

THETFORD PROPERTIES III

(CORPORATE SEAL)

ATTEST:

[signature]
Asst. Secretary

By: THETFORD ASSOCIATES, INC., a Virginia corporation, General Partner

By: [signature] President

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards as General Partner of RIVER FALLS APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

[signature: Carolyn Jo Collura]
Notary Public

STATE OF NORTH CAROLINA
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as Proprietor of HOLIDAY TOWN APARTMENTS, a N.C. proprietorship, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

[signature: Carolyn Jo Collura]
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of JOHNSON COURT APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Colluna
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. D. Richards, as General Partner of ICEMORLEE STREET APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Colluna
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. D. Richards, as General Partner of YOUNG AVENUE APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Colluna
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. D. Richards, as General Partner of HENRY STREET APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Colluna
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. D. Richards, as General Partner of MILLBANK COURT APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of HARDEE STREET APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of OAKWOOD AVENUE APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of RALEIGH NORTH APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of COLERIDGE ROAD APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of WASHINGTON STREET APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of HOLLOWAY COURT APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of BEAUMONT AVENUE APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. N. Richards, as General Partner of PERSON COURT APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/ COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. D. Richards, as General Partner of TUCKER STREET APARTMENTS, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87.

Carolyn J. Collins
Notary Public

STATE OF NORTH CAROLINA:
CITY/COUNTY OF WAKE:

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by E. D. Richards, as General Partner of MARKET/NORTH APARTMENTS #2, a N.C. General partnership, on behalf of the partnership.

My commission expires: My Commission Expires 2-17-87

Carolyn J. Collins
Notary Public

STATE OF ~~NORTH CAROLINA~~ Virginia:
CITY/~~COUNTY~~ OF ~~WAKE~~: Richmond

The foregoing instrument was acknowledged before me this 15th day of June, 1983, by M. Bradley Blaylock as President of Thetford Associates, Inc., a Virginia corporation, as General Partner of Thetford Properties III, a Virginia limited partnership, on behalf of the partnership.

My commission expires: Aug. 4, 1985.

Patricia A. Creed
Notary Public

23

EXHIBIT A

Property Description
Beaumont Avenue Apartments

BEGINNING at an iron pin, said pin being located in the western right-of-way line of Beaumont Avenue 203 feet south of the centerline of Crestview Drive measured along the right-of-way line of Beaumont Avenue; thence with the western edge of the right-of-way of Beaumont Avenue South 08 degrees 30 minutes 46 seconds West 435.11 feet; thence with the northern property line of A. E. Blackwell property North 85 degrees 40 minutes 34 seconds West 759.14 feet to a point; thence with the eastern property line of the W. P. Baldwin Estate property North 39 degrees 04 minutes 41 seconds East 251.28 feet and North 38 degrees 50 minutes 35 seconds East 179.29 feet to a point; thence with the eastern property line of the R. S. Rogers property North 23 degrees 19 minutes 00 seconds East 160.50 feet to a point in the centerline of a 68-foot wide easement of Duke Power Company; thence with the centerline of said easement South 73 degrees 55 minutes 31 seconds East 723.27 feet to the point of beginning. The above described tract containing 9.857 acres, according to a plat of survey entitled "Boundary Survey of Property of Beaumont Avenue Apartments, A Partnership Consisting of E. N. Richards & R. A. Bryan, Jr., Burlington Township, Alamance County, North Carolina", dated February 9, 1971, prepared by Moore, Gardner & Associates, Inc., Consulting Engineers.

EXHIBIT A

Property Description
Coleridge Road Apartments

RACT 1: BEGINNING at a concrete monument in the western edge of the right f way of Coleridge Road, said concrete monument being located South 9 egrees 37 minutes 47 seconds East 314.88 feet from the point of inter-ection of said right of way of Coleridge Road with the southern edge of he right of way of Old Salisbury Road; thence with the western edge of he right of way of Coleridge Road South 9 degrees 57 minutes East 68.83 feet to a point and South 9 degrees 55 minutes East 33.63 feet to point; thence with the northern property line of the Hussey property outh 71 degrees 44 minutes 30 seconds West 139.48 feet to a point and orth 76 degrees 30 minutes West 117.02 feet to a point; thence with the astern property line of the Garner property North 06 degrees 55 minutes ast 322.94 feet to a point, North 49 degrees 50 minutes East 12.83 feet o a point and North 40 degrees 17 minutes West 239.78 feet to a concrete onument; thence with the southern property line of the Brown property orth 88 degrees 50 minutes East 284.83 feet to the point of BEGINNING, ontaining 2.667 acres or 116,175 square feet.

RACT 2: BEGINNING at a concrete monument located at the point of inter-ection of the eastern edge of the right of way of Coleridge Road with the northern edge of the right of way of East Salisbury Street; thence ith said right of way of Coleridge Road North 9 degrees 57 minutes 0 seconds West 489.65 feet to another concrete monument and North 9 egrees 57 minutes West 186.19 feet to a point in the southern edge of he right of way of an 60 foot dedicated unopened street; thence with the outhern edge of the right of way of said unopened street South 84 degrees 6 minutes 20 seconds East 453.25 feet to a point in the western edge f the right of way of a 60 foot dedicated unopened street; thence with the western edge of the right of way of said 60 foot unopened street outh 01 degree 04 minutes West 479.20 feet to a point; thence with the orthern and western property lines of the property of North Hills, Inc. orth 88 degrees 56 minutes West 120 feet to a point, South 45 degrees 0 minutes 30 seconds West 75.49 feet to a point, and South 04 degrees 0 minutes 15 seconds East 125.89 feet to a point in the northern edge of the right of way of East Salisbury Street; thence with said right of way of East Salisbury Street North 78 degrees 18 minutes West 164.15 feet to the point of BEGINNING, containing 5.220 acres or 227,383 square feet.

