(1-70)

MHFA MASSACHUSETTS HOUSING FINANCE AGENCY

# MORTGAGE NOTE

Boston, Massachusetts

$ 3,652,900. July 1, 1970

FOR VALUE RECEIVED, C-W Associates, a limited partnership organized and operated pursuant to a Partnership Agreement dated April 23, 1970 as amended by instrument dated June 25, 1970 under the provisions of Chapter 109 of the General Laws of Massachusetts.

with a place of business at 131 Sewall Avenue, Brookline, Massachusetts ("Maker"), promises to pay to the MASSACHUSETTS HOUSING FINANCE AGENCY, a body politic and corporate, organized and operated under the provisions of Chapter 708 of the Acts of 1966 of the Commonwealth of Massachusetts, as amended, ("Payee"), or its order, at 73 Tremont Street, Boston, Massachusetts or at such other place as may be designated in writing by Payee, on or before April 1, 1971, the principal sum of Three million six hundred fifty two thousand nine hundred and 00/100 ($3,652,900.00) Dollars lawful money of the United States or so much thereof as may be advanced under and pursuant to a certain Construction Loan Agreement of even date, entered into by and between the Maker and the Payee under which Maker promises to develop a low and middle income housing project in Brookline, Massachusetts, (the "Project), and to the Regulatory Agreement and the Mortgage on the Project securing this Note, as hereinafter referred to, all intended to be filed in the Norfolk County Registry of Deeds, with interest on each sum advanced, from the time of advance at the rate of six and three quarter percent (6 3/4%) per annum on unpaid balances, however, commencing April 1, 1971 the interest hereon shall be computed on unpaid balances at a rate of 1/2% in excess of the rate which Payee must pay from time to time to fund or refund notes issued to make this loan, first payable on the first day of October , 1970, and quarter annually thereafter. If completion of the Project has not occurred in accordance with all of the terms and provisions of said Construction Loan Agreement before October 1, 1971, or before the expiration of such further period for completion as may be permitted by the Payee under the terms and provisions of said Construction Loan Agreement, the principal and any unpaid interest on this Note shall become fully due and payable. If said completion has occurred, then, in that event, upon issuance by Payee of a Certificate of approval and acceptance of such completion, this Note shall become extended for a term expiring forty (40) years from and after the date on which Payee issued bonds to refinance its funding of this loan. If the term is so extended, the interest hereon, commencing on October 1, 1971, shall be computed on unpaid balances at a rate of 1/4% in excess of the rate which Payee must pay from time to time to fund or refund notes issued to make this loan, and, after Payee's bonds have been issued, at 1/4% in

IRH 0078705

excess of the rate which Payee must pay on such bonds; and said interest shall become payable monthly in arrears on the tenth day of each month. The principal shall become payable by equal monthly payments on the tenth day of each month commencing upon issuance of said bonds by Payee; all of such interest and principal payments after said issuance being computed as if interest were payable semi-annually and principal annually, so as to provide for equal monthly payments continuing for a period of forty (40) years after said bond issue, and so that full repayment of principal and interest shall be completed at the expiration of said period; and any unpaid balance of principal and interest shall become due and payable at such expiration, and each monthly payment shall be applied first to the payment of interest computed at a rate or rates as aforesaid, and the balance shall be applied in reduction of the principal sum. The foregoing provisions of this Mortgage Note with respect to the time of payment of the sums due and payable by Maker to Payee shall be subject, in all respects, to requirements of the Mortgage collateral to this Mortgage Note providing for the establishment of an escrow account by Maker and the payment into the same of certain of the sums due and payable and promises to pay to Payee on a monthly basis the Fees and Charges imposed upon Maker by Payee pursuant to the provisions of the Mortgage collateral to this Mortgage Note.

The said principal sum secured by this Note, and all accrued interest, shall become immediately due and payable without further demand, presentment or notice, at the option of the holder thereof, on the happening of any default in the payment of any installment of interest or of interest and principal due hereunder, or any portion thereof, or upon the happening of any event by which, under the terms of the aforesaid Construction Loan Agreement, Regulatory Agreement or the Mortgage securing this Note, said principal sum may or shall become due and payable, provided that interest on the principal sum shall thereafter be increased by one percent (1%) over the rate then applicable according to the terms hereof, and, if this Note is placed in the hands of an attorney for collection, by suit or otherwise, or to enforce its collection, or to protect the security for its payment, the undersigned immediately and without demand will pay all costs of collection and litigation together with a reasonable attorney's fee; provided, however, that none of the foregoing provisions of this paragraph shall apply until and unless Payee has given Maker 30 days written notice of said default or of said event, as the case may be, and Maker has not corrected same, or if correction would take more than 30 days if correction is not commenced within 30 days and diligently pursued thereafter until correction has been accomplished.

Maker, except as otherwise expressly provided herein, and every endorser, principal, surety, or guarantor of this Note, or the obligation represented hereby, waives presentment for payment, notice of dishonor, demand, protest, notice of protest, and all demands, notices and suretyship defenses generally, in connection with the delivery, acceptance, performance, default or endorsement of this Note, assents to any extension or postponement of the time for payment or other indulgence, and/or to the addition or release of any other party or person primarily or secondarily liable.

No general partner of the Maker shall be personally liable on this Note, the Payee hereby agreeing to look only to the assets of the Maker for the payment of this indebtedness.

-3-

Maker shall not be entitled to any deduction from, or credit on, the interest or principal herein and in said Mortgage agreed to be paid by reason of, on account of, or for any tax or taxes assessed or to be assessed on the real property described in said Mortgage, or on any part thereof.

Signed under seal, the day and year first above written.

C-W Associates

Witness:

(Seal)
General Partner

(Seal)
General Partner

(MHFA 2)
(1-70)

Copy

MHFA
MASSACHUSETTS HOUSING FINANCE AGENCY

Registry B 4676 - 186
Land Court Doc 308722 on
Cert 89345 B 447 & P 195

MORTGAGE

C-W ASSOCIATES, a Massachusetts limited partnership of which Samuel Stern, Roger W. Stern and Matthew W. Stern are the General Partners, for consideration paid, grant to the MASSACHUSETTS HOUSING FINANCE AGENCY, a body politic and corporate organized and operated under the provisions of Chapter 708 of the Acts of 1966 of the Commonwealth of Massachusetts, as amended, with MORTGAGE COVENANTS, to secure the payment of $ 3,652,900 with interest as provided in its promissory note of even date, ("Mortgage Note"), the land, with the buildings and other improvements now or hereafter erected thereon, and all fixtures now or hereafter attached thereto, situated in Brookline, Massachusetts which is more fully described in Exhibit A below (the "Property").

