EXHIBIT 17

Increase 6/83
MHFA No. 70-008-N

**MODIFICATION AND RESTATEMENT OF MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS**

Date: August 3 , 1988

Borrower's Name and Address: C-W ASSOCIATES, a Massachusetts Limited Partnership, 100 Centre Street, Brookline, MA

Project Name and Location: 100 CENTRE STREET, Brookline, MA

Principal Amount of Mortgage Note: -- FIVE MILLION, NINE HUNDRED TWENTY-SEVEN THOUSAND, SIX HUNRED SEVENTY-NINE ($5,927,679) DOLLARS

Original Mortgage Recording: Document No. 308723, on Certificate No. 89395, and Document No. 321052 on Certificate No. 92432 at Norfolk Registry District of the Land Court.
First Amendment to Mortgage: March 1, 1972 - Document No. 322435 on Certificate Nos. 92432 and 89395, Norfolk Registry District of the Land Court.
Second Amendment to Mortgage: November 24, 1981 - Document No. 418691 on Certificate Nos. 92432 and 89395.

FOR CONSIDERATION PAID, including but not limited to an increase in the Mortgage Loan, the Borrower and the MASSACHUSETTS HOUSING FINANCE AGENCY (the "Agency"), a body politic and corporate organized and operated under the provisions of Chapter 708 of the Acts of 1966 of the Commonwealth of Massachusetts, as amended, (the "Act") agree to Modify and Restate completely the above-referenced Mortgage, Security Agreement and Assignment of Leases and Rents as herein provided. For such consideration paid, the Borrower grants to the Agency to secure the payment of the Mortgage Debt and the performance of the covenants and agreements contained in the Contract Documents:

(a) with MORTGAGE COVENANTS, the land described in Exhibit A (see attached) hereto, with the buildings and other improvements now or hereafter erected thereon, and all rights and interests appurtenant thereto, and all fixtures now or hereafter attached thereto, and,

(b) a security interest in all equipment, including household appliances, heating and air-conditioning apparatus, fire extinguishing systems, storm and screen doors and screens, lawn mowing and other gardening equipment and snow removal equipment, now or hereafter owned or leased by the Borrower and placed on said land or relating to its use or the Project, and all accounts,

contract rights and other intangible property now or hereafter owned or acquired by the Borrower and in any way arising out of or in connection with or relating to the use or operation of the Project, in each case together with the proceeds therefrom.

The Borrower, for consideration paid, also assigns to the Agency to secure the payment of the Mortgage Debt and the performance of the covenants and agreements contained in the Contract Documents, all of the right, title, and interest of the Borrower in or under present or future leases including any extensions and renewals thereof (the "Leases") on all or any part of the Property, and all rents and payments in the nature or in lieu thereof, income and profits accruing under the Leases, and in or under guarantees of the lessees' obligations under the Leases, reserving, however, to the Borrower the right, provided there is no default by the Borrower under this Mortgage or the Contract Documents, to collect the rents, income and profits accruing under the Leases, for not more than one month in advance, and otherwise enforce the Leases.

All of the foregoing real and personal property, including the rents, income and profits and the Borrower's interests as lessor under the Leases, are herein referred to as the "Property". The low and middle-income residential housing development to be constructed and operated on the Property is herein referred to as the "Project".

The Mortgage Debt shall consist of the Borrower's Substitute Mortgage Note of even date and any notes given in addition, exchange or substitution therefor (the "Mortgage Note") and all other indebtedness or liabilities, direct or indirect, of the Borrower to the Agency due or becoming due under the Contract Documents (including, without limitation, all advances, disbursements, payments, charges or costs) even if the aggregate amount of the Mortgage Debt exceeds the face amount of the Mortgage Note. The Contract Documents shall consist of this Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents (the "Mortgage"), the Mortgage Note, Construction Loan Agreement, Regulatory Agreement, Disposition Agreement, any other documents, agreements, contracts, and guarantees between the Borrower and the Agency, and all agreements between the Borrower and the Agency, or either of them, and any agency public or private and/or the United States Department of Housing and Urban Development ("HUD") and/or the Department of Community Affairs ("DCA") of the Commonwealth of Massachusetts relating to the provision of mortgage or rental subsidies for the Project (the "Subsidy Documents").

1. <u>Borrower's Covenants.</u> The Borrower covenants and agrees as follows:

1.1. Payment and Performance. The Borrower will duly and punctually pay the principal and interest to become due in respect of the Mortgage Note according to the terms thereof and all other amounts becoming due on the Mortgage Debt and will perform and observe all of the terms and conditions of the Mortgage Note and the Contract Documents.

1.2 Agency's Bond Resolution and Certain Agency Expenses.

(a) Prior to the Agency's issuance of its Funding Bonds, the Borrower will pay to the Agency, commencing on the first day of the month following the first advance to the Borrower by the Agency and on the first day of each month thereafter, such amounts as the Agency shall determine to be sufficient, together with other monies available for such purposes, to pay (i) the administrative expenses of the Agency with respect to the Mortgage Loan, and (ii) the costs and expenses of the Agency incurred in connection with the authorization, issuance, sale and delivery of its notes issued with respect to the Property.

