# INTEREST REDUCTION CONTRACT

THIS AGREEMENT, made and entered into as of Sept. 1 , 1971, by C-W Associates, a limited partnership organized under M.G.L. chapter 109 (hereinafter called "Mortgagor"); Massachusetts Housing Finance Agency (hereinafter called "Mortgagee"); and the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner (hereinafter called "Commissioner").

W I T N E S S E T H:

WHEREAS, the Commissioner is authorized under Section 236 of the National Housing Act, as amended, (hereinafter referred to as "Section 236") to make interest reduction payments with respect to a rental or cooperative housing project owned by a private non-profit corporation or other private non-profit entity, a limited dividend corporation or other limited dividend entity or a cooperative housing corporation, which is financed under a state or local program providing assistance through loans, loan insurance or tax abatements, and

WHEREAS, the Mortgagee has agreed to make a loan under such a state program in the amount of $3,652,900 to the Mortgagor, which loan shall be secured by a mortgage, and

WHEREAS, said mortgage shall cover the project known as 100 Centre Plaza located at Brookline, Massachusetts (the "project").

NOW THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties agree as follows:

1. The terms of the mortgage and note to be secured thereby (hereinafter collectively referred to as the "project mortgage"), as shown in Exhibit A attached hereto, have been submitted to and approved by the Commissioner for purposes of this contract. The interest rate payable by the Mortgagor to the Mortgagee, upon which subsidies will be computed hereunder, except as hereinafter stated, shall consist of the rate which the Mortgagee pays from time to time on notes and bonds which it issues to fund or refund the loan, calculated on the unpaid balances, plus additional interest* of 1/2% calculated on the aforesaid face amount of the mortgage loan, but said interest

* During the period Sept. 1, 1971 - March 1, 1972 the "additional interest" will be 1/2% calculated on unpaid balances.

Kelly Decl. Ex. C

rate, for the purpose of computing Federal subsidies under this contract, shall in no event exceed the maximum allowable FHA interest rate for insured mortgage loans, which on the effective date hereof is 7 %, plus the amount of the FHA Mortgage Insurance Premium which would be appropriate for the project were it subject to FHA mortgage insurance, which on the effective date hereof is 1/2%.

2. With respect to the assisted units in the project, which are shown on Exhibit B hereof, the Commissioner shall make monthly interest reduction payments to the Mortgagee in amounts equal to the difference between:

(a) the monthly payments, computed on an annual basis, for principal attributable to the assisted units, if any, and interest attributable to the assisted units which the Mortgagor is obligated to pay under the project mortgage; and

(b) an even monthly payment, computed on an annual basis, for principal attributable to the assisted units, if any*, and interest attributable to the assisted units, based upon an assumed amortization period of 40 years, which the Mortgagor would be required to pay if the project mortgage were to bear interest at the rate of 1% per annum;

provided, however, that the total of interest reduction payments shall not exceed $ 53,853 per annum for a period not to exceed the lesser of the term of the project mortgage or 50 years; provided further, that in no event shall the period of the obligation for the payment of principal under the project mortgage be less than 40 years; and provided finally, that at the time permanent financing is arranged by the Mortgagee for the project, and the amount computed under subsection (a) above upon which the aforesaid "difference" is based, shall be recomputed, subject to the availability of funds, to reflect the rate of interest paid by Mortgagee on its permanent loan. Said amount, as recomputed, shall not exceed the sum of (i) the maximum allowable FHA interest rate for insured mortgage loans as of the date of the sale of bonds for permanent financing, adjusted for yield purposes to the nearest 1/8 of one percent to reflect the FNMA discount rate for Section 236 projects resulting from the FNMA auction most recent to the date of the sale of the bonds, and (ii) the FHA Mortgage Insurance Premium amount which would be appropriate for the project were it subject to FHA mortgage insurance.

3. Payments hereunder shall commence to accrue with the due date of the first payment to interest as provided under the project mortgage, but not before the date when the

*The words "if any" will apply only to periods subsequent to to February 1, 1972.

project is or a major portion thereof as defined by the Secretary, is substantially ready for occupancy unless otherwise approved by the Commissioner. Payments shall continue on the first day of each month thereafter until the payments are terminated as hereinafter provided, or until this contract is terminated. Payments hereunder shall be made upon the receipt of a billing from the Mortgagee on a form prescribed or approved by the Commissioner. Payments as to a portion of the project substantially ready for occupancy shall be made in an amount bearing the same relationship to the estimated full amount of such payments were the entire project substantially ready for occupancy as the number of assisted rooms in the portion of the project substantially ready for occupancy bears to the total number of assisted rooms in the project.

4. The Mortgagor covenants and agrees with respect to each dwelling unit for which an interest reduction payment is made hereunder, that:

(a) It has established or will establish for each such unit (i) a basic rental charge determined on the basis of operating the porject with even monthly payments, computed on an annual basis, for principal and interest, based upon an assumed amortization period of 40 years, under a mortgage bearing interest at 1% with respect to any period of time subsequent to the effective date hereof, and (ii) a fair market rental charge determined on the basis of operating the project with payments of principal and interest on the unpaid balances, based upon an amortization period of 40 years plus interest on the face amount, due under the project mortgage. Such basic rental charges and fair market rental charges, for the units authorized for the Section 236 subsidy, are shown in Exhibit B hereof.

(b) Any revision in the basic rental or fair market rental for any such unit shall be made or approved by the Mortgagee and shall be subject to approval by the Commissioner as further provided below in this subparagraph (b). The Mortgagee will make or approve rental revisions in conformity with applicable state law and regulations, and will notify the Commissioner in writing of every such revision. The Commissioner will not unreasonably withhold approval of rent revisions made or approved by the Mortgagee. Notice of approval or disapproval of any revision will be given within thirty days of the date of receipt of the Mortgagee's notification to the Commissioner of the revision. The Mortgagee has furnished the Commissioner copies of such laws and regulations and shall inform him of any changes in such laws and regulations.

(c) The rent for each such unit, except for units occupied

by tenants admitted under the exception set forth in (e) below, which will include all utilities except telephone, will be equal to 25% of the tenant's income, as determined by the Commissioner, or the basic rental, whichever is greater, but in no event shall the rent charged exceed the fair market rental established for each dwelling unit.

(d) It shall limit admission to such units to those families whose incomes do not exceed the lower of the applicable limits prescribed by either the Commissioner or the Mortgagee with the exception of such tenants as may agree to pay the fair market rental.

(e) Preference for occupancy in such units shall be given to those families who have been certified as displaced families on a form approved by the Commissioner and the Mortgagee, and to those families whose incomes are within the lowest practicable limits for obtaining rental units in the project.

(f) It shall comply with the provisions of any applicable Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, creed or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), and all requirements imposed by or pursuant to the Regulations of the Department of Housing and Urban Development (24 CFR, Subtitle A, Part 1) issued pursuant to Executive Order 11063.

(g) It shall not restrict occupancy by reason of the fact that there are children in the family, unless the project has been designed primarily for elderly persons.

(h) No tenant of such a unit shall be permitted to rent more than one unit in the project at any given time without the prior written approval of the Commissioner and the Mortgagee.

(i) On forms approved by the Commissioner and Mortgagee it will obtain from each prospective tenant of such a unit a certification of income, and a recertification of income from all such tenants who are paying less than fair market rental at intervals as required by the Commissioner.

(j) In a manner prescribed by the Commissioner and the Mortgagee, it will obtain written evidence substantiating the information given on such tenants' certifications and recertifications of income and shall retain the evidence in its files for three years.

(k) If any recertification reveals a change in income whereby such a tenant would be eligible for a lower or higher rent, such adjustment in rent charged shall be made, provided that the adjusted rent for any such unit shall be the basic rental or an amount equal to 25% of the tenant's income, whichever is greater, but shall never exceed fair market rental.

(l) It shall require all tenants who pay less than market rental to execute a lease in a form approved by the Commissioner and the Mortgagee.

(m) It shall remit to the Commissioner on or before the tenth day of each month the amount by which the total rents collected on such units exceed the sum of the approved basic rentals for all such units, which remittance shall be accompanied by a monthly report on a form approved by the Commissioner, provided that a monthly report must be filed and a copy forwarded to the Mortgagee even if no remittance is required. The computation of total rents collected shall not include any surcharges.

(n) It shall maintain accurate records and accounts in such form and manner as the Commissioner and the Mortgagee may prescribe and shall make such records and accounts available for inspection and audit by the Commissioner at any time.

(o) It will not sell, convey or transfer the project, except to a purchaser who is approved by the Commissioner as entitled to participation under Section 236 (b) of the National Housing Act, as amended, and who assumes the duties and obligations under this contract.

5. The Mortgagee covenants and agrees that, without the prior written approval of the Commissioner, it will not assign the project mortgage, or agree to the forbearance or deferment of any payment due under the project mortgage.

6. Payments under this contract shall terminate:

(a) if an action of foreclosure is instituted by the Mortgagee, or the property is acquired by the Mortgagee by means other than by foreclosure; provided, however, that if a foreclosure proceeding is instituted by the Mortgagee subject to the continuing lien of the project mortgage, and the project is acquired by a purchaser eligible to be an owner under Section 236 (b) of the National Housing Act, then payments shall not be terminated, or

(b) at the discretion of the Commissioner, upon default hereunder by the Mortgagor or Mortgagee.

7. If payments are terminated pursuant to Paragraph 6 herein, such payments may be reinstated by the Commissioner at his discretion and on such conditions as he may prescribe.

8. This contract shall terminate (a) when the project mortgage is paid in full, or (b) at the option of, and upon written notice from, the Commissioner, after the expiration of one year from the date of the termination of payments in accordance with Paragraph 6 hereof unless such payments have been reinstated in accordance with Paragraph 7.

9. The rights and obligations under this contract are not assignable by the Mortgagee, or by the Mortgagor, without the prior written approval of the Commissioner. In the event of an approved assignment, the obligations under this contract shall bind, and the benefits shall insure to, the assignee.

10. As used in this contract the term "tenant" shall include a member of a cooperative. The term "Lease" shall include a cooperative occupancy agreement. The term "rent" shall include carrying charge paid to the cooperative Mortgagor under an occupancy agreement.

11. The Commissioner and the Mortgagee shall look only to the assets of C-W Associates for redress in the event of default hereunder by the Mortgagor, and to any funds held by any person which by the provisions hereof they are not entitled to retain.

This contract is being executed in five counterparts, each of which shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals as of the day and year first above written.

SEAL:

WITNESS:

Mortgagor:
C-W ASSOCIATES

By
General Partner

By
General Partner

SEAL:

WITNESS:

Mortgagee:
MASSACHUSETTS HOUSING FINANCE AGENCY

By
Executive Director

SEAL:

WITNESS:

SECRETARY OF HOUSING AND URBAN DEVELOPMENT acting by and through the FEDERAL HOUSING COMMISSIONER

By

See Exhibits A and B attached hereto.

AMENDMENT TO INTEREST REDUCTION CONTRACT

I No. 023-35-NI
MHFA No. 70-8-N

Amendment effective this 28th day of June 1974 to the Interest Reduction Contract dated as of September 1, 1971 by and between C-W Associates, a limited partnership organized under Massachusetts General Laws Chapter 109 Massachusetts Housing Finance Agency, and the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner.

For adequate mutual consideration, receipt of which is acknowledged by each party, the parties hereby amend the aforesaid Interest Reduction Contract as follows:

1. Exhibit B is amended to read as shown on the form attached.

2. In paragraph numbered 2, the figure of $53,853. contained in the first clause following sub-paragraph 2.(b) shall be deleted, and the figure $49,064 shall be substituted in its place.

In all other respects, the provisions of the said Interest Reduction Contract are affirmed.

IN WITNESS WHEREOF, the parties have set their hands and seals, or caused this Amendment to be executed by a duly authorized representative, as of the day and year first above written.

SEAL

WITNESS:

[signature]

Mortgagor: C-W

By [signature: Roger W. Stern]
General Partner

By [signature]
General Partner

SEAL

WITNESS:

[signature]

Mortgagee:
MASSACHUSETTS HOUSING FINANCE AGENCY

By [signature]
Executive Director

SEAL

WITNESS:

[signature]

SECRETARY OF HOUSING AND URBAN DEVELOPMENT acting by and through the FEDERAL HOUSING COMMISSIONER

By [signature]

Exhibit B
to Interest Reduction
Contract

Name of Project:

Total Mortgage Amount ........................................$ 3,652,980.

Amount of Mortgage Attributable to 236-assisted Units ...............$ 1,217,600.

Total Units in Project ........................................ 214

236-assisted Units in Project ................................ 71

Rental Schedule of 236-assisted Units

| Bedroom Size | Number of Units | Basic Rental Charge | Fair Market Rental Charge |
|---|---|---|---|
| 0 BR | 23 | 118.00 | 163.00 |
| 1 BR | 38 | $ 157.00 | $ 220.00 |
| 2 BR | 10 | 185.00 | 265.31 |
| 3 BR | | | |
| 4 BR | | | |
| 5 BR | | | |

# CODE OF FEDERAL REGULATIONS

## TITLE 24

**Revised as of January 1, 1970**

CONTAINING A CODIFICATION OF DOCUMENTS OF GENERAL APPLICABILITY AND FUTURE EFFECT AS OF JANUARY 1, 1970

***With Ancillaries***

Published by the Office of the Federal Register, National Archives and Records Service
General Services Administration, as a Special Edition of the Federal Register
Pursuant to Section 11 of the Federal Register Act as Amended

[redacted]

(b) The provisions of paragraph (a) of this section shall not apply where a lien inferior to the lien of the insured mortgage is given in favor of an agency of the United States under such circumstances as may be approved by the Commissioner.

[28 F.R. 7659, July 25, 1963, as amended at 33 F.R. 11160, Aug. 7, 1968]

### § 221.521 Covenant for hazard insurance.

The mortgage shall contain a covenant acceptable to the Commissioner binding the mortgagor to keep the property insured by a standard policy or policies against fire and such other hazards as the Commissioner, upon the insurance of the mortgage, may stipulate, in an amount which will comply with the coinsurance clause applicable to the location and character of the property, but not less than 80 percent of the actual cash value of the insurable improvements and equipment of the project. The initial coverage shall be in amount estimated by the Commissioner at the time of completion of the entire project or units therefor. The policies evidencing such insurance shall have attached thereto, a standard mortgagee clause making loss payable to the mortgagee and the Commissioner, as their interests may appear.

[26 F.R. 7476, Aug. 12, 1961]

### § 221.522 Accumulation of accruals.

(a) Except in the case of mortgages bearing interest at the rate set out in § 221.518(b), the mortgage shall provide for payments by the mortgagor to the mortgagee on each interest payment date of an amount sufficient to accumulate in the hands of the mortgagee one payment period prior to its due date, the next annual mortgage insurance premium payable by the mortgagee to the Commissioner. Such payments shall continue only so long as the contract of insurance shall remain in effect.

(b) In the case of all mortgages insured under this subpart, the mortgage shall provide for such equal monthly payments by the mortgagor to the mortgagee as will amortize the ground rents, if any, and the estimated amount of all taxes, water rates and special assessments, if any, and fire and other hazard insurance premiums, within a period ending one month prior to the dates on which the same become delinquent. The





mortgage shall further provide that such payments shall be held by the mortgagee, for the purpose of paying such ground rents, taxes, water rates and assessments, and insurance premiums, before the same become delinquent. The mortgage must also make provision for adjustments, in case the estimated amount of such taxes, water rates and assessments, and insurance premiums shall prove to be more, or less, than the actual amount thereof so paid by the mortgagor.

[26 F.R. 7476, Aug. 12, 1961]

### § 221.523 Application of payments.

(a) The mortgage shall provide that all monthly payments being made by the mortgagor to the mortgagee shall be added together and the aggregate thereof shall be paid by the mortgagor upon each monthly payment date in a single payment. The mortgagee shall apply the same to the following items in the order set forth:

(1) Premium charges under the contract of insurance, where applicable.

(2) Ground rents, taxes, special assessments and fire and other hazard insurance premiums.

(3) Interest on the mortgage.

(4) Amortization of the principal of the mortgage.

(b) Any deficiency in the amount of the aggregate monthly payment shall constitute an event of default. The mortgage shall further provide for a grace period of thirty days, within which time the default must be cured.

[26 F.R. 7476, Aug. 12, 1961]

### § 221.524 Prepayment privileges.

(a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner in the following cases:

(i) Where the mortgage is insured under section 221(d)(4) of the Act.

(ii) Where the mortgagor is a limited distribution type, which is not receiving payments from the Commissioner under a rent supplement contract executed pursuant to the provisions of §§ 5.1 et seq. of this title, and where the prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage.

(iii) Where the project is converted to condominium ownership or is purchased by a cooperative mortgagor, which actions are taken pursuant to section 221(i) or 221(j) of the Act.

(iv) Where the mortgage is insured pursuant to section 221(h) of the Act and the prepayment occurs as a result of a sale of the individual units comprising the project.

(2) *With prior Commissioner consent.* In all other cases, except those outlined in subparagraph (1), a mortgage indebtedness shall not be prepaid in full and the Commissioner's controls will not be terminated unless the Commissioner gives his prior consent to such prepayment.

(b) *Partial prepayments.* With the prior written approval of the Commissioner, partial prepayments may be made for the purpose of reducing succeeding monthly payments of the remaining balance as recast over the remaining portion of the original mortgage term.

(c) *Optional provision.* The mortgage may, if required by the mortgagee, contain a provision that, prior to maturity, and with the approval of the Commissioner, partial prepayments may be made, after thirty days' written notice to the mortgagee, on any principal payment date. If prepayments are made in any calendar year in excess of 15 percent of the original face amount of the mortgage, the mortgagee will be permitted to collect such reasonable charge on such excess as is agreed upon between the mortgagor and the mortgagee.

[26 F.R. 7476, Aug. 12, 1961, as amended at 31 F.R. 16615, Dec. 29, 1966; 33 F.R. 16615, Aug. 7, 1968; 34 F.R. 6980, Apr. 26, 1969]

### § 221.525 Late charge.

The mortgage may provide for the collection by the mortgagee of a late charge, not to exceed 2 cents for each dollar of each payment to interest and principal more than 15 days in arrears, to cover the extra expense involved in handling delinquent payments. Late charges shall be separately charged to and collected from the mortgagor and shall not be deducted from any aggregate monthly payment.

