LIHPRHA permitting the Department to deny approval of a plan of action if an owner is found to be in noncompliance with any of the foregoing statutes, this requirement is consistent with the Department's obligations under the authorities cited above to affirmatively further fair housing. Furthermore, the Department cannot approve a plan of action permitting prepayment of the mortgage or termination of the mortgage insurance contract unless it finds that such prepayment or termination will not adversely affect the housing opportunities of minorities. An owner's failure to comply with the civil riqhts legislation listed above may support an inference that the prepayment or termination will produce a negative impact on minorities.

It should be noted owners of eligible low income housing must continue to comply with the Fair Housing Act and implementing regulations regardless of whether or not they prepay the mortgage or terminate the mortgage insurance contract on the project.

*Section 248.145 (Criteria for Approval of a Plan of Action Involving Incentives)*

Section 222(e) of LIHPRHA directs the Department, if feasible, to provide incentives only to owners of projects in those rental markets where there is an inadequate supply of decent, affordable housing, in order to prevent owners from receiving "windfall profits." The Department submitted a report to Congress on April 4, 1991 containing its findings and concluding that a windfall profits test is feasible. The Department intends to implement the windfall profits test in a separate issuance which will be published for notice and comment. In response to the proposed rule, the Department received forty-three comments concerning windfall profits and these comments have been given full consideration in developing the windfall profits test.

A commenter suggested that the Department abandon the "fair market rent" standard set forth in subparagraph (a)(5) and instead require that tenants pay the lesser of 30% of adjusted income or the preservation rent. The statute at section 222(a)(2)(D) explicitly requires that current tenants not pay more than 30% of their adjusted income or the published existing fair market rent. Additionally, the statute provides in section 214(b) that preservation rents are aggregate rents, not unit rents, and are used solely for the purpose of comparison with the Federal cost limit, implying that Congress did not intend the preservation rents to be the actual rents paid by the tenants. At the time of plan of action approval, the Department will determine the actual rents needed to support operating expenses, adequate reserves and rehabilitation needs.

The Department received eighteen comments concerning the phasing-in of rents for current tenants under subparagraph (a)(6) of this section. The most frequent responses were that the phase-in period should be extended, and that rent increases in any given year should be capped.

The proposed rule tracks the statutory language of section 222(a)(2)(E), which provides that rent increases of 10 to 30% will be phased in at not more than 10% per year and rent increases of more than 30% will be phased in equally over not less than three years. The statute clearly defines the parameters for the rent phase-in, providing the Department with no discretion to limit annual increases to 5% or 8%, or 10% in the case of very low income tenants, or 15% for increases greater than 30%, as commenters suggested. The statute places a cap of 10% on yearly increases if the total rent increase does not exceed 30%, but implicitly contemplates that if the total rent increase is greater than 30%, tenants may be faced with an annual increase of more than 10%. In order to decrease the burden on the tenants, an owner or purchaser may agree to phase in a rent increase over a period of more than three years, at its option. The Department also notes, in response to another comment, that all current tenants, including those of moderate income, will be subject to the phase-in provisions of this section.

Seven comments were received regarding subparagraph (a)(7) of this section, which authorizes the Department to provide section 8 assistance, if available, to current very low and low income tenants not already receiving section 8 assistance, who otherwise may experience adverse effects due to the implementation of a plan of action. To carry out this section, the Department will execute a section 8 housing assistance payments contract providing subsidy sufficient

to cover the number of very low and low income tenants residing in the project at the time of plan of action approval or at the time of the tenant income profile submitted under § 248.135(e)(5), whichever is higher. If the number of very low income tenants was higher at the time of the earlier profile, then the owner will be required to replace low and moderate income tenants who move out with very low income tenants. There is no need to reserve additional section 8 certificates, as one commenter suggested, since the assistance provided under this section is project-based.

Two commenters stated that there is no justification for restricting section 8 assistance to the amount established at the time of plan of action approval and that owners who wish to rent to additional very low and low income tenants should be entitled to a proportionate increase in section 8 assistance. Section 222(a)(2)(E)(ii) directs that section 8 assistance be provided to current tenants. At the time the plan of action is approved, if section 8 assistance is needed and is available, the Department will execute a housing assistance payments contract for the provision of this assistance. If a section 8 contract already exists, but is inadequate to meet the project's needs, the Department will also amend this contract in order to implement the plan of action. The statute does not obligate the Department to provide additional section 8 assistance to future very low and low income tenants. Future very low or low income tenants not covered by the new or amended section 8 housing assistance payments contract may apply for section 8 certificates or vouchers to subsidize its rent payments.

A commenter suggested that section 8 assistance should be provided to subsidize all of the units in a project in order to ensure sufficient rental income to support all acquisition costs. The statute only authorizes the Department to provide section 8 assistance to very low and low income tenants; therefore units occupied by moderate income and market-rate tenants will not be eligible for this assistance. However, the Department can provide section 8 assistance in excess of the section 8 existing fair market rent, as long as the total rent stream for the project does not exceed the Federal cost limit. If the rental income is still inadequate to pay for acquisition costs, the Department may provide grants to priority purchasers under § 248.157 and to qualified purchasers under § 248.161. The Department expects that the section 8 assistance provided to very low and low income tenants, along with the rents paid by moderate income and market rate tenants, will be sufficient to support the costs of the entire project since, for eligible low income housing, on average, an estimated 93% of the tenants currently residing in eligible low income housing are eligible for project-based section 8 assistance pursuant to this section.

Paragraph (a)(8) of the proposed rule permits the Department to approve rent levels for future tenants, including moderate income tenants. One commenter objected to providing future tenants with the same protections given to current tenants, claiming that this would make the project financially infeasible. Section 612 of the National Affordable Housing Act restricts the rents which can be charged to moderate income and market-rate tenants, capping rents at 30% of the adjusted income or the section 8 fair market rent, whichever is lower. This restriction applies to projects insured or assisted under section 236 and section 221(d)(3) of the National Housing Act, and, while independent of the preservation program, also applies to moderate income and market-rate tenants of eligible low income housing, which is financed by section 221 or section 236. Thus, the rent caps established by HUD for future tenants are consistent with section 612.

Section 222(a)(2)(G) of LIHPRHA requires that future rent adjustments for projects receiving incentives under a plan of action be made by applying an annual factor, to be determined by the Secretary, to the portion of rent attributable to operating expenses for the project. The Department received seventeen comments concerning the implementation of the annual adjustment factor under paragraph (a)(9) of this section. Four commenters merely requested further guidance, while others suggested specific methodology for determining the factor. The annual adjustment factor and the methodology for determining the factor will be issued by the Department as a separate administrative guidance.

The Department has decided to rely on the Consumer Price Index-Urban ("CPI-U") data collected by the Bureau of Labor Statistics, United States Department of Labor, to implement the annual adjustment factor method of adjusting the operating cost component of rents. These data are available on a reasonably current basis for the four census regions and for 74 metropolitan areas and the State of Hawaii, covering about two-thirds of the nation's population. Both national

data for the four census regions and metropolitan data are usually available within three months of the most recent survey period. The national sample for the four census regions is done on a monthly basis, and the metropolitan samples are done every three or four months. Regional factors will be used only if a project is not covered by one of the 74 CPI local data areas.

This approach provides for operating cost increases using factors that reflect changes in the underlying components of operating costs. The two major components of operating costs are utility and non-utility costs. These components are available on both regional and metropolitan levels. Non-utility costs include administrative expenses, operating and maintenance expenses, and taxes and insurance. The non-utility operating cost increase will be set equal to the overall change in the cost of all goods and services during the past year, as measured by the CPI-U "All Items" factor for the region or metropolitan area, less the weight for the utility change component for the area. The utility change component will be based on changes in the residential energy cost CPI-U factor for the region or metropolitan area (i.e., the CPI-U "Housing, Fuel and Other Utilities" factor). Both the utility and non-utility factors will be separately applied to the project's utility and non-utility operating cost components. Consumer Price Index data may be found in the "CPI Detailed Report(s)" published by the Bureau of Labor Statistics, U.S. Department of Labor.

In order to take extraordinary operating expenses into account, the Department has provided for an appeals mechanism. Appeals may be made by owners for the utility or non-utility change factors provided. Owners wishing to appeal must submit their entire project budgets to the Department for review. Documentation showing that a single component of operating expenses, such as insurance or taxes, increased faster than the CPI non-utility factor would not, of itself, be considered a basis for approving a higher annual adjustment factor. The Department will grant an owner a higher factor only if the total amount of all actual costs and expenses of the project exceed the aggregate change provided by the CPI-Urban factors.

A commenter stated that until HUD develops an annual adjustment system, it should use a property-specific budget-based rent increase. The Department will have in place an annual adjustment factor system by the time that it is needed for the first plans of action approved under LIHPRHA, so there is no need for any interim budget-based system for rent increases.

Three commenters were concerned that the regulation did not contain a mechanism for determining rent increases for purchasers. The annual adjustment factor will apply to purchasers as well as to owners extending the use of eligible low income housing.

Two commenters asked that HUD develop a project-based cost approach for making operating cost annual adjustment factors to section 8 rents. The Department declines to use such an approach, except on an appeals basis, since it has no authority to do so under LIHPRHA.

The Department received three comments stating that HUD should publish the methodology utilized in determining the rent adjustment factor so that underwriters can adjust their underwriting procedures. The commenters recommended that this method should be flexible and responsive to changing circumstances. The determination of the rent adjustment factor is flexible since it provides an owner with an appeals process based on a project budget review if it believes it has incurred extraordinary expenses. Three other commenters indicated their preference for budget-based operating expense increases. The Department can only respond, however, that the combination of the statutorily required annual adjustment factor and the opportunity for budget-based appeals will fairly address all their concerns.

A commenter suggested that the annual adjustment factor for rents should be based on the current section 8 annual adjustment factor. The Department rejects this suggestion because section 8 annual adjustment factors reflect changes in the rental market supply and demand conditions, and have no necessary relationship to changes in operating costs. For instance, in a depressed market, operating costs often continue to increase even though rents are stable or decreasing.

The Department received one comment asking whether, if an annual adjustment factor is used, the rent increase

will be processed in the same manner as the existing section 8 special adjustments, i.e., only for taxes, utilities, and insurance. As discussed, the annual adjustment factor is applied to operating expenses as a whole.

Three commenters suggested that any annual adjustment factor also be applied to replacement reserve contributions. Replacement reserve contributions are not included as operating expenses and thus are not subject to the annual adjustment factor. Changes to replacement reserve contributions may be requested of the local HUD field office which will review the adequacy of the existing level of contribution.

Three commenters asked that the annual adjustment factor be determined for geographic regions. As described above, the Department has decided to use data for the adjustment factor that is available on a fairly current basis for the four census regions and for 72 metropolitan areas that cover about two-thirds of the nation's population. Another commenter suggested that in developing an annual adjustment factor, HUD should allow each area office to modify the factor to reflect unusual operating costs in a particular geographic region. The Department has decided to handle geographic variations with the consistently available CPI data described earlier. Again, an owner who has experienced unusual operating costs may use the appeals process that the Department has created for this purpose.

Five commenters requested clarification of paragraph (a)(10) of this section, which permits any savings from reductions in operating expenses due to management efficiencies to be deposited in the project's reserve for replacements account, and then distributed to the owner with HUD approval. The commenters wondered how savings from reductions in operating expenses would be calculated. The Department believes that this provision, set forth in section 222(a)(2)(H) of LIHPRHA, is a remnant from an earlier version of the statute, which provided for budget-based rent increases. With the budget method, it would be simple to determine reductions in operating expenses and decide how much of the reduction was due to management efficiencies. However, the use of an annual adjustment factor to increase operating expenses, makes it difficult to determine what portion of any savings are due to management efficiencies. For this reason, the Department will not make the determination required under this section and will seek a technical amendment of this section of the statute. Such savings instead will go into the residual receipts account.

One commenter objected to, and one commenter approved of, the requirement that in order for the Department to approve a plan of action for a project, there must be no open findings of noncompliance with the fair housing and civil rights legislation and regulations listed in paragraph (a)(12). The Department has retained this requirement, for the reasons noted in the previous section, discussing § 248.141. The Department reiterates that owners of eligible low income housing must continue to comply with the civil rights legislation and regulations listed in this paragraph of the interim rule after approval of a plan of action.

One commenter stated that the proposed rule did not make it clear under what circumstances a prepayment or termination could occur in connection with a plan of action for incentives and recommended that paragraph (c), which refers to prepayments and terminations, be deleted. Pursuant to section 211(a) of LIHPRHA, an owner of eligible low income housing may prepay its mortgage or terminate the mortgage insurance contract only in accordance with a plan of action which has been approved by the Department. When the Department approves a plan of action for incentives, it does not prohibit mortgage prepayment or insurance termination, but in exchange for providing incentives, places restrictions on the use of the property in the event of prepayment or termination. This is the purpose of the agreements referred to in paragraph (c) of this section, which are executed at the time of approval of the plan of action. If an owner prepays or terminates after a plan of action for incentives has been approved, the regulatory agreement on the project will no longer be effective, but a use agreement, containing the affordability restrictions approved in the plan of action as well as other tenant protections, will continue to bind the project for its remaining useful life. Although prepayment occurs, the project will still be preserved for low income use, in accordance with the purpose of LIHPRHA.

A commenter requested that paragraph (d) permit State or local governments, as well as owners, to appeal a determination of remaining useful life. Section 222(c)(3) of LIHPRHA specifically provides for an owner's appeal of the Department's determination of the project's remaining useful life. However, the owner may not exercise this appeal right until fifty years after approval of the plan of action. Because an appeals mechanism is not needed at this time, the

Department will delay formulating such a system until a later date. At that time, HUD will consider extending this right to State and local governments.

*Section 248.147 (Housing Standards)*

A commenter suggested that this section, requiring an owner to "maintain the project in accordance with local codes or housing quality standards, whichever is stricter," is too permissive and that the owner must not merely agree to maintain the project, but must also demonstrate that the project is in compliance with the housing standards as a condition of receiving incentives. LIHPRHA assumes that a project will be in compliance with housing standards as part of the rehabilitation plan required for approval of a plan of action involving incentives. It is the intent of the Department to examine projects that are in violation of housing code standards at the time of plan of action review and to require owners to accept incentives such as a section 241 rehabilitation loan or a flexible subsidy capital improvements loan in order to cure these violations and secure approval of the plan of action. Pursuant to § 248.145(b), an owner who retains the project under this subpart may not receive any incentives or distributions, except those designed to correct the project's deficiencies, until the project is in accord with the housing quality standards. This should provide sufficient assurance that an owner will bring the project up to the standards required under this section. If the owner fails to do so, several sanctions are available. The owner's annual distribution can be denied or limited and the disbursements from an equity take-out loan can be withheld and used for repair of the project.

Two commenters wanted to allow tenants and State or local governments the opportunity to trigger sanctions against an owner if it fails to comply with the housing quality standards. The Department will receive complaints from tenants or governmental entities of building deficiencies and violations of building codes and will then impose sanctions where warranted.

The question of whether sanctions will be effective against nonprofit purchasers was raised by one commenter. Sanctions could trigger a default on the section 241(f) acquisition loan and on the original project mortgage. While discretion will be exercised, HUD will use whatever sanctions it considers appropriate to enforce the housing quality standards. HUD recognizes that its sanctions could trigger a loan default and cause a mortgage assignment, yet HUD would carry out such a sanction if it determined that this would be the only method for maintaining the quality of the property.

A suggestion was made by two commenters that tenants should be directly involved in the annual inspection and have input on the project's condition. In response to these comments, HUD has agreed to notify the tenant representative 30 days prior to the annual inspection, and in the absence of a tenant representative, HUD will require the owner to post a 30-day notice of the annual inspection, inviting tenants and their representatives to participate in the inspection with Departmental personnel and to submit comments regarding the physical condition of the project. Two commenters also recommended that local city code enforcement officials should be contacted to obtain the history of enforcement actions against the project and to cooperate in the enforcement of housing standards. State and local officials carry out their own project inspections and the Department believes that it is not necessary to formally obtain their input. HUD encourages local housing code officials, tenants and the tenant representatives to submit any comments concerning the past history and current physical condition of the project.

Two commenters recommended that potential purchasers be given the results of HUD's annual inspection, particularly if deficiencies are found. The annual inspection is performed by the Department after approval of the plan of action and after rehabilitation has been completed. Prospective purchasers are allowed, pursuant to § 248.157(f), to inspect the property after filing an expression of interest. Another commenter proposed that tenants be given up to 30 days to comment on the results of HUD's annual inspection. The Department intends to fully enforce housing quality standards and tenants are encouraged to submit complaints of deficiencies at any time, but a 30-day comment period would serve only to delay the Department's orders to make repairs. The results of an annual physical inspection are available to tenants and other interested parties through the submission of a Freedom of Information Act request.

One commenter asked for clarification as to the sanctions available to HUD if an owner fails to comply with the terms of the use agreement or the Plan of Action. The sanctions listed in § 248.147 pertain only to violations of housing standards. In cases where the requirements of the plan of action are imposed through the execution of a regulatory agreement or amendment of the existing regulatory agreement, the sanctions available to HUD are those stated in the regulatory agreement, i.e., chiefly, requesting the insured mortgagee to declare a default and accelerate the debt, foreclosure (in the case of a HUD-held mortgage), taking possession of the project, or injunctive or other judicial relief or remedies. If the plan of action's requirements are implemented through a use agreement, the primary method of enforcement would be judicial relief.

*Section 248.149 (Timetable for Approval of a Plan of Action)*

Six comments were received regarding the amount of time the Department has in which to approve a plan of action, once submitted. Two commenters suggested that the Department's deadline for approval be shortened to 90 days from 180. The 180-day period is derived from section 225 of the statute and is necessary to provide the Department with adequate processing time. This time frame allows 60 days for HUD to review the plan and notify the owner of any deficiencies, 60 days for the owner to respond, and another 60 days for HUD to review any revisions.

Another commenter requested that the processing clock be interrupted during any period where the owner has been asked to submit additional information or remedy deficiencies. The 180-day time limit applies only to the Department and is applicable in cases where the owner (and purchaser, in the case of a plan of action involving a transfer) have adequately addressed all issues related to the plan of action. If plan of action revisions are not received within that time frame, the statute does not require Departmental approval of the plan within this time frame.

The 180-day deadline does not apply to plans of action that are not approved because of deficiencies. One commenter suggests this should only be the case if there are material deficiencies. Section 225 of LIHPRHA, from which this provision of the rule is derived, does not distinguish between material and nonmaterial deficiencies, and thus the interim rule likewise makes no such distinction.

