1990 Act prior to January 1, 1991, may elect to file a plan of action under either statute. On December 11, 1990, the Department issued notice 90-88, "Transition Rule for Filing Notices of Intent Pursuant to section 604(a) of the Cranston-Gonzalez National Affordable Housing Act of 1990," which informed owners of their right to file a notice of intent prior to January 1, 1991 under either statute and thus preserve their option under section 604(a).

Section 604(b) of the 1990 Act provides that any owner who has filed a plan of action on or before October 11, 1990, shall have the right to convert to the system of incentives and restrictions under the 1990 Act, with such adjustments as the Secretary deems appropriate to compensate for the value of any incentives received under the 1987 Act. It provides further that owners filing plans of action after October 11, 1990, shall not have any such right to convert to a system of incentives under the 1990 Act. To the extent that a conflict may exist between sections 604(a) and 604(b), the Department construes the latter provision as taking precedence. Thus, if an owner has filed a notice of intent prior to January 1, 1991, but then files a plan of action under the 1987 Act after October 11, 1990, it is the Department's view that the owner is barred from subsequently converting to a system of incentives under the 1990 Act.

Accordingly, the proposed regulation provides that owners of projects which have become eligible low income housing prior to January 1, 1991, who have, prior to that date, filed a notice of intent to prepay under the existing rule, but who have not submitted a plan of action after October 11, 1990, may choose to proceed under the provisions of either subpart B or subpart C. Section 248.5 of the proposed rule describes the procedure that an owner of eligible low income housing must follow in order to exercise its option to proceed under either subpart B or subpart C.

It should be noted that if an owner files a plan of action prior to October 11, 1990 under the existing rule, and then prior to its approval, but after the effective date of this rule, withdraws the plan of action, a subsequent notice of intent and plan of action may be filed under subpart B of this rule and the owner need not comply with the conversion provisions of § 248.5(c).

Section 248.5 states in part that an owner who has filed a plan of action on or before October 11, 1990, and who wishes to convert to the system of incentives and restrictions under subpart B of the proposed rule, must declare its election to do so by filing a notice of intent under subpart B by the latter of February 5, 1992 or 30 days after the date of HUD's final approval of the plan of action. Section 248.5 supersedes § 248.235 of the existing rule, which is deleted in the proposed rule. The February 5, 1992 date is derived from section 230 of the 1987 Act and § 248.235 of the existing regulations; the 30-day period is provided so that an owner whose plan of action is approved shortly before February 5, 1992 would have a sufficient period of tme to elect to convert to a plan of action under subpart B. While section 604(b) does not explicitly provide a date by which owners must elect to convert to the system of incentives and restrictions under the 1990 Act, the Department construes section 604(b) as permitting HUD to establish a reasonable deadline for such elections. An owner that wishes to convert to the system of incentives and restrictions under the 1990 Act must comply with all of the procedural and substantive requirements of the 1990 Act, and must also provide such documentation as is necessary for the Department to evaluate the incentives received by the owner under the 1987 Act.

*Section 248.7 (Preemption of State and Local Laws)*

Section 248.7 repeats verbatim the language of section 232 of the 1990 Act. Section 232 prohibits any State or locality from establishing, continuing in effect or enforcing any law or regulation that (a) restricts or impairs the right of an owner of eligible low income housing to prepay its mortgage, voluntarily terminate mortgage insurance or receive incentives under the 1990 Act, (b) is limited in its application to eligible low income housing for which the owner has prepaid the mortgage or voluntarily terminated the insurance, or (c) is otherwise inconsistent with the 1990 Act. Section 232, and § 248.7 of the proposed rule, specifically exclude from such preemption any State or local law or regulation, to the extent such law or regulation is applicable both to housing receiving Federal assistance and to nonassisted housing, and also excludes from preemption any contractual restrictions or obligations entered into before the enactment of the 1990 Act that prevent or limit prepayment. Thus, for example, the preemption provision has no effect on any mortgage note provisions requiring the consent of the State housing finance agency for prepayment of the mortgage.

*Section 248.9 (Waivers)*

Section 248.9 authorizes the Secretary to waive any provision of part 248, subject to statutory limitations, on the basis of a written determination of good cause. The existing rule does not contain a waiver provision.

84Subpart B -- Prepayments and Plans of Action Under the 1990 Act

*Section 248.101 (Definitions)*

*Aggregate Preservation Rents* -- Aggregate preservation rents are the gross potential income required by the project to meet certain expenses and preservation costs, depending on whether the owner intends to retain the project with the low income affordability restrictions -- the "extension preservation rent" -- or transfer the project to a qualified purchaser -- the "transfer preservation rent." In both instances, the project's gross potential income must be sufficient to support debt service on any rehabilitation loan and federally-assisted mortgage, project operating expenses and adequate reserves. In this context the term "rehabilitation loan" would include not only a rehabilitation loan insured by the Secretary under part 241 that would be obtained in connection with the plan of action, but also any other rehabilitation loan for the project that is outstanding at the time of the notice of intent. In calculating "adequate reserves" the Department will determine what additional funds must be added to existing reserves in order to maintain the project in accordance with the housing standards specified in § 248.147.

Project operating expenses would be determined by HUD, based on operating expenses for the past three years, adjusted for trend, reasonable reductions in maintenance and utility costs attributable to rehabilitation and energy improvements financed under the plan of action or a trended expense estimate based on the reasonable reductions in maintenance and utility costs attributable to rehabilitation and energy improvements. More weight will be given to the actual expenses, assuming they are reasonable.

If the owner intends to retain the property, the extension preservation rent must also include sufficient income to cover the annual authorized return. Where the owner plans to transfer property, the transfer preservation rent must be sufficient to cover debt service on any acquisition loan.

It should be noted that aggregate preservation rents are to be determined for the project as a whole, and not for each unit in the project, and that the sole purpose of the aggregate preservation rents is to provide a basis for comparison with the Federal cost limit. If the owner intends to transfer the project, the transfer preservation rent would be used to determine whether the project exceeds the Federal cost limit; if the owner intends to retain the project, the extension preservation rent would be used for this purpose.

*Annual Authorized Return* -- The proposed rule defines annual authorized return as the sum of (a) allowable distributions each year plus (b) the debt service attributable to the equity take-out portion of any loan approved under the plan of action, expressed as a percentage of the project's extension preservation equity. This definition recognizes that a plan of action involving incentives could allow the owner to realize its equity in a project through either an increase in allowable distributions, an equity take-out loan, or both.

*Bona fide offer* -- The proposed definition of bona fide offer, along with other requirements concerning sale transactions under the proposed rule, have been designed to ensure that neither owners nor priority purchasers take advantage of the sales process to undermine the purposes of the rule. Section 224(a) of the 1990 Act provides that if the purchaser under a plan of action is unable to consummate a sale for reasons other than HUD's inability to provide incentives, the owner may, subject to the provisions of sections 220 and 221, prepay the mortgage and terminate low income affordability restrictions. This provision is implemented at § 248.169 of the proposed rule. HUD will seek to ensure that owners do not contrive sham offers that are designed to discourage other offers and then fall through, thus leaving the owner free to prepay its mortgage. In part, HUD will do so through enforcement of the requirement that an

entity which is a "related party" to the owner does not qualify as a priority purchaser or a qualified purchaser. See definition of "related party." In addition, HUD will seek to ensure that organizations do not make offers in bad faith for the purpose of forestalling an owner from exercising its right to prepay the mortgage under the rule. The one percent earnest money deposit requirement is designed in part to prevent such offers. Moreover, the three-month time limits for submitting a plan of action and for closing on a sale, see §§ 248.135(a), 248.157(*l*), will prevent undue delay in this regard. The Department intends to seek administrative sanctions against the seller and/or purchaser if it uncovers evidence of any such sham transaction.

The rule provides that HUD will make a determination as to whether an offer to purchase the project qualifies as a bona fide offer. As set forth in § 248.157, the purchaser must include with the offer a substantial earnest money deposit and a contract of sale in form acceptable to HUD.

*Community-based nonprofit organization* -- The definition of community-based nonprofit organization is derived from the definition of "community housing development organization" used in the HOME program established in title II of the Cranston-Gonzalez National Affordable Housing Act. In light of language in the House Conference Report to the Cranston-Gonzalez National Affordable Housing Act, Conf. Rep. No. 101-943, 101st Cong., 2nd Sess. (the "Conference Report") indicating that Congress intended the definition of nonprofit organization to "conform" to the definition of community housing development corporation under the HOME program, the Department has included this definition in the proposed rule and provided that entities meeting this definition would have a priority in purchasing a project over State and local government agencies and other nonprofit organizations (other than resident councils offering to purchase the project under a homeownership program).

*Default* -- The proposed definition provides that a mortgage would not be considered to be in default unless the 30-day "grace period" provided by the mortgage for the cure of a default has expired. A mortgage for a project that is subject to a workout agreement would not be considered in default under this definition. The proposed definition recognizes the fact that the owner's failure to make a mortgage payment on the first day of the month does not mean that the project is in financial jeopardy or that an insurance claim is imminent. The proposed definition differs from that applicable to multifamily mortgage insurance claims, which provides that a mortgage is considered in default upon the mortgagor's failure to make any payment due or upon the mortgagee's acceleration of the debt due to the mortgagor's failure to perform any other covenant under the mortgage. See *24 CFR 207.255*.

*Eligible Low Income Housing* -- The definition of "eligible low income housing" in section 229(1) of the 1990 Act tracks the language of the corresponding definition in section 233(1) of the 1987 Act, except that under the 1990 Act, the project must be within two years of becoming eligible for prepayment without the prior written approval of the Secretary, whereas the 1987 Act's definition provides that the project must be within one year of becoming eligible for prepayment.

If, at any time on or after November 1, 1987, a project meets the criteria of both subsections (a) and (b) of the definition at the same time, then the project is thereafter an eligible low income housing project, regardless of future events. Thus, if a section 221(d)(3) market rate project was receiving section 8 Loan Management Set-Aside assistance on November 1, 1987, and at that time the mortgage was in its 20th year from final endorsement, the project would be considered to be eligible low income housing at all times thereafter, even if the owner subsequently decided not to renew the section 8 contract. If, on the other hand, the section 8 contract for a section 221(d)(3) market rate project expires during the 15th year from final endorsement, the project would not meet the criteria in both subsection (a) and subsection (b) at the same time, and thus the project would not constitute eligible low income housing. (This analysis applies to the definitions of eligible low income housing in both subparts B and C.)

The definition of "eligible low income housing" in the proposed rule adds an exception for projects which are subject to a use restriction imposed by the Secretary that restricts the project to low and moderate income use for a period at least equal to the remaining term of the mortgage. The primary impact of this exception is to exclude from the universe of eligible low income housing projects those projects which have received assistance under the Flexible

Subsidy program authorized by section 201 of the Housing and Community Development Amendments of 1978, as amended, *12 U.S.C. 1715z-1a*, and are subject to a use agreement imposed pursuant to that statute. Section 201(d)(1) of the 1978 Amendments was amended by section 211(c) of the Housing and Community Development amendments of 1979 to require that an owner receiving Flexible Subsidy assistance must agree, as a condition to receiving such assistance, to "maintain the low- and moderate-income character of (the) project for a period at least equal to the remaining term of the project mortgage." HUD has implemented this requirement by conditioning the provision of Flexible Subsidy assistance on the execution and recordation of a use agreement that requires the owner to maintain the project under the provisions of the applicable insurance program until the maturity date of the mortgage.

The existing rule does not explicitly address the issue of whether a project that is subject to a Flexible Subsidy use agreement may constitute "eligible low income housing" or whether its owner may receive incentives. However, the Department has taken the position that since the owner of such a project would be unable to demonstrate that the project has a "higher and better use," as required by § 248.233(b), the Department would not entertain a request for incentives with respect to such a project. Likewise, the Conference Report states at page 461 that the valuation process, which is at the heart of the procedures for determining incentives under the 1990 Act, "is designed primarily to determine what economic result an owner might have achieved by prepaying the existing HUD-assisted mortgage, ending the affordability restrictions on the housing and converting the housing to alternative use (i.e., market rate rental housing, condominiums or nonresidential uses)." Accordingly, the Department believes that it is consistent with the Congressional intent of the 1990 Act to exclude from the definition of eligible low income housing those projects which are subject to a Flexible Subsidy use agreement.

Under the language of the proposed rule the Department would likewise exclude projects which are subject to a use restriction imposed pursuant to section 203(h)(2) of the Housing and Community Development Amendments of 1978, as amended by section 181(g) of the Housing and Community Development Act of 1987. Section 203(h)(2) provides that the Secretary may not approve the sale of any subsidized project (a) that is subject to a HUD-held mortgage, or (b) if the sale transaction involves the provision of any additional subsidy funds by the Secretary or a recasting of the mortgage, unless such sale is made as part of a transaction that will ensure that the project will continue to operate at least until the maturity date of the mortgage in a manner that will provide rental housing "on terms at least as advantageous to existing and future tenants as the terms required by the program under which the loan or mortgage was made or insured prior to the proposed sale of the project." An owner may comply with this requirement either by having the mortgage note amended to prohibit prepayment without HUD's consent for the remaining term of the mortgage or by executing and recording a use agreement obligating the owner to operate the project until the maturity date of the mortgage in accordance with the low income affordability restrictions applicable to the program under which the mortgage was insured. Under the definition of eligible low income housing in the proposed rule, owners who choose either option would be precluded from subsequently filing a notice of intent.

Since projects encumbered with use restrictions imposed under the Flexible Subsidy statute or section 203(h)(2) would not be deemed eligible low income housing under the definition in the proposed rule, the owners of such projects would not be precluded by the proposed rule from prepaying their mortgages. However, even if the mortgage on such a project were prepaid, the owner would still be required to comply with the use restriction for the duration thereof.

Projects which receive rent supplement assistance under section 101 of the Housing and Urban Development Act of 1965 and 24 CFR part 215 are prohibited from prepaying the mortgage debt in full without HUD's consent at any time during the 40-year term of the mortgage. See 24 CFR § § 221.524(a); 236.30(a). Therefore, it is the Department's position that such projects do not constitute eligible low income housing. (Although the definitions of eligible low income housing in both the 1987 and 1990 Acts include housing financed by a mortgage insured under the section 221(d)(3) market rate program and assisted under the rent supplement program, there is no indication that these references were intended to overturn HUD's long-standing regulatory prohibitions on prepayment for rent supplement projects.) The Department is aware that in some cases the mortgage note language for projects receiving rent supplement assistance does not prohibit prepayment without the Secretary's consent for the full mortgage term, and thus is inconsistent with the regulatory prohibition; however, in such cases the Department would view the regulatory

prepayment prohibition as superseding any conflicting mortgage note language. Thus, HUD would not view such projects as being entitled, under the operative "regulation or contract," as being eligible for prepayment without HUD's consent, and would not consider such projects to be eligible low income housing. Likewise, if the applicable program regulations at § 221.524 or § 236.30 allow prepayment at the expiration of 20 years after final endorsement, but the mortgage note prohibits prepayment without HUD's consent for the full term of the mortgage, HUD would construe the regulation as superseding the prepayment prohibition in the mortgage note.

*Fair Market Rent* -- The fair market rent is the section 8 existing fair market rent published for effect, applicable to the jurisdiction in which the project is located.

*Federal Cost Limit* -- The Federal cost limit for a project is the greater of (a) an amount determined by multiplying 120 percent of the section 8 existing fair market rent published for effect for the market area by the number of units in the project (according to appropriate unit bedroom sizes) and (b) an amount determined by multiplying 120 percent of the prevailing rents in the relevant local market area in which the project is located by the number of units in the project (according to appropriate unit bedroom sizes). The Federal cost limit is used to determine whether an owner may proceed under the "voluntary sale" provisions of § 248.157 or under the "mandatory sale" provisions of § 248.161. If the transfer preservation rent does not exceed the Federal cost limit, the owner, if it seeks to transfer the project, must proceed under § 248.157; if the transfer preservation rent exceeds the Federal cost limit, the owner seeking to transfer the project must proceed under § 248.161.

In addition, the Federal cost limit provides an upper ceiling to the incentives and determines the types of incentives that may be obtained under § 248.153, since the rent stream obtainable through the incentives under § 248.153 may not exceed the Federal cost limit. See sections 215(b)(2)(A) and (B), 219(a) and 220(a) of the statute. While rents for individual units assisted by section 8 may exceed the Federal cost limit, the projected rental income stream for the entire project may not exceed the Federal cost limit for the project.

*Federally-assisted Mortgage* -- The definition in the proposed rule includes the first mortgage that is insured, held or assisted by HUD, plus any operating loss loan or loan insured by HUD under part 241. The definition of "preservation equity" in the 1990 Act refers to "federally assisted-mortgage or mortgages" for the project, and thus appears to imply that loans in addition to the first mortgage could qualify as federally-assisted mortgages. The Department would take into account any operating loss loan or existing section 241 loan when calculating the aggregate preservation rents under § 248.121.

*Homeownership Program* -- A homeownership program for purposes of this subpart is a program, proposed by a resident council, that meets the requirements established under § 248.173. A plan of action in which the tenants intend to operate the project as a nonprofit rental project would not constitute a homeownership program.

