periods or deadlines under this part for actions following the filing of the notice of intent, the date on which the owner submits the new notice of intent under this paragraph shall be deemed the date of the filing of the notice of intent.

(d) An owner who has filed a plan of action after October 11, 1990, pursuant to § 248.213 of this part, may not elect to proceed under subpart B of this part.

§ 248.7 Preemption of State and local laws.

(a) *In general.* No State or political subdivision of a State may establish, continue in effect, or enforce any law or regulation that --

(1) Restricts or inhibits the prepayment of any mortgage described in § 248.101 or the voluntary termination of any insurance contract pursuant to § 207.253 of this chapter on eligible low income housing projects;

(2) Restricts or inhibits an owner of such projects from receiving the authorized annual return provided under § 248.121;

(3) Is inconsistent with any provision of this subpart, including any law, regulation, or other restriction that limits or impairs the ability of any owner of eligible low income housing to receive incentives authorized to increase rental rates, transfer the project, obtain secondary financing, or use the proceeds of any such incentives; or

(4) In its applicability to low income housing is limited only to eligible low income housing for which the owner has prepaid the mortgage or terminated the insurance contract.

(b) *Effect.* Any law, regulation or restriction described in paragraph (a) of this section shall be ineffective and any eligible low income housing exempt from the law, regulation, or restriction, only to the extent that it violates the provisions of this section.

(c) *Law of general applicability; contractual restrictions.* This section shall not prevent the establishment, continuing in effect, or enforcement of any law or regulation of any State or political subdivision of a State not inconsistent with the provisions of this subpart and relating to building standards, zoning limitations, health, safety, or habitability standards for housing, rent control, or conversion of rental housing to condominium or cooperative ownership, to the extent such law or regulation is of general applicability to both projects receiving Federal assistance and nonassisted projects. This section shall not preempt, or alter any contractual restrictions or obligations existing before November 28, 1990 that prevent or limit an owner of eligible low income housing from prepaying the mortgage on the project or terminating the mortgage insurance contract.

§ 248.9 Waivers.

Upon making a determination and finding a good cause, the Commissioner may waive any provision of this part, subject to statutory limitations. Each waiver shall be in writing and shall be supported by documentation of the facts and reasons which form the basis for the waiver.

Subpart B -- Prepayments and Plans of Action Under the Low Income Housing Preservation and Resident Homeownership Act of 1990

§ 248.101 Definitions.

*Acquisition Loan.* A loan or advance of credit made to a qualified purchaser of eligible low income housing and insured by the Commissioner under part 241, subpart E of this chapter.

*Adjusted Income.* Annual income, as specified in §813.106 of this title, less allowances specified in the definition of "Adjusted Income" in §813.102 of this title.

*Aggregate Preservation Rent.* The extension preservation rent or transfer preservation rent, as defined under this section.

*Annual Authorized Return.* The amount an owner of an eligible low income housing project may receive in distributions from the project each year, plus debt service payments payable each year attributable to the equity takeout portion of any loan approved under the plan of action, expressed as a percentage of the project's extension preservation equity.

*Bona Fide Offer.* A certain and unambiguous offer to purchase an eligible low income housing project pursuant to this subpart made in good faith by a qualified purchaser with the intent that such offer result in the execution of an enforceable, valid and binding contract.

*Capital Improvement Loan.* A direct loan originated by the Secretary under part 219, subpart C of this chapter.

*Community-Based Nonprofit Organization.* A nonprofit organization that maintains, through significant representation on the organization's governing board and otherwise, accountability to low income community residents and to the extent practicable, low income beneficiaries with regard to decisions as to the management and preservation of affordable housing.

*Default.* For purposes of § 248.105(a), the failure of the owner to make any payment due under the mortgage (including the full amount of the debt if the mortgagee has accelerated the debt on the basis of a non-monetary default) within 30 days after such payment becomes due.

*Eligible Low Income Housing.* Any project that is not subject to a use restriction imposed by the Commissioner that restricts the project to low and moderate income use for a period at least equal to the remaining term of the mortgage, and that is financed by a loan or mortgage --

(1) That is --

(i) Insured or held by the Commissioner under §221(d)(3) of the National Housing Act and assisted under part 215 of this chapter or project-based assistance under parts 880, 881 or 886 of this title;

(ii) Insured or held by the Commissioner under part 221 of this chapter and bearing a below market interest rate as provided under §221.518(b) of this chapter;

(iii) Insured, assisted, or held by the Commissioner or a State or State agency under part 236 of this chapter; or

(iv) A purchaser money mortage held by the Commissioner with respect to a project which, immediately prior to HUD's acquisition, would have been classified under paragraph (1), (2) or (3) of this definition; and

(2) That, under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Commissioner.

*Equity Loan.* A loan or advance of credit to the owner of eligible low income housing and insured by the Commissioner under part 241, subpart E of this chapter.

*Extension Preservation Equity.* The extension preservation equity of a project is:

(1) The extension preservation value of the project determined under §248.111; less

(2) The outstanding balance of any debt secured by the property.

*Extension Preservation Rent.* The extension preservation rent is the gross potential income for the project that

would be required to support:

(1) The annual authorized return;

(2) Debt service on any rehabilitation loan for the project;

(3) Debt service on the federally-assisted mortgage for the project;

(4) Project operating expenses; and

(5) Adequate reserves.

*Extension Preservation Value.* The fair market value of the project based on the highest and best use of the project as multifamily market-rate rental housing.

*Fair market rent.* The section 8 existing fair market rent published for effect and as defined under §882.102 of this title, applicable to the jurisdiction in which the project is located, with adjustments, where appropriate, for projects in which tenants pay their own utilities.

*Federal Cost Limit.* The greater of 120 percent of the section 8 existing fair market rent for the market area in which the project is located or 120 percent of the prevailing rents in the relevant local market area in which the project is located.

*Federally-assisted Mortgage.* Any mortgage as defined in this section, any operating loss loan secured by the project and any loan insured by the Commissioner under part 241 of this chapter.

*Good Cause.* With respect to displacement, the temporary or permanent uninhabitability of the project justifying relocation of all or some of the project's tenants (except where such uninhabitability is caused by the actions or inaction of the owner), or actions of the tenant that, under the terms of the tenant's lease and applicable regulations, constitute a basis for eviction.

*HOME Investment Trust Fund.* A public fund established in the general local or State government in which a project is located pursuant to title II of the Cranston-Gonzalez National Affordable Housing Act.

*Homeownership Program.* A program developed by a resident council for the sale of an eligible low income housing project to the tenants in accordance with the standards in § 248.173.

*Interest Reduction Payments.* Payments made by the Secretary pursuant to a contract to reduce the interest costs on a mortgage insured under part 236 of this chapter, as provided under subpart C of part 236 of this chapter.

*Limited Equity Cooperative.* A cooperative housing corporation in which the income eligibility of purchasers or appreciation upon resale of membership shares, or both, are restricted in order to maintain the project as available to and affordable by low and moderate income families and persons.

*Low Income Affordability Restrictions.* Limits imposed by regulation or regulatory agreement on tenant rents, rent contributions, or income eligibility with respect to eligible low income housing.

*Low Income Families.* Families or persons whose incomes do not exceed the levels established for low income families under part 813 of this title.

*Low Vacancy Area.* A market area in which the current supply of vacant available rental units, as a proportion of the total overall rental inventory in the area is not sufficient to allow for normal growth and mobility, taking into account the need for vacancies resulting from turnover and to meet growth in renter households. The determination of a

low vacancy area, as set forth in § 248.165(h), will be made by the Commissioner, utilizing the most recent available data for the market area on the rental inventory, renter households, rental vacancy rates and other factors as appropriate.

*Moderate Income Families.* Families or persons whose incomes are between 80 and 95 percent of median area income, as determined by the Commission, with adjustments for smaller and larger families.

*Mortgage.* The mortgage or deed of trust insured or held by the Commissioner or a State or State agency under parts 221 or 236 of this title or the purchase money mortgage taken back by the Commissioner in connection with the sale of a HUD-owned project and held by the Commissioner, where such mortgage, deed or trust or purchase money mortgage is secured by eligible low income housing.

*Nonprofit Organization.* Any private, nonprofit organization that --

(1) Is organized or chartered under State or local laws;

(2) Has no part of its net earnings inuring to the benefit of any member, founder, contributor, or individual;

(3) Complies with standards of financial accountability acceptable to the Commissioner; and

(4) Has among its principal purposes significant activities related to the provision of decent housing that is affordable to very low, low, and moderate income families.

*Notice of Intent.* An owner's notification to the Commissioner of its intention to terminate the low income affordability restrictions on the project through prepayment of the mortgage or voluntary termination of the insurance contract, to extend the low income affordability restrictions on the project, or to transfer the project to a qualified purchaser.

*Owner.* The mortgagor or trustor under the mortgage secured by eligible low income housing.

*Participating Jurisdiction.* For purposes of the resident homeownership program established in § 248.173, any State or unit of general local government that has been so designated in accordance with section 216 of title I of the Cranston-Gonzalez National Affordable Housing Act of 1990.

*Plan of Action.* A plan providing for the termination of the low income affordability restrictions on the project through prepayment of the mortgage or voluntary termination of the insurance contract, for extension of the low income affordability restrictions on the project, or for the transfer of the project to a qualified purchaser. A homeownership program constitutes a plan of action for purposes of this subpart.

*Prepayment.* Prepayment in full of a mortgage, or a partial prepayment or series of partial prepayments that reduces the mortgage term by at least six months, except where the prepayment in full or partial prepayment results from the application of condemnation proceeds.

*Preservation Equity.* The extension preservation equity or transfer preservation equity, as defined under this section.

*Preservation Value.* The extension preservation value or transfer preservation value, as defined under this section.

*Priority Purchaser.* Any entity that is not a related party to the owner and that is either --

(1) A resident council organized to acquire the project in accordance with a resident homeownership program that meets the requirements of this subpart; or

(2) Any nonprofit organization or State or local agency that agrees to maintain low income affordability restrictions

for the remaining useful life of the project. A nonprofit organization or State or local agency that is affiliated with a for-profit entity for purposes of purchasing a project under this subpart shall not be considered a priority purchaser.

*Public Housing Agency.* A public housing agency, as defined in section 3(b) of the United States Housing Act of 1937 *(42 U.S.C. 1437a*(b)).

*Qualified Purchaser.* Any entity that is not a related party to the owner and that agrees to maintain low income affordability restrictions for the remaining useful life of the project, and includes for-profit entities and priority purchasers.

*Regulatory Agreement.* The agreement executed by the owner and the Secretary or a State agency providing for the regulation of the operation of the project.

*Related Party.* An entity that, either directly or indirectly, is wholly or partially owned or controlled by the owner of the project being transferred under this subpart, is under whole or partial common control with such owner, or has any financial interest in such owner or in which such owner has any financial interest. For purposes of this definition, the owner and the purchaser shall be considered "related parties" if the owner has made or intends to make any loan to the purchaser in connection with the transfer of the project, or if any officer, director or employee of the owner is an officer or director of the purchaser. The purchaser and the owner shall not be deemed related parties solely by reason of the purchaser's retention of a property management entity of a company that is owned or controlled by the owner or a principal thereof, if retention of the management company is neither a condition of sale nor part of consideration paid for the project and the property management contract is negotiated by the qualified purchaser on an arm's length basis.

*Relevant Local Market.* An area geographically smaller than the a market area established by the Commissioner for purposes of determining the section 8 existing fair market rent, that is identifiable as a distinct rental market area in which similar projects and units would effectively compete with the subject project, for potential tenants.

*Relocation Expenses.* Relocation expenses shall consist of payment for --

(1) Advisory services, including timely information, counseling (including the provision of information on a resident's rights under the Fair Housing Act), and referrals to suitable, affordable, decent, safe and sanitary alternative housing; and

(2) Payment for actual, reasonable moving expenses.

*Remaining Useful Life.* With respect to eligible low income housing, the period during which the physical characteristics of the project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as becomes necessary.

*Reserve for Replacements.* The escrow fund established under the regulatory agreement for the purpose of ensuring the availability of funds for needed repair and replacement costs.

*Resident Council.* Any incorporated nonprofit organization or association that --

(1) Is representative of the residents of the project;

(2) Adopts written procedures providing for the election of officers on a regular basis; and

(3) Has a democratically elected governing board, elected by the residents of the project.

*Residual Receipt Fund.* The fund established under the regulatory agreement for holding cash remaining after deducting from the surplus cash, as defined by the regulatory agreement, the amount of all allowable distributions.

*Return on Investment.* The amount of allowable distributions that a purchaser of a project may receive under a plan of action under § 248.157 or § 248.161.

*Section 8 Assistance.* Assistance provided under parts 880 through 887 of this title.

*Special Needs Tenants.* Those "elderly persons," "elderly families," or families that include "disabled persons," as such terms are defined in § 812.2 of this title.

*Tenant Representative.* A designated officer of an organization of the project's tenants, a tenant who has been elected to represent the tenants of the project with respect to this subpart, or a person or organization that has been formally designated or retained by an organization of the project's tenants to represent the tenants with respect to this subpart. To qualify as a tenant representative under this subpart, the person or organization claiming such status must have been elected as a representative by, or its retention endorsed by, tenants representing at least 50 percent of the units occupied at the time of the election or endorsement, either by vote or signature on a petition.

*Termination of Low Income Affordability Restrictions.* The elimination of low income affordability restrictions under the regulatory agreement through termination of mortgage insurance or prepayment of the mortgage.

*Transfer Preservation Equity.* The transfer preservation equity of a project is:

(1) The transfer preservation value of the project determined under § 248.111; less

(2) The outstanding balance of the federally-assisted mortgage or mortgages for the project.

*Transfer Preservation Rent.* For purposes of receiving incentives pursuant to a sale of the project, transfer preservation rent shall be the gross income for the project that would be required to support:

(1) Debt service on the loan for acquisition of the project;

(2) Debt service on any rehabilitation loan for the project;

(3) Debt service on the federally-assisted mortgage for the housing;

(4) Project operating expenses; and

(5) Adequate reserves.

*Transfer Preservation Value.* The fair market value of the project based on its highest and best use.

*Very Low Income Families.* Families or persons whose incomes do not exceed the level established for very low income families under § 813.102 of this title.

*Voluntary Termination of Mortgage Insurance.* The termination of all rights under the mortgage insurance contract and of all obligations to pay future insurance premiums.

§ 248.103 General prepayment limitation.

(a) *Prepayment.* An owner of eligible low income housing may prepay, and a mortgagee may accept prepayment of, a mortgage on such project only in accordance with a plan of action approved by the Commissioner.

(b) *Termination.* A mortgage insurance contract with respect to eligible low income housing may be terminated pursuant to § 207.253 of this chapter only in accordance with a plan of action approved by the Commissioner.

(c) *Foreclosure.* A mortgagee of a mortgage insured by the Commissioner may foreclose the mortgage on, or

acquire by deed in lieu of foreclosure, any eligible low income housing only if the mortgagee also conveys title to the project to the Commissioner in connection with a claim for insurance benefits.

