1. **Definitions**

a. "Adjusted Income" has the meaning set forth in the definition of "adjusted income" in 24 CFR Part 248 on the effective date of this Agreement.

b. "Low Income Tenants" are persons or families whose incomes are more than 50 percent but not in excess of 80 percent of Median Income as determined by HUD with adjustments for smaller or larger families.

c. "Median Income" is the median income for a four-person family as calculated by HUD based on the median income for the Los Angeles PMSA (or 125 percent of the national median income, if less).

d. "Moderate Income Tenants" are persons or families whose incomes are more than 80 percent of Median Income but not in excess of 95 percent of Median Income as determined by HUD with adjustment for smaller or larger families.

e. "Plan of Action" is that document submitted by the Owner, and approved by HUD, pursuant to LIHPRHA requesting incentives in exchange for maintaining the low and moderate income character of the Project for its remaining useful life.

f. "Remaining Useful Life" is the period during which the physical characteristics of the Project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as becomes necessary.

g. "Very Low Income Tenants" are persons or families whose incomes do not exceed 50 percent of Median Income as determined by HUD with adjustments for smaller and larger families.

2. **Term.** This Agreement shall remain in effect for the remaining useful life of the Project, as that term is defined in Paragraph 1 of this Agreement. The Owner may petition HUD to make a determination that the remaining useful life of the Project has expired not less than fifty years from the date of approval of the Plan of Action for the Project. In making such a determination, HUD shall presume that the useful life of the Project has not expired, and the Owner shall have the burden of proof in establishing such expiration. HUD will not determine that the useful life of the Project has expired if such determination results primarily from failure to make regular and reasonable repairs and replacement, as become necessary. Tenants and interest persons and organizations may provide comments on the Owner's petition and may appeal HUD's determination.

3. **Use Restriction.** The Project shall be used solely as rental housing for Very Low, Low and Moderate Income Tenants, except to the extent that commercial use has been approved by the Commissioner. If there is any approved commercial use in the Project, rents from the units receiving Section 8 assistance shall not be used to pay any expenses incurred with respect to the commercial use.

4. **Maintenance of Affordability.**

a. Paragraphs 4(a) and 4(d) of the Regulatory Agreement are deleted in their entirety. The Owner, to the extent practicable, will maintain the Project as affordable to the following proportions of Very Low, Lower and Moderate Income Families:

| | |
|---|---|
| Very Low Income Tenants (up to 50 percent of Median Income) | 88 |
| Low Income Tenants (50.1 to 80 percent of Median Income) | 0 |
| Moderate Income Tenants (80.1 to 95 percent of Median Income) | 0 |

b. The Owner may rent to a higher proportion of Very Low Income Tenants than required by the foregoing tenant income profile, however, the Department does not agree to provide Section 8 assistance beyond that which is indicated in Paragraph 11 of this Agreement.

c. No tenant in occupancy as of the effective date of this Agreement ("Current Tenant(s)") shall be required to relocate on the basis of his or her income.

d. Paragraph 4(b) of the Regulatory Agreement is amended to read as follows:

> (b) to the extent that it does not conflict with the tenant income profile established in Section 222 of LIHPRHA, preference for occupancy shall be given to those families displaced from an urban renewal area, or as a result of governmental action, or as a result of a disaster determined by the President, to be a major disaster;

5. **Rents for Current Tenants.**

a. **General.** Any increase in rents paid by Current Tenants shall be phased in within the restrictions imposed by Section 222(a)(2)(E) of LIHPRHA, as follows: If the total rent increase is greater than 30 percent of the existing rent, it will be phased in equally over a period of not less than three years with each increase occurring at the beginning of a lease year; the first lease year beginning upon the date of this Agreement.

If the total increase is greater than 10 percent yet less than 30 percent, it will be phased in at no more than 10 percent per year. However, the rent level of any Current Tenant determined in accordance with this phase in provision may be increased, if made necessary by reasonable increases in operating costs, during the phase in period.

b. **Very Low and Low Income Tenants.** Current Very Low and Low Income Tenants shall be assisted by Section 8 assistance pursuant to Paragraph 9 of this Agreement and shall pay rent in accordance with the Housing Assistance Payments Contract ("HAP Contract").

c. **Moderate Income Tenants.** Current Moderate Income Tenants and tenants with incomes exceeding the limit for Moderate Income Tenants shall pay for rent not more than the lowest of 30 percent of their Adjusted Income, the existing Section 8 fair market rent ("FMR"), or the prevailing rent for the area. Any rent increases resulting from this Paragraph shall be phased in in accordance with Paragraph 5(a) of this Agreement. If the rents paid by Moderate Income Tenants and tenants with incomes exceeding the limit for Moderate Income Tenants immediately prior to the date of this Agreement are higher than those specified in this Paragraph, those rents shall not be changed because of the implementation of this Agreement.

d. In the event the income of a Current Moderate Income Tenant decreases below 80 percent of Median Income and Section 8 assistance is not available, that tenant shall pay the lesser of the FMR or the "Minimum Rent." The Minimum Rent shall be equal to 30 percent of 80 percent of Median Income, adjusted by family size.

6. **Rents for Future Tenants.**

a. **Very Low and Low Income Tenants.** Future Very Low and Low Income Tenants admitted in accordance with the tenant income profile established in Paragraph 4 of this Agreement shall be assisted by Section 8 assistance pursuant to Paragraph 9 of this Agreement and shall pay rent in accordance with the HAP Contract.

b. The Owner may admit additional Very Low Income Tenants to the Project in excess of that required by the tenant income profile set forth in Paragraph 4 of this Agreement. In the event that Section 8 assistance is not available for these additional Very Low Income Tenants, they shall pay for rent the lesser of the FMR or the "Floor Rent." The Floor Rent shall be equal to 30 percent of 50 percent of Median Income, adjusted by family size.

c. **Low Income Tenants.** Future Low Income Tenants shall receive Section 8 assistance and shall pay rent in accordance with the HAP Contract. In the event that Section 8 assistance is not available, Future Low Income Tenants shall pay the lesser of the FMR or the Minimum Rent.

d. **Moderate Income Tenants.** Future Moderate Income Tenants shall pay for rent not more than the lowest of 30 percent of Adjusted Income, the FMR, or the prevailing rent for the area. In the event the income of a Future Moderate Income Tenant decreases below 80 percent of Median Income and Section 8 assistance is not available, that tenant shall pay the Minimum Rent.

7. **Rent Adjustments.**

a. Any increase in rents for Current Tenants that results from implementation of this Agreement will be phased in in accordance with Paragraph 5(a) of this Agreement.

b. Tenants shall be recertified annually. Any tenant who refuses to certify or recertify income shall pay for rent the lesser of the FMR or the prevailing rent for the area.

c. Rent increases shall be calculated based on an adjustment factor established by HUD and applied to the portion of rent attributable to project operating expenses pursuant to LIHPRHA. The Owner may apply for a rent increase on an annual basis on the anniversary date of approval of a LIHPRHA Plan of Action. If the Owner believes that the rent increase approved by HUD is not adequate, the Owner may appeal the Department's determination within 30 days of receiving notice of HUD's decision. HUD may approve a rent increase in excess of that needed to cover project operating expenses only if HUD determines such an increase is necessary to reflect extraordinary necessary expenses of owning and maintaining the Project.

d. Paragraph 4(f) of the Regulatory Agreement is deleted in its entirety.

8. **Utility Payments.** Utility allowances must be included in the rents established in Paragraphs 5 and 6 of this Agreement.

9. **Section 8 Assistance.** The Owner agrees to accept assistance under a HAP Contract executed pursuant to Section 8 of the United States Housing Act of 1937 with respect to 88 units in the Project. The Owner agrees to accept and utilize such assistance in accordance with the HAP Contract, and agrees to accept any renewal or extension of the HAP Contract or any

contract under a program designated by the Secretary as a successor to the Section 8 Program. To the extent authorized by law and to the extent that appropriated funds are available, the Secretary agrees to provide Section 8 assistance under Section 8 or any successor program with respect to 88 units in the Project. Notwithstanding any provision herein, if assistance under Section 8 or any successor program ceases to be available during the term of this Agreement, this Agreement will be renegotiated by the parties in accordance with Section 224(b) of LIHPRHA.

10. **Distributions and Amendment of Regulatory Agreement.** Paragraphs 6(e)(1) and (2) of the Regulatory Agreement are amended to read as follows:

> (1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, or as indicated in paragraph 6(e)(2) of this agreement, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one year shall be limited to $ 328,018.00 and the right to such distributions shall be cumulative. All or a portion of the distributions may be applied to monthly debt service payments for an equity takeout loan approved by the Secretary. Except with respect to the proceeds of a HUD-approved equity takeout loan, no distribution shall be made from borrowed funds or when there is any default under this agreement or under any mortgage secured by the project.
>
> (2) The Owner shall obtain a physical inspection report each year from a certified architect, engineer, or other party whose qualifications have been approved by the Secretary. The Owner shall keep the inspection report in the Project records for at least three years. Prior to distribution of surplus cash, the Owner must certify to the Secretary that the Project meets the requirements of Paragraph 16 of this Agreement and that any deficiencies known to the Owner are being corrected.