EXHIBIT A

Property Description
Icemorlee Street Apartments

COMMENCING at the point of intersection of the center line of the right of way of Icemorlee Street with the center line of Gilman Place; thence with the center line of Icemorlee Street North 79 degrees 33 minutes 02 seconds West 313 feet to a point; thence North 23 degrees 27 minutes 00 seconds East 11.80 feet to a point, which point shall be the Point of Beginning; thence from the Point of Beginning along the northern property line of Dickerson, Inc., North 69 degrees 39 minutes 20 seconds West 730.13 feet to an existing iron pipe, said pipe being a common corner with Dickerson, Inc., and James A. Staton; thence along the eastern property line of James A. Staton, Duke Power Company, James Marzone, Sr., Harry J. Howard, Henry A. Smith and John H. Powell, North 16 degrees 02 minutes 00 seconds East 844.00 feet to an existing iron pipe; thence along the southern property lines of J. H. Powell; Duke Yow, Manetta Mills, Clarence M. Walsh and across the right of way of Lablon Street, South 76 degrees 12 minutes 00 seconds East, 627.00 feet to an existing iron pipe, said pipe being a common corner with Manetta Mills and Jack O. Elms; thence along the western property line of Jack O. Elms, South 08 degrees 42 minutes 00 seconds West 268 feet to an existing iron pipe; thence along the southern property line of Jack O. Elms South 76 degrees 03 minutes 00 seconds East 174.00 feet to an existing iron pipe, said pipe being a common corner with Jack O. Elms and Dickerson, Inc.; thence along the western property lines of Dickerson, Inc., Major A. Melton, J. A. Hudson and W. K. Tyson, South 23 degrees 27 minutes 00 seconds West 670.93 feet to the Point of Beginning. The above described tract contains 15.245 acres or 664,090.20 square feet. Said land is described according to a plat of survey entitled "Boundary Survey for Icemorlee Street Apartments, A Partnership Consisting of E. N. Richards & R. A. Bryan, Monroe Township, Monroe, Union County, North Carolina", dated June 30, 1971, prepared by Moore, Gardner & Associates, Inc., Greensboro, North Carolina.

EXHIBIT A

Property Description
Hardee Street Apartments

COMMENCING at a nail marking the point of intersection of the center line of Cheek Road and the center line of Hardee Street; thence with the center line of Hardee Street South 09 degrees 10 minutes West 325.92 feet to another nail in the center line of Hardee Street; thence South 78 degrees 30 minutes East 30.01 feet to an iron pin in the eastern edge of the 60 foot right of way of Hardee Street, which iron pin marks the point of beginning; thence with the southern property line of Herbert W. Perry South 78 degrees 30 minutes East 190.69 feet to an iron pin; thence with the eastern property lines of Herbert W. Perry, Floyd R. Griffin and Lessie G. Miller North 10 degrees 19 minutes East 312.16 feet to an iron pin; thence with the southeastern property line of Mary Cheek Faucette North 54 degrees 06 minutes East 128 feet to an iron pin; thence with the property line of E. N. Richards and R. A. Bryan, Jr. four calls as follows: (1) South 13 degrees 28 minutes East 296.15 feet to an iron pin; (2) South 29 degrees 59 minutes East 180.10 feet to an iron pin; (3) South 37 degrees 20 minutes East 402.42 feet to an iron pin; and (4) South 13 degrees 57 minutes East 445.93 feet to an iron pin; thence with the northern property lines of Evelyn M. and Thomas W. Young, William S. Mangum and W. E. Watson North 84 degrees 06 minutes West 605.29 feet to an iron pin; thence with the eastern property line of W. E. Watson North 9 degrees 08 minutes East 209.70 feet to an iron pin; thence with the northern property line of W. E. Watson North 84 degrees 37 minutes West 392 feet to an iron pin in the eastern edge of the 60 foot right of way of Hardee Street; thence with said right of way of Hardee Street North 10 degrees 11 minutes East 365.32 feet to an iron pin; thence continuing with said right of way of Hardee Street North 10 degrees 04 minutes East 190.87 feet to the iron pin marking the point of beginning, containing 13.305 acres or 579,571 square feet, being the land shown on plat of survey entitled "Boundary Survey for Hardee Street Apartments, A Partnership Consisting of E. N. Richards and R. A. Bryan, Jr., Durham, Durham County, North Carolina", dated July 28, 1970, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Holloway Court Apartments