Including as a part of the realty all portable or sectional buildings, heating apparatus, plumbing, dishwashers, washing machines and dryers, stoves, ranges, mantels, storm doors and screens, screen doors, awnings, electric and gas refrigerators, air conditioning apparatus, fire extinguishing systems, trees and hardy shrubs, and other fixtures of whatever kind and nature, on said premises, or hereafter placed thereon prior to the full payment and discharge of this mortgage, insofar as the same are or can by agreement of the parties be made a part of the realty.

The rents and all other income and revenue, of the premises, including insurance proceeds, as well as all warranties and guarantees in favor of Mortgagor in any contracts, subcontracts or purchase orders, and agreements relating to construction and equipping or re-equipping buildings and other improvements on the property, are also hereby specifically mortgaged, granted, pledged and assigned to Mortgagee as further security for payment of the mortgage debt provided that Mortgagor shall be entitled to collect and enjoy said rents, income, revenue, and proceeds, and to enforce such warranties and guarantees until and unless a default hereunder exists, following due notice and opportunity to cure.

This conveyance also includes all awards now or hereafter made prior to satisfaction of the mortgage indebtedness for the taking of the Property, or any part thereof (including any easement), by the exercise of the power of eminent domain, including any award for change of grade of any street or other roadway, which awards are hereby assigned to Mortgagee and are deemed a part of the Property, and Mortgagee is hereby authorized and empowered jointly with Mortgagor, to adjust and compromise claims for, and to collect and receive the proceeds of, such awards, to give proper receipts and releases therefor, and to apply the same toward the payment of the indebtedness secured by this mortgage, notwithstanding the fact that the amount owing thereon may not then be due and payable; and Mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning each such award to Mortgagee, free, clear

and discharged of any encumbrances of any kind or nature whatsoever except those encumbrances, to which this mortgage has been made expressly subject.

Mortgagor further covenants and agrees as follows:

1. To perform and observe all of the terms and conditions of the Mortgage Note, and the terms and conditions of any other indebtedness that may accrue to Mortgagee under the terms of this Mortgage, and all of the terms and conditions of the Regulatory Agreement and the Construction Loan Agreement (said Note, this Mortgage, and said Agreements being sometimes referred to collectively as the "Contract Documents"), which are recorded herewith and are hereby made a part of this Mortgage, relating, among other things to construction and operation of a low and middle income residential housing development (the "Project"); and to pay when due all taxes, charges and assessments upon the Property, whether levied directly or indirectly or as excise taxes or income taxes, and for this purpose, as required by the Mortgage Note, a monthly apportionment of the sum estimated from time to time by Mortgagee to be sufficient to make all such payments as they become due, will be paid to a joint account of Mortgagor and Mortgagee, pending disbursement, and interest earned on said account will constitute project income and be reflected in all financial reports relating to operation of the premises, and any balance due for any of said payments will be paid to Mortgagee on demand. Mortgagee is hereby authorized to pay when due or any time thereafter all of said payments and to add the same to the principal debt secured hereby;

2\. a. On the tenth day of the month following an advance to Mortgagor by Mortgagee on the Mortgage Loan and on the tenth day of each month thereafter, as scheduled by Mortgagee, until Mortgagee has issued bonds for the purpose of obtaining monies to fund the mortgage loan or to fund notes issued to obtain such monies, Mortgagor will pay to Mortgagee, at the office of Mortgagee, or at such other place as Mortgagee may designate, such fees and charges (hereinafter referred to as "Fees and Charges") as Mortgagee shall determine to be sufficient, together with other monies available for such purposes, in order to reimburse Mortgagee for the following costs and expenses of Mortgagee in connection with the making of this mortgage loan:

(i) administrative expenses of Mortgagee with respect to the mortgage loan;

(ii) costs and expenses of Mortgagee incurred in connection with the authorization, issuance, sale and delivery of its notes issued with respect to the Project.

b. On the tenth day of the month after Mortgagee has issued bonds for the purpose of obtaining monies to fund the mortgage loan, or to fund notes issued to obtain such monies, and on the tenth day of each month thereafter as scheduled by Mortgagee, Mortgagor will pay to Mortgagee, at the office of Mortgagee, or at such other place as Mortgagee may designate, such Fees and Charges as Mortgagee shall determine to be sufficient, together with other monies available for such purposes under the provisions of Mortgagee's Bond Resolution, to:

(i) provide the amounts required to pay the principal of and interest on Mortgagor's Capital Reserve Fund Obligations, as determined by Mortgagee in accordance with the applicable provisions of the Bond Resolution;

(ii) pay, as the same become due, Mortgagor's allocable proportion of Mortgagee's administrative expenses;

(iii) pay, as the same become due, Mortgagee's costs and expenses incurred in connection with the authorization, issuance, sale and delivery of its bonds and notes issued with respect to the Project;

(iv) pay, as the same become due, Mortgagor's allocable proportion of the fees and expenses of the Trustee, Depository, and Paying Agents under the Bond Resolution;

(v) provide the amounts required to pay Mortgagor's Commonwealth Repayment Obligation, as determined by Mortgagee, in accordance with the applicable provisions of the Bond Resolution.

For the purposes of this subsection (b) the term "Mortgagor's allocable proportion" shall mean the proportionate amount of the total requirement determined by the ratio that the Mortgagor's total mortgage loan bears to the total of all the mortgage loans made by Mortgagee from the proceeds of bonds issued for the purpose of obtaining monies to make mortgage loans or for the purpose of funding notes or refunding bonds issued to obtain such monies.

3. That Mortgagor will establish, at the direction of Mortgagee and under an instrument approved by Mortgagee, an escrow account with the Trustee under the Bond Resolution, and will deposit in said escrow account at the times and in the amounts as scheduled by Mortgagee, the monies required to be paid by Mortgagor in repayment of that portion of the Mortgage Loan made by Mortgagee from funds obtained from the principal of the Bonds issued by Mortgagee for such purpose, and the interest thereon at the applicable rate or rates. The provisions establishing said escrow account shall be such that no withdrawals therefrom shall be made by Mortgagor, or otherwise, except for the purpose of making payment of the indebtedness secured by this Mortgage and the interest thereon; provided, however, that in the event bonds issued to provide monies with which to fund the Mortgage Loan are being purchased, redeemed or retired prior to the maturity thereof, Mortgagee may direct the escrowee to transfer monies in said escrow account to the Interest Account established under the Bond Resolution to the extent required to pay interest accrued on the bonds being so purchased, redeemed or retired to the date of such purchase, redemption or retirement, and in such event, Mortgagor will be credited toward the indebtedness secured hereby for any monies so transferred. The escrowee of said escrow account shall be authorized and directed to withdraw therefrom, fifteen (15) days before each principal payment date on the Bonds, an amount equal to the principal of the indebtedness secured by this Mortgage to become due on the next succeeding principal payment date on the Bonds.