(b) On the first day of the month after the Agency's issuance of its Funding Bonds as that term is defined in the Mortgage Note, and on the first day of each month thereafter, the Borrower will deposit with the trustee under the Agency's resolution or resolutions authorizing the issuance of the Funding Bonds (the "Resolution or Bond Resolution"), such amounts as the Agency shall determine to be sufficient, together with other monies available for such purposes, to pay as the same become due the Borrower's proportionate share, as determined by the Agency, of:

(i) The principal of and interest in the Agency's Funding Bonds issued for the purposes specified in the Bond Resolution;

(ii) The Agency's administrative expenses;

(iii) The Agency's costs and expenses incurred in connection with the authorization, issuance, sale and delivery of its Bonds and notes issued with respect to the Project;

(iv) The fees and expenses of the trustee, depositories, and paying agency under the Bond Resolution.

The Funding Bonds shall be the Bonds issued by the Agency and designated by it to fund this loan or to refund the bond anticipation notes from time to time issued by the Agency and designated by it to fund the Mortgage Loan evidenced by the Mortgage Note.

(c) The Borrower will make further deposits with the Trustee of such amounts at such times all as provided in the Mortgage

IRH 0002981

Note.

1.3. Taxes, Etc. The Borrower will pay 10 days at least before the same become delinquent (and will provide, by such time, evidence of such payment, satisfactory to the Agency) all taxes, charges, sewer use fees, water rates and assessments of every name and nature, whether or not assessed against the Borrower, if applicable or related to the Property, or any interest therein, or the debt, obligation or any agreement secured hereby, or the disbursement or the application of the proceeds thereof or any income or profits from the Project whether levied directly or indirectly or as an excise or income tax. Delinquency shall mean when interest or penalties commence to accrue.

1.4. Insurance.

(a) Casualty and Rental. The Borrower shall obtain and keep in force a policy or policies of insurance covering loss or damage to the improvements constituting part of the Property, in the amount of the full replacement value thereof or such lesser amount with such deductibles as the Agency may permit, providing protection against all perils included within the classifications of fire and extended coverage and such other classifications as the Agency may from time to time require. Such full replacement value shall be determined from time to time at the request of the Agency (but not more frequently than annually) by a person selected by the Agency and paid by the Borrower. The Borrower shall also obtain and keep in force a policy of rental insurance in amounts sufficient to protect the Borrower against any substantial reduction in rental income for a period of one year.

Such policies of insurance shall be first payable to the Agency, as its interest may appear, pursuant to a standard mortgagee endorsement, except that such policies may provide for payment of losses up to $5,000 directly to the Borrower. The Borrower shall perform, observe and keep all the conditions of all insurance policies covering the Property and, in case of any loss or damage, or claim, the Borrower shall forthwith render to the insurance company a statement in writing, in compliance with the terms of the appropriate policy, and will give immediate notice by mail to the Agency. The Borrower shall in good faith, and with due diligence, file and prosecute the Borrower's claim for damages, but shall not settle any such claim without the Agency's prior written consent. Each insurance company is hereby authorized and directed to make payment for such loss directly to the Agency instead of to the Borrower, except for losses not in excess of $5,000. The insurance proceeds, or any part thereof, for any loss in excess of $5,000, under any such policy shall be adjusted by and paid to the Agency and may be applied by the Agency, at the Agency's option, either to the reduction of the Mortgage Debt or to the restoration or repair of the damaged Property, or both, with any balance to be paid to the Borrower.

Proceeds paid to the Borrower shall be used by it to repair and restore the Property as promptly as reasonably possible to substantially the same condition as it was in before the casualty. All such policies issued by the respective insurers shall provide that the loss, if any, thereunder shall be adjusted and paid as provided in this Mortgage. All policies of insurance provided for herein shall also provide (a) that such policies shall not be cancelled without at least thirty (30) days' prior written notice to each insured named therein and to the Agency, and (b) that any loss shall be payable to the Agency, notwithstanding any act or omission or negligence of the Borrower which might otherwise result in forfeiture of said insurance. In the event of foreclosure, the Borrower shall, and does hereby, assign to the Agency all of its right, title and interest in such insurance. A foreclosure of this Mortgage shall forever bar the Borrower and all persons claiming under the Borrower from all right, title and interest in and to any and all such insurance, including all rights to return premiums on cancellations. In the event the Agency elects not to make such proceeds available for restoration, the Borrower shall be relieved of its obligations under Section 1.6 below to restore the damage or injury caused by such casualty.