[26 F.R. 7476, Aug. 12, 1961]

### § 221.526 Issuance of bonds secured by trust indenture.

In the event that bonds or other obligations are to be issued as a part of the insured mortgage transaction, the form of bonds and the form of trust indenture shall be subject to the approval of the

(1) Construct or rehabilitate a multifamily project for sale (upon final endorsement) to a private nonprofit corporation meeting the qualifications of paragraph (a). Prior to insurance of the mortgage, the mortgagor shall have entered into a written agreement with such nonprofit corporation to sell the project at a purchase price not to exceed the project's actual cost as certified pursuant to § 221.550 of this chapter.

(2) Operate the project, subject to special controls and requirements of the Commissioner as to rents, charges, rates of return, and methods of operation, until the conveyance to the nonprofit mortgagor.

(3) Operate the project as a limited distribution mortgagor subject to the supervision, controls and requirements prescribed by the Commissioner for such mortgagor, in the event of failure to convey to a nonprofit mortgagor either at final endorsement or within such additional period as may be agreed to in writing by the Commissioner.

(c) *Limited distribution mortgagor.* The limited distribution mortgagor shall be a corporation, trust, partnership, association, other entity, or an individual. Such mortgagor shall be restricted by law (or by the Commissioner) as to distribution of income and shall be regulated as to rents, charges, rate of return, and methods of operation in such form and manner as is satisfactory to the Commissioner to effectuate the purposes of this subpart.

(d) *Cooperative and investor sponsor mortgagors.* (1) The cooperative mortgagor shall be a nonprofit cooperative ownership housing corporation which restricts permanent occupancy of the project to the members of the corporation who must meet membership eligibility requirements approved by the Commissioner.

(2) The investor sponsor mortgagor shall be a special type of mortgagor which is organized to:

(i) Construct or rehabilitate a multifamily project to be transferred to a cooperative mortgagor within 2 years from the date of completion.

(ii) Operate the project until 2 years from the date of completion or until the conveyance to the cooperative mortgagor, whichever occurs sooner, subject to the controls and requirements of the Commissioner.

(iii) Operate the project as a limited distribution mortgagor subject to the controls and requirements of the C… missioner, in the event of failure to c… vey to a cooperative mortgagor wit… the 2-year period.

(3) Such a mortgagor will be regula… or restricted by the Commissioner as… rents or sales, charges, rate of return, a… methods of operation in such manner… will effectuate the purposes of this su… part and protect the consumer inter…

[33 F.R. 16082, Nov. 1, 1968, as amended at… F.R. 17952, Nov. 6, 1969]

## § 236.15 Maximum interest rate.

The mortgage shall bear interest … the rate agreed upon by the mortgag… and the mortgagor, but in no case sh… the interest rate exceed 7½ percent p… annum with respect to mortgages i… sured on or after January 24, 1969.

[34 F.R. 1439, Jan. 30, 1969]

## § 236.20 Mortgage release provisions.

A mortgage insured under this subpa… may provide that, at any time after fin… endorsement, the property covered b… the mortgage may be released, in who… or in part, with the approval of the Com… missioner and under such terms and con… ditions as he may prescribe, upon pay… ment of the portion of the unpaid bal… ance of the mortgage allocable to th… property released.

## § 236.25 Application of payments.

(a) The mortgage shall provide tha… all amounts to be paid monthly by th… mortgagor to the mortgagee shall be add… ed together and the aggregate thereo… shall be paid by the mortgagor upon… each monthly payment date in a single… payment. The mortgage shall further… provide that such payment will be applied… in the following order:

(1) Premium charges under the contract of mortgage insurance.

(2) Ground rents, taxes, special assessments and fire and other hazard insurance premiums.

(3) Interest on the mortgage.

(4) Amortization of the principal of the mortgage.

(b) Any deficiency in the amount of the monthly payment by the mortgagor shall constitute an event of default. The mortgage shall further provide for a grace period of 30 days, within which time the default must be cured.

## § 236.30 Prepayment privileges.

(a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage

controls and requirements of the Commissioner, in the event of failure to convey to a cooperative mortgagor within the 2-year period.

(3) Such a mortgagor will be regulated or restricted by the Commissioner as to rents or sales, charges, rate of return, and methods of operation in such manner as will effectuate the purposes of this subpart and protect the consumer interest.

[33 F.R. 16082, Nov. 1, 1968, as amended at 34 F.R. 17952, Nov. 6, 1969]

**§ 236.15 Maximum interest rate.**

The mortgage shall bear interest at the rate agreed upon by the mortgagee and the mortgagor, but in no case shall the interest rate exceed 7½ percent per annum with respect to mortgages insured on or after January 24, 1969.

[34 F.R. 1439, Jan. 30, 1969]

**§ 236.20 Mortgage release provisions.**

A mortgage insured under this subpart may provide that, at any time after final endorsement, the property covered by the mortgage may be released, in whole or in part, with the approval of the Commissioner and under such terms and conditions as he may prescribe, upon payment of the portion of the unpaid balance of the mortgage allocable to the property released.

**§ 236.25 Application of payments.**

(a) The mortgage shall provide that all amounts to be paid monthly by the mortgagor to the mortgagee shall be added together and the aggregate thereof shall be paid by the mortgagor upon each monthly payment date in a single payment. The mortgage shall further provide that such payment will be applied in the following order:

(1) Premium charges under the contract of mortgage insurance.

(2) Ground rents, taxes, special assessments and fire and other hazard insurance premiums.

(3) Interest on the mortgage.

(4) Amortization of the principal of the mortgage.

(b) Any deficiency in the amount of the monthly payment by the mortgagor shall constitute an event of default. The mortgage shall further provide for a grace period of 30 days, within which time the default must be cured.

**§ 236.30 Prepayment privileges.**

(a) *Prepayment in full*—(1) *Without prior Commissioner consent.* A mortgage





indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where the mortgagor is a limited distribution type and either of the following conditions is met:

(i) If the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage, provided the mortgagor is not receiving payments from the Commissioner under a rent supplement contract executed pursuant to the provisions of §§ 5.1 et seq. of this title.

(ii) If the prepayment occurs as a result of the sale of the project to a cooperative or private nonprofit corporation or association, provided the sale is financed with a mortgage insured pursuant to § 236.40(d).

(2) *With prior Commissioner consent.* In all cases, except those outlined in subparagraph (1) of this paragraph, a mortgage indebtedness shall not be prepaid in full and the Commissioner's controls shall not be terminated unless the Commissioner gives his prior consent to such prepayment.

(b) *Partial prepayments.* With the prior written approval of the Commissioner, partial prepayments may be made for the purpose of reducing succeeding monthly payments of the remaining balance as recast over the remaining portion of the original mortgage term.

(c) *Optional provision.* The mortgage may, if required by the mortgagee, contain a provision that, prior to the maturity and with the approval of the Commissioner, partial prepayments may be made after 30 days' written notice to the mortgagee on any principal payment date. If prepayments are made in any calendar year in excess of 15 percent of the original face amount of the mortgage, the mortgagee will be permitted to collect such reasonable charge on such excess as is agreed upon between the mortgagor and the mortgagee.

(d) *Prepayment in connection with sale of units.* With the prior written approval of the Commissioner, the mortgagor may sell the individual dwelling units in the project to lower income, elderly, or handicapped purchasers. The mortgagee shall not collect any charge for the prepayment of the mortgage in connection with the sale of such units.

[33 F.R. 16082, Nov. 1, 1968, as amended at 34 F.R. 12889, Aug. 8, 1969]

**§ 236.35 Late charge.**

A late charge may be collected by the mortgagee for each payment to interest or principal more than 15 days in arrears, if provided in the mortgage, but such charge shall not exceed 2 cents for each dollar of the mortgagor's share of such payment. Such charge shall be separately charged to and collected from the mortgagor and shall not be deducted from any aggregate monthly payment. Such charge shall not be included in the interest reduction payment made by the Commissioner to the mortgagee pursuant to § 236.501 et seq.

**§ 236.40 Eligibility of miscellaneous mortgages.**

(a) *Transfer.* A mortgage initially insured under Part 221, Subpart C of this chapter, which has been approved for the below market interest rate (§ 221.518(b) of this chapter) and which has not received the Commissioner's final endorsement, may be insured under this subpart. The principal amount of such mortgage shall not exceed that which would be applicable if the mortgage were to be insured under Part 221.

(b) *Refinancing—in general.* A mortgage given to refinance an existing mortgage insured under the Act may be insured under this subpart pursuant to section 223(a)(7) of the Act. The new mortgage shall be limited in amount and in term as follows:

(1) The principal of the new mortgage shall not exceed the lowest of these amounts:

(i) The original principal amount of the existing insured mortgage.

(ii) The unpaid principal amount of the existing insured mortgage, to which may be added—

(*a*) The outstanding indebtedness incurred in connection with capital improvements made to the property which are acceptable to the Commissioner.

(*b*) The costs, as determined by the Commissioner, of improvements, upgrading or additions required to be made to the property.

(*c*) Loan closing charges.

(iii) The Commissioner's estimate of the value of the property after completion of the repairs, improvements or additions to the property, except for general or limited distribution mortgagors when the amount shall not exceed 90 percent of the Commissioner's estimate of the value of the property

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
ADDITIONAL ASSISTANCE PROGRAM FOR PROJECTS WITH HUD-INSURED AND HUD-HELD MORTGAGES
24 CFR PART 886, SUBPART A

HOUSING ASSISTANCE PAYMENTS (HAP) CONTRACT RENEWAL

This Contract is between the United States of America, acting through the Department of Housing and Urban Development (called "HUD"), and Joseph R. Biafora and Stefi Biafora, (called "Owner"). This Contract is executed pursuant to the United States Housing Act of 1937 (called the "Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The housing project covered by this Contract is identified as follows:

Project Name: Milwood Apts.
Street Address: 6922 Milwood Avenue
Section 8 No.: CA16-M000-339

City: Canoga Park
County: Los Angeles

I. Sections 1 through 28 and Exhibits Q and B of the Initial/Renewal Contract beginning June 1, 1985 and continuing through May 31, 1990, are incorporated herein by reference as if fully set forth hereafter.

II. Sections 5 and 6a are modified as follows:

Section 5. Term of Contract. This Contract shall run for a period of five years, beginning June 1, 1990 and continuing through May 31, 1995. This Contract may be renewed for One additional five-year period at the option of the Owner and Hud. The Owner may elect to terminate this Contract at any time during the Contract term provided that the Owner has furnished HUD and each and every tenant with not less tha[n] ONE YEAR'S written notice of such termination.

Section 6. Maximum Amount of Housing Assistance Payments

Maximum Annual Contract Commitment. Notwithstanding any other provision of this Contract (other than Paragraph b) or any other contract between HUD and the Owner, HUD shall not be obligated to make assistance payments and pay PHA fees, if any in excess of $32,796 under this Contract during any contract year. In addition, HUD shal[l] not be obligated to pay assistance for more than the total number of contract units shown in Exhibit B.

III. All other sections of the contract shall remain the same.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, ficitious, or fraudulent statement or entry in any manner within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 29. Signatures.

Owner Joseph R. Biafora and Stefi Biafora
By [signature] [signature]
Joseph R. Biafora, Stefi Biafora
Name
Co-Owner
Official Title

Date January 24, 1990

UNITED STATES OF AMERICA
Secretary of Housing and Urban Development
HUD
By [signature]
L. Joseph Lagerbauer
Name
Director, Housing Management Division
Official Title

Date 1/31/90, 19

Kelly Decl. Ex. D



DOJ0961300

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
ADDITIONAL ASSISTANCE PROGRAM FOR PROJECTS WITH HUD-INSURED AND HUD-HELD MORTGAGES
24 CFR PART 886, SUBPART A

HOUSING ASSISTANCE PAYMENTS (HAP) CONTRACT RENEWAL

This Contract is between the United States of America, acting through the Department of Housing and Urban Development (called "HUD"), and B & C COMPANY, A PARTNERSHIP (called "Owner"). This Contract is executed pursuant to the United States Housing Act of 1937 (called the "Act), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The housing project covered by this Contract is identified as follows:

Project Name: Parthenia Manor City: Panorama City
Street Address: 14920 Parthenia Street
Section 8 No.: CA16-M000-271 County: Los Angeles

I. Sections 1 through 28 Exhibits A and B of the Initial/Renewal Contract beginning September 1, 19 83 and continuing through August 31, 19 88, are incorporated herein by reference as if fully set forth hereafter.

II. Sections 5 and 6a are modified as follows:

Section 5. Term of Contract. This Contract shall run for a period of five years, beginning September 1, 19 88, and continuing through August 31, 19 93. This Contract may be renewed for 1 additional five-year periods at the option of the Owner and HUD. The Owner may elect to terminate this Contract at any time during the Contract term provided that the Owner has furnished HUD and each and every tenant with not less than ONE YEAR'S written notice of such termination.

Section 6. Maximum Amount of Housing Assistance Payments

Maximum Annual Contract Commitment. Notwithstanding any other provision of this Contract (other than Paragraph b) or any other contract between HUD and the Owner, HUD shall not be obligated to make assistance payments and pay PHA fees, if any, in excess of $ 226,638.00 under this Contract during any contract year. In addition, HUD shall not be obligated to pay assistance for more than the total number of contract units shown in Exhibit B.

III. All other sections of the contract shall remain the same.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 29. Signatures

| | |
|---|---|
| Owner: B & C Company, a Partnership | HUD: Los Angeles Office |
| X By: Joseph Biafora (Signature) | By: (Signature) |
| Joseph Biafora (Type or Print Name) | L. Joseph Lagerbauer (Type or Print Name) Director, Housing Management |
| Date: 3/2/89 | Date: March 3, 1989 |

114

PA 059

DOJ0740027

Kelly Decl. Ex. E

SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
ADDITIONAL ASSISTANCE PROGRAM FOR PROJECTS WITH HUD-INSURED AND HUD-HELD MORTGAGES
24 CFR PART 886, SUBPART A

COPY

## HOUSING ASSISTANCE PAYMENTS (HAP) CONTRACT RENEWAL

This Contract is between the United States of America, acting through the Department of Housing and Urban Development (called "HUD"), and Thetford Properties III, Limited Partnership (called "Owner"). This Contract is executed pursuant to the United States Housing Act of 1937 (called the "Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq. The housing project covered by this Contract is identified as follows:

Project Name: Market North Apartments #2 City: Wilmington, NC
Street Address: Rosemont Avenue
Section 8 No.: NC-19-M000-053 County: New Hanover

I. Sections 1 through 28 and Exhibits A and B of the Initial/[redacted] Contract beginning December 1, 19 81 and continuing through November 30, 19 86, are incorporated herein by reference as if fully set forth hereafter.

II. Sections 5 and 6a are modified as follows:

Section 5. Term of Contract. This Contract shall run for a period of five years, beginning December 1, 19 86, and continuing through November 30, 1991. This Contract may be renewed for 1 additional five-year periods at the option of the Owner.

Section 6. Maximum Amount of Housing Assistance Payments

Maximum Annual Contract Commitment. Notwithstanding any other provision of this Contract (other than Paragraph b) or any other contract between HUD and the Owner, HUD shall not be obligated to make assistance payments and pay PHA fees, if any, in excess of $ 230,997.00 under this Contract during any contract year. In addition, HUD shall not be obligated to pay assistance for more than the total number of contract units shown in Exhibit B.

III. All other sections of the contract shall remain the same.

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willingly makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

Section 29. Signatures.

| | |
|---|---|
| Owner Thetford Properties III, Limited Partnership | HUD Greensboro, NC Office |
| By [signature] | By [signature] |
| R. H. Urban | Robert W. Fields |
| Name | Name |
| General Partner | Director, Housing Management Division |
| Official Title | Official Title |
| Date 10/7, 19 86 | Date 10/16, 19 86 |

OCT 3 19

Prepayment--Conversion of Rent Supp. Units to Sec. 8

Legal Opinion: GHM-0042

Index: 3.270, 3.346
Subject: Prepayment--Conversion of Rent Supp. Units to Sec. 8

July 17, 1992

MEMORANDUM FOR: Albert B. Sullivan, Deputy Director
Office of Multifamily Housing Management, HMH

Frank Malone, Director, Office of Preservation
and Property Disposition, HMP

FROM: David R. Cooper, Assistant General Counsel
Multifamily Mortgage Division, GHM

SUBJECT: Conversion of Rent Supplement Units to Section 8
Assistance

This memorandum is in response to Kevin East's and Buz Schick's May 8, 1992 request for a legal opinion concerning whether projects which convert from rent supplement to Section 8 assistance would be deemed eligible low income housing under the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA").

On May 19, 1992 a NOFA entitled "Fund Availability (NOFA) for the Conversion of Rent Supplement and Rental Assistance Program Units to Section 8 Assistance" (the "NOFA"), was published at 57 Fed. Reg. 21334 announcing funds for the conversion of rent supplement project units to Section 8 assistance under the loan management set-aside program. This conversion was authorized by Title II of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1992 (the "1992 Appropriations Act). Owners of projects with HUD-insured or HUD-held mortgages would be eligible to apply for conversion under the NOFA. The effect of the conversion would be that the rental assistance payments contract ("RAP Contract") on the converted units would be terminated and a 5-year housing assistance payments contract ("HAP Contract") would be executed to cover those units.

About ten years ago, a similar conversion from rent supplement to Section 8 assistance occurred. The Department determined, in the preamble to the interim rule implementing LIHPRHA and amending Part 248 of Title 24 of the Code of Federal Regulations (the "Interim Rule"), published on April 8, 1992 at 57 Fed. Reg. 11992, that those projects which were converted from rent supplement to Section 8 assistance ten years ago may be considered eligible low income housing under LIHPRHA. The question has now arisen whether projects which will be converting

under the May 19, 1992 NOFA would also meet the definition of "eligible low income housing."

Section 229 of LIHPRHA defines the term "eligible low income housing" as any housing:

> "that is financed by a loan or mortgage--
> (A) that is--
> (i) insured or held by the Secretary under section 221(d)(3) of the National Housing Act and assisted under section 101 of the Housing and Urban Development Act of 1965 or section 8 of the United States Housing Act of 1937;
> (ii) insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act;
> (iii) insured, assisted, or held by the Secretary or a State or State agency under section 236 of the National Housing Act; or
> (iv) held by the Secretary and formerly insured under a program referred to in clause (i), (ii), or (iii); and
> (B) that, under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Secretary."

At issue here is whether projects converting from rent supplement to Section 8 assistance which meet the criteria of paragraph (A), as quoted above, fulfill the requirements of paragraph (B) in order to qualify the projects as eligible low income housing.