The rule provides that if the Department does not act within the time constraints of this section, the owner will receive incentives and assistance in an amount that the owner would have received if the Department had complied with the time limitations. One commenter questioned whether the owner will be permitted to accrue interest on the amount it would have received if the plan of action was approved in a timely manner. The Department will pay the owner retroactively for incentives delayed due to HUD's failure to meet processing deadlines, but will not pay interest on any late payment of incentives.

Another commenter recommended that the rule be changed so that State or local governments receive all deficiency letters from the Department regarding plans of action. This change is not necessary because any revisions submitted by the owner to the Department must also be submitted to the State or local agency. As part of the requirement that owners give plans of action to State or local agencies, owners are also responsible for keeping those agencies informed about any changes or revisions to those plans.

*Section 248.153 (Incentives to Extend Low Income Use)*

The Department received eleven comments concerning the provision of incentives to retain the affordability restrictions on eligible low income housing. A commenter recommended that paragraph (b)(1) of this section be amended to authorize release of all residual receipts as of the plan of action approval date. The commenter stated that the release of residual receipts should be automatic and should be in addition to the annual authorized return because residual receipts belong to the owner and the owner paid taxes on this money. The Department declines to make the release of residual receipts automatic since it does not have the authority to do so under LIHPRHA. Section 219(a) of

the statute only authorizes the Department to provide incentives necessary "to enable the owner to receive the annual authorized return for the housing determined under section 214(a), pay debt service on the federally-assisted mortgage covering the housing, pay debt service on any loan for rehabilitation of the housing, and meet project operating expenses and establish adequate reserves." Thus, the owner can access the residual receipts account only when it has unpaid distributions accruing prior to implementation of the plan of action, or to realize the 8% annual authorized return under the plan of action.

A commenter also suggested that the regulations should authorize release of land owned by the owner and currently included as security under the mortgage, if such land is not an integral part of the housing. The Department will consider allowing a partial release of security on a case- by-case basis as part of the plan of action in accordance with the administrative requirements applicable to FHA programs generally. Partial releases of security require mortgagee consent. Owners are advised to request the release at the time of their first notice of intent so that appraisers can be instructed to make separate value determinations. If a partial release of security is requested after this point, the owner would be required to obtain another appraisal and to pay for HUD's new appraisal and any third appraisal, if necessary.

A commenter recommended that sufficient section 8 assistance should be provided to cover all the units occupied by tenants with income at or below 80% of the area median income. The Department reaffirms that it intends to provide section 8 assistance to all current low and very- low income tenants. Additional assistance may also be reserved based on the tenant income profile required in § 248.135(e).

A commenter stated that the Department should accept rehabilitation, equity and acquisition financing from any source, public or private, without necessarily using section 241 mortgage insurance. The Department's position is that the plan of action may include an uninsured rehabilitation loan provided that the terms of the loan, including monitoring of rehabilitation, and default acceleration and foreclosure provisions are acceptable to the Department.

A commenter asked about the impact to the debt service on the section 236 mortgage if the interest reduction payment is redirected to the second mortgage. The Department has determined that redirection of the interest reduction payment ("IRP") will have no effect on the project's total debt service. Instead, the IRP will be redirected to service the debt on the second mortgage and the first loan will be fully serviced from project rental income. Two commenters also pointed out that a redirection of the section 236 interest reduction payment has no effect as an incentive. The Department agrees but will still allow the redirection to be requested as part of the plan of action since it is authorized by statute as an incentive. Mortgagee consent would also be required in this case.

A commenter asked how the owner is guaranteed the income reflected in the section 236 basic rents if the rents of moderate income residents are limited to the lower of 30% of the adjusted gross income or the section 8 existing FMR. The Department has determined that section 8 contract rents may go over 120% of the FMR as long as the gross potential income for the project does not exceed the Federal cost limit. Where necessary, section 8 rents in effect will subsidize market rents in order to ensure that the project remains affordable and that the owner has enough income to operate the project and receive an adequate return on preservation equity. If the rent stream in the future were to fall short of the amount needed to provide the owner with an 8 percent return, access to residual receipts could be provided or the shortfall accrued for distribution in a future year.

*Section 248.157 (Voluntary Sale for Projects Not Exceeding the Federal Cost Limit)*

The Department received 397 comments concerning this section of the proposed rule. The majority of the comments focused on three major issues: The ranking of priority purchasers, the twelve-month priority purchaser marketing period, and the level and timing of the earnest money deposit.

The Department received 86 comments concerning the earnest money deposit which must be submitted by qualified purchasers as part of a bona fide offer to purchase eligible low income housing pursuant to this subpart. The

issues raised by the commenters concerned the amount of the earnest money deposit, specifically whether it would be feasible for priority purchasers to raise the money; the timing of the deposit, along with the concern that the funds could be tied up for a year; and the waiver of the deposit by an owner or the Department. The proposed rule, in paragraph (g) of this section, requires that a bona fide offer include an earnest money deposit equal to one percent of the transfer preservation value of the project. While the statute does not expressly require such a deposit, the Department believes that an earnest money deposit is a reasonable means of ensuring that a purchaser is making a good faith offer. The purpose of the earnest money deposit is not to decrease an owner's risk or to ensure that a purchaser has the financial capacity to complete the transfer, as two commenters suggested, but to prevent sham offers which could result in an owner prepaying the mortgage or terminating the insurance contract in contravention of the purposes of this subpart. One commenter suggested that a more appropriate requirement for preventing sham offers would be to require HUD review of corporate documents, the history of the organization, and previous HUD participation information. The Department intends to review a purchaser's corporate documents when an expression of interest is submitted and will look at its previous participation information when approving a plan of action. However, the Department believes that an earnest money deposit is necessary at the time of submission of a bona fide offer in order to deter sham offers and to fulfill the requirements of LIHPRHA. Therefore, the Department has retained the concept of an earnest money deposit with the following modifications made in response to public comments.

Commenters suggested a range of alternatives to the amount of the earnest money deposit established in the proposed rule. All of the commenters who raised a concern as to the amount of the deposit, except for two, claimed that the proposed amount was excessive. Commenters protested that many priority purchasers would not be able to raise the predevelopment funds for the deposit, and that the deposit would limit the participation of many nonprofit organizations in the preservation program. In order to mitigate these effects, commenters suggested that the earnest money deposit be eliminated, or decreased to anywhere from $100 per unit, to $50,000 per project. Many commenters suggested a range for the deposit, such as the lesser of $400 per unit or $40,000 for the project.

The Department acknowledges that a large earnest money deposit may be prohibitive to many priority purchasers. In response to the reactions of the commenters, the Department has amended paragraph (g)(1)(ii) of this section to require an earnest money deposit equal to the lesser of one percent of the transfer preservation value of the project, $50,000, or $500 per unit. Resident councils intending to purchase a project pursuant to a resident homeownership plan under § 248.173 or § 248.175 must submit an earnest money deposit equal to $200 per unit for 75% of the occupied units. The rational for the lower amount of the deposit under a resident homeownership plan is that the purpose of the earnest money deposit is different. It is not to deter sham offers, but to ensure sufficient tenant support to make the homeownership plan successful. Paragraph (f) of the proposed rule, which lists the information the Department must provide to a purchaser who has submitted an expression of interest, has also been amended to include a worksheet which will indicate the level of the earnest money deposit required of the purchaser.

One commenter questioned what source could be used to raise the earnest money deposit. The statute and the proposed rule are both silent on this matter. The Department is not authorized to provide funds to a purchaser except in connection with an approved plan of action. The Department defers to the purchaser to choose the source of the deposit, whether from the purchaser's own funds, loans or grants. With regard to resident councils who intend to purchase the project under a homeownership plan under § 248.173 or § 248.175, the earnest money could come from a pledge of the tenants' security deposits as long as this pledge would not violate any State or local laws and the owner has given its agreement to the pledge.

The earnest money deposit may not, in any transfer under this subpart, be provided by the owner, or by any entity affiliated with the owner. However, an owner may waive the requirement of an earnest money deposit or decrease the amount of the deposit. Paragraph (g)(2) has been amended to provide for this waiver or decrease. In order to waive or lower the deposit, an owner must state in its second notice of intent, submitted under § 248.133, that it intends to waive or accept a lower earnest money deposit, and that the waiver or decrease will apply to all qualified purchasers. If an owner fails to declare its intent to waive or decrease the deposit in the second notice of intent, the deposit may be waived or decreased during the time the project is held out for sale through written notice to the Secretary. The

Secretary will then notify all purchasers which have submitted an expression of interest of the owner's decision to waive the deposit or accept a lower deposit. A waiver of or decrease in the earnest money deposit applies to all qualified purchasers who submit a bona fide offer for a particular project, except for resident councils who intend to purchase the project under a homeownership plan pursuant to § 248.173 or § 248.175. Resident councils will still be required to provide an earnest money deposit, despite an owner's waiver or decrease, because, in the case of resident homeownership, the purpose of the deposit is to ensure sufficient tenant support to make such an undertaking successful, not to avoid sham offers.

With regard to the timing of the deposit, comments ranged from suggesting that the deposit be tied to site control to requiring that the deposit be due 45 days after HUD approval of the bona fide offer. The Department concedes that there is a concern among purchasers that under the proposed rule the earnest money could be tied up for a year without acceptance of the offer, making it difficult for purchasers to obtain predevelopment funding and preventing purchasers from putting the money to use elsewhere. In response to public comments, the Department, while still requiring the earnest money deposit at the time a bona fide offer is submitted, has amended paragraph (h) of this section to require an owner to accept or reject a bona fide offer, which has been made during the appropriate purchase period, within 30 days from the receipt of the offer. If the owner rejects an offer, the earnest money deposit must be returned to the purchaser; however, the offer will still be deemed a bona fide offer which an owner may later accept. If the owner accepts an offer at a later date, after first rejecting it and returning the earnest money deposit, the purchaser, if still interested in buying the project, must redeposit the earnest money within 30 days from receipt of the owner's acceptance of the offer.

Five commenters stated that while an earnest money deposit is held by an owner, it should be deposited in a HUD-supervised escrow account, earning interest to the benefit of the purchaser. The Department will defer to State and local law on this issue. The earnest money deposit must be held in accordance with the laws of the jurisdiction in which the project is located.

The Department received 89 comments concerning the ranking of priority purchasers under paragraph (h) of this section. Twenty-nine of these comments suggested abolishing any type of ranking among priority purchasers, while 60 comments expressed agreement with the concept, but suggested expanding the first priority beyond resident councils who intend to purchase the project pursuant to a homeownership plan under § 248.173 or § 248.175. Commenters claimed that expanding the ranking system would acknowledge tenant preferences for rental housing and would permit nonprofit organizations with experience in owning and operating low income housing more opportunity for purchasing projects under this subpart. Commenters wishing expansion of the ranking system suggested that first priority be given to any resident council, regardless of the type of ownership it seeks, to community-based nonprofit organizations, or at least those community-based nonprofits with tenant- endorsement, or to any priority purchaser with tenant endorsement.

The Department acknowledges that resident homeownership will account for only a small portion of all preservation plans of action for eligible low income housing. In most cases the projects will remain as low income housing and in this situation tenants may support a tenants association or a community-based nonprofit organization to own and manage the project. In order to accommodate these preferences and to provide community-based nonprofit organizations with the maximum opportunity to purchase eligible low income housing, the Department has decided to expand the groups who are eligible to purchase a project during the first priority purchaser marketing period to include resident councils purchasing a project as rental housing and community-based nonprofit organizations with tenant endorsement.

In order for a community-based nonprofit organization or a resident council intending to purchase a project and maintain it as rental housing to be among the first of priority purchasers, the organization or council must demonstrate that it has the support of a majority of the tenants of the project. This support can be demonstrated by a resolution of the resident council or by a petition signed by tenants representing a majority of the occupied units. A resident council intending to purchase the project under a resident homeownership plan must demonstrate that it has the tenant support required under § 248.173(c). The proposed ranking system in paragraph (h) has been omitted from the regulation, paragraph (c) has been amended to change the priorities during the lock-out period, and paragraph (g) has been

amended to require that evidence of tenant support be submitted as part of the bona fide offer, if the offer is made during the first priority purchaser marketing period.

The Department received 68 comments contesting the 12-month marketing period for resident councils under paragraph (h) of this section of the proposed rule. All of the commenters preferred a shorter marketing period; many advocated two, three or six month periods for priority purchasers, while others suggested permitting an owner to negotiate a sale at any time with any priority purchaser, giving tenants a right of first refusal, or allowing known priority purchasers to certify that they do not want to make an offer. The commenters expressed concern that owners may be reluctant to sell if they have to wait 12 months before accepting an offer and hence, may decide to retain the project instead. Also, there was a concern that purchasers may find it difficult to obtain funding and might be hesitant to invest time and resources in an offer which could be held for a year before acceptance or rejection. In recognition of these concerns, the Department has amended paragraph (c) to shorten the marketing period.

Beginning on the date of receipt of the second notice of intent, resident councils and community-based nonprofits, with the requisite tenant support, will have six months in which to make a bona fide offer without competition from any other priority or qualified purchasers. During this six-month period, an owner may accept a bona fide offer from a resident council or community-based nonprofit organization with tenant endorsement, within 30 days of receiving the offer. Any acceptance by an owner is conditioned on HUD's approval that the offer meets the requirements of a bona fide offer. From the end of this six-month period, until 12 months after receipt of the second notice of intent, any priority purchaser may submit a bona fide offer, and an owner may accept an offer from any priority purchaser it chooses, conditioned on HUD's determination that the offer is bona fide. Once the 12-month period has expired, all qualified purchasers will have the opportunity to submit bona fide offers during the next three months.

Twenty comments were received regarding the language in paragraph (a) of the proposed rule which states that an owner is not obligated to accept a bona fide offer under this section, but may elect to retain the project and request incentives. The commenters expressed concern that permitting an owner to change its mind about selling the project after receipt and acceptance of a bona fide offer would result in the loss of time and resources by priority purchasers who go to the trouble of obtaining tenant endorsement and raising an earnest money deposit. Some commenters suggested that to deter owners from changing their minds, there should be a penalty, such as a five year period from the date of rejection of an offer which was previously accepted, in which an owner may not submit another notice of intent or prepay the mortgage or terminate the mortgage insurance contract.

The Department recognizes the concern raised by potential purchasers with regard to this issue. However, section 220 of LIHPRHA imposes no obligation on an owner to accept a bona fide offer. LIHPRHA creates two separate types of sales transactions; those under section 220 for sales of property within the Federal cost limit, where an owner "may" accept a bona fide offer from a qualified purchaser, and those under section 221, where the property exceeds the Federal cost limit, and an owner must accept the first bona fide offer it receives at a price that is not less than the transfer preservation value. The establishment of this dichotomy illustrates Congress' intent that the provisions of section 220 be voluntary, as opposed to the mandatory provisions of section 221. To impose an obligation on an owner to accept a bona fide offer under this section would be contrary to standard real estate practice, where an owner may change its mind and take a property off the market, and in the absence of any indication to the contrary in the statute, the Department does not have the authority to create such an obligation. A purchaser whose bona fide offer has been accepted by an owner who later withdraws its acceptance may seek remedies under State and local law. Also, there are certain restrictions built into the statute and the regulation which should have the effect of deterring an owner from changing its mind once it has accepted a bona fide offer. For instance, if an owner changes its mind and fails to submit a plan of action within six months after receiving the information from the Department in § 248.131, the waiting period of § 248.135(h) applies, precluding the filing of another initial notice of intent for six months.

One commenter suggested, that in carrying out its responsibilities under paragraph (b) of this section, the Department solicit and maintain a list of priority purchasers who will be notified when purchasing opportunities are available. The Department intends to create such a list, including qualified, non-priority purchasers, in order to

streamline its informational duties under this paragraph, and requests that any potential purchasers who wish to be part of this list contact the local HUD office with their request.

One commenter contested that the three-month qualified purchaser period in paragraph (c) of this section is inadequate since it would not give priority purchasers who are unsuccessful in the priority purchaser period sufficient time to seek a partner and restructure a deal. The three-month period in paragraph (c) is derived from the statutory language of section 220(c), and hence cannot be modified by the Department. Also, the Department sees no reason why a bona fide offer by a priority purchaser would not be accepted, unless an owner accepts another offer or changes its mind about selling the project in which case, extending the three-month period would not benefit the failed purchaser. If an offer is not accepted because it is not bona fide, a purchaser may resubmit an acceptable contract of sale and earnest money deposit.

Three commenters stated that in cases where an owner receives more than one bona fide offer from priority purchasers, the owner should be required to accept the offer from the priority purchaser which has the highest ranking in paragraph (h) of the proposed rule, provided that the offer is at least 80% of the project's transfer preservation value. As previously noted, paragraph (h) has been amended to omit the ranking system contemplated in the proposed rule. If an owner receives more than one offer, it may choose which one it wishes to accept; the only requirement being that the offer is bona fide. Section 220 of the statute states that the purchase price of a project sold under that section may not exceed the preservation value of the project and paragraph (d) of this section repeats that language. The statute does not establish a minimum purchase price for the voluntary sale of a project under this section and, in the absence of any statutory direction, the Department has decided not to impose such a requirement.

The Department received two comments questioning whether community-based nonprofit organizations will be required to establish a separate nonprofit subsidiary to purchase a project under this section, as is required for projects constructed under section 202. Most eligible low income housing is covered by a regulatory agreement which requires an owner to be a single asset mortgagor. The Department, therefore, expects that separate subsidiaries will be established in order to meet this regulatory requirement. It is expected that State and local governments shall also establish separate mortgagor entities for the purpose of purchasing eligible low income housing. If a separate subsidiary is established or being established, the purchaser should notify HUD of this fact when submitting an expression of interest under paragraph (e) of this section.

One commenter requested that the State or local government be informed of all expressions of interest received by the Department, while another asked for notification at the time a bona fide offer is submitted. The State or local government will receive a copy of the second notice of intent submitted by the owner, and will be made aware at that time that the project is up for sale. A copy of the plan of action will also be submitted to the State or local government, which will then have a 60-day comment period. These requirements provide sufficient notice to these entities.

One commenter stated that in order to estimate the expenses involved in acquiring the project, the purchaser must have access to any expense analyses, operating income, and rehabilitation estimates for the project. This information shall be provided to any purchasers under paragraph (f) of this section who have submitted an expression of interest.

Eleven comments were received by the Department concerning the fact that a bona fide offer, as set forth in paragraph (g) of this section, must contain a contract of sale as well as an earnest money deposit. The primary concern was that priority purchasers may not have the sophistication and experience necessary to draft an acceptable contract, and this could lead to rejection of their offer. The commenters suggested that HUD prepare draft contracts of sale to be used by purchasers under this subpart. The Department will provide some guidance at to required or prohibited language for the contract in its administrative guidance, but sees no need to prescribe an entire model contract.