*Low Vacancy Area* -- The proposed rule defines "low vacancy area" to mean a market area in which the supply of vacant, available rental housing units is not sufficient to allow for normal growth, and mobility, taking into account the need for vacancies resulting from turnover and for meeting growth in renter households. Such a level of vacancy is the minimum level, below which the range of choice is very limited and mobility is restricted or restrained.

*Nonprofit Organization* -- A nonprofit organization is defined as a chartered or organized entity that is not operating for profit, that complies with HUD's standards of financial accountability, and that has as a principal purpose significant activities related to the provision of housing for low income families. As noted above, the Conference Report expresses the Conference Committee's intent that qualified nonprofit organizations "essentially conform" with the requirements established for community housing development organizations under the HOME program authorized under title II of the 1990 Act. However, the definition of community housing development organization in section 104(6) of the 1990 Act requires, *inter alia*, that the organization have a history of serving the local community or communities in which the housing is to be located. The Department envisions that a nonprofit organization under title VI of the 1990 Act could be an organization that is founded specifically in response to the opportunities made available

under the statute, in which case the organization would not have any "history" of service. Therefore, the Department has adopted in the proposed rule the language verbatim from section 229(11) of the statute, and has not included standards from the definition of community housing development corporation. However, the proposed rule addresses Congress' interest in supporting community housing development organizations by establishing a priority for community-based nonprofit organizations in the procedures for selecting among priority purchasers that make bona fide offers. See § 248.157.

*Notice of Intent* -- The definition of notice of intent differs slightly under subpart B and subpart C. Under subpart C, it is defined as the owner's notification of its intent to prepay the mortgage, terminate the mortgage insurance contract, or amend the mortgage or regulatory agreement. Under subpart B, a notice of intent is defined as the owner's notification of its intent to prepay, terminate the insurance contract, extend the low income affordability restrictions or transfer the project to a qualified purchaser.

The notice of intent is not binding on the owner. Based on the results of the appraisal, or other reasons, the owner may generally change its intentions regarding the property. However, once an owner accepts an offer to purchase the project (or, under § 248.161, receives an offer to purchase the project), the owner is required to consummate the sale, if possible.

*Plan of Action* -- The proposed rule defines the plan of action as a plan providing for the termination of low income affordability restrictions, extension of low income affordability restrictions, or transfer of the project to a qualified purchaser. A homeownership program submitted to the Secretary pursuant to § 248.173 constitutes a plan of action for purposes of subpart B.

*Preservation Equity* -- In the proposed rule, preservation equity has two different definitions depending on whether the owner of an eligible low income housing project intends to retain the property and extend the low income affordability restrictions or transfer the project to a qualified purchaser who will agree to retain the restrictions. The extension preservation equity is extension preservation value less the outstanding balance of any debt secured by the property, whether in the form of a federally-assisted mortgage or other mortgage. The statute defines preservation equity as preservation value less "any debt secured by the property." The Department interprets this phrase to mean the "outstanding balance" of any debt secured by the property. The transfer preservation equity is the transfer preservation value of the project, less the outstanding balance of the federally-assisted mortgage(s) secured by the project at the time that the transfer preservation equity is calculated.

*Preservation Value* -- Like preservation equity, the proposed rule also establishes two different definitions for preservation value, depending on the owner's intentions for the property. The extension preservation value is the fair market value of the project based on the project's highest and best use as multifamily market-rate rental housing. The transfer preservation value is the fair market value of the project based on the project's highest and best use. In either case the appraisal must take into account the costs that the owner could reasonably expect to incur in order to achieve the use upon which the value is based. For example, if the highest and best use of the property is based on replacement of the project by a shopping center, the appraiser would, in addition to examining the value of comparable raw land parcels suitable for shopping center development, take into consideration demolition and relocation expenses.

*Priority Purchaser* -- Resident councils organized to acquire a project under a HUD-approved homeownership program, and nonprofit organizations and State and local government agencies agreeing to maintain the low income affordability restrictions for the remaining useful life of the project, are deemed priority purchasers and as such are given the first opportunity to purchase projects offered for sale pursuant to this subpart. In addition, such purchasers may receive reimbursement for transaction expenses related to acquisition of the project. Moreover, only priority purchasers are eligible to receive grants under section 220(d)(3)(B) of the statute and § 248.157(o) of the proposed rule. (Both priority and other qualified purchasers are eligible to receive grants under section 221(d)(2) of the statute and § 248.161(d) of the proposed rule.)

Section 236(j)(4) of the National Housing Act, *12 U.S.C. 1715z-1*, provides that a mortgage is eligible for insurance under section 236 only if executed by a "private mortgagor" eligible under section 221(d)(3) or section 221(e). However, recent legislation, including title VI, makes clear that Congress intends State and local government agencies to be eligible purchasers of section 236 projects in the context of plans of action under subpart B of part 248. Section 203(a)(1) of the HUD Reform Act amended section 236(b) to provide that interest reduction payments may be made with respect to a mortgage on a project owned by a public entity, and section 203(c)(2) of the HUD Reform Act amended section 241(f)(3), as enacted by the 1987 Act, to make public entities purchasing eligible low income housing projects eligible to receive an equity loan insured under section 241(f). The legislative history of the HUD Reform Act indicates that these amendments were included in the Senate bill to "(make) public entities eligible mortgagors to acquire section 236 projects." Cong. Rec. H9686 (daily ed. November 21, 1989) ("Changes Made in the Senate Amendment to H.R. 1, the HUD Reform Act of 1989"). The inclusion of State or local government agencies in the definition of priority purchaser under section 231(a) of title VI is further evidence of Congress' intent in this regard. Therefore, under the proposed rule, State or local government agencies can be priority purchasers with respect to section 236 projects as well as other eligible low income housing projects.

The Department construes the definition "nonprofit organization" in the statute and in the proposed rule as including a tenant organization that seeks to purchase the project and operate it as a rental project, provided the organization otherwise meets the definition of "nonprofit organization." (see definition of "resident council,' below).

A purchaser that consists of a nonprofit organization or governmental entity that is affiliated with a for-profit entity for purposes of purchasing the project would not constitute a priority purchaser, but could constitute a qualified purchaser. This includes cases where Low Income Housing Tax Credits are allocated to a non-profit entity in connection with the purchase of a project. Additionally, if a nonprofit organization, after receiving assistance and at any time while a plan of action is in effect, becomes affiliated with a for-profit entity or transfers the project to a for-profit entity, the Secretary shall seek reimbursement from the nonprofit purchaser for any assistance provided to it by virtue of its status as a priority purchaser.

*Related Party* -- The definition is derived primarily from sections 231 (c) and (d) of the 1990 Act. The proposed rule elaborates on the statutory definition by making clear that if any member of the board of directors of the purchaser is an employee, officer or director of the owner, of if the owner has made or intends to make a loan or grant or provide other financial assistance to the purchaser in connection with the transfer of the project, the purchaser and the owner would be deemed "related parties."

*Relevant Local Market* -- The proposed rule defines a relevant local market for a project as being an area geographically smaller than the market area established by the Secretary for purposes of determining the section 8 existing fair market rent, and that is identifiable as a distinct rental market area. In nonmetropolitan areas, where comparable multifamily projects might not exist in the same specific geographic locality, it is customary for appraisers to use comparables in other noncontiguous localities that have similar market characteristics. Appraisers may employ this practice with regard to nonmetropolitan areas as long as the noncontiguous localities are within the same county and have similar market characteristics. If there are no comparables in the relevant local market area in terms of physical conditions, use restrictions and other factors and it is not otherwise possible to determine prevailing rents in that area, the section 8 existing fair market rent shall be the sole measure for determining the Federal cost limit.

*Relocation Expenses* -- The definition of relocation expenses is derived from the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646, *42 U.S.C. 4601 et seq.*, and is consistent with the HOPE Program Guidelines. Under this definition, relocation expenses must include, at a minimum, payment for advisory services, referrals, and payment for actual, reasonable moving expenses.

*Remaining Useful Life* -- Subpart B of the proposed rule requires all owners and purchasers of projects who accept incentives pursuant to this subpart to maintain the low income affordability restrictions on the project for the project's remaining useful life. This is a departure from the provisions of the existing rule, which requires maintenance of the low

income affordability restrictions only for the remaining term of the original mortgage, a period of approximately eighteen years. The remaining useful life of a project under subpart B is the structure's anticipated physical life, assuming normal maintenance and repairs and replacement of major systems and capital components as necessary. The Department construes section 222(c) of the 1990 Act as requiring that the remaining useful life of a project would be at least 50 years from the date of approval of a plan of action under subpart B, since an owner is precluded, until that date, from petitioning the Department for a determination that a project's remaining useful life has expired. The Department will establish standards and procedures for determining when the useful life of a project has expired.

*Resident Council* -- The proposed rule adopts the definition stated in section 229(11) of the 1990 Act. Only entities qualifying as resident councils may purchase a project pursuant to a homeownership program under § 248.173. However, the Department recognizes that a tenants' organization may seek to purchase a project as rental housing and not under a homeownership program. Such a tenant organization would not be limited to purchasing the project under a homeownership program, even if the organization met the formal elements of the definition of resident council.

*Special Needs Tenants* -- The proposed rule defines special needs tenants as those who are "Elderly Persons," "Elderly Families," "Disabled Persons," or families that include a "Disabled Person," all as defined in 24 CFR 812.2. The Department specifically invites comments as to any other categories of tenants that should be included within the definition of special needs tenants.

*Tenant Representative* -- The proposed rule's definition of tenant representative includes a designated officer of an organization of the project's tenants, a tenant who has been elected to represent the tenants of the project, and individuals and organizations, such as legal aid organizations and other nonprofit organizations, that have been formally designated or retained by an organization of the project's tenants to represent the tenants. In any case, the tenant representative must represent the tenants residing in at least 50 percent of the currently occupied units. The tenant representative must be elected or appointed by the project's tenants themselves and not by an outside entity. The Department recognizes that situations may occur in which more than one person or organization may claim to represent the tenants. In such situations both persons or organizations would be considered tenant representatives for purposes of receiving notifications and information under the proposed rule, until such time as the tenants resolve collectively who is to be their representative.

*Voluntary Termination of Mortgage Insurance* -- The proposed definition of "voluntary termination of mortgage insurance" is derived from § 207.253 of this chapter. That section provides that the mortgagor and mortgagee may jointly request that the Secretary terminate insurance on a mortgage. Such termination of insurance has the effect of discharging the regulatory agreement (since that agreement, by its terms, is in effect only as long as the mortgage is insured or held by HUD) and thereby terminating the low income affordability restrictions that are tied to the federally-assisted mortgage.

*Section 248.103 (General Prepayment Limitation)*

This section generally states that owners of eligible low income housing may not prepay a mortgage or terminate a mortgage insurance contract without first receiving approval from the Secretary of a plan of action submitted pursuant to this subpart. The provisions of this section are identical to that of § 248.203 of subpart C, except that this section also implements section 211(b) of the 1990 Act by prohibiting mortgagees from foreclosing on, or acquiring by deed in lieu of foreclosure, eligible low income housing projects unless the mortgagee conveys title to the project to the Secretary in connection with a claim for insurance benefits. This provision was apparently enacted in order to prevent collusion between an owner and an insured mortgagee to contrive a foreclosure and enable the owner to redeem the project at foreclosure (or purchase it through a straw party), thereby circumventing the prepayment restrictions of the statute.

State agencies which hold mortgages on non-insured State agency projects do not have the right to receive insurance benefits in exchange for conveying the project to the Secretary. Therefore, § 248.103(c) is limited in its

applicability to insured projects. The Department assumes that if a State agency is forced to foreclose on a project that is eligible low income housing, it will take whatever steps are necessary to ensure that the project is preserved after foreclosure as low and moderate income housing.

The penalties set forth in both this section and in § 248.203 for violating the prepayment limitations include a rescission of the prepayment, reinstatement of the mortgage insurance contract, and a declaration that the unlawful prepayment or termnation is null and void.

*Section 248.105 (Notice of Intent)*

The procedure for owners to notify the Secretary of their intent to prepay, terminate a mortgage insurance contract, extend the low income affordability restrictions, or transfer the project to a qualified purchaser, are set forth in § 248.105 of subpart B of the proposed rule. Any owner of eligible low income housing, as defined in subpart B, may submit a notice of intent to the Secretary within 24 months of the date the owner would be contractually eligible to prepay in the absence of this regulation. By contrast, due to the definition of eligible low income housing applicable to subpart C, owners may file notices of intent under that subpart only within one year of being eligible to prepay in the absence of the regulation.

Section 212(c) of the 1990 Act provides that an owner shall not be eligible to file a notice of intent if the mortgage (a) falls into default on or after November 28, 1990, or (b) fell into default before, but is current as of, that date, and the owner does not agree to recompense the appropriate insurance fund, in an amount that HUD determines to be appropriate, for any losses sustained by the insurance fund as a result of any workout or other arrangement agreed to by HUD and the owner with respect to the defaulted mortgage. The statute further directs HUD to carry out this provision in a manner consistent with the provisions of section 203 of the Housing and Community Development Amendments of 1978, *12 U.S.C. 1701z-11*.

With respect to loans that fall into default on or after November 28, 1990, the proposed rule provides that the default will disqualify the owner only if the mortgage is held by HUD at the time of the default or if the insured mortgage is assigned to HUD as a result of the default. Thus, if the mortgage falls into default after November 28, 1990, but the owner cures the default prior to the assignment of the mortgage to HUD, the owner would be entitled to file a notice of intent.

The proposed rule also applies this standard to an owner of a project whose mortgage fell into default prior to November 28, 1990 and has continued in default after that date. Although the statute does not specifically address this situation, it would be incongruous to treat such projects differently than projects that fall into default after November 28, 1990. However, if the owner entered into a workout agreement with HUD prior to November 28, 1990 and has continued to comply with the terms of the workout past that date, the owner would be entitled to file a notice of intent, provided the owner brings the mortgage current and recompenses the appropriate insurance fund before filing the notice of intent.

The Department construes the exclusion for projects that fall into default after November 28, 1990 to be applicable even if the default occurred when the project was owned by a former owner; a contrary interpretation would enable owners to evade the prohibition simply by transferring the project. Moreover, this interpretation is more consistent with the plain language of the statute, which refers to the mortgage falling into default, rather than the owner (i.e., the party filing the notice of intent) defaulting under the mortgage.

The Department has also added the requirement that owners who file a notice of intent pursuant to this subpart may not receive incentives unless the mortgage is current at the time of approval of the plan of action. See § 248.145(a)(11).

With respect to mortgages which fell into default prior to November 28, 1990, but were current as of that date, the Department will require, as a condition to eligibility for filing a notice of intent, that the owner repay the Department for

any debt forgiven by HUD in connection with a workout arrangement or modification agreement. The Department notes, however, that the Department has rarely forgiven debt in connection with such workouts. The amounts to be repaid would not include reserve for replacements or other escrow deposits that HUD agreed to waive as part of the workout or modification.

The purpose of the allusion to section 203 of the Housing and Community Development Amendments of 1978, which prescribes goals and requirements for the management and disposition of HUD-owned projects and projects with HUD-held mortgages in default, and authorizes HUD to enter into partial payments of claim transactions, is unclear. Therefore, the statutory reference to section 203 is not reflected in the proposed rule.

Both subparts B and C list those parties to whom a copy of the notice of intent must be sent. The 1987 Act does not specify that a copy of the notice of intent be delivered to each tenant; however, the existing rule includes such a requirement. See § 248.211 of subpart C. Similarly, while section 230 of the 1990 Act provides that notification of information to tenants may be accomplished by posting in an accessible location in all affected buildings and delivery to a representative of the tenants, if one exists, the Department has interpreted this as a minimal standard of notice and in the proposed rule requires that a copy of the notice of intent be given to each tenant. In addition, the rule provides that if the project contains a substantial number of tenants that do not speak English, the notice of intent must be written in a language understood by such tenants.

The reason for these requirements is twofold. First, at this early stage in the prepayment process, it is likely that the Secretary and the owner will be unaware of the existence of a tenant representative, and hence could fail to fulfill the statute's notification requirements by merely posting a copy of the notice. By providing a copy of the notice of intent containing instructions for the tenants to notify either the owner or the Secretary of the identity and address of any representative, if one exists, the owner and the Secretary will be able to establish at an early stage in the process who the tenant representative is, and ensure that the tenant representative receives notification as the statute directs. Second, notification to all affected tenants at the time of submission of a notice of intent provides these tenants with the maximum opportunity for taking an active role in the prepayment process, including the opportunity to organize and seek assistance to purchase the project if it is to be sold.

Section 248.105 includes a requirement that the owner provide each tenant with a HUD-prepared summary of the 1990 Act, which will describe in summary form the possible outcomes for the project, including homeownership. The summary will explain in simplified terms what impact the filing of the notice of intent may have on the tenants. Although not required by statute, the Department has added this requirement because of the complexity of the legislation. The summary, like the notice of intent itself, will be posted in each affected building in the project.