(d) *Effect of unauthorized prepayment.* A mortgagee's acceptance of a prepayment in violation of paragraph (a) of this section, or the voluntary termination of a mortgage insurance contract in violation of paragraph (b) of this section, shall be null and void and any low income affordability restrictions on the project shall continue to apply to the project.

(e) *Remedies for unauthorized prepayment.* A mortgagee's acceptance of a prepayment in violation of paragraph (a) of this section, or attempt to obtain voluntary termination of a mortgage insurance contract in violation of paragraph (b) of this section, is grounds for administrative action under parts 24 and 25 of this title, in addition to any other remedies available by law, including rescission of the prepayment or reinstatement of the insurance contract.

§ 248.105 Notice of intent.

(a) *Eligibility for filing.* An owner of eligible low income housing intending to prepay the mortgage or voluntarily terminate the mortgage insurance contract pursuant to § 248.141, extend the low income affordability restrictions of the housing in accordance with § 248.153, or transfer the housing to a qualified purchaser under § 248.157, may file a notice of intent unless the mortgage covering the project --

(1) Continued in default or fell into default on or after the November 28, 1990, and the mortgage has been assigned to the Commissioner as a result of such default;

(2) Continued in default or fell into default on or after November 28, 1990, while the mortgage was held by the Commissioner;

(3) Fell into default prior to November 28, 1990, if the owner entered into a workout agreement prior to that date, and on or after that date, the owner has defaulted under the workout agreement (and, if the agreement was with an insured mortgagee, the mortgage has been assigned to the Commissioner as a result of the default under the workout agreement); or

(4) Fell into default prior to November 28, 1990, but has been current since that date and the owner has not agreed to recompense the appropriate insurance fund for losses sustained by the fund as a result of any work-out or other arrangement agreed to by the Commissioner and the owner with respect to the defaulted mortgage.

(b) *Filing with the Commissioner.* The notice of intent shall be filed with the HUD Field Office in whose jurisdiction the project is located. The notice of intent shall identify the project by name, project number and location, briefly describe the owner's plans for the project, and the reason the owner seeks to prepay the mortgage, terminate the mortgage insurance contract, extend the income restrictions, or transfer the project. The notice of intent shall also request the tenants to notify the owner and the Commissioner of any individual or organization that has been designated or retained by the tenants to represent the tenants with respect to the actions to be taken under this subpart.

(c) *Filing with the State or local government and tenants.* The owner simultaneously shall file the notice of intent with the chief executive officer of the appropriate State or local government in which the project is located, and with the mortgagee. In addition, the owner shall deliver a copy of the notice of intent to each tenant in the project and to any tenant representative, if any, known to the owner, and shall post a copy of the notice of intent in readily accessible locations within each affected building of the project. If the project includes a substantial number of non-English speaking tenants, the notice of intent shall be translated into a language understood by such tenants. The copies of the notice of intent delivered to the tenants and the tenant representative shall include a summary of possible outcomes of the filing which shall be furnished by the Commissioner.

§ 248.111 Appraisal and preservation value of eligible low income housing.

(a) *Appraisal.* Upon receiving a notice of intent indicating an intent to extend the low income affordability restrictions under § 248.153 or transfer the project under § 248.157, the Commissioner shall provide for determination of the preservation values of the project pursuant to this section.

(b) *Notice.* Within 30 days after the filing of a notice of intent to extend the income restrictions or to transfer the project, the Commissioner shall provide the owner with written notice of --

(1) The need for, and the rules and guidelines governing, an appraisal of the project;

(2) The filing deadline for submission of the appraisal;

(3) The need for an appraiser retained by the Commissioner to inspect the project and the project's financial records; and

(4) Any delegation to an appropriate State agency, if any, by the Commissioner of responsibilities regarding the performance of an appraisal pursuant to this section.

(c) *Appraisers.* The Commissioner and the owner shall each select and compensate an appraiser who shall:

(1) Neither be an employee of the Federal Government nor an employee or officer of any entity that is affiliated with the owner;

(2) Be certified by the appropriate State agency under the standards established by the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989; and

(3) Have six years of experience in the appraisal profession and at least three years' experience in the practice of appraising multifamily residential properties.

(d) *Guidelines.* The Commissioner shall provide to each appraiser guidelines for the conduct of the appraisal. The guidelines estabished by the Commissioner shall be consistent with customary appraisal standards. The guidelines shall assume repayment of the existing federally-assisted mortgage, termination of the existing low income affordability restrictions, and costs of compliance with any State or local laws of general applicability. The guidelines may permit reliance upon assessments of rehabilitation needs and other conversion costs determined by an appropriate State agency, as determined by the Commissioner.

(e) *Operating expenses.* For the purpose of determining preservation values, the guidelines shall instruct the appraiser to use the greater of actual project operating expenses at the time of the appraisal, based on the average of the actual project operating expenses during the preceding three years, or projected operating expenses after conversion, as determined by the Commissioner. However, if the current year operating expenses are higher than those of the preceding three years and the Commissioner has made a determination that these costs are unlikely to decrease in the future, the appraiser shall use current year operating expenses rather than projected operating expenses for purposes of comparison with projected operating expenses after conversion.

(f) *Preservation values.* The preservation values will be determined on the basis of the appraisals conducted by the owner's and the Commissioner's independent appraisers. Each appraiser will determine both the extension preservation value and the transfer preservation value, regardless of the owner's intentions as indicated in the notice of intent.

(g) *Highest and best use as residential property.* In determining the extension preservation value of the project, the appraiser shall assume conversion of the project to market-rate rental housing. The appraiser shall, in accordance with the guidelines established by the Commissioner, determine the amount of rehabilitation expenditures that would be necessary to bring the project up to quality standards required to attract and sustain a market-rate tenancy upon conversion and assess other costs that the owner could reasonably be expected to incur if the owner converted the

property to market-rate multifamily rental housing.

(h) *Highest and best use.* In determining the transfer preservation value for the project, the appraiser shall assume conversion of the project to highest and best use for the property, and shall, in accordance with the guidelines established by the Commissioner, determine the amount of any rehabilitation expenditures that would be necessary to convert the project to such use and assess other costs that the owner could reasonably be expected to incur if the owner converted the property to its highest and best use.

(i) *Submission of appraisal.* Within four months after filing the notice of intent:

(1) The owner shall submit to the HUD Field Office in whose jurisdiction the project is located, the appraisal made by the owner's selected appraiser; and

(2) The Commissioner's selected appraiser shall conduct and submit an appraisal to the Commissioner.

(j) *Joint determination of preservation values.* No later than one month after the submission of the appraisal by the owner to the HUD Field Office, the owner and the Commissioner, shall, on the basis of the appraisals delivered to them, agree on the preservation values of the project. If no agreement as to preservation values can be reached, the owner and the Commissioner shall jointly select a third appraiser meeting the qualifications set forth in paragraph (c) of this section by the end of six months from the date that the notice of intent was filed. The cost of this third appraisal shall be borne equally by both parties. The third appraiser must comply with the guidelines set forth in paragraph (d) of this section and must conduct the appraisal and submit an appraisal within two months after accepting the assignment. The determination by the third appraiser of the project's preservation values shall be binding on both the owner and the Commissioner.

(k) *Timeliness of appraisals.* The Commissioner may approve a plan of action to receive incentives under §§ 248.153, 248.157 or 248.161 only based upon an appraisal conducted in accordance with this section that is not more than 30 months old, unless the failure of the Commissioner to approve the plan of action within the 30-month period was due to circumstances beyond the control of the owner.

§ 248.121 Annual authorized return and aggregate preservation rents.

(a) *Annual authorized return.* For each eligible low income housing project appraised under § 248.111, the Commissioner shall set an annual authorized return on the project equal to 8 percent of the extension preservation equity.

(b) *Aggregate preservation rents.* For each eligible low income housing project appraised under § 248.111, the Commissioner shall also determine the aggregate preservation rents. The aggregate preservation rents shall be used solely for the purposes of comparison with the Federal cost limit under § 248.123. Actual rents received by the owner (or a qualified purchaser) shall be determined pursuant to § 248.153, § 248.157, and § 248.161.

(c) *Extension preservation rent.* The extension preservation rent shall be the gross potential income for the project, as determined by the Commissioner, that would be required to support --

(1) The annual authorized return determined under paragraph (a);

(2) Debt service on any rehabilitation loan for the project, assuming a market rate of interest and customary terms;

(3) Debt service on the federally-assisted mortgage for the project;

(4) Project operating expenses as determined by the Commissioner; and

(5) Adequate reserves.

(d) *Transfer preservation rent.* The transfer preservation rent shall be the gross income for the project, as determined by the Commissioner, that would be required to support --

(1) Debt service on the loan for acquisition of the project;

(2) Debt service on any rehabilitation loan for the project, assuming a market rate of interest and customary terms;

(3) Debt service on the federally-assisted mortgage for the project;

(4) Project operating expenses; and

(5) Adequate reserves.

(e) *Adequate reserves.* For purposes of this section --

(1) Adequate reserves are the amount of funds which, when added to existing reserves, are sufficient to maintain the project, including needed deferred maintenance, at a level that meets the standards set forth in § 248.147; and

(2) Project operating expenses shall be based on operating expenses for the preceding 3 years, adjusted for reasonable reductions in operating costs due to rehabilitation and energy improvements.

(f) *Debt service.* For purposes of this section, the amount of debt service for an acquisition loan will be estimated based on the maximum loan to which the purchaser is entitled under § 241.1067 of this chapter. The debt service on any rehabilitation loan will be estimated using costs derived from the appraisals conducted under § 248.111, taking into account any funds provided for rehabilitation by State or local governments and assuming market rate interest rates.

§ 248.123 Determination of Federal cost limit.

(a) *Initial determination.* For each eligible low income housing project appraised under § 248.111, the Commissioner shall determine whether the aggregate preservation rents for the project exceed the amount determined by multiplying the number of dwelling units in the project, according to appropriate unit sizes, by 120 percent of the section 8 existing fair market rent for the appropriate unit size.

(b) *Relevant local markets.* If either the extension or transfer preservation rent for a project exceeds the amount determined under paragraph (a) of this section, the Commissioner shall determine whether such extension or transfer preservation rent exceeds the amount determined by multiplying the number of units in the project, according to the appropriate unit sizes, by 120 percent of the prevailing rents in the local market area. The relevant local market, and the prevailing rents in such relevant local market, shall be determined on the basis of the appraisal conducted by the appraiser selected by the Commissioner pursuant to § 248.111 and any other information that the Commissioner determines is appropriate. If there are no comparables in the relevant local market and it is not otherwise possible to determine prevailing rents in that area, the section 8 existing fair market rent shall be the sole measure for determining the Federal cost limit.

(c) *Effect.* The extension or transfer preservation rent for an eligible low income housing project appraised under § 248.111 shall be considered to exceed the Federal cost limit only if the extension or transfer preservation rent exceeds the amount determined under paragraphs (a) and (b) of this section.

§ 248.127 Limitations on action pursuant to Federal cost limit.

(a) *Retention of the project.* With respect to owners who seek to retain the project, the owner may file a plan of action to receive incentives under § 248.153, except that if the extension preservation rent exceeds the Federal cost limit, the amount of the incentives may not exceed an amount that can be supported by a projected income stream equal to the Federal cost limit.

(b) *Transfer of the project.* With respect to owners who seek to transfer the project --

(1) If the transfer preservation rent does not exceed the Federal cost limit, or if the transfer preservation rent exceeds the Federal cost limit and the owner is willing to transfer the project at a price which will result in project rents that, on an aggregate level, do not exceed the Federal cost limit, the owner may file a second notice of intent indicating an intention to transfer the project under § 248.157; or

(2) If the transfer preservation rent exceeds the Federal cost limit, the owner may file a second notice of intent to transfer the project under § 248.161 or, if no bona fide offers are received, to prepay the mortgage or terminate the mortgage insurance.

§ 248.131 Information from the Commissioner.

(a) *Information to owners terminating affordability restrictions.* Within six months after receipt of a notice of intent to terminate the low income affordability restrictions under § 248.141, the Commissioner shall provide the owner with a description of the criteria for such termination and with information that the owner needs to prepare a plan of action. This shall include information concerning the standards under § 248.141 regarding the approval of a plan of action and a list of the Federal incentives authorized under § 248.153 and available to those projects for which a plan of action involving termination of low income affordability restrictions, through prepayment of the mortgage or termination of the mortgage insurance contract, would not be approvable. The Commissioner shall also provide the owner with any other relevant information which the Commissioner may possess.

(b) *Information to owners extending affordability restrictions.* Within nine months of receipt of a notice of intent to extend the low income affordability restrictions under § 248.153 or to transfer the project under § 248.157, the Commissioner shall provide the owner who submitted the notice with --

(1) A statement of the preservation values of the project as determined under § 248.111;

(2) A statement of the aggregate preservation rents for the project as calculated under § 248.121;

(3) A statement of the applicable Federal cost limit for the market area (or relevant local market, if applicable) in which the project is located, and an explanation of the limitations under § 248.127 on the amount of assistance the Commissioner may provide based on such cost limits;

(4) A statement of whether either of the aggregate preservation rents exceeds the Federal cost limit; and

(5) A direction to file a plan of action and the information necessary to file a plan of action; or

(6) A direction to submit a second notice of intent under § 248.133.

(c) *Information to tenants.* The Commissioner shall make any information provided to the owner under paragraphs (a) and (b) of this section available to the tenants, together with other information relating to the rights and opportunities of the tenants, including --

(1) The potential opportunity of the tenants to become priority purchasers under § 248.157 and § 248.161; and

(2) The potential opportunity of resident homeownership under § 248.173.

§ 248.133 Second notice of intent.

(a) *Filing.* A second notice of intent must be filed by all owners who, after receiving the information provided by the Commissioner in § 248.131, elect to --

(1) Transfer the project under § 248.157 or § 248.161; or

(2) Prepay the mortgatge or voluntarily terminate the insurance contract on the mortgage pursuant to § 248.141.

(b) *Timeliness.* A second notice of intent must be submitted not later than 30 days after receipt of the information provided by the Commissioner under § 248.131. If an owner who is required to submit a second notice of intent fails to do so within this time period, the original notice of intent submitted under § 248.105 shall be void and ineffective for purposes of this subpart.

(c) *Filing with the State or local government and tenants.* The owner simultaneously shall file the second notice of intent with the chief executive officer of the appropriate State or local government in which the project is located; and with the mortgagee. In addition, the owner shall deliver a copy of the second notice of intent to each tenant in the project and to any tenant representative, if any, known to the owner, and shall post a copy of the second notice of intent in readily accessible locations within each affected building of the project.

§ 248.135 Plans of action.

(a) *Submission.* An owner seeking to terminate the low income affordability restrictions through prepayment of the mortgage or voluntary termination under § 248.141, or to extend the low income affordability restrictions on the project under § 248.153, shall submit a plan of action to the Commission in the form and manner prescribed in paragraph (d) or (e) of this section respectively, within 6 months after receipt of the information from the Commissioner under § 248.131.