11. **Reserve for Replacements and Amendment of Regulatory Agreement.** Paragraph 2(a) of the Regulatory Agreement is amended by adding the following language to the end thereof:

> The Secretary will not approve the release of funds from the Reserve for Replacements account if doing so would reduce the balance below an amount equivalent to one month's maximum gross rent potential, except in emergencies such as natural disasters requiring

immediate repairs or to avoid a default on the mortgage insured by the Commissioner.

12. **Savings Due to Management Efficiencies.** Any net savings from reductions in operating expenses due to management efficiencies shall be deposited into the Reserve for Replacements Account. The Owner may have access to these funds on a semiannual basis upon a finding by the Commissioner that a withdrawal will not reduce the balance in the Reserve for Replacements Account below that required in Paragraph 2(a) of the Regulatory Agreement, as amended by this Agreement, and that the Owner is maintaining the property in accordance with the housing quality standards set forth in 24 CFR part 886.

13. **Residual Receipts.** On an annual basis, during the rent phase in period established in Paragraph 5(a) of this Agreement, the Secretary may permit the Owner to withdraw funds from the Residual Receipts Account as necessary to ensure that the Owner receives an annual distribution equalling 8 percent of its extension preservation equity during the phase in period.

14. **Displacement.** No Current Tenant shall be displaced, except for good cause.

15. **Civil Rights Requirements.** The Owner will comply with the provisions of any Federal, State or local law prohibiting discrimination in housing on the basis of race, color, religion, sex, national origin, handicap or familial status, including but not limited to: Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Executive Order 11063, Section 504 of the Rehabilitation Act of 1973, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities, including, but not limited to 24 CFR Parts 1, 100, 107, and 110, and Subparts I and M of Part 200.

16. **Housing Quality Standards.** The Owner shall maintain the Project in accordance with the housing quality standards set forth in 24 CFR part 886 and local housing codes. In the event there is a conflict between the housing quality standards and local codes, the stricter standard shall prevail. The Department shall conduct an annual physical assessment of the Project in order to ensure compliance with the housing quality standards.

17. **Violations of this Agreement.** If the Department determines that the Owner has violated the terms of this

Agreement, including compliance with the housing quality standards, HUD shall notify the Owner of its determination and the Owner shall have 90 days in which to cure the violation. At the expiration of the 90 days, HUD shall reinspect the Project or take other investigative steps in order to ensure compliance. The failure to cure any violation within 90 days of notification of the violation may result in the forfeiture of, or reduction in, the Owner's annual distribution; withholding of escrowed equity loan proceeds; reduction in, or suspension of, the Section 8 assistance authorized in this Agreement, acceleration of debt secured by the Project; payment of relocation expenses to tenants admitted to the Project inconsistently with the tenant income profile established in this Agreement; and the imposition of any other sanctions authorized in law.

18. **Agreement Binding Upon Successors and Assigns.** Upon conveyance of the Project during the term of this Agreement, the Owner shall require its successor or assignee to assume its obligations under this Agreement. In any event, this Agreement shall be binding upon the Owner's successors and assigns.

19. **Reports.** The Owner shall furnish the Secretary with such reports concerning the financial condition, operation and condition of the Project as the Secretary may prescribe.

20. **Incorporation of Regulatory Agreement by Reference.** Paragraphs 2; 4(c); 4(e); 4(j); 5; 6(a)-(h); 6(k); 7; 9; 10; 13; and 17 of the Regulatory Agreement, are adopted and incorporated by reference herein. In the event that the Owner prepays the Mortgage Note or the FHA mortgage insurance is terminated, the provisions listed above shall remain in full force and effect, binding the Owner, its successors and assigns as if the Mortgage Note were not prepaid or the mortgage insurance terminated, except that in the case of such prepayment or termination:

a. the phrase "the Secretary" shall be substituted for the term "Mortgagee" throughout the adopted language of the Regulatory Agreement; and

b. the "mortgaged property" or "mortgaged premises" referred to in the Regulatory Agreement, shall be the Project.

21. **Enforcement.** In the event of a breach or threatened breach of any of the provisions of this Agreement, any eligible tenant or applicant for occupancy, or the Secretary or his or her successors or delegates, may institute proper legal action to enforce performance of such provisions, to enjoin any acts in violation of such provisions, to recover whatever damages can be

proven (including refunds, with interest, on rent overcharges), and/or to obtain whatever other relief may be appropriate.

22. **Severability.** The invalidity, in whole or in part, of any of the provisions set forth above shall not affect or invalidate any remaining provisions.

23. **Impairment of Regulatory Agreement.** The terms and provisions of the Regulatory Agreement shall continue in full force except as modified herein. Conflicts between this Agreement and the Regulatory Agreement shall be resolved in favor of this Agreement.

24. **Execution of Other Agreements.** The Owner agrees that it has not and will not execute any other agreement with provisions contradictory of, or in opposition to, the provisions of this Agreement, and that in any event, the provisions of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have agreed that it shall be effective as of the 01 day of June, 1994.

Witness

Witness

OWNER

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

BY:
Director
Office of Housing Management
HUD, Los Angeles Field Office

STATE OF California )
) SS:
COUNTY OF Los Angeles )

Before me, Edith V. Lyons, a Notary Public in and for said State, on this 01 day of June, 1994, personally appeared __________, who is personally well known to me to be the Director, Housing Management Div, and the person who executed the foregoing instrument by virtue of the authority vested in him by Section 204(g) of the National Housing Act, as amended, and I having first made known to him the contents thereof, he did acknowledge the signing thereof to be his free and voluntary act and deed on behalf of Henry G. Cisneros, as the Secretary of Housing and Urban Development for the uses, purposes and considerations therein set forth.

Witness my hand and official seal this 01 day of June, 1994.

(SEAL)

EDITH V. LYONS
COMM. # 1025146
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires MAY 1, 1998

Notary Public

My commission expires May 1, 1998.

STATE OF California )
) ss:
COUNTY OF Los Angeles )

On this 01 day of June, A.D., 1994, before me residing therein, duly commissioned and sworn, personally appeared Edith V. Lyons, a Notary Public in and for said county and State, proved to me on the basis of satisfactory evidence to be the owners of the limited partnership that executed the within instrument and acknowledged to me that such limited partnership executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

EDITH V. LYONS
COMM. # 1025146
Notary Public — California
LOS ANGELES COUNTY
My Comm. Expires MAY 1, 1998

Edith V. Lyons
NOTARY PUBLIC

(SEAL)

My Commission expires May 1, 1998.

STATE OF HAWAII )
) ss.
CITY AND COUNTY OF HONOLULU )

On this 7th day of April, 1972, before me personally appeared NORMAN M. KRONICK and LOUIS DULIEN, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

[signature]
Notary Public, First Circuit
State of Hawaii

My commission expires: May 31, 1972

STATE OF HAWAII )
) ss.
CITY AND COUNTY OF HONOLULU )

LIBER 8233 PAGE 189

On this 7th day of April, 1972, before me personally appeared NORMAN M. KRONICK and LOUIS DULIEN, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

Masao Kosaka

Notary Public, First Circuit
State of Hawaii

My commission expires: May 31, 1972

JUN 05 '96 03:39PM HUD GREENSBORO P.2

4.