COMMENCING at the point of intersection of the center line of Holloway Drive Extended in an Easterly direction with the Eastern edge of the right of way of Bynum Boulevard; thence with the Eastern edge of the right of way of Bynum Boulevard South 04 degrees 42 minutes West 21.80 feet and South 00 degrees 27 minutes West 59.69 feet to an iron pin marking the Southwest corner of the property of North Carolina Christian Missionary Society and which iron pin shall be the point of beginning; thence with the Southern property line of North Carolina Christian Missionary Society South 89 degrees 33 minutes East 173 feet to an iron pin; thence with the Eastern property lines of North Carolina Christian Missionary Society and North Hills, Inc. North 12 degrees 09 minutes East 206.42 feet to an iron pin in the Southern edge of the right of way of an unopened street; thence with the Southern edge of the right of way of said unopened street South 73 degrees 32 minutes East 603.27 feet to an iron pin; thence with the Western property line of Dr. C. F. West South 4 degrees 30 minutes West 383.53 feet to a point in the center line of a drainage ditch; thence with the center line of said drainage ditch nineteen calls as follows: (1) South 50 degrees 19 minutes West 70.80 feet, (2) South 66 degrees 51 minutes West 48.05 feet, (3) South 65 degrees 22 minutes West 50.01 feet, (4) South 67 degrees 36 minutes West 79.24 feet, (5) South 86 degrees 27 minutes West 47.15 feet, (6) North 88 degrees 54 minutes West 50.02 feet, (7) South 89 degrees 23 minutes West 41.99 feet, (8) North 83 degrees 30 minutes West 49.11 feet, (9) North 78 degrees 58 minutes West 50.06 feet, (10) North 76 degrees 18 minutes West 10.38 feet, (11) North 67 degrees 41 minutes West 47.80 feet, (12) North 61 degrees 24 minutes West 53.72 feet, (13) North 54 degrees 18 minutes West 47.71 feet, (14) North 52 degrees 14 minutes West 50 feet, (15) North 47 degrees 35 minutes West 50.37 feet, (16) North 56 degrees 37 minutes West 11.42 feet, (17) North 72 degrees 49 minutes West 50.49 feet, (18) North 73 degrees 06 minutes West 31.33 feet, and (19) North 76 degrees 44 minutes West 9.63 feet to a point in the Eastern edge of the right of way of Bynum Boulevard; thence with the Eastern edge of the right of way of Bynum Boulevard North 00 degrees 27 minutes East 163.97 feet to the point of beginning, containing 376,579 square feet or 8.645 acres. Said land is described according to a plat of survey entitled "Boundary Survey for Holloway Court Apartments, A Partnership Consisting of E. N. [illegible]

EXHIBIT A

Property Description
Holiday Town Apartments

BEGINNING at the terminal point of the presently dedicated southern edge of the right of way of Shaw Avenue, said point also being the northernmost corner of Lot 73 of Pinedene Subdivision according to a map recorded in Map Book 1, Section 1, Page 7 of the Moore County Registry, North Carolina; thence with the western property line of said Lot 73 of Pinedene Subdivision South 12 degrees 27 minutes West 5.61 feet to a point; thence along a new property line ten calls as follows: (1) North 50 degrees 37 minutes West 89.92 feet to a point of curve, (2) in a northwesterly direction along a curve to the right (said curve having a radius of 441.67 feet and a chord with a bearing of North 43 degrees 41 minutes West and a length of 106.49 feet) a distance of 106.76 feet to a point, (3) North 36 degrees 46 minutes West 222.04 feet to a point of curve, (4) in a northwesterly direction along a curve to the left (said curve having a radius of 423.24 feet and a chord with a bearing of North 62 degrees 40 minutes West and a length of 369.63 feet) a distance of 382.52 feet to a point, (5) North 88 degrees 33 minutes West 177.99 feet to a point of curve, (6) in a southwesterly direction along a curve to the left (said curve having a radius of 25 feet and a chord with a bearing of South 46 degrees 27 minutes West and a length of 35.36 feet) a distance of 39.27 feet to a point, (7) South 01 degree 27 minutes West 117 feet to a point of curve, (8) in a southerly direction along a curve to the right (said curve having a radius of 319.94 feet and a chord with a bearing of South 4 degrees 19 minutes West and a length of 32 feet) a distance of 32.05 feet to a point, (9) North 88 degrees 33 minutes West 254.39 feet to a point, and (10) North 39 degrees 53 minutes West 184 feet to a point in the property line of North Carolina Department of Conservation and Development, Division of Forestry and Parks; thence with said last mentioned line North 50 degrees 07 minutes East 179 feet to a point; thence continuing with said line North 45 degrees 44 minutes West 250 feet to a point, a corner of the land of the Town of Southern Pines; thence with the property line of the Town of Southern Pines three calls as follows: (1) North 50 degrees 04 minutes East 144.13 feet to a point, (2) North 65 degrees 40 minutes East 208.99 feet to a concrete monument, and (3) South 64 degrees 52 minutes East 791.48 feet to a concrete monument; thence with the property line of Mount Hope Cemetery three calls as follows: (1) South 12 degrees 19 minutes West 220.02 feet to the terminal point of the southern edge of the right of way of Bell Avenue, (2) along the southern edge of

EXHIBIT A

Property Description
Henry Street Apartments

TRACT A:

BEGINNING at the point of intersection of the southwestern edge of the right of way of Fourth Street with the southeastern edge of the right of way of Henry Street; thence with said right of way of Fourth Street South 63 degrees 30 minutes East 181.92 feet to a point in the western edge of the right of way of Seaboard Coast Line Railroad; thence with said railroad right of way four calls as follows: (1) South 15 degrees 06 minutes West 122.40 feet to a point; (2) South 13 degrees 21 minutes West 100 feet to a point; (3) South 10 degrees 56 minutes West 100 feet to a point; and (4) South 8 degrees 21 minutes West 111.97 feet to a point; thence North 63 degrees 30 minutes West 292.54 feet to a point in the southeastern edge of the right of way of Henry Street; thence with said right of way of Henry Street North 26 degrees 30 minutes East 420 feet to the point of BEGINNING, containing 2.24 acres.

TRACT B:

BEGINNING at a point in the southeastern edge of the right of way of Franklin Street, said point being located 150 feet in a southwesterly direction measured along said right of way from the point of intersection of said right of way of Franklin Street with the southwestern edge of the right of way of Third Street; thence South 63 degrees 30 minutes East 203.2 feet to a point in the northwestern edge of the right of way of Henry Street; thence with said right of way of Henry Street South 26 degrees 30 minutes West 300 feet to a point; thence North 63 degrees 30 minutes West 203.2 feet to a point in the southeastern edge of the right of way of Franklin Street; thence with said right of way of Franklin Street North 26 degrees 30 minutes East 300 feet to the point of BEGINNING, containing 1.40 acres.