4. Following the Completion of the Project Mortgagor will maintain (i) comprehensive general liability insurance with responsible insurers satisfactory to Mortgagee, indemnifying Mortgagor against claims for personal injury or death and for damage to property suffered by others occurring upon, in or about the Property and the passageways thereon in amounts of not less than $500,000 in respect to bodily injury or death to any one person, not less than $1,000,000 in respect of bodily injury or death to any persons in

any one accident or occurance and not less than $100,000 for property damage, and (ii) rental insurance in amounts sufficient to protect Mortgagor against any substantial reduction of rental income.

5. To insure for the lesser of the amount of the mortgage loan or the replacement value of the Project, and for the benefit of Mortgagee and to the extent of its interest, with insurers licensed to do business in Massachusetts and reasonably satisfactory to Mortgagee, the aforesaid real and personal property for fire and extended coverage, and to deposit with the Mortgagee all such insurance policies and renewal policies, which shall contain mortgagee clauses reasonably satisfactory to Mortgagee, requiring insurance proceeds to be first payable to Mortgagee and providing for at least five (5) days notice to Mortgagee prior to expiration or cancellation; and in the event of loss or damage, Mortgagor will give Mortgagee immediate notice, and will use the insurance proceeds promptly to repair and restore the damaged property as promptly as reasonably possible to substantially the same condition for use and occupancy as it was in immediately prior to the casualty. If the parties agree that the proceeds will not be used to repair and restore, the proceeds will be used to reduce the indebtedness secured hereby. Mortgagee may file proof of loss if such is not promptly done by Mortgagor. In the event of foreclosure or transfer of title to extinguish the indebtedness secured hereunder, Mortgagor shall assign to Mortgagee all of its rights, title and interest in such insurance.

6. That a foreclosure of this mortgage shall forever bar Mortgagor and all persons claiming under Mortgagor from all right, title and interest in and to any and all of the fire or other hazard insurance policies on the buildings upon the land covered by this mortgage at the time of such foreclosure, including all rights to return premiums on cancellations, whether at law or in equity.

7. That following completion of construction Mortgagor will keep the Property in such good order, repair and condition as it is at the time or as it may be put in while this Mortgage is outstanding, reasonable wear and tear and damage by casualty excepted; and will not substantially remove, demolish, add to, or alter said premises after construction is completed, or remove any fixtures, equipment or personal property secured hereby without replacing them with equal quality, without Mortgagee's prior written consent; and will not use or permit the premises to be used in violation of any covenant or restriction of record or of any law or municipal ordinance or regulation, including all building, fire, and zoning codes or regulations, or for any unlawful or improper purpose; and will not commit, permit or suffer any waste, impairment, or deterioration of the property or any part thereof.

8. That upon default in any condition of the Contract Documents which remains uncured following due notice and opportunity to cure, Mortgagee, without waiving or prejudicing such other remedies as it may have, may apply any sums credited by or due from Mortgagee to Mortgagor to cure such default without first enforcing any of the other rights of Mortgagee against Mortgagor or the mortgaged premises.

9. That Mortgagor will pay on demand to Mortgagee, or Mortgagee may at its option add to the principal balance then due, any sums advanced or paid by Mortgagee on account of any default which remains uncured after due notice, of whatever nature, by

Mortgagor, or any sums advanced or paid, for taxes, repairs, improvements or insurance, or any sums paid by Mortgagee, including reasonable attorney's fees, in prosecuting, defending, or intervening in any legal or equitable proceeding wherein Mortgagee deems any of the rights created by this mortgage are jeopardized or in issue. Mortgagor also shall pay all reasonable costs including reasonable attorney's fees, incurred by Mortgagee in collecting on the Mortgage Note after it has declared said Note fully due and payable pursuant to its rights upon a default which remains uncured after due notice and opportunity to cure or in enforcing any term, covenant or conditions of this mortgage or foreclosing thereon or defending or upholding the lien thereof. Any such sums shall become a part of the secured indebtedness and bear interest at the rate stated in the Mortgage Note.

10. That this mortgage shall also secure the repayment of such future advances as Mortgagee may, from time to time for any purpose, make to Mortgagor, and the same may be added to the mortgage debt.

11. From time to time whenever demand may be made therefore by Mortgagee, Mortgagor within ten (10) days from such demand shall execute and deliver to Mortgagee in form and content reasonably satisfactory to it such Uniform Commercial Code documents and other security instruments covering the equipment, fixtures, chattels and personal property then or thereafter to be installed in or used in connection with the operation of the plant of the mortgaged premises, other than property of tenants as Mortgagee shall deem useful or necessary to perfect and retain its security in the Project; any delay, failure or refusal so to do shall constitute a default under this Mortgage; and all the equipment, fixtures, chattels and personal property aforesaid shall be and remain clear and unencumbered except by the lien or security interest created by this Mortgage and such security interest delivered to Mortgagee. However, neither a demand so made by Mortgagee nor the failure by Mortgagee to demand any such security instrument shall be construed as a release of such equipment, chattels or personal property from the security of this Mortgage, it being agreed that this provision and any security instruments delivered to Mortgagee pursuant hereto are cumulative and given as additional security and shall not remove the equipment, chattels or personal property from the lien of this Mortgage.

12. That Mortgagor has a good and clear record, fee simple title to the premises, and will not create or permit any encumbrance thereon, or security interest therein, or in any fixture or article or personal property now or hereafter subject to this Mortgage, or purporting by the terms hereof to be made so subject, which in the reasonable opinion of counsel to Mortgagee would take priority over this Mortgage, whether under the provisions of the Uniform Commercial Code, as the result of attachments, liens, lis pendens, or otherwise, and will not attach or use in connection with construction or operation of any improvements on the mortgaged premises any personal property which is subject to such prior encumbrance or security interest. Mortgagor will at all times on request of Mortgagee and of any person deriving title hereunder, execute and do all such assurances, deeds, and things for further or more perfectly assuring the Property and every part thereof in the manner in which this Mortgage is to be made or which shall be reasonably required. If any lien for labor, skill, or material shall be filed for record while this Mortgage is outstanding upon or against the Property, Mortgagor, within 30 days after the date of such filing for record will either pay off said lien and secure its sale of record or will provide Mortgagee with such protection as Mortgagee shall reasonably

require by depositing the amount claimed to be due on the lien and Mortgagee may use any such deposit to pay off any such lien the validity of which shall be established to Mortgagor's reasonable satisfaction.