(b) Liability Insurance. The Borrower will maintain (i) comprehensive general liability insurance with responsible insurers satisfactory to the Agency, indemnifying the Borrower against claims for personal injury or death and for damage to property suffered by others occurring upon, in or about the Property and the passageways thereon in amounts of not less than $500,000 in respect to bodily injury or death to any one person, nor less than $1,000,000 in respect to bodily injury or death to any persons in any one accident or occurrence, and (ii) not less than $250,000 for property damage to the property of any one owner.

(c) Insurers. All insurance provided for in this section shall be effected with insurers licensed to do business in Massachusetts and reasonably satisfactory to the Agency.

(d) Evidence of Insurance. Upon delivery hereof and thereafter not less than fifteen (15) days prior to the expiration dates of the expiring policies, originals or certified copies of the policies provided for in this section, each bearing notations evidencing the payment of premiums or accompanied by other evidence satisfactory to the Agency of such payment shall be delivered by the Borrower to the Agency.

1.5. Escrow for Taxes and Insurance. Commencing immediately after there is any project income (except when there are Mortgage Loan proceeds available for the purpose under the terms of the Contract Documents) a monthly apportionment of the sum estimated from time to time by the Agency to be sufficient to make as they become due, all payments owing by the Borrower under Sections 1.3 and 1.4 above, will be deposited by the Borrower in an account

IRH 0002983

which may be drawn on jointly by the Borrower and the Agency or by the Agency alone. The amounts from time to time in said account will be applied to payment of amounts due under said sections and to the extent there is a deficiency the Borrower will pay the same into said account on demand from the Agency. Interest earned on said account will constitute income of the Project and be reflected in all financial reports relating to operation of the Project.

1.6 Repairs, Alterations and Compliance with Law. The Borrower will keep the Property in good order, repair and condition, reasonable wear and tear (but not casualty except to the extent provided in Section 1.4 above) excepted, and without the Agency's prior written consent will not substantially remove, demolish, add to, or alter the Property, or remove any fixtures, equipment or personal property secured hereby without replacing them with fixtures, equipment or property of equal quality; and will not at any time use or permit the Property to be used in violation of any covenant or restriction of record or of any law or municipal ordinance or regulation, including all building, fire, and zoning codes or regulations, or for any unlawful or improper purpose; and will not commit, permit, or suffer any waste, impairment, or deterioration of the Property or any part thereof. The Borrower hereby covenants to secure all governmental approvals as from time to time are required by law for the acquisition and commencement and continuation of construction, ownership and operation of the Property and the Project by the Borrower.

1.7 Eminent Domain. In case of any condemnation for public use (a "Taking") of all or any part of the Property, or the commencement of any proceedings or negotiations which might result in a Taking, the Borrower shall promptly give written notice thereof to the Agency, generally describing the nature and extent of the Taking or the nature of such proceedings and negotiations for the Taking and the nature and extent of the Taking which might result therefrom, as the case may be. The Agency may, at its option, appear in any proceeding for a Taking or any negotiations relating to a Taking and the Borrower shall promptly give to the Agency copies of all notices, pleadings, determinations and other papers in any such proceedings. The Borrower shall in good faith and with due diligence file and prosecute the Borrower's claim or claims for any award or payment on account of any Taking of the Property. The Borrower shall not settle any such claim or claims without the Agency's prior written consent. The Borrower hereby assigns all of the Borrower's right, title and interest in any award received in connection with a Taking to the Agency and hereby authorizes such awards to be paid directly to the Agency. If the Borrower collects any such claim or claims, by settlement, judicial decree, or otherwise, the Borrower shall promptly pay the same to the Agency. Any such payments may be applied by the Agency, at its option, either to

the reduction of the Mortgage Debt, or to a restoration of so much of the Property as remains, with any balance to be paid over to the Borrower. In the event the Agency elects not to make such proceeds available for restoration, the Borrower shall be relieved of its obligations under Section 1.6 above to restore the damage or injury caused by such public action.

1.8. Title and Encumbrances. The Borrower represents and warrants to the Agency that, except as may be stated in Exhibit A hereof, the Borrower has a good and clear record, fee simple title to such of the Property as is real property and good and marketable title to the remainder of the Property, and has good right and lawful authority to mortgage and grant a security interest in the Property hereunder. The Borrower will not sell, lease or otherwise encumber the Property unless approved by the Agency and a Prepayment in full is made by the Borrower in compliance with the requirements of the Agency's Bond Resolution, except that (i) The Borrower, with the written consent of the Agency, may grant easements, licenses or rights-of-way over, under or upon the site of the Property, so long as such easements, licenses or rights-of-way do not destroy or diminish the value or usefulness of such sites, as determined by the Agency in connection with the provision of such written consent, (ii) when and to the extent authorized by law, the Borrower, with the written consent of the Agency may lease the Property or a portion thereof to a third party for the purposes of operation, such lease to be subject to all of the terms, provisions and limitations of the Mortgage relating to the Property, (iii) the Borrower, with the written approval of the Agency, may sell or exchange any land not required for the Project, provided that the proceeds derived by the Borrower from the sale of any such lands shall be paid over to the Agency for deposit into the account established by the Bond Resolution from which amounts may be paid for optional redemption of bonds issued thereunder and such monies shall be used and applied as provided in the Bond Resolution, and (iv) the Borrower may sell the Property to any mortgagor qualified to be a mortgagor under the Bond Resolution and approved by the Agency, which successor in interest shall assume this Mortgage. If any lien for labor, skill or material shall be filed or recorded against the Property while this Mortgage is outstanding, the Borrower within 30 days after the date of such filing or recording will either pay off said lien and secure its discharge of record or will deposit with the Agency the amount claimed to be due on the lien and the Agency may use any such deposit to pay off any such lien the validity of which shall be established to the Agency's reasonable satisfaction.