Sections 221.524 and 236.30 of the Department's regulations state that a limited distribution mortgagor may prepay its insured or assisted mortgage without the prior consent of HUD if the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage, "provided the mortgagor is not receiving payments from the Commissioner under a rent supplement contract." Because owners of projects currently receiving rent supplement assistance are prohibited, pursuant to Sections 221.524 and 236.30, from prepaying the mortgage without the Department's prior consent, those projects do not meet the requirements of paragraph (B) above, and therefore, are not eligible low income housing.

However, if the rent supplement is converted to Section 8 assistance, the project would no longer be considered a rent supplement project and would not be subject to the prepayment prohibitions of Sections 221.524 and 236.30; rather, a limited distribution mortgagor which is not receiving rent supplement assistance would be permitted to prepay its mortgage without HUD's consent after 20 years from the date of final endorsement.

Section 229 of LIHPRHA requires that in order for housing to be deemed "eligible low income housing" there must not only be the right to prepay without HUD's consent, but this right must

have existed by regulation or contract which was in effect prior to February 5, 1988. Sections 221.524 and 236.30, which permit a limited distribution mortgagor which is not receiving rent supplement to prepay its mortgage without HUD's approval after 20 years from final endorsement, became effective on December 22, 1971, long before February 5, 1988. Hence, a project meeting the requirements of paragraph (A), as quoted above, would fall within the definition of "eligible low income housing" if the mortgagor is a limited dividend entity and the mortgage is within 24 months of, or past, the 20th anniversary of final endorsement.

The preamble to the Interim Rule, at 57 Fed. Reg. 11997, summarizes the Department's position on converted rent supplement projects, stating that:

> " a project whose rent supplement assistance was converted to section 8 assistance is no longer subject to the regulations concerning rent supplement assistance. These projects would be governed by the section 8 regulations once the conversion took place. Since projects receiving section 8 assistance are not subject to a prepayment prohibition based on the receipt of such assistance, these projects can qualify as eligible low income housing."

Projects which will be converting from rent supplement assistance to Section 8 assistance pursuant to the May 19, 1992 NOFA should be treated in the same manner as those projects which converted from rent supplement to Section 8 assistance ten years ago. Those projects which will be converting will be subject to the same provisions of Section 221.524 and 236.30 as the formerly converted projects. There is no reasonable basis for treating differently those projects which will be converting and those which have already converted from rent supplement to Section 8 assistance.

Therefore, as long as the project meets the requirements of paragraph (A), as quoted above, and can be prepaid, or is within 24 months of being able to prepay, without HUD's consent, the project that formerly received rent supplement assistance and has been converted to Section 8 assistance would be deemed "eligible low income housing" for purposes of LIHPRHA. Similarly, a project that is currently receiving rent supplement and subsequently converts to Section 8 assistance pursuant to the May 19, 1992 NOFA, will be considered "eligible low income housing" after conversion if it continues to meet the requirements of paragraph (A) and, as of the time it seeks to prepay, it is able, or is within 24 months of being able, to prepay without HUD's consent.

If you have any questions regarding this matter, please contact Susan M. Sturman at 708-3667.

LEXSEE 57 FR 11992

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

Office of the Secretary

AGENCY: Office of the Secretary, HUD.

24 CFR Parts 50, 219, 221, 236, 241, and 248

Prepayment of a HUD-Insured Mortgage by an Owner of Low Income Housing

[Docket No. R-92-1513; FR-2978-I-02]

RIN 2501-AB14

*57 FR 11992*

April 8, 1992

ACTION: Interim rule.

SUMMARY: This interim rule implements and makes effective HUD's procedures and standards for administering subtitle A of title VI of the Cranston-Gonzalez National Affordable Housing Act, entitled the "Low Income Housing Preservation and Resident Homeownership Act of 1990" ("LIHPRHA"), which repeals and replaces the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"). This rule creates a permanent and comprehensive program which preserves privately-owned low income housing projects while not unduly restricting the owners, mortgage prepayment rights. In localities where there is an adequate supply of low income housing, prepayment of the mortgage would not otherwise undermine public policy objectives set forth in the statute, and prepayment would not result in a material increase in the economic hardship of the current tenants, owners of projects subject to low income affordability restrictions may terminate these restrictions and prepay their HUD-insured mortgages or terminate their mortgage insurance contracts. In areas where the supply of low income housing is inadequate, the low income affordability restrictions must be maintained on the projects for their remaining useful life, but owners may receive a fair market return on their investment through the receipt of incentives provided by HUD or through the transfer of the property to other entities which agree to continue the low income affordability restrictions. This rule provides an opportunity for homeownership of eligible low income housing projects by the tenants through resident homeownership programs. It also encourages the transfer of low income housing projects to nonprofit organizations and State and local government entities, by giving these entities the first opportunity to purchase available projects.

DATES: *Effective date:* May 8, 1992. The effective date of this interim rule may be postponed if the Department is unable, on or before that date, to publish a companion document, the final Guidelines for Determining Appraisals of Preservation Value under the Low Income Housing Preservation and Resident Homeownership Act of 1990.

11*Comment due date:* All written comments must be received on or before June 8, 1992.Display Classification Information Display Classification Information Display Classification Information Display Classification Information Display Classification Information

ADDRESSES: Submit written comments to the Office of the General Counsel, Rules Docket Clerk, room 10276, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410. Communications should refer to the above docket number and title. A copy of each communication submitted will be available for public inspection and copying during regular business hours (7:30 a.m.-5:30 p.m. Eastern Standard Time) at the above address.
FOR FURTHER INFORMATION CONTACT: Kevin J. East, Office of Multifamily Housing Preservation and Property Disposition, Department of Housing and Urban Development, 451 7th Street, SW., Washington, DC 20410. Telephone, voice (202) 708-2300; TDD, (202) 708-4594. (These are not toll-free numbers).

**TEXT:** SUPPLEMENTARY INFORMATION: The information collection requirenents contained in the interim rule have been submitted to the Office of Management and Budget for review under the provisions of the Paperwork Reduction Act of 1980 *(44 U.S.C. 3501*-3502). No person may be subject to a penalty for failure to comply with these information collection requirements until they have been approved and assigned an OMB control number. The OMB control number, when assigned, will be announced by separate notice in the Federal Register.

On May 2, 1991, the Department of Housing and Urban Development (the "Department" or "HUD") published a proposed rule at *56 FR 20262*. The purpose of the proposed rule was to establish policies and procedures for implementing LIHPRHA and to solicit public comments in response to the Department's proposal. This interim rule responds to the public comments received by the Department in reaction to the proposed rule. The interim rule, as published herein, is made effective as of the date indicated.

Discussion of Public Comments and Changes Made in the Interim Rule

A discussion of the public comments and modifications made in response to the public comments and as a result of additional HUD consideration, follows.

General Overview of Commenters and the Major Issues

During the sixty-day public comment period for the proposed rule, 256 sets of comments, comprising approximately 1,500 pages, were received from 185 different commenters. Approximately 23% of the commenters were nonprofit organizations. The nonprofits were composed of local groups, national foundations, lobbying organizations, and trade associations. Approximately 38% of the nonprofits submitting comments are organized on the national level. The response received from State and local governments was also large, with these entities representing about 16% of the commenters. Another 10% of the commenters were tenants, both individual tenants and tenant organizations, while owners made up 6% of the total commenters. Attorneys representing owners, tenants, developers, governments and nonprofits, made up approximately 11% of the commenters. Forty percent of the comments received from attorneys were from legal aid organizations. The remaining comments were submitted by management organizations, housing advocates, brokers, lenders, investors, consultants, developers and an accountant. Comments were also received from members of Congress. Many of the sets of comments were submitted jointly by a number of different individuals and/or organizations. The Department has not included in the foregoing breakdown each of the entities and individuals who jointly submitted comments; in most instances the joint commenters consisted of entities or individuals of the same type and with the same interests as the entity or individual under whose name the comments were submitted.

The following is a list of the primary issues raised by the commenters:

(1) Section 241.1060 -- Whether the section 241(f) equity and acquisition loan terms and amortization periods should be extended to 40 years or remain at 20 years;

(2) Section 248.101 -- Whether projects receiving flexible subsidy or rent supplement assistance should be included

in the definition of eligible low income housing;

(3) Section 248.101 -- Whether the related party rule was interpreted too broadly so as to exclude a number of relationships between buyers and sellers, thus unduly restricting the transfer of projects;

(4) Section 248.157 -- Regarding the appropriate level and timing for an earnest money deposit;

(5) Section 248.157 -- How priority purchasers should be ranked, if at all;

(6) Section 248.157 -- Whether imposition of a twelve month marketing period for certain priority purchasers is proper; and

(7) Section 248.121 -- Whether owners are guaranteed an eight percent annual authorized return.

The Department's resolution of each of these significant issues, as well as other issues identified by the public commenters, is addressed in the following discussion.

*Section 248.1 (Purpose)*

Three commenters, a non-profit organization, a State government, and a law firm objected to the purposes of LIHPRHA, as stated in this section of the proposed rule. The primary objection made by the commenters concerned including the facilitation of resident homeownership as the fourth purpose of the rule. One commenter also submitted its own list of objectives and suggested that these be substituted for those of the Department. Upon considering these comments, HUD has decided that this section of the rule should remain unchanged.

The primary objection raised by one of the commenters was that Congress considered and rejected HUD's proposal promoting conversion to resident homeownership as the principal means of preserving low income housing and therefore homeownership should not be listed as an objective of the preservation program. Another commenter stated that resident homeownership should be promoted only in certain markets and circumstances and should not be the key purpose of the rule.

HUD recognizes that Congress did not intend that homeownership be the only means of preservation, but also believes that tenant empowerment through homeownership is a viable preservation alternative. This alternative was recognized by Congress when it named the authorizing legislation the "Low Income Housing Preservation and Resident Homeownership Act of 1990," and, therefore, the Department believes that homeownership should be listed as one of the four purposes referenced in this provision. The preamble to the proposed rule recognizes that the "basic purpose" of the rule is to balance low income housing preservation with the right of owners to prepay their mortgages. Minimizing tenant displacement and facilitating resident homeownership are additional purposes listed in this section. The Department's position is that adding resident homeownership as one of four objectives of the rule does not circumvent Congress, intent. Additionally, by stating that homeownership is one of the objectives, HUD is by no means declaring that homeownership is the only means of preservation or that it is suitable in all situations. The Department acknowledges that resident homeownership is not workable in all cases.

The commenter, who provided its own list of objectives, suggested that the goals of the rule should be to: (1) Permanently preserve eligible low income housing; (2) maximize tenant participation in preservation; (3) encourage the sale of housing to nonprofits; and (4) ensure full participation by local governments. While the rule is clearly designed to promote all of the foregoing, HUD believes that the purposes, as stated in the proposed rule, provide a more balanced view of the rule's intentions than do those proposed by the commenter. Therefore, this section of the proposed rule has not been amended.

*Section 248.5 (Election to Proceed Under Subpart B or C)*

Eleven comments were received by the Department regarding the right of owners to preserve their choice of proceeding under either subpart B or subpart C of this rule. The two primary issues raised by these comments concerned the increase in size of the eligible low income housing universe that could opt to file a plan of action under subpart C and the time frame in which owners have to exercise their option.

Paragraph (c) of this section permits owners of projects which became eligible low income housing prior to January 1, 1991, and who submitted a notice of intent to the Department prior to that date, to elect which subpart they wish to proceed under. To determine which projects may exercise this option, HUD uses the definition of eligible low income housing found in subpart B of the proposed rule, which includes projects within two years of being eligible to prepay. Four commenters challenge the use of this definition, contending that HUD's interpretation expands the number of projects which can choose to file a plan of action under subpart C, by providing the option to projects which previously would have been ineligible under subpart C, i.e., those projects more than one year away from being eligible to prepay.

The Department disagrees with the commenters' position and has not amended the proposed rule to incorporate those comments. LIHPRHA clearly is intended to supersede ELIHPA and ELIHPA was effectively repealed upon the enactment of LIHPRHA. Therefore, the definition of eligible low income housing which must be employed in connection with section 604(a) of LIHPRHA is the definition set forth in section 229 of LIHPRHA. This position is supported by the statutory language in section 604(c) which states that the repealed provisions of ELIHPA are applicable to those projects which, under section 604(a), have opted to be subject to ELIHPA. This language implies that the election occurs first, and the ELIHPA provisions are then applied to those projects electing ELIHPA. Hence, the subpart B provisions, including the definition of eligible low income housing, are applied until an owner chooses to be subject to subpart C. This conclusion is also supported by the fact that, under section 604(a), an owner may file a notice of intent "under" LIHPRHA and thereby preserve its right to be subject to ELIHPA. The Department recognizes that using the more liberal subpart B definition of eligible low income housing in administering this section of the rule has the potential to increase the population of projects proceeding under subpart C; however, there is no indication that Congress intended that HUD use the repealed definition and not the new one in administering this section of the rule.

Another concern raised by two commenters was that sixty days from the effective date of this rule is not sufficient time for an owner to make its election to proceed under subpart B or subpart C. In response to these concerns, the Department recognizes and agrees that this time frame may not be adequate to allow an owner to make an informed decision and has amended paragraph (c) of this section of the proposed rule by permitting an owner to change its election within thirty days after receiving the valuation information from the Secretary under § 248.131. This will provide the owner with more information to make an informed choice, based on appraisals to be conducted on the project pursuant to § 248.111. It should be noted that the proposed rule has also been amended to require owners who choose to proceed under subpart C to reimburse the Department for the cost of HUD's appraisal, and the third appraisal, if one is conducted. This reimbursement is required since the Department does not have the authority or appropriations to expend funds for appraisals under ELIHPA.

A suggestion was made by another commenter that paragraph (c) be amended to permit owners to convert to subpart B if a plan of action submitted under subpart C is approved before the effective date of this rule. The Department believes, however, that Congress did not authorize HUD to extend the right of conversion as the commenter suggests. Section 604(b) of LIHPRHA explicitly grants the right of conversion to owners who have submitted a plan of action on or before October 11, 1990, and states that owners filing plans after such date shall not have any right of conversion under that subsection. Therefore, HUD concludes that Congress, by its express language, intended to give the right of conversion only to those owners specified in section 604(b) and that its failure to include any other class of owners was intentional. In accordance with this position, paragraph (c) of the proposed rule has not been amended to expand the right of conversion.

Paragraph (b) of this section permits an owner who has filed a plan of action under subpart C on or before October

11, 1990 to convert to subpart B by filing a notice of intent prior to February 5, 1992 or within thirty days of approval of the plan of action, whichever is later. Two commenters stated that the February 5, 1992 and thirty-day deadlines should be extended. One commenter was concerned that owners may have to make the decision to convert without adequate information, the other felt that this would not give nonprofit organizations sufficient opportunity to explore the possibility of purchasing tha project. Given the fact that this rule was not made effective by February 5, 1992, the Department has decided to amend this paragraph to extend the time period for conversion to thirty days after the effective date of the rule.

The conversion deadline will have no impact on any nonprofit organizations or other potential purchasers of the project. At the time that an owner exercises its right to convert, it shall notify the Department of its intention by filing a notice of intent pursuant to § 248.105 and proceeding under subpart B in exactly the same manner as any other owner of eligible low income housing. Prospective purchasers will learn of the availability of the project for sale at the same time and by the same method as all other potential purchasers who are interested in buying housing subject to the provisions of subpart B.

Paragraph (d) of this section prohibits an owner who filed a subpart C plan of action after October 11, 1990 from changing its mind and filing a plan under subpart B. On fairness grounds, one commenter objected to this prohibition and argued that if a plan of action is rejected by HUD under subpart C, the owner should be permitted to file a notice of intent under subpart B. The Department has rejected this recommendation. Under both subparts B and C, if a plan of action submitted by an owner is unacceptable to the Department, the owner has the opportunity to revise it. If, after revision, it is still rejected by the Department either because the Department has not made the required findings under § 248.221 or because the project is not eligible for incentives under § 248.231, then the plan of action would also be unapprovable under the relevant provisions of subpart B since the same standards would be applied by the Department under both subparts.

*Section 248.7 (Waivers).*

Three commenters stated that, when the Department permits a waiver of any provision of this part, the tenants, State and local government, and the public should receive notice of the waiver. One of these commenters also suggested the opportunity for a thirty-day comment period for tenants and the State and local government. The Department recognizes that a waiver under this program could have an impact on the tenants of the eligible low income housing and on the State and local government. In order to accommodate their interests, HUD has amended §§ 248.135(d) and (e) to require owners to submit with their plans of action a list of all waivers which they have requested. This information will be available to the tenants and State and local government as part of the plan of action package submitted to them under § 248.135(h) of subpart B and §§ 248.213 and 248.218 of subpart C and they will have the same opportunity to comment on the request for waivers as they do on the plan of action itself. Also, pursuant to the requirements of section 106 of the Housing and Urban Development Reform Act of 1989, any waivers granted by HUD will be published in the Federal Register on a quarterly basis.

*Section 248.183 (Preemption of State and Local Laws)*

In accordance with one commenter's suggestion, this section of the rule has been renumbered as § 248.183 and made part of subpart B in order to demonstrate its applicability to State and local laws which conflict with subpart B, and not those that conflict with subpart C. Twelve commenters, consisting of State and local governments, national foundations, nonprofit organizations, and attorneys requested further clarification and guidance as to what types of State and local laws would be preempted by this section of the proposed rule.

In examining the legislative history concerning this provision, the Department has noted an inconsistency between the language of section 232(a) of LIHPRHA and the House Conference Report to the Cranston-Gonzalez National

Affordable Housing Act, Conf. Rep. No. 101-943, 101st Cong., 2d Sess. (the "Conference Report"). The statute grants the Department authority to preempt State and local laws which restrict or inhibit the prepayment of eligible low income housing, restrict or inhibit an owner of such housing from receiving the authorized annual return, are inconsistent with LIHPRHA or are limited in their applicability to eligible low income housing for which the mortgage has been prepaid or the insurance contract terminated. The Conference Report, however, at page 460, indicates an intention to preempt only those State and local laws which target "prepayment projects for special treatment." A circumstance may arise where a law of general applicability is inconsistent with LIHPRHA. If the Conference Report language is adopted in the rule, then that law could not be preempted. However, if the statutory language is followed, LIHPRHA would supersede the inconsistent State or local law. Since the statutory language is clear on its face, the Department has no basis to resort to the contrary discussion contained in the Conference Report.

The language of subparagraph (a)(3) authorizes the Department to preempt State and local laws which are "inconsistent with any provision of this subtitle, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives, * * * ." Even though subparagraph (a)(3) explicitly permits preemption of only those laws which interfere with the receipt of incentives, HUD has construed the reference to this category of laws to be illustrative, and not complete. Congress' use of the word "includes" in subparagraph (a)(3) implies that laws interfering with incentives are only one type of legislation which comes within the bounds of that subparagraph. The Department, therefore, interprets subparagraph (a)(3) as authorizing it to preempt any State or local law which is inconsistent with subpart B and LIHPRHA.