Paragraph (g) of this section of the proposed rule has been amended to explicitly state that a bona fide offer must be for a purchase price which does not exceed the transfer preservation value of the project. This limitation applies to voluntary sales under this section, as well as to mandatory sales under § 248.161. It is equally applicable regardless of

whether the transfer is financed solely through HUD assistance or through other sources.

Five commenters stated that an owner should have the sole responsibility of deciding whether an offer is bona fide, and HUD should not have to review each offer. The Department agrees that reviewing each offer is not necessary. Therefore, paragraph (i) has been amended to require HUD review only of the offer which is accepted by the owner, rather than of all of the offers which are submitted. Departmental review of the accepted offer is necessary to ensure compliance with the statutory requirement that a project can be sold only to a qualified purchaser which has made a bona fide offer. While HUD will not review all offers to ensure that they are bona fide, all offers which are received by an owner must still be submitted to the Department in case a review is required to ensure that an owner has not received any bona fide offers and thus, is entitled to prepay or terminate the insurance contract under § 248.169.

Another commenter stated that the contract of sale and earnest money deposit should be a minimum standard and that an owner should be entitled to conduct further investigation before determining that an offer is bona fide. Paragraph (h) has been amended to require an owner to accept or reject a bona fide offer within 30 days of receipt. During that 30-day period an owner may conduct any investigation it desires prior to accepting or rejecting the offer.

Paragraph (*l*) of this section permits an owner to prepay or voluntarily terminate the insurance contract if a sales transaction, for which a bona fide offer was accepted and approved by HUD, is not consummated within 90 days of approval of the plan of action and if the failure to complete the transaction was for reasons not attributable in whole or in part to the owner. One commenter stated that the proposed rule should be clarified to show that prepayment would not be allowed if a bona fide offer is made and rejected; if the purchaser is unable to complete the sale for reasons within the owner's control; or if HUD fails to act in a timely fashion. Under section 220 of the statute, an owner is not required to accept a bona fide offer. If it rejects all of the offers it receives, an owner may not prepay, but must continue the affordability restrictions in place and may submit a plan of action for incentives, if it can meet the time requirements of § 248.135(a), or file a new notice of intent under § 248.105 to receive incentives. If an owner attempts to sell the project under the mandatory sale provisions of § 248.161, it must accept the first bona fide offer it receives, in accordance with the priority purchaser marketing period established in this section. If an owner rejects any offers under § 248.161, it will not be permitted to prepay or terminate under this paragraph. Paragraph (*l*) clearly encompasses the commenter's second concern; if a purchaser cannot consummate a sales transaction, for which a bona fide offer has been accepted and approved by HUD, and the owner is to blame, the owner will not be permitted to prepay or terminate. If the Department does not meet the time requirements for providing assistance under an approved plan of action, an owner is eligible to prepay or terminate, pursuant to § 248.169. Sanctions are not imposed if the Department misses any other time constraints.

Three commenters contested the additional 60-day lock-in period set forth in paragraph (*l*)(2) of this section, which requires an owner, if a transfer falls through after the conclusion of the 15-month sales period, to contact those qualified purchasers whose bona fide offers were not accepted, to invite them to renew their offers and purchase the project. The commenters claimed that the statute does not provide any authority for this extension of the sales period. The Department acknowledges that there is no express authority in LIHPRHA for this requirement; however, the primary intent of the statute is to preserve eligible low income housing and this one-time window would fulfill the statute's intent without unduly restricting an owner's rights. If an offer is made and accepted during the 60-day period, the owner would be in the same position as if the first transaction had been consummated. If an offer is not made or accepted, an owner will be eligible to prepay only two months after it would have in the absence of this requirement. The Department believes that the benefit of this 60-day period, the purpose of which is in part to ensure that an owner does not accept an offer it knows will fail in order to thwart the purpose of the statute, far outweighs any cost.

One commenter suggested that the proposed rule be amended to provide that an owner would not be required to wait longer than 12 months before receiving incentives or opening the sale period to qualified purchasers and that an owner would not be required to wait more than 15 months before gaining the unencumbered right to prepay. Pursuant to section 220 of the statute, as long as an owner has not accepted a bona fide offer from a priority purchaser, the sales period for qualified purchasers will begin automatically 12 months after submission of the second notice intent.

However, an owner will not be guaranteed the receipt of incentives within this 12-month period or eligibility to prepay within 15 months. Section 224 of LIHPRHA, implemented in § 248.169 of the proposed rule, sets forth the period of time an owner must wait before being eligible to prepay due to the failure of HUD to provide the agreed upon incentives in a timely manner because of the failure of a sales transaction for which the owner was not to blame, or because no bona fide offers were received. These time constraints were established in the statute and the Department has no authority to override them.

Sixty-three comments were received by the Department concerning paragraph (m) of this section, which limits the Federal financial assistance provided to qualified purchasers to that needed to cover certain enumerated project costs. Two commenters stated that the assistance provided under this section should be the same for both priority and qualified purchasers. Three commenters stated that technical assistance funds should be available to all tenant groups, regardless of the form of ownership they choose. In addition to the assistance and incentives given to all qualified purchasers, priority purchasers may be reimbursed, under paragraph (m)(6), for transaction expenses incurred in acquiring the project, and may receive a grant under paragraph (o) of this section. Also, pursuant to paragraph (m)(7), those resident councils who are purchasing a project in accordance with a resident homeownership plan under § 248.173 or § 248.175 may receive financial assistance to cover the costs of training for the tenants, the resident council and for homeownership counseling. The additional assistance for priority purchasers and resident councils under the homeownership program is specifically authorized in section 220(d) of LIHPRHA. HUD cannot exceed its statutory authority by providing funding in excess of that designated in the statute for each type of purchaser.

Another commenter stated that the Federal assistance provided to a purchaser should be sufficient to cover the debt service on all of the federally-assisted mortgages on the project. This section of the rule has been amended accordingly.

Ten commenters were concerned that sufficient assistance be provided under paragraph (m)(4) to ensure that all project operating costs will be supported by the project's rental income. The commenters suggested that the organizational and overhead costs of ongoing ownership and operation, including management oversight, financial monitoring, inspections, budget preparation, and audit oversight should be expenses which will be paid out of project income. The Department will include as project operating expenses those reasonable expenses which are ordinarily covered in the program under which the project is insured.

One commenter stated that an owner should earn interest on reserve for replacement deposits. All reserve for replacement accounts may be invested and earn interest at the request of the owner to the mortgagee. Under Mortgagee Letter 83-24, mortgagees may not refuse such requests, provided the requested investment is eligible and the owner agrees to pay a reasonable fee to compensate the mortgagee for expenses.

The Department received 23 comments stating that priority purchasers should be entitled to a return on equity, pursuant to paragraph (m)(5). The definition of priority purchaser, in § 248.101, requires that the purchaser be a nonprofit organization. A nonprofit organization is not normally entitled to a return on its investment. However, the Department acknowledges that virtually all priority purchasers will be dependent on Federal assistance in order to consummate a transfer under this section and will need an acquisition loan under section 241(f). An acquisition loan may only cover 95% of the transfer preservation equity of the project, plus, in the case of priority purchasers, expenses associated with the acquisition, loan closing and implementation of the plan of action, and the remaining 5% must come from the purchaser's own funds or other financing sources. The Department recognizes that priority purchasers may need to borrow the 5%. Therefore, the Department will build into the rent stream a return on any actual cash investment by the purchaser and debt service on any gap financing. The extra income must be allocated towards debt service payments on the non-federal loan, and if there is no non-federal loan, or if the return exceeds the debt service on the loan, then the surplus cash must be deposited in the residual receipts account for the project. For priority purchasers, HUD may also provide a grant to cover the 5% equity requirement.

Sixteen commenters asked for more clarification as to what transaction costs will be reimbursed to priority purchasers under paragraph (m)(6). The Department will provide a one-time grant to priority purchasers on a

case-by-case basis in an amount not in excess of 5% of the project's transfer preservation equity. The purchaser should list those costs for which it is seeking reimbursement in the plan of action. At the time of plan of action approval, the Department will determine the amount of the grant. As noted in the preamble to the proposed rule, organizational costs incurred in establishing the nonprofit purchasing organization are reimbursable. Tenant training and education costs incurred by a priority purchaser which is not a resident council purchasing the project under a homeownership plan, may be reimbursed depending on the need for the training and the reasonableness of the costs. In response to one commenter's request, brokers fees are not a reimbursable expense. Seller financing will not be permitted to cover transaction costs.

Fifteen commenters stated that resident councils and other priority purchasers should be permitted to receive the assistance set forth in paragraphs (m)(6) and (7) to cover transaction, training, and counseling costs, on an up-front basis, rather than being reimbursed after the fact. These commenters asserted that resident councils and other priority purchasers require seed money for predevelopment costs to assist in the preparation of a bona fide offer and the plan of action and for tenant education. The Department recognizes the need for financial backing early in the prepayment process. However, statutory constraints prohibit the Department from expending funds prior to approval of a plan of action. Section 220(d)(2), from which paragraph (m) of this section is derived, authorizes the Department to provide assistance only for approvable plans of action. The same constraint exists for mandatory sales under section 221(d)(1). Therefore, the Department is not able to provide any of the assistance authorized under paragraph (m) prior to approving a plan of action. The plan of action should include the transaction and training expenses which the resident council or other priority purchaser incurred or will incur with regard to the transfer of the project. HUD will reimburse the purchaser for those expenses covered under this section at the time of the transfer.

Two commenters suggested that HUD have a specific technical assistance pool for resident groups who require such assistance and a standard set of curricula for training which will be covered under paragraph (m)(7). Resident councils purchasing under a resident homeownership plan must include in their plan a description of the scope of any training they intend to undertake. The council must work with a nonprofit organization, approved by HUD, to develop the tenants' capacity for homeownership. These requirements are stringent enough to ensure that any training program is acceptable to the Department, while leaving resident councils with sufficient flexibility to tailor any training program to their particular needs. For these reasons, the Department believes that it is unnecessary for it to establish training criteria or to preapprove trainers.

The Department received 11 comments concerning paragraph (n) of this section, which requires that the amount of any residual receipts transferred to the selling owner be deducted from the sale price of the project. This language is derived from section 220(d)(3) of the statute. As noted in the preamble to the proposed rule, this provision poses a problem since residual receipts are not included in the sale price of the project, which is capped at the project's transfer preservation value. Therefore, deducting the amount of the residual receipts from the sale price will result in owners realizing less than the full amount of the project's transfer preservation value. In the proposed rule, the Department specifically requested comments as to how this inconsistency should be dealt with. Two commenters expressed agreement with the statutory language; one commenter responded by suggesting that the purchaser buy the residual receipts from the owner; and eight commenters asserted that an owner should be permitted to receive the full transfer preservation value of the project and suggested that residual receipts be added to transfer preservation value in the appraisals and then deducted pursuant to this section. The Department has considered this problem and feels that adding residual receipts to preservation value would be inconsistent with customary appraisal standards, which section 213(c) of the statute instructs HUD to implement. Since the statute and its legislative history give no indication that this provision was a drafting error, the Department must assume that Congress intended that HUD deduct residual receipts from transfer preservation value. Therefore, the rule continues to track the language of the statute. Purchasers may buy the residual receipts from the owner as part of the sales transaction; however, the Department will not subsidize this purchase.

Three commenters raised concerns regarding paragraph (o) of this section, which authorizes grant assistance for priority purchasers. The assistance may not be in excess of the present value of the total projected fair market rent for

the next ten years, or such longer period if necessary to cover the costs listed in paragraph (m). One commenter questioned whether the grant would be available concurrently with section 8 assistance. Another commenter asked whether the grant can be provided for more than ten years and if there is a limit on the amount of the grant. As the proposed rule indicates, a grant under this paragraph is a one-time grant. The reference to the ten year or longer period of time is to compare the grant to the present value of the fair market rents over time. The purpose of the grants is to provide HUD with more flexibility to work with priority purchasers to determine the most appropriate mix of subsidies, i.e., grants and incentives. Grant funds could, therefore, be made available in conjunction with section 8 assistance. There is no cap on the grant; however, the amount will depend on the costs listed in paragraph (m) and will be limited to what is necessary to cover those costs for each particular project. Another commenter stated that HUD should develop guidelines for allocating these grants. As noted above, the purpose of providing assistance in the form of grants is to give HUD flexibility in financing specific projects. The Department will review plans of action to assure that the mix of proposed subsidies is appropriate and is the least costly alternative to the Federal government.

Three comments were received concerning paragraph (p) of this section, which states that the Department shall be entitled to seek reimbursement for any assistance provided under this subpart to a priority purchaser who becomes affiliated with, or sells the project to, a non-priority purchaser who would not otherwise be eligible for such assistance. One commenter claimed that the language of this paragraph should be amended to state that HUD "may under some circumstances" be reimbursed in order to permit a nonprofit to affiliate with a for-profit organization and not be penalized. This type of affiliation is exactly what this paragraph is intended to discourage. If a nonprofit and for-profit jointly own the project, the ownership entity would no longer meet the definition of a priority purchaser, and hence should not have access to the additional assistance available only to priority purchasers. Another commenter stated that if a priority purchaser sells the project to a qualified purchaser, HUD should modify the plan of action and only seek reimbursement of the grant on a prorated basis and reimbursement of the transaction expenses which have not already been used. The Department has decided not to prorate the grant. The grant is provided in one lump sum and the Department may seek reimbursement in the full amount. This paragraph requires reimbursement of assistance which is in excess of that to which a nonpriority purchaser is entitled. Since Federal reimbursement of transaction expenses is assistance which is only provided to priority purchasers, the entire amount of the assistance must be returned if the owner is no longer a priority purchaser. Another commenter suggested that this paragraph set a time limit on reimbursements to the Department. The Department believes that a time limit of ten years from the date of approval of the plan of action would be sufficient to serve the purpose of this provision, while providing HUD with adequate reimbursement. The rule has been amended to permit HUD to seek reimbursement for assistance if a priority purchaser affiliates with, or sells the project to, a for-profit organization within ten years of approval of the plan of action.

*Section 248.161 (Mandatory Sale for Housing Exceeding Federal Cost Limit)*

In the proposed rule, the Department requested comments concerning how the Federal grants provided to qualified purchasers under paragraph (d) should be allocated if there are insufficient appropriations to fund all the requests. The Department received nineteen comments in response to this request. Many commenters suggested that in allocating insufficient grant money, priority be given to projects with the greatest amount of tenant involvement, the highest percentage of very low income tenants and those which will remain permanently affordable to low income tenants. Others recommended that preference be given according to when the projects are eligible to prepay, with those being eligible within twelve months given priority over those which are eligible within twenty-four months. Some commenters stated that there should be equal access to the grants and suggested that State and local governments be required to pay the shortfall that cannot be covered by Federal funds. Another commenter recommended that preferences be based on a demonstrated need for low income housing or on a showing that minority housing opportunities and racial integration would be adversely affected if the mortgage is prepaid. One commenter also recommended that first priority for grant assistance should be provided to projects located in areas with low income housing shortages.

Allocating grants according to the need for the housing may be unrealistic since it is expected that there is a need

for each project being sold under the mandatory sale provisions of this section and that its prepayment may affect minorities; otherwise the owner most likely would be eligible to prepay the mortgage or terminate the insurance contract under § 248.141 and would not be selling the project under this section. Additionally, the Department does not have the authority to require a State or local government to provide grants to make up for the shortfall in Federal funds.

The statutory restrictions governing the manner in which plans of action are submitted and the time frames for their approval make the rest of these suggestions infeasible. LIHPRHA establishes a specific time in which the Department must approve a plan of action and provide the agreed-upon funding. If the assistance is not provided within the statutory time frames, as set forth in § 248.169, then an owner may prepay the mortgage or terminate the insurance contract and the project will be lost from the low income housing inventory. In order to implement the allocation processes suggested by the commenters, the Department would be required to withhold its approval of a plan of action until it received other plans and could then compare them to determine which have the most tenant involvement or the most very low income tenants. Since owners and purchasers will be submitting their plans of action at different times, withholding approval of the plans could result in more prepayments and terminations due to the delay caused by this process.

The alternative would be to provide grants to only a certain class of projects, such as those that are only twelve months away from prepayment; however, if there are few projects in this class in a particular year, funds which could have been provided to other projects would be withheld, resulting in needless losses to the low income housing inventory. The Department has decided to continue considering this matter in the event that it receives inadequate funding in the future.

In response to internal discussions, the Department has amended § 248.161 of the proposed rule to permit an owner, at its option, to accept an offer to purchase eligible low income housing at a sale price less than the transfer preservation value of the project. Sections 221 (b)(1) and (c) of LIHPRHA require an owner, under the mandatory sale provisions, to accept a bona fide offer to purchase the housing for a sale price not less than the transfer preservation value. While the Department recognizes that an offer to purchase the housing at a price less than the transfer preservation value does not meet the definition of bona fide offer, there is no language in the legislation prohibiting an owner from accepting an offer other than a bona fide offer. Since LIHPRHA does not prohibit an owner from voluntarily accepting an offer for a lower sale price, the Department has revised the rule to allow an owner to accept such an offer.

Permitting an owner to accept an offer at a lower sale price could avert unnecessary prepayments under section 224 of the statute in the event no bona fide offers are received. Additionally, a lower sale price would most likely require less Federal subsidy, in furtherance of section 221(a)(1) of LIHPRHA, which requires that the Department employ the least costly alternative to the Federal government in achieving the purposes of the legislation.

Under the mandatory sale provisions of this section, if an owner receives an offer at a sale price less than the project's transfer preservation value, the offer may be accepted as long as it is submitted by a qualified purchaser within the appropriate sales periods set forth in § 248.157(c) and as long as the offer meets all of the requirements of a bona fide offer in § 248.157(g), except for the amount of the sale price.

*Section 248.165 (Assistance for Displaced Tenants)*

Fourteen comments were received by the Department regarding this section of the proposed rule. The most frequently made comment concerned relocation expenses. One commenter asserted that owners should not have to pay fifty percent of the relocation costs incurred by displaced tenants plus additional costs imposed by State or local laws. Two commenters expressed the view that owners should be required to pay more than fifty percent of the relocation expenses incurred by displaced tenants. Three commenters stated that if an owner pays fifty percent of the relocation expenses, HUD should pay the rest.

Section 223(b) of the statute states that the Secretary shall require the owner to "pay fifty percent of the moving expenses of each family relocated, except that such percentage shall be increased to the extent that State or local law of general applicability requires a higher payment by the owner." Therefore owners must pay at least fifty percent of the relocation costs of displaced tenants.