*Section 248.111 (Appraisal and Preservation Value of Eligible Low Income Housing)*

This section implements section 213 of the statute by establishing the procedure for appraising eligible low income housing for which the owner has submitted a notice of intent to transfer the project or to extend its low income affordability restrictions. Two appraisals must be conducted within the four months following submission of a notice of intent to transfer the project or extend its low income affordability restrictions. Both the owner and the Secretary shall retain an independent appraiser to conduct an appraisal of the property. Both appraisers shall possess the same minimum qualifications, to be established by the Department, and shall conduct the appraisals using the same specifications, also to be established by the Department, to determine the project's extension and transfer preservation values. If the appraisals yield different preservation values, the proposed rule establishes a one month period during which the owner and Secretary will attempt to reach agreement as to the project's preservation values based on the results from both appraisals. While the statute does not limit the negotiation period to one month, the Department has determined that in order to comply with the strict time frame which runs throughout the prepayment process and which depends in part on the determination of the project's preservation values, a reasonable time limitation is needed. HUD expects that it will be able to reach agreement with the owner regarding the preservation values if, after review of the

two appraisals by the Department, it determines that the discrepancy between the appraisals is no more than 5 percent of the lower appraisal. If agreement cannot be reached within the one month period, the owner and the Secretary must jointly select a third appraiser whose determination of preservation values shall be binding on both parties.

The Department interprets the requirement for "independent appraisers" to mean that the appraisers must not be employees of the Federal Government and may also not be employees or officers of any entity that is affiliated with the owner.

Under title 11 of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989, Public Law 101-73, *12 U.S.C. 3310 et seq.*, appraisals performed in connection with federally-related transactions must be conducted by individuals certified or licensed by the State in accordance with the Act's requirements. States are scheduled to have licensing procedures and standards in place by December 31, 1991. The Department will require that all appraisals conducted under subpart B must be done by an appraiser approved by the State under these standards, and that the appraiser must also have six years of appraisal experience, including three years of multifamily property appraisal experience.

The Department is currently developing more detailed procedures for the selection, procurement, instruction and compensation of appraisers under the 1990 Act. These procedures will be included as part of the field instructions implementing these regulations. Such procedures may, consistent with the proposed rule, provide for the establishment of an open-ended "roster" of approved HUD appraisers, from which "HUD's" appraiser and the third appraiser, if needed, would be selected.

The appraisal procedure provides for the estimation of both the extension and transfer preservation values for each project. The former would equal the appraised fair market value of the project as multifamily rental housing less certain adjustments. The latter would equal the appraised "highest and best use" value of the property less certain adjustments. The former figure is the preservation value of the project for purposes of providing incentives in the event that the owner retains the property, while the latter is the preservation value in the case of the transfer of the project to a qualified purchaser. The proposed regulation requires that both of these values be determined for all appraised projects regardless of the owner's intentions as specified in the notice of intent. This is consistent with section 216(b)(1) of the statute, which states that HUD shall provide the owner with the preservation value determined in accordance with the residential rental standard and the highest and best use standard.

For the purpose of determining the preservation values, the statute directs appraisers to use the greater of actual project operating expenses at the time of the appraisal, based on the average of the actual project operating expenses during the preceding three years, or projected operating expenses after conversion. The Conference Report at page 462 states that the purpose of using average expenses is to enable an appraiser to adjust for extraordinary and nonrecurring costs that make the current year operating expenses abnormally high or low. The Conference Report then states that if current year operating expenses are higher than that of the preceding years and the Secretary determines that this is not due to extraordinary or nonrecurring costs, and that the operating expenses are not expected to decrease, then current year operating expenses should be used in making the comparison with post-conversion expenses. Conversely, where project operating expenses are lower in the current year than in preceding years and are expected to continue at the lower level due to energy efficiencies or rehabilitation, these reductions should be accounted for, and current year expenses, rather than the average expenses during the preceding three years, should be used in comparison with post-conversion expenses.

The Conference Report at page 462 states that the appraiser must take into account any use agreements entered into by the owner when determining value. The Department construes the term "use agreements" in this context to include provisions in the mortgage note prohibiting prepayment without the consent of the State housing finance agency or other such entity or agency. Clearly, if such a prohibition exists and the agency's position is that prepayment would not be approved unless the project were maintained as low and moderate income housing for an extended period of time, the impact of the prepayment prohibition on the appraised value of the project would be quite substantial. In addition,

the Conference Report directs HUD to examine the Committee Report accompanying the Senate bill with respect to its discussion of the types of costs that owners would incur in the event of prepayment and conversion. The Senate Report (Senate Report No. 101-316, 101st Cong., 2nd Sess., dated June 8, 1990) (the "Senate Report") notes at page 110 that conversion costs vary widely by jurisdiction, especially because of differences in State and local laws governing conversions, rent control and zoning; in addition, the Senate Report states that the appraiser must take into account the availability of financing for potential purchasers of cooperative shares or condominium units. It further provides that conversion costs must assume rehabilitation to a market standard, and must take into account both hard and soft costs, including losses due to vacancies, rent skips, rent withholding, legal costs, advertising, etc. HUD will require that the appraisers include a capital needs assessment as part of the appraisal for this purpose. The Senate Report points out that in estimating such costs, the income distribution of the current tenants and the gap between current rents and market rents must be taken into account. The appraisal instructions to be issued by the Department will discuss all of these considerations.

Although the appraised value will take into account the cost of adding amenities, making upgrades and otherwise elevating the quality of the housing up to its highest and best residential use, and will estimate project value based on such upgraded condition, such amenities and upgrades will not be financed as part of the plan of action. The incentives will finance repairs necessary to restore the project to its original physical standards for occupancy, to account for any required capital improvements, as identified by HUD, and to fund operating reserves needed to maintain the project at that level of quality. The appraisal must also estimate the repairs and replacements needed to meet these housing standards, since HUD will rely on such information in calculating the aggregate preservation rents under § 248.121.

Section 213(a)(3) of the statute provides that the Secretary may provide incentives only based upon an appraisal that is not more than 30 months old. The appraised values used in determining the preservation values shall be the appraised values as of the date that the appraisal is "conducted," i.e., the date on which it is signed and delivered to HUD or the owner. No adjustment shall be made to take into account projected trends in real estate values or the length of time required to transfer a project or receive incentives under subpart B.

*Section 248.121 (Annual Authorized Return and Aggregate Preservation Rents)*

This provision, which implements section 214 of the statute, establishes the procedure for determining the aggregate preservation rents, which are the incomes required to meet certain project costs if the project is to be preserved for low income families. These project costs include debt service on any rehabilitation loan or federally-assisted mortgage, project operating expenses, adequate reserves, an annual authorized return if the project is retained by the owner, and debt service on an acquisition loan if the project is sold to a qualified purchaser.

Given that a project's aggregate preservation rents must be calculated at an early stage in the prepayment process, certain project costs covered by aggregate preservation rents may need to be estimated by the Department. For this reason, the Department has established guidelines for making these determinations. For instance, to determine the debt service on a rehabilitation loan for the project, the loan amount will be based on the estimates made in the appraisals conducted under § 248.111, and market rate interest rates will be assumed. Additionally, rehabilitation funds contributed by State or local government agencies to the project will be deducted from the potential loan amount. To calculate the debt service on an acquisition loan if the project will be sold to a qualified purchaser, the Department will assume that the sale price is equal to the transfer preservation value of the project, and that the Department will provide the maximum acquisition loan allowable under part 241 of this title.

Adequate reserves will be determined by calculating the amount that must be added to existing reserves and sustained on a continuous basis in order to ensure that the project will be able to meet housing quality standards. This estimate will take into account preventive maintenance, necessary replacements and future repairs.

One component of the extension preservation rent is the amount which would enable the owner to realize the

annual authorized return. This section states that annual authorized return "shall be equal to 8 percent of the (project's) extension preservation equity." The Department interprets this to mean that while an owner is authorized an 8 percent annual authorized return, the statute does not necessarily guarantee this distribution on an annual basis. This is particularly true during the first three years of implementation of a plan of action when rent increases for tenants residing in the project at the time a plan of action was executed must be phased in and the project has a substantial number of tenants that do not receive section 8 assistance. See § 248.145(a)(6). HUD will approve rents at a level that ensures that owners receive the full annual authorized return beginning in the third year. Moreover, if the owner is unable to realize the full 8 percent annual authorized return in any year, including the first three years, the owner may accrue the amount not realized, and realize that amount in later years through withdrawal of residual receipts. Under the plan of action owners would also be entitled to withdraw residual receipts or take distributions of surplus cash in order to realize distributions that had accrued prior to implementation of the plan of action.

*Section 248.123 (Determination of Federal Cost Limit)*

This section implements section 215(a) of the statute. Pursuant to this section, aggregate preservation rents determined in § 248.121 for each project are compared to the Federal cost limit for the area in which the project is located.

The extension or transfer preservation rent of a project exceeds the Federal cost limit if it exceeds, for the same number and size of units as the project, both 120 percent of the section 8 existing fair market rent in the market and 120 percent of the prevailing rents in the relevant local market in which the project is located.

*Section 248.127 (Limitations on Action Pursuant to Federal Cost Limit)*

This section, implementing section 215(b) of the statute, governs the procedure to be followed based on the owner's intentions for the project, as stated in the notice of intent submitted pursuant to § 248.105, and based on whether or not the extension or transfer preservation rent for the project exceeds the Federal cost limit.

With respect to owners that seek to retain the project, the extension preservation rent must be compared to the Federal cost limit. If the extension preservation rent is within the Federal cost limit, the owner may file a plan of action to receive incentives. If the extension preservation rent exceeds the Federal cost limit, the owner may likewise receive incentives, but the amount of the incentives may not exceed an amount that can be supported by a projected income stream equal to the Federal cost limit. In that event, the owner would only be entitled to receive as much of the annual authorized return as could be supported by an income stream capped at the Federal cost limit, after taking into account debt service on the rehabilitation loan and on the federally-assisted mortgage, project operating expenses and payments for adequate reserves.

The transfer preservation rent is compared to the Federal cost limit in order to determine the owner's options with respect to sale of the project. If the transfer preservation rent does not exceed the Federal cost limit, the owner may file a second notice of intent to transfer the project pursuant to § 248.157. If the transfer preservation rent exceeds the Federal cost limit, the owner may either (a) file a second notice of intent indicating an intention to transfer the project under § 248.157 at a price which will result in project rents that, on an aggregate level, do not exceed the Federal cost limit; or (b) file a second notice of intent indicating an intention to transfer the project under § 248.161. Under any of these options, if no bona fide offers are received, the owner may prepay the mortgage or voluntarily terminate the mortgage insurance.

(The statute, at section 215(b)(2)(B), states that the owner shall agree to transfer the project at a price "that shall not exceed the Federal cost limit." Since the Federal cost limit is a rent level and not an amount corresponding to a sales price or project value, the Department construes the statutory language to mean that the purchase price, when combined

with the other components of the transaction, requires an income stream which may not exceed the Federal cost limit.)

*Section 248.131 (Information From the Commissioner)*

This provision implements sections 216 (a), (b) and (c) of the statute. Once a notice of intent is submitted to the Secretary by an owner of eligible low income housing, the Secretary has a specified period of time in which to respond by supplying the owner with the necessary information for filing a plan of action. The specific information which the Secretary must provide the owner, which varies depending on whether the owner has submitted a notice of intent to terminate or to extend the low income affordability restrictions on the project, is listed in this section.

In the case of a notice of intent to terminate the low income affordability restrictions, section 223(a) of the 1987 Act directed the Secretary to furnish the owner with "any relevant market area demographic information that the Secretary has custody of and that the owner may use in preparing the plan." The 1990 Act does not include this requirement; however, the Conference Report at page 460 directs the Secretary to furnish such information, and the proposed rule includes this requirement.

Section 216(c) specifies that the Secretary shall make available to the tenants the information supplied to the owner under section 216 and any other information relating to the rights and opportunities of the tenants. If the owner has expressed an intent to transfer the project, the Secretary shall provide the tenants with information concerning their opportunity to become a priority purchaser or to organize as a resident council for purposes of purchasing the project under a homeownership program.

*Section 248.133 (Second Notice of Intent)*

This section, implementing section 216(d) of the statute, requires submission of a second notice of intent to the Secretary by owners who intend to transfer the project to a qualified purchaser either under § 248.157, or in connection with a mandatory sale, prepayment or termination under § 248.161. The second notice of intent must be submitted not later than 30 days after receiving the financial information on the project from the Secretary under § 248.131. The second notice of intent would generally conform to the requirements for the initial notice of intent, except that copies would not have to be delivered to every tenant. Instead, the owner would be required only to post the notices in each occupied building and send a copy to the tenant representative(s), if any.

The Department recognizes that during the lengthy prepayment process created by the 1990 Act and this proposed rule, some owners may alter their original intentions for the project which were communicated to the Secretary in the notices of intent submitted under § 248.105. Owners may be especially likely to alter their decisions after receiving the projects' financial information which was derived from the appraisals and which may limit the owners' options for proceeding under this subpart. If the owner originally indicated an intent to retain the project and then decides to transfer the project, the second notice of intent will provide HUD, the State or local government and tenants with advance notice of that intent. If the owner originally indicated an intent to transfer the project and then decides to retain it, the owner would file a plan of action based on its revised intentions, without the necessity of a second notice of intent.

The submission of a second notice of intent commences the 12-month period during which owners may negotiate a sale and sell the project only to priority purchasers.

*Section 248.135 (Plans of Action)*

This section prescribes deadlines and procedures for submission of the plan of action, the contents of the plan of action, the procedures for revisions to the plan of action, and the consequences for failure to file the plan of action.

Paragraph (b) provides that a plan of action involving transfer of the project must be submitted jointly by the owner and the purchaser within 90 days after the owner's acceptance of a bona fide offer under § 248.157 or the purchaser's making of a bona fide offer under § 248.161. The Department believes that this procedure will minimize confusion and the possibility for misunderstanding between the parties. Paragraph (c) provides in part for notification of the tenants through posting in each occupied building a summary of the plan of action and delivery of a copy of the plan of action to the tenant representative, if any. In addition, the summary must indicate that a copy of the plan of action shall be available in a convenient location for inspection and copying.

Paragraph (e) describes the contents of a plan of action involving incentives or a transfer of the project. Paragraph (e)(2) requires the owner to submit cash flow projections, and analyses of how the owner will address any physical or financial deficiencies and maintain the low income affordability restrictions on the project. The Department's implementing instructions will require the owner to submit a five-year pro forma analysis of cash flows. The analysis of physical deficiencies must describe how the owner will make any repairs and deferred maintenance needed to sustain the project at a level that meets section 8 housing quality standards and local housing codes. The analysis of financial deficiencies must describe how the owner will address any accounts payable, deficiencies in reserves or other escrows, and other delinquencies.

Paragraph (f) provides in part that any revisions to the plan of action must be delivered and made available to HUD, the State or local government, the tenants and the tenant representative, if any, in the same manner as the original plan of action. Thus, for example, a summary of the revision would be posted in each occupied building in the project and a copy made available in a convenient location for inspection and copying by the tenants.

*Section 248.141 (Criteria for Approval of a Plan of Action Involving Prepayment or Voluntary Termination)*

Section 218(a) of the 1990 Act is identical to section 225 of the 1987 Act, and thus the Department's implementation of the two provisions will be consistent. The Department views section 218(a), and thus § 248.141 of the proposed rule, as constituting a basis for prepayment or voluntary termination that is independent of other restrictions in the statute. That is, an owner whose project meets the standards for prepayment under § 248.141 is not required to comply with any other standards in subpart B regarding protection of tenants or availability of affordable housing, and the standards in § 248.141 are inapplicable to any prepayment or voluntary termination that is permitted under § 248.169.

*Section 248.145 (Criteria for Approval of a Plan of Action Involving Incentives)*

This provision implements sections 222 (a) through (c) of the statute. An initial determination will be based on the appraisals which establish the preservation value of a project. The appraisals will determine whether or not the project has any "preservation equity" and, if so, the amount the incentives which could be made available to owners under this subpart. A "windfall profits" test pursuant to section 222(e) of the statute will also be conducted to determine whether a project is located "in those rental markets where there is an inadequate supply of decent, affordable housing." If not, and if the provision of incentives would not serve "other public policy objectives," then no incentives will be made available to owners. A report on section 222(e) explaining how the "windfall profits" test will be applied is being transmitted to Congress.

In establishing the level of incentives to be provided by the Department, HUD will take into account any Low Income Housing Tax Credits and assistance provided to a project by State and local governments and that will be used in connection with a plan of action pursuant to section 102(d) of the Housing and Urban Development Act of 1989. The Department will exercise due diligence in reviewing and evaluating plans of action to assure that a package of incentives is the least costly alternative to HUD and that it is consistent with the full achievement of purposes of the statute.

Paragraph (a)(8) provides that rents for new tenants shall be set at levels that will ensure, to the extent practicable, that the units will be affordable to existing proportions of very low, low and moderate income tenants. Although the statute and the proposed rule explicitly state that this limitation shall not prohibit a higher proportion of very low income families and persons from occupying the project, the Department does not construe this as meaning that HUD must provide additional section 8 assistance if the owner selects additional very low income (and correspondingly fewer moderate income) tenants during the term of the plan of action. The maximum level of section 8 assistance for the project authorized under the plan of action is established at the time of plan of action approval. If the owner admits additional very low income tenants at a later date, such tenants must be subsidized by the project itself or by other sources of assistance, such as a separate allocation of section 8 Loan Management Set-Aside assistance.