(b) *Joint Submission.* An owner and purchaser seeking a transfer of the project under § 248.157 or § 248.161 shall jointly submit a plan of action to the Commissioner in the form and manner prescribed in paragraph (e) of this section within 90 days after the owner's acceptance of a bona fide offer under § 248.157 or the purchaser's making of a bona fide offer under § 248.161.

(c) *Filing with the State or local government and tenants.* The owner shall notify the tenants of the plan of action by posting in each occupied building a summary of the plan of action and by delivery of a copy of the plan of action to the tenant representative, if any. In addition, the summary must indicate that a copy of the plan of action shall be available for inspection and copying during reasonable hours in a location convenient to the tenant. Simultaneously with the submission to the Commissioner, the owner shall submit the plan of action to the office of the chief executive officer of the appropriate State or local government for the jurisdiction within which the project is located. An appropriate agency of such State or local government shall review the plan of action and advise the tenants of the project of any programs that are available to assist the tenants in carrying out the purposes of this subpart.

(d) *Termination of affordability restrictions.* If the plan of action proposes to terminate the low income affordability restrictions through prepayment or voluntary termination in accordance with § 248.141, it shall include:

(1) A description of any proposed changes in the status or terms of the mortgage or regulatory agreement;

(2) A description of any proposed changes in the low income affordability restrictions;

(3) A description of any change in ownership that is related to prepayment or voluntary termination;

(4) An assessment of the effect of the proposed changes on existing tenants;

(5) An analysis of the effect of the proposed changes on the supply of housing afforable to low and very low income families or persons in the community within which the project is located and in the area that the housing could reasonably be expected to serve; and

(6) Any other information that the Commissioner determines is necessary to achieve the purposes of this subpart.

(e) *Extension of affordability restrictions.* If the plan of action proposes to extend the low income affordability restrictions of the project in accordance with § 248.153 or transfer the project to a qualified purchaser in accordance with § 248.157 or § 248.161, the plan of action shall include:

(1) A description of any proposed changes in the status or items of the mortgage or regulatory agreement;

(2) A description of the Federal incentives requested, including cash flow projections and analyses of how the owner will address any physical or financial deficiencies and maintain the low income affordability restrictions of the project;

(3) A description of any assistance from State or local government agencies, including low income housing tax credits that have been offered to the owner or purchaser or for which the owner or purchaser has applied or intends to apply;

(4) A description of any transfer of the property, including the identity of the transferee and a copy of any documents of sale;

(5) An income profile of the tenants as of January 1, 1987 (based on the area median income limits established by the Commissioner in February 1987) and as of the date of submission of the plan of action;

(6) A transfer of physical assets package; and

(7) Any other information that the Commissioner determines is necessary to achieve the purposes of this subpart.

(f) *Revisions.* The owner and purchaser may from time to time jointly revise and amend the plan of action as may be necessary to obtain approval here under this subpart and must amend the plan of action no later than 30 days after a change in any of the information required in paragraphs (d) or (e) of this section. The owner or purchaser shall submit any revision to the Commissioner, and provide a copy of the revision to the office of the chief executive officer of the appropriate State or local government for the jurisdiction within which the project is located, and (unless the purchaser is a resident council or other organization comprised of the project's tenants) to the tenants of the project, and to any tenant representative, if any, known to the owner.

(g) *Failure to Submit.* If the owner fails to submit a plan of action to the Commissioner when prepayment or termination is sought within the 6 month period set forth in paragraph (a) of this section or, when a transfer is sought, if the owner and purchaser fail to submit a plan of action within the 90-day time period set forth in paragraph (b) of this section, the notice of intent filed by the owner under § 248.105 shall be ineffective for the purposes of this subpart and the owner shall be barred from submitting another notice of intent under § 248.105 until 6 months after expiration of such period.

(h) *Notification to tenants of plan of action approval.* Upon the Commission's approval of the plan of action, the owner shall notify tenants of the terms thereof by posting in each occupied building a summary of the plan of action and by delivery of a copy of the plan of action to the tenant representative, if any. In addition, the summary must indicate that a copy of the plan of action shall be available for inspection and copying during reasonable hours in a location convenient to the tenants.

§ 248.141 Criteria for approval of a plan of action involving prepayment and voluntary termination.

(a) *Approval.* The Commissioner may approve a plan of action that provides for the termination of the low income affordability restrictions through prepayment of the mortgage or voluntary termination of the mortgage insurance contract only upon a written finding that --

(1) implementation of the plan of action will not --

(i) Materially increase economic hardship for current tenants, and will not in any event result in a monthly rental payment by any current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower); or in the case of a current tenant who already pays more than such pecentage, an increase in the Consumer Price Index or 10 percent (whichever is lower); or

(ii) Involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2) The supply of vacant, camparable housing is sufficient to ensure that such prepayment will not materially affect --

(i) The availability of decent, safe, and sanitary housing affordable to low income and very low income families or persons in the area that the housing could reasonably be expected to serve;

(ii) The ability of low income and very low income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(iii) The housing opportunities of minorities in the community within which the housing is located.

(3) There are no open findings of noncompliance with title VI of the Civil Rights Act of 1964; the Fair Housing Act; Executive Order 11063; and Age Discrimination Act of 1975; Section 504 of the Rehabilitation Act of 1973; and all regulations promulgated under such statutes and authorities, and no open audit findings with respect to violations of the regulatory agreement.

(b) *Disapproval.* If the Commissioner determines a plan of action to prepay a mortgage or terminate an insurance contract fails to meet the requirements of paragraph (a) of this section, the Commissioner shall disapprove the plan and within a reasonable time, and shall inform the owner of the reasons for disapproval and suggest alternatives. In the case of disapproval of the plan of action, except for the failure to meet the requirement of paragraph (a)(3) of this section, the notice of intent filed under § 248.105 shall be rendered ineffective for the purposes of this subtitle, and the owner, in order to receive incentives, must file a new notice of intent under such section. If the plan of action is disapproved because of an outstanding civil rights or audit finding, the finding must be closed before the Commissioner will approve a plan of action under this section.

§ 248.145 Criteria for approval of a plan of action involving incentives.

(a) *Approval.* The Commissioner may approve a plan of action for extension of the low income affordability restrictions on an eligible low income housing project or transfer the housing to a qualified purchaser, other than a resident council, only upon a finding that --

(1) Due diligence has been given to ensuring that the package of incentives set forth in the plan of action is, for the Federal Government, the least costly alternative that is consistent with the full achievement of the purposes of this subpart. The Commissioner will conduct a "windfall profits" test to determine whether the project is located in a rental market where there is an adequate supply of decent, affordable housing. If the project is located in such a rental market, and if the provision of incentives would not serve other public policy objectives under this subpart, then no incentives will be provided to the owner;

(2) The project will be retained as housing affordable for very low, low and moderate income families and persons for the remaining useful life of the project, as determined under paragraph (a)(8);

(3) Throughout the remaining useful life of the project, adequate expenditures will be made for maintenance and operation of the project and that the project meets the housing standards established in § 248.147 as determined by

inspections conducted by the Commissioner;

(4) Current tenants will not be involuntarily displaced, except for good cause;

(5) Any increase in rent contributions for current tenants will be to a level that does not exceed 30 percent of the adjusted income of the tenant or the fair market rent, whichever is lower. However, the rent contributions of any tenants occupying the project at the time of any increase may not be reduced by reason of this paragraph, except with respect to tenants receiving section 8 assistance in accordance with paragraph (a)(7) of this section;

(6) Any resulting increase in rents for current tenants (except for increases made necessary by increased operating costs) shall be phased in as follows:

(i) If such increase is 30 percent or more, the increase shall be phased in equally over a period of not less than three years, with the first increase occurring upon the effective date of the plan of action, and the subsequent two increases occurring annually thereafter;

(ii) If such increase is more than 10 percent but less than 30 percent, it shall be limited to not more than 10 percent per year;

(7) Section 8 assistance shall be provided, to the extent appropriations are available, if necessary to mitigate any adverse effect on current very low and low income tenants;

(8) Rents for unit becoming available to new tenants shall be at levels approved by the Commissioner, taking into account any incentives provided under this subpart, that will ensure, to the extent practicable, that the units will be available and affordable to the same proportions of very low, low and moderate income families and persons, including families and persons whose incomes are 95 percent or more of area median income, as based on the area median income limits established by the Commissioner in February 1987, as resided in the project as of January 1, 1987, or the date the plan of action is approved, whichever date results in the highest proportion of very low income families. This limitation shall not prohibit a higher proportion of very low income families and persons from occupying the project;

(9) Future rent adjustments shall be --

(i) Made by applying an annual factor, to be determined by the Commissioner, to the portion of rent attributable to operating expenses for the project; and

(ii) Subject to a procedure, established by the Commissioner, for owners to apply for rent increases not adequately compensated by annual adjustment under paragraph (a)(9)(i) of this section, under which the Commissioner may increase rents in excess of the amount determined under paragraph (a)(9)(i) of this section only if the Commissioner determines such increases are necessary to reflect extraordinary necessary expenses of owning and maintaining the project;

(10) Any savings from reductions in operating expenses due to management efficiencies shall be deposited in project reserves for replacement and the owner shall have periodic access to such reserves, to the extent the Commissioner determines that the level of the reserves is adequate and that the project is maintained in accordance with the standards established in § 248.147;

(11) The mortgage on the project is current; and

(12) There are no open findings of noncompliance with title VI of the Civil Rights Act of 1964; the Fair Housing Act; Executive Order 11063; the Age Discrimination Act of 1975; section 504 of the Rehabilitation Act of 1973; and all regulations promulgated under such statutes and authorities, and no open audit findings with respect to violations of the regulatory agreement.

(b) *Compliance with housing standards.* No incentives under § 248.153 may be provided, other than to qualified purchasers under §§ 248.157 and 245.161, and no distributions may be taken by the owner or purchaser, until the Commissioner determines that the project meets the housing standards set forth in § 248.147, except that incentives designed to correct deficiencies in the project may be provided.

(c) *Implementation.* Any agreement to maintain the low income affordability restrictions for the remaining useful life of the project may be made through execution of a new regulatory agreement, modifications to the existing regulatory agreement or mortgage, or in the case of prepayment of a mortgage or voluntary termination of mortgage insurance, a recorded instrument.

(d) *Determination of remaining useful life.* The Commissioner shall make determinations, on the record and after opportunity for a hearing, as to when the useful life of an eligible low income housing project has expired. Under procedures and standards to be established by the Commissioner, owners of eligible low income housing may petition the Commissioner for a determination that the useful life of such project has expired. Such petition may not be filed before the expiration of the 50-year period beginning upon the approval of a plan of action under this subpart with respect to such project. In making a determination pursuant to a petition under this paragraph, the Commissioner shall presume that the useful life of the project has not expired, and the owner shall have the burden of proof in establishing such expiration. The Commissioner may not determine that the useful life of any project has expired if such determination results primarily from failure to make regular and reasonable repairs and replacement, as became necessary. In making a determination regarding the useful life of any project pursuant to a petition submitted under this paragraph, the Commissioner shall provide for comment by tenants of the project and interested persons and organizations with respect to the petition. The Commissioner shall also provide the tenants and interested persons and organizations with an opportunity to appeal a determination under this paragraph.

§ 248.147 Housing standards

(a) *Standards.* As a condition to receiving incentives under this subpart, the owner shall agree to maintain the project in accordance with local housing codes and the housing quality standards set forth in § 887.251 of this title. Where a housing quality standard conflicts with local housing codes, the owner shall maintain the project in compliance with the standard that is stricter.

(b) *Annual inspections.* The Commissioner shall inspect each project at least annually in order to determine compliance with the standards in paragraph (a). The Commissioner shall notify the owner of any deficiencies within 30 days following the inspection. The owner shall have 90 days from the date of such notification to correct any deficiencies cited by the Commissioner and shall promptly notify the Commissioner when such deficiencies have been corrected. The Commissioner shall reinspect the project upon such notification or, if the owner does not notify the Commissioner, upon the expiration of the 90-day period.

(c) *Sanctions for noncompliance.* If the Commissioner determines, upon reinspection of the project, that the project is still not in compliance with the standards set forth in paragraph (a), the Commissioner shall take any action appropriate to bring the project into compliance, including --

(1) Directing the mortgagee, with respect to an equity take-out loan provided under part 241 of this chapter, to withhold the disbursement to the owner of any escrowed loan proceeds and requiring that such proceeds be used for repair of the project; and

(2) Reduce the amount of the allowable distributions to 4 percent of extension preservation equity or (in the case of a purchaser) 4 percent of cash invested, as appropriate, for the period ending upon a determination by the Commissioner that the project is in compliance with the standards and requiring that such amounts be used for repair.

(d) *Continued compliance.* To ensure continued compliance with the standards set forth in paragraph (a) of this section for a project subject to any action under paragraph (c) of this section, the Commissioner may limit access of and

use by the owner of such amounts set forth in paragraph (c) of this section, for not more than the 2-year period beginning upon the determination that the project is in compliance with the housing standards.

(e) *Sanctions for continuous noncompliance.* If, upon inspection, the Commissioner determines that any eligible low income housing project has failed to comply with the standards established under this section for two consecutive years, the Commissioner may, upon notification to the owner of the noncompliance, take one or more of the following actions:

(1) Subject to the availability of appropriations, provide assistance, other than project-based assistance attached to the project, under parts 882 and 887 of this title for any tenant eligible for such assistance who desires to terminate occupancy in the project. For each unit in the project vacated pursuant to the provision of assistance under this paragraph, the Commissioner may, notwithstanding any other law or contract for assistance, cancel the provision of project-based assistance attached to the project for one dwelling unit, if the project is receiving such assistance, or convert the project-based assistance allocation for that unit to assistance under part 882 or 887 of this title;

(2) In the case of projects for which an equity take-out loan has been made under part 241 of this chapter, direct the mortgagee to declare such a loan to be in default and accelerate the maturity date of the loan;

(3) Declare, or direct the insured mortgagee to declare, any rehabilitation loan insured or provided by the Commissioner with respect to the project, including loans provided under part 219 of this chapter, to be in default and accelerate the maturity date of the loan; and

(4) Suspend payments under or terminate any contract for project-based rental assistance under section 8 of the United States Housing Act of 1937.

(f) *Sanctions not exclusive.* The Commissioner may take any other action authorized by law or the project regulatory agreement to ensure that the project will be brought into compliance with the standards established under this section or with other requirements pertaining to the condition of the project.

§ 248.149 Timetable for approval of a plan of action.

(a) *Notification of deficiencies.* Not later than 60 days after receipt of a plan of action, the Commissioner shall notify the owner in writing of any deficiencies that prevent the plan of action from being approved. Such notice shall describe alternative ways in which the plan may be revised to meet the criteria for approval set forth in § 248.145.