Recorded Book 1877 Page 1014
5-1-95

Project Name: Market North
Apartments #2
Project Location: Wilmington, NC
Project Number: 053-35017-LDP-SUP

USE AGREEMENT AND AMENDMENT OF EXISTING REGULATORY AGREEMENT FOR MULTIFAMILY PROJECTS INSURED OR ASSISTED UNDER SECTION 221(D)(3) (MARKET RATE) * OF THE NATIONAL HOUSING ACT AND SUBJECT TO THE LOW INCOME HOUSING PRESERVATION AND RESIDENT HOMEOWNERSHIP ACT OF 1990 WITH SECTION 241 LOAN

This Agreement, entered into by the Secretary of Housing and Urban Development (the "Secretary" or "HUD"), and Thetford Properties III Limited Partnership, a Virginia Limited Partnership ("Owner") provides as follows:

WHEREAS, Market North Apartments #2 (the "Project"), a 100 unit project located in Wilmington, NC was financed with a secured note and mortgage and insured by the Secretary under Section 221(d)(3) of the National Housing Act, 12 U.S.C. Section 1715l(d)(3), and which project may be subject to future secured notes insured pursuant to other provisions of the National Housing Act, as are described in the Regulatory Agreement dated January 1, 1984 or any amendments to the Regulatory Agreement as may be made from time to time and covering real property as described in Exhibit "A" attached hereto;

WHEREAS, the Project is subject to a Regulatory Agreement or any amendments thereto, (the "Regulatory Agreement"), dated January 1, 1984 and recorded on April 13, 1984 in the Office of the Register of Deeds, New Hanover County, at Book 1250, Page 1512;

WHEREAS, the Owner is eligible to prepay the mortgage and the Project is subject to the provisions of Subtitle A of Title VI of the National Affordable Housing Act, the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), 12 U.S.C. 4101 et seq., as amended by Title II of the Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1995, Pub. L. 103-327, 108 Stat. 2298, 2316, approved September 28, 1994, because it meets the definition of "eligible low income housing" in LIHPRHA;

WHEREAS, pursuant to LIHPRHA, the Owner has requested, and HUD has agreed to provide certain incentives, as set forth herein, in exchange for the Owner's agreement to continue low-

* OR BELOW MARKET INTEREST RATE, IF THE 10/69 EDITION OF HUD FORM 1730 IS THE EXISTING REGULATORY AGREEMENT

Kelly Decl. Ex. K



DOJ0960906

income affordability restrictions on the Project for the remaining useful life of the Project;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties hereby agree as follows:

1. Definitions

a. "Adjusted Income" has the meaning set forth in the definition of "adjusted income" in 24 CFR Part 248 on the effective date of this Agreement.

b. "Low Income Tenants" are persons or families whose incomes are more than 50 percent but not more than 80 percent of Median Income as determined by HUD with adjustments for smaller or larger families.

c. "Median Income" is the median income for a four-person family as calculated by HUD based on the lesser of the median income for the Wilmington PMSA or 125 percent of the national median income.

d. "Moderate Income Tenants" are persons or families whose incomes are more than 80 percent of Median Income but not more than 95 percent of Median Income as determined by HUD with adjustment for smaller or larger families.

e. "Plan of Action" is that document submitted by the Owner, and approved by HUD, pursuant to LIHPRHA requesting incentives in exchange for maintaining the low and moderate income character of the Project for its remaining useful life.

f. "Project Specific Rent" is the market rent that an unsubsidized tenant would reasonably expect to pay for the subject unit, as determined by HUD, based on actual project conditions after repair.

g. "Remaining Useful Life" is the period during which the physical characteristics of the Project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as becomes necessary.

h. "Total Tenant Payment" is the portion of the rent plus, if applicable, a utility allowance, that is payable by the tenant.

i. "Very Low Income Tenants" are persons or families whose incomes are not more than 50 percent of Median Income as determined by HUD with adjustments for smaller and larger families.

2. Term. This Agreement shall remain in effect for the Remaining Useful Life of the Project, as that term is defined in Paragraph 1 of this Agreement. The Owner may petition HUD to make a determination that the remaining useful life of the Project has expired not less than fifty years from the date of approval of the Plan of Action for the Project. In making such a determination, HUD shall presume that the useful life of the Project has not expired, and the Owner shall have the burden of proof in establishing such expiration. HUD will not determine that the useful life of the Project has expired if such determination results primarily from failure to make regular and reasonable repairs and replacement, as become necessary. Tenants and interested persons and organizations may provide comments on the Owner's petition and may appeal HUD's determination.

3. Use Restriction. The Project shall be used solely as rental housing for Very Low-, Low- and Moderate-Income Tenants, except to the extent that commercial use has been approved by the Commissioner. If there is any approved commercial use or non-subsidized units in the Project, rents from the units receiving Section 8 assistance shall not be used to pay any expenses incurred with respect to the commercial use or non-subsidized units.

4. Maintenance of Affordability.

a. Paragraphs 4(a) and 4(d) of the Regulatory Agreement are deleted in their entirety. The Owner, to the extent practicable, will maintain the Project as affordable to the following proportions of Very Low-, Low- and Moderate-Income Tenants:

| | No. of Units |
|---|---|
| Very Low-Income Tenants | 95 |
| Low-Income Tenants | 5 |
| Moderate-Income Tenants | 0 |

b. The Owner may rent to a higher proportion of Very Low-Income Tenants than required by the foregoing tenant income profile. However, HUD does not agree to provide Section 8 assistance beyond that which is indicated in Paragraph 7 of this Agreement.

c. No tenant in occupancy as of the effective date of this Agreement ("Current Tenant(s)") shall be required to relocate on the basis of his or her income.

d. Paragraph 4(b) of the Regulatory Agreement is amended to read as follows:

> (b) To the extent that it does not conflict with the tenant income profile established in Section 222 of LIHPRHA, preference for occupancy shall be given to those families displaced as a result of a major disaster as determined by the President or asd a result of governmental action;

5. Rents.

a. Phase In of Rents For Current Tenants. Any increase in Total Tenant Payments for Current Tenants that results from the initial implementation of this Agreement shall be phased in within the restrictions imposed by Section 222(a)(2)(E)(1) of LIHPRHA (42 U.S.C. 4112(a)(2)(E)(1)), as follows: If the increase in Total Tenant Payment is greater than 30 percent, it will be phased in equally over a period of not less than three years with each increase occurring at the beginning of a lease year, the first lease year beginning upon the date of this Agreement. If the total increase is greater than 10 percent yet not in excess of 30 percent, it will be phased in at no more than 10 percent per year. However, the rent level of any Current Tenant determined in accordance with this phase-in provision may be increased, if such increase is made necessary by reasonable increases in operating costs, during the phase-in period.

b. Very Low-Income Tenants. Current and Future Tenants classified as occupying very low-income units under the tenant profile, including tenants receiving Section 8 assistance pursuant to Paragraph 7 of this Agreement, shall make a Total Tenant Payment that does not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or (2) 90 percent of the Project Specific Rent.

c. Low-Income Tenants. (1) Current and Future Tenants classified as occupying Low-Income units under the tenant profile, including tenants receiving Section 8 assistance pursuant to Paragraph 9 of the Agreement, shall make a Total Tenant Payment that does not exceed the lesser of 30 percent of the tenant's monthly Adjusted Income or 90 percent of the Project Specific Rent but may not be less than the lesser of 30 percent of 45 percent of median income for that area (as determined by HUD and adjusted for family size) or 90 percent of the Project Specific Rent.

> (2) If a tenant who is classified as occupying a Low-Income unit under the tenant profile becomes a Very Low-Income Tenant, then:

When the next unit designated for Very Low-Income families or persons becomes available under the tenant profile, the tenant shall be classified as occupying a Very Low-Income unit and the unit that became available shall be made available as a Low-Income unit; and

Notwithstanding the Total Tenant Payment requirements of Paragraph 5.c.1. of this Agreement, until the tenant is reclassified as occupying a Very Low-Income unit, such tenant shall make Total Tenant Payments that are not more than 30 percent of the tenant's monthly Adjusted Income. Any resulting decrease in the tenant's Total Tenant Payment shall be incorporated in the Section 8 Housing Assistance Payments Contracts for units designated as Low-Income. The tenant may not be evicted for nonpayment of rent if the tenant makes Total Tenant Payments permitted under this Paragraph.

d. Moderate-Income Tenants. Current and Future Tenants classified as occupying Moderate-Income units under the tenant profile shall make Total Tenant Payments that do not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or (2) 90 percent of the Project Specific Rent. However, if the Total Tenant Payment paid immediately prior to the date of this Agreement by a Current Moderate-Income Tenant or by a tenant with income exceeding the limit for Moderate-Income Tenants is higher than the Total Tenant Payment would be under the preceding sentence, the Total Tenant Payment shall not be changed because of implementation of this Agreement.

e. Exception. If the Owner's Plan of Action was approved by the Secretary on or before September 28, 1994, paragraphs 5.b., 5.c. and 5.d. of this Agreement shall not apply to current tenants until the first date on which their next annual rent adjustments are made following September 28, 1994. Until such time, Total Tenant Payments for current tenant rents shall be as follows:

(1) Very Low- and Low-Income Tenants. Current Very Low- and Low-Income Tenants shall be assisted by Section 8 assistance pursuant to Paragraph 7 of this Agreement and shall pay rent in accordance with the Housing Assistance Payments Contract ("HAP Contract").