The foregoing descriptions are according to a plat of survey of said property entitled "Boundary Survey for Henry Street Apartments, A Partnership Consisting of E. N. Richards & R. A. Bryan, Jr., Roanoke Rapids, Halifax County, N. C." dated November 5, 1970, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Market North Apartments #2

BEGINNING at an iron pipe in the Western line of Rosemont Avenue, said Rosemont Avenue being a 60 foot wide right of way as shown by map "Right of Way and Easement Dedication for Market North Apartments" recorded in Map Book 10, Page 15 in the New Hanover County Registry, said BEGINNING point being located South 2 degrees 30 minutes West 1278.90 feet as measured with said western line of Rosemont Avenue from its intersection with the southern line of Market Street (a 100 foot right of way) running thence from said BEGINNING North 87 degrees 31 minutes West 203.71 feet to a point in the eastern line of a W. J. Taylor Tract, thence with said eastern line South 3 degrees 07 minutes West 44.10 feet to an old iron pipe; thence continuing with said eastern line South 3 degrees 58 minutes West 171.29 feet to a concrete monument at the northeastern corner of the Johnson Tract; thence with the eastern line of said Johnson Tract South 2 degrees 48 minutes West 141.2 feet to an old axle in the northern line of Broad Street, said Broad Street right of way being shown by said Map Book 10, Page 15; thence crossing Broad Street South 2 degrees 48 minutes West 60.60 feet to a point at the northeastern corner of the W. J. Taylor home Tract; thence with the eastern line of said Taylor tract South 2 degrees 48 minutes West 173.08 feet to an iron pipe in the northern line of the land to be retained by W. J. Taylor, thence with said northern line South 87 degrees 30 minutes East 210.51 feet to an iron pipe in the aforementioned western line of Rosemont Avenue, thence South 87 degrees 30 minutes East 60.0 feet crossing said Rosemont Avenue to a point; thence with the eastern line of Rosemont Avenue North 2 degrees 30 minutes East 100.0 feet to a point, thence continuing with the northern line of said Taylor Tract South 87 degrees 30 minutes East 555.00 feet to an iron pipe, thence South 67 degrees 09 minutes East 165.30 feet to an iron pipe, thence South 86 degrees 35 minutes East 330.0 feet to an iron pipe in the western line of the Atlantic Land and Investment Company tract; thence with said western line North 3 degrees 25 minutes East 155.0 feet to a point in the southern line of Metting Road said Metting Road right of way being shown in said Map Book 10, Page 15; thence with the southern line of Metting Road North 86 degrees 35 minutes West 230.0 feet to the point of curvature of a curve having a radius of 293.93 feet and a deflection angle of 33 degrees 06 minutes to the right; thence with said curve westward 169.74 feet to the point of tangency of said curve; thence continuing with said southern line of Metting Road North 53 degrees 29 minutes West 408.30 feet to the point of curvature of a curve having a radius of 381.97 feet and a deflection angle of 34 degrees 01 minute to the left; thence with said curve westwardly 226.78 feet

EXHIBIT A

Property Description
Millbank Court Apartments

BEGINNING at the point of intersection of the Northern edge of the right of way of Millbank Road with the Eastern edge of the right of way of Raleigh Boulevard; thence in a Northerly direction with the Eastern edge of the right of way of Raleigh Boulevard and a line extended from said right of way along a curve to the left with a radius of 548.37 feet, and a chord with a bearing of North 07 degrees 09 minutes West and a length of 131.14 feet, a distance along the arc of said curve of 131.45 feet to a point of tangency; thence with the Eastern property line of Raleigh North Apartments North 14 degrees 03 minutes West 229.76 feet to a point of curve; thence in a general Northerly direction along a curve to the right with a radius of 553.36 feet, and a chord with a bearing of North 22 degrees 14 minutes East and a length of 655.04 feet, a distance along the arc of said curve of 700.94 feet to a point; thence with the Southwestern property line of the Delany heirs South 48 degrees 57 minutes East 318.07 feet to a point, the Northernmost corner of Lot 174 of Lockwood Subdivision according to a map recorded in Book of Maps 1953, Page 111 of the Wake County Registry; thence with the rear property lines of Lots 174 and 173 of Lockwood Subdivision South 28 degrees 06 minutes West 177.7 feet to a point; thence with the rear property lines of Lots 173, 172, 171, 170 and 169 of Lockwood Subdivision South 17 degrees 12 minutes West 294.4 feet to a point; thence with the rear property lines of Lots 168 and 167 of Lockwood Subdivision South 4 degrees 54 minutes West 190.7 feet to a point; thence with the rear property line of Lot 166 of Lockwood Subdivision South 17 degrees 17 minutes East 93.9 feet to a point in the Northern edge of the right of way of Millbank Road; thence South 32 degrees 29 minutes East 111.2 feet to a point in the Southern edge of the right of way of Millbank Road; thence with the Western property line of Lot 165 of Lockwood Subdivision South 19 degrees 05 minutes East 185 feet to a point; thence with the rear property lines of Lots 159, 158, 157 and 156 of Lockwood Subdivision South 3 degrees 41 minutes East 298.24 feet to a point; thence with the Northern property line of Lockwood Shopping Center property North 88 degrees 18 minutes West 320.87 feet to a point; thence with the Eastern property line of Raleigh North Apartments North 01 degree 42 minutes East 446.28 feet to a point in the Northern edge of the right of way of Millbank Road; thence in a Westerly direction with the said right of way of Millbank Road along a curve to the right with a radius of 304.95 feet, and a chord with a bearing