13. That upon default in any condition of any of the Contract Documents, existing after due notice for more than 30 days, or if it should be impossible to cure in 30 days for any additional period during which Mortgagor is diligently proceeding to cure, the entire indebtedness secured hereby shall become due and payable on demand at the option of Mortgagee, and Mortgagor will surrender the premises and Mortgagee shall thereupon have the right to foreclose upon this mortgage, and to enter the premises and collect all the rents which are then due or become due, and apply the same after paying charges and expenses, on account of the indebtedness hereby secured, and all such rents and leases existing at the time of the default are hereby assigned to Mortgagee as further security for the indebtedness secured hereby; and Mortgagee may also dispossess, by summary proceedings, any tenant defaulting in the payment of any rent to Mortgagee. In the event that Mortgagor remains in possession after such default, such possession shall be as a tenant of Mortgagee, and Mortgagor shall pay in advance, upon demand by Mortgagee, as a reasonable monthly rental for the premises occupied by Mortgagor, an amount at least equivalent to one-twelfth (1/12) of the aggregate of the twelve monthly installments payable in the then current calendar year, under the Mortgage Note plus the actual amount of the taxes, assessments, water rates, other governmental charges, and insurance premiums payable in connection with the premises during such year, and upon the failure of Mortgagor to pay such monthly rental, Mortgagor may also be dispossessed by the usual summary proceedings applicable to tenants. This covenant shall become effective immediately upon the happening of any such default, as determined in the reasonable opinion of Mortgagee, who shall give Mortgagor notice of such determination, and following expiration of the period during which there exists a right to cure such default; and in the case of foreclosure and appointment of a receiver of the rents, this covenant shall inure to the benefit of such receiver.

14. That the principal amount owing on the Mortgage Note, together with all interest and charges, shall become immediately due and payable, without notice or demand, and Mortgagee shall be entitled to foreclose upon this Mortgage, in the event that Mortgagor files a petition in bankruptcy, or for appointment of a creditor's receiver or in insolvency, or for reorganization or compositon, or makes an assignment for the benefit of creditors or to a trustee for creditors, or to permit an adjudication in bankruptcy or, the taking of possession of the Property or any part thereof by a receiver for creditors or the seizure and sale of the Property or any part thereof under judicial process or pursuant to any power of sale and fails to have such adverse actions set aside within thirty (30) days.

15. Mortgagor will not convey transfer, change the ownership of or encumber the Property or assign the whole or any part of the rents or revenues of the Property without the prior written approval of Mortgagee, which approval will not unreasonably be withheld. In the event of the conveyance or transfer of the mortgaged premises, or any part thereof, Mortgagee may, without notice to Mortgagor, deal with such successor or successors in interest with reference to the mortgage and the debt hereby secured, and in the same manner as with Mortgagor, without in any way vitiating or discharging Mortgagor's liability hereunder or upon the debt hereby secured, and in the event such transfer has not been approved by Mortgagee under the provisions of Section 10 of the

Regulatory Agreement, Mortgagee at the option of Mortgagee, may declare the entire principal and interest of said Mortgage Note due and payable. No sale of the premises hereby mortgaged and no forebearance on the part of Mortgagee and no extension whether oral or in writing of the time for the payment of the debt hereby secured given by Mortgagee shall operate to release, discharge, modify, change or affect the original liability of Mortgagor herein, either in whole or in part.

16. That upon any action to foreclose this Mortgage, Mortgagee shall be entitled, without regard to the adequacy of security, to the appointment of a receiver.

17. That Mortgagor will not make any advance principal payment prior to twenty years from the date of the permanent loan, and thereafter only in the event that at the time of such payment, all of the bonds issued by Mortgagee for the purpose of obtaining funds with which to make this mortgage loan are redeemable and in that event the Mortgagor shall pay an amount equal to the aggregegage of (i) the principal amount of this Mortgage remaining unpaid, (ii) the interest to accrue on all bonds of Mortgagee to be paid or redeemed by Mortgagee upon the making of such advance principal payment to the date of redemption or payment not previously paid by Mortgagor, (iii) the call premium, if any, on the bonds to be redeemed, and (iv) the costs and expenses of Mortgagee in effecting the redemption of the bonds to be redeemed, as determined by Mortgagee; provided, however, that in the event the bonds issued to provide the funds with which the Mortgagee made this mortgage loan have been refunded and the refunding bonds issued for the purposes of refunding such original bonds were issued in a principal amount in excess of the principal amount of this Mortgage remaining unpaid at the date of such refunding issue, the amount which Mortgagor shall be obligated to pay under item (i) above shall be the principal amount of such refunding bonds then outstanding.

18. That Mortgagor has heretofore provided, or will provide in a manner satisfactory to Mortgagee in payment of the cost of the Project, as determined by Mortgagee in accordance with the Act, the difference between said cost of the Project and the amount of this mortgage loan.

19. That within ninety (90) days following the close of Mortgagor's fiscal year and annually thereafter, Mortgagor shall furnish Mortgagee a certified audit with respect to the operation of the premises during such fiscal year, which report shall include a detailed, itemized statement of all income and expenditures and shall be prepared in accordance with approved accounting practices.

20 That Mortgagee shall enjoy the right, at all reasonable times, to inspect the premises and the business and financial records respecting ownership and operation of the Project.

21. Promptly upon request Mortgagor will furnish a written statement, duly acknowledged, of the amount advanced under the mortgage loan, and whether to its knowledge any offsets or defences exist against the mortgage indebtedness.

22. That failure or delay of Mortgagee to assert in any one or more instances any of its rights hereunder shall not be deemed or construed a waiver of any such rights.

23. Notice hereunder shall be sufficiently given if mailed, by certified mail, return receipt

requested, in the case of Mortgagor if addressed to C-W Associates, 131 Sewall Ave, Brookline, Massachusetts (02146), and, in the case of the Mortgagee if addressed to 73 Tremont Street, Boston, Massachusetts (02108), or as either party may designate in writing.

24. That wherever the words Mortgagor and Mortgagee are used herein they shall include their several successors, grantees and assigns subject to the limitations of law and of this instrument, and if the context requires, the words Mortgagor and Mortgagee and the pronouns referring to them shall be contrued as plural, neuter or feminine.

This Mortgage is upon the STATUTORY CONDITION, for any breach of which, or for any breach of any of the aforementioned covenants or agreements, the holder hereof shall have the STATUTORY POWER OF SALE.