The Borrower shall cause this Mortgage, and each amendment, modification or supplement hereto, and appropriate financing and continuation statements, to be recorded and filed and to be kept recorded and filed in such manner and in such places, and to pay all such recording, filing or other taxes, fees and other charges

IRH 0002985

and expenses, and to comply with all such statutes and regulations, as may be required by law in order to establish, preserve and protect the lien and security interests of the Agency in the Property, including, without limitation, any property acquired after the execution hereof, and the rights of the Agency hereunder. The Borrower will execute such further assurances, deeds, and instruments and take such action as may be requested by the Agency to perfect and protect the lien and priority of this Mortgage and the security interest hereunder.

1.9. Transfer by Borrower. The Borrower will not convey, transfer or change the ownership of the Property, other than as permitted by Section 1.8 above, or, without the prior written approval of the Agency, assign the whole or any part of the rents or revenues of the Property. In the event of such conveyance, transfer or change of part or all of the Property, the Agency may, without notice to the Borrower, deal with such successors in interest in the same manner as with the Borrower, without in any way vitiating or discharging liability on the Mortgage Debt. No such conveyance, transfer or change and no forbearance on the part of the Agency and no extension whether oral or in writing of the time for the payment of the Mortgage Debt shall operate to release, discharge, modify, change or affect liability on the Mortgage Debt.

1.10. Notices and Estoppel Certificates. The Borrower shall:

(a) Deliver to the Agency promptly upon receipt of the same, copies of all notices, certificates, documents and instruments received by the Borrower which materially affect the Property or its use;

(b) Furnish, from time to time, on the request of the Agency, written statements, signed and if so requested, acknowledged, setting forth the amount of the Mortgage Debt, specifying any claims of offset or defense which the Borrower asserts against the Mortgage Debt or any obligations to be paid or performed hereunder, and the then state of facts relative to the condition of the Property.

2. Default.

2.1 Events of Default. The following events shall constitute events of default hereunder.

(a) Failure to complete construction of the Project within the time specified in the Contract Documents.

(b) Failure to make due and punctual payment of the Mortgage Debt when and as the same shall become due and payable as in the Contract Documents expressed.

IRH 0002986

(c) Default by the Borrower in the performance of any covenant requiring the payment of monies contained in Sections 1.1-1.6.

(d) Default by the Borrower in the performance of any covenant contained in Sections 1.8-1.9 of this Mortgage.

(e) The Borrower files a petition in bankruptcy, or for appointment of a creditor's receiver or in insolvency, or for reorganization or composition, or makes an assignment for the benefit of creditors or to a trustee for creditors, or there occurs an adjudication in bankruptcy or the taking of possession of the Property or any part thereof by a receiver for creditors or the seizure and sale of the Property or any part thereof under judicial process or pursuant to any power of sale.

(f) Any representation or warranty made by the Borrower to the Agency in the Contract Documents or in connection with the Mortgage Loan shall be false in any material respect when made.

(g) Occurrence of any other default in the terms, conditions, covenants and obligations of the Borrower under the Contract Documents which continues for more than thirty days after notice by the Agency or if in the Agency's reasonable judgment it is impossible to cure such default in thirty (30) days, for any additional period during which, in the Agency's reasonable judgment, the Borrower is diligently proceeding to cure.

2.2. **Remedies.** Upon the occurrence of any Event of Default:

(a) The entire Mortgage Debt shall become due and payable on demand at the option of the Agency (except that no demand or notice shall be required in the case of a default under 2.1(e) above).

(b) Upon demand of the Agency (except that no demand or notice shall be required in the case of a default under 2.1(e) above), the Borrower will surrender the Property and the Agency shall have the right to enter upon and operate the Property, including without limitation, making all proper repairs, renewals and replacements and such alterations, additions, betterments and improvements as it may deem useful and advisable, collecting all the rents and other income which are then due or become due and applying the same to the Mortgage Debt, and dispossessing any tenant defaulting in the payment of any rent.

(c) The Agency shall have the right to foreclose upon this Mortgage with respect to such of the Property as is real property and to exercise the remedies of a secured party under the Uniform Commercial Code of Massachusetts, or other applicable law, with respect to such of the Property as is personal property.