In order to clarify how preemption will work in practice, one commenter suggested that a statement be included in the regulation to the effect that State and local laws of general applicability which are more onerous to eligible low income housing are discriminatory, and hence are preempted under this section. The Department agrees that if a statute establishes different standards, requirements or restrictions with respect to eligible low income housing than it does for other categories of housing, section 232(a)(4) of LIHPRHA would preempt the statute as to the disparity in treatment. Another commenter suggested that State and local governments be given clear guidance that laws which assist the implementation of this subpart are not subject to preemption under this section. The statute does not distinguish between State and local laws that assist in implementing LIHPRHA and those which impede the statute. However, as a general matter, any State or local law which does not materially affect the timetable for approval of a plan of action under subpart B and which does not impose substantive restrictions on prepayment would not be deemed by HUD to be "inconsistent" with LIHPRHA.

A commenter questioned whether, given HUD's interpretation of the statute, State and local governments can enact legislation to fill gaps in LIHPRHA and this subpart. State and local governments may enact legislation concerning the preservation of low income housing as long as the legislation does not violate any of the four conditions set forth in section 232(a). For example, one commenter suggested that the proposed rule be amended to allow a State or local law which limits owners, rate of return and applies generally to both federally-assisted and unsubsidized projects. HUD would preempt such a law, finding it to be in violation of subparagraph (a)(2) of this section. While the law is of general applicability, it restricts and inhibits owners from receiving the annual rate of return to which they are entitled under § 248.121 of this subpart. However, it should be noted that the law would be taken into consideration in appraising the project under § 248.111.

Certain commenters expressed concern that, in implementing this provision HUD may not recognize the historical deference given to State and local governments in the regulation of real property, land use and landlord- tenant relations. For instance, many communities have laws restricting conversion of rental housing to cooperatives and condominiums. These laws will be preempted only if they fall into one of the four categories listed in paragraph (a) of this section. Additionally, HUD acknowledges that this provision applies only to State and local laws affecting eligible low income housing, as that term is defined in § 248.101, and not to FmHA projects, projects with expiring HAP contracts, or section 8 nonrenewals.

Section 232(b) of the statute lists those State and local laws which are not preempted by the Department to the

extent that such laws are of general applicability and are not inconsistent with this subpart. The list consists of laws concerning building standards, zoning limitations, health, safety and habitability standards, rent control and condominium and cooperative conversion. One commenter stated that the regulation should indicate that this list is merely illustrative, and not exhaustive. The Department disagrees with this interpretation and takes the position that this list is inclusive. The statutory language, which was tracked in the proposed regulation, does not indicate in any way that it is meant only to be exemplary. In the absence of any direction to the contrary, the Department presumes that Congress only meant to exclude the preemption of those types of legislation specifically enumerated in section 232(b). Furthermore, this position is supported by the fact that the types of laws listed in paragraph (b) of the statute are those concerning the health and safety powers, which are generally retained by the States without Federal government interference.

The Department has chosen not to amend the proposed regulatory language to address specific legislation commenters have brought to the Department's attention. In the course of implementing this subpart, HUD will determine on a case-by-case basis, based on the language of this section, whether specific State or local laws should be preempted. The Department believes that it is impractical to make any preemption determination at this time, prior to the existence of a conflict. This section was amended, however, at one commenter's suggestion, to include the phrase, "under this subtitle including authorization" in paragraph (a)(3), in order to conform to the statutory language.

In response to a recommendation from another commenter, paragraph (c), which states that contracts entered into by an owner prior to November 28, 1990 and which restrict the owner's right to prepay the mortgage or terminate the mortgage insurance contract are not preempted, has been amended to include any contracts which are voluntarily entered into by the owner, on or after the enactment of LIHPRHA. The Department has decided to make this revision because owners of eligible low income housing have constructive notice of LIHPRHA and its impact on prepayment and termination of insurance contracts. If an owner wants to restrict its rights under LIHPRHA by entering into a contract, it is free to do so.

Subpart B -- Prepayments and Plans of Action Under the 1990 Act

*Section 248.101 (Definitions)*

Aggregate Preservation Rent

A recommendation was made by three commenters that the definition of "aggregate preservation rent" be amended to include asset management fees, standard debt service coverage, vacancy underwriting allowances, and debt service for third party acquisition or rehabilitation financing. The definitions of extension and transfer preservation rents in the proposed rule already include debt service on any rehabilitation financing, which includes loans made by third parties. Debt service on any acquisition loans is included in the proposed definition of transfer preservation rent, and again, includes third party financing. Sections 214(b) (1) and (2) of the statute, which define extension and transfer preservation rents, do not include asset management fees as one of the costs to be supported by the preservation rents, and the Department has concluded that asset management fees are not an appropriate component of preservation rents.

Two commenters suggested that the debt service on federally-assisted mortgages be included in the calculation of extension preservation rent. The proposed rule already includes debt service on the federally-assisted mortgage as a component of both extension and transfer preservation rents.

The Department has decided to include vacancy underwriting allowances in the calculation of preservation rents. The need for a vacancy allowance is implied by the building block preservation rent approach, the statute's use of the term "gross potential income," in section 214 and the comparison of preservation rents to the income the property would produce if each unit charged 120% of the FMR, i.e., assuming full occupancy. In short, the aggregate preservation rent

could not support the costs that the statute requires it to support unless some allowance is made for vacancy loss. Consistent with underwriting practices for assisted properties, the Department will assume a three percent vacancy cost. For similar reasons, the Department will include standard debt service coverage allowances in the calculation of aggregate preservation rents. Consistent with its underwriting practices, the Department will assume a 1.11 debt service coverage ratio in figuring the preservation rents needed to support debt service on the existing mortgage, the rehabilitation loan, and the acquisition loan in the case of a transfer. Debt service coverage will only add to extension preservation rents if the required 8 percent return on preservation equity is inadequate to provide the required income cushion.

Bona fide Offer

The Department received 19 comments regarding its proposed definition of bona fide offer. The commenters requested further clarification of this definition. The Department has retained its original definition, but included a cross-reference to § 248.157(g), which sets forth the contents of a bona fide offer. The Department will consider an offer bona fide if the purchaser submitting the offer submits it within the applicable marketing period, under § 248.157(c), for that particular purchaser and if the offer contains a contract of sale acceptable to the Department and the appropriate earnest money deposit. Also, for an offer submitted under § 248.161 to be bona fide, the contract of sale must include a purchase price equal to the transfer preservation value of the project. The Department will include in its administrative guidelines language which will be required in the contract of sale.

Community-Based Nonprofit Organization

The Department has amended its proposed definition of community-based nonprofit organization in response to changes made in the regulatory definition of "community-based nonprofit organization" under the HOME program, title II of the Cranston-Gonzalez National Affordable Housing Act. However, the definition of community-based nonprofit organization does not require that the organization have a demonstrated capacity to carry out housing activities or a history of local community service, as is required in the HOME definition, and as one commenter requested. The reason for this difference is that HUD expects many community-based nonprofit organizations to be established as a result of the preservation program, and such newly-created organizations will not have any demonstrated capacity, as organizations, in these areas.

Default

The way the term "default" is defined in this section differs from the definition applicable to multifamily mortgage insurance claims. For claims purposes, a mortgage is considered in default as soon as a mortgagor fails to make a payment under the mortgage. However, for purposes of filing a notice of intent, a 30-day grace period is provided for making any payments under the mortgage. A default does not occur, for purposes of this subpart, unless an owner fails to make a payment within 30 days after it becomes due. The rationale for this distinction, as noted in the preamble to the proposed rule, is to recognize that an owner's failure to make a mortgage payment on the first day of the month does not necessarily mean that a project is in financial jeopardy.

Six commenters suggested that the definition of the term "default" be amended to include covenant, as well as monetary, defaults. When a covenant default occurs, a mortgagee may accelerate the mortgage debt. The mortgagor's failure to pay the accelerated debt would convert the covenant default into a monetary default. (The Department would view an attempt by the owner to pay the accelerated debt as tantamount to a prepayment, which would thus be barred by LIHPRHA.) Thus, there is no reason to amend the definition since a covenant default may lead to a monetary default, which falls within the proposed definition of "default." Under this subpart, a default is relevant in determining an owner's eligibility to file a notice of intent and in approving a plan of action. In either of these instances, it is irrelevant whether the default was precipitated by a covenant default or a failure to make a monthly payment under the mortgage.

One commenter stated that an owner should not be barred from filing a notice of intent if a default was caused by

HUD's abuse of discretion, such as by improperly denying a rent increase, thereby making the owner unable to make its mortgage payments. Under the terms of the mortgage contract, a mortgagor is required, to make its payments in a timely manner (unless the actions of the mortgagee have excused performance, for example, by waiving timely payment). This contractual obligation exists without regard to the actions of the Department. Therefore, the Department has not amended this definition as the commenter has suggested.

Eligible Low Income Housing

The Department received thirty comments concerning its definition of "eligible low income housing." The proposed rule excludes from this definition those projects which are subject to a use restriction imposed by the Department to maintain the low and moderate income use of the project for the remaining term of the mortgage. This exclusion primarily affects those projects which have received flexible subsidy assistance, as authorized by section 201 of the Housing and Community Development Amendments of 1978, as amended, and 24 CFR part 219. Fourteen owners, developers, national nonprofit organizations, management entities, lenders, and an accounting firm, contested the Department's exclusion of projects receiving flexible subsidy assistance. Eight tenant organizations, legal aid services, nonprofit organizations, and State and local governments agreed with the Department's interpretation.

The Department notes that section 201 of the Housing and Community Development Amendments of 1978, as amended by section 211(c) of the Housing and Community Development Amendments of 1979, provides that HUD may provide flexible subsidy assistance only if the owner agrees to maintain the low and moderate income character of the project for the remaining term of the mortgage; HUD has implemented this requirement by obtaining the owner's agreement to prohibit prepayment of the mortgage or by execution of a use agreement. Only those projects which first received flexible subsidy assistance after the enactment of section 211(c) on December 21, 1979 are excluded from the definition of eligible low income housing. Projects which received flexible subsidy prior to that date are eligible low income housing and may proceed under this subpart.

The preamble to the proposed rule provides that the Department's rationale for excluding from ELIHPA flexible subsidy projects subject to use restrictions is principally because projects subject to a use agreement have no "higher and better use," as required by § 248.233, for the purpose of receiving incentives under that subpart. The same rationale supports excluding from this subpart those flexible subsidy projects subject to use restrictions.

Three commenters disputed this explanation, claiming that, while a use restriction could significantly decrease a project's appraised value, it may not preclude a higher or better use for the project. These commenters suggested that this determination is one which should be made by an appraiser and not by HUD before the project is appraised.

The Department does not agree with this point of view, believing instead that Congress never intended to include projects with use restrictions in the eligible low income housing inventory. The purpose of LIHPRHA, as noted at page 457 of the Conference Report, is to preserve low income housing which could be lost if an owner exercises its right to prepay the mortgage or terminate the mortgage insurance contract, resulting in the termination of the Federal use restrictions. Since those projects receiving flexible subsidy assistance are subject to use restrictions for the remaining term of their mortgages, it is irrelevant whether the mortgage is prepaid or the insurance contract is terminated. Hence, providing Federal incentives to these projects would not further the purpose of the statute. Congress has also tacitly acknowledged that projects receiving flexible subsidy assistance are excluded from this definition, for purposes of LIHPRHA, by adopting HUD's numerical estimate of eligible low income housing, which has never included projects receiving flexible subsidy assistance.

Although, as pointed out by two commenters, the inclusion of projects with flexible subsidy assistance would increase the period of time during which use restrictions will be maintained on the projects, from the end of the term of the original mortgage until the end of the projects' remaining useful life, the Department's position is that this consideration does not have any bearing on the issue of eligibility under the statute. The preservation of these projects as low and moderate income housing will be addressed at the expiration of the mortgage term.

Eleven commenters, mostly State and local governments and nonprofit organizations, stated that if the Department takes the position that projects receiving flexible subsidy assistance are not eligible low income housing, and hence the owners of such projects may prepay their mortgages or terminate the mortgage insurance contracts without complying with the provisions of this subpart, the use restrictions on the projects must still remain in place until the date the mortgage would have been paid, in the absence of prepayment. The Department reiterates here the language contained in the preamble to the proposed rule. Projects encumbered with use restrictions under the flexible subsidy program are not deemed eligible low income housing and are therefore not precluded by this subpart from prepaying their mortgages. However, even if the mortgage on such a project were prepaid, the owner would still be required to comply with the use restrictions for the duration of the term of the mortgage. Additionally, if the project was sold to another owner during the term of the mortgage, the purchaser would take the property subject to the use restrictions on the project.

Two commenters stated that where HUD has failed, in connection with the provision of flexible subsidy assistance, to require the execution of a use agreement to maintain the affordability restrictions for the remaining term of the project's mortgage, those projects should not be excluded from the definition of eligible low income housing. As previously noted, the requirement of use restrictions in conjunction with flexible subsidy was incorporated into the statute on December 21, 1979, so that projects which received flexible subsidy before that date were not required to have an executed use agreement to maintain affordability restrictions on the project for the term of the mortgage, and hence would be considered eligible low income housing. Projects receiving flexible subsidy after that date are required to have a use agreement in effect or otherwise ensure that the low and moderate income requirement be fulfilled (such as by agreeing to prepay the mortgage debt only with HUD's consent for the full term of the mortgage). While the Department is unaware of any cases, since December 21, 1979, where a use agreement or prepayment prohibition has not been executed as a condition of receiving flexible subsidy assistance, if such a case surfaces, the failure to execute a use agreement or to agree to a prepayment prohibition will not qualify the project as eligible low income housing. The requirement that an owner may receive flexible subsidy assistance only upon its agreement to maintain the affordability restrictions on the project for the mortgage's remaining term is statutory. The Department cannot waive this requirement, and if this statutory requirement has not been implemented due to an administrative error, the Department's position is that the owner nevertheless accepted the flexible subsidy assistance with constructive knowledge of the condition that the use restrictions be maintained on the project, and therefore, that the owner is bound by these restrictions.

One commenter asked for clarification as to what restrictions and obligations are imposed for projects receiving flexible subsidy assistance. This issue is one which need not be addressed in this rulemaking. The commenter may refer to 24 CFR part 219 or the use agreement on a specific project to obtain this information.

Another commenter questioned whether projects which originally received rent supplement assistance which was later converted to section 8 assistance would be excluded from the definition of eligible low income housing. Sections 221.524 and 236.30 of HUD's regulations prohibit the prepayment of mortgages on projects receiving rent supplement assistance without the Department's consent. Section 229(1)(B) of LIHPRHA provides that only projects which are eligible to prepay without the Department's prior approval are deemed eligible low income housing. Thus, projects receiving rent supplement assistance are clearly not eligible to proceed under this subpart. However, a project whose rent supplement assistance was converted to section 8 assistance is no longer subject to the regulations concerning rent supplement assistance. These projects would be governed by the section 8 regulations once the conversion took place. Since projects receiving section 8 assistance are not subject to a prepayment prohibition based on the receipt of such assistance, these projects can qualify as eligible low income housing.

Fair Market Rent

One commenter recommended that this definition state that the fair market rent is adjusted for utilities. As noted in this section of the proposed rule, the fair market rent is the section 8 published existing fair market rent which is adjusted for utilities, where appropriate. The utility adjustment is equal to the personal benefit expense for each unit in a

project, as of the most recent HUD-approved rent increase. While no amendment is needed on this point, the definition has been amended to clarify that the fair market rent is not adjusted for utilities for the purpose of determining whether preservation rents exceed the Federal cost limit under § 248.123.

Low Vacancy Area

In response to one comment, the Department has amended the definition of "low vacancy area" to ensure that in measuring the number of vacant units only units in standard condition, which are "decent, safe and sanitary," will be included in the survey. The Department has decided not to accept two comments suggesting that HUD determine that the vacant units are actually available to tenants who are likely to be displaced. The proposed definition already requires the units to be "vacant available rental units." It would be too cumbersome to require the Department to ascertain for each market area that the units will be vacant at some future time for tenants who will potentially be displaced due to prepayment. Additionally, HUD has rejected the comment recommending that a specific vacancy rate, such as 2-3%, be adopted to determine whether a particular market area qualifies as a low vacancy area. Because market conditions will vary in different areas, this type of threshold has a high potential for inaccuracy. For example, in an expanding market area, 7% vacancy may be considered low, while in a stagnant market, 6% vacancy may be very high. The Department believes that a more reliable estimate could be made by examining the market conditions in each area, rather than by adopting a vacancy rate which would be applicable across the nation.

Nonprofit Organization

A suggestion was made by thirteen commenters that limited partnerships be included in the definition of "nonprofit organization" on the condition that no profits inure to the benefit of the partnership or any member, founder, contributor, partner or individual associated with the partnership. The commenters suggesting this amendment consisted of State agencies, national and regional nonprofits, and a legal services organization. The rationale for including limited partnerships would be to permit these entities to utilize tax credits when purchasing eligible low income housing. The Department's position is that a limited partnership does not satisfy the definition of a nonprofit organization. Any limited partner, regardless of the legal composition of the managing general partners, is still by definition profit-motivated and, therefore, cannot be considered a priority purchaser for purposes of this subpart. It is irrelevant whether the general partner of the partnership is a nonprofit entity or whether there is only one limited dividend or for-profit partner in the partnership. This interpretation does not exclude limited partnerships from eligibility to purchase projects under this subpart. However, they will not have the priority status granted to nonprofit organizations.

Preservation Equity

Several commenters questioned the elements included in the definition of extension preservation equity. One suggested that the amount of funds in the residual receipts account as of the effective date of the plan of action should be included as part of the owner's equity. Residual receipts belong to the owner of a project, but are not considered part of the project itself for purposes of determining equity. This conclusion is supported by the fact that residual receipts are not normally included in the calculation of the project's value under standard appraisal practices. Extension preservation equity is the value on which an owner's annual rate of return is based, and the Department believes that an owner is not entitled to a return under LIHPRHA on the funds deposited in this account.

Another commenter contested the fact that outstanding balances on non-federally-assisted mortgages are deducted from extension preservation equity, resulting in a possible reduction in the annual return to an owner who retains the project and receives incentives. Section 229(8)(A) of the statute requires that all debt secured by the property be deducted from extension preservation equity. The Department recognizes that this differs from the statute's definition of transfer preservation equity, which only requires the outstanding balance of the federally-assisted mortgage to be subtracted. However, since the statute unambiguously makes this distinction between extension and transfer preservation equity, the Department believes that it is left with no authority to alter it and, hence, has not amended either definition.