However, it would clearly be inconsistent with this statutory limit for the Department to impose a financial burden on owners in excess of fifty percent of the costs, in the absence of a State or local law directing a higher payment. As one commenter pointed out, those expenses which must be paid by the owner must be actual and reasonable relocation expenses, as defined in § 248.101 of this section. The Department will not require an owner to pay unreasonable relocation expenses or expenses which were not actually incurred by the tenants. Additionally, the statute does not impose any burden on HUD to pay relocation expenses. Those relocation expenses which are not paid by the owner must be borne by the tenants.

According to one commenter, tenants who voluntarily move in response to a notice of intent to prepay, and tenants who pay rents beyond the regulated levels after prepayment, should be included in the definition of displaced tenant and should be entitled to the protections of this section. Section 223 of the statute applies only to tenants who are displaced as a result of prepayment of the mortgage or termination of the mortgage insurance under § 248.169 of this subpart. Tenants who voluntarily leave when a notice of intent is submitted are not leaving due to prepayment or termination, for at that point, an owner would not know that it could prepay under § 248.169, which only applies in extenuating circumstances. If an owner prepays or terminates under § 248.169, the Department no longer regulates rents except for special needs tenants who continue to reside in the project and for current tenants if the project is located in a low-vacancy area. If, in these cases, a tenant is paying more than the regulated rents, he or she should notify the Department and HUD will enforce the lower rent, but any such tenant would not be considered displaced for purposes of this section.

One commenter requested clarification as to the assistance to be provided by the Department in paragraph (a) of this section. This paragraph refers to the section 8 certificates and vouchers which will be provided by the Department to any low and very low, income tenants who are displaced as a result of a mortgage prepayment or insurance termination under § 248.169 of this subpart. This section 8 assistance will be provided pursuant to 24 CFR parts 882 and 887.

As one commenter noted, the Conference Report at page 467 indicates that HUD is authorized to set section 8 existing fair market rents at the "exception rent," i.e., 120% of the fair market rent, so that tenants who receive the assistance provided in paragraph (a) may use section 8 certificates or vouchers at the project even if the project's rents exceed the section 8 existing fair market rent. In order to implement this, the Department has amended § 882.106(a) and § 887.351(b) of this title, to permit approval of the exception rent on a case-by-case basis, as the Secretary deems appropriate. Paragraph (a) of this section has also been amended accordingly.

Special needs tenants, and, if the project is located in a low vacancy area, all current tenants, may accept the section 8 assistance provided in paragraph (a) in addition to the protections set forth in paragraphs (e) and (f), which permit special needs tenants and those who reside in a low vacancy area to continue to occupy their unit in the project or receive a replacement unit at the same rent levels, for three years after the date of approval of the plan of action. If these tenants initially refuse the section 8 assistance provided in paragraph (a), they may apply for section 8 certificates or vouchers during or after the three-year protection period; as displaced tenants, they will be given priority for receiving section 8 assistance.

Paragraph (f) of this section provides that in order for the owner to fulfill its obligations with respect to a tenant by providing assistance enabling the tenant to occupy a replacement unit, rather than continued occupancy, the tenant must freely waive its right to continued occupancy in the project. A commenter suggested that for tenants who are 60 years or older, the rights which they would be waiving should be explained to them by an appropriate community services group. The Department concedes that special needs tenants may not be aware that they are entitled to continued

occupancy in the project or a replacement unit. For this reason, the Department will notify special needs tenants, which includes tenants 62 years of age, or older, of their status and of the protections they can receive under this section at the same time they are notified of approval of the plan of action under § 248.169. The Department does not find that there is a justification for mandating that the owner arrange to have a community services group advise the tenants.

Two commenters suggested that the three year continued occupancy period should be applicable to all current tenants who are displaced. However, section 223(c) of the statute expressly states that the continued occupancy and replacement unit provisions "shall only apply" to special needs tenants or tenants residing in a low vacancy area. In the face of this clear statutory limitation, the Department cannot extend these protections to cover all displaced tenants. However, as previously noted, any displaced low income tenant may receive section 8 certificates or vouchers. Also, as one commenter pointed out, under paragraph (d) of section 223 of the statute and paragraph (i) of the proposed regulation, an owner cannot refuse to rent to tenants because they receive section 8 assistance.

The Department received a suggestion from one commenter that upon being notified that tenants will be displaced, HUD should request vacancy information from the local public housing agency in order to locate suitable housing for elderly and disabled tenants. Paragraph (c) of the proposed rule already requires the Department to consult with public housing agencies to ensure that any very low and low income families which are displaced are able to find suitable replacement housing. Therefore, the proposed regulation need not be amended to accommodate this comment.

*Section 248.169 (Permissible Prepayment, Voluntary Termination or Modification of Commitments)*

The Department received one comment stating that an owner should not be permitted to prepay its mortgage or terminate the mortgage insurance contract under any condition if it would mean that low income tenants are displaced and if the prepayment or termination would result in a loss of affordable housing. Section 224 of the statute, however, authorizes prepayments and/or terminations if the Department approves a plan of action and then fails to provide the agreed upon incentives within a specified time period; if an owner offers the project for sale in accordance with the voluntary or mandatory sale provisions and no bona fide offers are received; or if an owner accepts a bona fide offer, but the sales transaction fails through no fault of the owner. Also, an owner may be permitted to prepay under this section at a later date if HUD is unable to renew a section 8 housing assistance payments contract due to the lack of funding and cannot modify the commitments or revise the incentive package to compensate the owner for the lack of section 8 assistance.

Another commenter suggested that in order to minimize prepayments and terminations under this section, if a resident council makes a bona fide offer to purchase the project and the offer is dependent upon Federal funding which is not forthcoming, the residents should have time to seek alternative financing before an owner is permitted to terminate the affordability restrictions. Section 224(a) of the statute states that an owner may prepay or terminate if any of the enumerated circumstances occur. The statute does not provide any extra time period in order to secure other assistance. The Department interprets this to mean that an owner has the option to prepay or terminate as soon as the Department fails to meet the time periods for the provision of assistance set forth in paragraph (a)(1) of the statute, or as soon as the fifteen-month purchase period ends and the owner fails to receive a bona fide offer. The Department acknowledges that an owner is not required to exercise its option to prepay or terminate, and if an owner, or owner and purchaser, decide to extend the time in which HUD can provide assistance, the Department will recognize this extension and make every effort to provide the agreed upon incentives. Likewise, if an owner wishes to hold the project for sale past the purchase period, the Department will recognize a plan of action submitted by the owner and a qualified purchaser, subject to the restriction in § 248.111, which prohibits HUD from approving a plan of action with an appraisal which is more than thirty months old.

A commenter expressed concern that it is likely that many owners with projects in rural areas or small municipalities will be entitled to prepay the mortgage or terminate the insurance contract under this section. The commenter suggested that, in order to minimize this possibility, the preservation program should be flexible and

encourage broad participation of potential purchasers. The Department recognizes the commenter's concern, and intends to minimize this outcome by notifying as many potential purchasers as possible about the project under § 248.157(b) and by providing incentive packages which are attractive to qualified purchasers and will enable them to meet the costs of owning and operating the project.

Paragraph (a)(4)(i) permits an owner to prepay the mortgage or terminate the insurance contract if the owner receives and accepts a bona fide offer, but the sales contract falls through for reasons not attributable in whole or in part to the owner. One commenter stated that title defects or covenants on the property which run with the land and housing violations which can be cured by making repairs should not be considered attributable to the owner. The Department disagrees, with one exception. Covenants that run with the land, such as utility easements, should not affect an owner's title to the property to the extent that it would preclude completing a sales transfer, but if they do, and the owner has acted diligently to have the covenants or easements removed and has failed to do so, the owner would not be penalized and could take action under this section. However, if there are defects in an owner's title to the property, such as mechanics liens or liens resulting from unpaid taxes, it is the owner's responsibility to clear up these defects and if it fails to do so and the sale falls through as a result, the owner will not be entitled to prepay or terminate the mortgage contract. Likewise, if the project has been cited for housing code violations, it is the owner's responsibility to bring the project up to code. A housing code violation is not the same as not meeting the housing standards. If a project does not meet housing standards, the owner may still transfer the project and the Department will make a rehabilitation loan available to a qualified purchaser, but the purchaser must agree to maintain the project in accordance with the housing standards upon completion of the rehabilitation.

One commenter requested clarification as to what happens if the Department is unable to provide the section 8 assistance required under an approved plan of action. If section 8 assistance is not available to a project for which a plan of action has been approved and, as a result, the Department fails to meet the deadline for providing assistance under paragraph (a), the owner has the option of prepaying the mortgage or terminating the mortgage insurance contract. If section 8 assistance is unavailable at the time of renewal of the housing assistance payments contract, the provisions of paragraph (b) of this section are applicable.

Pursuant to paragraph (b), if HUD is unable to extend the term of the section 8 assistance, it may attempt to revise the package of incentives provided to the owner under the plan of action and provide benefits which are comparable to those the owner had been receiving. If HUD is unable to create a comparable incentive package, the owner may request that the commitments it made pursuant to § 248.145(a) (2) through (10) be modified or that the plan of action be terminated, which would result in termination of the affordability restrictions on the project. If the owner intends to request a modification of commitments or termination of the plan of action, it must first send a notice to HUD stating this intention. The Department then has ninety days from the date of receipt of this notice to extend the section 8 assistance or comparable incentives and to continue the binding commitments on the project. If the Department is unable to do either of the foregoing within the ninety-day period, HUD may modify the commitments, and if this fails, permit termination of the plan of action. If an owner does not request a modification of commitments or termination of the plan of action, the Department is not bound to the ninety-day period.

*Section 248.173 (Resident Homeownership Program)*

The Department received comments from 46 individuals and groups on this section. The most significant issue expressed by commenters was their concern that the Department had not given sufficient priority to forms of homeownership that involved continuing restrictions to assure that units remained affordable to low income families. This concern was raised in several different contexts.

Most directly, 12 comments stated that too much emphasis was placed on resident homeownership programs where there was no requirement for permanent affordability restrictions and no additional limitations on resale profits beyond the 20 year phase-out required by statute and described in paragraphs (i)-(k). Thirteen comments advocated the

inclusion of a requirement that all resident homeownership programs be subject to the continuing affordability restrictions for the remaining useful life of the project under § 248.145. Four comments recommended or asked whether a resident council could impose more stringent resale restrictions than those included in paragraphs (i)-(k).

An additional 15 comments specifically recommended that limited equity cooperatives with continuing income affordability restrictions be considered an eligible form of homeownership. These comments were received despite the fact that proposed paragraph (f) explicitly includes such entities as an eligible form of homeownership.

Similarly, 20 comments requested that the Department allow limited equity cooperatives to assume the existing federally-assisted mortgage. By statute, the assumption of such a mortgage would also require the limited equity cooperative to comply with the continuing low-income affordability restrictions under § 248.145.

Lastly, in regard to funding resident homeownership programs, 10 commenters recommended that limited equity cooperatives be eligible to receive continuing project- based section 8 assistance to assure that the housing remains affordable to low-income purchasers. This assistance would be in place of, or as a supplement to, the grants provided for resident homeownership programs. Five of these commenters pointed out that section 220(d)(3)(A) of the statute expressly authorizes the provision of incentives (including section 8) under section 219(b) to all qualified purchasers, which includes resident councils proposing homeownership programs. This set of comments went on to note that the Conference Report at page 465 indicates that HUD should work with priority purchasers to determine the most appropriate mix of subsidies, i.e., grants and incentives.

The Department attributes the number of comments raising these concerns to the structure of § 248.173, which attempted to cover various types of homeownership programs, and which did not highlight the fact that this section includes limited equity cooperatives as an eligible form of homeownership.

The lack of requirements to retain affordability restrictions beyond the initial purchaser and the phaseout of restrictions on resale profits are designed to provide current low-income tenants and other initial low-income purchasers with an opportunity to become homeowners in the fullest sense of the term. This goal includes the ability over time to fully benefit, like any other homeowner, from making a profit at resale. However, the Department has long recognized that homeownership can take a variety of forms. This is implicitly recognized in paragraph (d)(xii) of this section, which requires that resident councils include with their homeownership plan any restrictions on resales beyond those imposed by the statute.

In order to fully respond to this overall concern, the Department has decided to add a new § 248.175, entitled "Resident homeownership program -- limited equity cooperatives." Resident councils seeking to convert the ownership form of their project to a limited equity cooperative would be subject to the requirements of this new section.

These limited equity cooperatives would be operated very much like those currently assisted by the Department under the section 236 and section 221(d)(3) BMIR programs. These entities would be eligible to assume the existing federally-assisted mortgage and, therefore, be subject to the continuing low-income affordability restrictions under § 248.145. With respect to restrictions on resale profits, sellers would be subject to the limitations described in the preamble discussion of § 248.175.

With respect to providing section 8 assistance and, as appropriate, other incentives, the Department agrees that such assistance is authorized and can be used for resident homeownership plans submitted under § 248.175. Limited equity cooperatives receiving incentives will be subject to the continuing low-income affordability restrictions under § 248.145.

Since grants will not be the sole source of HUD funding under § 248.175, the Department anticipates that the amount of grant funding will be less than for a similar project submitted under § 248.173. This expectation is based on the "due diligence" that the Department must provide to assure that the funding will result in a homeownership program that is both financially feasible and is the least costly alternative that is consistent with establishing a viable

homeownership program.

The Department received a number of comments on more specific aspects of resident homeownership programs. Six comments were received on paragraph (a) of this section. Two commenters recommended that tenant-controlled nonprofits, in addition to resident councils, be eligible to develop and implement a resident homeownership plan. By statute, tenants seeking to purchase a project to develop a resident homeownership plan must form a resident council, which is a tenant-controlled nonprofit. A tenant-controlled nonprofit that is not a resident council may, however, be a priority purchaser eligible to acquire a project and receive assistance to maintain it as affordable rental housing under § 248.157 or § 248.161.

Three commenters endorsed the use of public-spirited for-profit organizations to assist resident councils and tenants to consider their options and develop the capacity necessary to own and manage a project. The statute requires resident councils to work exclusively with public or private nonprofit organizations for these purposes. However, such nonprofit organizations may subcontract with for-profit entities.

The last comment on this paragraph stated that a resident council should be required to be incorporated under State law. The statute and the proposed rule require a resident council to be both incorporated and to be a nonprofit, and require a nonprofit to be organized or chartered under State or local law. To make this linkage more directly, the rule will change the definition of "nonprofit organization" in § 248.101 to say that it must be incorporated under State or local law.

Seven comments were submitted in reference to requirements for "bona fide offers" for resident councils under both paragraph (c) of this section and § 248.157(g). Three commenters, two local community service agencies and a national housing trade association, stated that a resident council should be required to demonstrate that a simple majority of the tenants should have expressed an interest in participating in a resident homeownership program. Two other commenters, a law firm and a national tenant's organization, felt that a simple majority was too onerous and recommended that the Department establish procedural standards to ensure legitimate tenant representation rather than using an arbitrary percentage of residents.

The remaining two comments were directed at the amount of the earnest money deposit required to be made as part of a resident council's bona fide offer. These comments are in addition to those discussed under § 248.157(g). Both commenters felt that one percent of the transfer preservation value was too high an amount and one comment went on to suggest that $200 for each interested tenant was an appropriate amount. The latter commenter also urged that security deposits pledged by tenants interested in becoming homeowners be counted as part of the earnest money deposit.

The proposed rule required that the resident council demonstrate that at least 75 percent of all families, representing at least 50 percent of all the units, express an interest in participating in a homeownership program at the time an offer is made. The Department strongly believes that a substantial interest, as described in the proposed rule, has to be shown by the tenants to realize a viable homeownership program. This is particularly important given the time frames involved in having the resident council prepare and submit a detailed homeownership plan to HUD for approval and acquire ownership of the project upon HUD's approval the plan. If the resident council is unable to meet these time frames, the owner may be able to prepay the mortgage and convert the project to a market-rate rental property or to other uses.

The Department, therefore, will maintain the current requirement in terms of the percentage of tenants needed to express an interest in participating in a homeownership program. In light of the comments on earnest money deposits above and the changes made in regard to comments received in response to § 248.157(g), the Department will make the following adjustment with respect to bona fide offers submitted by resident councils pursuing a homeownership plan under this section or § 248.175. Resident councils will be required to submit as an earnest money deposit $200 from each interested tenant (i.e., $200 x the number of units that constitute 75 percent of the occupied units). This requirement cannot be waived or reduced by the current owner under § 248.157(g). However, the tenants will be allowed to pledge their security deposits if the owner agrees and such a pledge is permitted under applicable State and

local law. The Department feels that this change is responsive to legitimate concerns about the amount of the earnest money deposit and that this expression of support from a very substantial portion of the tenants is a good indicator of the likelihood of realizing a viable homeownership program.

Seven comments were received on requirements for submitting a homeownership plan under paragraph (d) of this section in relation to activities and costs eligible for funding under paragraph (e) of this section. One comment recommended that repairs as well as rehabilitation activities be included as an eligible item. Paragraph (d)(iii) already requires a resident council to indicate as part of its description of rehabilitation activities what major types of repairs will be undertaken. A second commenter urged that a reserve for unforeseen replacements for a period of at least five years be included in the homeownership plan submitted to HUD. The proposed rule requires that the project be brought up to the housing standards set forth in § 248.147 and provides funding for an adequate reserve for replacements (both an initial contribution as well as monthly contribution from occupancy charges). The Department, therefore, does not feel that a special reserve for "unforeseen replacements" is needed. However, the Department will carefully review homeownership plans to assure that replacement needs are fully addressed through the proposed rehabilitation activities and reserve for replacements account.

The remaining five comments asked what types of activities and costs are allowable for technical assistance, training, and counseling. One commenter suggested that continuing homeownership training provided by staff or on a contractual basis be included, another stressed the need for legal and organizational assistance, and two other commenters simply asked for more clarification. The fifth commenter stated that funding should be at a sufficient level to enable resident councils to seek services at prevailing rates rather than requiring the use of the lowest cost services in a local area. The need for assistance will vary considerably from project to project and, therefore, the Department feels that the language in the rule should remain unchanged and inclusive. This will permit HUD to fund a wide range of activities if they are justified in the homeownership plan and come within the overall cost limits established in § 248.157(m)(7). With respect to allowable cost rates, there is no requirement that the costs be the lowest in the area. The Department will review the proposed costs to determine if they are reasonable.