The Department intends to use the same standards of affordability for new tenants as are applicable to current tenants under paragraph (a)(5), namely, the lower of the section 8 existing fair market rent published for effect or 30 percent of adjusted income.

Section 222(a)(2)(G)(i) of the 1990 Act provides that future rent adjustments shall be made "by applying an annual factor (to be determined by the Secretary) to the portion of rent attributable to operating expenses for the housing and by making changes in the annual authorized return under section 214." The reference in the statute to changes in the annual authorized return appears to be a vestige from a previous version of the bill, in which the authorized return was not fixed at 8 percent preservation equity, but instead was adjusted annually; therefore, this reference is not reflected in the proposed rule.

With respect to the use of an annual factor based on increases in operating expenses, the Department would not be able to develop such a factor if the intent were similar to the intent underlying the requirement that was included in section 8(c)(2)(D) of the United States Housing Act of 1937, as added by section 371(b) of the Housing and Community Development Amendments of 1981. That provision stated that the Secretary shall limit increases in contract rents for section 8 construction and substantial rehabilitation projects to "the amount of operating cost increases incurred with respect to comparable rental dwelling units of various sizes and types in the same market area * * *." On December 22, 1986, the Department informed the Congress that the provision was "inherently flawed because of the absence of 'normal' year-to-year changes in operating expenses * * *." At the Department's initiative Congress repealed section 8(c)(2)(D). See section 142(e) of the Housing and Community Development Amendments of 1987. Some localized data are available to describe wages, prices and costs. The Department is investigating whether these can form a meaningful basis for a rent adjustment procedure. If it is determined that it is not feasible to adjust rents on the basis of currently available data, the Department may seek a technical amendment eliminating the requirement in section 222(a)(2)(G)(i) that HUD use an annual adjustment factor for operating costs. In the meantime, the proposed rule tracks the statutory language.

Paragraph (a)(10) provides that any savings from reductions in operating expenses due to management efficiencies shall be deposited in the reserve for replacement escrow, and the owner shall have periodic access to such reserves, to the extent that the reserve for replacements is adequate and the housing is maintained in accordance with the standards established in § 248.147.

Paragraph (b) provides that no incentives (other than to qualified purchasers) shall be provided, until the Secretary determines that the project meets the housing standards set forth in § 248.147, except that incentives designed to correct deficiencies in the project may be provided. Thus, if a project does not currently meet the housing standards set forth in § 248.147, the proceeds of a capital improvements loan or rehabilitation loan could be disbursed as needed to correct the deficiencies; other incentives would not be available to an owner retaining a project, but would be available to a qualified purchaser. In addition, no distributions would be permitted to either the owner or a purchaser until the housing standards have been met.

As noted above, the Department is not at this time establishing standards and procedures for making determinations of remaining useful life. Accordingly, sections 222(c)(2)-(4) of the statute have been restated in the proposed rule, but

more specific standards and procedures will not be developed until a later date.

*Section 248.147 (Housing Standards)*

This provision implements section 222(d) of the statute. The rule states that eligible low income housing projects receiving incentives must be maintained in compliance with local codes in the jurisdiction where a project is situated and with the section 8 housing quality standards. Where a conflict exists between the two sets of standards, the stricter standard shall be applicable.

Paragraph (b) states that HUD will inspect each project at least annually for compliance with the housing standards. HUD will notify the owner of any deficiencies within 30 days after the inspection, and the owner will have 90 days in which to bring the project into compliance. HUD will reinspect the project once the repairs have been completed or at the expiration of the 90-day period, whichever is earlier.

The sanctions listed in paragraph (c) of § 248.147 could be imposed either if the owner initially fails to bring the project up to housing standards, or if an owner, after having met the housing standards, has allowed the project to fall below such standards during the term of the plan of action. Section 241(f)(5)(B) of the National Housing Act provides that advances of equity loan proceeds shall be phased in to reflect the phasing in of rent levels. In addition, under section 241(f)(2)(B)(ii) of the National Housing Act, as added by section 602 of the 1990 Act, the lender shall deposit on behalf of the owner 10 percent of the loan amount in an escrow account, controlled by the Secretary or a State housing finance agency approved by the Secretary, and such funds shall be made available to the owner upon the expiration of 5 years from the date that the loan is made, subject to compliance with the 1990 Act's housing standards requirements. Both of these requirements are reflected in § 241.1069 of the proposed rule. Section 248.147(c)(1) of the proposed rule provides that HUD may direct the mortgagee to withhold the disbursement of any such unadvanced equity loan proceeds. HUD would condition the release of the proceeds on the completion of repairs by the owner.

Section 222(d)(2)(A)(ii) of the statute authorizes HUD to reduce the annual authorized return until such standards have been complied with and requires that the amounts withheld be used for repairs. In this context the reference to "annual authorized return" appears to mean the allowable annual distributions, and the proposed rule reads accordingly. The proposed rule states that HUD would prohibit the owner from taking the allowable distributions and direct that such funds be used instead to make required repairs. The owner would not be allowed to accrue the unpaid distributions. This sanction would remain in effect for as long as HUD determines that the project is not in compliance with the housing standards. Once the project is brought into compliance, the allowable distributions would be reduced to 50 percent of the otherwise allowable distributions for the following two years. The owner may accrue the balance during these two years for later distribution from surplus cash.

Paragraph (e) sets forth sanctions that are available to HUD in the event that a project fails to comply with the housing standards for two consecutive years. These provisions generally track the statutory language. With respect to paragraph (e)(2), HUD would direct the mortgagee to declare a covenant default and to accelerate the debt. This procedure is consistent with the enforcement mechanism available to HUD under *24 CFR 207.257*.

Paragraph (f) is intended to clarify that the sanctions described in paragraphs (c) through (e) are in addition to, and not in substitution of, any sanctions or remedies that the Department may have under the mortgage, regulatory agreement, section 8 HAP contract or other agreement to enforce compliance with the owner's obligation to maintain the project in good repair and condition.

*Section 248.149 (Timetable for Approval of a Plan of Action)*

This section implements section 225 of the statute. Section 225(b)(2) states that if a plan of action is rejected on the basis of deficiencies, the Secretary shall give the owner a reasonable opportunity to revise the plan of action and seek

approval. Paragraph (c) of the proposed rule limits this time period to 60 days, and provides further that if the owner fails to comply with this deadline and HUD fails to approve the plan of action within the time periods specified in paragraph (b), the owner will not be entitled to relief under paragraph (d). Paragraph (d) of the proposed rule provides that if the Secretary fails to approve a plan of action within the time periods specified in paragraph (b), HUD shall provide incentives and assistance in an amount that the owner would have received if the Secretary had complied with the time limitations, except that owners shall have no such right if the plan of action is not approved because of deficiencies.

*Section 248.153 (Incentives to Extend Low Income Use)*

Section 248.153 implements section 219 of the statute. The proposed rule lists the incentives specified in the statute, plus the incentive of increases in allowable distributions. Incentives would be capped so that the aggregate rents resulting from the incentives would not exceed the Federal cost limit. To the extent that section 8 rents and rents from unassisted tenants are insufficient in any given year to realize the full 8 percent return, the rule provides that the owner or purchaser may have access to existing and future residual receipts to make up the shortfall. Section 8 contract rents would be capped at the Federal cost limit.

The incentive limit stated in paragraph (a) is based on the extension preservation rent, which in turn assumes market-rate financing for any rehabilitation. If the Department provides below market-rate financing for the rehabilitation under the capital improvement loan program authorized by paragraph (b)(5), the Department would require corresponding adjustments of the rent levels for section 8 tenants.

Paragraph (b)(7) authorizes HUD to redirect the Section 236 Interest Reduction Payment subsidies to a second mortgage. The Senate Report at page 112 indicates that this provision is designed to "alleviate 'phantom income' problems caused by rapid amortization of the underlying section 236 mortgage;" it further points out that the redirected payments could be applied to subsidize interest on a rehabilitation loan provided the Secretary determines that withdrawing the subsidy from the section 236 mortgage will not present a risk of a mortgage insurance claim. The Department is uncertain whether this provision will achieve the objective stated in the Senate Report; in addition, it is unclear how the financial benefits, if any, of the redirection are intended to relate to the overall incentive scheme of the statute, since redirection is the only incentive which constitutes a potential "net after taxes" benefit. Nonetheless, the Department has included the provision in the proposed rule and specifically invites comments as to the effect such redirection may have on eligible low income housing projects and their owners.

Paragraph (b)(9) lists as an incentive an increase in allowable distributions, if necessary to enable the owner, in extension plans of action, to achieve the annual authorized return of 8 percent of the extension preservation equity. In addition, in cases where the project is being transferred to a for-profit qualified purchaser, incentives will be structured to enable the purchaser to realize an 8 percent return on investment.

Section 219(b) of the statute also includes language addressing the problem of reconciling section 236's excess income requirements with the incentive provisions of the statute. Under section 236(f)(1) of the National Housing Act, *12 U.S.C. 1715z-1*(f)(1), the Secretary establishes a basic rental charge determined on the basis of operating the project with a mortgage bearing interest at one percent, and a "fair market rent" determined on the basis of operating the project with a mortgage bearing interest at the face amount. Under section 236(g) the owner is obligated to return to the Secretary all rental charges collected in excess of basic rent.

Section 219(b) provides that with respect to a plan of action providing incentives for a section 236 project, the section 236 fair market rent for each unit may be increased in accordance with the incentives provided, but the owner shall pay to HUD the excess rent "in an amount not greater than the fair market rental charges as such charges would have been established under section 236(f) * * * absent the requirements of this paragraph." The Department construes this to mean that the amount of excess rent payable to HUD would be capped at the fair market rent as it would have

been calculated if no incentives had been provided. However, even this interpretation does not resolve the problems arising from the interplay of the section 236 requirements and the characteristics of a plan of action. One aspect of this problem is that the full benefit of incentives can be realized only if both the basic rent and the fair market rent are increased on the basis of the incentives. Accordingly, the Department proposes to implement this provision by providing that the owner under a plan of action shall calculate the basic rent by taking into account the operating expenses, debt service on the section 236 mortgage at an interest rate of one percent, debt service on any equity take-out or acquisition loan, debt service on any rehabilitation loan, and the owner's allowable distributions under the plan of action. The section 236 market rent would be derived by applying the appropriate factor to the basic rent. Thus, both the basic rent and market rent would reflect the incentives provided to the owner. The owner would be required to remit to the Secretary all rents collected in excess of the basic rent.

*Section 248.157 (Voluntary Sale for Projects Not Exceeding the Federal Cost Limit)*

Section 248.157 implements section 220 of the statute, which sets forth the rules governing transfers of eligible low income housing where the transfer preservation rent does not exceed the Federal cost limit. Under this provision the owner offers the project for sale, first to priority purchasers and then to any other qualified purchaser. Paragraph (a) provides in part that the owner is not required to accept any offer that is made for the project. However, if the owner receives and rejects a bona fide offer to purchase the project, the owner may not prepay the mortgage and terminate low income affordability restrictions pursuant to § 248.169. The owners option in such a case would be to file a new plan of action for incentives under § 248.153. If the owner does not receive any bona fide offer to purchase the project, then the owner may prepay the mortgage and terminate low income affordability restrictions, subject only to the protections for tenants provided in § 248.165.

Paragraph (b) details the methods that HUD will use in order to notify potential qualified purchasers of the availability of the project for sale. HUD will compile a list of nonprofit organizations, utilize mailing lists for Resolution Trust Corporation property sales and other clearinghouse networks, contact appropriate State and local government agencies, and advertise in major local newspapers.

Paragraph (c) provides that, for the 12-month period beginning on the date that HUD receives the second notice of intent, the owner may offer to sell the project only to priority purchasers. At the end of the 12-month period, if the owner has not accepted an offer, the owner must offer the project for sale to any qualified purchaser for a 3-month period. Paragraph (d) provides that the sale price shall not exceed the transfer preservation value, even if the purchaser is willing to pay an additional amount with its own funds or with funds from sources other than HUD.

Paragraph (e) establishes a procedure for the prospective purchaser to notify HUD of its interest in acquiring the project. If the purchaser is a priority purchaser that intends to make an offer during the 12-month period, it must so notify the Department, and must submit sufficient evidence for HUD to determine that the purchaser is a priority purchaser. In addition, if the purchaser is a resident council seeking to purchase the project under a homeownership program, the purchaser must submit evidence demonstrating that it qualifies as a resident council. If the purchaser is a community-based nonprofit organization or a State or local government entity, it must likewise submit documentation demonstrating that it qualifies as such under the appropriate definition. In making determinations under this paragraph the Department will, to the extent feasible, use any information previously submitted by the purchaser to HUD in connection with its application for a planning grant under the HOPE 2 program, "HOPE for Homeownership of Multifamily Units." Qualified purchasers that are not priority purchasers may, at their option, notify the Department of their interest in submitting an offer.

Paragraph (f) describes the information that the Secretary will provide to the purchaser. This information will include the Secretary's determination as to the priority status of the purchaser and whether the purchaser qualifies as a resident council, community-based nonprofit organization or State or local government entity.

Paragraph (g) discusses the requirements for submission of an offer to purchase the project. The purchaser must submit a signed contract of sale to the owner. The contract of sale must specify that acceptance is contingent upon approval of the plan of action by HUD. The contract of sale must be accompanied by an earnest money deposit. HUD has determined that the earnest money deposit requirement is appropriate and necessary in order to discourage frivolous and disruptive offers. The deposit must be in an amount equal to one percent of the preservation value. The earnest money deposit would be retained by the seller if the offer is accepted and the purchaser, for reasons not attributable to HUD or the owner, fails to close.

Paragraph (h) establishes a procedure for setting priorities among the priority purchasers. It is the Department's position that this procedure is consistent with the statutory intent of encouraging resident homeownership programs and community-based nonprofit organizations. Under the proposed rule, if more than one offer is made during the 12 month period, then at the expiration of this period, the owner may accept the highest offer among those received, not to exceed the transfer preservation value. If more than one purchaser offers the highest amount, the owner must select the purchaser in the following order of priority: A resident council offering to purchase under a homeownership program, a community-based nonprofit organization, a State or local government, and any other nonprofit organization. These priorities apply only with respect to bona fide offers made during the 12-month period or if the sale is reopened pursuant to paragraph (*l*) because of a transaction which fails to close.

If at any time during the 12-month period a bona fide offer is made by a resident council seeking to purchase the project under a tenant homeownership program, then the owner may accept the offer without waiting until the expiration of the 12-month period. However, the owner may, if it chooses, elect to wait until the expiration of the 12-month period, either in anticipation of a higher offer or because of indecision as to whether to sell the project. If the owner receives no bona fide offers during either the 12-month or the 3-month period, the owner may prepay the mortgage or terminate the mortgage insurance in accordance with §248.169.

Paragraph (i) establishes a procedure for submitting an offer to HUD for a determination that the offer is bona fide. Once the Department notifies the owner that the offer is bona fide, the owner may make a binding acceptance of the offer. The owner and the purchaser would then submit a plan of action to the Secretary in accordance with paragraph (j).

Paragraph (*l*) establishes a procedure to address the possibility of transactions which fail to close. If an offer by a resident council is accepted but the sale transaction falls through within the 12-month priority purchase period or does not close within 90 days after the Secretary's approval of the plan of action, the owner would resume holding the project open for sale under paragraph (c). If, at any time beyond the 12-month priority purchase period (i.e., during the 3-month qualified purchase period or thereafter), the sale falls through or does not close within 90 days after the Secretary's approval of the plan of action, the owner would be required to (a) immediately notify the Secretary; (b) contact any purchaser who had previously submitted offers; and (c) give such parties and any other qualified purchasers 60 days from the date of notification to HUD in which to submit or resubmit offers to purchase the project. At the end of the 60-day period the owner would accept offers in accordance with the priorities set forth in paragraph (h). If an offer submitted during the 60-day period is accepted, but the sale is not consummated within 90 days of HUD's approval of the plan of action for reasons not attributable in whole or in part to the owner, the owner may terminate the low income affordability restrictions through prepayment or voluntary termination, subject to compliance with the requirements of § 248.165.

Paragraph (m) sets forth the amount of assistance that HUD will provide in connection with plans of action involving transfers. One component of this amount is the amount necessary to acquire the project from the current owner at a price not greater than the transfer preservation value. (Although the statute at section 220(d)(2)(A) uses the term "preservation equity" and not "preservation value" in this context, the Conference Report discussion at page 465 and the statute at sections 220(b)(1) and 220(c) refer to the preservation value as the cap on the sales price. The discrepancy appears to be a matter of terminology. Since the purchaser will be assuming the federally-assisted mortgage, the amount payable to the owner by the purchaser will not exceed the transfer preservation equity; stated differently, the compensation to the owner, including the assumption of the owner's debt on the federally-assisted

mortgage, would not exceed the transfer preservation value.) Other components include debt service on the federally-assisted mortgage(s) on the project, debt service on any rehabilitation loan on the project, amounts necessary to meet project operating expenses and establish adequate reserves, and amounts necessary to receive an adequate return on any actual cash investment. As noted above, the Department has determined that a return of 8 percent on actual cash invested by the purchaser would constitute an adequate return.