(b) *Notification of approval.* Not later than 180 days after receipt of a plan of action, or such longer period as the owner requests, but not more than 365 days, the Commissioner shall notify the owner in writing whether the plan of action, including any revisions, is approved. If approval is withheld, the notice shall describe --

(1) The reasons for withholding approval; and

(2) Suggestions to the owner for meeting the criteria for approval.

(c) *Opportunity to revise.* The Commissioner shall give the owner a reasonable opportunity, of not more than 60 days, to revise the plan of action when approval is denied. If the owner fails to comply with this time period, it shall not be eligible for relief under paragraph (d) of this section.

(d) *Delayed approval.* If the Commissioner fails to approve a plan of action within the time set forth in paragraph (b) of this section, the Commissioner shall provide incentives and assistance under this subpart, to an owner who is entitled to receive such incentives and assistance, in the amount that the owner would have received if the Commissioner had complied with such time limitations. This paragraph does not apply to plans of action that are not approved because of deficiencies.

§ 248.153 Incentives to extend low income use.

(a) *Agreements by the Secretary.* After approving a plan of action filed pursuant to § 248.145, from an owner of eligible low income housing that includes the owners's plan to extend the low income affordability restrictions of the project, the Commissioner shall, subject to the availability of appropriations for such purpose, enter into such agreements as are necessary to enable the owner to --

(1) Receive the annual authorized return for the project as determined under § 248.121;

(2) Pay debt service on the federally-assisted mortgage covering the project;

(3) Pay debt service on any loan for rehabilitation of the project;

(4) Meet project operating expenses; and

(5) Establish adequate reserves.

(b) *Permissible incentives.* Such agreements may include one or more of the following incentives, as determined necessary by the Secretary:

(1) Increased access to residual receipts accounts as necessary to enable the owner to realize the annual authorized return;

(2) An increase in the rents permitted under an existing project-based section 8 contract;

(3) Additional project-based section 8 assistance or an extension of any project-based assistance attached to the housing;

(4) An increase in the rents on non-section 8 units occupied by current tenants up to the maximum allowable rents;

(5) Financing of capital improvements under part 219 of this chapter;

(6) Financing of rehabilitation through provision of insurance for a second mortgage under part 241 of this chapter;

(7) Redirection of the Interest Reduction Payment subsidies to a second mortgage for projects which are insured, assisted, or held by the Commissioner or a State or State agency under part 236 of this chapter;

(8) Access by the owner to a portion of the preservation equity in the project through provision of insurance for an acquisition or equity loan insured under part 241, subpart E of this chapter or through a non-insured mortgage loan approved by the Commissioner and the mortgagee;

(9) An increase in the amount of allowable distributions; and

(10) Other incentives authorized in law.

(c) *Limitation on the provision of permissible incentives.* (1) The total amount of incentives provided to a project under paragraphs (b)(2), (3), and (4) of this section shall not result in a projected rental income stream which exceeds the Federal cost limit.

(2) The debt service on the loan obtained by the owner under paragraph (b)(8), when added to the allowable distributions under paragraph (b)(9), shall not exceed the annual authorized return.

(d) *Interest reduction subsidies.* Where Interest Reduction Payment subsidies are sought to be redirected, pursuant to paragraph (b)(7) of this section, the lender may not unreasonably withhold its consent to such redirection.

(e) *Recalculation of section 236 basic rent and market rent.* With respect to any project with a mortgage insured or otherwise assisted pursuant to part 236 of this chapter, the basic rent and market rent, as defined in § 236.2 of this chapter, for each unit in such project may be increased to take into account the allowable distributions permitted under this section and the debt service on any equity loan, rehabilitation loan or acquisition loan approved under a plan of action under this subpart.

§ 248.157 Voluntary sale of housing not in excess of Federal cost limit.

(a) *Offer to sell.* Where an owner has submitted a second notice of intent under § 248.133 for the purpose of transferring the project to a qualified purchaser, and the transfer preservation value does not exceed the Federal cost limit, the owner shall offer the housing for transfer as provided in this section. The owner shall not be obligated to accept any offer made under this section, but may instead elect to retain the project and receive incentives under § 248.145.

(b) *Notification of qualified purchasers.* Upon receipt of a second notice of intent to transfer the project to a qualified purchaser, the Commissioner shall notify potential qualified purchasers of the availability of the project for sale, and of the names and addresses of the owner, or of a person representing the owner in the sale of the project, by --

(1) Mailing notices to non-profit organizations;

(2) Placing notices in the major local newspaper(s) in the jurisdiction in which the project is located;

(3) Mailing notices to clearinghouse networks; and

(4) Using any other means of notification which the Secretary determines would be effective to notify potential qualified purchasers of the sale of the project.

(c) *Right of first offer to priority purchasers.* (1) For the 12-month period beginning on the date of receipt by the Commissioner of a second notice of intent under § 248.133, the owner may offer to sell the project only to priority purchasers.

(2) If no bona fide offer to purchase the project is made and accepted during or at the end of the 12-month period specified in paragraph (c)(1) of this section, the owner may offer to sell the project during the 3 months immediately following the 12-month period only to qualified purchasers.

(d) *Purchase price.* The sale price, including assumption of the debt on the federally-assisted mortgage, may not exceed the transfer preservation value of the project.

(e) *Expression of interest.* Any priority purchaser seeking to make an offer during the 12-month period specified in paragraph (c)(1) shall, and other qualified purchasers may, submit written notice thereof to the Commissioner. Such notice, if made by a priority purchaser seeking to make an offer during the 12-month period, shall contain the following --

(1) A statement identifying the priority purchaser as a State or local government agency, a nonprofit organization, or a resident council;

(2) A copy of its articles of incorporation, charter and list of officers and directors, if the purchaser is a nonprofit organization or a resident council; and

(3) A statement as to whether the purchaser is affiliated with any other entity for purposes of purchasing the project and whether any Low Income Housing Tax Credits may be awarded in connection with the purchase of the project.

(f) *Information from the Commissioner.* Within 30 days of receipt of an expression of interest by a priority

purchaser, the Commissioner shall determine the status of the priority purchaser with respect to the categories listed in paragraph (h) of this section, and provide such purchaser with --

(1) A list of all possible assistance available from the Federal Government to facilitate a transfer of the project;

(2) The appraisal reports for the project as submitted under § 248.111;

(3) The Commissioner's determination as to the priority status of the purchaser and as to whether the purchaser qualifies as a resident council, community-based nonprofit organization or State or local government entity; and;

(4) Any other relevant financial information that the Commissioner possesses concerning the project, including the information determined under § 248.121. Within the same 30 day period, the Commissioner shall also notify the owner of the purchaser's expression of interest and instruct the owner to provide to the purchaser any information concerning the project that the Commissioner deems relevant to the transfer of the project.

(g) *Bona fide offer.* A bona fide offer must include the following:

(1) A contract of sale signed by the purchaser, which states that acceptance of the contract is contingent upon approval by the Commissioner; and

(2) An earnest money deposit in the amount of one percent of the transfer preservation value.

(h) *Retention and acceptance of offers.* The owner shall hold all bona fide offers received from priority purchasers until the expiration of the 12-month period stated in paragraph (c) of this section, provided, however, that an owner who receives a bona fide offer from a resident council seeking to purchase the project under a resident homeownership program may accept the offer at any time during the 12-month period. If an owner does not receive such an offer from a resident council or does not wish to accept such an offer prior to the expiration of the 12-month period, then the 12-month purchase period will continue unabated and at the end of that period, the owner may accept the highest offer among those received, not to exceed the transfer preservation value. If more than one purchaser offers the highest amount, the owner must select the purchaser based on the following order of priority:

(1) A resident council offering to purchase under a homeownership program;

(2) A community-based nonprofit organization;

(3) A State or local government; and

(4) Any other nonprofit organization.

(i) *Submission of offer to HUD.* Upon preliminary acceptance of an offer, the owner shall submit the offer to the Commissioner. The Commissioner shall review the offer to determine whether it meets the requirements of a bona fide offer. The Commissioner shall notify the owner or purchaser, within 30 days after receipt, whether the offer meets such requirements. The owner's preliminary acceptance of any offer pursuant to this section shall be conditional upon the Commissioner's certification that the offer is bona fide. If the Commissioner determines that the offer is not a bona fide offer, the offer will be considered invalid for the purposes of this subpart.

(j) *Submission of plan of action.* Upon a determination by the Commissioner that the offer is bona fide and final acceptance of such an offer, the owner and purchaser shall jointly submit a plan of action to the Commissioner pursuant to § 248.135. The plan of action shall include any request for assistance from the Commissioner for purposes of transferring the project. Upon final acceptance of an offer, the owner shall return all earnest money deposits to the other offerors.

(k) *Requirements for plan of action approval.* If the qualified purchaser of the project is a resident council seeking

to purchase the project under a resident homeownership program, the Commissioner may approve a plan of action only if the resident council's proposed resident homeownership program meets the requirements under § 248.173. For all other qualified purchasers, the Commissioner may approve a plan of action submitted pursuant to this section only if the plan of action meets the criteria listed in § 248.145.

(l) *Failure to consummate sales transaction.*

(1) If the owner accepts an offer from a resident council during the 12-month period specified in paragraph (c) of this section, and the sales transaction falls through during that period or does not close within 90 days after the Secretary's approval of the plan of action, the owner shall resume holding the project open for sale for remainder of the time periods specified in paragraph (c) of this section.

(2) If the owner accepts an offer from a purchaser at the end of the 12-month period or during the 3-month period, both as specified in paragraph (c) of this section, or thereafter, and the sales transaction falls through or does not close within 90 days after the Secretary's approval of the plan of action, the owner shall take the following steps:

(i) Immediately notify the Commissioner that the sale has fallen through;

(ii) Contact any other purchaser that had submitted an offer to purchase the project and give such purchaser and any other qualified purchaser 60 days from the date of notification to the Commissioner in which to resubmit an offer to purchase the project.

(3) At the end of the 60-day period the owner may accept an offer submitted under paragraph (l)(2) in accordance with the order of priority set forth in paragraph (h).

(4) If an offer submitted during the 60-day period specified in paragraph (l)(2) is made and accepted, but the sale is not consummated within 90 days of the Commissioner's approval of the plan of action for reasons not attributable in whole or in part to the owner, the owner may terminate the low income affordability restrictions through prepayment or voluntary termination, subject to compliance with the provisions of § 248.165.

(m) *Assistance.* Subject to the availability of amounts approved in appropriation acts, the Commissioner, shall, for approvable plans of action, provide assistance sufficient to enable qualified purchasers to --

(1) Acquire the eligible low income housing project from the current owner for a purchase price not greater than the transfer preservation value of the project;

(2) Pay the debt service on the federally-assisted mortgage covering the project;

(3) Pay the debt service on any loan for the rehabilitation of the project;

(4) Meet project operating expenses and establish adequate reserves for the housing;

(5) Receive a return on investment in an amount equal to 8 percent on any actual cash investment made to acquire the project;

(6) In the case of a priority purchaser, receive an adequate reimbursement for transaction expenses relating to acquisition of the project, subject to approval by the Commissioner in accordance with standards applicable to insured loan transactions under this chapter; and

(7) In the case of an approved resident homeownership program, cover the costs of training for the resident council, homeownership counseling and training, the fees for the nonprofit entity or public agency working with the resident council, if such entity or agency is approved by the Commissioner, and costs related to relocation of tenants who elect to move. Assistance for such costs, exclusive of relocation expenses, shall not exceed $500 per unit or $200,000 for the

project, whichever is less.

(n) *Incentives: residual receipts.* The Commissioner may provide assistance for all qualified purchasers under this subpart in the form of one or more of the incentives authorized under § 248.153, except that any residual receipts for the project transferred to the owner shall be deducted from the sale price of the project. The incentives provided by the Commissioner to any qualified purchaser may include an acquisition loan provided under subpart E of part 241 of this chapter.

(o) *Grants to priority purchasers.* The Commissioner may provide assistance for priority purchasers under this subpart in the form of a grant for each unit in the project in an amount, as determined by the Commissioner, that does not exceed the present value of the total of the projected fair market rent for the next ten years, or such longer period if additional assistance is necessary to cover the costs set forth in paragraph (m) of this section.

(p) *Reimbursement of assistance.* The Commissioner reserves the right to seek reimbursement from a priority purchaser who, at any time while a plan of action is in effect, becomes affiliated with or transfers the project to any non-priority purchaser. The Commissioner shall be entitled to receive reimbursement for the difference between the assistance provided to the priority purchaser and the assistance that would have been provided in the same circumstances to a non-priority purchaser.

§ 248.161 Mandatory sale of housing in excess of the Federal cost limit.

(a) *In general.* With respect to any eligible low income housing for which the transfer preservation rent determined under § 248.121 exceeds the Federal cost limit, the owner shall offer the housing for transfer to qualified purchasers as provided in this section.

(b) *Applicability of voluntary sale provisions.* The provisions of § 248.157, other than paragraphs (a), (d), and (p) thereof, shall be applicable to any sale conducted under this section, except that in the case of a sale pursuant to this section, the sales price of the project may not be less than the transfer preservation value of the project, and if the owner receives an offer to purchase the project for a sale price not less than the preservation value of the project, as determined under § 248.111, the owner shall be obligated to accept the offer and sell the project to the purchaser.

(c) *Section 8 assistance.* Subject to the availability of amounts approved in appropriation acts, the Commissioner shall, for approvable plans of action, provide assistance to qualified purchasers under part 886, subpart A sufficient to produce a gross income potential equal to the amount determined by multiplying 120 percent of the prevailing rents in the relevant local market in which the project is located by the number of units in the project, according to appropriate unit size, and any other incentives authorized under § 248.153 that would have been provided to a qualified purchaser under § 248.157.

(d) *Grants to qualified purchasers.* From amounts made available by Congress, the Commissioner may make grants to assist in the completion of transfers under this section to any qualified purchasers. Any grant made pursuant to this paragraph shall be in an amount not exceeding the difference between the amount of assistance provided under paragraph (c) of this section and the amount of assistance specified in § 248.157(m).

(e) *Securing State and local funding.* The Commissioner shall assist any qualified purchaser of a project pursuant to this section in securing funding and other assistance, including tax and assessment reductions from State and local governments to facilitate a transfer under this section.

§ 248.165 Assistance for displaced tenants.

(a) *Section 8 assistance.* Each low income family that is displaced as a result of the prepayment of the mortgage or voluntary termination of an insurance contract on eligible low income housing shall, subject to the availability of funds, receive assistance under parts 882 or 887 of this title.

(b) *Notification of Commissioner.* The owner of any eligible low income housing project who prepays the mortgage or voluntarily terminates the mortgage insurance contract pursuant to this subpart, shall notify the Commissioner of the names and addresses of all of the tenants in the project who will be displaced as a result of prepayment or termination of the insurance contract, as well as the size of the unit in which each of the tenants who will be displaced are currently dwelling. The owner shall provide the Commissioner with this information within 30 days of identifying such tenants for displacement, but in no event less than 30 days prior to the date when the tenants must vacate the premises.