(2) Moderate-Income Tenants. Current Moderate-Income Tenants and tenants with incomes exceeding the limit for Moderate-Income Tenants

shall make a Total Tenant Payment of not more than the lowest of 30 percent of their Adjusted Income, the existing Section 8 fair market rent ("FMR") or (if applicable in accordance with HUD instructions) the Project Specific Rent (PSR). Any rent increases resulting from this Paragraph shall be phased in in accordance with Paragraph 5.a. of this Agreement. If the rents paid by Moderate- Income Tenants and tenants with incomes exceeding the limit for Moderate-Income Tenants immediately prior to the date of this Agreement are higher than those specified in this Paragraph, those rents shall not be changed because of the implementation of this Agreement.

(3) In the event the income of a Current Moderate-Income Tenant decreases below 80 percent of Median-Income and Section 8 assistance is not available, that tenant shall pay the lower of: (i) the FMR (or the PSR, when applicable); or (ii) the higher of 30 percent of the Adjusted Monthly Income (AMI) or the Minimum Rent. The Minimum Total Tenant Payment shall be equal to 30 percent of 80 percent of Median-Income for the applicable family size adjusted by family allowances.

6. **Adjustments to Total Tenant Payments and to Project Rent.**

a. Tenants shall be recertified annually. Any tenant who refuses to certify or recertify income shall make a Total Tenant Payment that is equal to 90 percent of the Project Specific Rent.

b. Project rent adjustments shall be calculated based on an adjustment factor established by HUD and applied to the portion of rent attributable to project operating expenses. The Owner may apply for a rent adjustment on an annual basis on the anniversary date of approval of a LIHPRHA Plan of Action. If the Owner believes that the rent adjustment approved by HUD is not adequate, the Owner may appeal the HUD's determination within 30 days of receiving notice of HUD's decision. HUD may approve a rent increase in excess of that needed to cover project operating expenses only if HUD determines such an increase is necessary to reflect extraordinary and necessary expenses of owning and maintaining the Project (any such budget based increase is only for the year approved and does not carry forward into subsequent years).

c. Paragraph 4(f) of the Regulatory Agreement is deleted in its entirety.

7. **Section 8 Assistance.** The Owner agrees to accept assistance under a HAP Contract executed pursuant to Section 8 of the United States Housing Act of 1937, as amended, with respect to 100 units in the Project. The Owner agrees to accept and utilize such assistance in accordance with the HAP Contract, and agrees to accept any renewal or extension of the HAP Contract or any contract under a program designated by the Secretary as a successor to the Section 8 Program. To the extent authorized by law and to the extent that appropriated funds are available, the Secretary agrees to provide Section 8 assistance under Section 8 or any successor program with respect to 100 units in the Project. If assistance under Section 8 or any successor program ceases to be available during the term of this Agreement, this Agreement will be renegotiated by the parties in accordance with Section 224(b) of LIHPRHA (42 U.S.C. 4114(b)).

8. **Distributions and Amendment of Regulatory Agreement.** Paragraph 6(e)(1) of the Regulatory Agreement is amended to read as follows:

> (1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, or as indicated in paragraph 6(e)(2) of this Agreement, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be no more than $166,590 and the right to such distributions shall be cumulative. All or a portion of the semiannual or annual distribution may be applied to monthly debt service payments for an equity takeout loan approved by the Secretary. Except with respect to the proceeds of a HUD-approved equity takeout loan, no equity withdrawal shall be made from borrowed funds or when there is any default under this Agreement or under any mortgage secured by the Project.

9. **Reserve for Replacements and Amendment of Regulatory Agreement.** Paragraph 2(a) of the Regulatory Agreement is amended by adding the following language to the end thereof:

> The Secretary will not approve the release of funds from the Reserve for Replacements account if doing so would reduce the balance below an amount equivalent to twenty-four months' deposit, except in emergencies such as natural disasters requiring immediate repairs or to avoid a default on, or assignment of, the mortgage insured by the Commissioner.

10. **Savings Due to Management Efficiencies.** Any net savings from reductions in operating expenses due to management efficiencies as determined by the Secretary shall be deposited into the Reserve for Replacements Account. The Owner may have access to these funds on a semiannual basis upon a finding by the Commissioner that a withdrawal will not reduce the balance in the Reserve for Replacements Account below that required in Paragraph 2(a) of the Regulatory Agreement, as amended by this Agreement, and that the Owner is maintaining the property in accordance with the Housing Quality Standards set forth in 24 CFR Part 886.

11. **Residual Receipts.** (a) On an annual basis, the Secretary may permit the Owner to withdraw funds from the Residual Receipts account as necessary to ensure that the Owner receives an annual distribution equalling the authorized return determined pursuant to the HUD-approved Plan of Action, less any amounts paid as debt service on a HUD-approved equity loan.

(b) To the extent necessary to ensure that the Owner receives the annual authorized return (including debt service payments on a HUD-approved equity loan) during the tenant rent phase-in period established pursuant to Paragraph 5.a. of this Agreement, the Secretary shall permit the Owner to receive the following additional incentives, in the following order of preference:

(1) Access to Residual Receipts accounts;

(2) Increases in rents, as permitted under the Section 8 HAP Contract.

(c) Subparagraph (b) will apply only if the short-fall in income is due to the rent phase-in period, itself, and not due to other factors such as vacancies or excess costs.

12. **Displacement.** No Current Tenant shall be displaced, except for good cause.

13. **Civil Rights Requirements.** The Owner will comply with the provisions of any Federal, State or local law prohibiting discrimination in housing on the basis of race, color, religion, sex, national origin, handicap or familial status, including but not limited to: Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d-1), the Fair Housing Act (42 U.S.C. 3601), Executive Order 11063, Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities, including, but not limited, to 24 CFR Parts 1, 100, 107, and 110, and Subparts I and M of Part 200.

14. **Housing Quality Standards.** The Owner shall maintain the Project in accordance with the Housing Quality Standards set forth in 24 CFR Part 886 and applicable local codes. In the event there is a conflict between the housing quality standards and local codes, the stricter standard shall prevail. The Secretary shall conduct an annual physical assessment of the Project in order to ensure compliance with the Housing Quality Standards.

15. **Violations of this Agreement.** If HUD determines that the Owner has violated the terms of this Agreement, including compliance with the Housing Quality Standards, HUD shall notify the Owner of its determination and the Owner shall have 90 days in which to cure the violation. At the expiration of the 90 days, HUD shall reinspect the Project or take other investigative steps in order to ensure compliance. The failure to cure any violation within 90 days of notification of the violation may result in, but not be limited to, the forfeiture of, or reduction in, the Owner's annual distribution; withholding of any escrowed equity loan proceeds; reduction in, or suspension of, the Section 8 assistance authorized in this Agreement; acceleration of debt secured by the Project; payment of relocation expenses to tenants admitted to the Project inconsistently with the tenant income profile established in this Agreement; and the imposition of any other sanctions authorized in law.

16. **Agreement Binding Upon Successors and Assigns.** Upon conveyance of the Project during the term of this Agreement, the Owner shall require its successor or assignee to assume its obligations under this Agreement. In any event, this Agreement shall be binding upon the Owner's successors and assigns.

17. **Reports.** The Owner shall furnish the Secretary with such reports concerning the financial condition, operation and condition of the Project as the Secretary may prescribe.

18. **Incorporation of Regulatory Agreement by Reference.** Paragraphs 2(a); 2(c); 4(c); 4(e); 4(j); 5; 6(b); 6(d); 6(e); 6(g); 6(h); 6(k); 9; 10; 13; and 17 of the Regulatory Agreement (HUD Form 1730 dated 10/69), are adopted and incorporated by reference herein. In the event that the Owner prepays all mortgage note or notes as are described in the Regulatory Agreement or any Regulatory Agreement amendments or all FHA mortgage insurance is terminated, the provisions listed above shall remain in full force and effect, binding the Owner, its successors and assigns as if the Mortgage Note were not prepaid

or the mortgage insurance terminated, except that in the case of such prepayment or termination:

a. the phrase "the Secretary" shall be substituted for the term "Mortgagee" throughout the adopted language of the Regulatory Agreement; and

b. the "mortgaged property" or "mortgaged premises" referred to in the Regulatory Agreement, shall be the Project.

19. **Enforcement.** In the event of a breach or threatened breach of any of the provisions of this Agreement, any eligible tenant or applicant for occupancy, or the Secretary or his or her successors or delegates, may institute proper legal action to enforce performance of such provisions, to enjoin any acts in violation of such provision and to recover damages (including refunds, with interest, on rent overcharges), and/or to obtain whatever other relief may be appropriate.

20. **Severability.** The invalidity, in whole or in part, of any provision of this Agreement shall not affect or invalidate any remaining provisions.

21. **Impairment of Regulatory Agreement.** The terms and provisions of the Regulatory Agreement shall continue in full force and effect except as modified herein. Conflicts between this Agreement and the Regulatory Agreement shall be resolved in favor of this Agreement.