EXHIBIT A

Property Description
Johnson Court Apartments

BEGINNING at a point in the northwestern edge of the right of way of U. S. Highway 301, said point being located 242.1 feet in a southwesterly direction as measured along said right of way of U. S. Highway 301 from the point of intersection of said right of way of U. S. Highway 301 with the southwestern edge of the right of way of [illegible] Drive; thence with said right of way of U. S. Highway 301 South 55 degrees 29 minutes West 331.63 feet to a point; thence along the northern property line of the Sallie Lee Robenson property North 87 degrees 54 minutes West 381.07 feet to a point, the southeast corner of the William Wellons Estate property; thence with the eastern property line of the William Wellons Estate property North 1 degree 4 minutes East 1052.51 feet to a point, a corner of the Smithfield Promotors' property; thence South 35 degrees 50 minutes East 1083.62 feet to the point of BEGINNING, containing 8.25 acres or 359,535.39 square feet. Said land is described according to a plat of survey entitled "Boundary Survey for Johnson Court Apartments, A Partnership Consisting of E. N. Richards and R. A. Bryan, Smithfield, Johnston County, N. Carolina", dated April 30, 1971, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Oakwood Avenue Apart...

COMMENCING at the point of intersection of the Eastern edge of the right of way of Seventh Street with the Southern edge of the right of way of Oakwood Avenue; thence with the Southern edge of the right of way of Oakwood Avenue North 77 degrees 08 minutes East 217.9 feet to a stone monument; thence continuing with the right-of way of Oakwood Avenue North 30 degrees 25 minutes East 6.17 feet to another stone monument which marks the point of beginning; thence with the right of way of Oakwood Avenue North 30 degrees 25 minutes East 193 feet to an iron pin; thence with the property line of North Hills, Inc. seven calls as follows: (1) South 59 degrees 35 minutes East 79.5 feet to a point of curve, (2) thence in an Easterly direction along a curve to the left with a radius of 253.41 feet, and a chord with a bearing of North 89 degrees 00 minutes 30 seconds East and a length of 264.12 feet, a distance along the arc of said curve of 277.83 feet to a point of tangency, (3) thence North 37 degrees 36 minutes East 67 feet to a point of curve, (4) thence in an Easterly direction along a curve to the right with a radius of 287.44 feet, and a chord with a bearing of South 76 degrees 48 minutes East and a length of 410.74 feet, a distance along the arc of said curve of 457.54 feet to a point of tangency, (5) thence South 31 degrees 12 minutes East 207 feet to a point of curve, (6) thence in a Southeasterly direction along a curve to the left with a radius of 548.69 feet, and a chord with a bearing of South 40 degrees 47 minutes East and a length of 182.81 feet, a distance along the arc of said curve of 183.67 feet to an iron pin, and (7) thence South 39 degrees 25 minutes West 277.26 feet to a point in the Northern property line of A. C. Morgan; thence North 52 degrees 45 minutes West 677.50 feet to an iron pin, the Easternmost corner of the property of Neil McKay; thence with the rear property lines of Neil McKay North 23 degrees 58 minutes West 83.5 feet to an iron pin and South 43 degrees 12 minutes West 110.74 feet to an iron pin; thence with the Northeastern property line of June Matthews North 56 degrees 09 minutes West 271.70 feet to the point of beginning, containing 375,427 square feet or 8.619 acres. Said land is described according to a plat of survey entitled "Boundary Survey for Oakwood Avenue Apartments, A Partnership Consisting of E. N. Richards and R. A. Bryan, Jr., Sanford, Lee County, N. Carolina" dated March 31, 1970, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Person Court Apartments

COMMENCING at the point of intersection of the center line of Person Court with the center line of Hurdle Mills Road (N. C. Highway #157), thence with the center line of Person Court North 52 degrees 54 minutes West 271.77 feet to a point; thence South 47 degrees 30 minutes West 30.10 feet to a point in the southwestern edge of the right of way of Person Court, which point shall be the point of beginning; thence South 47 degrees 30 minutes West 843.27 feet to a point; thence North 22 degrees 09 minutes West 901.32 feet to a point; thence South 86 degrees 11 minutes East 805.79 feet to a point in the southwestern edge of the right of way of Person Court; thence with said right of way of Person Court three calls as follows: (1) South 28 degrees 50 minutes East 100 feet to a point, (2) South 37 degrees 58 minutes East 100 feet to a point, and (3) South 46 degrees 04 minutes East 66.09 feet to the point of beginning, containing 428,049 square feet or 9.827 acres, being the land shown on plat of survey entitled "Boundary Survey for Person Court Apartments, A Partnership Consisting of E. N. Richards and R. A. Bryan, Jr., Roxboro, Person County, N. Carolina", dated October 7, 1970, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Raleigh North Apartments