WITNESS the execution hereof as a sealed instrument, this first day of July, 1970

C-W ASSOCIATES

_________________ L.S.
General Partner

[signature] L.S.
General Partner

[signature] L.S.
General Partner

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss. July 1, 1970

Then personally appeared the above named [signature] & Samuel Stern General Partners of C-W Associates

and acknowledged the foregoing instrument to be his free act and deed and the free act and deed of said

Before me

[signature]
Notary Public
My Commission Expires:

Parcel 1 - Registered Land

A certain parcel of land in Brookline, Norfolk County, Massachusetts, bounded and described as follows:

| | |
|---|---|
| NORTHEASTERLY: | by the southwesterly line of Centre Street, 277 feet; |
| SOUTHEASTERLY: | by Williams Street, 155 feet; |
| SOUTHWESTERLY: | by lands now or formerly of Charles Weinstein and of Eve Dansker et al, 195 feet; |
| SOUTHEASTERLY: | by land now or formerly of said Eve Dansker et al, 20 feet; |
| SOUTHWESTERLY: | by land now or formerly of Max R. Cohen et al, 140 feet |
| NORTHWESTERLY: | by land now or formerly of Vera C. Gillespie et al, 20 feet; and |
| NORTHEASTERLY: | 58 feet, and |
| NORTHWESTERLY: | 155 feet by land now or formerly of James G. Jameson. |

All of said boundaries are determined by the Land Court to be located as shown on a plan drawn by Charles A. Perkins Co., Surveyors, dated March 1963, as modified and approved by said Court, filed in the Land Registration Office as No. 32776A, a copy of a portion of which is filed in Norfolk Registry District with Certificate No. 75806, Book 380.

Parcel 2 - Unregistered Land

A certain parcel of land in said Brookline containing 6,875 square feet of land, more or less, and being shown on a plan by Alexis H. French, C. E., dated September 1, 1887 and recorded with Norfolk Registry of Deeds in Book 601, Page 154, bounded and described as follows:

| | |
|---|---|
| SOUTHEASTERLY: | by Williams Street, 55 feet; |
| NORTHEASTERLY: | by parcel 1 described above, 125 feet; |
| NORTHWESTERLY: | by land now or formerly of Eve Dansker et al, 55 feet; |
| SOUTHWESTERLY: | by land now or formerly of S. T. Gwock et al and B. I. and S. Sohn, 125 feet. |

Both parcels together contain approximately 52,477 square feet of land.

1 Debtor(s) (Last Name First) and address(es)
C-W Associates, Limited
Partnership
1 Sewall Avenue
Brookline, Massachusetts

2 Secured Party(ies) and address(es)
Massachusetts Housing Finance
Agency
73 Tremont St., Room 350
Boston, Mass. 02108

4 This financing statement covers the following types (or items) of property:

Property in Brookline described in Mortgage of even date filed herewith

Check [x] If covered: [ ] Proceeds of Collateral are also covered. [ ] Products of Collateral are also covered. No. of additional sheets presented:

Filed with: Norfolk Registry of Deeds + Land Court

C-W Associates, Limited Partnership
By: [signature]
Signature(s) of Debtor(s)

Massachusetts Housing Finance Agency
By: [signature]
Exec. Director
Signature(s) of Secured Party(ies)

FILING OFFICER COPY — ALPHABETICAL

This form of financing statement is approved by the Secretary of State.

STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UCC-1 Forms may be purchased from Samuel Narcus, Boston, Mass.

DEDHAM, MASS. July 16, 1970
at 9 o'clock and 35 Minutes A M
Received and Entered with Norfolk deeds
Vol. 4676 Page 220
Attest:
[signature]
Register of Deeds

The foregoing is a duplicate of
Document No. 308725 filed in the
Norfolk Registry District of
the Land Court on Jul/16/1970
Attest: [signature]
Asst. Recorder



IRH 0078712

DISPOSITION AGREEMENT

AGREEMENT made and entered into this 3rd day of August, 1988 between MASSACHUSETTS HOUSING FINANCE AGENCY, a body politic and corporate, organized and operated under the provisions of Chapter 708 of the Acts of 1966, as amended ("MHFA") and C-W ASSOCIATES ("Owner"), a Massachusetts limited partnership with a principal place of business at 100 Centre Street, Brookline, Massachusetts.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, MHFA and Owner agree as follows:

ARTICLE I

Definitions:

As used herein the following terms shall have the meanings ascribed to them below:

(a) "low-income persons or families" - those persons and families whose annual income is equal to or less than the maximum amount which would make them eligible for units owned and leased by the Brookline Housing Authority;

(b) "Mortgage" - that instrument dated August 3, 1988 recorded with the Norfolk Registry of Deeds ~~in Book , Pages~~ herewith including all amendments and modifications thereto;

(c) "Property", "land", "Project" - that certain parcel of land, as more particularly described in the Mortgage, known as 100 CENTRE STREET, located at Brookline, Massachusetts,

together with the improvements thereon, which consist of a 217unit low and moderate income housing complex and related amenities, the construction of which was financed by MHFA;

(d) "Note" - that instrument dated August 3 , 1988, for which the Mortgage was given as security including all amendments and substitute notes thereto;

(e) "Regulatory Agreement" - that agreement dated August 3, 1988 , recorded herewith;

(f) "Enabling Act" - chapter 708 of the Acts of 1966, as amended;

(g) "annual income" - a family's or person's gross annual income less such reasonable allowances for dependents (other than spouse) and for medical expenses as MHFA determines;

(h) "adjusted monthly income" - one-twelfth of the annual income remaining after making the exclusions from gross annual income as allowed by the subsidy regulations.

(-) "Monthly Rental Charge" - a monthly sum, determined by MHFA, not to exceed twenty-five percent of a tenant's adjusted monthly income as that term is herein defined, or such greater percentage as may be required by applicable law;

(j) "family" - two or more persons related by blood, marriage, or operation of law, who occupy the same dwelling or unit;

(k) "moderate-income persons or families" - those persons or families other than low-income persons or families whose annual income is less than the amount necessary to enable them to obtain and maintain decent, safe and sanitary housing without the expenditure of over twenty-five percent of such income for basic shelter costs, including the additional costs, if any, of heat and hot water.

(l) "subsidy" - governmental financial assistance which when applied reduces rents.

ARTICLE II

RESTRICTIONS ON USE OF THE PROJECT

(1) For the term of this Agreement, hereinafter defined, Owner COVENANTS AND AGREES for itself, and any successors and assigns that it shall:

(a) Use the Project as a mixed-income rental housing project, which shall include low and moderate income tenants, at rental levels consistent with the terms of the Enabling Act, MHFA regulations, and the Regulatory Agreement;

(b) Provide that not less than twenty-six [handwritten insertion: "-six"; initialed] percent of the total rental units be rented at all times to low-income persons or families at or below the Monthly Rental Charge; and

(c) Provide, to the extent that available state and federal subsidies permit, that not less than Thirty-Three [handwritten; ~~twenty-five~~ struck through; initialed] percent of the total rental units be rented at all times to moderate-income persons or families. MHFA shall have the exclusive right to determine rental levels for moderate-income persons or families consistent with the the terms of the Enabling Act, MHFA regulations and the Regulatory Agreement.

ARTICLE III

ENFORCEABILITY

The covenants set forth in this Agreement shall run with the land; be binding upon the Owner, and any successors and assigns, to the fullest extent permitted by law; be for the exclusive benefit of MHFA; be enforceable solely by MHFA, its successors and assigns in either law or equity; and survive the foreclosure of the Mortgage and be binding upon and enforceable against any purchaser at a foreclosure sale.