IRH 0002987

(d) Without waiving or prejudicing its other remedies the Agency may apply any sums credited by or received from the Borrower to cure the default without enforcing any of its other rights against the Borrower or the Property.

(e) The Agency may apply to any court, state or federal, for specific performance of any of the Contract Documents, for an appointment of a receiver to take over and operate the Project in accordance with the terms of the Contract Documents (all of the covenants of which shall inure to the benefit of the receiver), or for such other relief as may be appropriate. It is agreed that injury to the Agency arising from a default would be irreparable and that the amount of damage would be difficult to ascertain.

(f) The Agency may remove any or all of the managers, agents and employees of the Borrower, and if the Borrower is a corporation, or any general partner dealing with the Property is a corporation, remove the officers of said corporation, and appoint in their place such persons as the Agency may deem advisable, including employees or officers of the Agency.

(g) The Agency may collect the rents, income, and profits under the Leases, enforce payment thereof and the performance of any and all other terms and provisions of the Leases, exercise all the rights and privileges of the Borrower thereunder including the right to fix or modify rents, to demand
and sue for possession of the premises covered by the Leases, or any of them, to relet the premises or any part thereof and to collect the rents, income and profits under any such new or amended Leases.

(h) The Agency may take such other action and exercise such other rights and remedies as it deems necessary or advisable and as permitted by law to protect its interest in the Property and the Mortgage Debt.

2.3. <u>No Waiver; Remedies Cumulative, Expenses.</u> The failure of the Agency to exercise any right or remedy or option provided for in this Mortgage or otherwise shall not be deemed to be a waiver of such right or remedy or of any of the covenants or obligations secured by this Mortgage.

No sale of all or any of the Property, no forbearance on the part of the Agency, and no extension, whether oral or in writing, of the time for the payment of the whole or any part of the Mortgage Debt or any other indulgence given by the Agency to the Borrower or any other person or entity, shall operate to release or in any manner affect the lien of the Mortgage or the original liability of the Borrower, notice of any such extensions or indulgences being hereby waived by the Borrower.

All of the foregoing rights, remedies and options are cumulative, and the exercise of one shall not be construed to be a waiver of any of the others. The Borrower shall pay on demand all reasonable costs including reasonable attorney's fees, incurred by the Agency in collecting the Mortgage Debt or in enforcing any term, covenant or condition of the Contract Documents, including this Mortgage or foreclosing thereon or defending or upholding the lien thereof, and any such sums shall be part of the Mortgage Debt.

3. Prepayment. Prior to twenty (20) years from the date hereof, the Borrower may not prepay the principal amount of the Mortgage Note in advance of the amortization schedule established by the Agency, unless the Agency consents to prepayment and the purpose of the prepayment is to convert the ownership of the Project to cooperative or condominium ownership by occupants. Subsequent from the date hereof, prepayment shall be permitted, provided, however prepayment shall be permissible only if the Agency has determined prepayment will not result in a material escalation of rents and the need for low rental housing in the area is no longer acute. In no event, however, shall the Borrower at any time prepay the principal in advance of such schedule unless at the time of such payment, all of the Funding Bonds issued by the Agency for the purpose of obtaining funds to fund or refund the loan evidenced by the Mortgage Note are redeemable, and in that event, upon prepayment, the Borrower shall pay an amount equal to the aggregate of (i) the principal amount of the Borrower's Mortgage Loan remaining unpaid; (ii) the Borrower's proportionate share of the principal amount of the applicable Series of Funding Bonds issued for the Purpose of paying any bond discount and making deposits into any applicable Capital Reserve Fund and any other applicable reserve, cost of issuance of capitalized interest fund or account; (iii) the interest to accrue on all Funding bonds to be redeemed by the Agency upon the making of such Prepayment to date thereof not previously paid by the Agency, (iv) the redemption premium on the Funding Bonds so to be redeemed; (v) the costs and expenses of the Agency in effecting the redemption of the Funding Bonds so to be redeemed, less the amount of applicable monies in, or to be transferred to, any fund or account from which payment may be made under the Bond Resolution for the optional redemption of the Funding Bonds so to be redeemed and monies available for withdrawal from the applicable Capital Reserve Fund and any other reserve fund for application to the redemption of such Funding Bonds in accordance with the terms and provisions of the Resolution, as determined by the Agency; and (vi) all other unpaid Mortgage Debt. If the Funding Bonds issued to fund the Mortgage Note have been refunded and the refunding bonds issued for the purpose of refunding such original bonds were issued in a principal amount in excess of the principal amount of the Borrower's Mortgage Loan obligations remaining unpaid at the date of such refunding issue, the amount which the Borrower shall be obligated to under item (i) above shall be the

IRH 0002989

principal amount of such refunding bonds then unpaid.