Preservation Value

The Department does not agree with the comment that extension and transfer preservation value should both be based on the highest and best use of the eligible low income housing. The statutory language, at section 213(b), expressly provides that the extension preservation value is to be based on the highest and best use of the project as residential rental housing, while the transfer preservation value is based on its highest and best use. HUD has no justification for ignoring this statutory distinction.

Priority Purchaser

According to one commenter, the definition of priority purchaser should be modified to give priority to the purchaser who is most qualified to preserve the property, even if this purchaser is a for-profit entity. The definition of "priority purchaser" in the proposed rule tracks the statutory language, which gives priority to resident councils organized to acquire a project under a HUD-approved homeownership program, and nonprofit organizations and State and local government agencies agreeing to maintain the low income affordability restrictions for the remaining useful life of the project. For-profit entities are not included in the statutory definition of priority purchasers, but are explicitly classified as qualified purchasers in section 231 of the statute. In the Conference Report, at page 464, Congress explained that the reason for this distinction between priority and qualified purchasers is to "establish a genuine advantage for priority purchasers." Therefore, a for-profit organization will not be deemed a priority purchaser.

Additionally, HUD will not give preference to the priority purchaser which is most qualified. Attempting to ascertain which of the priority purchasers is most qualified would entail subjective judgments. The Department will not compare each potential purchaser's qualifications, but rather, will determine whether the potential purchaser has met the minimum standards of a priority purchaser and has submitted an offer which is bona fide. A priority purchaser will be chosen by the owner in accordance with the procedures set forth in § 248.157 of this subpart. If an owner receives more than one bona fide offer from priority purchasers, the owner may accept the highest bid which does not exceed the transfer preservation value. In a mandatory sale, the owner must accept the first bona fide offer at a sale price that is not less than the transfer preservation value.

Related Party

One hundred comments were received by the Department concerning its implementation of the related party rule. The overwhelming response was that the Department's interpretation of "related party" is too broad. The major issues addressed by the comments concerned seller financing, owners, membership on the board of directors of nonprofit purchasers, and nonprofits buying out the interest of their for-profit partners.

Fifty-seven commenters spoke out in favor of seller financing, with none opposed. The main argument they advanced was that the limitation on acquisition loans in § 241.1067(b), stating that the maximum amount of the loan may not exceed 95% of the project's transfer preservation equity, plus, in the case of priority purchasers, any expenses associated with the acquisition, loan closing, and implementation of the plan of action, would make it difficult for priority purchasers to raise the remaining 5% if sellers were not allowed to lend them the money to complete the transaction. The Department acknowledges that this is an important concern and one which may impede sales to priority purchasers. Therefore, the Department has decided to amend this definition to permit seller financing as long as (1) only take-back financing, and not a grant, is provided by the seller; (2) the maximum amount of the financing is limited to 5% of the project's transfer preservation equity; (3) the financing is not a condition of accepting a bona fide offer or entering into a sales contract; and (4) the financing is provided through an arms-length transaction where the seller has no input in the continued operation of the project. Under this interpretation, a management company that is affiliated with the seller may also provide financing to a purchaser; however, the terms of the loan must meet the four conditions required for seller financing, and in addition, the financing must not be conditioned on the retention of the management company to manage the project.

The Department notes that even though the acquisition loan is limited to 95% of transfer preservation equity, plus, for priority purchasers, any expenses associated with the acquisition, loan closing, and implementation of the plan of action, the Department may provide a grant to a priority purchaser, pursuant to § 248.157(o), to cover the remaining 5% of the sales price. If the Department provides a grant equal to, or more than, 5% of transfer preservation equity, then no seller financing will be needed and, therefore, will not be permitted.

According to thirteen commenters (eight national or regional nonprofit foundations or organizations, three State or local government agencies, one tenant, and one attorney), owners or former owners should be permitted membership on the boards of nonprofit purchasers. In addition, members of Congress cited the Conference Report as evidence of their intent that owners be permitted to sit on nonprofit boards. The Conference Report, at page 469, states that if "an individual is involved in the ownership of an assisted project and also participates, on the board of directors of a nonprofit organization that seeks to acquire a project from the owner, this participation alone should not trigger the application of the related party rule." This view was also expressed by members of Congress in the Congressional Record, on October 26, 1990, at page S.17137. In the face of this expression of legislative intent, despite the fact that this intent is not demonstrated in the statute itself, and because of the strong public support evidenced in the comments, the Department has amended the definition of related party to permit owners, and former owners, to be members of the board of directors of nonprofit purchasers, as long as the owners and former owners are nonvoting members, sit in their personal capacity and do not receive any compensation for their board membership.

Eighteen comments were received by the Department suggesting that nonprofit organizations should be permitted to buy out the interest of their limited dividend and for-profit partners. These comments were made by seven nonprofit organizations, four of which are organized on the national level, five State and local qovernment agencies, three tenants, an attorney, and members of Congress (See colloquy between Senators Kerry and Cranston at Congressional Record, October 26, 1990, p. S17137). As long as the transaction is at arm's length, the Department has decided to permit nonprofit organizations to buy out their partners, interest in eligible low income housing pursuant to the provisions of this subpart. The definition of related party has been revised accordingly.

Remaining Useful Life

One commenter suggested that a remaining useful life of 50 years may be unrealistic for some projects. LIHPRHA requires that in order to receive incentives the owner or purchaser of eligible low income housing must agree to retain the low income affordability restrictions on the project for its remaining useful life. The determination of when the remaining useful life of a particular project terminates is left to the Department's discretion. However, the owner is entitled to petition the Department for a determination that the project's useful life has expired. Since, pursuant to section 222(c) of the statute, owners are not permitted to exercise their right to petition for 50 years from the date of approval of a plan of action, the Department has assumed that Congress expects the remaining useful life of eligible low income housing to be at least 50 years from the date of plan of action approval.

Another commenter questioned what happens to rent levels if a project's remaining useful life exceeds the mortgage period. The Department has concluded that once the mortgage on a project has been paid in full, whether through prepayment, or at the end of the original amortization period, rents will be lowered commensurate with the decrease in debt service on the property. The decrease in rent will not affect an owner's rate of return, but may decrease the amount of Federal subsidy provided to the project, and at the same time protect the affordability of the units for low and moderate income families.

One commenter questioned what the Department's policy would be if a project covered under a plan of action is destroyed or demolished during the project's remaining useful life and the insurance proceeds are insufficient to rebuild the project. There are three options which could be considered. The owner could be required to rehabilitate the project to its original condition through the use of the insurance proceeds and subsidies provided by HUD and other sources; the owner could be required to pay-off the remaining balance of the mortgage with the insurance proceeds without rebuilding the project; or if there is no mortgage on the project at the time of the destruction, the owner could be

permitted to retain the insurance proceeds without rebuilding the project. Many factors could influence this decision, such as the number of years that would have been left of a project's remaining useful life if the destruction had not occurred, the extent of the destruction, the cost of rebuilding the project, the need for low income housing in that particular locality at the time of the destruction, etc. At this time, the Department declines to make a fixed policy concerning the impact of destruction or demolition on a project whose useful life has not ended, and intends to examine this issue on a case-by-case basis as the need arises.

Resident Council

A commenter recommended that the definition of "resident council" should be amended to state that it is an organization open to all residents and only to residents. In response to this recommendation, the Department has amended the definition accordingly. The Department has declined, however, to require that a resident council represent a minimum proportion of the tenants, as suggested by the same commenter. The Department feels that there is no need to require a certain level of representation for the formation of a resident council. If tenants wish to organize a resident council, they may do so even if only a minority of the tenants participate. If the resident council intends to purchase the project under a resident homeownership program, then a minimum indication of support is required under § 248.173(c), in connection with submitting a bona fide offer. Additionally, if the resident council submits a bona fide offer under § 248.157 or § 248.161, then it must provide an earnest money deposit, which will also demonstrate tenant support of the council's actions.

Special Needs Tenants

In order to provide additional protection to tenants who may be unable to find vacant affordable housing in the event of prepayment, the Department has expanded the definition of "special needs tenants" in response to the suggestion made by two commenters. The interim rule provides that, in addition to those who are elderly (at least 62 years of age) and/or disabled, special needs tenants include families of five or more persons which require units containing three or more bedrooms. The Department has added large families to this definition due to the shortage of large multifamily rental units in many market areas, making it difficult for these families to find suitable replacement housing. However, contrary to one commenter's suggestion, the Department has declined to expand this definition to include minority households and single parent families. Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Executive Order 11063, section 504 of the Rehabilitation Act of 1973, as well as 24 CFR parts 1, 100, 107, 110 and subparts I and M of part 200, should provide sufficient protection to minority families and single parent families seeking replacement housing. Additionally, inclusion of these household types in the definition of special needs tenants would make this classification almost meaningless, given the large number of these household types which reside in eligible low income housing.

Tenant Representative

Twelve comments were received concerning the definition of "tenant representative." Several commenters sought clarification as to the difference between a resident council and a tenant representative. For purposes of this subpart, a tenant representative is an individual or organization who represents some or all of the tenants, for purposes of receiving information under § 248.181. A tenant representative could be a tenant, a housing advocate, legal aid, or a nonprofit organization. A "tenant representative" is not necessarily designated to represent tenants in negotiations between the owner and/or HUD or in purchasing the project. The tenant representative represents the tenants for purposes of receiving notifications and information under this subpart.

In comparison, a resident council is an organization composed solely of tenants, whose function is to serve as the governing body of a tenant association; it represents the tenants in negotiations on purchasing the project on behalf of the tenants.

The proposed rule requires that tenant representatives represent at least 50% of the occupied units of a project. The

Department received seven comments claiming that this number is too high and one comment supporting this percentage. Those against the 50% limit were State and local government agencies, nonprofit organizations and an attorney, while the commenter in favor was a State agency. No response was received from any tenants. Upon reconsidering the issue, the Department has decided to omit the requirement that a tenant representative must represent a certain minimum percentage of the tenants. Since, as previously noted, a tenant representative's function under the regulation is purely informational, the Department feels that there is no need to require a minimum showing of support by the tenants. While this may mean that more than one tenant representative will exist for each project, this should not put a substantial burden on the Department or owners who are required to provide copies of documents to those tenant representatives. In order to identify these representatives, tenants are instructed, in the notice of intent, submitted pursuant to § 248.105, to provide the owner and HUD with the name(s), address(es), and telephone number(s) of their representative(s).

The Department notes that a tenant representative, whose function is to supply tenants with the information it receives pursuant to this subpart, must make available this information to all tenants who request it.

*Section 248.103 (General Prepayment Limitation)*

A comment was received suggesting that a list be compiled of all insured projects falling within the scope of paragraph (c) of this section, which restricts mortgagees from foreclosing the mortgage on, or acquiring by deed in lieu of foreclosure, eligible low income housing. The Department has compiled a list of eligible low income housing as a result of a survey of local field offices conducted earlier this year. Mortgagees may contact the field offices to request a copy of this list.

Another comment was received suggesting that a mortgagee letter should be issued by the Department, and that such a mortgagee letter should instruct the mortgagee on how to correctly proceed under this subpart and should constitute a defense against any charge of improper action directed at a mortgagee. The Department issued Mortgagee Letter 91-25 on May 28, 1991 which indicates the mortgagee actions which would constitute a violation under this subpart. This letter will not constitute a defense to any wrongdoing on the part of the mortgagee. Furthermore, administrative action may be taken by the Department, pursuant to paragraph (e) of this section in the event of any violation.

*Section 248.105 (Notice of Intent)*

Management organizations and national nonprofit foundations submitted seven comments regarding the prohibition of certain projects with mortgages which are, or have been, in default, from filing a notice of intent under this section. One commenter suggested that the Department accept notices of intent filed by owners whose mortgages are in default at the time of filing, as long as the default can be cured by the receipt of incentives. Section 212(c) of LIHPRHA precludes owners from submitting a notice of intent if the mortgage fell into default after the enactment date of the statute or if the mortgage fell into default prior to the enactment date and the owner does not agree to recompense the appropriate Insurance Fund in the amount of any loss. For those mortgages which are insured and that have fallen into default on or after the enactment date, the Department has determined they are not in default for purposes of filing a notice of intent unless the mortgages have been assigned to the Commissioner as a result of the default. Hence, certain owners with insured mortgages may be able to file a notice of intent under this section while in default. However, pursuant to § 248.145(a)(11), the owner must cure the default as a condition of the Department's approval of a plan of action. Since the default must be cured prior to plan of action approval and incentives will not be provided until after the plan of action is approved, incentives may not be used to cure the default.

The proposed rule provided that an owner of a project whose mortgage was in default prior to November 28, 1990 and continued in default past that date would be ineligible to file a notice of intent if the mortgage has been assigned to

the Commissioner as a result of the default or if the default occurred while the mortgage was held by the Commissioner. One commenter questioned HUD's statutory authority for treating projects whose mortgages continued in default past the date of enactment in the same manner as projects whose mortgages first fell into default after the date of enactment. HUD believes that statutory authority for its position lies in section 212(c)(2) of the statute, which provides in part that an owner shall not be eligible to file a notice of intent if the mortgage covering the housing --

(A) fell into default before, but is current as of, [November 28, 1990]; and (B) the owner does not agree to recompense the appropriate Insurance Fund, in the amount the Secretary determines appropriate * * *.

HUD construes this provision as establishing that owners of projects whose mortgages fell into default prior to November 28, 1990 are ineligible to file a notice of intent, except in cases where the owner brings the loan current by November 30, 1990 and agrees to recompense the Secretary for losses to the Insurance Fund. Under an alternative reading of the statute, the quoted language would be applicable only to loans which fell into default prior to November 30, 1990 but were current as of such date. If this interpretation were correct, there would be no provision in section 212(c) addressing projects whose mortgages coo that the workout agreement itself is not current, the impact on HUD is the same as a default under the mortgage. Therefore, if an owner is ineligible to file a notice of intent under subparagraph (a)(3) of this section, because it has failed to keep the workout agreement current as of the enactment date, then the owner is also ineligible under section 212(c)(2) of the statute because the mortgage has not been current as of that date.

Under subparagraph (a)(4) of this section, an owner whose mortgage fell into default prior to the enactment date and which has been current as of that date may submit a notice of intent if the owner agrees to recompense the insurance fund for any losses. One commenter suggested that the owner reimburse the fund for lost interest due to the default. There should not be any lost interest due to a default. While a loan is in default, interest is still charged against the unpaid principal balance of the mortgage. The owner will be required to pay this accrued interest under the terms of a workout agreement. The commenter also suggested that the owner reimburse HUD for any costs involved in recasting the delinquent principal and interest, as well as requiring the owner to replenish reserves or escrows for which deposits were waived as a result of the default. Any cost involved in recasting principal and interest is an administrative cost to the Department, not a cost to the insurance fund, and HUD does not have the statutory authority to require the owner to reimburse the Department for any costs which are not losses to the insurance fund. The waiver of any deposits to reserves and escrows because of a default likewise does not constitute a loss to the insurance fund. Again, the Department does not have the authority to require an owner to make these deposits as a condition to filing a notice of intent.

Another commenter suggested that the Department and the owner jointly determine the amount which needs to be reimbursed to the insurance fund. Section 212(c)(2)(B) of the statute states that to be eligible to file a notice of intent, the owner shall agree to recompense the insurance fund "in the amount the Secretary determines appropriate." Thus Congress gave HUD the discretion to determine this amount. The Department has, however, decided to permit the owner more latitude in the timing of the reimbursement. The preamble to the proposed rule requires that the reimbursement occur prior to filing a notice of intent. The Department has extended this to permit the owner to reimburse the insurance fund at any time prior to the date a plan of action is approved. If reimbursement does not occur prior to this time, the plan of action will not be approved. No changes to the proposed rule are needed in order to implement this procedure.

A commenter inquired whether an owner must file a notice of intent upon reaching the project's eligibility date under LIHPRHA, or else lose its eligibility to proceed under this subpart. Pursuant to this section, a notice of intent may be submitted by the owner within 24 months of the 20th anniversary date of the final endorsement of the mortgage. The owner has no obligation to file at this time and may file at any time during the remaining term of the mortgage.

Paragraph (b) of this section of the proposed rule states that a notice of intent must include the name, number and location of the project, a bri latitude in the timing of the reimbursement. The preamble to the proposed rule requires that

the reimbursement occur prior to filing a notice of intent. The Department has extended this to permit the owner to reimburse the insurance fund at any time prior to the date a plan of action is approved. If reimbursement does not occur prior to this time, the plan of action will not be approved. No changes to the proposed rule are needed in order to implement this procedure.

A commenter inquired whether an owner must file a notice of intent upon reaching the project's eligibility date under LIHPRHA, or else lose its eligibility to proceed under this subpart. Pursuant to this section, a notice of intent may be submitted by the owner within 24 months of the 20th anniversary date of the final endorsement of the mortgage. The owner has no obligation to file at this time and may file at any time during the remaining term of the mortgage.

Paragraph (b) of this section of the proposed rule states that a notice of intent must include the name, number and location of the project, a brief description of the owner's plans for the project, the reason the owner intends to prepay the mortgage, terminate the insurance contract, or extend the affordability restrictions, and a request to tenants that they notify the Department and the owner of the existence of any tenant representatives. The Department received four comments requesting that this language be modified. Two commenters requested that State or local governments also be notified by the tenants of the existence of any tenant representatives. The Department has amended this paragraph of the proposed regulation to request tenants to provide the State or local government official to whom the owner sent a copy of the notice of intent with the names of any tenant representatives.

One commenter suggested that the Department eliminate the requirement that an owner must state its intentions for the project under the preservation program. While the notice of intent is not meant to bind an owner to a particular course of action, the Department believes that a statement of an owner's intentions with regard to the preservation of the project is relevant to the prepayment process. It will provide HUD with some indication of the time and financial resources which will be required to process the plan of action. Tenants, State and local agencies and other interested parties will also be able to become aware of an owner's preliminary intentions if this information is included in the notice of intent. Therefore, the Department has retained this requirement.

One commenter recommended that an occupancy profile be included in the notice of intent. The proposed rule requires submission of the profile as part of the plan of action under § 248.135 and the Department sees no reason for requiring the submission of an occupancy profile at the time a notice of intent is filed. An occupancy profile is required only if the owner extends the use restrictions on the project, either by retaining the project or transferring it to a qualified purchaser. At the time a notice of intent is submitted the owner may be uncertain as to whether it will extend the restrictions, and if a profile is required at that time, it may be prepared needlessly. Additionally, because an occupancy profile must reflect the project occupancy as of the date a plan of action is approved, the profile will tend to be more accurate if it is submitted closer to that date. If it is submitted with the notice of intent, it is more likely that another profile will need to be compiled later in the process.