In addition to the comments discussed above regarding limited equity cooperatives, the Department received 6 comments on eligible forms of homeownership under paragraph (f) of this section. Four comments urged that mutual housing associations be included as a separate and distinct form of homeownership. One commenter provided the following definition for a mutual housing association:

A private, section 501(c)(3) non-profit organization organized under state law, which owns, manages and continuously develops affordable housing by providing resident involvement in the provision of such housing, long-term housing for low and moderate income families in which residents participate in the ongoing management of such housing, through membership in the association, and have the right to continue residing in such housing as long as they remain members of the association.

This definition indicates that members of a mutual housing association do not have any ownership or equity interest in their units and, therefore, such an ownership form would not be approvable. The proposed rule follows the statutory language in allowing a broad range of ownership forms including cooperatives, limited equity cooperatives, condominiums and fee simple ownership as long as ownership interests or shares are transferred to individual purchasers. Insofar as ownership or equity interests are to be held by the individual purchasers and a mutual housing association meets the other requirements of the rule then such an ownership form could be approved. The Department believes that this determination is best made on an administrative, case-by-case basis rather than through a change in the rule. It should also be noted that a mutual housing association may qualify as a priority purchaser eligible to acquire a project and receive assistance to maintain it as affordable rental housing under § 248.157 or § 248.161.

The two remaining comments on this subsection recommended that condominium arrangements not be allowed as an eligible form of homeownership. Both of these commenters are tenant organizations and they described their own adverse experience in getting condominium associations to enforce use agreements and other restrictions vis-a-vis

individual association homeowners. The Department recognizes that a condominium association may have more difficulty enforcing use agreements than a cooperative corporation. Nevertheless, the statute specifically authorizes condominium ownership and HUD feels that a broad range of ownership forms should be allowed. In approving homeownership plans, the Department will review the resident council's capacity to own and manage a project, including its ability to meet the various ongoing compliance requirements specified in this section.

Three comments took issue with the requirement in paragraph (g) of this section; that the initial owners must occupy their units for at least the initial 15 years of ownership. The comments felt that this requirement was too long and would discourage tenant interest in purchasing, and did not accommodate changes in employment or emergencies. This requirement was included in the proposed rule for two reasons. The first reason was to assure that the units remained owner occupied rather than having the units revert to a primarily rental status, although with no continuing affordability restrictions and potentially with significantly higher rents. The second reason was to keep homeowners from effectively evading the minimum 20 year phase-out on limitations on resale profits by renting out their units at rents considerably higher than their occupancy charges. The Department feels that these reasons continue to be legitimate. With respect to accommodating employment changes or an emergency situation, this subsection explicitly allows resident councils to make such determinations and allow owners to rent out their units.

The Department is removing the owner-occupancy requirement for homeownership plans submitted under the new § 248.175. This occupancy requirement is not needed for a limited equity cooperative with continuing affordability restrictions and limitations on resale profits. Furthermore, most of the limited equity cooperatives will assume the existing federally-assisted mortgage or receive section 8 assistance. As a result, they will be subject to other HUD program regulations restricting the ability of the initial owners to rent out their units.

Three commenters objected to the recapture requirements in paragraphs (h) and (*l*). One commenter stated that returning 50 percent of any net sales proceeds from the sale of the units to HUD is unnecessary and that these proceeds should have been reflected in funding for the resident council's homeownership plan. This requirement is statutory and is directed at the situation where there may be unexpected proceeds from the initial sale of the units. Two commenters stated that the requirement that any net proceeds from resale not retained by the homeowner at resale be paid into a local HOME Investment Trust Fund was wrong in principle and should be restructured. This requirement is also statutory. The Department, therefore, has not made any changes to these recapture provisions.

Two comments were received on paragraph (o) concerning qualified management. The first commenter stated that resident councils should be required to use professional management to operate the project after conversion. This subsection, in fact, already establishes this requirement. Resident councils will either have to demonstrate their management experience and ability or enter into a contract with a qualified management firm approved by HUD.

The second comment urged that HUD establish a process to regain control of a unit if the individual unit owner leaves or if the unit becomes uninhabitable. The Department expects that the resident council will have primary responsibility for dealing with the types of situations described by the commenter. In approving homeownership plans, the Department will pay very close attention to the resident council's capacity to own and manage a project. Limited equity cooperatives approved under § 248.175 are also likely to be subject to other HUD program regulations covering vacated or uninhabitable units. This will occur because most limited equity cooperatives will assume the existing federally-assisted mortgage.

Five comments were submitted on the timely homeownership provisions of paragraph (o) of this section. One commenter stated that since the transfer of ownership has to be approved as part of the homeownership plan, resident councils should be required to acquire ownership of the project immediately rather than within six months after approval, as included in the proposed rule. Three other commenters felt that six months was too short a period and suggested that this period be extended for good cause or be at least one year.

The proposed rule, in fact, contained an inconsistency with respect to this issue. Section 248.135(*l*) of the proposed

rule required qualified purchasers, a term that includes resident councils, to close transactions within 90 days of HUD's approval. Paragraph (o) has been changed to conform to this overall requirement. The Department believes that all qualified purchasers, as well as sellers, are likely to need a reasonable period of time to actually close on a sales transaction after the date of HUD's approval. It is only after HUD's approval of a plan that both the buyer and the seller may be able to complete such closing requirements, among others, as finalizing financing arrangements (e.g. the precise amount of principal) or obtaining the consent of the partners to the terms approved by HUD. The Department believes that 90 days is fair to both the buyer and the seller.

The Department is sensitive to the concerns that resident councils will not have sufficient time to complete a transaction. This concern applies to all purchasers, but may have particular relevance for resident councils and community-based nonprofits. The process of transferring a property set forth in the statute for either continued rental use or for resident homeownership under the best circumstances is a very long procedure and the Department is hesitant to further lengthen the time periods. As noted in the discussion of § 248.135(b), the Department has, in part, addressed this issue by extending the period for submitting plans of action after the owner has accepted an offer from 90 days in the proposed rule to six months. This additional time should enable purchasers to develop better plans of action that most often lead to closing transactions within 90 days of HUD's approval. The rule also does not preclude a buyer and seller from agreeing to extend this period as long as the owner waives its right to prepay during this extension.

Finally, one commenter felt that the resident council should be required to transfer ownership of the units to individual purchasers within one year of its acquisition of the project rather than the four year period provided for in the proposed rule. The Department agrees with the basic thrust of this comment, i.e., ownership interests should be transferred to individual purchasers as quickly as possible. The four year period was intended to account for a variety of contingencies that might reasonably delay this transfer, such as making sales contingent on the completion of rehabilitation activities. The Department believes that this intent remains valid and has not shortened the maximum transfer period to individual purchasers.

*Section 248.175 (Resident Homeownership Program -- Limited Equity Cooperative)*

As discussed above with respect to § 248.173, the Department has included in the interim rule a new provision setting forth the requirements applicable to the purchase and operation of an eligible low income housing project by a limited equity cooperative. The limited equity cooperative model includes the procedures and requirements otherwise applicable to the purchase and operation of projects with continued low income affordability restrictions. Although certain provisions of § 248.173 which ensure the feasibility of the resident homeownership program and do not conflict with such procedures and requirements or with the nature of a limited equity cooperative have been incorporated by reference into § 248.175, the Department does not view § 248.175 as being based solely on the statutory authority of section 226; instead, it is a variation of the "transfer" plan of action authorized under LIHPRHA generally.

Paragraph (b) lists those paragraphs of § 248.173 which are incorporated by reference into § 248.175. Paragraph (d)(i) of § 248.173 states that the homeownership program shall include a statement of the amount of grant funds requested. Under § 248.175 the limited equity cooperative will be eligible for both grants and for any incentives otherwise available to nonprofit purchasers. The "type of homeownership contemplated," for purposes of § 248.173(d)(ix), would be a limited equity cooperative, and the "restrictions on resale" referred to in § 248.173(d)(xii) would be those restrictions on resale required by HUD in FHA multifamily programs for limited equity cooperatives. HUD's Model Form of By-Laws, Form No. 3245, for limited equity cooperatives, imposes restrictions on the amount of equity which a cooperative shareholder may realize; those restrictions provide that memberships may be sold at no more than the "transfer value," which generally equals the sum of the down payment paid by the first occupant, the value of improvements installed by the selling member, the amount of principal amortized by the selling member and previous members, and, with HUD's approval, an amount corresponding to an increase in the cost of living.

Section 248.173(f) is not cross-referenced in paragraph (b), since the Department has determined that a limited

equity cooperative is an acceptable for of homeownership. Of course, the specific features of the resident homeownership program must nevertheless be approved by HUD in accordance with § 248.175. Paragraphs (g)(2) and (g)(4) have also not been incorporated by reference. The former establishes a standard for affordability which is inapplicable to limited equity cooperatives; instead, the affordability requirements under § 248.145 shall be applicable. Likewise, paragraph (g)(4) would not be applicable, since such restrictions are not needed for projects where availability and affordability restrictions will continue for the full term of the plan of action and HUD program regulations restrict the ability of tenants to rent out their units.

Section 248.175 also does not cross-reference paragraphs (i) (1) and (3), (j), (k) and (53151) of § 248.175. These provisions require the execution of a promissory note payable to HUD, establish formulas for the amount of equity which a cooperative shareholder may retain from sales proceeds and provide for the use of recaptured funds. These provisions would overlap with and conflict with the provisions applicable under HUD's program requirements for section 236 and section 221(d)(3) limited equity cooperatives. Paragraphs (p), (q) and (r) have not been cross-referenced, because housing standards, audit and reporting requirements in those paragraphs would likewise overlap HUD's analogous program requirements for limited equity cooperatives and requirements under the plan of action. Paragraph(s) is not cross-referenced because the limited equity cooperative would have continued low income affordability restrictions that are consistent with those applicable under the section 236 or section 221(d)(3) mortgage and its regulatory agreement, as modified pursuant to subpart B.

Paragraph (c) provides that the purchase and operation of eligible low income housing by a limited equity cooperative under this section shall be carried out in accordance with all provisions of subpart B that are otherwise applicable to the transfer and operation of a project with continued low income affordability restrictions, except as otherwise provided in § 248.175. Thus, for example, the total charges for housing costs (i.e., principal and interest, taxes, insurance, occupancy charges and utilities) for current tenants that become cooperative share holders may not exceed 30% of the adjusted income of the tenant, or the fair market rent, whichever is lower, in accordance with § 248.145(a)(5).

*Section 248.177 (Delegated Responsibility to State Agencies)*

The Department received six comments regarding this section, two from State housing agencies, two from trade organizations or lobbyists, and one from a consultant and one from an advocacy organization. Two commenters suggested that HUD expand on the regulation by publishing the implementing instructions normally reserved for administrative guidance. As stated in the preamble to the proposed rule, the Department will publish its application and approval procedures in its administrative guidance. The rule has not been changed to reflect these comments. Two comments stated that the Department should employ State agencies as "processors" without regard to State preservation plans approved under this section. The Department will contract for technical assistance with State agencies as the need arises. Such contracting will be done through established contracting and bidding procedures, such as those used for HUD's multifamily program, Delegated Processing, which do not necessitate a change to the proposed rule.

Two comments were received regarding the ability of State agencies to charge fees for processing notices of intent and plans of action as part of an approved State preservation plan under this subpart; one commenter was in favor of such fees and one opposed. The Department does not believe that State agencies should charge owners of eligible low income housing fees for processing notices of intent or plans of action where the owner, absent an approved State preservation plan, would be able to file such notices of intent or plans of action with Department at no charge. Accordingly, paragraph (d) has been added to the rule, prohibiting a State agency from charging owners fees for processing any notice of intent or plan of action or taking other action under an approved State preservation plan.

Three commenters suggested that the Department entertain proposals for various levels of delegated authority under this section. The proposed rule stated that the Department would "delegate some or all responsibility" to a State agency as part of a delegation plan approved under this section. The administrative instructions will allow State agencies to

specify those activities for which they desire delegated responsibility. The rule has not been changed to reflect these comments.

One commenter suggested that the Department use Standard and Poor's "top tier" bond rating certification as satisfaction of the "independent analysis" requirement. The Department will adopt this standard as well as others in its administrative instructions.

Three comments were received regarding the lack of regulations implementing a portion of section 602(a) of the statute, amending section 241(f)(1) of the National Housing Act, regarding risk sharing arrangements with State agencies for the insurance of section 241(f) equity and acquisition loans. The three commenters all proposed some modified form of State agency coinsurance. The proposals conform with the Department's interpretation of the statutory language. State agency coinsurance, the Department's only coinsurance program that has not been formally terminated, is administratively inactive at this time. If the Department decides to implement section 602(a) as a form of coinsurance for section 241(f) loans, it will do so through separate rulemaking.

*Section 248.179 (Consultation With Other Interested Parties)*

The Department received two comments on this section expressing the importance of communication between HUD and State and local governments and suggesting that HUD identify contact persons from these entities, permit the submission of comments on notices of intent and plans of action, and give State and local governments the opportunity to provide economic data and other information relevant to the preservation process. One commenter suggested that this section of the proposed regulation be expanded to identify specific responsibilities that State and local governments should be expected to undertake.

The Department intends to implement fully this section of the regulation and is currently meeting with State and local governments to formulate criteria for consultation and to identify specific contact persons in State and local governments where eligible low income housing is located. The Department has also expanded the role of State and local governments in the preservation program by providing them with a sixty-day comment period on plans of action submitted for projects within their jurisdiction, as set forth in § 248.135. While the State or local government will also receive copies of notices of intent submitted in their jurisdiction, no comment period has been established for notices of intent since the Department sees no need for comments at that stage in the process. State and local governments are encouraged to submit comments or any relevant data they may possess to the Department at any time during the preservation process. The Department declines, however, to impose any responsibility on State and local governments under this section. The Department assumes that these entities are familiar with the preservation program and will act accordingly.

*Section 248.181 (Notice to Tenants)*

Nineteen comments were received by the Department concerning the notification of tenants affected by owners' actions under this subpart. The comments suggested that tenants be notified at every stage in the preservation process and that they receive copies of all correspondence between owners and the Department.

Under the provisions of this rule, tenants residing in projects subject to this subpart will receive copies of the first and second notices of intent, under §§ 248.105 and 248.133, including a summary of possible outcomes for the project. Tenant representatives will also receive the valuation information provided to the owner under § 248.131. A summary of the plan of action, along with any revisions, will be posted, in accordance with § 248.135, in accessible places in all affected buildings with the name, address and telephone numbers of any tenant representatives, or if none are known, of the local HUD field office, where tenants may obtain a complete copy of the plan of action. The plan of action will also be available at the on-site office for tenant inspection and copying. The tenants are entitled to a 60-day comment period

on the plan of action. After taking into consideration the tenant comments, the Department will notify the tenants as to whether the plan is approved. Tenants will also have the opportunity to submit comments and participate in the annual HUD inspections of the project under § 248.147. Any tenants who are eligible for relocation assistance under § 248.165 will be notified of their status. If the tenants submit an expression of interest to purchase the project under § 248.157, they will be entitled to receive all the information which is made available to other qualified purchasers. The Department believes that these provisions provide sufficient notice and comment to all affected tenants of the various stages of the preservation process. Also, there is no need to supply tenants with all of the correspondence between the Department and the owner, since the Department expects that the outcome of any correspondence pertaining to the preservation program will be reflected in the plan of action.

Four commenters raised the concern of enforceability of the notice provisions and suggested that if an owner fails to notify the tenants in accordance with this subpart, that the notice of intent submitted by the owner should be considered void. These comments are in accord with the Department's position. If an owner fails to notify the tenants, in violation of this subpart or of LIHPRHA, then the notice of intent will be invalidated and the owner will be required to submit a new notice of intent under § 248.105.

Four commenters suggested that HUD designate a contact person for arranging meetings, answering questions, and generally assisting tenants who are affected by this subpart. The Department recognizes the need for tenant support. Field office staff will be available to help tenants in understanding the preservation process and to aid them in identifying nonprofit organizations who can help them to promote greater tenant participation and possibly to work towards homeownership under § 248.173 or § 248.175. Also, informational meetings for the tenants may be held by the Department at the discretion of personnel in the local field office. Tenants are welcome to request such meetings.

Another commenter suggested that the Department provide tenants with a list of all properties in the area, designating which are eligible to prepay. The Department intends to distribute a list of eligible low income housing which has been compiled from a survey conducted earlier this year of the local HUD field offices. The field offices shall make this list available to the public upon request.

Subpart C

*Section 248.213 (Plan of Action)*

One commenter suggested that this section of subpart C be amended to provide the same notice requirements for tenants and State and local governments as is set forth in § 248.135(c) of subpart B. The Department does not have the statutory authority to impose this notification burden on owners proceeding under ELIHPA and has declined to amend this section of the rule.

*Section 248.218 (Tenant Notice and Opportunity to Comment)*

One commenter recommended that tenants should have the same right to receive information and make comments as provided under § 248.181 of subpart B. The Department believes that this section provides sufficient opportunity for tenant notice and comment and has not amended it as suggested.

*Section 248.221 (Approval of a Plan of Action That Involves Termination of Low Income Affordability Restrictions) and Section 248.233 (Approval of a Plan of Action That Includes Incentives).*

Two commenters contested the Department's basis for requiring that there be no outstanding findings of noncompliance with the civil rights legislation enumerated in these sections of the proposed rule prior to approving any plan of action submitted pursuant to this subpart. For the reasons previously stated in the discussion concerning §

248.141(a)(3), the Department has determined that this requirement will remain in the rule.

Subpart D

In response to concerns raised by a State agency and a member of Congress, the Department is implementing section 613(b) of the statute by adding subpart D to the interim rule.

*General.* Section 613(b) directs the Department to offer incentives to owners of low income housing developed under a State (i.e., non-Federal) housing program, upon application of a State agency, where an owner is able to prepay the State assisted or subsidized mortgage on the housing. The statute states that the level of incentives to be provided under this section should conform to the incentives provided to a similarly situated project under subtitle B of title II of the Housing and Community Development Act of 1987. Since LIHPRHA repeals and replaces ELIHPA (except for those owners which elect to proceed under ELIHPA), the reference to title II of the 1987 Act is presumed to mean LIHPRHA. Therefore, in implementing section 613(b), this subpart refers to subpart B rather than subpart C.

Although Congress did not specifically define the term "State assisted or subsidized mortgage," the Department construes section 613(b) as being inapplicable to any project that would constitute eligible low income housing under subpart B, such as a section 236 non-insured mortgage.

The Department interprets the statutory language "State assisted or subsidized mortgage" as meaning that the State program must entail a form of mortgage assistance or subsidy. This interpretation of "assisted or subsidized" precludes other forms of housing assistance, such as rental assistance or tax abatement programs, in which there is no direct mortgage subsidy.