Paragraph (m)(6) provides that in the case of a priority purchaser, the amount of assistance shall also include adequate reimbursement for transaction expenses relating to the purchase of the project, subject to HUD's approval. In reviewing such expenses HUD will apply the standards used by the Department in approving transaction expenses in connection with FHA multifamily full insurance loan transactions. The allowable expenses would include the organizational costs, if any, incurred in establishing a nonprofit organization which is organized solely for the purpose of purchasing the project. Broker's fees would not be permissible as a transaction expenses under this paragraph.

Paragraph (m)(7) provides that in the case of an approved homeownership program, the amount of the assistance would also include the costs of training for the resident council, homeownership counseling and training, the fee for the nonprofit entity or public agency working with the resident council and costs related to relocation of tenants who elect to move. See § 248.173(m)(4). Expenses incurred before approval of the plan of action will be allowed, even though no assistance will be disbursed until HUD and the resident council enter into a grant agreement pursuant to a homeownership program. The proposed rule caps the assistance that may be provided under this paragraph at $500 per unit, but not more than $200,000 for the project, exclusive of relocation expenses. Moreover, expenses payable to the nonprofit or public entity assisting the resident council will be included in the assistance payable to the purchaser only if HUD approves the nonprofit or public entity. Since reimbursement for the resident council's organizational, training, and planning costs will not be available unless and until the resident council and HUD enter into a grant agreement, resident councils may wish to explore other sources of funding for these costs, including planning grants under the HOPE 2 program.

Paragraph (n) discusses the incentives available to purchasers under this section. In accordance with the Conference Report at page 465, the Department will work closely with priority purchasers to determine the mix of subsidies that best meet their preferences and organizational capacity. Section 220(d)(3) of the statute provides in part that "any residual receipts for the housing transferred to the selling owner shall be deducted from the sale price of the housing * * *" However, the sale price is capped at the preservation value which, in accordance with standard appraisal practices, does not take into consideration the amount of project escrows such as residual receipts. Thus, since the full value of the owner's asset includes both the preservation value and amount of residual receipts, requiring the owner to deduct the amount of residual receipts retained by the owner upon sale from the purchase price would appear to deprive the owner of a portion of the project's value. Paragraph (n) repeats the statutory language regarding this deduction; however, the Department specifically invites comments as to the proper construction of this statutory provision.

Paragraph (o) provides that where the qualified purchaser is a priority purchaser the Secretary may provide, in addition to incentives, assistance in the form of a grant in an amount that does not exceed the present value of the total of the projected section 8 existing fair market rents for section 8 existing housing for the next ten years or such longer period if additional assistance is necessary to cover the costs referred to in paragraph (m). The Department reserves the right to determine what combination of incentives and grant assistance is the least costly alternative to the Federal government. The 10-year grant amount provided under this paragraph would be calculated as follows: The section 8 existing fair market rent for each bedroom size would be multiplied by the number of units of each bedroom size, and then added together. This total amount would be adjusted by the latest applicable Annual Adjustment Factor used for the local area. The present value would be discounted using the interest rate on 10-year Treasury notes.

Paragraph (p) of the proposed rule provides that the Secretary shall seek reimbursement for assistance provided to a priority purchaser that, during the term of a plan of action, becomes affiliated with or sells the property to a non-priority purchaser. The Secretary would be entitled to reimbursement for the difference between the assistance provided to the priority purchaser and the assistance that would have been provided if the purchaser had been a non-priority purchaser.

The Department is imposing this requirement in order to prevent transactions in which "straw" priority purchasers seek to purchase the project under an arrangement in which they will later transfer it to a for-profit entity.

*Section 248.161 (Mandatory Sale for Housing Exceeding Federal Cost Limit)*

The procedures for sale of a project whose transfer preservation rent exceeds the Federal cost limit generally parallel the procedures for voluntary sales under § 248.157, and § 248.161 therefore includes appropriate cross-references. The major distinction between the sale procedures under the two sections is that an owner proceeding under §248.157 is not required to accept any offer, regardless of the purchase price being offered, whereas an owner proceeding under § 248.161 is required to accept a bona fide offer to purchase the project for a purchase price that equals the transfer preservation value of the project. (If the owner receives more than one such offer, the selection of the purchaser would be based upon the priorities as set forth in section § 248.157(h).)

In addition, a bona fide offer under § 248.157 could be at a purchase price that is up to the transfer preservation value, whereas the purchase price under § 248.161 would in all cases equal the transfer preservation value. Although the statute at sections 221(b)(1) and 221(c) refers to a purchase price "not less than" the transfer preservation value, the Conference Report at page 465 indicates that the purchase price would be equal to the transfer preservation value. The Department believes that the Conference Report is more consistent with the overall scheme of the statute, which is to compensate the owner for the value of its asset, and with the mandate in section 222(a)(1) to provide incentives that are the "least costly alternative" that is consistent with the full achievement of the statute's purposes. If the owner receives no bona fide offers that are at a purchase price equal to the transfer preservation value, the owner would be free to prepay the mortgage and terminate low income affordability restrictions under § 248.169.

The incentives and assistance available in connection with a sale under § 248.161 are generally similar to those under § 248.157, except that instead of providing, for priority purchasers only, a grant authorized by section 234(a) of the statute, the Secretary may provide grant assistance from funds made available under section 234(b) of the statute, and such funds would be available to both priority and for-profit purchasers. Section 221(b)(2) of the statute states that such assistance shall be in an amount not exceeding the difference between the preservation value of the housing and the level of assistance under section 221(d)(1), which authorizes the provision of section 8 assistance and other incentives. However, in the Department's view the total amount of assistance that must be provided under § 248.161 must be sufficient to fund all of the components listed in § 248.157(m). Section 248.161(d) has been drafted accordingly.

*Section 248.165 (Assistance for Displaced Tenants)*

This section implements section 223 of the 1990 Act, and provides detailed procedures for the protection of tenants who will be displaced through prepayment of the mortgage. The requirements of this section would be applicable in any case where the owner is permitted to prepay the mortgage and terminate low income affordability restrictions under § 248.169. As previously discussed, these requirements would not be applicable to prepayments under § 248.141.

Paragraph (d) requires the owner to pay 50 percent of the relocation expenses of each tenant, regardless of the income level of the tenant, except that the owner shall be required to increase the owner's contribution if so mandated by State or local law of general applicability. HUD will inform the tenants in the project of their rights to reimbursement for relocation expenses and other rights under this section.

Paragraph (e) provides that all tenants, regardless of income, shall be entitled to remain in the project for three years, at rent levels, except for increases due to increased operating costs, existing at the time of prepayment. The proposed rule states that the three-year period shall commence on the date of prepayment. Paragraph (f) allows the owner to fulfill this requirement by providing assistance necessary for the tenant to rent a decent, safe and sanitary unit

in another project at a rental cost (i.e., cost to the tenant) that is no more than the amount that the tenant would be required to pay under paragraph (e). This option would be available only if the tenant freely waives his or her right to remain in occupancy in the owner's project.

Paragraph (g) provides special protections for tenants (a) in projects located in low-vacancy areas, and (b) for special needs tenants. See discussion *supra* regarding the definitions of "low vacancy area" and "special needs tenants."

Paragraph (i) prohibits the owner from discriminating against any current tenant or future tenant or applicant for tenancy because that person receives assistance under section 8 of the United States Housing Act of 1937. The Conference Report at page 467 indicates that HUD would be authorized to set section 8 existing fair market rent levels at the "exception rent" so that tenants could use section 8 certificates or vouchers at the project even if the project's rents exceed the section 8 existing fair market rent. The Department is considering whether to make a technical amendment to the part 882 and part 887 regulations authorizing such exception rents, on a case-by-case basis, if necessary to protect current tenants. With respect to section 8 certificate holders for whom HUD does not approve exception rents, the discrimination prohibition in this paragraph would be applicable only to units that rent for an amount not in excess of the section 8 existing fair market rent.

*Section 248.169 (Permissible Prepayment, Voluntary Termination or Modification of Commitments)*

This section implements section 224 of the 1990 Act and sets forth the circumstances under which the owner may prepay the mortgage or otherwise modify or terminate the low income affordability restrictions. As noted above, this provision is inapplicable to prepayments approved under § 248.141. In general, prepayment will be permitted when HUD does not provide assistance approved in the plan of action within the specified time periods (or cannot approve the plan of action because of lack of adequate appropriations), or if the owner has offered the project for sale under either §248.157 or § 248.161 and has failed to receive any bona fide offers within the specified time periods. In either case the owner would not be entitled to prepay if HUD's failure to provide assistance or if the absence of a bona fide offer was attributable to the owner's actions or inaction. For example, the owner's refusal to execute a new regulatory agreement in connection with the provision of incentives would be grounds for HUD to refuse to permit the owner to prepay the mortgage.

The possibility that adequate funds may not exist to support all of the anticipated plans of action filed under the 1990 Act, with the result that many projects may be lost from the affordable housing inventory, is an issue of concern to the Department. The 1990 Act does not explicitly establish any basis for prioritizing among projects for funding assistance. However, if appropriations are insufficient to fund plans of action for all eligible low income housing projects for which plans of action are filed, the Department would by necessity have to fund some projects and not others. The Department specifically invites comments as to how it should allocate funds if that situation arises.

The statute does not define what is meant by "assistance" for purposes of section 224(a). Section 248.169(a)(1) defines such assistance as including section 8 assistance, a capital improvement loan under 24 CFR part 219, assistance for a homeownership program under § 248.173, a grant provided under § 248.157(o), or a grant under § 248.161(d), but not insurance of a rehabilitation, equity or acquisition loan under part 241.

Section 224(b) of the 1990 Act, which discusses the consequences if HUD is unable to continue providing section 8 assistance for the full term of the plan of action, generally tracks the language of section 225(c) of the 1987 Act. The 1987 Act specified three successive actions that HUD would take in the event that section 8 funds are no longer available: (1) Modifying the low income affordability restrictions that are dependent on the assistance; (2) if (1) is infeasible, releasing the owner from such restrictions; and (3) if (1) and (2) would result in a default under the insured loan, allowing the termination of all low income affordability restrictions. The 1990 Act specifies the following actions: (1) Modifying the low income affordability restrictions that are dependent on the assistance; and (2) permitting the owner to prepay the mortgage and terminate low income affordability restrictions, if the owner agrees to comply with

the provisions of section 223 regarding assistance for displaced tenants. Unlike the 1987 Act, the 1990 Act does not state the order in which these alternatives are to be considered. Nonetheless, the proposed rule states that prepayment and termination of low income affordability restrictions will be permitted only if modification of the low income affordability restrictions is infeasible.

*Section 248.173 (Resident Homeownership Program).*

This section implements section 226 of the statute and sets forth in considerable detail the requirements for a resident homeownership program. The homeownership program would be implemented in the context of a transfer of the project to the resident council under § 248.157 or § 248.161, and the resident council would be eligible to receive grant funds necessary to pay the purchase price, transaction expenses, and reimbursement for costs of training for the resident council, homeownership counseling and training, fees for the nonprofit entity or public agency working with the resident council, and relocation expenses.

Outside of the assistance provided to the resident council under the plan of action, the Department does not intent to provide any subsequent or ongoing assistance to the resident council, with the following exceptions: First, HUD intends to continue section 8 assistance for prospective homeowners who reside in the project on the date that it is transferred; such assistance would continue until the Department has determined that the project has achieved normalized operating expense levels, but in no event later than the completion of the transfer of ownership of units in the project (other than units occupied by nonpurchasing tenants) to the tenants. Project-based assistance to nonpurchasing tenants would be terminated at the time of the transfer of the project to the resident council; however, such tenants would be entitled to receive section 8 certificates or vouchers under § 248.173(m)(2) of the proposed rule. Second, amounts needed for certain ongoing operating expenses, including reserve for replacements escrows and reserves for contingencies against unexpected increases in expenses or shortfalls in homeowners' payments, may be capitalized and included within the assistance provided as part of the homeownership program.

Paragraph (a) contains the statutory requirement that the resident council work with a nonprofit entity or public body approved by the Secretary. The resident council should submit the name and qualifications of such entity or agency as early in the process as possible, so that the resident council will not incur expenses that HUD later determines are not eligible for reimbursement. The entity must have a demonstrated capacity for assisting the tenants to consider their options and develop a workable homeownership program.

Paragraph (c) establishes requirements for demonstrating the sufficient level of tenant interest in the homeownership program at the time that the resident council makes an offer to purchase the project. The resident council must submit a list of at least 75 percent of all of the families, representing at least 50 percent of all of the units in the project, who have expressed an interest in participating in the homeownership program. Although the statute does not impose any such requirement, the Department views such documentation of tenant interest to be an integral part of demonstrating that the offer is a bona fide offer.

Paragraph (d) describes the contents of the homeownership program which must be submitted in connection with the plan of action. These provisions are derived from section 226(b)(1) of the statute and are also drawn from the HOPE Program Guidelines.

Paragraph (f) describes the forms of homeownership which the Secretary could approve under a homeownership program. Although condominium and cooperative arrangements are the most likely forms of ownership, fee simple ownership could also be used in the case of townhouse or side-by-side garden apartment projects, provided a homeowner association or other similar entity is created to exercise the legal control over the project necessary to comply with the requirements of the rule.

Paragraph (g) sets forth requirements concerning occupancy of the project. The Department has determined that it

is appropriate to require the same proportionality of very low, low and moderate income initial owners in the project as the proportionality required under § 248.145 for tenants under a non-resident homeownership plan of action. The resident council may, if it elects, sell vacant units and units occupied by tenants who choose not to purchase their units, to very low income and low income purchasers, regardless of the proportions of very low income, low income and moderate income tenants in the project.

The resident council must demonstrate in its homeownership program that the aggregate incomes of initial and subsequent owners and other sources of funds for the project are sufficient to permit occupancy charges to cover the full operating costs of the housing and any debt service. The resident council may provide that occupancy charges will vary on the basis of the homeowner's income, provided that the total charges for housing costs (i.e., principal, interest, taxes, insurance, occupancy charges and utilities) are projected to be no more than 35% of the homeowner's income. The resident council must establish adequate underwriting standards for homeownership.

Section 226(b)(3)(D) of the statute requires that each initial owner occupy the unit that it acquires. The proposed rule provides in addition that each initial owner agree not to lease or otherwise make the property available for occupancy by other residents during the 15-year period from the date of acquisition, unless the resident council determines that the initial owner is required to move outside the market area due to a change in employment or an emergency situation. This requirement is based on a parallel provision in the HOPE Program Guidelines.

Paragraphs (h) through (*l*) establish detailed requirements concerning restrictions on resale of the units and application of sales proceeds. The provisions of section 226(b)(5) of the 1990 Act are largely consistent with the analogous provisions of title IV of the 1990 Act and thus the provisions of the proposed rule largely track the analogous provisions of the HOPE Program Guidelines. As in the case of the HOPE programs, HUD will consult with the Internal Revenue Service on the tax consequences to families participating in the homeownership program, and will inform the resident council as to the advice received.

If the initial homeowner sells the unit during the first six years after acquisition of the unit, that homeowner may retain only the amount computed under paragraph (k), i.e., the homeowner's equity contribution, the value of any improvements installed at the homeowner's expense, and the appreciated value, determined by applying the Consumer Price Index (urban consumers) against the equity contribution and the value of improvements.

Paragraph (i)(3) requires the execution of a promissory note payable to the Secretary in the amount of the difference between the market value of the unit and the purchase price paid by the initial owner. If the initial homeowner sells the unit between the seventh year and the expiration of 20 years after acquisition of the unit, the homeowner may retain any net sale proceeds not payable to HUD under the promissory note. For example, if the homeowner sells at the end of the 13th year of homeownership (at the half-way point between the end of the 6th year and the end of the 20th year of homeownership), 84/168 (or one-half) of the note would be forgiven, and only half of the principal amount of the note would be payable from sales proceeds. The homeowner could retain all remaining proceeds, including proceeds due to normal market value increases in the value of the unit. If the initial homeowner retains ownership for 20 or more years, the entire amount of the note would be forgiven.

Paragraph (j) provides that if a subsequent owner purchases the property during the 20-year period for less than the then-current fair market value, the subsequent purchaser shall also execute a promissory note for the balance of the 20-year period. For example, if the subsequent homeowner acquires the unit at the end of the 4th year, 192 months would remain in the 20-year period. If the subsequent homeowner sells the unit at the end of the 10th year, having owned the unit for 72 months, 72/192 (37.5 percent) of the note would be forgiven, and 62.5 percent of the principal amount of the note would be payable from sales proceeds. The subsequent homeowner could retain all remaining sales proceeds. If the subsequent homeowner retains ownership to the end of the initial 20-year period, the entire amount of the note would be forgiven.

Paragraph (m) establishes requirements for protection of nonpurchasing families. As provided in section

226(b)(6)(B) of the statute, HUD would provide section 8 certificates or vouchers for section 8-eligible tenants. The requirements for giving preference to certain categories of eligible families under 24 CFR 882.219 and 887.157 would not apply to the provision of assistance to such families. In addition, the proposed rule provides that tenants whose incomes exceed section 8 eligibility standards would be required to pay no more than the section 8 existing fair market rent published for effect or 30 percent of adjusted income, whichever is less, and rent increases for such tenants would be phased in in accordance with §248.145(a)(6). These rent limitations would continue in effect until the tenant moves out. Thus, nonpurchasing tenants would receive the same level of protection against rent increases that is provided to current tenants under a nonhomeownership plan of action involving incentives.