(c) *Relocation of displaced tenants.* The Commissioner shall coordinate with public housing agencies to ensure that any very low or low income family displaced from eligible low income housing as the result of prepayment of the mortgage or termination of the mortgage insurance contract on such project is able to acquire a suitable, affordable dwelling unit in the area where the project from which the family is displaced is located. The Commissioner, upon receiving information from the owner under paragraph (b) of this section stating that certain tenants will be displaced, shall request from the public housing agencies located in the same area as the affected project, notices of vacancies in other affordable projects which would be suitable for the displaced tenants. The Commissioner shall convey the notices of vacancies to the tenants who will be displaced along with the addresses of the local public housing agencies.

(d) *Relocation expenses.* The Commissioner shall require the owner of eligible low income housing who prepays or terminates the insurance contract resulting in the displacement of tenants to pay 50 percent of the relocation expenses of each family which is relocated, except that the Commissioner shall increase such percentage to the extent that State or local law of general applicability requires a higher payment by the owner.

(e) *Continued occupancy.* Each owner that prepays the mortgage or terminates the mortgage insurance contract on eligible low income housing shall, as provided in paragraph (g) of this section, allow all tenants occupying units in such project on the date of submission of a notice of intent under § 248.105 to remain in the project for a period of three years, commencing on the date of prepayment or contract termination, at rent levels existing at the time of prepayment or termination, except for rent increases made necessary due to increased operating costs.

(f) *Replacement unit.* In any case in which the Commissioner requires an owner to allow tenants to occupy units under paragraph (e) of this section, an owner may fulfill the requirements of such paragraph by providing such assistance necessary for the tenant to rent a decent, safe, and sanitary unit in another project for the same 3-year period and at a rental cost to the tenant not in excess of the rental amount the tenant would have been required to pay to the owner in the owner's project, except that the tenant must freely agree to waive the right to occupy the unit in the owner's project. The provisions of paragraph (d) of this section requiring an owner who prepays or terminates an insurance contract to pay a portion of the relocation expenses incurred by displaced tenants shall also be applicable to tenants who relocate pursuant to this paragraph.

(g) *Applicability.* The provisions of paragraphs (e) and (f) of this section shall apply only to --

(1) All tenants in eligible low income housing projects located in a low-vacancy area; and

(2) Special needs tenants.

(h) *Low Vacancy Areas.* The Commissioner shall notify the owner, within 30 days of the approval of a plan of action, whether the project is located in a low vacancy area for purposes of paragraph (g) of this section.

(i) *Required acceptance of section 8 assistance.* Any owner who prepays the mortgage or terminates the mortgage insurance contract on eligible low income housing and maintains the project for residential rental occupancy may not refuse to rent, refuse to negotiate for the rental of, or otherwise make unavailable or deny the rental of a dwelling unit in such project to any person, or discriminate against any person in the terms, conditions, or privileges or rental of a unit, or in the provision of services or facilities in connection therewith, because the person receives assistance under parts 882 or 887 of this title.

(j) *Regional pools.* In providing assistance under this section, the Commissioner shall allocate the assistance on a regional basis through the regional offices of the Department of Housing and Urban Development. The Commissioner shall allocate assistance under this section in a manner so that the total number of assisted units in each such region available for occupancy by, and affordable to, low income families and persons does not decrease because of the prepayment of a mortgage on eligible low income housing or the termination of an insurance contract on such project.

§ 248.169 Permissible prepayment or voluntary termination and modification of commitments.

(a) *In general.* Notwithstanding any limitations on prepayment or voluntary termination under this subpart, an owner may terminate the low income affordability restrictions through prepayment or voluntary termination, subject to compliance with the provisions of § 248.165, under one of the following circumstances:

(1) The Commissioner is unable to approve a plan of action because of a lack of appropriated funds, or the Commissioner approves a plan of action under § 248.153(a), but does not provide the assistance approved in such plan and contained in an executed use agreement between the Commissioner and the owner, including section 8 assistance, a loan provided under part 219 of this chapter, assistance for a homeownership program under § 248.173, a grant provided under § 248.157(o), or a grant under § 248.161(d), but not including insurance of a rehabilitation, equity take-out, or acquisition loan under part 241 of this chapter, during the 15-month period beginning on the date of final approval of the plan of action;

(2) After the date that the project would have been eligible for prepayment pursuant to the terms of the mortgage, notwithstanding this part, the Commissioner approves a plan of action under § 248.157 or § 248.161, but does not provide the assistance approved in such plan before the earlier of --

(i) The expiration of the 2-month period beginning on the commencement of the first fiscal year beginning after such final approval; or

(ii) The expiration of the 6-month period beginning on the date of final approval.

(3) The Commissioner approves a plan of action under § 248.157 for any eligible low income housing not covered by paragraph (a)(2) of this section, but does not provide the assistance approved in such plan before the earlier of --

(i) The expiration of the 2-month period beginning on the commencement of the first fiscal year beginning after such final approval; or

(ii) The expiration of the 9-month period beginning on the date of final approval.

(4) An owner who intended to transfer the project to a qualified purchaser under § 248.157 or § 248.161, and fully complied with the provisions of such section,

(i) Did not receive any bona fide offers from any qualified purchasers within the applicable time periods; or

(ii) Received and accepted a bona fide offer from a qualified purchaser, but the sales transaction fell through for reasons not attributable in whole or in part to the owner, and the owner then complied with the requirements of § 248.157(*l*) and did not receive another bona fide offer from any qualified purchasers.

(b) *Section 8 assistance.* When providing section 8 assistance, the Commissioner may enter into a contract with an owner, contingent upon the future availability of appropriations, for the purpose of renewing expiring contracts for rental assistance as provided in appropriations acts, to extend the term of such rental assistance for such additional period or periods necessary to carry out an approved plan of action. The contract and the approved plan of action shall provide that, if the Commissioner is unable to extend the term of such rental assistance or is unable to develop a revised package of incentives providing benefits to the owner comparable to those received under the original approved plan of

action, the Commissioner, upon the request of the owner, shall take the following actions, subject to the limitations under the following paragraphs --

(1) Modify the binding commitments made pursuant to § 248.145(a) (2)-(10) that are dependent upon such rental assistance; or

(2) If the Commissioner determines that such modification is infeasible, permit the owner to prepay the mortgage and terminate the plan of action and any implementing use agreements or restrictions, but only if the owner agrees in writing to comply with the provisions of § 248.165.

(c) *Failure to provide section 8 assistance.* With regard to paragraph (b) of this section, the Commissioner shall notify the owner of an inability to either extend the term of section 8 rental assistance or to develop a revised package of incentives providing benefits comparable to those received under the original plan of action as soon as practicable upon discovering that fact. The owner shall inform the Commissioner in writing, within 30 days of receipt of the notice that, since the Commissioner is unable to fulfill the terms of the original plan of action, the owner intends to request that the Commissioner take action under paragraph (b) (1) or (2) of this section. The Commissioner shall, no later than 90 days from receiving the owner's notice, take action to extend the rental assistance contract and to continue the binding commitments under § 248.145(a) (2)-(10).

§ 248.173 Resident homeownership program.

(a) *Formation of resident council.* Tenants seeking to purchase eligible low income housing in accordance with § 248.157 and § 248.161 shall organize a resident council for the purpose of developing a resident homeownership program in accordance with standards established by the Commissioner. In order to fulfill the purposes of this section, the resident council shall work with a public or private nonprofit organization or a public body, including an agency or instrumentality thereof. Such organization shall have sufficient experience to enable it to help the tenants to consider their options and to develop the capacity necessary to own and manage the project, where appropriate, and shall be approved by the Commissioner.

(b) *Submission of expression of interest.* A resident council shall identify itself as such in an expression of interest submitted pursuant to § 248.157 or § 248.161 and shall state that it is interested in purchasing the project pursuant to a homeownership program.

(c) *Bona fide offer.* When submitting an offer to purchase the project pursuant to this section, the resident council must simultaneously submit a certified list of project tenants representing at least 75 percent of the occupied units in the project, and representing at least 50 percent of all of the units in the project, who have expressed an interest in participating in the homeownership program developed by the resident council. An offer made without this certified list will not be considered a bona fide offer for the purposes of this subpart.

(d) *Submission of a homeownership program.* (1) The resident council shall prepare a homeownership program acceptable to the Commissioner for giving all residents of the project an opportunity to become homeowners. The plan shall describe the major elements of, and schedules for, the homeownership program and demonstrate how the program complies with all applicable requirements of this section. The plan shall also describe the resident council's current abilities and proposed capacity-building activities to successfully carry out the homeownership program in compliance with this section. The homeownership program shall include, at a minimum, the following information:

(i) The amount of grant funds requested from the Commissioner, and the expected amounts and sources of other funding;

(ii) The proposed use of the grant funds to be received from HUD and of all other funds, including proceeds from the sale of units to initial purchasers, consistent with paragraph (h) of this section;

(iii) A summary of major rehabilitation activities to be carried out, including repairs, replacements and improvements;

(iv) The price at which the resident council intends to transfer ownership interests in, or shares representing, units in the project, broken down by unit size and/or type; the factors that will influence the establishment of such price, including, but not limited to, the resident council's acquisition cost, estimated rehabilitation costs, capitalization of reserves and organizational costs; how the price arrived at by the resident council compares to the estimated appraised value of the ownership interests or shares; and the underwriting standard that the resident council plans to use, or reasonably expects a public or private lender to use, for potential tenant purchasers, consistent with paragraph (g)(2) of this section;

(v) The expected number of very low, low and moderate income tenants that will be initial owners under the program, consistent with paragraph (g)(1) of this section;

(vi) A pro forma analysis which demonstrates the financial feasibility and viability of the homeownership program, based on the required conditions specified in paragraph (g) of this section;

(vii) The financing arrangements that the tenants are expected to pursue or to be provided, including financing available through the resident council or a State or local governmental entity, and criteria for acceptability of conventional financing;

(viii) A description of the estimated costs expected to be paid by the homeowner at closing;

(ix) The type of homeownership contemplated, consistent with paragraph (f) of this section;

(x) How the marketing of currently vacant units and units occupied by nonpurchasing tenants that become vacant will affect the sales price and occupancy charges to purchasers;

(xi) A workable schedule of sale, subject to the limitations of paragraph (o) of this section, based on estimated tenant incomes;

(xii) Any restrictions on resale by homeowners over and above those specified in paragraph (i) of this section, and any restrictions on homeowners' equity, over and above those specified in paragraph (k) of this section;

(xiii) The qualifications of the resident council or the proposed management entity to manage the project, in compliance with paragraph (n) of this section;

(xiv) The expected number of non-purchasing tenants and their eligibility for section 8 rental assistance under paragraph (m)(2) of this section;

(xv) Expected scope and expenses of relocation activities, both for any temporary relocation due to rehabilitation as well as relocation assistance for non-purchasing tenants, consistent with paragraph (m)(4) of this section;

(xvi) Expected scope and costs of technical assistance, training and counseling for the resident council, purchasers and non-purchasing tenants; and

(xvii) A certification that the resident council shall comply with the provisions of the Fair Housing Act, title VI of the Civil Rights Act of 1964, Executive Order 11063, section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and all regulations issued pursuant to these statutes and authorities.

(2) The Commissioner shall give the resident council a reasonable opportunity to revise the homownership program if approval is denied.

(e) *Approval of a homeownership program; assistance provided.* (1) When the Commissioner determines that the homeownership program submitted by the resident council meets the requirements of this section, is financially feasible, and is the least costly alternative that is consistent with establishing a viable homeownership program, the Commissioner shall approve the program.

(2) In connection with an approved homeownership program the Commissioner shall provide grant assistance sufficient to pay the following costs:

(i) The purchase price, which shall not exceed the transfer preservation value;

(ii) Transaction costs, as provided in § 248.157(m)(6);

(iii) Other costs, as provided in § 248.157(m)(7);

(iv) The costs of rehabilitation;

(v) The establishment of an adequate reserve for replacements; and

(vi) If necessary, the establishment of operating reserve escrows including contingencies against unexpected increases in expenses or shortfalls in homeowners' payments.

(3) Upon approval of the homeownership program, the Commissioner and the resident council shall enter into a grant agreement, which shall include, among other matters, procedures governing the drawdown of funds and remedies for noncompliance with the requirements of this section.

(f) *Method of conversion.* The Commissioner whall approve the method for converting the project to homeownership, which may involve acquisition of ownership interests in, or shares representing, the units in a project under any arrangement determined by the Commissioner to be appropriate, such as cooperative ownership, including limited equity cooperative ownership, and fee simple ownership, including condominium ownership.

(g) *Required conditions.* The Commissioner shall require that the form of homeownership impose appropriate conditions, including conditions to assure that --

(1) The number of initial owners that are very low, low, and moderate income persons at initial occupancy are of the same proportion of very low, low, and moderate income tenants (including families and persons whose incomes are 95 percent or more of area median income) as resided in the project on January 1, 1987 or as of the date of approval of the plan of action, whichever date results in the higher proportion of very low income families, except that the resident council may, at its option, increase the proportions of very low income and low initial owners;

(2) Projected debt service payments, occupancy charges and utilities payable by the owners shall not exceed 35 percent of the monthly adjusted gross income of the owners;

(3) The aggregate incomes of initial owners and other sources of funds for the project are sufficient to permit occupancy charges to cover the full operating costs of the project and any debt service; and.

(4) Each initial owner occupies the unit it acquires for at least the initial 15 years of ownership, unless the resident council determines that the initial owner is required to move outside the market area due to a change in employment or an emergency situation.

(h) *Use of proceeds from sales to eligible families.* The entity that transfers ownership interests in, or shares representing, units to eligible families, or another entity specified in the approved application, may use 50 percent of the proceeds, if any, from the initial sale for costs of the homeownership program, including improvements to the project, operating and replacement reserves for the project, additional homeownership opportunities in the project, and other

project-related activities approved by the Commissioner. The remaining 50 percent of such proceeds shall be returned to the Commissioner for use under § 248.157 and § 248.161, subject to the availability of appropriations. Such entity shall keep, and make available to the Commissioner, all records necessary to calculate accurately payments due the Commissioner under this paragraph.

(i) *Restrictions on resale by homeowners.* Resale of a homeowner's interest in a project with an approved homeownership program may occur subject to any reasonable restrictions placed on such a transfer by the resident council and approved by the Commissioner.

(1) *Transfer permitted.* A homeowner may transfer the homeowner's ownership interest in the unit, subject to the right to purchase under paragraph (i)(2) of this section, the requirement for the purchaser to execute a promissory note, if required under paragraph (i)(3) of this section and the restrictions on retention of sales proceeds in paragraph (k) of this section. An appicant may propose in its application, and HUD may approve, reasonable restrictions on the resale of units under the program.

(2) *Right to purchase.* Where a resident management corporation, resident council, or cooperative has jurisdiction over the unit, it shall have the right to purchase the ownership interest in the unit from the initial homeowner for the amount specified in a firm contract between the homeowner and a prospective buyer. Where a resident management corporation, resident council, or a cooperative exercises a right to purchase, it shall resell the unit to an eligible family within a reasonable period of time.