22. **Execution of Other Agreements.** The Owner agrees that it has not and will not execute any other agreement with provisions contradictory of, or in opposition to, the provisions of this Agreement, and that in any event, the provisions of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other conflicting requirements.

23. **Subsequent Statutory Amendments.** If revisions to the provisions of this Use Agreement are necessitated by subsequent statutory amendments, the Owner agrees to execute modifications to this Use Agreement that are needed to conform to the statutory amendments. In the alternative, at HUD's option, HUD may implement any such statutory amendment through rulemaking by amending 24 C.F.R. Part 248.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have agreed that it shall be effective as of the 27 day of April, 1995.

OWNER:
THETFORD PROPERTIES III LIMITED PARTNERSHIP, a Virginia Limited Partnership

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

BY: Dan McCanless, Jr.
Director
Multifamily Division
HUD, North Carolina State Office

STATE OF NORTH CAROLINA )
) SS:
COUNTY OF GUILFORD )

Before me, Shirley S. Long, a Notary Public in and for said State, on this 19th day of April, 1995, personally appeared DAN McCANLESS, JR., who is personally well known to me to be the Director, Multifamily Division, and the person who executed the foregoing instrument by virtue of the authority vested in him by 59 FR 62739 and I having first made known to him the contents thereof, he did acknowledge the signing thereof to be his free and voluntary act and deed on behalf of the Secretary of Housing and Urban Development for the uses, purposes and considerations therein set forth.

Witness my hand and official seal this 19th day of April, 1995.

(SEAL) SHIRLEY S. LONG
NOTARY PUBLIC
GUILFORD COUNTY, NC
COMM. EXPIRES Nov. 7, 1999

Notary Public

My commission expires Nov. 7, 1999.

STATE OF Virginia )
City ~~COUNTY~~ OF Richmond ) ss:

On this 27th day of April, A.D., 1995, before me, a Notary Public in and for said county and State, residing therein, duly commissioned and sworn, personally appeared RICHARD A. URBAN, and proved to me on the basis of satisfactory evidence to be the GENERAL PARTNER of the limited partnership that executed the within instrument and acknowledged to me that such limited partnership executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

[signature]
NOTARY PUBLIC

(SEAL)

My Commission expires March 31, 1997.

EXHIBIT A

BEGINNING at an iron pipe in the western line of Rosemont Avenue, said Rosemont Avenue being a 60 foot wide right of way as shown by map "Right of Way and Easement Dedication for Market North Apartments" recorded in Map Book 10, Page 15 in the New Hanover County Registry, said BEGINNING point being located South 2 degrees 30 minutes West 1278.90 feet as measured with said western line of Rosemont Avenue from its intersection with the southern line of Market Street (a 100 foot right of way) running thence from said BEGINNING North 87 degrees 31 minutes West 203.71 feet to a point in the eastern line of a W. J. Taylor Tract, thence with said eastern line South 3 degrees 07 minutes West 44.10 feet to an old iron pipe; thence continuing with said eastern line South 3 degrees 58 minutes West 171.29 feet to a concrete monument at the northeastern corner of the Johnson Tract; thence with the eastern line of said Johnson Tract South 2 degrees 48 minutes West 141.2 feet to an old axle in the northern line of Broad Street, said Broad Street right of way being shown by said Map Book 10, Page 15; thence crossing Broad Street South 2 degrees 48 minutes West 60.60 feet to a point at the northeastern corner of the W. J. Taylor home Tract; thence with the eastern line of said Taylor tract South 2 degrees 48 minutes West 173.08 feet to an iron pipe in the northern line of the land to be retained by W. J. Taylor, thence with said northern line South 87 degrees 30 minutes East 210.51 feet to an iron pipe in the aforementioned western line of Rosemont Avenue, thence South 87 degrees 30 minutes East 60.0 feet crossing said Rosemont Avenue to a point; thence with the eastern line of Rosemont Avenue North 2 degrees 30 minutes East 100.0 feet to a point, thence continuing with the northern line of said Taylor Tract South 87 degrees 30 minutes East 555.00 feet to an iron pipe, thence South 67 degrees 09 minutes East 165.30 feet to an iron pipe, thence South 86 degrees 35 minutes East 330.0 feet to an iron pipe in the western line of the Atlantic Land and Investment Company tract; thence with said western line North 3 degrees 25 minutes East 155.0 feet to a point in the southern line of Metting Road said Metting Road right of way being shown in said Map Book 10, Page 15; thence with the southern line of Metting Road North 86 degrees 35 minutes West 230.0 feet to the point of curviture of a curve having a radius of 293.93 feet and a deflection angle of 33 degrees 06 minutes to the right; thence with said curve westward 169.74 feet to the point of tangency of said curve; thence continuing with said southern line of Metting Road North 53 degrees 29 minutes West 408.30 feet to the point of curviture of a curve having a radius of 381.97 feet and a deflection angle of 34 degrees 01 minute to the left; thence with said curve westwardly 226.78 feet to the point of tangency of said curve; thence continuing with said southern line of Metting Road North 87 degrees 30 minutes West 99.94 feet to its intersection with the eastern line of Rosemont Avenue; thence North 87 degrees 30 minutes West 60.0 feet crossing Rosemont to a point; thence with the western line of Rosemont Avenue North 2 degrees 30 minutes East 50.0 feet to the point of BEGINNING containing 10.13 acres, and being the land shown on plat of survey entitled "Property Line Survey, Stage I, Market North Apartments", dated July 1, 1969, prepared by Henry Von Oesen & Associates, Consulting Engineers, Wilmington, North Carolina.

Subject to the dedication to public use of the rights of way of Rosemont Avenue and Broad Street as shown on said plat of survey dated July 1, 1969.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JUN 23 1995

| | | |
|---|---|---|
| ANAHEIM GARDENS, ET AL., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 93-655C (Judge Robinson) |

**DEFENDANT'S COUNTER-LIST OF ANNIVERSARY DATES**

Pursuant to this Court's order of June 7, 1995, defendant respectfully submits a counter-list of anniversary dates for the properties listed in Exhibit B to Plaintiffs' Reply To Defendant's Opposition To Second Motion To Amend Complaint filed in these proceedings on or about June 9, 1995. As indicated upon the copy of plaintiffs' list, appended to this filing, defendant disputes the dates for nine properties, agrees with the dates for 28 properties, and has no position at this time with respect to the dates for two properties -- Florin Meadows I and Florin Meadows II. Defendant will advise the Court as soon as possible of its position with respect to those two properties.

Kelly Decl. Ex. L

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

DAVID M. COHEN
Director

RICHARD E. RICE
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
2nd Floor, Todd Bldg.
Washington, D.C., 20530
(202) 307-6288

Attorneys for Defendant

OF COUNSEL:

KIM KENDRICK, ESQ.
Assistant General Counsel
KATHLEEN BURTSCHI, ESQ.
Trial Attorney
Office of General Counsel
Department of Housing
and Urban Development

June 23, 1995

# APPENDIX

| | PROJECT OWNER | PROJECT | PARTY POSITIONS AS TO PREPAYMENT DATES: DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 1. | Anaheim Gardens, a limited partnership<br>c/o L.S. Ames<br>P.O. Box 515<br>25332 Narbonne Avenue - Suite 200<br>Lomita, CA 90717 | Anaheim Gardens<br>No. 122-44378 | A/1 | 08/23/93 |
| 2. | Araspark Associates, a limited partnership<br>c/o Sanford H. Webster<br>P.O. Box 1694<br>Palo Alto, CA 94302-1694 | Arastradero Park<br>No. 121-44342 | A | 08/20/94 |
| 3. | Joseph R. Biafora and Stefi Biafora<br>c/o Joseph R. Biafora<br>733 Etiwanda Avenue<br>Suite 100<br>Reseda, CA 91335 | Millwood Apts.<br>No. 122-35130 | A | 01/12/92 |
| | | Parthenia Manor Apts.<br>No. 122-35090 | A | 10/29/92 |
| 4. | Cedar Gardens Associates, a partnership<br>c/o James R. Bancroft<br>Bancroft & McAlister<br>601 Montgomery Street, Suite 900<br>San Francisco, CA 94111-2612 | Cedar Gardens<br>No. 121-55062 | A | 04/21/91 |

/1 "A" indicates that defendant agrees with plaintiffs' asserted prepayment date.