BEGINNING at a concrete monument in the northern edge of the right of way of Glascock Street marking the southwest corner of the [illegible]wood Shopping Center property; thence with said right of way of Glascock Street North 60 degrees 11 minutes West 65.10 feet to a point of curve; thence continuing with said right of way of Glascock Street in a westerly direction along a curve to the left with a radius of 994.93 feet a distance of 221.10 feet to an iron pin; thence North 02 degrees 10 minutes West 170 feet to a point; thence North 10 degrees 02 minutes East 133 feet to a point; thence North 00 degrees 51 minutes East 129.45 feet to a point; thence South 73 degrees 29 minutes West 113 feet to a point; thence in a westerly direction along a curve to the left with a radius of 45 feet a distance of 92.15 feet to a point; thence North 43 degrees 52 minutes West 15.79 feet to an iron pin which marks the reference line east of Bridgers Branch; thence North 43 degrees 52 minutes West 10.36 feet to a point; in the center of Bridgers Branch; thence along the center of Bridgers Branch by a reference line beginning at the iron pin last mentioned above as follows: North 42 degrees 38 minutes East 206.37 feet, North 35 degrees 46 minutes East 231.38 feet, North 59 degrees 22 minutes East 117.45 feet, North 42 degrees 07 minutes East 175.55 feet, South 82 degrees 07 minutes East 112.05 feet, North 59 degrees 55 minutes East 153.30 feet, North 63 degrees 46 minutes East 161.81 feet, North 70 degrees 18 minutes East 210.85 feet, North 43 degrees 29 minutes East 150.95 feet, North 03 degrees 51 minutes East 134.89 feet, North 12 degrees 10 minutes West 169.66 feet, North 36 degrees 57 minutes West 102.24 feet, North 1 degree 22 minutes West 136.63 feet, North 3 degrees 45 minutes East 296.09 feet, North 46 degrees 29 minutes East 286.75 feet and North 8 degrees 21 minutes West 133.20 feet to an iron pin marking said reference line; thence from the center of Bridgers Branch South 48 degrees 57 minutes East 27.58 feet to the iron pin last mentioned above; thence South 48 degrees 57 minutes East 220.42 feet to an iron pin; thence as follows: in a southerly direction along a curve to the left with a radius of 553.36 feet a distance of 700.94 feet to a point, South 14 degrees 03 minutes East 229.76 feet to a point and in a southerly direction along a curve to the right with a radius of 548.37 feet a distance of 131.45 feet to an iron pin; thence South 88 degrees 01 minute East 106.60 feet to a point of curve; thence continuing in an easterly direction along a curve to the left with a radius of 304.95 feet a distance of 42.31 feet to a point; thence South 01 degree 42 minutes West 446.28 feet to an iron pin; thence North 88 degrees 18 minutes West 348 feet to an iron pin; thence as follows: South 52 degrees 29 minutes West

EXHIBIT A

Property Description
River Falls Apartments

BEGINNING at an iron pin in the southeastern edge of the right of way of Leggett Road, said iron pin being 30 feet measured at right angles from the center line of Leggett Road and 608.08 feet in a northeasterly direction measured along said right of way of Leggett Road from the point of intersection of said right of way with the northeastern edge of the right of way of Barnes Street; thence with said right of way of Leggett Road North 35 degrees 49 minutes East 620.95 feet to an iron pin; thence continuing with said right of way North 36 degrees 31 minutes 58 seconds East 99.99 feet to an iron pin; thence continuing with said right of way North 40 degrees 36 minutes 55 seconds East 99.99 feet to an iron pin; thence continuing with said right of way North 50 degrees 16 minutes 53 seconds East 88.11 feet to an iron pin, a corner of Lot 453 of Hillsdale - 4th Addition; thence with the property line of Hillsdale - 4th Addition five calls as follows: (1) South 34 degrees 22 minutes 09 seconds East 165.84 feet to an iron pin, (2) North 82 degrees 26 minutes 48 seconds East 97.02 feet to an iron pin, (3) South 07 degrees 34 minutes 44 seconds East 208.11 feet to an iron pin, (4) South 47 degrees 00 minutes 14 seconds West 144.21 feet to an iron pin, and (5) South 17 degrees 30 minutes 48 seconds East 436.85 feet to a point, a corner of the property of R. T. Brinn and H. M. Daley, Jr.; thence with the northern property line of R. T. Brinn and H. M. Daley, Jr. in a westerly direction along a curve to the left with a radius of 2,462.831 feet a distance along the arc of said curve of 813.49 feet to the point of BEGINNING, containing 8.03 acres, and being the land shown on plat of survey entitled "Boundary Map, River Falls Apartments, Rocky Mount, N. C.", dated July 1, 1969, prepared by Castleberry-Edgerton Co., Consulting Engineers, Raleigh, North Carolina.

EXHIBIT A

Property Description
Washington Street Apartments

COMMENCING at the point of intersection of the center line of Crestview Avenue with the center line of Downing Street; thence with the center line of Downing Street South 74 degrees 43 minutes 30 seconds West 542.46 feet to a point; thence South 15 degrees 17 minutes East 30 feet to a point in the southeastern edge of the right of way of Downing Street, which point shall be the point of beginning; thence with the property line of W. A. Deans three calls as follows: (1) South 15 degrees 17 minutes East 568.45 feet to a point, (2) North 74 degrees 28 minutes 30 seconds East 412.13 feet to a point, and (3) South 15 degrees 15 minutes East 905.06 feet to a point; thence South 61 degrees 56 minutes 30 seconds West 627.98 feet to a point; a corner of M. B. Barefoot property; thence with the property line of M. B. Barefoot North 15 degrees 15 minutes West 1610.83 feet to a point in the southeastern edge of the right of way of Downing Street; thence with said right of way of Downing Street North 74 degrees 43 minutes 30 seconds East 200 feet to the point of beginning, and containing 709,894.71 square feet or 16.297 acres, according to a plat of survey entitled "Boundary Survey of Washington Street Apartments; A Partnership Consisting of E. N. Richards and R. A Bryan, Jr., Wilson, Wilson County, N. C.", dated June 8, 1970, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Tucker Street Apartments

BEGINNING at the point of intersection of the center line of Center Avenue Extended in a Westerly direction with the Western edge of the right of way of Tucker Street; thence with the said right of way of Tucker Street South 04 degrees 37 minutes West 202.67 feet to an iron pin; thence North 85 degrees 23 minutes West 301 feet to an iron pin; thence North 72 degrees 15 minutes West 323 feet to an iron pin; thence North 58 degrees 35 minutes West 289.34 feet to an iron pin; thence North 58 degrees 34 minutes West 413.42 feet to a point in the center of Tarpley Branch; thence along the center of Tarpley Branch 3 calls as follows: (1) North 08 degrees 06 minutes East 92.63 feet; (2) North 07 degrees 13 minutes East 78.89 feet, and (3) North 18 degrees 39 minutes East 46.98 feet; thence leaving the center line of Tarpley Branch South 73 degrees 30 minutes East 1248.90 feet to a point in the Western edge of the right of way of Tucker Street; thence with said right of way of Tucker Street South 04 degrees 37 minutes West 147.33 feet to the point of beginning, containing 438,265 square feet or 10.06 acres, according to a plat of survey entitled "Boundary Survey for Tucker Street Apartments, A Partnership Consisting of E. N. Richards and R. A. Bryan, Jr., Burlington, Alamance County, N. C.", dated May 15, 1970, prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT A