ARTICLE IV

OTHER INSTRUMENTS

Owner, its successors and assigns agree to execute and deliver to MHFA, in form suitable for recording, any document which MHFA requires to further ensure the enforceability of the terms and provisions of this Agreement.

ARTICLE V

WAIVER AND RELEASE

MHFA and its successors and assigns, as sole beneficiary of this Agreement, may release any provision of this Agreement, at any time during its term, if MHFA determines that any provision hereof may adversely affect either the tenants of the Project or MHFA's security for repayment of the Note and any other obligation which is secured by the Mortgage.

ARTICLE VI

TERM

The terms and provisions of this Agreement shall remain in full force and effect until ~~fifteen years from the date hereof,~~ march 12, 2012, [initials] unless sooner terminated as herein provided.

ARTICLE VII

SEVERABILITY

The provisions of this Agreement are severable, and if any of its provisions shall be declared invalid by any court of

competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions.

Executed as a sealed instrument the day first noted above.

Issuer: MASSACHUSETTS HOUSING FINANCE AGENCY

By_________________________________________

Edward T. Pollack, General Counsel

C-W ASSOCIATES

By_________________________________________

Roger W. Stern, General Partner

By_________________________________________

Jeffrey A. Stern, General Partner

COMMONWEALTH OF MASSACHUSETTS

August 3, 1988

SUFFOLK, SS.

Then personally appeared before me the above-named Roger W. Stern and Jeffrey A. Stern, both of whom are General Partners of C-W Associates, and acknowledged the foregoing instrument to be their free act and deed and the free act and deed of C-W Associates.

Thomas G. Taylor

Notary Public

THOMAS G. TAYLOR
NOTARY PUBLIC
My Commission Expires Dec. 4, 1992

Nrfolk Reg # 549896

Increase
6/83
MHFA No: 70-008-N

REGULATORY AGREEMENT

**Date:** August 3, 1988

**Borrower's Name and Address:** C-W ASSOCIATES, a Massachusetts Limited Partnership, 100 Centre Street, Brookline, MA

**Project Name and Location:** 100 CENTRE STREET, Brookline, MA

**Replacement Reserve:**

**Borrower's Equity:** $ 18,881 Developers fee
\+ $188,818 cash
= $207,699 on Increase

AGREEMENT between Borrower and MASSACHUSETTS HOUSING FINANCE AGENCY (the "Agency"), a body politic and corporate, organized and operated under the provisions of Chapter 708 of the Acts of 1966 of the Commonwealth of Massachusetts as amended (the "Act").

IN CONSIDERATION of the Mortgage Loan increase which the Agency has agreed to advance the Borrower for the benefit of the Project, which is more fully described in the Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents (the "Mortgage") of even date herewith (certain capitalized terms are identified in the Mortgage) the Borrower covenants and agrees that in connection with ownership and operation of the Project it will comply, and will require any purchaser of the Property to comply, with the following:

1. Rentals in the Project shall be in accordance with the Rental Schedule previously approved by the Agency and is hereby made a part hereof. Any changes in said schedule shall require the Agency's prior written approval, and if necessary, the prior written approval pursuant to the Subsidy Documents. Notwithstanding any rental increases pursuant to the immediately preceding sentence, not less than twenty-five percent (25%) of the units shall be rented at all times to low-income persons or families at or below the "actual rentals" which are shown on said schedule; and in fulfilling this requirement the Borrower will accept referrals of tenants from the Public Housing Authority in the city or town in which the Project is located, and will not unreasonably refuse occupancy to any prospective tenants so referred. Income verifications satisfactory in form and manner to the Agency will be made at least every two (2) years for all tenants or annually if necessary to comply

with requirements of the Subsidy Documents. As used in this Agreement, the term "low-income families" shall mean persons or families eligible at any given time for occupancy in public housing in the city or town in which the Project is located; the terms "adjusted rental", "below market rental", and "market rate rental" shall have the same meaning as in Section 6 of the Act, and the term "annual income" shall have the same meaning as in Section 1(e) of the Act.

2. The requirement of Section 1, above, that twenty-five percent (25%) of the units of the Project be rented to persons and families of low income is intended by the parties to be achieved by the following means: While the Mortgage is in effect the parties will use best efforts to ensure that i) 71 units are the subject of an interest subsidy under Section 236 Interest Reduction Program of the U.S. Department of Housing and Urban Development; and (ii) 56 of the units are assisted through 707 Rental Assistance Program of the Commonwealth of Massachusetts. In the event of the unavailability to the Project at any time while this Agreement is in effect of any of these programs, Borrower will use best efforts to secure assistance under any other presently or subsequently enacted federal or state program under which low-income persons may be eligible for public assistance in paying for the cost of shelter. In the event of the unavailability of such housing subsidy programs at any time while this Agreement is in effect, Borrower will make every reasonable effort to fulfill the Agency's statutory requirement that twenty-five percent (25%) of the units be available to low-income persons and families at rents not exceeding twenty-five percent (25%) of their annual income, by upward adjustment of rentals for the units occupied by other than low-income persons or any other means that are then available, and the actual rentals payable by the persons and families of low income occupying at least twenty-five percent (25%) of the units will be increased only in the event of proof, to the Agency's reasonable satisfaction, that the only alternative to such increase would lead to Borrower's inability to meet his obligation to amortize the permanent Mortgage Loan. In the event of any such increase, the rentals payable by said persons and families will be reduced again upon determination by the Agency that such additional rental is no longer required to prevent said inability to amortize the Mortgage Loan. Borrower shall use its best efforts to rent units to low-income families throughout the income eligibility range and reasonable efforts to rent to families who are not in need of subsidy.

3. This Agreement, the Substitute Mortgage Note (the "Mortgage Note"), the Mortgage, and the Construction Loan Agreement, Development Fund Agreement, executed by the parties, all of

even date and relating to the Project, and all agreements between the Borrower and the Agency, or either of them, and the United States Department of Housing and Urban Development ("HUD") and/or the Commonwealth of Massachusetts relating to the provision of mortgage or rental subsidies for the project (the "Subsidy Documents") shall be construed as a single agreement, and default by the Borrower under the provisions of any one shall be deemed a default under each of the others. Said documents collectively shall be known as the "Contract Documents". The terms "Property" and "Project" are defined in the Mortgage.

4. The Resident Selection Plan which has been approved by the Agency will be complied with. Said plan is hereby made a part of this Agreement. As between applicants equally in need and eligible for occupancy, preference shall be given in the leasing of units, in accordance with statutory requirements, to persons displaced by public action or natural disaster. There shall be no discrimination in the selection of tenants by reason of the fact that there are children in the family of the applicant.