4. Agency's Right to Pay, Perform and Access. The Agency may make, at the Agency's sole option, any or all payments required to be made either hereunder or otherwise in respect of the Property by the Borrower. Such payments may include, but are not limited to, payments for taxes, assessments and other governmental levies, water rates, insurance premiums, maintenance, repairs or improvements constituting part of the Property. The Agency shall have the right, but not the duty, to perform any obligations of the Borrower related to the Property, without waiving any other rights or releasing the Borrower from any obligation hereunder, and to intervene or otherwise participate in any legal or equitable proceeding which, in the Agency's sole judgment, affect the Property or any of the rights created or secured by the Note or the Contract Documents. The Agency shall have reasonable access to inspect the business and financial records respecting ownership and operation of the Property. At the request of the Agency the Borrower will bring to the Agency's office at the address provided for notices hereunder, all books and records relating to the Property, including computer printouts, requested by the Agency, for inspection by the Agency.

Any action taken or sums paid, and any costs or expenses incurred, including attorney's fees, by the Agency, pursuant to the Agency's exercise of rights under this Mortgage, shall: (a) as between the parties hereto and their successors in interest, be deemed valid, so that in no event shall the necessity or validity of any such payments, costs or expenses be disputed; and (b) with respect to such sums, costs, and expenses, be until paid, part of the Mortgage Debt. The Borrower shall pay to the Agency, on demand, any sums advanced or expended by the Agency in connection with the Agency's exercise of its rights, remedies and options under this Section 4 or Section 2.3 above, or any other provision of this Agreement, together with interest at the rate of twelve percent (12%) per annum thereon.

5. Notice. Notice hereunder shall be sufficiently given if mailed, by certified mail, return receipt requested, in the case of the Borrower, to the address first set forth above, and in the case of the Agency addressed to 50 Milk Street, Boston, Massachusetts (02109), or as either party may otherwise designate in writing. Payments to the Agency shall be made to such address or as the Agency shall otherwise direct.

6. Successors and Assigns. All covenants and agreements of the Borrower herein contained shall be binding upon the Borrower and the heirs, executors, administrators, successors and assigns of the Borrower. The word "Borrower" shall mean the person or persons named at the beginning of this instrument and any subsequent owner or owners of the equity of redemption of the Property. Where more than one person constitutes the Borrower, provisions

in this Mortgage referring to bankruptcy or insolvency or the like shall refer to each of the persons who is at that time one of the Borrowers, so that if for example, but without limitation, a person who is one of the Borrowers shall file a petition in bankruptcy, such filing shall be treated as a breach of condition of this Mortgage.

7. Partners not personally liable. If the Borrower is a partnership, no general or limited partner shall have any personal liability for the payment or performance of all or any part of the Borrower's obligations hereunder, and the Agency shall look only to the Borrower's assets for such payment or performance.

This Mortgage is upon the Statutory Condition, for any breach of which, or for any breach of any of the aforementioned covenants or agreements, the Agency shall have the Statutory Power of Sale.

WITNESS the execution hereof of the Amended and Restated Mortgage Security Agreement Assignment of Leases and Rents as a sealed instrument on the date set forth above.

MASSACHUSETTS HOUSING FINANCE AGENCY

By________________________________
Edward T. Pollack, General Counsel

BORROWER: C-W ASSOCIATES6

By Roger W. Stern
Roger W. Stern, General Partner

By________________________________
Jeffrey A. Stern, General Partner

Attachment:
Exhibit A - Description of Property

U.S. Department of ...using
and Urban Development

Boston Regional Office, Region I
Thomas P. O'Neill Jr. Federal Building
10 Causeway Street
Boston, MA 02222-1092

SEP 1 9 1990

Pamela Goodman
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111

Dear Ms. Goodman:

Subject: Project Name: 100 Centre Plaza
Project No. : 023-35NI

This is in response to your letter dated August 22, 1990 transmitting a document entitled "First Amendment to Limited Equity Home Ownership Conversion Document" for the above-referenced development.

On March 20, 1990, we had notified you that the MHFA Restatement of Mortgage, dated August 2, 1988, prohibited prepayment of the subject mortgage any earlier than August 3, 2008, unless MHFA consents and the project is to be converted into a cooperative or a condominium as set forth in Section 3 of the mortgage. On May 16, 1990 we received a letter from MHFA responding to the March 20, 1990 letter to you referenced above.

Our Office of Counsel reviewed the May 16, 1990 and August 22, 1990 letters. They found no language in the May 16, 1990 letter from MHFA granting their consent to prepayment. Attorney Patricia Allen of HUD had separate telephone conversations with David Keene, Senior Real Estate Officer and Marvin Siflinger, Executive Director of MHFA, who expressed the opinions that the letter did not signify consent of MHFA to prepayment of the mortgage. Mr. Keene told Mrs. Allen that since the project owners have not provided his agency with a plan to convert the project to a cooperative, MHFA could not grant consent to the mortgage prepayment. He stated that although the May 16, 1990 letter asked HUD to accept the owner's Notice of Intent, the letter cannot, for the reasons outlined above, be construed as MHFA consent. Mr. Siflinger stated that MHFA will not provide consent to prepayment unless a plan addressing their concern with the preservation of housing for low and moderate income tenants is submitted.