Other commenters suggested that the notice of intent be written comprehensibly, in plain English, so it is understandable by relatively uneducated tenants and recommended that the Department consult with tenants or nonprofit organizations for assistance in preparing the notice. The Department acknowledges the importance of submitting notices to the tenants which are understandable and will not cause alarm. The Department has drafted the language for the notice, which will be included in the Department's administrative guidelines, and has taken this concern into account by listing all of the possible outcomes for the project, but also reassuring tenants that the Department wants to work with the owner in preserving the project. If tenants or nonprofit organizations are still concerned about this matter, they are welcome to provide the Department with their specific comments on how the notice can be clarified and made easier to understand.

Paragraph (c) of this section of the proposed rule requires that the notice of intent be simultaneously submitted to the State or local government, the mortgagee, the tenants, and any tenant representatives known to the owner. Fifty-six comments were received by the Department concerning this provision. The majority of these comments addressed the issue of translating the notice of intent for non-English-speaking tenants. The proposed rule states that the notice of

intent shall be translated if a substantial number of the tenants in the project do not speak English. Commenters questioned the meaning of "a substantial number" and suggested amounts, such as five or ten percent of the total number of tenants. Others stated that translation should be required upon the request of any tenant or group of tenants. Also, commenters suggested that translations be posted in the affected buildings and that HUD should do the translating rather than require owners to take on this responsibility. The Department has decided to resolve this issue by adopting the suggestion of one commenter. The Department will provide owners with a cover sheet to be attached to the notices of intent delivered to the tenants. The cover sheet shall instruct tenants, in the necessary languages, that if they require a translated copy of the notice of intent, they may contact the owner of the project who will request an appropriate translation from the local field office. The owner's address and telephone number will be indicated on this sheet. The owner will tabulate the number of translated copies needed and request them from the local field office, which will prepare the translations. The owner will be responsible for making the translated copies provided available to the tenants. This resolution will ensure that all tenants have the opportunity to receive an accurately translated copy of the notice of intent and will keep the burden of preparing the translation from falling on the owners.

A large number of the commenters on this section were concerned with the method of delivery of the notice of intent to the tenants. Three commenters suggested that the proposed rule's requirement that notices of intent be sent to each tenant and any tenant representative imposes an additional burden not required by the statute. Fourteen other commenters, however, suggested strengthening the proposed rule's standard by requiring that the notices of intent be sent by certified mail or by the local HUD field office to ensure their receipt by each tenant. Another commenter stated that sending the notices of intent to tenants will only confuse them, and they should not be sent at all.

Section 230 of LIHPRHA requires that all notices to the tenants be posted in the affected buildings and sent to any tenant representatives. As noted in the preamble to the proposed rule, the Department interprets this as a minimal standard of notice. For purposes of notifying tenants of the submission of a notice of intent, an additional requirement was adopted in the proposed rule requiring submission of the notice to each tenant in order to identify tenant representatives who may not be known to the owner. The purpose of this requirement is to ensure that all tenants are made aware of the owner's submission and to request tenants to provide the names and addresses of all tenant representatives to HUD and the owner. At this stage in the preservation process, it is very likely that the Department and the owner are unaware of the existence of any tenant representatives and without requesting this information from the tenants, HUD and the owner may unintentionally fail to fulfill the statutory requirement by not sending notices to these representatives. Requesting this information in the first notice will resolve this problem.

In response to the comments, the Department has decided to clarify the language in the proposed rule by requiring that the notice be sent to each "occupied unit," rather than each tenant. The Department does not wish to adopt a specific standard for delivery, however. The statute puts the responsibility of notifying the tenants on the owners, and the owner must certify that it has complied with the notice requirements when submitting the notice of intent. The manner in which the requirements are fulfilled, whether by sending the notice certified mail, regular mail, or hand delivery to each unit, or unit's mailbox, is left to the owner's discretion. The owner should be aware, however, that if it fails to comply with the notice requirements, the notice will be deemed invalid, and the owner will have to resubmit a new notice in order to proceed under this subpart. The Department believes that this is a sufficient enforcement mechanism, making it unnecessary for HUD to impose a stricter delivery standard.

Four commenters were concerned about delivery of the notice of intent to State and local governments. Section 212 of LIHPRHA requires the owner to simultaneously submit the notice of intent to "the appropriate State or local government for the jurisdiction in which the housing is located * * *." Three comments were received suggesting that in the proposed rule, the term "State or local" should be replaced with "State and local." The statute provides the owner with the option of sending the notice to either the State or the local government. It does not require notification of both, and the Department has decided not to restrict this option. Another commenter suggested that the language of the proposed rule be amended to state that not only the chief executive officer, but also any officer designated by executive order or State or local law, should be sent a copy of the notice. This would ensure that the proper individual is made aware of the notice. The Department has added this requirement to the rule.

Other commenters suggested that the notice should also be sent to tenant advocacy groups, legal services organizations, holders of seller financing, and limited partners of the owner. Tenant advocacy and legal services groups would be sent copies of the notice of intent only if they are designated tenant representatives, as that term is defined under § 248.101, otherwise an owner is not required to send them copies of the notice of intent. Additionally, with regard to limited partners, the Department presumes that an owner is acting within its authority by submitting a notice of intent and has notified any interested parties of its submission. The Department cannot enforce a requirement that partners be notified of the notice of intent since HUD may not have knowledge of the existence of these parties. This section of the proposed rule does require notification of mortgagees. Therefore, the proposed rule has not been amended in response to these comments.

Notices of intent will not be considered properly filed for purposes of this subpart unless the notification requirements specified in paragraph (c) of the rule are fulfilled. However, the failure of an owner to comply with any non-federal notification requirements will not invalidate a notice of intent. In the case of owners who filed notices of intent pursuant to section 604 of the statute and § 248.5 of subpart A, in order to preserve the option of proceeding under either this subpart or subpart C, the notification requirements in the transition notice issued by the Department on December 11, 1990, as *Notice 90-88*, "Transition Rule for Filing Notices of Intent Pursuant to Section 604(a) of the Cranston-Gonzalez Nation Affordable Housing Act of 1990," must have been complied with. If an owner failed to comply with the notice requirements set forth in the transition notice, the owner will have failed to preserve its option of proceeding under ELIHPA. An owner who properly filed a notice of intent under the transition provisions must comply with the notice requirements of this section or § 248.211 upon making its election to proceed under this subpart or subpart C in order to maintain the validity of the notice of intent.

If an owner files a notice of intent under this section and the Department determines that the owner is not eligible to proceed under this subpart, then HUD will notify those persons and entities listed in paragraph (c) of this section of the interim rule that the notice is invalid. The purpose of this requirement is to ensure that tenants and State or local governments do not needlessly expend time and resources in anticipation of purchasing the project or providing financial assistance to the project.

*Section 248.111 (Appraisal and Preservation Value of Eligible Low Income Housing)*

This section of the proposed rule establishes the appraisal process for valuing eligible low income housing under this subpart. Two commenters took issue with the need for the preservation process to include appraisals at all. However, since the performance of appraisals is mandated in section 213 of the statute, the Department has no authority to omit this requirement.

One commenter stated that the appraisal process is expensive for both the owner and HUD and is very time-consuming and imprecise. This commenter requested that section 8 fair market rents (the "FMRs") should be used instead of appraisals. The Department sees no reason to supplant the appraisal with FMRs. While FMRs are a good measure of rents in a metropolitan area, they are not generally an acceptable measure of value. The most accurate manner to determine a project's value is through independent and professional appraisals.

The second commenter asked that owners be permitted to sell their projects for what a willing buyer will pay a willing seller, and not be limited to the transfer preservation value. By statute, the appraisal process determines fair market value and appropriate compensation for an owner. Under a voluntary sale an owner may sell its project for no more than the transfer preservation value. The appraisal is central to the LIHPRHA preservation strategy because it fairly establishes the preservation value upon which the Department will base incentives and compensation.

Two commenters said that tenants should be allowed to perform their own appraisal. The Department will not consider such tenant appraisals in determining preservation value since it does not have the authority to do so under LIHPRHA. HUD is confident that the process of reconciling HUD's and the owner's appraisals, possibly with a third

appraisal, will objectively establish preservation value. As is discussed in response to related comments, the separately published Appraisal Guidelines do provide tenants with opportunities for appropriate input into the appraisal process.

One commenter recommended that HUD permit qualified appraisers to determine the fair market value of the property without further guidance from the Department. The Department notes that the statute requires it to publish appraisal guidelines to implement assumptions and procedures mandated by statute and the preservation program process.

The Department received 19 comments asking that these Appraisal Guidelines be published for notice and comment. These guidelines were published for notice and comment on December 12, 1991 at *56 FR 64932*. One commenter said that the lack of defined appraisal standards made it appear less likely that owners will realize their equity. Appraisal standards have been defined in the published Appraisal Guidelines.

We received approximately two dozen additional comments that dealt with issues specific to the Appraisal Guidelines. These comments were forwarded to HUD staff preparing the Appraisal Guidelines. They have been taken into consideration and are not discussed here. Comments that apply both to this regulation and the Appraisal Guidelines are considered here.

One commenter suggested that among the qualifications for an appraiser should be that it not be affiliated with the original mortgage lender or the lender that will be used for the section 241(f) loan. The Department agrees that the appraiser should not be involved in a situation that may constitute a conflict of interest. At the time of the appraisals, however, no mortgagee for the rehabilitation, equity take-out, or acquisition loans will have been identified. Thus, the Department has amended § 248.111(c)(1) of the regulations to require that appraisers not be affiliated with the current mortgage holder.

A commenter said that it may be an undue burden to have the requirement that the appraiser be certified or licensed in states where certification is not required. The Department declines to change this requirement since under title 11 of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, Public Law 101-73, *12 U.S.C. 3310 et seq.*, appraisals performed in connection with federally-related transactions must be conducted by individuals certified or licensed by the State in accordance with the Act's requirements. States are required to have licensing procedures and standards in place by December 31, 1992.

Two commenters said that the assessment of rehabilitation costs, or capital needs assessment, should be done by a competent estimator with experience in multi-unit construction. Similarly, five commenters said that HUD should require an independent engineering survey and a capital needs assessment. Another suggested that the analysis of replacement reserves be done by professional architects or engineers. These arguments, among others, persuaded the Department to have its own Architectural and Engineering staff or contractor undertake the capital needs assessment and reserves analysis instead of leaving these to each appraiser. The joint inspection format, discussed in the separately published Appraisal Guidelines, ensures that all concerned and knowledgeable parties have input to the capital needs assessment. At the same time, having a single, experienced estimator ensures that appraisers have in common a realistic, professional rehabilitation cost estimate and that eventual rehabilitation costs do not differ radically from those used at this stage to determine preservation value. It should be noted that, after initial reserve funding requirements are set by a formula described in the Appraisal Guidelines, future annual contributions will be determined periodically by HUD upon request of the owner.

Three commenters said that the Department should consider in its guidelines those applicable regulations and covenants that affect value, and that these should be furnished by owners' lawyers and appraisers. One commenter asked that the analysis of laws and contracts that affect value be done by lawyers. The Department agrees that such analyses should be done by competent professionals, but believes that it is the appraisers' responsibility as part of the appraisal assignment to collect such input from the appropriate sources and, using the Appraisal Guidelines provided by the Department, determine the effect of any covenants or use restrictions on value.

Two comments suggested that the appraisal guidelines contain specific instructions for estimating "conversion costs" and conducting capital needs assessments. The Department has published specific instructions regarding conversion costs and capital needs in the Appraisal Guidelines. The Department will conduct a capital needs assessment as part of the appraisal that will determine the costs of bringing the property back to original physical standards. This assessment will be provided to the appraisers.

A commenter recommended that the determination of operating expenses, reserve requirements, and rehabilitation needs in conjunction with HUD's review and approval of a plan of action be separate from the determinations made at the appraisal stage. Operating expense estimates and rehabilitation needs identified in the plan of action will receive a separate review and are expected to be more detailed than those conducted as part of the appraisal.

Three commenters suggested that HUD needs to distinguish between rehabilitation costs that an owner would incur to convert the project to a higher and better use for purposes of preservation value as opposed to rehabilitation costs necessary to preserve the project as low income housing for its remaining useful life. Another commenter questioned why, since the appraised value can be used to determine the amount of market rents, section 241 loans, etc., the proposed regulations say that the amenities and upgrades necessary to bring the project to its highest and best use will not be financed as part of the plan of action. Although fair market value is estimated as if the amenities and upgrades required to attract a market rate tenancy are added, they are not actually added since the project is not converted to market rate rental. These upgrades influence actual rents and equity or acquisition loan amounts only because the owner must be fairly compensated for preserving the housing for a low income tenancy. The rehabilitation necessary for the preservation of the affordable housing as decent, safe, and sanitary housing is independent of the upgrades necessary to attract a market-rate tenancy, and will be determined by the Department after a joint inspection conducted by HUD and the purchaser or owner during the preparation and review of the plan of action.

Two commenters recommended that the appraisal process include input from or participation of resident councils. Another commenter asked that tenants be permitted to submit information to HUD on the physical condition of the project. In response, the Department has provided in the Appraisal Guidelines opportunities for appropriate input before and during the project's inspection for capital needs. Two additional commenters suggested that HUD add a provision to the regulations to require that HUD consider any information submitted by a resident council. The Department will consider comments from resident councils prior to the inspection, but due to the statutory time frames established in section 213, it cannot lengthen the appraisal process in order to provide a formal comment period.

A similar comment asked that the appraisal process include input from the State housing finance agency. The Appraisal Guidelines provide that appraisers may place reliance upon the assessment of conversion costs (over and above the capital needs assessment) determined by an appropriate State agency, if such an agency has been approved by the Secretary.

Three commenters suggested that the Appraisal Guidelines should require the consideration of local ordinances or restrictions. Reflecting the statute, the Appraisal Guidelines will require the consideration of local ordinances and use restrictions. The same three commenters said that the guidelines should allow some opportunity for local government or tenant input into the appraisal instructions. Since the Appraisal Guidelines are being published for comment, local and tenant groups have an opportunity to comment on them. If the commenters intended that these groups have the opportunity to comment on the appraisal instructions sent out to the appraisers of each project, the Department feels that this would be unnecessary and would lengthen the process without justification. As discussed earlier, the Department has provided for appropriate participation of State and local government entities and tenant groups prior to and during the inspection of the property.

A commenter stated that the estimator who will calculate the rehabilitation costs should obtain and consider any inspection reports issued by the State or local government or by HUD. The Appraisal Guidelines clarify that HUD Architectural and Engineering staff or contractors will determine rehabilitation costs. The Department would expect State and local government to provide any such input at or prior to the time of the joint inspection.

The Department received three comments recommending that the appraisal take into account as conversion costs restrictions imposed by LIHPRHA itself on projects that prepay their mortgage or voluntarily terminate their mortgage insurance. Examples would include relocation costs for tenants, continued occupancy, etc. The Department has not accepted the recommendation, since the essential purpose of the LIHPRHA appraisal process is to determine the value of the project in the absence of the constraints imposed by LIHPRHA itself. However, State or local restrictions on conversion will be taken into account in the appraisal.

A commenter stated that the regulations do not take into account the fact that historical operating expenses may include extraordinary nonrecurring expenses and that an owner's accountants may characterize some capital expenditures as operating expenses in order to avoid phantom income. The Appraisal Guidelines will instruct appraisers to eliminate extraordinary or nonrecurring expenses from the operating expense analysis. In cases where capital expenditures have been allowed by auditors as operating expenses, the Department will assume the allowance is valid.

The Department received two comments stating that the three year rule on operating expenses should be a guide only and that HUD should instruct appraisers to look at the real operating expenses expected after conversion. Since the three year rule on operating expenses is a statutory provision, the Department lacks the authority under LIHPRHA to change this rule. Again, in the interests of determining "real operating expenses," the Department instructs appraisers in the Appraisal Guidelines to identify extraordinary or nonrecurring expenses. Section 248.111(e) has also been revised to clarify when and for what purposes appraisers may use the most recent year's operating expenses instead of the three year historical average.

A commenter also pointed out that in cases where the project's highest and best use is something other than residential rental use or cooperative ownership, it makes little sense to require a comparison to the three year average operating expenses of the property as a rental. The Department has accordingly revised the regulation to allow for the use of projected operating expenses alone in such cases.

The Department received three comments stating that if the cost of rehabilitation is to be deducted from value, then the replacement reserve funds available to be applied towards that cost must be offset against the deduction. The commenters suggest that the amount of the replacement reserves be included in the calculation of preservation value. The Department has decided not to include replacement reserves in the calculation of preservation value. As in other sales, upon the transfer of a property under LIHPRHA, reserve for replacement and other escrows are either purchased or retained by the owner and thus not included as part of the value of the property.

One commenter suggested that special rehabilitation needs be considered when computing the preservation value. The need to pay for seismic reinforcement or removal of toxic materials, such as asbestos, are among the most critical examples. Lead-based paint and asbestos abatement are included in the capital needs assessment performed by the Department. Other toxic material removal and seismic reinforcements will be included in the capital needs assessment if specified by State or local laws or codes.

One commenter stated that if the appraisal demonstrates that there is no preservation equity in the project, HUD's regulations do not specify the result. The Department has determined that if a project has no preservation equity, it cannot prepay, except pursuant to approval of a plan of action filed under § 248.141, nor is it eligible for any incentives under LIHPRHA. LIHPRHA is designed to provide owners with a fair market return on their investment through the receipt of incentives provided by HUD in exchange for maintaining low income affordability restrictions for the project's remaining useful life. If a project has no preservation equity, there is no basis on which to increase an owner's return. In these cases, if calculated, the new annual authorized return would be less than the current allowable distributions. Since owners have no preservation equity, permissible incentives under section 220(b) are, therefore, not necessary to provide owners with a fair market return on their investment. Owners, of course, could apply for such "incentives" as additional section 8 assistance or capital improvement loans under other program authorities designed to maintain the stock of HUD-assisted or insured loans.

Two commenters were concerned that priority purchasers were precluded from any involvement in setting the preservation value of a project. There is no provision in the statute for priority purchasers to be involved in setting the preservation value. The preservation value is established objectively in the appraisal process. Any purchaser in a voluntary or mandatory sale may submit an offer at less than the preservation value. Further, since HUD, with the possible exception of the five percent equity requirement, will provide insured financing and support the debt service on acquisitions, purchasers have less interest in the purchase price than they would in an ordinary transaction. Thus, the Department has decided not to accept the commenters' recommendation.