In order to implement this provision, the Department will require a two-phase application process. The first will qualify the State's mortgage subsidy program as conforming to the requirements of the statute. The second will require owners of such housing, in order to avail themselves of the incentives, to submit a notice of intent and plan of action similar to that for eligible low income housing under subpart B. Processing of such projects will, however, be done by the State agency or a designated local housing authority, which will then make application to the Department for the incentives. The costs of appraisals and capital needs assessments will be borne by the State agency. The State agency will review and approve the notice of intent, plan of action and all other submitted documents. The State agency's application for assistance must demonstrate that the amount of incentives, pursuant to subpart B, required to induce the owner to preserve the housing for low and moderate income families, does not exceed that available for housing otherwise designated as "eligible low income housing" under subpart B.

Because prepayment of the State-assisted or subsidized mortgage is a matter of State law and regulation, this subpart does not incorporate the provisions of subpart B regarding the prepayment of such mortgages and the termination of affordability restrictions. Similarly, the rule does not address tenant protections in the event of termination of the affordability restrictions, either in the event of a prepayment or the inability of the Department to provide funding for incentives. With respect to the latter event, section 613(b) requires only that the Department "may" provide incentives upon application of the State agency or a local housing authority. This language contrasts with the Department's obligation to provide incentives pursuant to a plan of action approved for eligible low income housing under subpart B, the lack of funding for which may entitle an owner to prepay and terminate the affordability restrictions. Although the Department, therefore, views its funding obligations under section 613(b) as discretionary, as opposed to its funding of approved Plans of Action for otherwise eligible low income housing which is solely subject to funding availability, it will fund such applications by a State agency or local housing authority so long as such funding will not interfere with the funding of an approved plan of action for eligible low income housing under subparts B or C.

The statutory language presents some interpretive difficulties by generally requiring, as noted above, that incentives made available to owners under State assisted programs conform with those made available to owners of eligible low income housing. However, with two exceptions discussed below, the statute is silent with respect to the terms and

conditions for rendering assistance and incentives. The Department believes that since the amount of incentives is inextricably bound to the determinations of value, it would be incongruous to require a less rigorous determination of value for State assisted mortgages. Further, since the amount and type of incentives in subpart B is dependent on an owner's decision to maintain or transfer ownership in the housing, the Department believes that the same requirements should apply to State assisted mortgages and owners. Thus, the rule requires owners of State assisted projects to follow the process for notices of intent and plans of action required for owners subject to subpart B in order to receive incentives.

*Section 8 assistance.* The statute generally requires that section 8 assistance, awarded as an incentive under an approved plan of action, conform to the requirements for such assistance made available under subpart B; that is, it is available for all very low and lower income families; rent levels reflect those necessary to implement an approved plan of action; and no tenant shall pay in excess of the lesser of 30% of adjusted gross income or the fair market rent for rent. The rule, by incorporating the corresponding provisions of subpart B, reflects these statutory requirements.

The statute further specifies in section 613(b)(2) that if the owner receives section 8 assistance, the project will be subject to the standards for maintenance and sanctions in "Section 224(e) of the Housing and Community Development Act of 1987." Since LIHPRHA has replaced the 1987 Act in its entirety with the instant statute and since neither statute contains a provision at section 224(e), the Department believes that this language is a vestigial reference to a former version of LIHPRHA. It is intended to refer to section 222(d) ("Housing Standards") of the LIHPRHA. The rule reflects this interpretation.

*Restrictions.* Section 613(b)(3) requires an owner of housing awarded incentives under this subpart to maintain the housing as affordable to low and moderate income tenants for the period for which the assistance is received. This section departs from § 248.145(d) of subpart B which requires maintenance of the affordability restrictions for the remaining useful life of the project, such determination of which may not be appealed by the owner for 50 years following the agreement to maintain the affordability restrictions. Section 248.169(b) further prescribes remedies available to the owner if the Department fails to renew the contract for the assistance for the term of the plan of action. While subpart D generally conforms with the applicable requirements of subpart B, the rule requires maintenance of the affordability restrictions for State assisted mortgages only if the contract for assistance is renewed timely. The statute is silent with respect to a State's option to provide its own substitute assistance, in the absence of Federal assistance, in order to insure extension of the preservation agreement. While States may include such a provision in their preservation agreements, the rule tracks the statutory language.

*Preemption.* The Department has not incorporated § 248.7 into subpart D. The references in section 232(a)(3) and 232(b) to loans which are inconsistent with the provisions of "this subtitle" (i.e., subtitle A of title VI) indicate that section 232 is not intended to apply to subtitle B, of which section 613(b) is a part.

PART 241 -- SUPPLEMENTARY FINANCING FOR INSURED PROJECT MORTGAGES

Subpart A

Two commenters suggested that HUD waive the equity requirements for rehabilitation loans insured under this subpart. There is no statutory basis for the Department to consider such a proposal. Further, prudent underwriting practices demand an equity requirement. The rule has not been changed to reflect this comment. The commenter further suggests that owners receive an 8 percent return on the equity requirement for a rehabilitation loan. There is no statutory language in support of this suggestion, and it has not been adopted. Another suggestion by the same commenter would permit seller financing of the equity requirement for rehabilitation loans with the seller receiving "market return" on the loan. The Department has no objection to a seller providing take back financing for the equity requirements on rehabilitation loans. However, the seller may not charge interest at a rate in excess of that of the rehabilitation loan. The related party rule has been amended to reflect this change.

One commenter suggested that the Department use its housing standards when underwriting a rehabilitation loan insured under this subpart. The Department intends that rehabilitation activities under this program bring the project back to its original physical standard for occupancy.

Another comment stated that improvements financed through rehabilitation loans should include health and safety features for the elderly and disabled, including alarm systems, grab bars, sprinkler systems, etc. For projects constructed originally for the benefit of the elderly and disabled where these features were not included, the Department will permit them in the rehabilitation loan. In some jurisdictions retrofitted sprinkler systems are being required for high-rise structures regardless of the target tenant population. The Department will recognize these costs as well. These items will be handled administratively and do not require a change in the rule.

Another commenter suggested that the Department underwrite rehabilitation loans at 100 percent of required repairs and administer loan draws using the Flexible Subsidy program methodology. The Department intends to maintain the distinction between section 241(a) rehabilitation loans and Flexible Subsidy Capital Improvement Loans. Section 241(a) loans will be administered by the mortgagee on a draw basis like any insured rehabilitation or new construction loan program. Flexible Subsidy Capital Improvement Loans will be administered by the Department utilizing the program's disbursement procedures. The rule has not been changed to reflect this comment.

Subpart E

*Section 241.1000 Purpose and Scope*

The Department received eighteen comments suggesting that section 241(f) equity and acquisition loans be combined with section 241(a) rehabilitation loans. Most of the commenters were concerned with the financing costs associated with two loans versus one loan. With the exception of any ancillary fees charged by commercial mortgagees, financing fees for insured mortgages are based on the mortgage amount. It is doubtful, therefore, that two loans would be any more costly to the transaction than one. One commenter stated that separate rehabilitation loans and equity or acquisition loans would be difficult to sell on the secondary mortgage market. However, all forms of HUD-insured mortgages have been accepted in the secondary mortgage market and HUD does not foresee any reason to believe that these loans would not also be acceptable. Another commenter suggested that in combining the two loan programs, the Department waive its review and inspection requirements for section 241(a) rehabilitation loans.

The Department believes that the statute (see sections 214(b) and 219(b)) specifically contemplates and authorizes separate loans for rehabilitation and equity or acquisition, as stated in § 241.1067 of the proposed rule; however, HUD will consider combining the two programs to facilitate processing of loans pursuant to approved plans of action. (See also the comments on § 241.1067 below.) However, the Department will not waive its review and inspection requirements, pursuant to section 241(a) for the rehabilitation component of the loan.

*Section 241.1010 Feasibility Letters*

One comment requested that the Department make a feasibility letter for a section 241(f) acquisition loan available to priority purchasers who have submitted an expression of interest pursuant to § 248.157(f). This comment confuses the different processes designed in the part 248 rule for accepting expressions of interest and processing plans of action pursuant to an owner's acceptance of a bona fide offer. An owner's decision to offer the project for sale does not contain an application for a section 241(f) acquisition loan. That application is made when the purchaser and the seller jointly file the plan of action to transfer the project. However, purchasers will be advised pursuant to § 248.157(f) of the amount of the preservation equity and the maximum amount of a section 241(f) acquisition loan.

Another commenter suggested that the need for feasibility and conditional commitment letters are obviated by the identification of project income, expenses and required repairs in the appraisal. The income, expenses and repairs

identified in the appraisal are for the purpose of determining a project's values in accordance with section 213 of the statute. The actual project income, expenses and required repairs will be identified in the plan of action. The Department will accept applications for rehabilitation and acquisition loans with the filing of a plan of action to transfer the project to a qualified purchaser. Similarly, the Department will accept applications for rehabilitation loans and equity loans with a plan of action to extend the affordability restrictions.

*Section 241.1015 Application and Commitment Fees*

One comment suggested that the Department authorize the use of proceeds of an acquisition loan insured under this part to pay financing and application fees. The statute, in section 241(f)(3)(B), specifically limits the maximum insurable acquisition loan under this subpart to 95 percent of the preservation equity except, in the case of priority purchasers, any expenses associated with the acquisition, loan closing and implementation of plans of action may also be included. The Department is authorized, however, under sections 220(d)(2)(F) and 221(d)(2) to provide capital grants to priority purchasers in order to reimburse them for expenses incurred in the transfer of the project which are not included in an acquisition loan. Therefore, the Department will include the reasonable costs of applications and financing in a capital grant as part of its approval of a plan of action to transfer the project to a priority purchaser under a voluntary sale and any qualified purchaser under a mandatory sale. (See further discussions at § 241.1067 below.)

*Section 241.1020 Commitments*

One commenter requested that the Department combine conditional and firm commitment applications and lower the fees charged for making the application. The Department is considering bypassing the conditional commitment stage; however, it does not contemplate lowering its application fees.

*Section 241.1035 Charges by Lender*

One commenter asserted that the limitation on the initial service charge in § 241.1035(b) conflicted with the debt service coverage requirements of § 241.1067. The Department does not see any conflict between the two provisions, and the rule has not been changed to reflect the comment. Another comment requested that provisions regarding mortgagee consent to section 241(f) loans be clearly stated in the rule. The proposed rule did so at § 241.1120.

*Section 241.1046 Rental Assistance*

Three comments stated that the term of section 8 housing assistance payments contracts offered as an incentive to an owner or purchaser to support section 241(f) equity or acquisition loans should be coincidental with the term of the mortgage. Section 8 contract terms are limited to those provided for in appropriations acts. However, section 241(f)(7) requires the Department, when underwriting the mortgage insurance, to assume that the assistance will be available for the full period of time during which the plan of action is in effect. The proposed rule at § 241.1046(a) reflects this statutory intent. Further, § 248.169(b) of the interim rule prescribes the actions the Department must take to protect the owner and tenants should an assistance contract not be renewed.

Two commenters objected to the acceleration provision of § 241.1046(b), stating that it would make loans unmarketable, presumably on the secondary market. This provision reflects the language of the statute at section 241(f)(7), and will protect the mortgagee in case there are insufficient appropriations to fund a renewal of an assistance contract to support an equity or acquisition loan insured under this subpart. The provision does not affect the mortgage insurance or compromise a mortgagee's ability to file a claim in the event of a default. Indeed, its probable intention is to allow the Department the option of immediately causing a default, and subsequent assignment of the mortgage in exchange for insurance benefits, instead of having the mortgagee wait for a monetary default and then proceeding to an

assignment. The last comment suggested that the Department clarify that it will accept an insurance claim in the event that an assistance contract is not renewed. While section 241(f)(8) directs the Department to "take actions * * * to avoid default," the Department acknowledges its obligation under the mortgage insurance contract to pay insurance claims upon proper notification and assignment by the mortgagee.

*Section 241.1060 Maturity*

The Department received 86 comments objecting to the 20-year term for loans insured under this subpart for a variety of reasons: (1) The 20-year term would increase the likelihood of preservation rents exceeding the Federal cost limit, enabling more owners to prepay their mortgages and terminate the affordability restrictions; (2) the 20-year term is more costly to the Federal government than a 40-year term because of the assistance which must be provided to support increased debt service costs; (3) a 20-year term would make purchase of the loan for the Government National Mortgage Association's mortgage backed securities (MBS) program infeasible; and (4) a 20-year term would limit an owner's opportunity to realize the full 70 percent of preservation equity under an equity loan.

While it is true that the increased debt service associated with a shorter term loan might in some instances cause a project's aggregate preservation rents to exceed the Federal cost limit, the Department does not view this as impacting on the likelihood that an owner will prepay the mortgage and terminate the affordability restrictions. If the transfer preservation rents exceed the Federal cost limits, an owner may elect to prepay subject to the mandatory sales provisions of § 248.161 of this title. An owner may prepay only if it does not receive a bona fide offer at the preservation value. This is in effect identical to a voluntarily sales offer under § 248.157, where the owner may also prepay only if it does not receive a bona fide offer to purchase. Since the opportunity to prepay is a direct result of the lack of a purchaser available or willing to make a bona fide offer, the Department is not persuaded that an increase in the term of an acquisition loan would have any effect on prepayment.

While it is true that a shorter term loan would carry higher amortization costs, it is not true that a longer term loan would, therefore, be less costly to the government. The extra subsidy assistance necessary to support a longer term loan is greater than the reduction in annual debt service costs attendant to a longer term loan. The Department is, therefore, reluctant to support a loan program with inherently higher costs, the benefits of which have not been demonstrated.

The Department does not ordinarily structure program regulations around the potential for third parties to create investment opportunities. The Department's multifamily insured loan programs have traditionally carried 40-year terms, which have most likely been a contributing factor to the terms of various MBS programs. The Department is confident that the market can adjust to an insured mortgage of a lesser term.

*Section 241.1067 Maximum Loan Amount*

Fifteen commenters offered various suggestions for nonprofit purchasers to include soft costs and transaction costs in acquisition loans in addition to the maximum loan amount. As previously discussed in the comments to § 241.1015, the Department will include such costs which are not covered in the acquisition loan in a capital grant for priority purchasers in all sales and qualified purchasers in mandatory sales.

One comment stated that the Department should accept rehabilitation, equity and acquisition financing from any source, public or private, without necessarily using section 241 mortgage insurance. The Department's position is that the plan of action may include an uninsured rehabilitation, equity or acquisition loan provided that the terms of the loan, including monitoring of rehabilitation, and default acceleration and foreclosure provisions are acceptable to the Department.

The Department recognizes that purchasers may have difficulty obtaining the additional 5% of transfer preservation equity which may not be financed through an acquisition loan under this section. In order to make financing more

accessible, seller financing will be permitted as long as it meets the requirements of the related party rule in § 248.101. Any seller financing must be in the form of a loan, not a grant, and the total amount of the financing, including the acquisition loan provided under this subpart, may not exceed the project's transfer preservation equity, plus in the case of a priority purchaser, any expenses associated with the acquisition, loan closing, and implementation of the plan of action. Also, the interest rate charged by a seller on any financing may not be in excess of the interest rate imposed on the acquisition loan under this subpart. A new § 248.157(q) has been added to part 248 to provide for seller financing.

A commenter suggested that the 30 percent equity requirement for equity loans be construed as not requiring the owner to post any further equity to obtain the loan.

The Department concurs with the commenter. However, owners may have to pay loan fees and other transaction costs incidental to receiving such loans. The Department will not provide additional incentives for this purpose. A commenter suggested that priority purchasers be subject only to a 5 percent holdback. The 5 percent holdback pertains to equity loans. Only owners who extend low income affordability restrictions, and not purchasers, are eligible for equity loans, and the holdback requirement does not apply to purchasers. Another comment suggested that standard debt service coverage and vacancy allowance practices be used in setting the actual rents for servicing acquisition loans. The Department intends to assume a 3% vacancy cost in approving acquisition loans.

One comment asked why mortgagees, and in particular servicing mortgagees, were prohibited from charging transaction fees for consenting to secondary financing insured under this subpart. The mortgagee is prohibited from withholding consent to an equity or acquisition loan or an insured rehabilitation loan. HUD considers the imposition of a substantial transaction fee to be tantamount to the withholding of consent to the second mortgage. Moreover, since the mortgagee is prohibited from withholding consent, the servicer would undertake only a very limited review of the secondary financing. Therefore, the Department sees no basis for the mortgagee to charge a transaction fee.

One commenter inquired whether a mortgagee could withhold consent to a section 241(a) rehabilitation loan. Section 241.1661(c) of the proposed rule prohibited the holder of an insured mortgage from withholding its consent to a rehabilitation loan insured under section 241(a) with respect to "eligible multifamily housing," as defined in that section. This provision implements section 204(b) of the Department of Housing and Urban Development Reform Act. The interim rule retains the language of the proposed rule.

*Section 241.1069 Escrow Requirements*

One comment objected to HUD or a State housing finance agency controlling the disbursement of the 10 percent holdback from equity loans. The rule tracks the statutory language at section 241(f)(2)(B)(ii) and has not been changed.

One commenter noted that the language of this section suggested the possible use of insured advances with respect to equity and acquisition loans and further suggested a methodology similar to that used in the section 223(f) program. The Department interprets the statute as requiring disbursement of section 241(f) loan proceeds in full at loan closing, except to account for any phase-in of rents, and except for the 10 percent holdback on equity loans.

Therefore, the rule has not been changed to reflect this comment. Another commenter suggested that insured advances be deleted entirely, the Department also waiving its review and inspection requirements under section 241(a). As stated above (see § 241.1000), the Department will continue to review and inspect rehabilitation work performed under section 241(a).

Another commenter suggested that insured equity loans be fully disbursed at closing with the 10 percent holdback considered "subject to escrow." The statute at section 241(f)(2)(B)(ii) conditions the issuing of insurance on the holdback, held by the mortgagee for a period of not less than five years, to ensure compliance with the maintenance standards at section 222(d) of LIHPRHA. The rule reflects the statutory provisions.

With respect to the phase-in provisions in § 241.1069(b), another commenter stated that is was unlikely that any operating deficit would be required, and that a letter of credit posted by the borrower would offer the mortgagee sufficient protection in case a deficit actually occurred. While the Department generally agrees that operating deficits during the rent phase-in period will be exceptional, it sees no reason to amend this protection. Moreover, the phase-in provision is specifically contemplated by section 241(f)(5)(B).