Paragraph (o) establishes requirements for timely transfer of the project from the owner to the resident council and from the resident council to the initial purchasers. The rule states in part that the resident council shall transfer ownerhship interests in the units within four years from the date of acquisition by the resident council. This requirement is derived from a parallel requirement in the HOPE Program Guidelines. If the resident council fails to tranfer ownership interests within the prescribed period, HUD may invoke contractual remedies as set forth in the grant agreement between HUD and the resident council.

Paragraph (p) requires that, prior to transferring ownership interests to the initial purchasers, the resident council must maintain the project in accordance with the housing standards set forth in §248.147. The Department will conduct annual inspections to ensure that this requirement is complied with. Paragraphs (q) and (r) set forth audit and reporting requirements for the resident council.

Section 226(b)(10) of the statute states that any entity that assumes a mortgage in connection with a resident homeownership program must comply with any low income affordability restrictions for the remaining useful life of the project, provided that this requirement shall only apply to an entity, such as a cooperative association, that, as determined by the Secretary, intends to own the housing on a permanent basis. The HOPE Program Guidelines, implementing a parallel statutory provision, provide that grant recipients may not assume a mortgage where low income use restrictions would continue to apply. Likewise, paragraph (s) of the proposed rule states that a section 221(d)(3) market rate mortgage or purchase money mortgage, but not a section 221(d)(3) BMIR or section 236 mortgage, may be assumed by the resident council in connection with its purchase of the project.

*Section 248.177 (Delegated Responsibility to State Agencies)*

The proposed rule tracks the language of section 227 of the statute. The Department intends to accept applications from State agencies for delegation of responsibilities under the statute once it has gained some experience with implementation of the statute. More detailed requirements will be issued in the form of administrative instructions.

*Section 248.179 (Consultation with Other Interested Parties)*

The Department will implement this provision by consulting with State and local government agencies on an ongoing basis.

*Section 248.181 (Notice to Tenants)*

Section 248.181 provides for notification to the tenants of an affected project of the communications between the Commissioner, the owner, and purchaser, if any, concerning the status of the project as it proceeds under the provisions of this subpart. The language in this section is identical to that of the statute except for the more stringent notification requirements imposed for purposes of identifying tenant representatives when a notice of intent is submitted pursuant to § 248.105. As discussed in the description of § 248.105, the proposed rule provides a more stringent tenant notification procedure for the initial notice of intent than that specified in section 230 of the statute; the Department hopes that

through this notification procedure the tenant representative, if any, will be contacted at the earliest possible stage in the process, and tenants will be given the maximum opportunity to participate in the formulation of the plan of action. In addition, the proposed rule clarifies that, where the full text of material (e.g., the proposed plan of action, and the plan of action as finally approved) is to be kept at a convenient location and made available for examination by the tenants, the tenants must have access to such material for inspection and copying during reasonable hours.

Section 248.218 of the existing rule provides that, when the owner and the Secretary have reached preliminary agreement on the terms of a plan of action, the owner shall send to each tenant a HUD-prepared summary of the plan of action, and tenants shall have 60 days in which to submit comments to HUD before final approval of the plan of action. No such requirement is included in subpart B of the proposed rule, because under subpart B tenants will receive notification of the owner's intentions and information about the plan of action on an ongoing basis.

Subpart C

The proposed rule retains the provisions of §§ 248.201 through 248.261 as they exist in the existing rule, with the following exceptions:

*Section 248.221(c)*

This provision states that HUD will not approve a plan of action involving termination of low income affordability restrictions if there are open findings of noncompliance with civil rights authorities or open audit findings with respect to violations of the regulatory agreement. A corresponding requirement is applicable to plans of action under subpart B of this part. See § 248.141(a)(3).

*Section 248.221(d)*

Pursuant to section 203(d) of the HUD Reform Act, this provision is being revised to provide that the plan of action shall specify the actions that the Secretary and the owner shall take to ensure that any tenants displaced as a result of the termination of low income affordability restrictions are relocated to affordable housing.

*Section 248.233(f)*

This provision states that no incentives will be provided if there are open findings of noncompliance with civil rights statutes and authorities or open audit findings with respect to violations of the regulatory agreement. A corresponding requirement is applicable to plans of action under subpart B. See § 248.145(a)(12).

*Section 248.234(c)*

This provision also implements section 203(d) of the HUD Reform Act, and provides that the plan of action must specify what actions HUD and the owner would take to ensure that tenants displaced as a result of any modification of low income affordability restrictions stemming from the unavailability of section 8 assistance are relocated to affordable housing.

*Section 248.235*

This provision gives owners who have agreed to extend low income affordability restrictions under the 1987 Act a

right to convert to a subsequently-enacted system of incentives and restrictions. As noted above, it is deleted in the proposed rule and is superseded by § 248.5.

Part 241

Subpart A -- Eligibility Requirements

*Section 241.166*

This provision implements section 204(b) of the HUD Reform Act, which provides that, when underwriting a rehabilitation loan under part 241 in connection with "eligible multifamily housing," the Secretary may assume that any rental assistance provided for purposes of servicing the additional debt will be extended for the term of the rehabilitation loan, and states further that the Secretary shall exercise prudent underwriting in insuring rehabilitation loans under part 241. This provision is parallel to the first sentence of section 241(f)(7) of the National Housing Act, as amended by section 602(a) of the 1990 Act, which pertains to equity loans and acquisition loans. However, it is important to note that while the definition of "eligible multifamily housing" generally comprises the same categories of projects as those described in the statutory definition of "eligible low income housing," section 204(b)'s applicability is not tied to the eligibility of the project for prepayment or the status of the project under part 248.

Section 204(b) of the HUD Reform Act also provides that a mortgagee approved by the Secretary may not withhold consent to a rehabilitation loan insured in connection with eligible multifamily housing on which the mortgagee holds a mortgage. This provision parallels section 241(f)(9) of the National Housing Act, as amended by section 602(a) of the 1990 Act, which pertains to equity loans and acquisition loans.

Subpart B -- Contract Rights and Obligations

*Section 241.251.*

The proposed rule includes language incorporating by reference the "Contract Rights and Obligations" provisions of subpart D, "Contract Rights and Obligations -- Multifamily Projects Without a HUD-Insured or HUD-Held Mortgage," for noninsured projects that receive a rehabilitation loan under subpart A in connection with a HUD-approved plan of action. Section 241(d) of the National Housing Act, as enacted by section 313 of the Housing and Community Development Act of 1974, Public Law 93-383, provides in part that the Secretary may insure a loan for "improvements or additions" to a multifamily project not covered by a HUD-insured mortgage, if such a loan would assist in preserving, expanding or improving housing opportunities or in providing protection against fire or other hazards. Likewise, section 241(e)(1), as enacted by section 247 of the National Energy Conservation Policy Act of 1978, Public Law 95-619, authorizes the Secretary to insure a loan for energy conservation improvements, solar energy systems or individual utility metering for a project, without regard to whether the project is covered by a HUD-insured mortgage. In 1980 HUD amended part 241 to implement the latter provision only. See *45 FR 30352* (May 7, 1980). Under the proposed rule § 241.251 would be amended to authorize HUD to insure a rehabilitation loan under subpart A of part 241 for a project with a noninsured section 236 mortgage, in connection with a HUD-approved plan of action. A parallel amendment to § 241.1200 has also been included in the proposed rule, in order to authorize HUD to insure an equity or acquisition loan under subpart E for a project with a non-insured section 236 mortgage.

Subparts E and F -- Insurance for Equity Loans and Acquisition Loans

Section 602 of the 1990 Act substantially revised the provisions of section 241 of the National Housing Act, *12 U.S.C. 1715z-6*(f), by (1) expanding the scope of section 241 to include acquisition loans in connection with plans of action under the 1990 Act; (2) restricting the amount of an equity loan insured under section 241 to the lesser of 70 percent of the preservation equity in the project or the amount that the Secretary determines can be supported by the project on the basis of an 8 percent return on the preservation equity (assuming normal debt service coverage); (3) requiring the lender to escrow 10 percent of the equity loan, to be released after 5 years if the owner is in compliance with the housing standards mandated by section 222(d) of the statute; and (4) providing that an acquisition loan shall be limited to 95 percent of the preservation equity of the project, except that if the purchaser is a priority purchaser, the loan may include any expenses associated with the acquisition, loan closing and implementation of the plan of action.

Under the proposed rule owners whose plans of action are processed under the 1987 Act will be subject to section 241(f) as it existed under the 1987 Act, while owners whose plans of action are processed under the 1990 Act will be subject to section 241(f) as amended by the 1990 Act. Although section 602(a) amends section 241(f) and, under section 605, is effective upon the enactment of the 1990 Act (i.e., on November 28, 1990), it is the Department's view that the provisions of section 241(f) as they existed prior to their amendment remain in effect for owners who are or will be seeking approval of plans of action under the 1987 Act and subpart C of part 248. The Department takes this position because section 241(f) was originally enacted by section 231 of the 1987 Act, which is part of subtitle B of title II of the 1987 Act and is thus part of the "Emergency Low Income Housing Preservation Act of 1987," and, as explained in the preceding discussion of § 248.5, under sections 604 (a) and (b) of the 1990 Act owners retain their right to proceed under the 1987 Act and subpart C. For this reason, the proposed rule has revised part 241, subparts E and F to include provisions that implement both section 241(f) as it existed under the 1987 Act and as it has been revised by the 1990 Act.

*Section 241.1000 (Purpose and Scope)*

The language of this provision has been revised to state that the purpose of subpart E is to provide insurance for equity take-out loans under the 1987 Act and equity take-out loans and acquisition loans under the 1990 Act.

*Section 241.1005 (Definitions)*

The list of definitions has been expanded to include appropriate cross-references to subpart B of part 248 regarding the definitions of acqusition loan, extension and transfer preservation equity, priority purchaser and qualified purchaser.

*Section 241.1065 (Maximum Loan Amount -- Loans Insured in Connection with Plans of Action Under Part 248, Subpart C)*

This provision retains the language of the existing § 241.1065, but limits its applicability to equity take-out loans insured in connection with plans of action under the 1987 Act.

*Section 241.1067 (Maximum Loan Amount -- Loans Insured in Connection with Plans of Action Under Part 248, Subpart B)*

This provision implements section 241(f)(2)(B)(i) and 241(f)(3)(B), as amended by section 602 of the 1990 Act, and establishes the maximum loan amount for equity take-out loans and acquisition loans, respectively.

*Section 241.1069 (Escrow Requirements)*

This provision implements section 241(f)(2)(B)(ii), as amended by section 602, and requires that, in connection with equity loans made for plans of action under subpart B of part 248, the lender shall deposit on behalf of the owner 10 percent of the loan amount in the escrow account, controlled by the Secretary or a State housing finance agency approved by the Secretary, to be made available to the owner upon the expiration of 5 years from the date of origination of the loan, subject to the owner's compliance with the housing standards in § 248.147. In addition, with respect to both equity loans provided in connection with plans of action under subparts B or C of part 248, this provision requires the phasing in of advances to reflect rent levels.

*Section 241.1120 (Mortgagee's Consent)*

The proposed rule revises the provision on mortgagee's consent to provide that the holder of an insured mortgage may not charge a fee for consenting to the equity or acquisition loan. In the Department's view such a fee is tantamount to withholding consent, and allowing such a fee would be contrary to the intent of the statutory prohibition.

*Section 241.1200 (Cross-references)*

See discussion of § 241.251, *supra.*

Findings and Other Matters

This rule constitutes a major rule, as determined by the Office of Information and Regulatory Affairs, Office of Management and Budget, under the authority of Executive Order 12291 on Federal Regulations issued on February 17, 1981. A copy of the Regulatory Impact analysis has been transmitted to the Office of Management and Budget, and is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, room 10276, 451 Seventh Street, SW., Washington, DC 20410.

This rule was listed as item 1224 in the Department's Semiannual Agenda of Regulations published on April 22, 1991 *(56 FR 17360, 17371)*, under Executive Order 12291 and the Regulatory Flexibility Act.

A Finding of No Significant Impact with respect to the environment has been made in accordance with HUD regulations in 24 CFR part 50, which implement section 102(2)(C) of the National Environmental Policy Act of 1969, *42 U.S.C. 4332.* The Finding of No Significant Impact is available for public inspection during regular business hours in the Office of General Counsel, Rules Docket Clerk, room 10276, 451 Seventh Street, SW., Washington, DC 20410.

Under section 605 of the Regulatory Flexibility Act *(5 U.S.C. 601)*, HUD certifies that this rule does not have a significant economic impact on a substantial number of small entities, because it carries out statutorily-mandated limitations on prepayment of the affected mortgages. Any economic impact is a direct consequence of the statute and is not separately imposed by this rule.

The information collection requirements contained in the rule have been submitted to the Office of Management and Budget, Office of Information and Regulatory Affairs, HUD Desk Officer, room 3001, New Executive Office Building, Washington, DC 20503, for review under the provisions of the Paperwork Reduction Act of 1980 *(44 U.S.C. 3501*-3502). No person may be subject to a penalty for failure to comply with these information collection requirements until they have been approved and assigned an OMB control number, when assigned, will be announced by separate notice in the Federal Register.

Tabulation of Annual Reporting Burden

| Description of information collection and applicable program reference | Number of respondents 17.1 X | Number of responses per respo 17.2= | Total annual responses 17.3 X | Hours per response 17.4 | Total hours= 17.5 |
|---|---|---|---|---|---|
| A. First Notice of Intent 1990 Statute: Section 248.105 | 506.00 | 1.00 | 506.00 | 2.00 | 1,012.00 |
| B. Notice of Intent under 1987 Statute: 248.5 (*) | 275.00 | 1.00 | 275.00 | 2.00 | 550.00 |
| C. Appraisal: 248.111 | | | | | |
| D. Second Notice of Intent: 248.133 | 282.00 | 1.00 | 282.00 | 3.75 | 1,057.50 |
| E. Plan of Action: | | | | | |
| 1. Termination of Affordability: 248.141 | 4.00 | 1.00 | 4.00 | 33.00 | 132.00 |
| 2. Extension of Affordability/ Transfer of Project: 248.145 | 502.00 | 1.00 | 502.00 | 15.00 | 7,530.00 |
| F. Expression of Interest from Potential Purchasers: 248.157(c) | 282.00 | 1.00 | 282.00 | 1.00 | 282.00 |
| Additional Information from Resident Councils: 248.173(b) | 39.00 | 1.00 | 39.00 | 0.25 | 9.75 |
| G. Owner provides potential purchaser informaton on | | | | | |

Tabulation of Annual Reporting Burden

| Description of information collection and applicable program reference | Number of respondents 17.1 X | Number of responses per respo 17.2= | Total annual responses 17.3 X | Hours per response 17.4 | Total hours= 17.5 |
|---|---|---|---|---|---|
| housing: 248.157(e)(4) | 282.00 | 1.00 | 282.00 | 5.00 | 1,410.00 |
| H. Bona Fide Offers | 282.00 | 1.00 | 282.00 | 1.00 | 282.00 |
| Additional information from resident councils | 39.00 | 1.00 | 39.00 | 4.00 | 156.00 |
| I. Owner provides informaton on displaced tenants: 248.165(b) | 4.00 | 1.00 | 4.00 | 3.00 | 12.00 |
| J. Notices of vacancies from public housing agencies: 248.169(c) | 4.00 | 1.00 | 4.00 | 1.00 | 4.00 |
| K. Owner notifies HUD of expiring Section 8 contracts: 248.169(g) | 463.00 | 1.00 | 463.00 | 0.75 | 347.25 |
| L. Resident homeownership plan: 248.157(f) and 248.169(d) | 39.00 | 1.00 | 39.00 | 25.00 | 975.00 |
| M. State preservation plan: 248.179(b) | 6.00 | 1.00 | 6.00 | 11.00 | 66.00 |
| Totals | 3,009.00 | | | | 13,825.50 |
| Rounded | | | | | 13,826 |

(*) This notice will only be collected during the 60 days following the publication of this rule.

The Department specifically requests comments on how the paperwork burden on the public resulting from the proposed rule may be reduced.

The General Counsel, as the Designated Official under section 6(a) of Executive Order 12612, Federalism, has determined that the policies contained in this rule will not have substantial direct effects on States or their political subdivisions, or the relationship between the Federal government and the States, or on the distribution of power and responsibilities among the various levels of government. As a result, the rule is not subject to review under the Order.

The General Counsel, as the Designated Official under Executive Order 12606, The Family, has determined that some of the policies in this rule will have a significant impact on the formation, maintenance, and general well-being of the family. Achievement of homeownership by low income families under the regulation can be expected to support family values, by helping families to achieve security and independence, by enabling them to live in decent, safe, and sanitary housing, and by giving them the skills and means to live indpendently in mainstream American society. Since the impact on the family is beneficial, no further review is necessary.

The General Counsel, as the Designated Official under Executive Order 12630, Government Actions and Interference with Constitutionally Protected Property Rights, has determined that this proposed rule does not have "takings implications,' as defined in HUD's "Suplemental Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings." The proposed rules does not deny the owner an economically viable use for the project. Instead, the owner will, at a minimum, maintain ownership of the project with the below market rate mortgage or rental subsidies in place and with greatly enhanced access to the full equity in the project as residential rental housing; alternatively, the owner may transfer the project under a plan of action in which the Secretary will provide incentives that will enable the owner to realize the full value of the project at its highest and best use, or may be entitled to prepay the mortgage.