(3) *Promissory note required.* At closing, the initial homeowner shall execute a nonrecourse promissory note, in a form acceptable to HUD, equal to the difference between the fair market value of the unit and the purchase price, payable to the Commissioner, together with a mortgage securing the obligation of the note.

(i) With respect to sale by an initial homeowner, the note shall require payment upon sale by the initial homeowner, to the extent proceeds of the sale remain after paying off other outstanding debt incurred in connection with the purchase of the property, paying any other amounts due in connection with the sale, including closing costs and transfer taxes, and paying the family the amount of its equity in the property, computed in accordance with paragraph (k) of this section.

(ii) With respect to a sale by an initial homeowner during the first six years after acquisition, the family may retain only the amount computed under paragraph (k) of this section. Any excess is distributed as provided in paragraph (*l*) of this section.

(iii) With respect to sale by an initial homeowner six to twenty years, after acquisition, the amount payable under the note shall be reduced by 1/168th of the original principal amount of the note for each full month of ownership by the family after the end of the sixth year. The homeowner may retain all other proceeds of the sale.

(j) *Execution of promissory note by subsequent purchaser.* Where a subsequent purchaser during the 20-year period, measured by the term of the initial promissory note, purchases the property for less than the then current fair market value, the purchaser shall also execute at closing such a promissory note and mortgage, for the amount of the discount. The term of the promissory note shall be the period remaining of the original 20-year period. The note shall require payment upon sale by the subsequent homeowner, to the extent proceeds of the sale remain after paying off other outstanding debt incurred in connection with the purchase of the property, and paying any other amounts due in connection with the sale (such as closing costs and transfer taxes). The amount payable on the note shall be reduced by a percentage of the original principal amount of the note for each full month of ownership by the subsequent homeowner. The percentage shall be computed by determining the percentage of the term of the promissory note that the homeowner has owned the property. The remainder may be retained by the subsequent homeowner selling the property.

(k) *Homeowners' equity.* The amount of equity an initial homeowner has in the property is determined by

computing the sum of the following --

(1) The contribution to equity paid by the family, if any, including any down payment and any amount paid towards principal on a mortgage loan during the period of ownership;

(2) The value of any improvements installed at the expense of the family during the family's tenure as owner, as determined by the resident council based on evidence of amounts spent on the improvements, including the cost of material and labor; and

(3) The appreciated value, determined by applying the Consumer Price Index (urban consumers) against the contribution to equity under paragraphs (k)(1) and (2) of this section, excluding the value of any sweat equity or volunteer labor used to make improvements to the unit. The resident council may, at the time of initial sale, enter into an agreement with the family to set a maximum amount which this appreciation may not exceed.

(l) *Use of recaptured funds.* Any net sales proceeds that may not be retained by the homeowner under the homeownership program approved under this section shall be paid to the HOME Investment Trust Fund for the unit of general local government in which the project is located. If the project is located in a unit of general local government that is not a participating jurisdiction, as such term is defined in § 248.101, any such net sales proceeds shall be paid to the HOME Investment Trust Fund for the State in which the project is located. With respect to any proceeds transferred to a HOME Investment Trust Fund under this paragraph, the Commissioner shall take such actions as are necessary to ensure that the proceeds shall be immediately available for eligible activities to expand the supply of affordable housing under section 212 of the Cranston-Gonzalez National Affordable Housing Act of 1990. The Commissioner shall monitor the HOME Investment Trust Fund for each State and unit of local government and shall require maintenance of any records necessary to calculate accurately payments due under this paragraph.

(m) *Protection of nonpurchasing families.* Nonpurchasing families who continue to reside in a project subject to a homeownership program approved under this section shall be protected as follows --

(1) *Eviction.* No tenant residing in an eligible property on the date the Commissioner approves a plan of action may be evicted by reason of a homeownership program approved under this section. This does not preclude evictions for material violation of the terms of occupancy of the unit.

(2) *Section 8 assistance.* If a tenant decides not to purchase a unit, or is not qualified to do so, the Commissioner shall ensure that assistance under parts 882 or 887 of this title is available for use in that or another property by each tenant that meets the eligibility requirements thereunder,.

(3) *Rent increases for ineligible tenants.* Rents for tenants who do not purchase a unit but are ineligible for assistance under paragraph (m)(2) of this section may be increased to a level that does not exceed 30 percent of the tenant's adjusted income or the section 8 existing fair market rent, whichever is lower. Rent increases shall be phased in in accordance with § 248.145(a)6).

(4) *Relocation assistance.* The resident council shall also inform each tenant that if the tenant chooses to move, the resident council, as owner of the project, will pay relocation expenses in accordance with the approved homownership program. The provisions of § 248.165 shall not apply to resident councils who are project owners pursuant to an approved homeownership program under this section.

(n) *Qualified management.* As a condition of approval of a homeownership program under this subpart, the resident council shall have demonstrated its abilities to manage eligible properties by having done so effectively and efficiently for a period of not less than three years or by entering into a contract with a qualified management entity that meets such standards as the Commissioner may prescribe to ensure that the project will be maintained in a decent, safe and sanitary condition.

(o) *Timely homeownership.* The resident council shall acquire ownership of the project no later than 6 months after final approval of a plan of action pursuant to this section. The resident council shall transfer ownership of units in the project (other than units occupied by nonpurchasing tenants) to the tenants within a reasonable time thereafter, but in no event more than 4 years from the date of transfer of the project to the resident council. The Commissioner may seek contractual remedies against any resident council which fails to transfer ownership of all units within the 4-year period. During the interim period when the project continues to be operated and managed as rental housing, the resident council shall utilize written tenant selection policies and criteria that are approved by the Commissioner as consistent with the purpose of providing housing for very low income families. The resident council shall promptly notify in writing any rejected applicant of the grounds for any rejection.

(p) *Housing standards; inspections.* (1) Until the resident council has transferred all units in the project (other than those occupied by nonpurchasing tenants) to the initial purchasers, the project shall be maintained in accordance with the housing standards set forth in § 248.147 of this subpart.

(2) The Commissioner shall inspect the project at least annually in order to determine compliance with paragraph (p)(1).

(q) *Audits.* Each resident council shall be subject to the audit requirements in part 45 of this title and shall submit an annual audit to the Commissioner in such form as the Commissioner may prescribe. The resident council shall keep such records as may be reasonably necessary to fully disclose the amount and the disposition by such resident council of the proceeds of assistance received under this subpart, including any proceeds from sales under paragraphs (h) and (i) of this section, the total cost of the homeownership program in connection with which such assistance is given or used, and the amount and nature of that portion of the program supplied by other sources, and such other sources as will facilitate an effective audit. The Commissioner or his or her duly authorized representative shall have access for the purpose of audit and examination to any books, documents, papers, and records of the resident council that are pertinent to assistance received under this subpart. The Comptroller General of the United States, or any of the duly authorized representatives of the Comptroller General, shall also have access, for the purpose of audit and examination, to any books, documents, papers, and records of the resident council that are pertinent to assistance received under this subpart.

(r) *Reports.* The resident council shall submit reports, as required by the Commissioner, in order to demonstrate continued compliance with the requirements of this section.

(s) *Assumption of the federally assisted mortgage.* The resident council may not assume a mortgage insured, held or assisted by the Commissioner under part 236 of this chapter or under part 221 of this chapter and bearing a below market interest rate as provided under § 221.518(b) of this chapter. 12 § 248.177 Delegated responsibility to State agencies.

(a) *In general.* The Commissioner shall delegate some or all responsibility for implementing this subpart to a State housing agency if such agency submits a preservation plan acceptable to the Commissioner.

(b) *Approval.* State preservation plans shall be submitted in such a form and in accordance with such procedures as the Commissioner shall establish. The Commissioner may approve plans that contain --

(1) an inventory of low income housing located within the State that is or will be eligible low income housing under this subpart within five years;

(2) a description of the agency's experience in the area of multifamily financing and restructuring;

(3) a description of the administrative resources that the agency will commit to the processing of plans of action in accordance with this subpart;

(4) a description of the administrative resources that the agency will commit to the monitoring of approved plans of

action in accordance with this subpart;

(5) an independent analysis of the performance of the multifamily housing inventory financed or otherwise monitored by the agency;

(6) a certification by the public official responsible for submitting the comprehensive housing affordability strategy under section 105 of the Cranston-Gonzalez National Affordable Housing Act that the proposed activities are consistent with the approved housing strategy of the State within which the eligible low income housing is located; and

(7) such other certifications or information that the Commissioner determines to be necessary to implement an approved State preservation plan, which may include incentives that are authorized under other provisions of this subpart.

(c) *Implementation agreements.* The Commissioner may enter into any agreements necessary to implement an approved State preservation plan, which may include incentives that are authorized under other provisions of this subpart.

§ 248.179 Consultation with other interested parties.

The Commissioner shall confer with any appropriate State or local government agency to confirm any State or local assistance that is available to achieve the purposes of this subpart and shall give consideration to the views of any such agency when making determinations under this subpart. The Commissioner shall also confer with appropriate interested parties that the Commissioner believes could assist in the development of a plan of action that best achieves the purposes of this subpart.

§ 248.181 Notice to tenants.

Except as provided in § 248.105, with respect to the notice of intent, with regard to all provisions of this subpart which mandate that information or material be given to the tenants, by the Commissioner, the owner, or a qualified purchaser, or other party, this requirement shall be satisfied where the notifying entity --

(a) posts a copy of the information or material in readily accessible locations within each affected building, or posts notices in each location describing the information or material and specifying a location, as convenient to the tenants as is reasonably practical, where a copy may be examined and copied during reasonable hours; and

(b) supplies a copy of the information or material to a tenant representative, if any.

Subpart C -- Prepayment and Plans of Action under the Emergency Low Income Preservation Act of 1987

13. Section 248.221 would be revised by adding new paragraphs (c) and (d) to read as follows:

§ 248.221 Approval of a plan of action that involves termination of low income affordability restrictions.

* * * * *

(c) There are no open findings of noncompliance with title VI of the Civil Rights Act of 1964; the Fair Housing Act; Executive Order 11063; the Age Discrimination Act of 1975; section 504 of the Rehabilitation Act of 1973; and all regulations promulgated under such statutes and authorities, and no open audit findings with respect to violations of the regulatory agreement.

(d) Any plan of action approved under this section shall specify actions that the Secretary and the owner shall take to ensure that tenants displaced as a result of the termination of low income affordability restrictions are relocated to

affordable housing.

14. Section 248.233 would be revised by adding a new paragraph (f) to read as follows:

§ 248.233 Approval of a plan of action that includes incentives.

* * * * *

(f) The Commissioner shall not approve a plan of action under this section if there are open findings of noncompliance with title VI of the Civil Rights Act of 1964; the Fair Housing Act; Executive Order 11063; the Age Discrimination Act of 1975; section 504 of the Rehabilitation Act of 1973; and all regulations promulgated under such statutes and authorities, or if there are open audit findings with respect to violations of the regulatory agreement.

15. Section 248.234(c) would be redesignated as § 248.234(d), and a new § 248.234(c) would be added to read as follows:

§ 248.234 Section 8 rental assistance.

* * * * *

(c) The approved plan of action shall specify actions that the Secretary and the owner shall take to ensure that any tenants displaced as a result of actions taken under paragraph (b) of this section are relocated to affordable housing.

* * * * *

§ 248.235 [Removed]

16. Section 248.235 would be removed in its entirety.

Dated: April 2, 1991.

Jack Kemp,

Secretary.
[FR Doc. 91-10000 Filed 5-1-91; 8:45 am]

BILLING CODE 4210-32-M

Legal Opinion: CIM-0111

Index: 3.600
Subject: Preservation

May 1, 1995

Mr. Richard M. Price
Peabody & Brown
1255 23rd Street, N.W.
Washington, DC 20037

Dear Mr. Price:

Your letter to Michael Flores of the Honolulu, Hawaii Office of the Department of Housing and Urban Development ("HUD") dated January 27, 1995 regarding Maunakea Tower has been referred to our office for reply.

Your letter concerns the eligibility of the above project to participate in the preservation program under the Low-Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), 12 U.S.C. 4101 note, or, in the alternative, the eligibility of the project owner to prepay the mortgage. For the reasons set forth below, we have concluded that the project is not eligible for participation under LIHPRHA. Furthermore, we have concluded that the project owner may not prepay its mortgage at this time. The project mortgage will, however, become eligible for prepayment without the Commissioner's consent on November 25, 1996 pursuant to the HUD regulations in effect on the date the mortgage note was initially endorsed for insurance.

The facts, as understood by our office, are as follows. The project mortgage was insured under Section 221(d)(3) of the National Housing Act with a limited dividend mortgagor. The mortgage note received initial endorsement for insurance on October 10, 1974 and was finally endorsed on November 24, 1976. The project is receiving assistance under Section 8 of the United States Housing Act of 1937 ("Housing Act"), 42 U.S.C. 1437f, but not as a result of a conversion from rent supplement assistance under Section 101 of the Housing and Urban Development Act of 1965 ("HUD Act"), 12 U.S.C. 1701s. The mortgage note contains a prepayment prohibition for the full term of the mortgage.

A project, to be eligible for participation under LIHPRHA, must meet the eligibility requirements of Section 229 of LIHPRHA. The implementing regulations which govern LIHPRHA eligibility are found at 24 CFR Part 248. Pursuant to LIHPRHA, the determination of "eligible low-income housing" is a two-part process. LIHPRHA defines "eligible low-income housing" as:

> "any housing financed by a loan or mortgage-
> (A) that is-
> (i) insured or held by the Secretary under

Kelly Decl. Ex. H

section 221(d)(3) of the National Housing Act and receiving loan management assistance under section 8 of the United States Housing Act of 1937 due to a conversion from section 101 of the Housing and Urban Development Act of 1965;

(ii) insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act;

(iii) insured, assisted, or held by the Secretary or a State or State agency under section 236 of the National Housing Act; or

(iv) held by the Secretary and formerly insured under a program referred to in clause (i), (ii), or (iii); and

(B) that, under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Secretary." LIHPRHA section 229(1).

While the project meets the second part of the eligibility test of Section 229(1)(B), it does not meet the first part under Section 229(1)(A)(i). The project mortgage is receiving assistance under Section 8 of the Housing Act, but not due to a conversion from assistance under Section 101 of the HUD Act as required by the statute. Therefore, the project is not eligible for assistance under LIHPRHA.

The HUD regulations that govern the mortgage insurance contract for the project are those which were in effect on the date the mortgage note was initially endorsed for insurance, October 10, 1974. The regulations which govern mortgages insured under Section 221(d)(3) are found at 24 CFR Part 221. Prepayment privileges are contained at 24 CFR section 221.524. Section 221.524(a) provides in relevant part that a mortgage may be prepaid without the Commissioner's prior consent:

> "(ii) Where the mortgagor is a limited distribution type, which is not receiving payments from the Commissioner under a rent supplement contract executed pursuant to the provisions of sections 5.1 et seq. of this title, and where the prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage." 24 CFR section 221.524(a)(1)(ii) (1974) (emphasis added).