PA 325

| | PROJECT OWNER | PROJECT | DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 5. | Florin I Limited, a California Limited Partnership<br>c/o William B. Mitchell<br>P.O. Box 1765<br>Pebble Beach, CA 93953 | Florin Meadows I<br>No. 136-55010 | N /2 | 09/30/92 |
| 6. | Florin II, Limited, a California Limited Partnership<br>c/o William B. Mitchell<br>P.O. Box 1765<br>Pebble Beach, CA 93953 | Florin Meadows II<br>No. 136-44001 | N | 07/12/90 |
| 7. | Hillview Townhouses, Ltd.<br>c/o J. Brock Albert<br>2424 Burton SEpr<br>Grand Rapids, MI 49546 | Hillview Townhouses, Ltd.<br>No. 047-44049 | A | 06/22/92 |
| 8. | Hillview Townhouses, Incorporated<br>c/o J. Brock Albert<br>2424 Burton SE<br>Grand Rapids, MI 49546 | Hillview Townhouses No.1<br>No. 047-44014 | A | 12/13/90 |
| 9. | Peter Hwei-Yang Hsi and Priscilla Lai-Fong Hsi, dba General Partners of Waipahu Tower, a Hawaii limited partnership<br>615 Piikoi Street<br>Suite 2001<br>Honolulu, HI 96814 | Waipahu Tower<br>No. 140-44012 | A | 07/17/92 |
| 10. | Indian Head Manor Limited Partnership I<br>c/o Mid-City Financial Corporation<br>4340 East-West Highway<br>Suite 300<br>Bethesda, MD 20814 | Indian Head Manor Apts.<br>No. 000-55026 | A | 02/24/90 |

PA 326



/2 "N" indicates that defendant has no position at this time with respect to the accuracy of plaintiffs' asserted prepayment date.

| | PROJECT OWNER | PROJECT | DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 11. | Internal Trust, a general partnership<br>c/o Edmund C. Douglas and<br>Norma C. Fink, general partners<br>1652 Wedekind Road<br>Reno, NV 89512 | Centennial Park Annex<br>No. 125-44014 | A | 05/30/90 |
| 12. | Jewel Lake Villa II, a limited partnership<br>c/o Colin Lau<br>Imperial Associates, Ltd.<br>1542 Young Street, 3rd Floor<br>Honolulu, HI 96826 | Jewel Lake Villa II<br>No. 176-44014 | D/3<br>05/15/93 | 05/04/93 |
| 13. | Earl W. Kellenbeck and Denise A. Kellenbeck<br>dba/Victorian Arms Apartments<br>c/o David J. Pelletier<br>Kellenbeck Property Management<br>830 N.E. Victoria Street<br>Grants Pass, OR 97526 | Victorian Arms Apts.<br>No. 126-35116 | A | 03/22/92 |
| 14. | Norman M. Kronick and Louis Dulien<br>as Tenants in Common dba Halawa<br>View Apartments, a registered<br>general partnership<br>c/o Norman Kronick<br>Halawa View Apartments<br>3605 Manamana Pl.<br>Honolulu, HI 96822 | Halawa View Apartments<br>No. 140-44025 | A | 12/05/93 |
| 15. | Metro West Limited, a Limited Partnership<br>c/o Tod Spieker<br>1032 Elwell Court #115<br>Palo Alto, CA 94303 | Metro West Apartments<br>No. 122-44552 | A | 05/22/94 |

/3 "D" indicates that defendant disputes plaintiff's asserted prepayment date.

PA 327

| | PROJECT OWNER | PROJECT | DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 16. | Millwood Associates Limited Partnership<br>c/o Mid-City Financial Corporation<br>4340 East-West Highway<br>Suite 300<br>Bethesda, MD 20814 | Millwood Townhouses<br>No. 000-44077 | A | 01/04/93 |
| 17. | Napa Park Apartments, a limited partnership<br>c/o Mid-City Financial Corporation<br>4340 East-West Highway<br>Suite 300<br>Bethesda, MD 20814 | Napa Park Apartments<br>No. 121-44076 | D<br>10/26/92 | 10/31/92 |
| 18. | Ontario Townhouses, a limited partnership<br>c/o Mid-City Financial Corporation<br>4340 East-West Highway<br>Suite 300<br>Bethesda, MD 20814 | Ontario Town Houses<br>No. 122-44253 | D<br>02/20/93 | 10/06/92 |
| 19. | The Palomar Apartments, A Limited Partnership<br>c/o Jerald L. Katleman<br>3990 Old Town Avenue, Suite 305-C<br>San Diego, CA 92110 | The Palomar<br>No. 129-44026 | A | 03/21/93 |
| 20. | Rock Creek Terrace Limited Partnership<br>c/o Mid-City Financial Corporation<br>4340 East-West Highway, Suite 300<br>Bethesda, MD 20814 | Rock Creek Terrace<br>No. 000-44105 | D<br>12/28/93 | 12/28/92 |
| 21. | Sierra Vista One, a limited partnership<br>c/o Tod Spieker<br>1032 Elwell Court #115<br>Palo Alto, CA 94303 | Sierra Vista I<br>No. 121-44310 | D<br>06/19/94 | 02/28/93 |

PA 328

| | PROJECT OWNER | PROJECT | DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 22. | Silverlake Village, a Limited Partnership<br>c/o Tod Spieker<br>1032 Elwell Ct., #115<br>Palo Alto, CA 94303 | Silverlake Village<br>No. 122-44350 | A | 09/12/93 |
| 23. | Thetford Properties III, Limited Partnership<br>c/o Richard A. Urban<br>P.O. Box 168<br>Richmond, VA 23201 | River Falls Apts.<br>No. 053-44042 | A | 07/27/90 |
| | | Market North Apts. II<br>No. 053-35017 | A | 07/27/90 |
| | | Deanswood Apts.<br>No. 053-55048 | A | 12/28/91 |
| 24. | Thetford Properties IV, Limited Partnership<br>c/o Richard A. Urban<br>P.O. Box 168<br>Richmond, VA 23201 | Southgate Apts<br>No. 053-55010 | D<br>08/07/88 | 10/26/86 |
| | | Jefferson Court Apts<br>No. 053-55014 | A | 11/11/88 |
| | | Glendale Court Apts<br>No. 053-55030 | A | 06/04/89 |
| | | Market North Apts. I<br>No. 053-44047 | A | 05/19/90 |
| 25. | J. Derrick V. Ward and<br>Frances T. Ward, Joint Tenants<br>c/o J. Derrick V. Ward<br>P.O. Box 1916<br>Novato, CA 94948 | Creekside Terrace<br>No. 121-44156 | A | 12/18/93 |
| 26. | Washington Plaza Apartments., Ltd.<br>c/o Ronald Gerber<br>Gerber Investment Corporation<br>1437 Torrance Street<br>San Diego, CA 92103 | Washington Plaza Apts.<br>No. 082-55005 | D<br>02/26/90 | 02/28/90 |

PA 329

| | PROJECT OWNER | PROJECT | DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 27. | James W.Y. Wong<br>c/o Colin Lau<br>Imperial Associates, Ltd.<br>1542 Young Street, 3rd Floor<br>Honolulu, HI 96826 | Jewel Lake Villa I<br>No. 176-44002 | D<br>12/16/91 | 05/31/92 |
| 28. | Janey S. Wong<br>c/o Mel Nagata<br>Bob Tanaka, Inc.<br>1055 Kalo Place, Suite 200<br>Honolulu, HI 96826 | Kewalo Apartments<br>No. 140-55002 | A | 08/09/87 |
| 29. | William H. Zenklusen and Joseph F. McDonald, Jr.,<br>as joint venturers, dba<br>Community Gardens No. 2<br>P.O. Box 295<br>San Lorenzo, CA 94580 | Community Gardens II<br>No. 125-44025 | D<br>09/27/93 | 05/04/92 |
| 30. | 185-225 Parkhill Corp.<br>c/o Arlington Filler<br>Unithree Investment Corp.<br>240 Park Hill Avenue<br>Staten Island, NY 10304 | St. George Plaza<br>No. 012-55072 | A | 06/10/91 |
| 31. | 620 Su Casa Por Cortez, a California<br>general partnership<br>c/o Tod Spieker<br>1032 Elwell Ct., #115<br>Palo Alto, CA 94303 | Su Casa Por Cortez<br>No. 129-44097 | A | 10/18/93 |

PA 330

| | PROJECT OWNER | PROJECT | DEFENDANT | PLAINTIFF |
|---|---|---|---|---|
| 32. | 825 San Tomas Apartments, a California Limited Partnership<br>c/o Tod Spieker<br>1032 Elwell Ct., #115<br>Palo Alto, CA 94303 | San Tomas Gardens No. 121-44088 | A | 09/24/93 |
| 33. | 5324 Foothill Apartments, a California General Partnership<br>c/o Tod Spieker<br>1032 Elwell Ct., #115<br>Palo Alto, CA 94303 | Foothill Plaza No. 136-44132 | A | 01/23/93 |

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23th day of JUNE, 1995, I caused to be delivered by commercial carrier, for delivery on the next business day, copies of "DEFENDANT'S COUNTER-LIST OF ANNIVERSARY DATES" addressed as follows:

CHARLES L. EDSON, ESQ.
HARRY J. KELLY, ESQ.
RICHARD M. PRICE, ESQ.
PEABODY & BROWN
1255 23rd Street, N.W.
Suite 800
Washington, D.C. 20037

Rosa M. Robinson

C-W)
EXHIBIT NO. 11
7-18-07

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

Direct Dial Number

January 16, 1990

Mr. Frank Malone
U.S. Department of Housing
and Urban Development
Office of Multi-Family Housing
451 7th Street, S.W.
Washington D.C., 20410-8000
Attn: Operations Division
Room 6164

Re: 100 Centre Plaza, Brookline, MA

Dear Mr. Malone:

Pursuant to Title II of the Housing and Community Development Act of 1987, enclosed please find our submission of the Notice of Intent for 100 Centre Street (02316 NI).