Property Description
Young Avenue Apartments

TRACT NO. 1: BEGINNING at the point of intersection of the Northern edge of the right of way of Young Avenue with the Eastern edge of the right of way of High Street; thence with said right of way of High Street North 15 degrees East 250 feet to the point of intersection of said right of way with the Southern edge of the right of way of Wilson Street; thence with the Southern edge of the right of way of Wilson Street South 75 degrees East 300 feet to the point of intersection of said right of way with the Western edge of the right of way of Thomas Street; thence with the Western edge of the right of way of Thomas Street South 15 degrees West 250 feet to the point of intersection of said right of way with the Northern edge of the right of way of Young Avenue; thence with the Northern edge of the right of way of Young Avenue North 75 degrees West 300 feet to the point of beginning, containing 75,000 square feet or 1.722 acres, according to a plat of survey entitled "Boundary Survey for Young Avenue Apartments, A Partnership consisting of E. N. Richards and R. A. Bryan, Jr., Henderson, Vance County, N. C.", dated March 31, 1970, as prepared by Castleberry-Edgerton Co., Consulting Engineers.

TRACT NO. 2: BEGINNING at the point of intersection of the Northern edge of the right of way of Young Avenue with the Eastern edge of the right of way of Thomas Street; thence with the Eastern edge of the right of way of Thomas Street North 15 degrees East 250 feet to the point of intersection of said right of way with the Southern edge of the right of way of Wilson Street; thence with the Southern edge of the right of way of Wilson Street South 75 degrees East 300 feet to the point of intersection of said right of way with the Western edge of the right of way of McBorn Street; thence with the Western edge of the right of way of McBorn Street South 15 degrees West 250 feet to the point of intersection of said right of way with the Northern edge of the right of way of Young Avenue; thence with the Northern edge of the right of way of Young Avenue North 75 degrees West 300 feet to the point of beginning, containing 75,000 square feet or 1.722 acres, according to a plat of survey entitled "Boundary Survey for Young Avenue Apartments, A Partnership consisting of E. N. Richards and R. A. Bryan, Jr., Henderson, Vance County, N. C.", dated March 31, 1970, as prepared by Castleberry-Edgerton Co., Consulting Engineers.

EXHIBIT B

Purchase Price for Individual Projects

| Project | Cash Portion of Purchase Price | Mortgage Balance 7/1/83 | Total Purchase Price |
|---|---|---|---|
| Beaumont | $ 306,669 | $ 1,031,443 | $ 1,338,112 |
| Coleridge | 205,490 | 1,042,743 | 1,248,233 |
| Icemorlee | 292,335 | 1,100,737 | 1,393,072 |
| Hardee | 298,837 | 1,926,465 | 2,225,302 |
| Holloway | 192,749 | 865,810 | 1,058,559 |
| Holiday | 336,119 | 1,031,950 | 1,368,069 |
| Henry | 119,879 | 521,622 | 641,501 |
| Market II | 678,628 | 926,404 | 1,605,032 |
| Millbank | 226,179 | 823,537 | 1,049,716 |
| Johnson | 278,386 | 761,327 | 1,039,713 |
| Oakwood | 161,794 | 534,177 | 695,971 |
| Person | 356,510 | 473,744 | 830,254 |
| Raleigh North | 679,907 | 1,512,032 | 2,191,939 |
| River Falls | 263,732 | 489,655 | 753,387 |
| Washington St. | 778,761 | 891,849 | 1,670,610 |
| Tucker | 220,809 | 1,074,392 | 1,295,201 |
| Young Ave. | 103,218 | 549,912 | 653,130 |
| | $5,500,000 | $15,557,799 | $21,057,799 |

EXHIBIT C

Mortgage Notes

1. Beaumont Avenue

FHA #: 053-44078-LDP
FNMA #: 1-32-750633-5
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,111,600.00
PRINCIPAL BALANCE 7/1/83: $1,031,443.00
INTEREST RATE: 7.0%
MONTHLY PAYMENT: $6,907.83
MATURITY: January, 2013

2. Coleridge Road

FHA #: 053-44063-LDP-SUP
FNMA #: 1-32-750612-7
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,101,400.00
PRINCIPAL BALANCE 7/1/83: $1,042,743.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $8,074.30
MATURITY: May, 2012

3. Icemorlee Street

FHA #: 053-44065-LDP
FNMA #: 1-32-750774-3
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,183,400.00
PRINCIPAL BALANCE 7/1/83: $1,100,737.00
INTEREST RATE: 7.0%
MONTHLY PAYMENT: $7,354.02.26
MATURITY: December, 2012

4. Hardee Street

FHA #: 053-44035-LDP-SUP
FNMA #: 1-32-750624-4
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $2,033,500.00
PRINCIPAL BALANCE 7/1/83: $1,926,465.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $14,907.47
MATURITY: June, 2012

5. Holloway Court

FHA #: 053-44029-LDP-SUP
FNMA #: 1-32-750409-0
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $919,400.00
PRINCIPAL BALANCE 7/1/83: $865,810.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $6,740.07
MATURITY: December, 2011

6. Holiday Town

FHA #: 053-35045-LDI-SUP
FNMA #: 1-32-750773-1
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,105,200.00
PRINCIPAL BALANCE 7/1/83: $1,031,950.00
INTEREST RATE: 7.0%
MONTHLY PAYMENT: $6,868.06
MATURITY: December, 2012