5. There shall be no discrimination upon the basis of race, creed, color, sex, handicap or national origin in the lease, use, or occupancy of the Project, or in connection with the employment or applicant for employment of persons for the operation and management of the Project. An Affirmative Action Plan with regard to advertising for, hiring and promoting employees of the Borrower or of the management company hired by the Borrower must be approved by the Agency. Contracts for services and goods will be subject to such Affirmative Action Plan.

6. All records, accounts, books, tenant lists, applications, waiting lists, documents, and contracts relating to the Project shall at all times be kept separate and identifiable from any other business of the Borrower which is unrelated to the Project, and shall be maintained, as required by regulations issued by the Agency from time to time, in a reasonable condition for proper audit and subject to examination during business hours by representatives of the Agency. Failure to keep such books and accounts and/or make them available to the Agency will be a default pursuant to Section 2.1 of the Mortgage.

7. Borrower has established and agrees to continue to maintain a reserve fund for replacements in an escrow account controlled by the Agency in an amount per month specified above unless a different date or amount is approved in writing by the Agency. The interest earned on the account shall remain in the Replacement Reserve for the benefit of the Project. Disbursements from such fund, whether for the purpose of

effecting replacement of structural elements or mechanical equipment, may be made only after receiving the prior consent in writing of the Agency, which consent will not be withheld unreasonably. In the event of a default in the terms of the Mortgage whereby repayment of the Mortgage Loan is accelerated, the Agency may apply or authorize the application of the balance in such fund to the amount due on the Mortgage Debt as accelerated. In the event of prepayment of the Mortgage Loan pursuant to the provision of the Mortgage, the balance in such fund shall belong to the Borrower.

8. Borrower shall establish a Distribution Account, in accordance with the following requirements:

(a) Only such Project income from rents or other sources may be allocated to the Distribution Account as may remain after, and any amounts in the Distribution Account shall always be available for, in the following order of priority: (i) payment of or adequate reserve for all sums due or currently required to be paid under the terms of the Mortgage and the Mortgage Note; and (ii) payment of or adequate reserve for all current obligations of the Project other than the Mortgage Loan, including escrows for real estate taxes and insurance; and (iii) deposit of all amounts required to be deposited in the reserve fund for replacements; and (iv) payments of non-interest bearing expense loans made within three (3) years prior to the date of disbursement from the distribution account by the general partners of the Borrower for Project expenses, provided that the Borrower shall have supplied the Agency with such evidence as the Agency may reasonably request as to the application of the proceeds of such operating expense loans to Project expenses. Distribution may be made from the Distribution Account only when all currently payable obligations of the Borrower as identified in paragraphs (i), (ii), (iii) and (iv) above are paid as evidenced by a certificate provided by an independent accountant indicating that no such obligation are more than thirty (30) days past due.

(b) No additional amount shall be allocated to the Distribution Account, and no amount shall be paid out of said Account when a default for which notice has been issued exists under the Contract Documents, or when there has been failure to comply with the Agency's notice of any reasonable requirement for proper maintenance of the Project, or when there is outstanding against all or any part of the Project any lien or security interest on the Project assets other than the Mortgage unless provided for to the Agency's reasonable satisfaction by insurance, reserve, or in a similar manner. No amount shall be allocated to the Distribution Account which constitutes or is derived from the

borrowed funds or from the sale of capital assets, except with the prior written authorization of the Agency.

(c) Distribution to equity owners may be made from the Distribution Account, provided that no distribution for any fiscal year may exceed that percentage of the Borrower's Equity in the Project which from time to time is permitted under the Act, and which, at the time of execution hereof, is six percent (6%). The equity amount shall be subject to adjustment at the time of the final mortgage advance in the event that the difference between the amount of the Mortgage Loan and the total project cost as described in Section 5(d) of the Act, differs from said agreed amount. Distributions shall be permitted with respect to each fiscal year of the Project after Completion as defined in the Construction Loan Agreement, but not before all current and owed-to-date project expenses have been paid and reserves, then due or owing, have been funded. In the event that distributions are not made in any succeeding year to the maximum percentage permitted by law at the time with respect to such year, then in that event, but subject to the provisions of subsections (a) through (c), such deficiency may be made up without interest, out of amounts in the Distribution Account which have been accumulated over any three preceding or succeeding years. Distribution may in no case be made from the Excess Rental Account. Distributions may be made only after all deposits required pursuant to Paragraph 8(a) have been made.

9. All rentals, if any, received by the Borrower in excess of the below-market rentals established for each unit and not necessary for Project operations shall be applied pursuant to Agency direction to reduce rentals so as to make more units available to low-income persons and families.

10. Occupancy shall be permitted only upon execution of a lease in form satisfactory to the Agency. All leases shall be expressly subordinated to the Mortgage, and shall contain clauses, among others (though in the event such clauses are inconsistent with the Subsidy Documents, the Subsidy Documents will apply to those units for which there is a subsidy) wherein each individual Lessee:

(a) certifies the accuracy of the statements made in the application and income survey;

(b) agrees that the family income, family composition and other eligibility requirements, shall be deemed substantial and material obligations of his tenancy; that he will comply promptly with all requests for information with respect thereto from the Borrower or the Agency, and that his failure or refusal to comply with a request for information with respect thereto shall

be deemed a violation of a substantial obligation of his tenancy;

(c) agrees that at such time as the Borrower or Agency may direct, he will furnish to the Borrower certification of then current family income, with such documentation as the Agency shall require.

(d) agrees to such charges as the Agency has previously approved for any facilities and/or services which may be furnished by the Borrower or others to such tenant upon his request, in addition to the facilities and services included in the approved Rental Schedule;

11. Owner shall not without the prior written approval of the Agency, which approval will not unreasonably be withheld, and any other governmental authority whose jurisdiction includes regulation of Borrower, nor contrary to Agency law effective at the time in question:

(a) convey, transfer, or encumber any of the mortgaged property including the grant of commercial leases, or permit the conveyance, transfer or encumbrance of such property (except for apartment leases).

(b) assign, transfer, dispose of, or encumber any personal property of the Property, including rents, or pay out any funds other than: distributions with respect to equity expressly permitted hereunder, excess mortgage proceeds which are permitted to be distributed pursuant to the terms of the Construction Loan Agreement, reasonable operating expenses and necessary repairs, proceeds of the sale of ownership shares of the Borrower, subject to the terms of the Development Fund Agreement, by and between the Borrower and the Agency and any amendments or guarantees pertaining thereto, and repayment of loans which the Borrower makes to the Project at such rates and upon such conditions as the Agency reasonably agrees are fair and reasonable to the Project, provided, however, that Borrower is expressly permitted to assign, transfer, dispose of or encumber any tangible personal property to be replaced by or with other items of personal property of like quality and value, and free of superior title, liens and claims.