With regard to the "First Amendment to Limited Equity Home Ownership Conversion Document" HUD's Office of Counsel has reviewed the document along with the original Limited Equity Ownership Conversion Document. They find that neither document amends or modifies the State Agency non-insured mortgage on the project nor do they indicate MHFA consent to prepayment. Therefore, we find that the mortgage is not eligible for prepayment at this time.

If there are any questions regarding this matter, please contact Elaine Ormond at 565-5387.

Very sincerely yours,

Mary Noble

Mary Noble
Chief
Loan Management Branch

IRH 0003177

# FIRST AMENDMENT TO MODIFICATION AND RESTATEMENT OF MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS

FIRST AMENDMENT TO MODIFICATION AND RESTATEMENT OF MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS made as of this 27th day of December, 1990 (this "Amendment"), by and between C-W Associates, a Massachusetts limited partnership (the "Borrower") and the Massachusetts Housing Finance Agency (the "Agency").

WITNESSETH:

WHEREAS, in 1988 the Agency and the Borrower desired to begin the first phase of an expiring use restriction restructuring for 100 Centre Plaza, Brookline, Massachusetts (the "Project") which had an original mortgage lock-in expiration date of July 16, 1990;

WHEREAS, in order to begin the implementation of a congregate facilities program at the Project, the Agency agreed to increase the amount of the mortgage loan to fund the construction of dining facilities and unit reconfiguration;

WHEREAS, in connection with the mortgage increase, the Borrower and the Agency entered into that certain Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents, dated August 3, 1988 (the "Original Mortgage Modification"), a copy of which is attached hereto as Exhibit A;

WHEREAS, Section 3 of the Original Mortgage Modification contains restrictive language regarding loan prepayment rights of the Borrower;

WHEREAS, the Borrower and the Agency intended that the Borrower should retain its rights to seek incentives from the federal government for those seventy-one (71) units in the Project assisted under Section 236 of the National Housing Act (the "Section 236 Assisted Units") pursuant to the provisions of Title II of the Housing and Community Development Act of 1987 or any successor legislation governing projects assisted under Section 236 ("Title II");

WHEREAS, the U.S. Department of Housing and Urban Development has reviewed the Owner's request for federal incentives under Title II and has inquired as to whether the Section 236 Assisted Units are eligible for incentives because of certain lock-in restrictions set forth in the Original Mortgage Modification;

IRH 0002973

WHEREAS, the Borrower and the Agency desire to amend the Original Mortgage Modification to confirm and ratify the existing agreement between the Borrower and the Agency and to remove all doubt about the eligibility of the Section 236 Assisted Units for federal incentives under Title II;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

To delete Section 3 of the Original Mortgage Modification Agreement in its entirety and to substitute the following therefor:

"3. <u>Prepayment</u>.

(a) <u>Units Assisted Under Section 236.</u>

The Borrower shall have the right to prepay $1,948,428 of the principal amount of the Mortgage Note at any time and from time to time, without premium or penalty (such amount is hereinafter called the "Section 236 Portion of the Mortgage Note," which amount is the pro rata portion of the Mortgage Note attributable to the Section 236 Assisted Units). The Borrower agrees to use its best efforts to endeavor to obtain incentives for the Section 236 Assisted Units made available by the U.S. Department of Housing and Urban Development pursuant to Title II. In the event such incentives are offered to the Borrower on terms and conditions substantially similar to those incentives offered to other owners, the Borrower agrees to accept such incentives and will agree to continue the low and moderate income character of the Section 236 Assisted Units for at least the remainder of the term of the loan provided by the Agency and longer if so required under federal law.

In no event, however, shall the Borrower at any time prepay the Section 236 Portion of the Mortgage Note in advance of the amortization schedule established by the Agency unless at the time of such payment, all of the Funding Bonds issued by the Agency for the purpose of obtaining funds to fund or refund the loan evidenced by the Section 236 Portion of the Mortgage Note are redeemable, and in that event, upon prepayment, the Borrower shall pay an amount equal to the aggregate of (i) the principal amount of the