One commenter said that using the highest and best use appraisal for transfer preservation value, but the highest and best use as market rate rental for extension preservation value, will make selling the property more attractive to owners. Fair market values for transfer and extension are explicitly defined by LIHPRHA, and the Department has no authority to change them. In most situations, the highest and best use of a property will be market rate rental housing, so that the extension and transfer value will in fact be identical. It should be noted that other differences between the transfer and extension options will also influence owner decisions, e.g., tax consequences, processing times, and section 241(f) loan amounts.

Two commenters suggested that the owner should receive a copy of HUD's appraisal. The Department agrees, and has amended the regulation accordingly.

Fifteen comments requested that tenants should have the right to comment on the appraisals before they become final. The Department disagrees since this would make the appraisal process too burdensome and time-consuming. Furthermore, the determination of appraised value is best handled neither by HUD, nor the owner, nor the tenants, but by independent, professional appraisers. Tenants will be invited to HUD's inspection of the property for the capital needs assessment and may provide useful information about the physical condition and rehabilitation needs of the property, which will help the appraisers make accurate value determinations.

Section 213(a)(3) of the statute provides that the Secretary may approve an "extension" or "transfer" plan of action to receive incentives only based upon an appraisal that is not more than 30 months old. Five commenters were concerned that the appraisals could not be updated or adjusted during their thirty-month lifespan. Property values may change in this time period and owners could receive incentives based on an outdated property value. The Department recognizes the commenters' concerns but has been unable to formulate a workable and statutorily permissible mechanism to alleviate them. Preservation values drive the preservation process from the start. The resulting aggregate preservation rents are compared to the Federal cost limit to provide project-specific information to owners on their options. The property may be offered for sale for up to 15 months, and potential purchasers are informed of available assistance based on the preservation value and Federal cost limit. Reestimating value late in the process would change the ground rules for all parties concerned and unnecessarily lengthen the process. Adjusting preservation value would mean adjusting aggregate preservation rents and recomparing them to the Federal cost limit, which would also have changed since the original analysis. Moreover, property values are not subject to simple inflation factors that could be applied to all properties. An attempt to reach agreement on reevaluation might require multiple appraisals. Finally, the Department believes that the language of section 213(a)(3) implies an assumption on the part of Congress that no readjustment of preservation values is warranted as long as the plan of action is approved within 30 months from the date of the appraisal.

*Section 248.121 (Annual Authorized Return and Aggregate Preservation Rents)*

Fifteen commenters, composed of six national and regional nonprofit organizations, two State agencies, three law firms representing owners, two owners, one consultant, and members of Congress contested the Department's position concerning the annual authorized return which an owner may receive on its equity in the project. Paragraph (a) of this section of the proposed rule sets an annual authorized return of 8% for owners who retain the project and receive incentives in exchange for extending the project's affordability restrictions. This provision repeats, almost verbatim, the

language of section 214 of the statute. In addition, § 248.153(a)(1), which is based on section 219 of the statute, provides that the Commissioner shall "enter into such agreements as are necessary to enable the owner to receive the annual authorized return." The commenters have taken issue with the Department's interpretation of these provisions.

As noted in the preamble to the proposed rule, the Department's interpretation of the statute is that an owner is authorized to receive an 8% return, but is not guaranteed that return on an annual basis. The Department intends to set an annual authorized return of 8%, as mandated in section 214 of the statute, but cannot ensure that an owner will receive that level of return annually. The Department has not changed its position in the interim rule. The language of the statute, and the Conference Report at page 464, support the Department's interpretation by stating in section 219 that after HUD approves a plan of action, it should enter into such agreements so as to "enable" an owner to receive the annual authorized return. The common meaning of the term "enable" is to provide with a means, give an opportunity, make possible, or provide the capacity; it does not mean guarantee.

The Department, as set forth in paragraph (a) of this section, will set the annual authorized return equal to 8% and will provide incentives sufficient to enable an owner to receive that return. Because the statute requires, in section 222, that rent increases be phased-in when the increase is substantial, over a minimum three-year period, it is expected that some owners, especially those with a large proportion of non-section 8 units or vacant units, or those which own projects requiring substantial rehabilitation, will not receive the full 8% return in the first three years after approval of the plan of action. The Department intends to mitigate this effect as much as possible by permitting owners who fall short of the 8% to withdraw funds from the project's residual receipts account and, for those projects with a mortgage insured or assisted under section 236 of the National Housing Act, by permitting a temporary deferral in remitting excess income until such time as the phased-in rents allow the owner to receive an 8% return.

Another commenter questioned whether an owner who has deferred its distributions prior to approval of the plan of action may realize those distributions under this subpart. The commenter proposed a system for permitting an owner to receive accrued distributions by excluding them from the rent stream established under the plan of action. HUD's response is that an owner may receive its accrued, unpaid distributions by withdrawing funds from the residual receipts account or from surplus cash with HUD approval.

One commenter expressed concern that the preamble to the proposed rule indicated that the annual authorized return would be funded from the residual receipts account. The commenter claimed that at the conclusion of the preservation process, there would not be any residual receipts. The Department expects that the residual receipts account will continue to be funded after preservation. The annual authorized return will primarily come out of the rent stream for the project. It is anticipated that residual receipts funds will be utilized to enable an owner to receive its return only when the rent stream is insufficient to provide an adequate return, such as during the phase-in period required for rent increases under § 248.145.

A commenter questioned which rent levels would be used in the underwriting of section 241 acquisition and equity loans. The Department would like to clarify that the two rent levels established under this section, extension preservation rents and transfer preservation rents, are hypothetical estimates created by statute for the sole purpose, as noted in section 214(b) of LIHPRHA, of comparison to the Federal cost limit. Extension and transfer preservation rents are not determinative of the actual rents established under § 248.145. Rents will include debt service on the section 241 acquisition or equity loan. However, the total gross rents for the project cannot exceed 120% of the existing FMR. Extension and transfer preservation rents bear no relationship to the underwriting of any loans. Underwriting will be based on the actual rents for the project which will be established in accordance with § 248.145.

With regard to subparagraphs (c)(2) and (d)(2), a commenter requested more specificity on how HUD will determine the amount of the rehabilitation loan. The amount of the loans will depend on the rehabilitation which is needed, based on a physical inspection of the project at the time the plan of action is approved. If a project proceeding under this subpart requires rehabilitation, an owner or purchaser may receive financing under the rehabilitation loan program in part 241 of this title, or through the capital improvements loan program set forth in part 219 of this title.

Section 219.305 of title 24 of the CFR lists the rehabilitation expenses and energy improvements which may be covered by the capital improvements loan program.

The same commenter also suggested that the rehabilitation loan should include a one-time deposit to the project's replacement reserve fund as a sinking fund to protect against future rehabilitation costs. The Department expects that the monthly deposits made to the reserve for replacements fund will be sufficient to cover future project maintenance and the rehabilitation items, making the sinking fund unnecessary.

One commenter requested that the definition of adequate reserves in paragraph (e) be clarified in order to prevent arbitrary determinations. Adequate reserves will be determined in the same manner as in subpart C. The level of reserves is based on the amount of funds needed on a monthly basis to maintain the project in accordance with the housing quality standards of § 248.147.

*Section 248.123 (Determination of Federal Cost Limit)*

Section 215(a)(1) of LIHPRHA mandates that the Department separate high cost projects from the remainder of the eligible low income housing inventory by using a Federal cost limit. Twenty comments were received by the Department concerning the determination of relevant local markets, prevailing rents, and the Federal cost limit.

The term "relevant local market" is defined in both § 248.101 of this subpart and in the Appraisal Guidelines. The determination of what constitutes the relevant local market in which a specific eligible low income housing project is located is left up to the professional judgment of the appraiser retained by the Department under § 248.111. Section 248.101 of the proposed regulation defines a relevant local market as "identifiable as a distinct market area in which similar projects and units would effectively compete with the subject project, for potential tenants." It is expected that this market area will be smaller than that established by the Department to determine the section 8 existing fair market rents. This definition is expanded upon in the Appraisal Guidelines, which state that the relevant local market is a geographic area in which similar properties effectively compete with the subject project in the minds of probable, potential purchasers and users. In nonmetropolitan areas, if the appraiser ascertains that there is a lack of comparable rental housing, the appraiser may use comparables from noncontiguous localities as long as they are in the same county or parish and have similar demographics and market characteristics. If there are no comparables in the local market or noncontiguous areas, the appraiser will document that fact in his/her report.

One commenter suggested that paragraph (b) of this section be amended to delete the sentence permitting section 8 existing fair market rents to be the sole measure of the Federal cost limit if the appraiser determines that there are no comparables. HUD included this statement in the proposed rule in anticipation of situations where no comparables exist and where it is impossible to define a relevant local market and its prevailing rents. The Department sees no reason for amending this provision.

Two commenters questioned whether rent-controlled properties would be considered comparables for purposes of determining the prevailing rents for a relevant local market. The Department has decided that rent-controlled properties will be included as comparables to determine prevailing rents. Rent-controlled properties and eligible low income housing located in the same relevant local market area are very likely to compete with each other for tenants, supporting the position that they are similar properties, and hence, comparable. Also, it is expected that the inclusion of rent-controlled properties will not have a substantial impact on prevailing rents in most metropolitan areas.

However, rent-controlled properties will only be included as comparables in the determination of a project's fair market value if the appraised project would be subject to rent control in the event of prepayment. It is the responsibility of the appraisers retained by HUD and the owner to determine whether a project would fall within the scope of a locality's rent control laws.

To assist in determining prevailing rents for a particular relevant local market, the Department will instruct

appraisers to consult with the State and local governments in order to take advantage of any information they are able to provide. However, the Department has declined to make consultation with State and local governments over the appraisals mandatory, as six commenters suggested. HUD has also decided not to accept the suggestion that if a local government ascertains that there are no comparables for calculating prevailing rents, then only the section 8 existing fair market rents would be used to determine the Federal cost limit. The statutory language of section 215 leaves the determination of relevant local markets and prevailing rents up to HUD's discretion and, as the language of this section indicates, the Department will use information acquired by its appraiser and any other appropriate information in order to make the necessary calculations. HUD recognizes that State and local governments, as well as comments from community organizations and residents, may be a valuable source of information. HUD will take into consideration any information provided by the State and local government indicating the absence of comparables in a particular relevant local market; however, the State and local governments' determination will not be binding for purposes of determining the Federal cost limit.

In response to one comment, HUD believes that it is not necessary for the owner's appraiser to do a second relevant local market study to assist HUD in its determination of prevailing rents. A second study would be duplicative and would cause the owner to pay for additional work not required for determining the appraised value of the project. However, HUD will utilize, as appropriate, any information in the owner's appraisal or data submitted by interested parties in addition to the relevant local market study done by the HUD-retained appraiser.

A concern was raised by two commenters that the section 8 existing fair market rents which are used to determine the Federal cost limit would erroneously be adjusted for utilities. Utilities will not be deducted from the published fair market rents which are used for purposes of calculating the Federal cost limit. It should be noted, however, that for other purposes in this subpart, including the calculation of the actual rents to be paid by the tenants, the fair market rents will be adjusted by a utility allowance. To avoid confusion, the definition of fair market rent in § 248.101 has been amended to clarify that for Federal cost limit purposes utilities will not be deducted. For consistency, the Appraisal Guidelines will also instruct the HUD appraiser to use gross rents, i.e., contract rent plus all tenant-paid utilities, in determining the relevant local market rents. Section 248.121(e)(2) has also been modified to clarify that, for purposes of comparison to the gross rents used in determining the Federal cost limit, project operating expenses in aggregate preservation rents must include the cost of utilities paid by the residents.

The Department acknowledges one commenter's concern that underestimated rehabilitation costs may artificially inflate a project's preservation value, but disagrees with the conclusion that this will cause the Federal cost limit to be exceeded and lead to conversion to market rate housing and displacement of low income tenants. In determining whether or not the Federal cost limit is exceeded, HUD will compare a project's preservation rents to 120% of the section 8 existing fair market rents and 120% of the prevailing rents. One component of preservation rents is debt service on a rehabilitation loan. If rehabilitation is underestimated, the loan amount will be lower, leading to a corresponding decrease in the preservation rents. This decrease should offset any increase in the preservation rent resulting from a potentially overestimated preservation value. Moreover, regardless of how preservation rents are calculated, conversion to market rate housing would result only pursuant to § 248.169, either because of a lack of appropriated funds or because a bona fide offer is not made, or under § 248.141.

*Section 248.127 (Limitations on Action Pursuant to Federal Cost Limit)*

The discussion in the preamble of the proposed rule, regarding limitations on action pursuant to the Federal cost limit, states that where an owner intends to retain a project whose extension preservation rent exceeds the Federal cost limit, that owner may receive incentives only up to an amount that can be supported by a projected income stream equal to the Federal cost limit. Three commenters disagree with this position, asserting that the Conference Report, at page 464, states that section 8 assistance could be set at more than 120%. The Department's position is that section 8 rents can exceed 120% of the fair market rent; however, the income stream under the plan of action may not exceed the Federal cost limit.

*Section 248.131 (Information From the Commissioner)*

The Department received sixteen comments concerning this provision of the proposed rule which sets forth the information the Department is required to send to an owner and the tenants of a project for which a notice of intent has been submitted under this subpart. Section 216 of LIHPRHA requires that the Department supply the owner with any information necessary for preparation of a plan of action, including preservation values, preservation rents and a statement as to whether the aggregate preservation rents exceed the Federal cost limit. Two commenters noted that this information should be more extensive and should include audited financial statements, a current approved rent schedule and operating budget, a statement as to mortgage status, rent roll, physical inspection reports, and management reviews. The additional data mentioned by the commenters is already in the possession of the owner and will be made available to potential purchasers at the time they submit an expression of interest. The Department feels that it is not necessary to make this information available at an earlier stage in the process. For this reason, the Department declines to supply information which is not statutorily required.

Four commenters criticized the proposed rule's ambiguity in stating that this information shall be made "available to the tenants." In response to these comments, the Department has amended the proposed rule to state that information to be provided under this section will be sent to any tenant representatives who are known to the Department and if none exist, the information will be available from the local HUD field office. Notices will also be posted in each affected building apprising tenants of the information and explaining from whom, and where, that information can be obtained. The Department has also decided, in response to four additional comments, to provide this information to that officer in the State or local government to whom the owner sent a notice of intent, in order to fulfill the requirement of § 248.179 that HUD consult with other interested parties prior to approving a plan of action under this subpart.

*Section 248.133 (Second Notice of Intent)*

The Department received twenty-four comments regarding the submission by owners of a second notice of intent to the Secretary. Four of these comments concerned notification of the tenants, with three of the four commenters suggesting that the Department adopt the stricter notice requirements set forth in § 248.105, governing the original notice of intent, and requiring that all tenants and each tenant representative receive a copy of the second notice of intent. The fourth commenter suggested that the second notice of intent be posted in the affected buildings and be delivered to any tenant representatives. The Department has determined that it would be appropriate to require that the second notice of intent be delivered to each tenant representative, and if no tenant representative is known to the owner, then to each occupied unit. HUD has determined that it is unnecessary to send the second notice of intent to each of the tenants if a tenant representative exists since the tenants have already received the original notice of intent and it is presumed that the representative will act on the tenants' behalf and disseminate this information for them. The rule has been amended accordingly.

One commenter recommended that the Department require an owner submitting a second notice of intent to provide evidence of the consent of its general and/or limited partners to the submission. The Department has decided not to accept this proposition. It is presumed that an owner taking action under this rule has the authority to do so and has the consent and agreement of its partners.

Seventeen commenters suggested that the second notice of intent to transfer the project be binding on an owner. Commenters also noted that if an owner does change its mind after submitting a second notice of intent, it should have to face financial penalties, pay the costs incurred by potential purchasers, or be prohibited from prepaying the mortgage or terminating the mortgage insurance contract for a reasonable period of time. The concern raised by most of the commenters was that resident groups and nonprofit organizations would expend valuable time and funds attempting to put together a bona fide offer, and if an owner then decided not to sell the project, then these groups would needlessly lose that money.

The Department, acknowledges the validity of this concern; however, there is no statutory basis for requiring that a second notice of intent be binding and the Department has no authority to impose financial penalties on owners who change their minds after submitting a second notice of intent. Since the statute does not require an owner who receives a bona fide offer under § 248.157 to accept that offer, HUD cannot add the additional requirement that the second notice of intent be binding in that circumstance. Under the mandatory sale provisions of § 248.161, however, once an owner who has submitted a second notice of intent receives a bona fide offer for sale at a price equal at least to the transfer preservation value, the owner is bound to accept that offer, but prior to receipt of an offer under § 248.161, an owner is free to change its mind.

It should be noted that if an owner proceeding under § 248.157 or § 248.161 changes its mind after filing the second notice of intent, and in the case of § 248.161, before receiving a bona fide offer, and decides to retain the project and seek incentives, then the owner must comply with the statutory requirement that a plan of action be submitted within six months of receiving the information provided by the Secretary pursuant to § 248.131. If the owner fails to submit a plan of action for incentives within that six-month period, then it must begin the process over again by submitting a new notice of intent under § 248.105. Owners should also be aware that § 248.135(g), which bars an owner from resubmitting a notice of intent for six months from the date the process is aborted, is also applicable to owners who decide to pursue incentives after filing a second notice of intent and then fail to submit a plan of action for incentives within the applicable time frame.

This section of the proposed rule has been amended to delete subparagraph (a)(2), which requires the submission of a second notice of intent if an owner plans to prepay the mortgage or terminate the mortgage insurance contract under § 248.141. As a commenter pointed out, this is not required under section 216(d) of the statute. HUD has determined that this submission is not necessary since the tenants will be notified of this development when the plan of action is submitted.

*Section 248.135 (Plans of Action)*

This section discusses the submission of the plan of action. With respect to paragraph (b), which governs a joint submission by an owner and purchaser, the Department received six comments. Four commenters pointed out that if an owner terminates the use restrictions or retains the project with use restrictions in exchange for incentives, it has six months from receipt of the information provided by the Department under § 248.131 to submit a plan of action, but if the owner transfers the project under § 248.157 or § 248.161, it only has 90 days after accepting a bona fide offer in which to jointly submit a plan of action with the purchaser. The commenters claimed that the proposed timeframe for the joint submission is unreasonable and suggested extending it to six months. In order to treat owners equitably, regardless of whether they retain or sell the project, and in recognition of the fact that a joint submission may be difficult to prepare, the Department has amended paragraph (b) to provide the same six month period for submission of a plan of action to owners who retain the project and to those who sell.