*Section 241.1100 Prepayment Privileges and Charges*

One comment suggested that the Department include the provisions of Mortgagee Letter 87-9 to loans insured under this subpart. Mortgagee Letter 87-9 addresses prepayment lock-outs and prepayment charges imposed by lenders in bond-financed and other investor-financed transactions. Section 241.1100 provides the regulatory basis for HUD's approval of such lock-outs and charges. There is no need to include the provisions of the Mortgagee Letter in the regulation itself.

*Section 241.1120 Mortgagee's Consent*

One commenter suggested that the Department expand the coverage of this section by prohibiting a mortgagee from withholding its consent on any noninsured secondary financing pursuant to an approved plan of action. The Department has revised the language of this section to clarify that the prohibition on withholding consent to an equity loan is applicable with respect to both insured and noninsured equity loans. In addition, the prohibition has been expanded to include a prohibition on withholding consent to insured or noninsured acquisition loans. Sections 241(f) (2)(A) and (3)(A) define the terms "equity loan" and "acquisition loan" respectively without regard to whether the loan is insured by HUD. Section 241(f)(9) prohibits a HUD-approved mortgagee from withholding consent to an "equity loan" or "acquisition loan" on a property on which that mortgagee holds a mortgage. Thus, on the basis of the literal statutory language, HUD believes that the prohibition on withholding consent is applicable to both insured and noninsured equity and acquisition loans. (By contrast, the prohibition on withholding consent to a rehabilitation loan is restricted to loans insured under section 241; see section 241(g)(2) of the National Housing Act, as added by section 204(b) of the Department of HUD Reform Act of 1989.)

Subpart F -- Insurance for Equity Loans -- Contract Rights and Obligations

*Section 241.1210 Condition for Payment of Insurance Benefits*

One comment stated that this section should be clarified to ensure that all regulatory requirements regarding timely notice and other actions would also apply to an application for insurance benefits under this section. The proposed rule incorporated such regulatory requirements by cross-referencing the provisions of § 207.258 of this title. Further clarification is not deemed necessary.

*Section 241.1235 Cross Default*

One comment requested that the phrase "and the holder thereof initiates a foreclosure proceeding" be deleted from this section. The Department has retained the quoted language. In cases where the holder elects to assign the loan to HUD rather than foreclosing, there is no need to protect HUD's interests by creating a cross-default.

Another commenter stated that a mortgagee should only be obligated to inform the Department of defaults of which the mortgagee is aware. There is no expectation that a mortgagee be obligated to inform the Department of mortgage violations of which it does not have knowledge.

*Section 241.1245 Insurance Endorsement*

One commenter suggested that secondary market lenders be consulted when loans under this subpart are endorsed to avoid any secondary market problems. HUD presumes that primary lenders intending to sell their loans on the secondary market will consult with secondary lenders to ensure the marketability of their loans. The Department sees no need to amend the rule to address what is essentially a market transaction.

Part 219 -- Flexible Subsidy Program for Troubled Projects

Subpart C

The Department received one comment concerning part 219 of this title. The commenter suggested waiving any equity requirements for capital improvement loans provided to priority purchasers. Pursuant to § 219.305(c), an owner must contribute 25 percent of the total estimated cost of the needed capital improvements; however, if the owner is a nonprofit organization other than a cooperative association, it is exempt from this requirement. Therefore, cooperative associations, are subject to an equity requirement when applying for a capital improvement loan.

Part 236 -- Mortgage Insurance and Interest Reduction Payment for Rental Projects

Section 236.60 and paragraph (b) of § 236.55 have been restated in this interim rule to correct an error in the publication of the April 1, 1991 revised version of title 24 of the CFR in which language from both sections was inadvertently omitted.

Miscellaneous Comments

Thirty-four miscellaneous comments were received regarding a variety of issues that were not covered within any specific section of the rule.

A concern was raised by three commenters that an owner may attempt to interfere with the tenants right to organize or participate in the prepayment process. The commenter requested that a penalty be imposed or a warning clearly stated in the regulations in order to preclude any owner interference. The Department does not have express authority to impose a penalty on owners. If tenants feel that their right to organize has been violated, they may seek redress through any State or local tenant/landlord institutions or State or local law.

Three commenters want the Department to designate a contact person that will provide tenants with access to information and general planning assistance throughout the preservation process. The Department has already designated personnel in the regional and field offices whose primary responsibilities are providing information and guidance to the tenants and acting as facilitators between tenant groups, mortgage companies and non-profit organizations.

Another commenter requested that it be notified of all elderly projects that have submitted their second notice of intent. The Department has compiled a list of eligible low income housing and this information may be obtained from local field offices upon request.

Two commenters stated that the regulation should be neutral concerning an owner's choice of retaining or selling its property and should not undermine an owner's right to choose, as the commenters claim the sales provisions in the proposed rule do. The regulation reflects the statutory requirements relative to retaining or selling a project.

A commenter requested that a distinction be made between large and small projects (under 100 units) so that profit motivated developers could more easily purchase small projects. The same commenter stated that the regulations should

specifically enable individual owners, who are disabled, over 65 or financially stressed to be able to sell their property outright and receive cash. The implication is that such owners should not have to follow the regulatory process. The statute does not distinguish between small and large projects. A profit-motivated purchaser may buy projects so long as it meets the requirements of a qualified purchaser.

There was a concern by a commenter that the provision of financial incentives under a plan of action may be hampered by subsidy layering reviews. Pursuant to section 102(d) of the Housing and Urban Development Reform Act of 1989, the Department must perform a subsidy layering analysis to ensure that HUD funds are expended in the least costly manner, while assuring project feasibility. However, the overall preservation process, including approval of the plan of action, should not be materially affected by this requirement in terms of time delay.

Four commenters asked about advances to the owners to finance capital improvements, annual increases to section 8 and moderate income rents, and assistance to state-assisted or subsidized projects to prevent prepayment. The questions concerning advances pertain to section 611(b) of the statute and are not germane to this regulation; a rule implementing section 611(b) will be published separately for comment. While this rule does not implement section 612, which governs rent increases for moderate income and market-rate tenants, its impact on tenant rents has been explained in the discussion concerning § 248.145 of this subpart. Section 613(b), relating to the state mortgage programs, is implemented as subpart D herein.

Findings and Other Matters

This rule constitutes a major rule, as determined by the Office of Information and Regulatory Affairs, Office of Management and Budget, under the authority of Executive Order 12291 on Federal Regulations issued on February 17, 1981. A copy of the Regulatory Impact Analysis has been transmitted to the Office of Management and Budget, and is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, room 10276, 451 Seventh Street SW., Washington, DC 20410.

This rule was listed as item 1349 in the Department's Semiannual Agenda of Regulations published on October 21, 1991 *(56 FR 53380, 53396)*, under Executive Order 12291 and the Regulatory Flexibility Act.

A Finding of No Significant Impact with respect to the environment has been made in accordance with HUD regulations in 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969, *42 U.S.C. 4332*. The Finding of No Significant Impact is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, room 10276, 451 Seventh Street, SW., Washington, DC 20410.

Under section 605 of the Regulatory Flexibility Act *(5 U.S.C. 601)*, HUD certifies that this rule does not have a significant economic impact on a substantial number of small entities, because it carries out statutorily-mandated limitations on prepayment of the affected mortgages. Any economic impact is a direct consequence of the statute and is not separately imposed by this rule.

The Information collection requirements contained in the rule have been submitted to the Office of Management and Budget, Office of Information and Regulatory Affairs, HUD Desk Officer, room 3001, New Executive Office Building, Washington, DC 20503, for review under the provisions of the Paperwork Reduction Act of 1980 *(44 U.S.C. 3501*-3502). No person may be subject to a penalty for failure to comply with these information collection requirements until they have been approved and assigned an OMB control number. The OMB control number, when assigned, will be announced by separate notice in the Federal Register.

57 FR 11992

Tabulation of Annual Reporting Burden

| Description of information collection and applicable program reference | Number of respon dents 17.1 X | Number of respon ses per respo 17.2= | Total annual responses 17.3 X |
|---|---|---|---|
| A. First notice of intent 1990 statute: Section 248.105 | 509.00 | 1.00 | 509.00 |
| B. Election to proceed under 1987 statute: 248.5 | 120.00 | 1.00 | 120.00 |
| C. Appraisal: 248.111 | | | |
| D. Second notice of intent: 248.133 | 283.00 | 1.00 | 283.00 |
| E. Plans of action: | | | |
| 1. Termination of Affordability: 248.141 | 4.00 | 1.00 | 4.00 |
| 2. Extension of Affordability/Transfer of Project: 248.145 | 465.00 | 1.00 | 465.00 |
| (Resident councils plans included in L) | | | |
| F. Expression of interest from potential purchasers: 248.157(e) | 283.00 | 1.00 | 283.00 |
| Additional information from resident councils: 248.173(b) | 39.00 | 1.00 | 39.00 |
| G. Owner provides potential purchaser information on housing: 248.157(b) | 283.00 | 1.00 | 283.00 |
| H. Bona fide offers | 283.00 | 1.00 | 283.00 |
| Additional information from resident councils | 39.00 | 1.00 | 39.00 |
| I. Owner provides information on displaced tenants: 248.165(b) | 4.00 | 1.00 | 4.00 |
| J. Notices of vacancies from public housing agencies: 248.165(c) | 4.00 | 1.00 | 4.00 |
| K. Owner notifies HUD of expiring section 8 contracts: 248.169 1 | 0.00 | 1.00 | 0.00 |
| L. Resident homeownership plan: 248.173(d) | 39.00 | 1.00 | 39.00 |
| M. State preservation plan: 248.177(d) 2 | 6.00 | 1.00 | 6.00 |
| N. State insurance program application, 2 1990 statute: Section 248.301 | 1.00 | 1.00 | 1.00 |
| O. Application for project assistance statute: 248.319 | 3.00 | 1.00 | 3.00 |
| Totals | 2,365.00 | | |

1 See item 13 of supporting statement.

2 These items will be reported only in first year of program.

The Department specifically requests comments on how the paperwork burden on the public resulting from the interim rule may be reduced.

The General Counsel, as the Designated Official under section 6(a) of Executive Order 12612, Federalism, has determined that the policies contained in this rule will not have substantial direct effects on States or their political subdivisions, or the relationship between the Federal government and the States, or on the distribution of power and responsibilities among the various levels of government. As a result, the rule is not subject to review under the Order.

The General Counsel, as the Designated Official under Executive Order 12606, The Family, has determined that some of the policies in this rule will have a significant impact on the formation, maintenance and general well-being of the family. Achievement of homeownership by low income families under the regulation can be expected to support family values, by helping families to achieve security and independence, by enabling them to live in decent, safe and sanitary housing, and by giving them the skills and means to live independently in mainstream American society. Since the impact on the family is beneficial, no further review is necessary.

The General Counsel, as Designated Official under Executive Order 12630, Government Actions and Interference with Constitutionally Protected Property Rights, has determined that this interim rule does not have "takings implications," as defined in HUD's "Supplemental Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings." The interim rule does not deny the owner an economically viable use for the project. Instead, the owner will, at a minimum, maintain ownership of the project with the below market rate mortgage or rental subsidies in place and with greatly enhanced access to the full equity in the project as residential rental housing; alternatively, the owner may transfer the project under a plan of action in which the Secretary will provide incentives that will enable the owner to realize the full value of the project at its highest and best use, or may be entitled to prepay the mortgage.

The Catalog of Federal Domestic Assistance program number for this rule is 14.137 (Mortgage Insurance -- Rental and Cooperative Housing for Low and Moderate Income Families).

List of Subjects

*24 CFR Part 50*

Environmental assessments, Environmental impact statements, Environmental policies and review procedures.

*24 CFR Part 219*

Loan programs -- housing and community development, Low and moderate income housing.

*24 CFR Part 221*

Low and moderate income housing, Mortgage insurance, Reporting and recordkeeping requirements.

*24 CFR Part 236*

Grant programs -- housing and community development, Low and moderate income housing, Mortgage insurance, Rent subsidies, Reporting and recordkeeping requirements.

*24 CFR Part 241*

Energy conservation, Home improvement, Loan programs -- housing and community development, Mortgage

insurance, Reporting and recordkeeping requirements, Solar energy.

*24 CFR Part 248*

Intergovernmental relations, Loan programs -- housing and community development, Low and moderate income housing, Mortgage insurance, Reporting and recordkeeping requirements.

Accordingly, the Department amends title 24 of the Code of Federal Regulations as follows:

PART 50 -- PROTECTION AND ENHANCEMENT OF ENVIRONMENTAL QUALITY

1. The authority citation for part 50 is revised to read as follows:

Authority: *42 U.S.C. 4332, 42 U.S.C. 3535*(d).

2. In § 50.20, paragraph (n) is revised to read as follows:

§ 50.20 Categorical exclusions.

* * * * *

(n) Approval of mortgage prepayments or plans of action (including incentives) under the Emergency Low Income Housing Preservation Act of 1987 or the Low Income Housing Preservation and Resident Homeownership Act of 1990, and approval of mortgage prepayments under other statutes or authorities, when the proposal does not involve demolition of any buildings, or parts of any building, containing the primary use served by the project.

* * * * *

PART 219 -- FLEXIBLE SUBSIDY PROGRAM FOR TROUBLED PROJECTS

3. The authority citation for part 219 is revised to read as follows:

Authority: *12 U.S.C. 1715z-1a; 42 U.S.C. 3535*(d).

4. In § 219.325, the introductory text of paragraph (b) and paragraph (b)(3) are revised and a new paragraph (b)(5) is added to read as follows:

§ 219.325 Effect on rental rates.

* * * * *

(b) If rent increases that would result from the debt service and other expenses of a capital improvement loan under subpart C of this part for a project would cause the rents of lower income residents of the project to be higher than the amount that would be allowed for eligible families under 24 CFR 813.107, or where appropriate to implement a plan of action under part 248 of this chapter, the Secretary may consider taking any or all of the following actions:

* * * * *

(3) Notwithstanding § 219.320(b), reduce the rate of interest on the capital improvement loan to a rate not lower

than one percent.

* * * * *

(5) Permit repayment of the debt service to be deferred as long as the low and moderate income character of the project is maintained in accordance with § 219.110(b).

PART 221 -- LOW COST AND MODERATE INCOME MORTGAGE INSURANCE

5. The authority citation for part 221 is revised to read as follows:

Authority: *12 U.S.C. 1707*(a), 1715(b), 1715*l*, *42 U.S.C. 3535*(d).

6. In § 221.524, paragraph (e) is revised to read as follows:

§ 221.524 Prepayment privileges.

* * * * *

(e) *Prepayment of mortgages subject to part 248.* Where the mortgage described in paragraph (a)(1) of this section is, or prior to assignment to the Commissioner was, insured under section 221(d)(3) of the Act and the mortgagor receives project-based assistance under parts 880, 881 or 886 of this title, or where the mortgage is, or prior to assignment to the Commissioner was, insured under section 221(d)(5) of the Act, the mortgage may be prepaid in full only in accordance with a plan of action approved by the Commissioner under part 248 of this chapter.

PART 236 -- MORTGAGE INSURANCE AND INTEREST REDUCTION PAYMENT FOR RENTAL PROJECTS

7. The authority for part 236 is revised to read as follows:

Authority: *12 U.S.C. 1715b* and 1715z-1; *42 U.S.C. 3535*(d).

8. In § 236.55, paragraph (b) is revised to read as follows:

§ 236.55 Rental charges.

* * * * *

(b) *Monthly rental charge.* Except as agreed to by the Commissioner pursuant to a plan of action approved under part 248 of this chapter, monthly rental charges shall be calculated as follows:

(1) *Tenant Rent for qualified tenants whose initial lease is effective on or after May 1, 1983.* The Tenant Rent payable by a Qualified Tenant shall be the greater of the Basic Rent or 30 percent of the tenant's Adjusted Monthly Income, but not more than the Market Rent. In the case of tenant paid utilities, the Utility Allowance may not reduce the Tenant Rent below 25 percent of Adjusted Monthly Income.

(2) *Tenant Rent for qualified tenants whose initial lease was effective before May 1, 1983.* The Tenant Rent shall be calculated in accordance with paragraph (b)(1) of this section, except that instead of 30 percent, the percentage applied to Adjusted Monthly Income shall be as follows:

| Effective date of recertification | Percentage |
| --- | --- |
| May 1, 1983 to Sept. 30, 1983 | 27 |
| Oct. 1, 1983 to Sept. 30, 1984 | 28 |
| Oct. 1, 1984 to Sept. 30, 1985 | 29 |
| Oct. 1, 1985 and after | 30 |

(3) *Limitation on tenant's monthly rental payment.* In no event shall the monthly rental exceed the HUD-approved market rental.

* * * * *

9. Section 236.60 is revised to read as follows:

§ 236.60 Excess rental charges.

Except as agreed to by the Commissioner pursuant to a plan of action approved under part 248 of this chapter or in connection with an adjustment of contract rents under section 8(c)(10) of the United States Housing Act of 1937, the mortgagor shall agree to pay monthly to the Secretary the total of all rental charges collected in excess of the Basic Rent in accordance with the instructions prescribed by the Secretary.

PART 241 -- SUPPLEMENTARY FINANCING FOR INSURED PROJECT MORTGAGES

10. The authority for part 241 is revised to read as follows:

Authority: *12 U.S.C. 1715b,* 1715z-6, *42 U.S.C. 3535*(d).

11. Section 241.166 is added to subpart A to read as follows:

§ 241.166 Special underwriting standards for eligible multifamily housing.

(a) For purposes of this section, the term "eligible multifamily housing" means any housing financed by a loan or mortgage that is --

(1) Insured or held by the Commissioner under section 221(d)(3) of the National Housing Act and assisted under section 101 of the Housing and Urban Development Act of 1965 or section 8 of the United States Housing Act of 1937;

(2) Insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act; or

(3) Insured, assisted or held by the Secretary under section 236 of the National Housing Act.

(b) When underwriting a loan under subpart A of this part in connection with eligible multifamily housing, the Commissioner may assume that any rental assistance provided for purposes of servicing the additional debt will be extended for the term of the rehabilitation loan. The Commissioner shall exercise prudent underwriting practices in insuring rehabilitation loans under subpart A of this part.

(c) The holder of an insured mortgage which is recorded prior to the rehabilitation loan covering eligible multifamily housing may not withhold its consent to the rehabilitation loan or the security instrument executed in connection with the rehabilitation loan, and may not charge a fee as a condition to its consent to such loan or security instrument.

12. Section 241.251 is amended by adding a paragraph heading to paragraph (a) and by adding a new paragraph (c) to read as follows:

§ 241.251 Cross-reference.

(a) *Projects with a HUD-insured or HUD-held mortgage.* * * *

* * * * *

(c) *Projects without a HUD-insured or HUD-held mortgage.* The provisions of subpart D of this part shall be applicable to a project without a HUD-insured or HUD-held mortgage that is receiving a loan insured under subpart A of this part in connection with a plan of action approved by the Commissioner under part 248 of this chapter.