The Catalog of Federal Domestic Assistance program number for this rule is 14.137 (Mortgage Insurance -- Rental and Cooperative Housing for Low and Moderate Income Families).

List of Subjects

*24 CFR Part 50*

Environmental assessments; Environmental impact statements; Environmental policies and review procedures.

*24 CFR Part 219*

Loan programs -- housing and community development, Low and moderate income housing.

*24 CFR Part 221*

Condominiums; Low and moderate income housing; Mortgage insurance; Displaced families; Single family housing pojects; Cooperatives.

*24 CFR Part 241*

Energy conservation; Mortgage insurance; Solar energy; Projects.

*24 CFR Part 248*

Low and moderate income housing; Mortgage insurance.

Accordingly, the Department proposes to amend title 24 of the Code of Federal Regulations as follows:

PART 50 -- PROTECTION AND ENHANCEMENT OF ENVIRONMENTAL QUALITY

1. The authority citation for part 50 would continue to read as follows:

Authority: Sec. 7(d), Department of Housing and Urban Development Act *(42 U.S.C. 3535*(d)).

2. In § 50.20, paragraph (n) would be revised to read as follows:

§ 50.20 Categorical exclusions.

* * * * *

(n) Approval of mortgage prepayments or plans of action (including incentives) under the Emergency Low Income Housing Preservation Act of 1987 or the Low Income Housing Preservation and Resident Homeownership Act of 1990, and approval of mortgage prepayments under other statutes or authorities, when the proposal does not involve demolition of any buildings, or parts of any building, containing the primary use served by the project.

* * * * *

PART 219 -- FLEXIBILE SUBSIDY PROGRAM FOR TROUBLED PROJECTS

3. The authority for part 219 would continue to read as follows:

Authority: Sec. 201, Housing and Community Development Amendments of 1978, *12 U.S.C. 1715z*-la; sec. 7(d), Department of Housing and Urban Development Act *(42 U.S.C. 3535*(d)).

4. In § 219.325, the introductory text of paragraph (b) and paragraph (b)(3) are revised and a new paragraph (b)(5) is added to read as follows:

§ 219.325 Effect on rental rates.

* * * * *

(b) If rent increases that would result from the debt service and other expenses of a capital improvement loan under this subpart for a project would cause the rents of lower income residents of the project to be higher than the amount that would be allowed for eligible families under 24 CFR 813.107, or where appropriate to implement a plan of action under part 248 of this chapter, the Secretary may consider taking any or all of the following actions:

* * * * *

(3) Notwithstanding § 219.320(b), reduce the rate of interest on the capital improvement loan to a rate not lower than one percent.

* * * * *

(5) Permit repayment of the debt service to be deferred as long as the low and moderate income character of the project is maintained in accordance with § 219.110(b).

* * * * *

PART 221 -- LOW AND MODERATE INCOME MORTGAGE INSURANCE

5. The authority for part 221 would continue to read as follows:

Authority: Sec. 211, 221, National Housing Act *(12 U.S.C. 1715*(b), 1715*l*); section 221.544(a)(3) is also issued under section 201(a) of the National Housing Act, *12 U.S.C. 1707*(a).

6. In § 221.524, paragraph (e) would be revised to read as follows:

§ 221.524 Prepayment privileges.

* * * * *

(e) *Prepayment of mortgages subject to part 248.* Where the mortgage described in paragraph (a)(1) of this section is, or prior to assignment to the Commissioner was, insured under section 221(d)(3) of the Act and the mortgagor receives project-based assistance under parts 880, 881 or 886 of this title, or where the mortgage is, or prior to assignment to the Commissioner was, insured under section 221(d)(5) of the Act, the mortgage may be prepaid in full only in accordance with a plan of action approved by the Commissioner under part 248 of this title.

PART 241 -- SUPPLEMENTARY FINANCING FOR INSURED PROJECT MORTGAGES

7. The authority for part 241 would continue to read as follows:

Authority: Sec. 211, 241, National Housing Act *(12 U.S.C. 1715b,* 1715z-6); sec. 7(d), Department of Housing and Urban Development Act *(42 U.S.C. 3535*(d).

8. 24 CFR part 241, subpart A, would be amended by adding a new § 241.166 to read as follows:

§ 241.166 Special underwriting standards for eligible multifamily housing.

(a) For purposes of this section, the term "eligible multifamily housing" means any housing financed by a loan or mortgage that is --

(1) Insured or held by the Commissioner under section 221(d)(3) of the National Housing Act and assisted under section 101 of the Housing and Urban Development Act of 1965 or section 8 of the United States Housing Act of 1937;

(2) Insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act; or

(3) Insured, assisted or held by the Secretary under section 236 of the National Housing Act.

(b) When underwriting a loan under this subpart in connection with eligible multifamily housing, the Commissioner may assume that any rental assistance provided for purposes of servicing the additional debt will be extended for the term of the rehabilitation loan. The Commissioner shall exercise prudent underwriting practices in insuring rehabilitation loans under this subpart.

(c) The holder of an insured mortgage which is recorded prior to the rehabilitation loan covering eligible multifamily housing may not withhold its consent to the rehabilitation loan or the security instrument executed in connection with the rehabilitation loan, and may not charge a fee as a condition to its consent to such loan or security instrument.

9. Section 241.251 would be amended by adding a paragraph heading to paragraph (a) and adding paragraph (c) to read as follows:

§ 241.251 Cross-reference.

(a) *Projects with a HUD-insured or HUD-held mortgage.*

* * * * *

(c) *Projects without a HUD-insured or HUD-held mortgage.* The provisions of subpart D of this part shall be applicable to a project without a HUD-insured or HUD-held mortgage that is receiving a loan insured under subpart A of this part in connection with a plan of action approved by the Commissioner under part 248 of this chapter.

10. 24 CFR, subparts E and F, would be revised to read as follows:

Subpart E -- Insurance for Equity Loans and Acquisition Loans -- Eligibility Requirements

Sec.

241.1000 Purpose and scope.

241.1005 Definitions.

241.1010 Feasibility letter.

241.1015 Application and commitment fees.

241.1020 Commitments.

241.1025 Refund of fees.

241.1030 Mortgage insurance premiums.

241.1035 Charges by lender.

241.1040 Eligible lenders.

241.1045 Note and security form.

241.1046 Rental assistance.

241.1050 Method of loan payment.

241.1055 Date of first payment to principal.

241.1060 Maturity.

241.1065 Maximum loan amount -- loans insured in connection with a plan of action under subpart C of part 248.

241.1067 Maximum loan amount -- loans insured in connection with a plan of action under subpart B of part 248.

241.1069 Escrow requirements.

241.1070 Agreed interest rate.

241.1080 Eligibility of title.

241.1085 Title evidence.

241.1090 Accumulation of next premium.

241.1095 Application of payments.

241.1100 Prepayment privilege and charges.

241.1105 Late charges.

241.1120 Mortgagee's consent.

Subpart F -- Insurance for Equity Loans -- Contract Rights and Obligations

Sec.

241.1200 Cross-references.

241.1205 Payment of insurance benefits.

241.1210 Condition for payment of insurance benefits.

241.1215 Calculation of insurance benefits.

241.1220 Termination of insurance benefits.

241.1230 No vested right in fund.

241.1235 Cross default.

241.1245 Insurance endorsement.

241.1250 Effect of endorsement.

Subpart E -- Insurance for Equity Loans and Acquisition Loans -- Eligibility Requirements

§ 241.1000 Purpose and scope.

(a) Section 231 of the Housing and Community Development Act of 1987 (the "1987 Act") amended the National Housing Act by adding a new subsection (f) to section 241. This section authorizes the Secretary to provide insurance for an equity loan as a vehicle for the owner of an eligible multifamily project to capture a portion of the project's equity, in connection with a plan of action approved by the Commissioner under the 1987 Act.

(b) Section 602 of the Cranston-Gonzalez National Affordable Housing Act of 1990 (the "1990 Act") amended section 241 by expanding its scope to include both equity loans for owners, and acquisition loans for purchasers, under a plan of action approved under the provisions of the 1990 Act, and by making other changes. The provisions of section 241(f) as amended by the 1990 Act are applicable to owners with plans of action being processed under part 248, subpart B, which implements the 1990 Act.

(c) The provisions of section 241(f) of the Act as they were in effect prior to the 1990 Act remain in effect for owners with plans of action being processed under part 248, subpart C, which implements the 1987 Act.

(d) The insurance of an equity loan or acquisition loan under this subpart may be provided only as a specific element of a plan of action approved by the Commissioner under part 248 of this chapter and is not available under any other department program.

(e) Unless otherwise indicated, the provisions of this subpart and subpart F of this part are applicable to loans insured in connection with plans of action being processed under either subpart B or C of part 248.

(f) An owner or purchaser may obtain both a rehabilitation loan under subpart A of this part and an equity loan or rehabilitation loan under this subpart.

§ 241.1005 Definitions.

(a) All of the definitions of § 241.1 apply to equity and acquisition loans insured under this subpart E except the following definitions:

241.1(i) Borrower

241.1(k) Energy conserving improvements

241.1(l) Solar energy system

(b) As used in this subpart, the following terms have the meaning indicated:

*Acquisition loan* means a loan or advance of credit made to a purchaser of eligible low income housing which is made for the purpose of implementing a plan of action approved in accordance with part 248 of this chapter.

*Borrower* means the owner or qualified purchaser of an eligible low income housing project, which owner receives and becomes primarily obligated for the repayment of an equity loan.

With respect to loans insured in connection with a plan of action under part 248, subpart C, the term includes a public entity, a nonprofit organization or a limited equity tenant cooperative corporation, which entity is purchasing an eligible low income housing project by means of an equity loan and is obligated for the payment of the equity loan.

*Eligible low income housing* has the same meaning as provided at § 248.101 or §248.201 of this chapter, with respect to loans insured in connection with plans of action under subparts B or C of part 248, respectively.

*Equity* means, for purpose of subparts E and F of this part only, the difference between the fair market value of the project as determined by the Commissioner and the outstanding indebtedness relating to the property.

*Equity Loan* means a loan or advance of credit to the owner of an eligible low income housing project which is made for the purpose of implementing a plan of action approved in accordance with part 248 of this chapter.

*Extension preservation equity* has the same meaning as provided at § 248.101 of this chapter.

*Limited equity tenant cooperative corporation* means a tenant cooperative corporation which, in a manner acceptable to the Commissioner, restricts the initial and resale price of the shares of stock in the cooperative corporation so that the shares remain affordable to lower income families and moderate income families.

*Low income families* has the same meaning as provided at § 248.101 of this chapter.

*Moderate income families* has the same meaning as provided at § 248.101 of this chapter.

*Plan of action* has the same meaning as provided at § 248.101 or § 284.201 of this chapter.

*Preservation equity* has the same meaning as provided at § 248.101 of this chapter.

*Priority purchaser* has the same meaning as provided at § 248.101 of this chapter.

*Qualified purchaser* has the same meaning as provided at § 248.101 of this chapter.

§ 241.1010 Feasibility letter.

(a) *Request for study.* The owner may request the Commissioner to undertake a feasibility analysis of an equity or acquisition loan, and issue a feasibility letter. At the discretion of the Commissioner the feasibility analysis may be undertaken or denied.

(b) *Findings.* The issuance of a feasibility letter indicates completion of the Commissioner's preliminary analysis for the insurance of an equity or acquisition loan. The feasibility letter shall contain the Commissioner's estimate of the supportable loan amount, based upon the project's equity in the case of an equity loan and based on the project's purchase price in the case of an acquisition loan, but such feasibility letter shall neither constitute a commitment to insure nor bind the Commissioner in any other manner.

(c) *Fee.* The Commissioner shall not charge a fee for undertaking a feasibility analysis or for the issuance of a feasibility letter.

§ 241.1015 Application and commitment fees.

(a) *Application.* An application for the issuance of either a conditional or firm commitment for insurance of an equity or acquisition loan on a project shall be submitted by an approved lender and by the owner or purchaser of the project to the Commissioner on a form prescribed by the Commissioner. No application shall be considered unless the exhibits called for by such forms are furnished.

(b) *Application and commitment fees* -- (1) *Application for conditional commitment.* An application commitment fee of $2.00 per thousand dollars of the amount of the loan applied for shall accompany the application for a conditional commitment.

(2) *Application for firm commitment.* An application for a firm commitment shall be accompanied by the payment of an application-commitment fee in an amount which, when added to any prior fee received in connection with a conditional commitment application, will aggregate $3.00 per thousand dollars of the loan applied for.

§ 241.1020 Commitments.

(a) *Conditional commitment.* The issuance of a conditional commitment constitutes an agreement by the Commissioner, subject to specified terms and conditions, to accept an application for a firm commitment.

(b) *Firm Commitment.* The issuance of a firm commitment indicates the Commissioner's approval of the application for insurance and sets forth the terms and conditions upon which the equity or acquisition loan will be insured. The firm commitment may provide for the insurance of advances of equity or acquisition loan immediately upon endorsement of the note.

(c) *Term of commitment.*

(1) A conditional commitment is effective for whatever term is specified in the text of the commitment.

(2) A firm commitment is effective for whatever term is specified in the text of the commitment.

(3) The term of either a conditional commitment or firm commitment may be extended in such manner as the Commissioner may prescribe.

(d) *Reopening of expired commitments.* An expired conditional or firm commitment may be reopened if a request for reopening is received by the Commissioner within 90 days of the expiration of the commitment. The reopening request shall be accompanied by a fee of 50 cents per thousand dollars of the amount of the expired commitment. If the reopening request is not received by the Commissioner within the required 90-day period, a new application, accompanied by the required application and commitment fee, must be submitted.

§ 241.1025 Refund of fees.

If the amount of the commitment issued is less than the amount applied for, the Commissioner shall refund the excess amount of the application and commitment fees submitted by the applicant. If an application is rejected before it is assigned for processing, or in such other instances as the Commissioner may determine, the entire application and commitment fees or any portion thereof may be returned to the applicant. Commitment and reopening fees may also be refunded to the applicant, in whole or in part, in such other instances as the Commissioner may determine.

§ 241.1030 Mortgage insurance premiums.

The lender, upon endorsement of the note, shall pay the Commissioner a first mortgage insurance premium equal to 0.5 percent of the original face amount of the equity or acquisition loan.

(a) If the date of the first principal payment is more than one year following the date of endorsement, the lender upon each anniversary of such endorsement date, shall pay a premium equal to 0.5 percent of the original face amount of the loan. On the date of the first principal payment, the lender shall pay another premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the following year which shall be adjusted so as to accord with such date and so that the aggregate of said premiums shall equal the sum of:

(1) 0.5 percent of the average outstanding principal obligation of the loan for the year following the date of endorsement; and

(2) 0.5 percent per annum of the average outstanding principal obligation of the loan for the period from the first anniversary of the date of endorsement to one year following the date of the first principal payment.

(b) If the date of the first principal payment is one year or less than one year following the date of endorsement, the lender, upon such first principal payment date, shall pay a second premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the following year which shall be adjusted so as to accord with such date and so that the aggregate of the said two premiums shall equal the sum of:

(1) 0.5 percent per annum of the average outstanding principal obligation of the loan for the period from the date of endorsement to the date of the first principal payment; and

(2) 0.5 percent of the average outstanding principal obligation of the loan for the year following the date of the first payment following the date of the first principal payment.

(c) Until the equity or acquisition loan is paid in full or until receipt by the Commissioner of an application for insurance benefits, or until the contract of insurance is otherwise terminated with the consent of the Commissioner, the lender on each anniversary date of the first principal payment, shall pay an annual insurance premium equal to 0.5 percent of the average outstanding principal obligation of the loan for the year following the date on which such premium becomes payable.

(d) The premiums payable on or after the date of the first principal payment shall be calculated in accordance with the amortizing provisions without taking into account delinquent payments or prepayments.

(e) Premiums shall be payable in cash or in debentures at par plus accrued interest. All premiums are payable in advance and no refund can be made of any portion thereof except as hereinafter provided in this subpart.

§ 241.1035 Charges by lender.

(a) The lender may collect from the borrower the amount of the fees provided for by this subpart.

(b) The lender may also collect from the borrower an initial service charge, as reimbursement for the cost of closing

the transaction, in a amount not to exceed 2 percent of the original principal amount of the loan.

(c) Any charges to be collected by the lender in addition to those prescribed in paragraphs (a) and (b) of this section, shall be subject to the prior approval of the Commissioner.

§ 241.1040 Eligible lenders.

Lenders meeting the applicable eligibility qualifications and requirements contained in § 203.4 or §203.6 of this chapter are eligible for insurance of equity loans under this subpart.

§ 241.1045 Note and security form.

The Lender shall present for insurance a note and security instrument on forms approved by the Commissioner for use in the jurisdiction in which the property is located, which shall not be changed without the prior approval of the Commissioner. The security instrument shall provide for accelerated repayment at the request of the Commissioner pursuant to § 241.1046(b).

§ 241.1046 Rental assistance.