The above regulatory section requires that the mortgagor be a limited distribution type, that the project not be receiving rent supplement assistance, and that 20 years have elapsed since the mortgage note was finally endorsed for insurance before the mortgage is prepaid. The project owner is a "limited distribution type." Moreover, the project is not receiving rent supplement assistance. The mortgage note, however, was not finally endorsed until November 24, 1976, thus the 20-year time period from the date of final endorsement will not expire until November 24, 1996. Therefore, the project mortgage is not yet eligible for prepayment without HUD's consent pursuant to

Section 221.524(a). It will, however, become eligible for prepayment without HUD's prior consent on November 25, 1996.

The prepayment prohibition in the note does not change the result of the above analysis. In this case the governing regulations, 24 CFR Part 221, and the mortgage note language are in direct conflict. You are correct that in such cases the regulations supersede contrary language in the note. The preamble and interim rules for LIHPRHA reflect the HUD policy that where there is a conflict between HUD regulations and mortgage note language, the regulations will govern. Furthermore, footnote 4 above reflects that the endorsement panel on the mortgage note provides that the regulations in effect on October 10, 1974 govern the contract of mortgage insurance. This position was expressed in the context of LIHPRHA at 56 Fed. Reg. 20262, 20267 (May 2, 1991) as follows:

> "Likewise, if the applicable program regulations at section 221.524 or section 236.30 allow prepayment at the expiration of 20 years after final endorsement, but the mortgage note prohibits prepayment without HUD's consent for the full term of the mortgage, HUD would construe the regulation as superseding the prepayment prohibition in the mortgage note."

Therefore, despite the language in the note prohibiting prepayment, the project mortgage will become eligible for prepayment without prior HUD consent on November 25, 1996, which is after 20 years from the date of final endorsement, November 24, 1976.

In view of the foregoing, we conclude that the project is not eligible for participation under LIHPRHA because the project is not receiving Section 8 assistance due to a conversion from rent supplement assistance as required by the statute. We also conclude that the project mortgage is not eligible for prepayment without HUD's consent, but will become eligible under the applicable regulations on November 25, 1996, despite language in the mortgage note prohibiting prepayment.

I hope this letter has resolved your questions in this matter. If you have any further questions, please contact Athena Katcheves at (202) 708-3667.

Sincerely,

/s/David R. Cooper for

John J. Daly
Associate General Counsel
Office of Insured Housing

LEXSTAT 12 USC 4119

UNITED STATES CODE SERVICE
Copyright © 2008 Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved

*** CURRENT THROUGH PL 110-316, APPROVED 8/14/2008 ***
*** WITH A GAP OF 110-315 ***

TITLE 12. BANKS AND BANKING
CHAPTER 42. LOW INCOME HOUSING PRESERVATION AND RESIDENT HOMEOWNERSHIP
PREPAYMENT OF MORTGAGES INSURED UNDER NATIONAL HOUSING ACT

**Go to the United States Code Service Archive Directory**

*12 USCS § 4119*

§ 4119. Definitions

For purposes of this subtitle:
(1) The term "eligible low-income housing" means any housing financed by a loan or mortgage--
(A) that is
(i) insured or held by the Secretary under section 221(d)(3) of the National Housing Act [*12 USCS § 1715l(d)(3)*] and receiving loan management assistance under section 8 of the United States Housing Act of 1937 [*42 USCS § 1437f*] due to a conversion from section 101 of the Housing and Urban Development Act of 1965;
(ii) insured or held by the Secretary and bears interest at a rate determined under the proviso of section 221(d)(5) of the National Housing Act [*12 USCS § 1715l(d)(5)*];
(iii) insured, assisted, or held by the Secretary or a State or State agency under section 236 of the National Housing Act [*12 USCS § 1715z-1*]; or
(iv) held by the Secretary and formerly insured under a program referred to in clause (i), (ii), or (iii); and
(B) that, under regulation or contract in effect before February 5, 1988, is or will within 24 months become eligible for prepayment without prior approval of the Secretary.
(2) The term "Federal cost limit" means, for any eligible low-income housing, the amount determined under section 215(a) [*12 USCS § 4105(a)*].
(3) The term "low-income affordability restrictions" means limits imposed by regulation or regulatory agreement on tenant rents, rent contributions, or income eligibility in eligible low-income housing.
(4) The terms "low-income families or persons" and "very low-income families or persons" mean families or persons whose incomes do not exceed the respective levels established for low-income families and very low-income families, respectively, under section 3(b)(2) of the United States Housing Act of 1937 [*14 USCS § 1437a*(b)(2)].
(5) The term "moderate-income families or persons" means families or persons whose incomes are between 80 percent and 95 percent of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families.
(6) The term "nonprofit organization" means any private, nonprofit organization that--
(A) is organized or chartered under State or local laws;
(B) has no part of its net earnings inuring to the benefit of any member, founder, contributor, or individual;
(C) complies with standards of financial accountability acceptable to the Secretary; and
(D) has among its principal purposes significant activities related to the provision of decent housing that is affordable to very low-, low-, and moderate-income families.

(7) The term "owner" means the current or subsequent owner or owners of eligible low-income housing.
(8) The term "preservation equity" means, for any eligible low-income housing--
(A) for purposes of determining the authorized return under section 214(a) and providing incentives to extend the low-income affordability restrictions on the housing under section 219 [*12 USCS § 4109*]--
(i) the preservation value of the housing determined under section 213(b)(1) [*12 USCS § 4103(b)(1)*]; less
(ii) any debt secured by the property; and
(B) for purposes of determining incentives under section [sections] 220 and 221 [*12 USCS §§ 4110, 4111*] and determining the amount of an acquisition loan under the provisions of section 241(f)(3) of the National Housing Act [*12 USCS § 1715z-6(f)(3)*]--
(i) the preservation value of the housing determined under section 213(b)(2) [*12 USCS § 4103(b)(2)*]; less
(ii) the outstanding balance of the federally-assisted mortgage or mortgages for the housing.
(9) The term "preservation value" means, for any eligible low-income housing, the applicable value determined under paragraph (1) or (2) of section 213(b) [*12 USCS § 4103(b)*].
(10) The term "Secretary" means the Secretary of Housing and Urban Development.
(11) The term "resident council" means any incorporated nonprofit organization or association that--
(A) is representative of the residents of the housing;
(B) adopts written procedures providing for the election of officers on a regular basis; and
(C) has a democratically elected governing board, elected by the residents of the housing.

**HISTORY:**
(Feb. 5, 1988, P.L. 100-242, Title II, Subtitle B, § 229, as added Nov. 28, 1990, P.L. 101-625, Title VI, Subtitle A, § 601(a), 104 Stat. 4271; Oct. 28, 1992, P.L. 102-550, Title III, Subtitle A, §§ 310, 317(a)(5), 106 Stat. 3765, 3772; Sept. 28, 1994, P.L. 103-327, Title II, 108 Stat. 2316.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

References in text:
"This subtitle", referred to in this section, is Subtitle B of Act Feb. 5, 1988, P.L. 100-242, Title II, as added by Act Nov. 28, 1990, P.L. 101-625, Title VI, Subtitle A, § 601(a), 104 Stat. 4249, and appears as *12 USCS §§ 4101* et seq.
"Section 101 of the Housing and Urban Development Act of 1965", referred to in this section, is § 101 of Act Aug. 10, 1965, P.L. 89-117, Title I, 79 Stat. 451, which is classified to *12 USCS § 1701s* and *42 USCS §§ 1451* and *1465*. Section 1465 of 42 USCS was repealed by Act Jan. 2, 1971, P.L. 91-646, Title II, § 220(a)(5), 84 Stat. 1903.

Explanatory notes:
The bracketed word "sections" was inserted in para. (8)(B) as the word probably intended by Congress.

Effective date of section:
Act Nov. 28, P.L. 101-625, Title VI, Subtitle A, § 605, 104 Stat. 4278, which appears as *12 USCS § 4101* note, provides that this section is effective on enactment.

Amendments:

1992. Act. Oct. 28, 1992 (effective and applicable on enactment, as provided by § 2 of such Act, which appears as *42*

*USCS § 5301* note), in para. (1)(A)(i), substituted "receiving loan management assistance under section 8 of the United States Housing Act of 1937 due to a conversion from section 101 of the Housing and Urban Development Act of 1965" for "assisted under section 101 of the Housing and Urban Development Act of 1965 or section 8 of the United States Housing Act of 1937" and, in para. (11)(A), substituted "residents" for "resident".

1994. Act Sept. 28, 1994 (effective only during fiscal year 1995, as provided by Title II of such Act, incorporating § 601 of S. 2281 of the 103d Cong., 2d Sess.) substituted the following for para. (4):

"(4)

(A) The term 'low-income tenants' means families or persons with incomes that exceed 50 percent of the median income for the area (as determined by the Secretary with adjustments for family size).

"(B) The term 'very low-income tenants' means families or persons with incomes that are less than or equal to 50 percent of the median income for the area (as determined by the Secretary with adjustments for family size).".

Other provisions:

**Retrospective application of section.** Act Feb. 5, 1988, P.L. 100-242, Title II, Subtitle B, § 235, as added Nov. 28, 1990, P.L. 101-625, Title VI, Subtitle A, § 601(a), 104 Stat. 4274, which appears as *12 USCS § 4101* note, provides that this section is applicable to any project that is eligible low-income housing on or after Nov. 1, 1987.

**Termination of § 601 of S. 2281 (103d Cong., 2d Sess.).** Act Sept. 28, 1994, P.L. 103-327, Title II, 108 Stat. 2316, provides that the provisions of § 601 of S. 2281 of the 103d Cong., 2d Sess., which were incorporated into Act Sept. 28, 1994, P.L. 103-327, and which amended para. (4) of this section and *12 USCS § 4112(a)*, shall be effective only during fiscal year 1995.

**NOTES:**

Related Statutes & Rules:

This section is referred to in *12 USCS §§ 1715z-6, 1715z-15, 4104, 4109, 4122, 4146.*

JUN 02 1994

COPY of Document Recorded
94 1064466
Has not been compared with original. Original will be returned when processing has been completed.
LOS ANGELES COUNTY REGISTRAR - RECORDER/COUNTY CLERK

PROJECT NAME: Milwood Apartments
PROJECT LOCATION: Los Angeles, Cal
PROJECT NUMBER: 122-35130-LD

USE AGREEMENT AND AMENDMENT OF REGULATORY AGREEMENT

FOR MULTIFAMILY PROJECTS INSURED OR ASSISTED
UNDER SECTION 221(d)(3) (MARKET RATE) OF
THE NATIONAL HOUSING ACT AND SUBJECT TO THE
LOW INCOME HOUSING PRESERVATION AND
RESIDENT HOMEOWNERSHIP ACT OF 1990

This Agreement, entered into by the Secretary of Housing and Urban Development (the "Secretary" or "HUD"), and Joseph R. and Steffi Biafora ("Owner") provides as follows:

WHEREAS, Milwood Apartments (the "Project"), an 8 unit project located in Los Angeles, was financed with a Secured Note (the "Mortgage Note") and Mortgage (the "Mortgage"), dated January 4, 1971 and insured and subsidized by the Secretary under Section 221(d)(3) of the National Housing Act, 12 U.S.C. Section 1715l(d)(3), and covering real property as described in Exhibit "A" attached hereto, which Deed of Trust was recorded in the Recorder's Office of Los Angeles County on January 14, 1971 as document number 2275, at Book T 6866, Page 458;

WHEREAS, the Project is subject to a Regulatory Agreement, (the "Regulatory Agreement"), dated January 4, 1971 and recorded on January 14, 1971 in the County Recorder's Office of Las Angeles County as document number 2276 at Book M 3661, Page 116;

WHEREAS, the Project is subject to the provisions of Subtitle A of Title VI of the National Affordable Housing Act, the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), 12 U.S.C. 4101 et seq., because it meets the definition of "eligible low income housing" in LIHPRHA;

WHEREAS, pursuant to LIHPRHA, the Owner has requested, and HUD has agreed to provide certain incentives, as set forth herein, in exchange for the Owner's agreement to continue low-income affordability restrictions on the Project for the remaining useful life of the Project;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties hereby agree as follows:

1. Definitions

a. "Adjusted Income" has the meaning set forth in the definition of "adjusted income" in 24 CFR Part 248 on the effective date of this Agreement.

b. "Low Income Tenants" are persons or families whose incomes are more than 50 percent but not in excess of 80 percent of Median Income as determined by HUD with adjustments for smaller or larger families.

c. "Median Income" is the median income for a four-person family as calculated by HUD based on the median income for the Los Angeles, California PMSA (or 125 percent of the national median income, if less).

d. "Moderate Income Tenants" are persons or families whose incomes are more than 80 percent of Median Income but not in excess of 95 percent of Median Income as determined by HUD with adjustment for smaller or larger families.

e. "Plan of Action" is that document submitted by the Owner, and approved by HUD, pursuant to LIHPRHA requesting incentives in exchange for maintaining the low and moderate income character of the Project for its remaining useful life.

f. "Remaining Useful Life" is the period during which the physical characteristics of the Project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as becomes necessary.

g. "Very Low Income Tenants" are persons or families whose incomes do not exceed 50 percent of Median Income as determined by HUD with adjustments for smaller and larger families.

2. **Term.** This Agreement shall remain in effect for the remaining useful life of the Project, as that term is defined in Paragraph 1 of this Agreement. The Owner may petition HUD to make a determination that the remaining useful life of the Project has expired not less than fifty years from the date of approval of the Plan of Action for the Project. In making such a determination, HUD shall presume that the useful life of the Project has not expired, and the Owner shall have the burden of proof in establishing such expiration. HUD will not determine that the useful life of the Project has expired if such determination results primarily from failure to make regular and reasonable repairs and replacement, as become necessary. Tenants

and interest persons and organizations may provide comments on the Owner's petition and may appeal HUD's determination.

3. **Use Restriction.** The Project shall be used solely as rental housing for Very Low, Low and Moderate Income Tenants, except to the extent that commercial use has been approved by the Commissioner. If there is any approved commercial use in the Project, rents from the units receiving Section 8 assistance shall not be used to pay any expenses incurred with respect to the commercial use.