One Hundred Centre Plaza is a 216-unit housing development for the elderly located in Brookline, MA. The Project is owned by C-W Associates, a Massachusetts Limited Partnership and is financed by a mortgage loan from the Massachusetts Housing Finance Agency. Since no federal mortgage is involved, this sale will not require a transfer of physical assets. However, the Partnership receives section 236 assistance on behalf of seventy-one units in the Project. Therefore, pursuant to Title II, state-financed projects which include section 236 assisted units are subject to plan of action requirements for that portion of the Project receiving 236 assistance.

We intend to develop a Plan of Action based upon a thorough analysis of the property. In addition the plan will include a description of the package of incentives from the federal and state governments necessary to allow us to extend the use of 100 Centre Plaza as affordable housing. Our preliminary plan is to reorganize as a limited equity cooperative. We anticipate that the Partnership will enter into occupancy agreements with the cooperative corporation for the seventy-one section 236 assisted units; the balance of the units will either be sold as cooperative units or rented pursuant to an agreement with MHFA.

The Partnership signed a Pledge Agreement with the Executive Office of Communities and Development regarding the future use of the Project. The agreement provides that the Partnership will work with the Commonwealth of Massachusetts to develop a plan to protect the existing tenants and to promote long-term affordability.

Please do not hesitate to contact me if you have any questions regarding this Notice of Intent.

Sincerely,

Pamela Goodman

/jrp
Encl.

6361s/90

IRH 0082247

Date: January 16, 1990

INTENT TO PREPAY MORTGAGE

IMPORTANT: THIS FORM SHOULD BE COMPLETED IN TRIPLICATE AND SUBMITTED SIMULTANEOUSLY TO: 1) HUD FIELD OFFICE, 2) HUD HEADQUARTERS, AND 3) STATE AND/OR LOCAL AGENCY(S).

PROJECT NAME: 100 Centre Plaza

PROJECT NUMBER: 02316 NI

PROJECT ADDRESS: 100 Centre Street
Brookline, Masssachusetts 02146

PLANS FOR THE PROJECT:
(Pursuant to § 248.211) The project is a 216-unit development which receives Section 236 assistance on behalf of seventy-one units in the Project. The Project is financed by a mortgage loan from the Massachusetts Housing Finance Agency (MHFA). Pursuant to Title II, Section 236, assisted state financed projects are subject to plan of action requirements. The current owner plans to reorganize as a limited equity cooperative. The Partnership will enter into occupancy agreements with this corporation for the seventy-one 236-assisted units. In order to maintain the very low income restrictions, the Partnership will request loan management Sec. 8 assistance for all Section 236 assisted units which are eligible for Section 8. The non-Section 236 units in the development will be either sold as cooperative units or continue to be rented pursuant to an agreement with MHFA.

IRH 0082248

TIMETABLES OR DEADLINES FOR PROPOSED ACTIONS:

We expect to submit the Plan of Action to Dept. of HUD in February, 1990. Concurrently, a State Plan of Action will be submitted to the Massachusetts Executive Office of Communities and Development and the Massachusetts Housing Finance Agency.

REASON(S) FOR PREPAYMENT:

Not applicable

REASON(S) FOR CHANGING MORTGAGE TERMS/REGULATORY AGREEMENT:

The regulatory agreement must be amended to reflect the revised rent and income restrictions which will be imposed.

DESCRIPTION OF CONTACTS OR DISCUSSIONS WHICH HAVE BEEN HELD WITH OTHER GOVERNMENT AGENCIES OR OTHER INTERESTED PARTIES IN CONNECTION WITH THIS NOTICE OF INTENT:

Preliminary discussions have been held with the Massachusetts Executive Office of Communities & Development, Massachusetts Housing Finance Agency and local officials in the Town of Brookline.

ADDITIONAL COMMENTS: The Owner has signed the Massachusetts Pledge Agreement with the Executive Office of Communities and Development which provides that the Owner will work with the Commonwealth of Massachusetts to develop a plan to protect existing tenants and to promote long-term affordability.

FROM:

OWNER NAME: C-W Associates
OWNER ADDRESS: c/o Sterns Management Associates
100 Centre Street
Brookline, MA 02146

OWNER TELEPHONE: (617) 731-5905

Submitted by: [signature]

6220S

U.S. Department of Housing
and Urban Development
Boston Regional Office, Region I
Thomas P. O'Neill Jr. Federal Building
10 Causeway Street
Boston, MA 02222-1092

MAR 20 1990

Pamela Goodman
Mintz Levin, Cohn, Ferris
Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111

Dear Ms. Goodman:

SUBJECT: 100 Centre Plaza, Brookline, MA
Project No.: 023-35NI
Notice of Intent to Prepay Mortgage

We received your Notice of Intent to Prepay the Mortgage for the subject non-insured development. HUD currently provides Section 236 interest reduction payments for 71 of the 216 units. The Notice was sent pursuant to the Emergency Low Income Housing Preservation Act of 1987 which provides that an owner of eligible low income housing may prepay a mortgage on such housing only in accordance with a plan of action approved by HUD.

While it is clear that the subject project falls within the definition of "eligible low income housing," it is the opinion of this office that the Notice to Prepay is premature.

A Substitute Mortgage Note, (the Note) and a Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents (the Restatement of Mortgage) are dated August 3, 1988. The maximum term stated in the Note is March 1, 2012. Section three of the Restatement of Mortgage states:

> Prior to twenty (20) years from the date hereof, the Borrower may not prepay the principal amount of the Mortgage Note in advance of the amortization schedule established by the Agency, unless the Agency consents to prepayment and the purpose of the prepayment is to convert the ownership of the Project to cooperative or condominium ownership by occupants...

We interpret the August 3, 1988 Restatement of Mortgage to prohibit prepayment any earlier than twenty years from the date of the Restatement of Mortgage, or August 3, 2008 unless MHFA consents and the project is to be converted to a cooperative or a condominium as set forth in Section 3 of the Mortgage.

Kelly Decl. Ex. N

We advise the owner to request a written determination from MHFA that the Mortgage is either eligible to be prepaid, or, a confirmation that MHFA consents to prepayment prior to August 3, 2008 and approves the conversion of the project to a cooperative or a condominium. This must be a prerequisite to the submission of a Notice to Prepay from the owner to our office.

If there are any questions regarding this letter, please contact Elaine Ormond at 565-5311.

Very sincerely yours,

Nick M. Nibi, Director
for Office of Housing

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

April 17, 1990

Direct Dial Number

BY MESSENGER

Mr. David L. Keene
Senior Real Estate Officer
Massachusetts Housing Finance Agency
50 Milk Street
Boston, Massachusetts 02109

Re: 100 Centre Plaza, Brookline, MA
MHFA Project No. 70-008-N

Dear David:

We are writing in response to a March 20, 1990 letter we received from HUD regarding the Notice of Intent we submitted for 100 Centre Plaza. A copy of our original submission to HUD as well as HUD's response are enclosed for your review. As you will see, HUD has requested that the project owner obtain a letter from MHFA regarding prepayment and conversion to a limited equity cooperative. Before we discuss how we might respond to HUD's request, it might be helpful if we clarify what has transpired to date on this expiring use project and describe in more detail the Owner's current plans for the development.

Background

100 Centre Plaza was built in the early 1970s with financing provided by MHFA. The original mortgage lock-in expiration date was July 16, 1990. The project was designed as an elderly, mixed income development consisting of the following: 25% low income units, 33% moderate income units, and 42% market income units. Residents in the low income units have their rents subsidized by project-based Chapter 707 rental assistance. The moderate income units benefit from monthly Section 236 payments so that the effective interest rate on the

project mortgage for those units is reduced to one percent. The presence of this federal 236 subsidy brings the moderate income component of the development within the jurisdiction of the federal restrictions regarding prepayment of project mortgages (see discussion below).

Beginning in approximately 1984, the Owner began discussions with the Agency regarding a plan to provide more services to the elderly residents. Specifically, the Owner wanted to build a community dining room and common space for the residents. At about the same time, the Agency and the Owner began discussions about the potential that 100 Centre Plaza might be converted into a limited equity cooperative at some point in the future. Given that 100 Centre Plaza was one of the first expiring use projects in the Agency's portfolio, the Agency was anxious to develop a plan that would preserve the housing for those for whom it was originally built. In September, 1987 the Owner signed the Massachusetts Pledge Agreement in which he committed to work with the State and the federal government to attempt to preserve the housing. In the Owner's cover letter to EOCD which accompanied the Pledge Agreement, the Owner stated that his "thinking is in the direction of Limited Equity Cooperative."

Before the Owner and the Agency could finalize a comprehensive plan for the cooperative conversion and the congregate facilities, Congress passed Title II in December of 1987. As a result of the federal legislation, the Owner needed to obtain HUD's consent to a plan of action for the moderate income units. With the passage of Title II, HUD became a necessary player in any preservation plan, both as a subsidy provider and as an agency that must approve the plan of action. The problem was timing. MHFA and the Owner did not want to delay implementation of the congregate facilities pending HUD approval of a cooperative conversion plan. As a result, the Owner and the Agency agreed to begin the first phase of an expiring use restriction restructuring. In exchange for receiving additional mortgage funds for the construction of the dining facilities and unit reconfigurations, the Owner agreed to lock-in the development for an additional 20 years. At the same time, MHFA agreed to outline terms and conditions that must be present for the Agency to allow a cooperative conversion plan to be presented to the MHFA Board and consider changes to the MHFA Regulatory

Agreement. The document which evidences these agreements is entitled "Limited Equity Home Ownership Conversion Agreement" (copy enclosed). That Agreement states that MHFA will approve a cooperative plan which restricts prices for specified percentages of low income units and moderate income units. The document also permits a specified percentage of units to be sold at market levels and mandates additional rental protections for current residents. The requirement to restrict prices on the moderate income units is conditioned explicitly on the provision of subsidies for the moderate income units. In essence, the parties acknowledged that HUD needed to approve a plan under Title II for the Section 236 units. The parties also anticipated that incentives would be forthcoming from HUD to enable those units to be preserved.

Response to HUD

Given this rather complicated scenario, it is no wonder HUD was confused when it received the Owner's Notice of Intent. We think HUD's confusion was compounded by the fact that the only document HUD apparently reviewed for this development was the Modification and Restatement of Mortgage which was signed at the mortgage increase closing. The boilerplate language in Section 3 of the Modification Agreement includes a prohibition on prepayment for a 20-year period (see this same language referenced in the HUD letter). HUD does not realize that the Owner and MHFA simulaneously executed the Conversion Agreement which superseded the standard MHFA lock-in language.

In submitting the Notice of Intent, the Owner is simply attempting to complete MHFA's and the Owner's joint preservation plan outlined in the Conversion Agreement. Specifically, the Owner plans to request incentives from HUD to preserve the Section 236 units as affordable housing. We are looking forward to working with you so that together we can obtain the necessary federal funding to complete the final phase of our plan.

We have enclosed for your review a draft letter from the Agency to HUD which explains why the Notice of Intent should be

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Mr. David L. Keene
April 17, 1990
Page 4

accepted. We look forward to hearing from you so that we can respond quickly to HUD. Thanks for your assistance.

Very truly yours,

Pamela Goodman

Enclosures
8835S/90

cc: Mr. Roger Stern
Mr. Jeffrey Stern
Howard E. Cohen, Esquire
Kathleen M. Sheehan, Esquire

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

August 22, 1990

Direct Dial Number

Mr. Nick Nibi, Director
Office of Housing
U.S. Department of Housing and Urban Development
Boston Regional Office
Thomas P. O'Neill Jr. Federal Building
10 Causeway Street
Boston, MA 02222-1092

RE: 100 Centre Plaza, Brookline, MA
Project No. 023-35NI

Dear Mr. Nibi:

Enclosed is an executed copy of the First Amendment to the Limited Equity Home Ownership Conversion Document between C-W Associates and Massachusetts Housing Finance Agency for the above-referenced project. 100 Centre Plaza, a 216-unit housing development, is financed by a mortgage loan from the Massachusetts Housing Finance Agency and receives Section 236 mortgage subsidy payments on behalf of 71 of the units. In earlier correspondence and discussions, HUD questioned whether the project was eligible for incentives due to a lock-in restriction resulting from a mortgage increase granted by MHFA in 1988.

To alleviate confusion, the Owner and MHFA have amended the Limited Equity Home Ownership Conversion Document to clarify and explicity state their original agreement which is that the prepayment restriction set forth in the Modification and Restatement of Mortgage, Security Agreement, and Assignment of Leases and Rents dated August 3, 1988, did not apply to the units in the project assisted under the Section 236 mortgage subsidy program.

Therefore, since the lock-in restriction does not apply to the 236-assisted units, pursuant ot Title II of the Housing and Community Development Act of 1987, the Owner is eligible to seek incentives from the Department of Housing and Urban Development under a Plan of Action.

Please do not hesitate to contact me if you have any further questions.

Sincerely,

Pamela Goodman

3052y
cc: Ms. Mary Noble, HUD
Elaine Ormond, HUD
Patricia Allen, Esq., HUD
Mr. Bernard O'Shaughnessy, MHFA
Mr. Roger Stern
Jeffrey Stern, Esq.
Howard E. Cohen, Esq.

# FIRST AMENDMENT TO LIMITED EQUITY HOME OWNERSHIP CONVERSION DOCUMENT

FIRST AMENDMENT TO LIMITED EQUITY HOME OWNERSHIP CONVERSION AGREEMENT made as of this 13th day of August, 1990 (this "Amendment"), by and between C-W Associates Limited Partnership, a Massachusetts limited partnership (the "Owner"); and the Massachusetts Housing Finance Agency (the "Agency").

WITNESSETH:

WHEREAS, in 1988 the Agency and the Owner desired to begin the first phase of an expiring use restriction restructuring for 100 Centre Plaza, Brookline, Massachusetts (the "Development") which had an original mortgage lock-in expiration date of July 16, 1990;

WHEREAS, in order to begin the implementation of a congregate facilities program at the Development, the Agency agreed to increase the amount of the mortgage loan to fund the construction of dining facilities and unit reconfiguration;

WHEREAS, in connection with the mortgage increase, the Owner and the Agency entered into that certain Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents, dated August 3, 1988 (the "Mortgage Modification"), a copy of which is attached hereto as Exhibit A;

WHEREAS, Section 3 of the Mortgage Modification contains restrictive language regarding loan prepayment rights of the Owner;

WHEREAS, the Owner and the Agency intended that the Owner should retain its rights to seek incentives from the federal government for those seventy-one (71) units in the Development assisted under Section 236 of the National Housing Act (the "Section 236-Assisted Units) pursuant to the provisions of Title II of the Housing and Community Development Act of 1987 ("Title II");

WHEREAS, simultaneously with the Mortgage Modification, the Owner and the Agency entered into that certain Limited Equity Home Ownership Conversion Agreement, dated August 3, 1988 (the "Original Conversion Agreement");

WHEREAS, the U.S. Department of Housing and Urban Development has reviewed the Owner's request for federal incentives under Title II and has inquired as to whether the Development is eligible for incentives because of the lock-in restrictions set forth in the Mortgage Modification;

WHEREAS, the Owner and the Agency desire to amend the Original Conversion Agreement to remove all doubt about the eligibility of the Section 236-Assisted Units for federal incentives under Title II;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

To insert a new Section D immediately following Section C in the Original Conversion Agreement as follows:

"D. Units Assisted Under Section 236.

Notwithstanding the mortgage prepayment restriction set forth in Section 3 of that certain Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents, dated August 3, 1988 (the "Mortgage Modification") by and between the Owner and the Agency, said prepayment restriction shall not apply with respect to those seventy-one (71) units in the Development assisted under Section 236 of the National Housing Act (the "Section 236-Assisted Units"); provided, however, the Owner hereby agrees to use its best efforts to endeavor to obtain incentives for the Section 236-Assisted Units made available by the U.S. Department of Housing and Urban Development pursuant to Title II of the Housing and Community Development Act of 1987, as amended, or any subsequent legislation governing projects assisted under Section 236. In the event such incentives are offered to the Owner on terms and conditions substantially similar to those incentives offered to other owners, the Owner further agrees to accept such incentives and will agree to continue the low and moderate income character of the Section 236-Assisted Units for at least the remainder of the term of the loan provided by the Agency and longer if so required under federal law."

Except as amended hereby, the Original Conversion Agreement remains in full force and effect and the Owner hereby acknowledges that it continues to be bound by the Original Conversion Agreement.