7. Henry Street

FHA #: 053-44060-LDP
CL #: 81314
PRESENT HOLDER: Springfield Institution of Savings
ORIGINAL PRINCIPAL BALANCE: $556,000.00
PRINCIPAL BALANCE 7/1/83: $521,622.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $4,076.00
MATURITY: June, 2012

8. Market North II

FHA #: 053-35017-LDP-SUP
FNMA #: 1-32-750042-2
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,083,300.00
PRINCIPAL BALANCE 7/1/83: $926,404.00
INTEREST RATE: 7.5%
MONTHLY PAYMENT: $7,128.88
MATURITY: April, 2011

9. Millbank Court

FHA #: 053-44021-LDP
FNMA #: 1-32-750291-3
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $876,900.00
PRINCIPAL BALANCE 7/1/83: $823,537.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $6,428.50
MATURITY: October, 2011

10. Johnson Court

FHA #: 053-44080-LDP-SUP
FNMA #: 1-32-750756-1
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $822,000.00
PRINCIPAL BALANCE 7/1/83: $761,327.00
INTEREST RATE: 7.0%
MONTHLY PAYMENT: $5,108.17
MATURITY: March, 2013

11. Oakwood Avenue I

FHA #: 053-44018-LDP-SUP
FNMA #: 1-32-75034-0
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $566,500.00
PRINCIPAL BALANCE 7/1/83: $534,177.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $4,152.98
MATURITY: December, 2011

12. Person Court

FHA #: 053-55049-LDP
GNMA #: 6-32-750562-8:
PRESENT HOLDER: Government National Mortgage Association ("GNMA")
ORIGINAL PRINCIPAL BALANCE: $556,500.00
PRINCIPAL BALANCE 7/1/83: $473,744.00
INTEREST RATE: 3.0%
MONTHLY PAYMENT: $2,027.98
MATURITY: February, 2012

13. Raleigh North

FHA #: 053-44043-LDP
FNMA#: 1-32-750254-7:
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,615,100.00
PRINCIPAL BALANCE 7/1/83: $1,512,032.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $11,840.20
MATURITY: January, 2011

14. River Falls

FHA #: 053-44042-LDP-SUP
FNMA #: 1-32-750013-5
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $528,200.00
PRINCIPAL BALANCE 7/1/83: $489,655.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $3,872.20
MATURITY: April, 2011

15. Washington Street

FHA #: 053-55048-LDP
GNMA#: 6-32-750478-9
PRESENT HOLDER: Government National Mortgage Association ("GNMA")
ORIGINAL PRINCIPAL BALANCE: $1,070,700.00
PRINCIPAL BALANCE 7/1/83: $891,849.00
INTEREST RATE: 3.0%
MONTHLY PAYMENT: $7,849.24
MATURITY: April, 2012

16. Tucker Street

FHA #: 053-44031-LDP
FNMA #: 1-32-750415-5
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $1,136,300.00
PRINCIPAL BALANCE 7/1/83: $1,074,392.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $8,330.15
MATURITY: December, 2011

17. Young Avenue

FHA #: 053-44022-LDP
FNMA #: 1-32-750346-2
PRESENT HOLDER: Federal National Mortgage Association ("FNMA")
ORIGINAL PRINCIPAL BALANCE: $581,600.00
PRINCIPAL BALANCE 7/1/83: $549,912.00
INTEREST RATE: 8.5%
MONTHLY PAYMENT: $4,263.68
MATURITY: December, 2011

EXHIBIT D

Regulatory Agreements

1. Beaumont Avenue - Regulatory Agreement dated May 1, 1971 between Beaumont Avenue Apartments, a partnership, and the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner ("HUD").

2. Coleridge Road - Regulatory Agreement dated December 1, 1970 between Coleridge Road Apartments, a partnership, and HUD.

3. Icemorlee Street - Regulatory Agreement dated July 1, 1971 between Icemorlee Street Apartments, a partnership, and HUD.

4. Hardee Street - Regulatory Agreement dated October 1, 1970 between Hardee Street Apartments, a partnership, and HUD.

5. Holloway Court - Regulatory Agreement dated June 1, 1970 between Holloway Court Apartments, a partnership, and HUD.

6. Holidaytown - Regulatory Agreement dated July 1, 1971 between E. N. Richards, doing business as Holidaytown Apartments, and HUD.

7. Henry Street - Regulatory Agreement dated December 9, 1970 between Henry Street Apartments, a partnership, and HUD.

8. Market North II - Regulatory Agreement dated July 1, 1969 between Market North Apartments II, a partnership, and HUD.

9. Millbank Court - Regulatory Agreement dated April 1, 1970 between Millbank Court Apartments, a partnership, and HUD.

10. Johnson Court - Regulatory Agreement dated July 1, 1971 between Johnson Court apartments, a partnership, and HUD.

11. Oakwood Avenue I - Regulatory Agreement dated June 1, 1970 between Oakwood Avenue Apartments, a partnership, and HUD.

12. Person Court - Regulatory Agreement dated December 1, 1970 between Person Court Apartments, a partnership, and HUD.

13. Raleigh North - Regulatory Agreement dated December 1, 1970 between Raleigh North Apartments, a partnership, and HUD.

14. River Falls - Regulatory Agreement dated July 1, 1970 between River Falls Apartments, a partnership, and HUD.

15. Washington Street - Regulatory Agreement dated August 1, 1970 between Washington Street Apartments, a partnership, and HUD.

16. Tucker Street - Regulatory Agreement dated June 5, 1970 between Tucker Street Apartments, a partnership, and HUD.

17. Young Avenue - Regulatory Agreement dated June 1, 1970 between Young Avenue Apartments, a partnership, and HUD.