(c) convey, assign, transfer, or permit the surrender or relinquishment of any general partnership interest or twenty-five percent (25%) of the limited partnership interests to any limited partner or any right to manage or receive the rents and profits of the Project, except with the Agency's prior written approval, and unless the transferees or assignees of the general partners assume the obligations of the Contract Documents by an instrument

in writing satisfactory to the Agency;

(d) substantially remodel, add to, reconstruct, or demolish any part of the mortgaged property or substantially subtract from any real or personal property of the Project;

(e) permit the use of the dwelling accommodations of the Project for any purpose except residences or permit commercial use greater than that originally approved by the Agency, if any;

(f) incur any liability direct or contingent, out of the ordinary course of business in developing and operating a low and middle-income residential housing Project;

(g) except as stated expressly in the Contract Documents or otherwise approved by Mortgagee in writing, pay any compensation or make any distribution of income or other assets to any of the owners of shares of stock or of beneficial interest;

(h) enter into any management contract;

(i) modify or amend the Borrower's charter, by-laws, partnership agreement, or other governing instrument or instruments, except as permitted by the Contract Documents;

(j) if any general partner is a corporation or a partnership, modify or amend the general partner's charter, articles of organization, by-laws, partnership agreement, or other governing instrument or instruments; nor shall any interest in stock be transferred.

12. Borrower shall provide for the management of the Project in a manner reasonably satisfactory to the Agency. Any management contract entered into by Borrower shall contain a provision that it shall be subject to immediate termination, without penalty and with or without cause, upon notice of termination by the Agency addressed to the Borrower and the management agent. Upon receipt of such notice of termination, Borrower shall immediately make arrangements reasonably satisfactory to the Agency for continuing proper management of the Project. Any event of default under the Contract Documents shall be cause for termination of the management contract by the Agency. Borrower, with the approval of the Agency, may retain the terminated management company for up to thirty days while a replacement management company is being selected. In the event that, subsequent to thirty days after the termination of the management contract by the

Borrower (whether or not such termination is pursuant to the provisions of this section), Borrower has not made arrangements reasonably satisfactory to the Agency for continuing proper management of the Project, the Agency shall have the right to designate a management agent for the Project.

13. Payment for services, supplies, or materials shall not exceed the amount ordinarily and reasonably paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

14. Within the ninety (90) days following the end of each fiscal year of the Project, the Agency shall be furnished with a complete annual financial report for the Project based upon an examination of the books and records of the Borrower containing a detailed, itemized statement of all income and expenditures, prepared and certified by a Certified Public Accountant in accordance with the reasonable requirements of the Agency which include (i) the income statement submitted on an Agency format, and (ii) the financial report on an accrual basis and in conformity with generally accepted accounting principles applied on a consistent basis. A duly authorized agent of the Borrower must approve in writing such submission.

15. At the request of the Agency, the Borrower shall furnish quarterly financial statements and occupancy reports and shall give specific answers to questions upon which information is reasonably desired from time to time relative to the ownership and operation of the Project.

16. All rents and other receipts of the Project shall be deposited in the name of the Borrower or a nominee for the Borrower in a bank or banks, whose deposits are insured by the F.D.I.C. The Agency shall at all times be advised of the names of the accounts and names of the banks. Such funds shall be withdrawn only in accordance with the provisions of this Agreement. Any person receiving funds of the Project other than as permitted by the Contract Documents shall immediately deposit such funds in a Project bank account, and failing to do so in violation of this Agreement, shall hold such funds in trust for the Project.

The General Partner, General Partners, and the Managing Agent shall be responsible and account for any and all disbursements made from rents and receipts from the operation of the Project, and failure to account for any cash disbursements used for any purpose not permitted by the Contract Documents shall make the General Partner, General Partners and the Managing Agent personally liable to the extent of such unaccounted for disbursements. Project income may be used only for the purposes specified in Section 8(a)(i)-(iv)

and 8(c).

17. There shall be full compliance with the provisions of all state or local laws prohibiting discrimination in housing on the basis of race, sex, religion, handicap, color, national origin, age, marital status or ancestry, and providing for nondiscrimination and equal opportunity in housing. Failure or refusal to comply with any such provisions shall be a proper basis for the Agency to take any corrective action it may deem necessary including, but not limited to, the rejection of future applications for mortgage loans and the refusal to enter into future contracts of any kind with which the Borrower or its shareholders, trustees, or beneficiaries are identified.

18. This Agreement shall bind, and the benefits shall inure to, respectively, the Borrower and its successors and assigns, and the Agency and its successors and assigns, so long as the Mortgage continues in effect, whether or not the Agency shall continue to be the owner of the Mortgage, provided, however, that this Agreement shall become a nullity upon payment and discharge of the Mortgage.

19. Borrower warrants that it has not, and will not, execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

20. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

21. Notices shall be deemed delivered when mailed registered mail, return receipt requested, to the Borrower at the address set forth above and to the Agency at 50 Milk Street, Boston, Massachusetts 02109, or to such other place as a party may designate in writing.

22. If the Borrower is a partnership, (i) no limited partner of the Borrower, and except with respect to Section 16 and the provisions of this Section 22(ii)-22(iv), no general partner shall have any personal liability hereunder, and the Agency shall look only to the Borrower's assets for such payments or performance, (ii) no amendments will be made to the Borrower's Partnership Agreement which would affect the Agency's rights under any of the Contract Documents, without the Agency's prior written approval, (iii) in the event of retirement, death or insanity of a general partner business will be continued by the remaining general partners, and

(iv) no general partner will voluntarily withdraw from the partnership without the Agency's prior written approval. Following completion of the Project, said approval will not be unreasonably withheld if there are one or more remaining or substitute general partners who, in the Agency's reasonable opinion, are capable and competent to cause the Borrower to have the capacity to effectively own and operate the Project.

**IN WITNESS WHEREOF**, the parties have caused this **REGULATORY AGREEMENT** to be signed and sealed by their respective, duly authorized representatives, as of the day and year set forth above.

**MASSACHUSETTS HOUSING FINANCE AGENCY**

By_______________________
Edward T. Pollack, General Counsel

**BORROWER: C-W ASSOCIATES**

By_______________________
Roger W. Stern, General Partner

By_______________________
Jeffrey A. Stern, General Partner

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS. August 3, 1988

Then personally appeared before me the above-named Roger W. Stern and Jeffrey A. Stern, both of whom are General Partners of C-W Associates, and acknowledged the foregoing instrument to be their free act and deed and the free act and deed of C-W Associates.

Thomas G. Taylor

Notary Public

THOMAS G. TAYLOR
NOTARY PUBLIC
My Commission Expires Dec. 4, 1992