Section 236 Portion of the Mortgage Note remaining unpaid; (ii) the Borrower s proportionate share of the principal amount of the applicable Series of Funding Bonds attributable to the Section 236 Portion of the Mortgage Note issued for the purpose of paying any bond discount and making deposits into any applicable Capital Reserve Fund and any other applicable reserve, cost of issuance of capitalized interest fund or account; (iii) the interest to accrue on all Funding bonds to be redeemed by the Agency upon the making of such Prepayment to date thereof not previously paid by the Agency; (iv) the redemption premium on the Funding Bonds so to be redeemed; (v) the costs and expenses of the Agency in effecting the redemption of the Funding Bonds so to be redeemed, less the amount of applicable monies in, or to be transferred to, any fund or account from which payment may be made under the Bond Resolution for the optional redemption of the Funding Bonds so to be redeemed and monies available for withdrawal from the applicable Capital Reserve Fund and any other reserve fund for application to the redemption of such Funding Bonds in accordance with the terms and provisions of the Resolution, as determined by the Agency; and (vi) all other unpaid Mortgage Debt attributable to the Section 236 Portion of the Mortgage Note. If the Funding Bonds issued to fund the Section 236 Portion of the Mortgage Note have been refunded and the refunding bonds issued for the purpose of refunding such original bonds were issued in a principal amount in excess of the principal amount of the Borrower's Section 236 Portion of the Mortgage Note obligations remaining unpaid at the date of such refunding issue, the amount which the Borrower shall be obligated to under item (i) above shall be the principal amount of such refunding bonds then unpaid.

(b) <u>Non-Assisted Units</u>.

Prior to August 3, 2008 (which date is twenty (20) years from the date of execution of the Original Mortgage Modification), the Borrower may not prepay $3,979,251 of the the principal amount of the Mortgage Note (such amount is hereinafter called the "Non-Assisted Portion of the Mortgage Note," which amount is the pro rata portion of the Mortgage Note attributable to the 145 units in the Project which are not assisted under Section 236 of the National Housing Act (the "Non-Assisted Units")) in advance of the amortization schedule established by the Agency, unless the Agency consents to prepayment and the

purpose of the prepayment is to convert the ownership of the Project to cooperative or condominium ownership by occupants.

Subsequent from the date hereof, prepayment shall be permitted, provided, however prepayment of the Non-Assisted Portion of the Mortgage Note shall be permissible only if the Agency has determined prepayment will not result in a material escalation of rents and the need for low rental housing in the area is no longer acute. In no event, however, shall the Borrower at any time prepay the Non-Assisted Portion of the Mortgage Note in advance of such schedule unless at the time of such payment, all of the Funding Bonds issued by the Agency for the purpose of obtaining funds to fund or refund the loan evidenced by the Non-Assisted Portion of the Mortgage Note are redeemable, and in that event, upon prepayment, the Borrower shall pay an amount equal to the aggregate of (i) the principal amount of the Non-Assisted Portion of the Mortgage Note remaining unpaid; (ii) the Borrower s proportionate share of the principal amount of the applicable Series of Funding Bonds attributable to the Non-Assisted Units issued for the Purpose of paying any bond discount and making deposits into any applicable Capital Reserve Fund and any other applicable reserve, cost of issuance of capitalized interest fund or account; (iii) the interest to accrue on all Funding bonds to be redeemed by the Agency upon the making of such Prepayment to date thereof not previously paid by the Agency; (iv) the redemption premium on the Funding Bonds so to be redeemed; (v) the costs and expenses of the Agency in effecting the redemption of the Funding Bonds so to be redeemed, less the amount of applicable monies in, or to be transferred to, any fund or account from which payment may be made under the Bond Resolution for the optional redemption of the Funding Bonds so to be redeemed and monies available for withdrawal from the applicable Capital Reserve Fund and any other reserve fund for application to the redemption of such Funding Bonds in accordance with the terms and provisions of the Resolution, as determined by the Agency; and (vi) all other unpaid Mortgage Debt attributable to the Non-Assisted Units. If the Funding Bonds issued to fund the Mortgage Note have been refunded and the refunding bonds issued for the purpose of refunding such original bonds were issued in a principal amount in excess of the Non-Assisted Portion of the Mortgage Note remaining unpaid at the date of such refunding issue, the amount which the Borrower shall be obligated to under item (i) above shall be the principal amount of such refunding bonds then unpaid.

Except as amended hereby, the Original Mortgage Modification remains in full force and effect and the Borrower hereby acknowledges that it continues to be bound by the Original Mortgage Modification.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed and delivered as a sealed instrument by their respective duly authorized representatives, as of the date and year set forth above.

C-W ASSOCIATES

By: ______________________
Jeffrey A. Stern, General Partner

MASSACHUSETTS HOUSING FINANCE AGENCY

By: ______________________
Edward T. Pollack, General Counsel

COMMONWEALTH OF MASSACHUSETTS

Suffolk County, ss. November 28, 1990

Then personally appeared before me the above-named Jeffrey A. Stern, General Partner of C-W Associates, and acknowledged the foregoing to be his free act and deed and the free act and deed of C-W Associates.

Notary Public
My Commission expires: 08/21/93

COMMONWEALTH OF MASSACHUSETTS

Suffolk County, ss. December 28, 1990

Then personally appeared before me the above-named Edward T. Pollack, General Counsel of the Massachusetts Housing Finance Agency, and acknowledged the foregoing to be his free act and deed and the free act and deed of said Agency.

Notary Public Susan J. Goddard
My Commission expires: 1/24/97

3578S/90