Owner and purchasers should note that if a plan of action is not submitted within the applicable six month period, the notice of intent filed under § 248.105 becomes ineffective and the owner must wait six months before being eligible to resubmit the notice. Although one commenter claims that this result is inequitable if the failure to submit the plan of action was due to the fault of the purchaser or circumstances beyond the owner's control, this penalty is one that is statutorily imposed under section 217(a)(3) of LIHPRHA and the Department does not have the discretion to waive it. Owners and purchasers are also cautioned that if a bona fide offer to purchase the project is accepted late in the 15 month marketing period, it would be in the best interests of both parties to submit a plan of action as soon as possible during the six month submission period, given the fact that LIHPRHA authorizes the Department to accept only plans of action based on appraisals which are not more than thirty months old.

One commenter suggested that if an owner and purchaser cannot jointly agree on a plan of action, the owner should have the right to submit the plan alone and control the plan of action process. If an owner is selling a project, the

owner's primary interest in the transaction will be its return on the sale, which is established through the appraisal process; the owner's interest in the aspects of the plan of action which affect the operation of the project after the sale is minimal. Therefore, Department has decided to retain the requirement that the plan of action be jointly submitted. If the owner and purchaser are unable to submit a plan of action within the applicable time period, then the transaction will not be completed and the owner will be forced to file a new notice of intent after waiting the six months specified in paragraph (g) of this section.

One commenter recommended that procedures be established that ensure the purchaser's role in selecting professionals to prepare the plan of action. Another suggested that primary responsibility for demonstrating the feasibility of the sales transaction should rest with the purchaser, but the owner would ultimately control the contents of the submission. Still another commenter recommended that the plan of action be submitted by a qualified housing counseling agency that serves a low income clientele, rather than by the owner's staff or a housing consultant. The statute, under section 217, places the responsibility of submitting a plan of action with the owner, or in the case of a transfer, with the owner and the purchaser. The Department sees no need to further regulate the manner in which the plan of action is prepared. If an owner and purchaser are unable to submit a plan of action, the owner, as previously noted, will be forced to begin the process again by submitting a new notice of intent. The purchaser will be unable to purchase the project for at least another year and a half, until the six month waiting period, under paragraph (g), for submitting a new notice of intent expires, new appraisals are conducted, and the project is again offered for sale. This, in itself, should be a sufficient inducement to ensure cooperation by both parties.

Paragraph (c) of the proposed rule requires that the plan of action be submitted to the chief executive officer of the appropriate State or local government. This paragraph has been amended to conform to the changes made in §§ 248.131 and 248.133, which require that the information from the Commissioner and the second notice of intent be submitted to that officer of the appropriate State or local government entity to whom the notice of intent was submitted under § 248.105. A commenter also proposed that an owner should provide certified documentation that the plan of action has been reviewed by a unit of local government. Section 217(a)(2) requires the appropriate State or local government entity to review any plans of action which are submitted by an owner and this requirement has been included in this paragraph. The Department has declined to require a certification, however, since it does not have the authority under LIHPRHA to enforce this requirement and because the Department believes that an owner should not be penalized for another party's failure to comply with the statute. As long as the owner properly submits the plan of action to the specified parties, the owner has fulfilled its obligations under this paragraph.

Three commenters requested that State or local governments be notified if a plan of action submitted to HUD will not maintain the use restrictions on the project for its remaining useful life or if the plan contemplates the resale of the project by tenants for a profit. With the exception of projects purchased by tenants pursuant to a resident homeownership program under § 248.173, all plans of action to extend affordability restrictions must provide that the restrictions will remain in place for the project's remaining useful life. Additionally, under § 248.173(h)(3)(ii) a resident may not receive a profit from the resale of its unit for at least six years from the time it purchases the unit. In light of the foregoing, and since the State or local government will receive a copy of the plan of action upon its submission to HUD and the appropriate State or local government agency must review the plan of action, the Department sees no need to impose an additional notification burden under this section.

Paragraph (c) reiterates the statutory language of section 217(a)(2), requiring the "appropriate" State or local government agency to review any plans of action submitted to the Department. One commenter requested guidance in determining the appropriate agency. The notification requirements under LIHPRHA require submissions to be made to the State or local government in whose jurisdiction the project is located. The Department recognizes that delivering the plan of action to the State or local government in the jurisdiction in which the project is located may not ensure that the "appropriate" agency is provided with the plan of action for review. In order to ensure that the statutory purpose is carried out, the Department itself will forward copies of the plans of action to the appropriate State or local government agency if that agency did not receive a copy from the owner.

The Department received eleven comments contending that tenants and the State or local governments should have the right to comment on any plans of action submitted to the Department. In response to these comments, the Department has amended the proposed rule to provide a sixty-day comment period for tenants and State and local governments. This period will begin on the date of HUD's receipt of the plan of action, which should be sent simultaneously to the tenants and the State or local government. This comment period will not extend the processing time under this subpart because the sixty-day comment period will begin on the same date as the six-month period, provided under § 248.149(b), for Departmental approval of the plan of action. If the plan of action is revised, the tenants and the State or local government will be provided with a copy of the changes, pursuant to paragraph (c), and will be given a reasonable opportunity to comment on the revision. The Department will not approve a plan of action before the end of the sixty-day comment period, and in making its determination, the Department will take into account any comments received during that period. Findings made by the State or local government will be considered in accordance with section 228 of the statute, but they will not be binding on HUD; decisions made by State agencies may be binding, under the statute, only when the Department has delegated authority to that State pursuant to section 227 of LIHPRHA. Similarly, tenant approval of the plan of action is not required under the statute and it is impractical for the Department to respond to each tenant comment, but these comments will be given serious consideration in the Department's examination of the plan of action.

Tenant representatives may take part in negotiations between the owner and HUD on the plan of action, if the plan of action is jointly submitted by the owner and the tenants in connection with a sale of the project to the tenants. If the tenants are not purchasing the project, the Department sees no justification for participation by tenant representatives, especially since tenants, as well as tenant representatives, have the opportunity to comment on the plan of action.

Seventeen commenters advocated that HUD provide tenants with access to the plan of action. Comments ranged from requesting that each tenant be given a copy of the full plan of action to recommending that the plan be available on site and copying permitted free of charge. The proposed rule provides that the owner shall post a summary of the plan of action in each occupied building, provide the full plan to any tenant representatives, and make a copy available in a convenient location, as well as provide a copy to the chief executive officer of the State or local government. The Department has amended this provision to require that the posted summary indicate the name, address and telephone number of any tenant representatives and personnel in the local HUD field office who possess a copy of the plan of action, and a statement that tenants may contact these persons to obtain or review a copy of the plan. In addition to sending the plan to any tenant representatives and the State or local government, the owner must make a copy of the plan, with revisions, available to tenants for copying in the on-site office, or if an office is not available, in the location where rents are collected, during normal business hours. Owners shall permit tenants to photocopy the plan of action, or shall provide copies at a reasonable cost. Any revisions made to the plan of action, including any deficiency letters issued by the Department under § 248.149(a), shall be submitted to the tenants and State or local government in the same manner as the original plan of action. The Department will not require copies of the plan of action to be given to every tenant, or require posting of the entire plan of action, since plans of action are generally quite lengthy and the interim rule provides sufficient opportunity for tenant access to the plan of action.

According to four commenters, tenants should have the right to inspect and copy all supporting documentation to the plan of action. The plan of action is intended to be a complete, self-contained document, containing all of the information necessary for the Department to make its determinations under this subpart. All supporting documentation is included in the plan of action itself and is available to the tenants in the manner provided under paragraph (c).

One commenter suggested that if an owner submits a plan of action to terminate the affordability restrictions, given the fact that the purpose of the statute is to restrict terminations, the contents of the plan should include more detailed documentation than that required under paragraph (d) of this section. The commenter did not specify what type of documentation should be required, but the Department believes that the information requested in this paragraph of the proposed rule is sufficient to enable HUD to determine whether or not the owner is eligible to prepay the mortgage or terminate the mortgage insurance contract pursuant to § 248.141. The same commenter also recommended that someone other than the owner, its staff, or consultant, such as a State or local government, submit the assessment, under

subparagraph (d)(4), of the effect the prepayment or termination will have on existing tenants. Section 228 of LIHPRHA requires the Department to confer with, and give consideration to, the views of any State or local government agency when making determinations under the statute. The Department recognizes that State and local governments are valuable sources of information concerning housing located in their jurisdictions and the Department encourages the submission of relevant data, as well as comments, regarding any plans of action submitted under this subpart. The Department fully intends to consult with these agencies prior to approving any plans of action to prepay the mortgage or terminate the mortgage insurance contract.

Subparagraph (e)(2) of this section requires an owner to submit in its plan of action package a description of the Federal incentives requested to address any physical deficiencies of the project. Three commenters expressed concern that the rehabilitation costs for the project should not be based on the costs determined in the appraisal process under § 248.111, but should be based on information contained in the plan of action and on current cost considerations. In response, the Department notes that the rehabilitation costs determined in the capital needs assessment utilized in the appraisals, while intended to be a fair assessment of rehabilitation costs, are for the purpose of calculating preservation rents and preservation equity, and not for the purpose of actually funding rehabilitation as part of a plan of action. The scope of the capital needs assessment may not always be sufficient to reveal the actual costs necessary to rehabilitate the project to conform with housing quality standards or to estimate the actual operating costs of the project after rehabilitation. The Department recognizes that these costs may be underestimated in the assessment or the estimates may be outdated by the time of plan of action approval. For these reasons, the initial determination made in the appraisals will be an initial basis for estimating rehabilitation needs and costs, but will not be binding for purposes of funding rehabilitation and supporting operating expenses under a plan of action.

Nine commenters questioned the requirement in subparagraph (e)(5) of this section, that an owner submit as part of the plan of action an income profile of the tenants as of January 1, 1987 and as of the date of filing of the plan of action. The reason for this submission is to fulfill the statutory directive of section 222(a)(2)(F)(i) which authorizes the Department to approve plans of action extending affordability restrictions only if the project maintains the same proportions of very low, low and moderate income families or persons as resided in the project as of January 1, 1987 or as of the date of plan of action approval, whichever date results in the highest proportion of very low income families. As these commenters pointed out, however, the Department only requires that income profiles be retained by owners for a period of three years, so it is very likely that many owners have disposed of the January 1, 1987 profile, making it impossible for them to submit this information as part of the plan of action. It is impossible for the Department to reconstruct the missing income profiles since HUD does not keep data on all tenants.

One commenter suggested that to remedy this problem, for those projects where an income profile for January 1, 1987 is unavailable, HUD should set the proportion of very low income tenants, as of that date, at fifty percent. Another commenter suggested assuming a one hundred percent very low income tenancy. The Department believes, however, that the implementation of these suggestions would be contrary to the intent of the statute. Instead, where an owner certifies that the January 1, 1987 tenant income profile is unavailable, the Department will require that the owner submit an income profile for January 1, 1988, and if that is unavailable, for January 1, 1989. The affordability restrictions will then be maintained on the project in the same proportions of very low, low and moderate income tenants as resided in the project as of the date the plan of action is approved or the date of the earlier profile, whichever has the greatest number of very low income tenants. In order to minimize the need for this policy, the Department will include a directive in its administrative guidance requiring owners who still possess the January 1, 1987, the January 1, 1988 or the January 1, 1989 profiles to retain them for purposes of submitting a plan of action.

The Department received one comment encouraging HUD to examine whether or not project management caused distortion of the tenant income profiles by engaging in illegal tenant selection practices. The Department's position is that this type of review is not germane to the preservation process and HUD presumes that its customary management reviews will reveal any irregularities on the part of project management. In response to another comment, the Department is unable to internally examine the authenticity of an owner's submissions under this section since HUD does not have the necessary data for comparison. However, pursuant to the statute's directive in section 228, the

Department will consider any data submitted by State or local governments which supports or conflicts with the owner's submissions.

For purposes of maximizing the number of eligible low income housing units which are preserved for the use of very low income families and persons, four commenters suggested that any units which were vacant on January 1, 1987 and on the date of submission of the plan of action should be deemed very low income units. The Department has decided to adhere to its practice in implementing ELIHPA of allocating vacant units in proportion to the share of very low, low and moderate income tenants residing in the occupied units as of the date of the profile. In filling these vacancies, owners must rent the units in a manner that will maintain the tenant income profile for the remaining useful life of the project. This method of filling vacancies represents a deviation from the Department's usual policy governing tenant selection for units receiving section 8 assistance, because under this subpart a vacated section 8 unit may not be filled with a section 8 recipient if it is necessary to place a tenant who is ineligible for section 8 assistance in the unit in order to maintain the project's proportionality.

One commenter noted that section 222(a)(2)(F)(i) tracks the language in ELIHPA, requiring that the profile used with the plan of action be the one which has the highest proportion of very low income tenants. The commenter argues that the apparent purpose for this requirement under ELIHPA is to maximize the amount of section 8 assistance provided to the owner under a plan of action. However, under LIHPRHA, the Department is authorized to provide section 8 assistance to low income tenants as well as very low income residents. In some circumstances, this may result in less section 8 assistance being provided to a particular project than would be the case if the profile with a higher number of low income tenants is used. The commenter claims that Congress overlooked this result in drafting the statute. However, this outcome may indicate that the purpose of choosing the profile with the most very low income tenants is not to maximize section 8 assistance, but to preserve the greatest number of units for the tenants with the lowest incomes, i.e., those who are most in need. Regardless of congressional intent, the statute is clear that the profile to be used in the plan of action is the one with the highest proportion of very low income tenants and the Department perceives no justification for deviating from this standard.

As part of the plan of action submission under paragraph (e), one commenter suggested that a nonprofit or resident council purchaser should certify that it has retained an experienced management agent who has successfully managed low and moderate income housing, is familiar with HUD procedures and has the capacity to manage the rehabilitation, marketing and relocation contemplated under this subpart. The Department has determined that it is not necessary to include this requirement in the regulation since the regulatory agreement which a nonprofit or resident council purchaser will be required to execute as part of the transfer already states that any management agent must be acceptable to the Department.

Paragraph (h) of this section has been amended in response to two comments recommending that the State or local government be notified of the approval of a plan of action. The Department will notify the appropriate agency at the same time, and in the same manner, that it notifies the tenants of such approval.

*Section 248.141 (Criteria for Approval of a Plan of Action Involving Prepayment or Voluntary Termination)*

This section requires the Department to decide whether prepayment of the mortgage or termination of the mortgage insurance contract would create hardship for current tenants, whether other affordable housing is readily available, and whether the general supply of low income housing will be materially affected by such prepayment or termination. One commenter requested guidance as to how the Department would make these determinations. The written findings which this section mandates are identical to the findings the Department must make in § 248.221, pursuant to subpart C, and the Department will use the same methods and procedures in both subparts. HUD's administrative guidelines will elaborate upon the regulatory criterion.

Pursuant to this section, the Department may have to determine whether there is comparable, affordable housing for

tenants who may be displaced if a plan of action is approved. If an owner agrees to comply with the requirements of section 218(a)(1)(A), including the maintenance of rent restrictions and continued occupancy for current tenants, then the Department does not have to make this finding. One commenter stated that when determining whether housing is "comparable," the Department should take into consideration the special needs of the tenants, such as elderly residents, and include as comparable housing only those projects which can meet the tenants' needs and are suitable to the tenants' particular situation. The Department acknowledges that, for purposes of this section, "comparable" means more than just affordable. When determining whether there is adequate, comparable housing, under paragraph (a) of this section, the Department will take into consideration the requirements of special needs tenants, as that term is defined in § 248.101, who reside in the affected project. Housing will be deemed comparable only if the Department determines it to be suitable for those tenants who would be displaced if a plan of action involving prepayment or termination is approved.

The Department's position in the proposed rule, that tenants of projects for which the mortgage is prepaid or the insurance terminated under this section are not entitled to the tenant protections set forth in § 248.165, was contested by three commenters. As the Department explained in the preamble to the proposed rule, once the Department makes the findings required under this section, an owner is permitted to terminate the affordability restrictions on the project and further compliance with this subpart by the owner is not required. The Department's approval of a plan of action under this section signifies that the owner has demonstrated that its prepayment or termination will not create a significant hardship on current tenants; that there is a sufficient supply of readily available comparable housing; that low income families will be able to find affordable, decent, safe and sanitary housing near employment opportunities; and that housing opportunities for minorities in the community will not be adversely affected by the prepayment or termination. Approval of the plan implies that the protections provided for displaced tenants under § 248.165 are not necessary for the tenants residing in the affected project.

It should be noted that income eligible tenants residing in a project which is the subject of a prepayment or termination may receive section 8 certificates or vouchers to enable them to continue residing in the project or to relocate to other suitable housing. If these tenants are displaced, they have priority for receiving section 8 assistance pursuant to § 886.132 of this title.

If necessary to protect current tenants, the Department will require the execution by the owner of a use agreement, containing restrictions enabling current tenants to continue living at the project at rents set forth in section 218(a)(1)(A). This use agreement is enforceable by the tenants, as well as by the Department. While local governments and fair housing groups would not have standing to enforce the use agreement, they may bring violations of the agreement to the attention of the Department. A suggestion was received from one commenter that HUD should perform audits regularly and provide tenants, local fair housing groups and the local government with the right to notice and comment on the audit process in order to enforce such use restrictions. No scheduled audits will be performed to enforce the use restrictions on projects for which the mortgage is prepaid or the insurance terminated.

A commenter suggested that HUD work closely with, and obtain data from, local governments, where HUD is considering permitting an owner to terminate the affordability restrictions on the project. Another commenter stated that data received from an owner should be verified as to its accuracy and it should be determined whether the owner's submission is consistent with the community's perception of its needs. As noted in the previous section, the owner will provide the State or local government with a copy of the plan of action and the Department will provide the appropriate reviewing agency with a copy. These entities will then have sixty days in which to submit comments and any additional data to the Department for consideration. Also, the Department will confer with State and local government agencies, in accordance with section 228 of LIHPRHA, prior to making any determinations under this section.

A commenter claimed that the Department has no statutory basis for conditioning approval of a plan of action, under this section or § 248.145, on the absence of open findings of noncompliance with title VI of the Civil Rights Act of 1964, the Fair Housing Act, Executive Order 11063, the Age Discrimination Act of 1975, section 504 of the Rehabilitation Act of 1973 and all regulations promulgated under these statutes. While there is no explicit authority in