13. Subpart E (consisting of §§ 241.1000 through 241.1120) and subpart F (consisting of §§ 241.1200 through 241.1250), are revised to read as follows:

Subpart E -- Insurance for Equity Loans and Acquisition Loans -- Eligibility Requirements

Sec.

241.1000 Purpose and scope.

241.1005 Definitions.

241.1010 Feasibility letter.

241.1015 Application and commitment fees.

241.1020 Commitments.

241.1025 Refund of fees.

241.1030 Mortgage insurance premiums.

241.1035 Charges by lender.

241.1040 Eligible lenders.

241.1045 Note and security form.

241.1046 Rental assistance.

241.1050 Method of loan payment.

241.1055 Date of first payment to principal.

241.1060 Maturity.

241.1065 Maximum loan amount -- loans insured in connection with a plan of action under subpart C of part 248 of this chapter.

241.1067 Maximum loan amount -- loans insured in connection with a plan of action under subpart B of part 248 of this chapter.

241.1069 Escrow requirements.

241.1070 Agreed interest rate.

241.1080 Eligibility of title.

241.1085 Title evidence.

241.1090 Accumulation of next premium.

241.1095 Application of payments.

241.1100 Prepayment privilege and charges.

241.1105 Late charges.

241.1120 Mortgagee's consent.

Subpart F -- Insurance for Equity Loans and Acquisition Loans -- Contract Rights and Obligations

Sec.

241.1200 Cross-references.

241.1205 Payment of insurance benefits.

241.1210 Condition for payment of insurance benefits.

241.1215 Calculation of insurance benefits.

241.1220 Termination of insurance benefits.

241.1230 No vested right in fund.

241.1235 Cross default.

241.1245 Insurance endorsement.

241.1250 Effect of endorsement.

Subpart E -- Insurance for Equity Loans and Acquisition Loans -- Eligibility Requirements

§ 241.1000 Purpose and scope.

(a) Section 231 of the Emergency Low Income Housing Preservation Act of 1989 ("ELIHPA") amended the National Housing Act by adding a new subsection (f) to section 241. This section authorizes the Secretary to provide insurance for an equity loan as a vehicle for the owner of an eligible multifamily project to capture a portion of the project's equity, in connection with a plan of action approved by the Commissioner under ELIHPA.

(b) Section 602 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA") amended section 241 by expanding its scope to include both equity loans for owners, and acquisition loans for purchasers, under a plan of action approved under the provisions of the 1990 Act, and by making other changes. The provisions of section 241(f) as amended by LIHPRHA are applicable to owners with plans of action being processed under part 248, subpart B of this chapter, which implements LIHPRHA.

(c) The provisions of section 241(f) of the Act as they were in effect prior to LIHPRHA remain in effect for owners with plans of action being processed under part 248, subpart C of this chapter, which implements ELIHPA.

(d) The insurance of an equity loan or acquisition loan under subpart E of this part may be provided only as a specific element of a plan of action approved by the Commissioner under part 248 of this chapter and is not available under any other departmental program.

(e) Unless otherwise indicated, the provisions of subparts E and F of this part are applicable to loans insured in connection with plans of action being processed under either subpart B or C of part 248 of this chapter.

(f) An owner or purchaser may obtain both a rehabilitation loan under subpart A of this part and an equity loan or

acquisition loan under subpart E of this part.

§ 241.1005 Definitions.

(a) All of the definitions of § 241.1 apply to equity and acquisition loans insured under subpart E of this part except the following definitions:

§ 241.1(i) -- Borrower;

§ 241.1(k) -- Energy conserving improvements;

§ 241.1(l) -- Solar energy system.

(b) As used in subpart E of this part, the following terms have the meaning indicated:

*Acquisition loan* means a loan or advance of credit made to a purchaser of eligible low income housing which is made for the purpose of implementing a plan of action approved in accordance with part 248 of this chapter.

*Borrower* means the owner or qualified purchaser of an eligible low income housing project, which owner receives and becomes primarily obligated for the repayment of an equity loan. With respect to loans insured in connection with a plan of action under part 248, subpart C of this chapter, the term includes a public entity, a nonprofit organization or a limited equity cooperative, which entity is purchasing an eligible low income housing project by means of an equity loan and is obligated for the payment of the equity loan.

*Eligible low income housing* has the same meaning as provided at § 248.101 or § 248.201 of this chapter, with respect to loans insured in connection with plans of action under subparts B or C of part 248 of this chapter.

*Equity* means, for purpose of subparts E and F of this part only, the difference between the fair market value of the project as determined by the Commissioner and the outstanding indebtedness relating to the property.

*Equity Loan* means a loan or advance of credit to the owner of an eligible low income housing project which is made for the purpose of implementing a plan of action approved in accordance with part 248 of this chapter.

*Extension preservation equity* has the same meaning as provided at § 248.101 of this chapter.

*Limited equity cooperative* means a tenant cooperative corporation which, in a manner acceptable to the Commissioner, restricts the initial and resale price of the shares of stock in the cooperative corporation so that the shares remain affordable to lower income families and moderate income families.

*Low income families* has the same meaning as provided at § 248.101 of this chapter.

*Moderate income families* has the same meaning as provided at § 248.101 of this chapter.

*Plan of action* has the same meaning as provided at § 248.101 or § 248.201 of this chapter.

*Preservation equity* has the same meaning as provided at § 248.101 of this chapter.

*Priority purchaser* has the same meaning as provided at § 248.101 of this chapter.

*Qualified Purchaser* has the same meaning as provided at § 248.101 of this chapter.

§ 241.1010 Feasibility letter.

(a) *Request for study.* The owner may request the Commissioner to undertake a feasibility analysis of an equity or acquisition loan, and issue a feasibility letter. At the discretion of the Commissioner the feasibility analysis may be undertaken or denied.

(b) *Findings.* The issuance of a feasibility letter indicates completion of the Commissioner's preliminary analysis for the insurance of an equity or acquisition loan. The feasibility letter shall contain the Commissioner's estimate of the supportable loan amount, based upon the project's equity in the case of an equity loan and based on the project's purchase price in the case of an acquisition loan, but such feasibility letter shall neither constitute a commitment to insure nor bind the Commissioner in any other manner.

(c) *Fee.* The Commissioner shall not charge a fee for undertaking a feasibility analysis or for the issuance of a feasibility letter.

§ 241.1015 Application and commitment fees.

(a) *Application.* An application for the issuance of either a conditional or firm commitment for insurance of an equity or acquisition loan on a project shall be submitted by an approved lender and by the owner or purchaser of the project to the Commissioner on a form prescribed by the Commissioner. No application shall be considered unless the exhibits called for by such forms are furnished.

(b) *Application and commitment fees* -- (1) *Application for conditional commitment.* An application commitment fee of $2.00 per thousand dollars of the amount of the loan applied for shall accompany the application for a conditional commitment.

(2) *Application for firm commitment.* An application for a firm commitment shall be accompanied by the payment of an application-commitment fee in an amount which, when added to any prior fee received in connection with a conditional commitment application, will aggregate $3.00 per thousand dollars of the loan applied for.

§ 241.1020 Commitments.

(a) *Conditional commitment.* The issuance of a conditional commitment constitutes an agreement by the Commissioner, subject to specified terms and conditions, to accept an application for a firm commitment.

(b) *Firm Commitment.* The issuance of a firm commitment indicates the Commissioner's approval of the application for insurance and sets forth the terms and conditions upon which the equity or acquisition loan will be insured. The firm commitment may provide for the insurance of advances of equity or acquisition loan immediately upon endorsement of the note.

(c) *Term of commitment.* (1) A conditional commitment is effective for whatever term is specified in the text of the commitment.

(2) A firm commitment is effective for whatever term is specified in the text of the commitment.

(3) The term of either a conditional or firm commitment may be extended in such manner as the Commissioner may prescribe.

(d) *Reopening of expired commitments.* An expired conditional or firm commitment may be reopened if a request for reopening is received by the Commissioner within 90 days of the expiration of the commitment. The reopening request shall be accompanied by a fee of 50 cents per thousand dollars of the amount of the expired commitment. If the reopening request is not received by the Commissioner within the required 90-day period, a new application, accompanied by the required application and commitment fee, must be submitted.

§ 241.1025 Refund of fees.

If the amount of the commitment issued is less than the amount applied for, the Commissioner shall refund the excess amount of the application and commitment fees submitted by the applicant. If an application is rejected before it is assigned for processing, or in such other instances as the Commissioner may determine, the entire application and commitment fees or any portion thereof may be returned to the applicant. Commitment and reopening fees may also be refunded to the applicant, in whole or in part, in such other instances as the Commissioner may determine.

§ 241.1030 Mortgage insurance premiums.

The lender, upon endorsement of the note, shall pay the Commissioner a first mortgage insurance premium equal to 0.5 percent of the original face amount of the equity or acquisition loan.

(a) If the date of the first principal payment is more than one year following the date of endorsement, the lender upon each anniversary of such endorsement date, shall pay a premium equal to 0.5 percent of the original face amount of the loan. On the date of the first principal payment, the lender shall pay another premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the following year which shall be adjusted so as to accord with such date and so that the aggregate of said premiums shall equal the sum of:

(1) 0.5 percent of the average outstanding principal obligation of the loan for the year following the date of endorsement; and

(2) 0.5 percent per annum of the average outstanding principal obligation of the loan for the period from the first anniversary of the date of endorsement to one year following the date of the first principal payment.

(b) If the date of the first principal payment is one year or less than one year following the date of endorsement, the lender, upon such first principal payment date, shall pay a second premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the following year which shall be adjusted so as to accord with such date and so that the aggregate of the said two premiums shall equal the sum of:

(1) 0.5 percent per annum of the average outstanding principal obligation of the loan for the period from the date of endorsement to the date of the first principal payment; and

(2) 0.5 percent of the average outstanding principal obligation of the loan for the year following the date of the first payment following the date of the first principal payment.

(c) Until the equity or acquisition loan is paid in full or until receipt by the Commissioner of an application for insurance benefits, or until the contract of insurance is otherwise terminated with the consent of the Commissioner, the lender on each anniversary date of the first principal payment, shall pay an annual insurance premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the year following the date on which such premium becomes payable.

(d) The premiums payable on or after the date of the first principal payment shall be calculated in accordance with the amortizing provisions without taking into account delinquent payments or prepayments.

(e) Premiums shall be payable in cash or in debentures at par plus accrued interest. All premiums are payable in advance and no refund can be made of any portion thereof except as hereinafter provided in subpart E of this part.

§ 241.1035 Charges by lender.

(a) The lender may collect from the borrower the amount of the fees provided for by subpart E of this part.

(b) The lender may also collect from the borrower an initial service charge, as reimbursement for the cost of closing

the transaction, in an amount not to exceed 2 percent of the original principal amount of the loan.

(c) Any charges to be collected by the lender in addition to those prescribed in paragraphs (a) and (b) of this section, shall be subject to the prior approval of the Commissioner.

§ 241.1040 Eligible lenders.

Lenders meeting the applicable eligibility qualifications and requirements contained in § 203.4 or § 203.6 of this chapter are eligible for insurance of equity or acquisition loans under subpart E of this part.

§ 241.1045 Note and security form.

The lender shall present for insurance a note and security instrument on forms approved by the Commissioner for use in the jurisdiction in which the property is located, which shall not be changed without the prior approval of the Commissioner. The security instrument shall provide for accelerated repayment at the request of the Commissioner pursuant to § 241.1046(b).

§ 241.1046 Rental assistance.

(a) When underwriting an equity or acquisition loan under subpart E of this part, the Commissioner may assume that the rental assistance provided in accordance with a plan of action approved under subparts B or C of part 248 of this chapter will be extended for the full term of the contract entered into under the plan of action.

(b) In the event that rental assistance is not extended under part 248 of this chapter, or the Commissioner is unable to develop a revised package of incentives to the owner comparable to those received under the original approved plan of action, the Commissioner may require the mortgagee to accelerate the debt of the equity or acquisition loan.

(c) If the Commissioner is unable to extend the term of rental assistance for the full term of the contract entered into under part 248 of this chapter, the Commissioner is authorized to take such actions as the Commissioner deems appropriate to avoid default, avoid disruption of the sound ownership and management of the property or otherwise minimize the cost to the Federal Government.

§ 241.1050 Method of loan payment.

The loan shall provide for monthly payments on the first day of each month on account of interest and principal and shall provide for payments in accordance with the amortization plan as agreed upon by the borrower, the lender, and the Commissioner.

§ 241.1055 Date of first payment to principal.

The date for first payment to principal shall be established by the Commissioner.

§ 241.1060 Maturity.

Acquisition loans and equity loans insured under subpart E of this part shall have a maturity equal to the remaining term of the first insured mortgage, or 20 years, whichever is longer.

§ 241.1065 Maximum loan amount -- loans insured in connection with a plan of action under subpart C of part 248 of this chapter.

The amount of the equity loan shall not exceed ninety percent of the owner's equity in the project, as determined by the Commissioner. Notwithstanding the above, the equity loan shall not exceed an amount which, when added to the existing indebtedness on the property, can be supported by 90 percent of the projected net operating income of the

project, as determined by the Commissioner. The Commissioner, in making a determination regarding the amount of an equity loan and sums available to service said loan, shall take into account the fact that the project's income may increase within the limits established by § 248.233(d) of this chapter.

§ 241.1067 Maximum loan amount -- loans insured in connection with a plan of action under subpart B of part 248 of this chapter.

(a) The amount of the equity loan shall not exceed the lesser of 70 percent of the extension preservation equity of the project or the amount the Commissioner determines can be supported by the project on the basis of an 8 percent return on extension preservation equity, assuming normal debt service coverage.

(b) The amount of the acquisition loan shall not exceed 95 percent of the transfer preservation equity of the project, except that, if the purchaser is a priority purchaser, the loan may include any expenses associated with the acquisition, loan closing, and implementation of the plan of action, subject to the approval of the Commissioner.

(c) The owner or purchaser may receive an equity or acquisition loan pursuant to subpart E of this part in combination with a rehabilitation loan insured under subpart A of this part, subject to the approval of the Commissioner.

§ 241.1069 Escrow requirements.

(a) An equity loan provided in connection with a plan of action under subpart B of part 248 of this chapter shall provide for the lender to deposit, on behalf of the borrower, 10 percent of the loan amount in an escrow account, controlled by the Commissioner or a State housing finance agency approved by the Commissioner, which shall be made available to the borrower upon the expiration of the 5-year period beginning on the date the loan is made, subject to compliance with § 248.147 of this chapter.

(b) An equity loan provided in connection with a plan of action under either subpart B or subpart C of part 248 of this chapter shall provide for the lender to phase in advances to reflect project rent levels.

§ 241.1070 Agreed interest rate.

The equity or acquisition loan shall bear interest at the rate agreed upon by the borrower and the lender.

§ 241.1080 Eligibility of title.

In order for the project to be eligible for insurance, the Commissioner shall determine that the title to the property is vested in the borrower as of the date the security instrument is filed for record. The title evidence will be examined by the Commissioner and the endorsement of the credit instrument for insurance shall be evidence of its acceptability.

§ 241.1085 Title evidence.

(a) Upon insurance of the loan, the lender shall furnish to the Commissioner a policy of title insurance as provided in paragraph (a)(1) of this section. If the lender is unable to furnish such policy for reasons satisfactory to the Commissioner, the lender shall furnish such evidence of title as provided in paragraphs (a)(2), (3) or (4) of this section as the Commissioner may require. Any policy of title insurance, or evidence of title required under this section shall be furnished without expense to the Commissioner. The acceptable types of title evidence are:

(1) A policy of title insurance issued by a company satisfactory to the Commissioner. Such policy shall comply with the "L.I.C. Standard Mortgage Form," or such other form as may be approved by the Commissioner; shall name the lender and the Secretary of Housing and Urban Development, as their respective interests may appear, as the insured; and shall become an owner's policy, running to the lender as owner upon its acquisition of the property in extinguishment of the debt, and to the Secretary as owner upon his acquisition of the property pursuant to the loan insurance contract;

(2) An abstract of title satisfactory to the Commissioner, prepared by an abstract company or individual engaged in the business of preparing abstracts of title, accompanied by a legal opinion satisfactory to the Commissioner, as to the quality of such title, signed by an attorney at law experienced in the examination of titles;

(3) A Torrens or similar title certification; or

(4) Evidence of title conforming to the standards of a supervising branch of the Government of the United States of America, or of any State or territory thereof.

§ 241.1090 Accumulation of next premium.

The security instrument shall provide for payments by the borrower to the lender on each interest payment date of an amount sufficient to accumulate in the hands of the lender one payment period prior to its due date the next annual insurance premium payable by the lender to the Commissioner. These payments shall continue only as long as the contract of insurance remains in effect.

§ 241.1095 Application of payments.

(a) The security instrument shall provide that all monthly payments to be made by the borrower shall be added together and the aggregate amount shall be paid by the borrower upon each monthly payment date in a single payment. The lender shall apply the payment in the following order:

(1) Premium charges under the contact of insurance;

(2) Interest on the loan; and

(3) Amortization of the principal of the loan.

(b) Any deficiency in the amount of any monthly payments required under paragraph (a) of this section shall constitute a default. The security instrument shall provide for a grace period of 30 days within which time the default must be cured.

§ 241.1100 Prepayment privilege and charges.

(a) *Prepayment privilege.* (1) Except as otherwise provided in paragraph (b) of this section, the security instrument shall contain a provision permitting the borrower to prepay the loan, in whole or in part, upon any interest payment date after giving to the lender 30 days advance notice of its intention to prepay.

(2) If the loan exceeds $200,000, the security instrument may contain a provision for an additional charge in the event of prepayment of principal as may be agreed upon between the borrower and lender. These charges shall not be imposed if the loan is accelerated at the request of the Commissioner, pursuant to § 241.1046(b). The borrower shall be permitted to prepay up to 15 percent of the original principal amount of the loan in any one calendar year without any additional charge. A provision for an additional charge in the event of prepayment may not be included in a loan of $200,000 or less.

(b) *Prepayment of bond-financed loan.* Where the lender has obtained the funds for the loan by the issuance and sale of bonds or bond anticipation notes, or both, the loan may contain a prepayment restriction and prepayment penalty charges acceptable to the Commissioner as to term, amount, and conditions.

§ 241.1105 Late charges.

The note and security instrument may provide for the lender's collection of a late charge, not to exceed 2 cents for each dollar of each payment to interest or principal more than 15 days in arrears, to cover the expense involved in