(a) When underwriting an equity or acquisition loan under this subpart, the Commissioner may assume that the rental assistance provided in accordance with a plan of action approved under subparts B or C of part 248 of this chapter will be extended for the full term of the contract entered into under the plan of action.

(b) In the event that rental assistance is not extended under part 248 of this chapter, or the Commissioner is unable to develop a revised package of incentives to the owner comparable to those received under the original approved plan of action, the Commissioner may require the mortgagee to accelerate the debt of the equity or acquisition loan.

(c) If the Commissioner is unable to extend the term of rental assistance for the full term of the contract entered into under part 248 of this chapter, the Commissioner is authorized to take such actions as the Commissioner deems appropriate to avoid default, avoid disruption of the sound ownership and management of the property or otherwise minimize the cost to the Federal Government.

§ 241.1050 Method of loan payment.

The loan shall provide for monthly payments on the first day of each month on account of interest and principal and shall provide for payments in accordance with the amortization plan as agreed upon by the borrower, the lender, and the Commissioner.

§ 241.1055 Date of first payment to principal.

The date for first payment to principal shall be established by the Commissioner.

§ 241.1060 Maturity.

The loan shall have a maturity equal to the remaining term of the first insured mortgage, or 20 years, whichever is longer.

§ 241.1065 Maximum loan amount -- loans insured in connection with a plan of action under subpart C of part 248

The amount of the equity loan shall not exceed ninety percent of the owner's equity in the project, as determined by the Commissioner. Notwithstanding the above, the equity loan shall not exceed an amount which, when added to the existing indebtedness on the property, can be supported by 90 percent of the projected net income of the project, as determined by the Commissioner. The Commissioner, in making a determination regarding the amount of an equity

loan and sums available to service said loan, shall take into account the fact that the project's income may increase within the limits established by § 248.233(d) of this chapter.

§ 241.1067 Maximum loan amount -- loans insured in connection with a plan of action under subpart B of part 248.

(a) The amount of the equity loan shall not exceed the lesser of 70 percent of the extension preservation equity of the project or the amount the Commissioner determines can be supported by the project on the basis of an 8 percent return on extension preservation equity, assuming normal debt service coverage.

(b) The amount of the acquisition loan shall not exceed 95 percent of the transfer preservation equity of the project, except that, if the purchaser is a priority purchaser, the loan may include any expenses associated with the acquisition, loan closing, and implementation of the plan of action, subject to the approval of the Commissioner.

(c) The owner or purchaser may receive an equity or acquisition loan pursuant to this subpart in combination with a rehabilitation loan insured under subpart A of this part.

§ 241.1069 Escrow requirements.

(a) An equity loan provided in connection with a plan of action under subpart B of part 248 shall provide for the lender to deposit, on behalf of the borrower, 10 percent of the loan amount in an escrow account, controlled by the Commissioner or a State housing finance agency approved by the Commissioner, which shall be made available to the borrower upon the expiration of the 5-year period beginning on the date the loan is made, subject to compliance with § 248.147 of this chapter.

(b) An equity loan provided in connection with a plan of action under either subpart B or subpart C of part 248 shall provide for the lender to phase in advances to reflect project rent levels.

§ 241.1070 Agreed interest rate.

The equity or acquisition loan shall bear interest at the rate agreed upon by the borrower and the lender.

§ 241.1080 Eligibility of title.

In order for the project to be eligible for insurance, the Commissioner shall determine that the title to the property is vested in the borrower as of the date the security instrument is filed for record. The title evidence will be examined by the Commissioner and the endorsement of the credit instrument for insurance shall be evidence of its acceptability.

§ 241.1085 Title evidence.

Upon insurance of the loan, the lender shall furnish to the Commissioner a policy of title insurance as provided in paragraph (a) of this section. If the lender is unable to furnish such policy for reasons satisfactory to the Commissioner, the lender shall furnish such evidence of title as provided in paragraph (b), (c) or (d) of this section as the Commissioner may require. Any policy of title insurance, or evidence of title required under this section shall be furnished without expense to the Commissioner. The acceptable types of title evidence are:

(a) A policy of title insurance issued by a company satisfactory to the Commissioner. Such policy shall comply with the "L.I.C. Standard Mortgage Form," or such other form as may be approved by the Commissioner; shall name the lender and the Secretary of Housing and Urban Development, as their respective interests may appear, as the insured; and shall become an owner's policy, running to the lender as owner upon its acquisition of the property in extinguishment of the debt, and to the Secretary as owner upon his acquisition of the property pursuant to the loan insurance contract;

(b) An abstract of title satisfactory to the Commissioner, prepared by an abstract company or individual engaged in

the business of preparing abstracts of title, accompanied by a legal opinion satisfactory to the Commissioner, as to the quality of such title, signed by an attorney at law experienced in the examination of titles;

(c) A Torrens or similar title certification; or

(d) Evidence of title conforming to the standards of a supervising branch of the Government of the United States of America, or of any State or territory thereof.

§ 241.1090 Accumulation of next premium.

The security instrument shall provide for payments by the borrower to the lender on each interest payment date of an amount sufficient to accumulate in the hands of the lender one payment period prior to its due date the next annual insurance premium payable by the lender to the Commissioner. These payments shall continue only as long as the contract of insurance remains in effect.

§ 241.1095 Application of payments.

(a) The security instrument shall provide that all monthly payments to be made by the borrower shall be added together and the aggregate amount shall be paid by the borrower upon each monthly payment date in a single payment. The lender shall apply the payment in the following order:

(1) Premium charges under the contact of insurance;

(2) Interest on the loan; and

(3) Amortization of the principal of the loan.

(b) Any deficiency in the amount of any monthly payments required under paragraph (a) of this section shall constitute a default. The security instrument shall provide for a grace period of 30 days within which time the default must be cured.

§ 241.1100 Prepayment privilege and charges.

(a) *Prepayment privilege.* (1) Except as otherwise provided in paragraph (b) of this section, the security instrument shall contain a provision permitting the borrower to prepay the loan, in whole or in part, upon any interest payment date after giving to the lender 30 days advance notice of its intention to prepay.

(2) If the loan exceeds $200,000, the security instrument may contain a provision for an additional charge in the event of prepayment of principal as may be agreed upon between the borrower and lender. These charges shall not be imposed if the loan is accelerated at the request of the Commissioner, pursuant to § 241.1046(b). The borrower shall be permitted to prepay up to 15 percent of the original principal amount of the loan in any one calendar year without any additional charge. A provision for an additional charge in the event of prepayment may not be included in a loan of $200,000 or less.

(b) *Prepayment of bond-financed loan.* Where the lender has obtained the funds for the loan by the issuance and sale of bonds or bond anticipation notes, or both, the loan may contain a prepayment restriction and prepayment penalty charges acceptable to the Commissioner as to term, amount, and conditions.

§ 241.1105 Late charges.

The note and security instrument may provide for the lender's collection of a late charge, not to exceed 2 cents for each dollar of each payment to interest or principal more than 15 days in arrears, to cover the expense involved in handling delinquent payments. Late charges shall be separately charged to and collected from the borrower and shall not

be deducted from any aggregate monthly payment.

§ 241.1120 Mortgagee's consent.

The holder of an insured mortgage which is recorded prior to the equity loan shall not withhold its consent to the equity loan or the security instrument executed in connection with the equity loan, and may not charge a fee as a condition to its consent to such loan or security instrument.

Subpart F -- Insurance for Equity Loans -- Contract Rights and Obligations

§ 241.1200 Cross-references.

(a) *Projects with a HUD-insured or HUD-held mortgage.* (1) All the provisions of part 207, subpart B of this chapter, covering mortgages insured under section 207 of the Act, apply to equity loans or acquisition loans on a project insured under section 241(f) of the Act, except the following provisions:

Sec.

207.251 Definitions.

207.252 First, second and third premium.

207.252a Premiums -- operating loss loans.

207.252b Premiums -- mortgages insured pursuant to section 223(f) of the Act.

207.252c Premiums -- mortgages insured pursuant to section 238(c) of the Act.

207.254 Insurance endorsement.

(2) For the purpose of this subpart, all references in part 207 of this chapter to section 207 of the Act and to the term "mortgage" shall be construed to refer to section 241(f) of the Act and "equity or acquisition loan," respectively.

(b) *Projects without a HUD-insured or HUD-held mortgage.* The provisions of subpart D of this part shall be applicable to a project without a HUD-insured or HUD-held mortgage that is receiving an equity loan or acquisition loan under subpart E of this part in connection with a plan of action approved by the Commissioner under part 248 of this chapter.

(c) All of the definitions in §241.1005 apply to this subpart. In addition, as used in this subpart, the term "contract of insurance" means the agreement evidenced by the Commissioner's insurance endorsement and includes the provisions of this subpart and of the Act.

§ 241.1205 Payment of insurance benefits.

All the provisions of §207.259 of this chapter relating to insurance benefits shall apply to an equity or acquisition loan insured under this subpart, except that insurance benefits shall be payable in cash if the insurance benefits under the senior insured mortgage are payable in cash, unless the lender files a written request for payment in debentures. If

such a request is made, payment shall be made in debentures with a cash payment to adjust for any difference between the total amount of the insurance payment and the amount of the debentures issued.

§ 241.1210 Condition for payment of insurance benefits.

(a) All of the provisions of §207.258 of this chapter apply to this subpart, except that, if the holder of the senior insured mortgage institutes a foreclosure action, the lender shall notify the Commissioner in a timely manner of such action. The Commissioner, at its option, may then direct the lender to assign the equity or acquisition loan to the Commissioner, or bid an amount necessary to acquire the project and convey the project to the Commissioner.

(b) If the equity loan or acquisition loan is assigned in accordance with this section, the Commissioner at a foreclosure sale may bid, in addition to amounts otherwise authorized, any sum not in excess of the aggregate unpaid indebtedness secured by the senior insured mortgage and equity or acquisition loan, plus taxes, insurance, foreclosure costs, fees and other expenses.

§ 241.1215 Calculation of insurance benefits.

All of the provisions of §207.259 of this chapter apply to this subpart, except that if the lender, at the direction of the Commissioner, acquires title to the project at a foreclosure sale instituted by the holder of the senior insured mortgage, the amount of the claim determined under §207.259(c) of this chapter shall also include an amount bid by the lender to satisfy the senior insured mortgage at the foreclosure sale.

§ 241.1220 Termination of insurance benefits.

All of the provisions of §207.253a of this chapter apply to this subpart, except that the following shall also constitute grounds for terminating the contract of insurance:

(a) The failure of the lender to notify the Commissioner in a timely manner of a foreclsoure action initiated by the holder of the senior insured mortgage; and

(b) The failure of the lender when directed by the Commissioner to assign the equity or acquisition loan or bid an amount necessary to acquire title to the project and convey the project to the Commissioner, in accordance with § 241.1210 of this part.

§ 241.1230 No vested right in fund.

Neither the lender nor the borrower shall have any vested or other right in the insurance fund under which the loan is insured.

§ 241.1235 Cross default.

In the event the borrower commits a default under a prior recorded insured mortgage and the holder thereof initiates a foreclosure proceeding, said default under the prior recorded insured mortgage shall constitute a default under the equity or acquisition loan.

§ 241.1245 Insurance endorsement.

(a) *Endorsement.* The Commissioner shall indicate his insurance of the equity loan or acquisition loan by endorsing the original credit instrument and identifying the section of the Act and the regulations under which the loan is insured and the date of insurance.

(b) *Endorsement of phased loan.* In the event the loan is phased, the Commissioner shall indicate his insurance of each amount by endorsing the original credit instrument and identifying the section of the Act and the regulations under

which such amount is insured and the date of the insurance.

(c) *Final advance of phased loan.* When all advances of a phased loan have been made and the terms and conditions of the commitment have been complied with to the satisfaction of the Commissioner, he or she shall indicate on the original credit instrument the total of all advances he has approved for insurance and again endorse such instrument.

§ 241.1250 Effect of endorsement.

From the date that the equity or acquisition loan is endorsed, the Commissioner and the lender shall be bound by the provisions of this subpart to the same extent as if they had executed a contract including the provisions of this subpart and the applicable sections of the Act.

PART 248 -- PREPAYMENT OF LOW INCOME HOUSING MORTGAGES

11. The authority for part 248 would be revised to read as follows:

Authority: Sections 201-235, Housing and Community Development Act of 1987, Public Law 100-242 (101 Stat. 1815); Section 604 of the Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625. Sections 201-235, Low Income Housing Preservation and Resident Homeownership Act of 1990, Public Law 101-625 *(12 U.S.C. 17151* note).

12. In chapter II, part 248, subpart A is revised, subpart B is redesignated as subpart C, a new subpart B is added, §§ 248.221, 248.233, 248.234, and 248.235 of newly designated subpart C would be revised and the table of contents for part 248 is set out to read as follows:

Subpart A -- General

Sec.

248.1 Purpose.

248.3 Applicability.

248.5 Election to proceed under subpart B or subpart C.

248.7 Preemption of State and local laws.

248.9 Waivers.

Subpart B -- Prepayments and Plans of Action under the Low Income Housing Preservation and Resident Homeownership Act of 1990

Sec.

248.101 Definitions.

248.103 General prepayment limitation.

248.105 Notice of intent.

248.111 Appraisal and preservation value of eligible low income housing.

248.121 Annual authorized return and aggregate preservation rents.

248.123 Determination of Federal cost limit.

248.127 Limitations on action pursuant to Federal cost limit.

248.131 Information from the Commissioner.

248.133 Second notice of intent.

248.135 Plans of action.

248.141 Criteria for approval of a plan of action involving prepayment and voluntary termination.

248.145 Criteria for approval of a plan of action involving incentives.

248.147 Housing standards.

248.149 Timetable for approval of a plan of action.

248.153 Incentives to extend low income use.

248.157 Voluntary sale of housing not in excess of Federal cost limit.

248.161 Mandatory sale of housing in excess of Federal cost limit.

248.165 Assistance for displaced tenants.

248.169 Permissible prepayment or voluntary termination and modification of commitments.

248.173 Resident homeownership program.

248.177 Delegated responsbility to state agencies.

248.179 Consultation with other interested parties.

248.181 Notice to tenants.

Subpart C -- Prepayments and Plans of Action under the Emergency Low Income Preservation Act of 1987

248.201 Definitions.

248.203 General prepayment limitation.

248.211 Notice of intent to prepay.

248.213 Plan of action.

248.215 Notification of deficiencies.

248.217 Revisions to plan of action.

248.218 Tenant notice and opportunity to comment.

248.219 Notification of approval.

248.221 Approval of a plan of action that involves termination of low income affordability restrictions.

248.223 Alternative State strategy.

248.231 Incentives to extend low income use.

248.234 Section 8 rental assistance.

248.241 Modification of existing regulatory agreements.

248.251 Consultation with other interested parties.

248.261 Agreements implementing plans of action and State strategies.

Subpart A -- General

§ 248.1 Purpose.

The purpose of this part is to --

(a) Preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance, without unduly restricting the owners' prepayment rights;

(b) Minimize the involuntary displacement of tenants currently residing in such housing;

(c) Work in partnership with State and local government and the private sector in the provision and operation of housing that is affordable to very low, low and moderate income families; and

(d) Facilitate the sale of housing to residents under a resident homeownership program.

§ 248.3 Applicability.

The requirements of subparts B and C of this part apply to any project that is eligible low income housing, as defined in subparts B and C respectively, on or after November 1, 1987, except that such requirements shall not apply to a project which receives assistance under title IV, subtitle B of the Cranston-Gonzalez National Affordable Housing Act in connection with a homeownership program approved by the Secretary thereunder.

§ 248.5 Election to proceed under subpart B or subpart C.

(a) Any owner who submits a notice of intent on or after January 1, 1991, pursuant to either § 248.211 or § 248.105, shall proceed under subpart B of this part.

(b) Any owner who has filed a plan of action with the Commissioner on or before October 11, 1990 pursuant to subpart C of this part, regardless of whether or not the Commissioner has approved such plan of action or whether the owner has received incentives thereunder, may proceed under subpart B of this part by submitting a notice of intent to the Commissioner in accordance with § 248.105 prior to February 5, 1992, or within thirty days after the Commissioner notifies the owner of HUD's final approval of the plan of action, whichever is later. The notice of intent shall state that the owner is exercising its conversion right pursuant to this section. If the owner fails to file a notice of intent prior to that date, the owner forfeits its right of conversion. In awarding incentives to an owner who elects to proceed under subpart B of this part in accordance with this section, the Commissioner shall take into consideration any incentives which the owner has already received under subpart C of this part.

(c) Any owner of housing that becomes eligible low income housing, as defined in subpart B of this part, before January 1, 1991, and who before such date, filed a notice of intent under § 248.211 of subpart C of this part, may, unless a plan of action is submitted after October 11, 1990, elect to proceed under subpart B or under subpart C of this part. An owner wishing to proceed under subpart B or subpart C of this part must indicate its election by submitting a new notice of intent to the Commissioner within 60 days after the effective date of this rule, in accordance with either § 248.105 (for owners electing to proceed under subpart B of this part) or § 248.211 (for owners electing to proceed under subpart C of this part). Any owner who fails to file a notice of intent within the 60-day period may not proceed under subpart C, but may proceed under subpart B by filing a new notice of intent thereafter. For purposes of calculating any time