4. **Maintenance of Affordability.**

a. Paragraphs 4(a) and 4(d) of the Regulatory Agreement are deleted in their entirety. The Owner, to the extent practicable, will maintain the Project as affordable to the following proportions of Very Low, Lower and Moderate Income Families:

| | No. of units |
|---|---|
| Very Low Income Tenants (up to 50 percent of Median Income) | 8 |
| Low Income Tenants (50.1 to 80 percent of Median Income) | 0 |
| Moderate Income Tenants (80.1 to 95 percent of Median Income) | 0 |

b. The Owner may rent to a higher proportion of Very Low Income Tenants than required by the foregoing tenant income profile, however, the Department does not agree to provide Section 8 assistance beyond that which is indicated in Paragraph 11 of this Agreement.

c. No tenant in occupancy as of the effective date of this Agreement ("Current Tenant(s)") shall be required to relocate on the basis of his or her income.

d. Paragraph 4(b) of the Regulatory Agreement is amended to read as follows:

> (b) to the extent that it does not conflict with the tenant income profile established in Section 222 of LIHPRHA, preference for occupancy shall be given to those families displaced from an urban renewal area, or as a result of governmental action, or as a result of a disaster determined by the President, to be a major disaster;

5. **Rents for Current Tenants.**

a. **General.** Any increase in rents paid by Current Tenants shall be phased in within the restrictions imposed by Section 222(a)(2)(E) of LIHPRHA, as follows: If the total rent

increase is greater than 30 percent of the existing rent, it will be phased in equally over a period of not less than three years with each increase occurring at the beginning of a lease year; the first lease year beginning upon the date of this Agreement. If the total increase is greater than 10 percent yet less than 30 percent, it will be phased in at no more than 10 percent per year. However, the rent level of any Current Tenant determined in accordance with this phase in provision may be increased, if made necessary by reasonable increases in operating costs, during the phase in period.

b. **Very Low and Low Income Tenants.** Current Very Low and Low Income Tenants shall be assisted by Section 8 assistance pursuant to Paragraph 9 of this Agreement and shall pay rent in accordance with the Housing Assistance Payments Contract ("HAP Contract").

c. **Moderate Income Tenants.** Current Moderate Income Tenants and tenants with incomes exceeding the limit for Moderate Income Tenants shall pay for rent not more than the lowest of 30 percent of their Adjusted Income, the existing Section 8 fair market rent ("FMR"), or the prevailing rent for the area. Any rent increases resulting from this Paragraph shall be phased in in accordance with Paragraph 5(a) of this Agreement. If the rents paid by Moderate Income Tenants and tenants with incomes exceeding the limit for Moderate Income Tenants immediately prior to the date of this Agreement are higher than those specified in this Paragraph, those rents shall not be changed because of the implementation of this Agreement.

d. In the event the income of a Current Moderate Income Tenant decreases below 80 percent of Median Income and Section 8 assistance is not available, that tenant shall pay the lesser of the FMR or the "Minimum Rent." The Minimum Rent shall be equal to 30 percent of 80 percent of Median Income, adjusted by family size.

6. **Rents for Future Tenants.**

a. **Very Low and Low Income Tenants.** Future Very Low and Low Income Tenants admitted in accordance with the tenant income profile established in Paragraph 4 of this Agreement shall be assisted by Section 8 assistance pursuant to Paragraph 9 of this Agreement and shall pay rent in accordance with the HAP Contract.

b. The Owner may admit additional Very Low Income Tenants to the Project in excess of that required by the tenant income profile set forth in Paragraph 4 of this Agreement. In the event that Section 8 assistance is not available for these additional Very Low Income Tenants, they shall pay for rent the

lesser of the FMR or the "Floor Rent." The Floor Rent shall be equal to 30 percent of 50 percent of Median Income, adjusted by family size.

c. **Low Income Tenants.** Future Low Income Tenants shall receive Section 8 assistance and shall pay rent in accordance with the HAP Contract. In the event that Section 8 assistance is not available, Future Low Income Tenants shall pay the lesser of the FMR or the Minimum Rent.

d. **Moderate Income Tenants.** Future Moderate Income Tenants shall pay for rent not more than the lowest of 30 percent of Adjusted Income, the FMR, or the prevailing rent for the area. In the event the income of a Future Moderate Income Tenant decreases below 80 percent of Median Income and Section 8 assistance is not available, that tenant shall pay the Minimum Rent.

7. **Rent Adjustments.**

a. Any increase in rents for Current Tenants that results from implementation of this Agreement will be phased in in accordance with Paragraph 5(a) of this Agreement.

b. Tenants shall be recertified annually. Any tenant who refuses to certify or recertify income shall pay for rent the lesser of the FMR or the prevailing rent for the area.

c. Rent increases shall be calculated based on an adjustment factor established by HUD and applied to the portion of rent attributable to project operating expenses. The Owner may apply for a rent increase on an annual basis on the anniversary date of approval of a LIHPRHA Plan of Action. If the Owner believes that the rent increase approved by HUD is not adequate, the Owner may appeal the Department's determination within 30 days of receiving notice of HUD's decision. HUD may approve a rent increase in excess of that needed to cover project operating expenses only if HUD determines such an increase is necessary to reflect extraordinary necessary expenses of owning and maintaining the Project.

d. Paragraph 4(f) of the Regulatory Agreement is deleted in its entirety.

8. **Utility Payments.** Utility allowances must be included in the rents established in Paragraphs 5 and 6 of this Agreement.

9. **Section 8 Assistance.** The Owner agrees to accept assistance under a HAP Contract executed pursuant to Section 8 of the United States Housing Act of 1937 with respect to 8 units in the Project. The Owner agrees to accept and utilize such assistance in accordance with the HAP Contract, and agrees to accept any renewal or extension of the HAP Contract or any contract under a program designated by the Secretary as a successor to the Section 8 Program. To the extent authorized by law and to the extent that appropriated funds are available, the Secretary agrees to provide Section 8 assistance under Section 8 or any successor program with respect to 8 units in the Project. If assistance under Section 8 or any successor program ceases to be available during the term of this Agreement, this Agreement will be renegotiated by the parties in accordance with Section 224(b) of LIHPRHA.

10. **Distributions and Amendment of Regulatory Agreement.** Paragraphs 6(e)(1) and (2) of the Regulatory Agreement are amended to read as follows:

> (1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, or as indicated in paragraph 6(e)(2) of this agreement, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one year shall be limited to $ $29,148 and the right to such distributions shall be cumulative. All or a portion of the distributions may be applied to monthly debt service payments for an equity takeout loan approved by the Secretary. Except with respect to the proceeds of a HUD-approved equity takeout loan, no distribution shall be made from borrowed funds or when there is any default under this agreement or under any mortgage secured by the project.
>
> (2) The Owner shall obtain a physical inspection report each year from a certified architect, engineer, or other party whose qualifications have been approved by the Secretary. The Owner shall keep the inspection report in the Project records for at least three years. Prior to distribution of surplus cash, the Owner must certify to the Secretary that the Project meets the requirements of Paragraph 7 of this Agreement and that any deficiencies known to the Owner are being corrected.

11. **Reserve for Replacements and Amendment of Regulatory Agreement.** Paragraph 2(a) of the Regulatory Agreement is amended by adding the following language to the end thereof:

The Secretary will not approve the release of funds from the Reserve for Replacements account if doing so would reduce the balance below an amount equivalent to one month's maximum gross rent potential, except in emergencies such as natural disasters requiring immediate repairs or to avoid a default on the mortgage insured by the Commissioner.

12. **Savings Due to Management Efficiencies.** Any net savings from reductions in operating expenses due to management efficiencies shall be deposited into the Reserve for Replacements Account. The Owner may have access to these funds on a semiannual basis upon a finding by the Commissioner that a withdrawal will not reduce the balance in the Reserve for Replacements Account below that required in Paragraph 2(a) of the Regulatory Agreement, as amended by this Agreement, and that the Owner is maintaining the property in accordance with the housing quality standards set forth in 24 CFR part 886.

13. **Residual Receipts.** On an annual basis, during the rent phase in period established in Paragraph 5(a) of this Agreement, the Secretary may permit the Owner to withdraw funds from the Residual Receipts Account as necessary to ensure that the Owner receives an annual distribution equaling 8 percent of its extension preservation equity during the phase in period.

14. **Displacement.** No Current Tenant shall be displaced, except for good cause.

15. **Civil Rights Requirements.** The Owner will comply with the provisions of any Federal, State or local law prohibiting discrimination in housing on the basis of race, color, religion, sex, national origin, handicap or familial status, including but not limited to: Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Executive Order 11063, Section 504 of the Rehabilitation Act of 1973, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities, including, but not limited to 24 CFR Parts 1, 100, 107, and 110, and Subparts I and M of Part 200.

16. **Housing Quality Standards.** The Owner shall maintain the Project in accordance with the housing quality standards set forth in 24 CFR part 886 and local housing codes. In the event there is a conflict between the housing quality standards and local codes, the stricter standard shall prevail. The Department

shall conduct an annual physical assessment of the Project in order to ensure compliance with the housing quality standards.

17. **Violations of this Agreement.** If the Department determines that the Owner has violated the terms of this Agreement, including compliance with the housing quality standards, HUD shall notify the Owner of its determination and the Owner shall have 90 days in which to cure the violation. At the expiration of the 90 days, HUD shall reinspect the Project or take other investigative steps in order to ensure compliance. The failure to cure any violation within 90 days of notification of the violation may result in the forfeiture of, or reduction in, the Owner's annual distribution; withholding of escrowed equity loan proceeds; reduction in, or suspension of, the Section 8 assistance authorized in this Agreement, acceleration of debt secured by the Project; payment of relocation expenses to tenants admitted to the Project inconsistently with the tenant income profile established in this Agreement; and the imposition of any other sanctions authorized in law.

18. **Agreement Binding Upon Successors and Assigns.** Upon conveyance of the Project during the term of this Agreement, the Owner shall require its successor or assignee to assume its obligations under this Agreement. In any event, this Agreement shall be binding upon the Owner's successors and assigns.

19. **Reports.** The Owner shall furnish the Secretary with such reports concerning the financial condition, operation and condition of the Project as the Secretary may prescribe.

20. **Incorporation of Regulatory Agreement by Reference.** Paragraphs 2; 4(c); 4(e); 4(j); 5; 6(a)-(h); 6(k); 7; 9; 10; 13; and 17 of the Regulatory Agreement, are adopted and incorporated by reference herein. In the event that the Owner prepays the Mortgage Note or the FHA mortgage insurance is terminated, the provisions listed above shall remain in full force and effect, binding the Owner, its successors and assigns as if the Mortgage Note were not prepaid or the mortgage insurance terminated, except that in the case of such prepayment or termination:

a. the phrase "the Secretary" shall be substituted for the term "Mortgagee" throughout the adopted language of the Regulatory Agreement; and

b. the "mortgaged property" or "mortgaged premises" referred to in the Regulatory Agreement, shall be the Project.

21. **Enforcement.** In the event of a breach or threatened breach of any of the provisions of this Agreement, any eligible tenant or applicant for occupancy, or the Secretary or his or her successors or delegates, may institute proper legal action to enforce performance of such provisions, to enjoin any acts in violation of such provisions, to recover whatever damages can be proven (including refunds, with interest, on rent overcharges), and/or to obtain whatever other relief may be appropriate.

22. **Severability.** The invalidity, in whole or in part, of any of the provisions set forth above shall not affect or invalidate any remaining provisions.

23. **Impairment of Regulatory Agreement.** The terms and provisions of the Regulatory Agreement shall continue in full force except as modified herein. Conflicts between this Agreement and the Regulatory Agreement shall be resolved in favor of this Agreement.

24. **Execution of Other Agreements.** The Owner agrees that it has not and will not execute any other agreement with provisions contradictory of, or in opposition to, the provisions of this Agreement, and that in any event, the provisions of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have agreed that it shall be effective as of the 01 day of June, 1994.

OWNER

Witness

Witness

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

BY:
Director
Office of Housing Management
HUD, Los Angeles Field Office

STATE OF California )
) SS:
COUNTY OF Los Angeles )

Before me, Edith V. Lyons, a Notary Public in and for said State, on this 01 day of June, 1994, ~~personally appeared~~ __________, who is personally well known to me to be the Director, Housing Management Div., and the person who executed the foregoing instrument by virtue of the authority vested in him by Section 204(g) of the National Housing Act, as amended, and I having first made known to him the contents thereof, he did acknowledge the signing thereof to be his free and voluntary act and deed on behalf of Henry G. Cisneros, as the Secretary of Housing and Urban Development for the uses, purposes and considerations therein set forth.

Witness my hand and official seal this 01 day of June, 1994.

(SEAL)

EDITH V. LYONS
COMM. # 1025146
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires MAY 1, 1998

Notary Public

My commission expires May 1, 1998.

STATE OF California )
COUNTY OF Los Angeles ) ss:

On this 01 day of June, A.D., 1994, before me residing therein, duly commissioned and sworn, personally appeared Edith V. Lyons, a Notary Public in and for said county and State, proved to me on the basis of satisfactory evidence to be the Owner of the limited partnership that executed the within instrument and acknowledged to me that such limited partnership executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

EDITH V. LYONS
COMM. # 1025146
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires MAY 1, 1998

Edith V. Lyons
NOTARY PUBLIC

(SEAL)

My Commission expires May 1, 1998.

COPY of Document Recorded
94 1064467
Has not been compared with original.
LOS ANGELES COUNTY REGISTRAR-RECORDER

PROJECT NAME: Parthenia Manor
PROJECT LOCATION: Los Angeles, Cal
PROJECT NUMBER: 122-35090-LDP

USE AGREEMENT AND AMENDMENT OF REGULATORY AGREEMENT

JUN 02 1994

FOR MULTIFAMILY PROJECTS INSURED OR ASSISTED UNDER SECTION 221(d)(3) (MARKET RATE) OF THE NATIONAL HOUSING ACT AND SUBJECT TO THE LOW INCOME HOUSING PRESERVATION AND RESIDENT HOMEOWNERSHIP ACT OF 1990

This Agreement, entered into by the Secretary of Housing and Urban Development (the "Secretary" or "HUD"), and Joseph R. and Steffi Biafora, ("Owner") provides as follows:

WHEREAS, Parthenia Manor (the "Project"), an 88 unit project located in Los Angeles, California, was financed with a Secured Note (the "Mortgage Note") and Mortgage (the "Mortgage"), dated December 1, 1970 and insured and subsidized by the Secretary under Section 221(d)(3) of the National Housing Act, 12 U.S.C. Section 1715l(d)(3), and covering real property as described in Exhibit "A" attached hereto, which Deed of Trust was recorded in the Recorder's Office of Los Angeles County on December 10, 1970 as document number 239, at Book T-6831, Page 22;

WHEREAS, the Project is subject to a Regulatory Agreement, (the "Regulatory Agreement"), dated December 1, 1970 and recorded on December 10, 1970 in the County Recorder's Office of Los Angeles County as document number 240 at Book M-3632, Page 209;

WHEREAS, the Project is subject to the provisions of Subtitle A of Title VI of the National Affordable Housing Act, the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), 12 U.S.C. 4101 et seq., because it meets the definition of "eligible low income housing" in LIHPRHA;

WHEREAS, pursuant to LIHPRHA, the Owner has requested, and HUD has agreed to provide certain incentives, as set forth herein, in exchange for the Owner's agreement to continue low-income affordability restrictions on the Project for the remaining useful life of the Project;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties hereby agree as follows: