IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed and delivered as a sealed instrument by their respective duly authorized representatives, as of the date and year set forth above.

C-W ASSOCIATES LIMITED PARTNERSHIP

By: ______________________
Roger W. Stern, General Partner

By: ______________________
Jeffrey A. Stern, General Partner

MASSACHUSETTS HOUSING FINANCE AGENCY

By: ______________________
Edward T. Pollack, General Counsel

0902S

# LIMITED EQUITY HOME OWNERSHIP CONVERSION AGREEMENT

THIS AGREEMENT dated August 3, 1988 by and between C-W ASSOCIATES a Massachusetts limited partnership with offices at 100 Centre Street, Brookline, Massachusetts (hereinafter the "Owner") and the MASSACHUSETTS HOUSING FINANCE AGENCY a Body Politic with offices at 50 Milk Street, Boston, Massachusetts (hereinafter the "Agency").

WHEREAS, the Agency granted on August 3, 1988, a mortgage increase of one million eight hundred sixty-nine thousand two hundred ninety-four ($1,869,294) dollars for 100 Centre Plaza, Brookline, Massachusetts (the "Development"); and

WHEREAS the Owner is intending to construct and develop a full services congregate care facility to augment its use as a rental housing development for the elderly and to later change the legal ownership from that of a limited equity limited partnership to a limited equity home ownership cooperative; and

WHEREAS as a condition of obtaining the mortgage increase, the Owner must enter into and execute an agreement with the Agency that outlines the terms and conditions that must be present for Agency approval of the conversion from the current legal ownership to that of the proposed Limited Equity Cooperative; and

WHEREAS, as a further condition for the receipt of the mortgage increase, the Owner executed a Disposition Agreement, the provisions of which constitute an interest in the land benefittng the Agency and until the year 2013; and

WHEREAS, in order to convert the ownership entity, the Owner must obtain from the Agency Board Members release of the Disposition Agreement which is allowable if the Agency determines in its Findings that the conversion to a limited equity home ownership cooperative would further the purposes of the Agency's Act; and

WHEREAS, it is understood and acknowledged that the actions of present Board Members in authorizing the Executive Director or his designee to execute this agreement does not and cannot bind and obligate those Board Members who will comprise the Agency Membership at the time the Owner elects to exercise his option to convert as provided under the terms of this agreement; and

NOW THEREFORE, it is agreed that should the Owner notify the Agency of his intent to convert to a limited equity home ownership cooperative, then to convert the following conditions must be present:

A. CONDITION PRECEDENT TO CONVERSION PLAN:

That the Agency Findings must be consistent with the intent of Subsection (g) of Section 5 of Chapter 23A of the Massachusetts General Laws as amended.

B. CONDITIONS CONCURRENT TO A CONVERSION PLAN:

Subject then to Findings consistent with the Agency's Act, the Owner shall have the right to plan the conversion from a limited equity limited partnership to a limited equity home ownership cooperative provided that the following restrictions and conditions are incorporated and made a part of the conversion plan (and provided further there are then no statutory or regulatory restrictions to the conversion plan outlined below):

1. RESTRICTIONS

a). Owner shall restrict twenty-five (25%) percent of the units to prices which will allow low-income persons as defined in Federal or State rental regulations or homeowner regulations to occupy the units at costs which are no greater than Federal rental guidelines then in effect which are currently thirty (30%) percent of income;

b). Owner shall restrict an additional thirty-three (33%) percent of the units to prices which will allow moderate-income persons as defined by Section 236 regulations then in effect or other regulations then in existence to occupy the units at costs to be determined by the application of subsidy programs to be achieved, such program achievement being a condition preceding the Owner's requirement to reserve such moderate-income units;

c). Owner shall restrict the remaining units to be sold at market rates in such a manner that resales of the units will require a payment of a percentage of net profits to a fund created within the limited equity home ownership cooperative which fund shall be available to the low-income occupants in amounts sufficient to maintain their costs within current low-income requirements as defined by Federal or State regulations;

d). Owner shall restrict the resale of low-income units and moderate-income units (if subsidy has been created for such moderate-income units) so as to maintain their affordability to persons in the income category of the initial purchaser of the unit; and

e). the Owner shall permit the shareholders/tenants to rent their units provided the tenant qualifies with respect to income, age and other restrictions for the income categories initially prescribed for that unit.

2. CONDITIONS

a). the Owner shall grant the existing tenants the right of first refusal for a period of six (6) months for the purchase of shares representing their units; and

b). the Owner shall grant to the existing tenants lifetime occupancy of their units as tenants if they do not wish to purchase under rentals restricted in price under current or future Agency regulations; and

c). the Owner shall provide the existing low-income tenants with 707 or Section 8 subsidies; to the extent currently available

d). the Owner shall guarantee under a predetermined formula, moderate-income rents for those then existing moderate-income tenants in the event subsidies are terminated.

C. CONDITIONS SUBSEQUENT TO THE CONVERSION PLAN:

If the conversion plan proposed by the Owner is found by the Agency to further the purposes of the Agency's Act and the release of the Disposition Agreement would be in the interest of furthering the purposes of this Act, then in that event, the Executive Director shall present to the Agency Members two resolutions for their approval:

1) the first resolution shall request the approval to authorize the change from a limited equity limited partnership entity to that of a limited equity homeowner cooperative; and

2) the second resolution shall request the approval to release the Owner from the Disposition Agreement.

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first above written.

MASSACHUSETTS HOUSING FINANCE AGENCY

By______________________________
Edward T. Pollack, General Counsel

C-W ASSOCIATES, a Massachusetts Limited Partnership

By [signature]
Roger W. Stern, General Partner

By [signature]
Jeffrey A. Stern, General Partner

U.S. Department of ...using
and Urban Development
Boston Regional Office, Region I
Thomas P. O'Neill Jr. Federal Building
10 Causeway Street
Boston, MA 02222-1092

SEP 1 3 1990

Pamela Goodman
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111

Dear Ms. Goodman:

Subject: Project Name: 100 Centre Plaza
Project No. : 023-35NI

This is in response to your letter dated August 22, 1990 transmitting a document entitled "First Amendment to Limited Equity Home Ownership Conversion Document" for the above-referenced development.

On March 20, 1990, we had notified you that the MHFA Restatement of Mortgage, dated August 2, 1988, prohibited prepayment of the subject mortgage any earlier than August 3, 2008, unless MHFA consents and the project is to be converted into a cooperative or a condominium as set forth in Section 3 of the mortgage. On May 16, 1990 we received a letter from MHFA responding to the March 20, 1990 letter to you referenced above.

Our Office of Counsel reviewed the May 16, 1990 and August 22, 1990 letters. They found no language in the May 16, 1990 letter from MHFA granting their consent to prepayment. Attorney Patricia Allen of HUD had separate telephone conversations with David Keene, Senior Real Estate Officer and Marvin Siflinger, Executive Director of MHFA, who expressed the opinions that the letter did not signify consent of MHFA to prepayment of the mortgage. Mr. Keene told Mrs. Allen that since the project owners have not provided his agency with a plan to convert the project to a cooperative, MHFA could not grant consent to the mortgage prepayment. He stated that although the May 16, 1990 letter asked HUD to accept the owner's Notice of Intent, the letter cannot, for the reasons outlined above, be construed as MHFA consent. Mr. Siflinger stated that MHFA will not provide consent to prepayment unless a plan addressing their concern with the preservation of housing for low and moderate income tenants is submitted.

Kelly Decl. Ex. Q

With regard to the "First Amendment to Limited Equity Home Ownership Conversion Document" HUD's Office of Counsel has reviewed the document along with the original Limited Equity Ownership Conversion Document. They find that neither document amends or modifies the State Agency non-insured mortgage on the project nor do they indicate MHFA consent to prepayment. Therefore, we find that the mortgage is not eligible for prepayment at this time.

If there are any questions regarding this matter, please contact Elaine Ormond at 565-5387.

Very sincerely yours,

Mary Noble
Chief
Loan Management Branch

1942.011

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

Direct Dial Number

October 23, 1990

BY FAX

Patricia Allen, Attorney
U.S. Department of Housing
and Urban Development
Boston Regional Office
10 Causeway Street
Boston, Massachusetts 02222

Re: 100 Centre Plaza
<u>Project No. 023-35NI</u>

Dear Pat:

Following up on our telephone conversation on October 5th, I wanted to see if you have spoken with Harold Levy in Washington regarding the eligibility of 100 Centre Plaza under Title II. Our client is anxious to move forward with processing a plan of action so I would appreciate hearing from you as soon as possible.

Thanks for your assistance.

Very truly yours,

Kathleen Sheehan

Kathleen M. Sheehan

3250S/90

cc: Howard E. Cohen, Esquire
Pam Goodman

Kelly Decl. Ex. R



IRH 0077063

1942.011

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

Direct Dial Number

October 31, 1990

BY FAX

Patricia P. Allen, Attorney
U.S. Department of Housing and
Urban Development
Boston Regional Office
10 Causeway Street
Boston, Massachusetts 02222

Re: 100 Centre Plaza
Project No. 023-35NI

Dear Pat:

I am writing to confirm our telephone conversation of earlier today. In order to move forward on the processing of 100 Centre Plaza, I agreed to draft a proposed revision to the MHFA Mortgage which addresses HUD's concerns regarding MHFA consent to the prepayment of the mortgage on the Section 236 units. You agreed to review my proposed revisions before we ask MHFA to sign off.

Please let me know if you have a different understanding of our conversation. Thanks for your assistance.

Very truly yours,

Kathleen

Kathleen M. Sheehan

KMS/cb
3446S/90

cc: Howard E. Cohen, Esquire

Kelly Decl. Ex. S

1942.017

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

Direct Dial Number

November 26, 1990

BY MESSENGER

Patricia P. Allen, Attorney
Office of the Regional Counsel
U.S. Department of Housing and
Urban Development
10 Causeway Street
Boston, Massachusetts 02222

Re: 100 Centre Plaza
Project No. 023-35NI

Dear Pat:

Enclosed please find a draft amendment to the MHFA Mortgage for the above-referenced project. I would appreciate your reviewing this document to determine if this would enable HUD to conclude that the mortgage on the 236 units can be prepaid, thus satisfying the higher and better use test and clarifying that the owner can receive incentives under the federal law.

I look forward to hearing from you at your earliest convenience so we can resubmit our Notice of Intent. Thanks.

Very truly yours,

Kathleen

Kathleen M. Sheehan

KMS/cb
Enclosure
cb\stern\allen.n21

cc: Mr. Roger Stern (w/ enclosure)
Mr. Jeffrey Stern (w/ enclosure)
Ms. Pamela Goodman (w/ enclosure)
Howard E. Cohen, Esquire

Kelly Decl. Ex. T

U.S. Department of Housing
and Urban Development
Boston Regional Office, Region I
Thomas P. O'Neill Jr. Federal Building
10 Causeway Street
Boston, MA 02222-1092

26

Attorney Kathleen Sheehan
Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

Dear Ms. Sheehan:

Subject: 100 Centre Plaza, Brookline, Massachusetts
FHA Project Number 023-0035N

This is in reply to your request dated November 26, 1990, asking for us to review a draft amendment to the MHFA mortgage on the above project.

The issue is whether this mortgage which covers a number of non-insured Section 236 assisted units is eligible for prepayment so as to entitle the owner to incentives under the Emergency Low Income Housing Preservation Act of 1987 (12 USC § 1715l, note 1). It is our opinion that the MHFA Restatement of Mortgage, dated August 3, 1988, prohibits prepayment as of right any earlier than August 3, 2008, unless MHFA consents and the project is to be converted to a cooperative or a condominium as set forth in paragraph 3 therein.

The draft amendment that you submitted purports to delete said paragraph 3 in its entirety and to substitute new language allowing prepayment for the Section 236 assisted units without mortgagee consent, while the non-assisted units appear to be under the same prepayment prohibition found in the original paragraph 3. This new language in effect, allows partial prepayment of the mortgage on the assisted units and deems them to be eligible for prepayment. The HUD regulations found at 24 C.F.R. § 248.201, 55 Fed. Reg. 38945, September 21, 1990, which define the term "prepayment" as including a prepayment in full as well as a partial prepayment or series of partial prepayments that would reduce the mortgage term by at least six months.

In our opinion, the amendment would effectively remedy the eligibility problem with respect to the assisted units except for the fact that the Amendment provides, in part:

> In no event, however, shall the Borrower at any time prepay the Section 236 Portion of the Mortgage Note in advance of the amortization schedule established by the Agency unless at the time of such payment, all of the Funding Bonds

Kelly Decl. Ex. U

P.02

PA 357

IRH 0077093

issued by the Agency for the purpose of obtaining funds to fund or refund the loan evidenced by the Section 236 Portion of the Mortgage Note are redeemable....

Since we would have no knowledge whether these contingencies have been satisfied, we would require an opinion from MHFA's counsel that the Section 236 portion of the mortgage is, in fact, eligible to be prepaid. In addition, we would also need an opinion that the prepayment would reduce the mortgage term by at least six months, as required by the regulation set forth above.

If you have any questions or require further assistance please contact Attorney Patricia P. Allen of my staff at 565-5126.

Yours truly,

Marvin H. Lerman
Regional Counsel

By: Kathy E. Machan
Associate Regional Counsel

cc: Nick Nibi, Director, Office of Housing, 1H

1G Lerman
1GP Official (FHA/LM - Prepayment of Mortgage File No. 3)
1GP Chron. (Log #F817 PA)

1GP:ALLEN:hp 12/26/90 5-5126

01942.011

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

Direct Dial Number

December 27, 1990

BY HAND

Mr. David Keene
Massachusetts Housing Finance Agency
50 Milk Street
Boston, Massachusetts 02109

Re: <u>100 Centre Plaza</u>

Dear David:

As a follow-up to our telephone conversation last week, enclosed please find the following for your review:

1. Letter dated November 26, 1990 from me to Pat Allen, together with our proposed amendment to the MHFA Mortgage;

2. Response letter dated December 26, 1990 from Marvin Lerman to me;

3. Draft opinion letter for Ed Pollack's signature;

4. Five execution copies of the proposed MHFA Mortgage Amendment; and

5. Draft transmittal letter from me to Nick Nibi resubmitting the Notice of Intent and the related documents.

Please give me a call as soon as possible after you receive this package so I can briefly describe its contents. You can reach me at my parents' house at 518-664-4612.

Kelly Decl. Ex. V

I apologize for the year-end rush but as you know, we need to submit the Notice of Intent before January 1st and I had a very difficult time getting HUD to respond to my previous letters and phone calls. Thanks.

Very truly yours,

Kathleen M. Sheehan

Kathleen M. Sheehan

Enclosures
4292S/90

cc: Ms. Pamela Goodman (w/enclosures)
Howard E. Cohen, Esquire

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 93-655C

(Judge Robert H. Hodges, Jr.)

- - - - - - - - - - - - - - - - - - - - - - -

ANAHEIM GARDENS, et al.,

Plaintiffs,

ORIGINAL

v.

THE UNITED STATES,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - -

Rule 30(b)(6) Deposition of

C-W Associates, LP

Jeffrey Stern, Designee

July 18, 2007

9:06 a.m. - 3:23 p.m.

U.S. Department of Housing and Urban Development

10 Causeway Street

Boston, Massachusetts

Reporter: Daria L. Romano, RPR/CRR

A P P E A R A N C E S:

NIXON PEABODY, LLP
(by Harry J. Kelly, III, Esq.)
401 Ninth Street, N.W., Suite 900
Washington, D.C. 20004
(202) 585-8080
hkelly@nixonpeabody.com
for the Plaintiffs.

DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
CIVIL DIVISION
(By Kenneth D. Woodrow, Esq.)
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
kenneth.woodrow@usdoj.gov
for the Defendant.

A P P E A R A N C E S, Continued

U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT
(by Alice Peterson, Esq.)
O'Neill Federal Building
10 Causeway Street
Boston, Massachusetts 02222
(617) 994-8258
alice.peterson@hud.gov
for the Defendant.

INDEX


| Deposition of: | Page |
|---|---|
| JEFFREY STERN | |
| By Mr. Woodrow | 6 |
| By Mr. Kelly | 199 |


EXHIBITS


| No. | | Page |
|---|---|---|
| 1 | Rule 30(b)(6) notice of deposition | 6 |
| 2 | Letter June 2, 1979 | 21 |
| 3 | Regulatory agreement | 30 |
| 4 | Substitute mortgage note | 36 |
| 5 | Regulatory agreement | 36 |
| 6 | Letter June 15, 1988 | 45 |
| 7 | Letter June 22, 1988 | 51 |
| 8 | Regulatory agreement | 69 |
| 9 | Disposition agreement | 71 |
| 10 | Limited Equity Home Ownership Conversion Agreement | 74 |
| 11 | Letter January 16, 1990 | 84 |
| 12 | Letter April 17, 1990 | 101 |
| 13 | Appraisal report July 1, 1990 | 113 |

E X H I B I T S, Continued


| | | |
|---|---|---|
| 14 | First amendment to limited equity home ownership conversion document | 118 |
| 15 | Letter | 128 |
| 16 | Letter | 133 |
| 17 | Intent to prepay mortgage December 28, 1990 | 138 |
| 18 | Letter January 25, 1991 | 144 |
| 19 | Memorandum March 19, 1991 | 147 |
| 20 | Letter June 5, 1992 | 151 |
| 21 | Letter May 14, 1992 | 153 |
| 22 | Letter October 19, 1992 | 160 |
| 23 | Fax transmittal sheet | 165 |
| 24 | Letter January 31, 1994 | 169 |
| 25 | Letter February 10, 1995 | 172 |
| 26 | Letter March 20, 1995 | 173 |
| 27 | Letter September 27, 1995 | 178 |
| 28 | Memorandum September 28, 1995 | 183 |
| 29 | Letter June 19, 1996 | 186 |
| 30 | Memorandum | 189 |

AFTERNOON SESSION

(Exhibit 14 marked for identification)

BY MR. WOODROW:

Q. I've placed in front of you what's been marked as Exhibit 14.

Could you just describe what this document is?

**A. It's entitled First Amendment to Limited Equity Home Ownership Conversion Document.**

Q. And this would be the first amendment to the document we discussed earlier, which was Exhibit 10?

**A. Sounds right, yep.**

Q. What was the purpose of this amendment?

**A. It appears that it inserted language covering the 236 assisted units, the Section 236 assisted units.**

Q. Okay. And what was the purpose of the inserted language?

**A. It states that "The owner hereby agrees to use its best efforts to endeavor to obtain incentives for the Section 236 assisted units."**

Q. Obtain incentives from HUD, correct?

**A. It doesn't say that, but I presume that's what's meant.**

Q. Okay.

**A. Yeah, it does say that. I take it back.**

Q. And this pertained to the 71 units within the project that were receiving Section 236 assistance?

**A. Correct.**

Q. And was it your understanding that the ELIHPA and LIHPRHA legislation prohibited the owner from prepaying its mortgage on the project?

**A. No. The practical effect of the program was to prevent the owner from prepaying, but it allowed -- it had a provision for prepayment, as we talked about earlier.**

Q. Okay. But it's your understanding that -- only 71 of 216 units in the project, at this point in time at least, were covered -- or strike covered -- received Section 236 assistance, correct?

**A. Correct.**

Q. Okay. So the prohibition -- let's take away that word. Let's say the restriction upon prepayment in ELIHPA and LIHPRHA, did it in any way affect the other units at the project?

**A. Absolutely. You can't segregate out 71 units out of 216 --**

Q. Why not?

**A. -- which covered the entire building.**

Q. Okay.

**A. You can't say -- you can't make an argument that says the provisions of LIHPRHA or ELIHPA covered only those units. It covered the entire building.**

Q. What about the provisions of ELIHPA and LIHPRHA that allowed for incentives, would those incentives then cover all of the units in

the building?

MR. KELLY: Objection to the form of the question.

You may answer.

A. Yeah.

Q. So to your understanding at least at the time then, the entire project could have potentially received incentives pursuant to either ELIHPA or LIHPRHA?

A. The entire project -- I'm thinking back to the processing that went on.

The entire project would have benefited -- to the extent that had we been allowed to prepay, we would have been freed of the regulatory schemes that were put on us by both Mass. Housing and HUD.

Since we were not allowed to prepay, we kept those regulatory schemes and processed for incentives.

The incentives -- I have to go back and look at the processing to see exactly what they were at this point, but my recollection is

**that they covered the whole project.**
Q. Okay. Why did the partnership believe it necessary to amend the equity home ownership conversion document?
**A. I don't think it did. I think this was required by HUD. The only beneficiary of this amendment is HUD.**
Q. How does HUD benefit from this amendment?
**A. By including the Section 236 units as being covered by the agreement. I don't think the partnership would have entered into this on its own.**
Q. Under the original agreement prior to this amendment, under the agreement as it stood in Exhibit 10, how would the 236 assisted units been affected had that agreement been put into place, in other words, had --
**A. Without the amendment?**
Q. Exactly.
MR. KELLY: Objection. Speculation.

But you may answer.

**A. It's not clear there's a difference, frankly, because the original agreement refers to the 25 percent low income. It also refers to an additional 33 percent of the units which are rented to moderate-income persons as defined by Section 236.**

Q. So, in essence, the -- a purpose of the amendment at least was to provide that the ownership would use its best efforts to obtain incentives pursuant to ELIHPA or LIHPRHA?

**A. No, not at all. What it says is "Said prepayment restriction shall not apply with respect to those 71 units in the development assisted under Section 236 provided that the owner agrees to use best efforts to obtain incentives."**

Q. The prepayment restriction being referenced in this paragraph which is set forth here on page two of Exhibit 14, what is that prepayment restriction?

**A. Paragraph 14, you said?**

Q. You were just now reading from the language under Paragraph D --

**A. Correct.**

Q. -- which is on page two of Exhibit 14.

And I'm just -- that paragraph and the section you just read referenced a mortgage prepayment restriction.

What was that mortgage prepayment restriction, and where was it contained?

**A. That would be referring to the original 20-year prepayment restriction contained in the mortgage, the original mortgage.**

Q. Okay. Does it reference the August 3, 1988 modification and restatement of mortgage?

**A. It does.**

Q. Okay. And you said that this restriction shall not apply to the 71 units, or you said that the document says that prepayment restrictions shall not apply with respect to the 71 units.

What is your understanding of the

meaning of that?
A. My understanding of the meaning of that was or is that this is a mistake, as I testified earlier, and that that prepayment restriction referenced in the August 3, 1988 mortgage modification was subsequently modified by a document, by an amended mortgage filed in the Registry of Deeds referencing a fact that that was a mistake.
Q. So the August 3, 1988 mortgage contained a restriction that would have restricted prepayment until the end of the mortgage term?
A. Until the end of the original mortgage term.
Q. Yes, that's what I meant. Okay. But you said that restriction was a mistake, correct?
A. That's correct.
Q. And the parties, being Mass. Housing and C-W Associates, subsequently revised that mortgage?

**A. That's correct.**
Q. Okay.
**A. Mass. Housing acknowledged that it was a mistake.**
Q. And so this document, this Paragraph D to Exhibit 14, this document is referencing that restriction, correct?
**A. Correct.**
Q. Now, at the point of the execution of this document, which was August 13, 1990, correct, is that when this document was executed?
**A. Yep, it looks that way.**
Q. Now, at that point in time, did C-W Associates and Mass. Housing consider the restriction upon prepayment in the August 3, 1988 mortgage to be a mistake?
**A. I don't recall the exact timing when the mistake was noticed. It was probably noticed subsequent to the signing of this.**
Q. Okay. Why was the August 3, 1988 mortgage, why did it contain a restriction upon

prepayment that lasted through the term of the original mortgage?

MR. KELLY: Objection to the form of the question.

You may answer.

**A. Because that was MHFA's standard policy on mortgage increase. What they didn't realize was that the standard policy didn't apply to us.**

Q. And why didn't it apply to C-W Associates?

**A. Because it had no prepayment restriction past the 20-year mark in the original document and then in all the other documents as well, all the other subsequent mortgage amendments.**

Q. So the mortgage amendment that the partnership obtained in 1981, for example, when it built the -- when it made improvements to the project, that mortgage amendment did not contain an additional prepayment restriction?

**A. That's correct.**

SIGNATURE OF THE WITNESS

MA Dr Lic

Subscribed and sworn to and before me

this 16 day of August, 2007.

Notary Public 8-23-2007-Exp.

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Daria L. Romano, RPR, CRR and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 17th day of July, 2007, at 9:12 a.m., the person hereinbefore named was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to nor employed by any of the parties or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 19th day of July, 2007.

Daria L. Romano

Notary Public
My Commission Expires
March 15, 2013

THE COMMONWEALTH OF MASSACHUSETTS
MASSACHUSETTS HOUSING FINANCE AGENCY
50 MILK STREET
BOSTON, MASSACHUSETTS 02109 • (617) 451-3480
FAX: (617) 451-0859 — TDD: (617) 451-3650

JOHN S. MARINI
Chairman

MARVIN M. SIFLINGER
Executive Director

ELEANOR G. WHITE
Deputy Director

December 27, 1990

Mr. Nick Nibi, Director
Office of Housing
U.S. Department of Housing
and Urban Development
Boston Regional Office
10 Causeway Street
Boston, Massachusetts 02222-1092

Re: 100 Centre Plaza
Project Number 023-35NI

Dear Mr. Nibi:

Reference is made to that certain First Amendment to Modification and Restatement of Mortgage, Security Agreement and Assignment of Leases and Rents, dated as of December 27, 1990 (the "Mortgage Amendment"), by and between C-W Associates and the Massachusetts Housing Finance Agency. It is my opinion that the contingencies set forth in the Mortgage Amendment have been satisfied so that the Section 236 portion of the Mortgage is eligible to be prepaid. Furthermore, it is my opinion that such prepayment of the Section 236 portion of the Mortgage would reduce the mortgage term by at least six (6) months.

Very truly yours,

E. T. Pollack

Edward T. Pollack
General Counsel

4291S

Kelly Decl. Ex. W

GOV-AG_18684

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, Massachusetts 02111

1825 Eye Street, N.W.
Washington, D.C. 20006
Telephone: 202/293-0500
Fax: 202/466-5479

Telephone: 617/542-6000
Telex: 94-0198
Fax: 617/542-2241

Direct Dial Number

December 28, 1990

BY HAND

Mr. Nick Nibi, Director
Office of Housing
U.S. Department of Housing and Urban Development
Boston Regional Office
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street
Boston, MA 02222-1092

Re: 100 Centre Plaza
Project Number 023-35NI

Dear Mr. Nibi:

In accordance with Section 604 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990 (which is Title VI of the Cranston-Gonzalez National Affordable Housing Act), enclosed please find our submission of a Notice of Intent for 100 Centre Plaza, Project Number 023-35NI. Under Section 604 of the new preservation legislation and HUD Notice #90-88, any owner of housing that becomes eligible low-income housing before January 1, 1992 and who files a Notice of Intent under Section 222 of Title II of the Housing and Community Development At of 1987 ("ELIHPA") prior to January 1, 1991, retains the right to elect to seek incentives either under ELIHPA or under the new Act. As required by HUD Notice 90-88, we are also submitting copies of the Notice of Intent to an appropriate state agency and to HUD Headquarters.

100 Centre Plaza is a housing development located in the Brookline, Massachusetts. The Project, owned by C-W Associates, a Massachusetts limited partnership, was partially financed under the HUD Section 236 program. The enclosed Notice of Intent is submitted only with respect to the seventy-one (71) units assisted under the 236 program.

Kelly Decl. Ex. X

On January 16, 1990, the Owner submitted a Notice of Intent to your office. In a March 20, 1990 letter, you notified us that the Notice of Intent was deficient. In that letter you stated that although the project falls within the definition of "eligible low income housing," it was HUD's opinion that the Notice of Intent was "premature." Your letter cited restrictive language regarding prepayment in a recent mortgage amendment as the reason for your concern. You advised that we must obtain a written determination from MHFA that the Mortgage on the property is either eligible to be prepaid, or that MHFA consents to prepayment prior to the maturity date and approves a cooperative or condominium conversion.

Although we disagreed with your legal analysis that our submission was premature, and expressed our disagreement to the Regional Counsel's Ofice, we attempted in August of this year to address your concerns by submitting an amendment to the Limited Equity Homeownership Conversion Document. In that amendment, MHFA acknowledged that the prepayment restriction in the MHFA Mortgage did not apply to the units assisted under Section 236. In response, HUD stated in a September 19, 1990 letter that our submission did not amend the MHFA Mortgage nor did it indicate MHFA consent to prepayment. On November 26, 1990 we submitted a proposed Mortgage amendment to Attorney Patricia Allen for review. In that Mortgage amendment, we attempted to address HUD's continuing concerns. In a December 26, 1990 response, your Regional Counsel advised us that our proposed Mortgage amendment would remedy the eligibility problem provided that we also submit an opinion from MHFA's counsel that addresses the prepayment issue and the mortgage term. As you will see, we have enclosed with this letter a signed copy of the HUD-approved Mortgage amendment as well as the requested opinion of MHFA's counsel. We believe that with

these materials, both we and HUD now agree that the eligibility issue is resolved in its entirety.

Very truly yours,

Kathleen M. Sheehan

Kathleen M. Sheehan

4271S
KMS:jal
Enclosure

cc: Mr. Kevin East, HUD Headquarters
Mr. David Keene, MHFA
Amy S. Anthony, Secretary, EOCD
Patricia P. Allen, Attorney, HUD Regional Counsel
Mr. Roger Stern
Mr. Jeffrey Stern
Ms. Pamela Goodman
Howard E. Cohen, Esquire

U.S. Department of Housing and Urban Development

Boston Regional Office, Region I
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street
Boston, Massachusetts 02222-1092

OCT 2 9 1992

Roger W. Stern, General Partner
C.W. Associates
c/o Stern Management Company
100 Centre Street
Brookline, MA 02146

Dear Mr. Stern:

SUBJECT: Appraisal Guidelines
100 Centre Plaza
Project No.: 023-035-NI

We have received your Notice of Election to Proceed (HUD Form 9610) requesting that we begin the appraisal process under Title VI of the Cranston-Gonzalez National Affordable Housing Act. We have determined that your project, 100 Centre Plaza located in Brookline, Massachusetts, is an eligible project. The results of the Windfall Profits Test, based upon information provided in the Federal Register of April 8, 1992, is that the project is not located in a market area on the Affordable Housing List. In order to determine fair compensation for you for not prepaying your mortgage, Section 213 of Subtitle A of Title VI of the National Affordable Housing Act of 1990 requires the owner and HUD to separately contract for independent appraisers. These appraisers will each perform an appraisal based upon certain assumptions as outlined in the enclosed Appraisal Guidelines.

An independent appraiser is defined as one who is not an employee of the Federal Government or an employee or officer of any entity that is affiliated with the owner of the property. The appraiser must not be the subject of a charge issued following a reasonable cause determination under the Fair Housing Act.

The appraiser must meet the following qualifications:

1. Six years of appraisal experience with three years in appraising multifamily projects; and

2. Certified or licensed by the State in accordance with Title 11 of the Federal Financial Institution Reform, Recovery Act of 1989. The States are scheduled to have licensing procedures and standards in place by December 31, 1992.

Appraisers have four months from the date HUD received your NOI to complete their assignments. HUD Loan Management will forward to its appraiser, and we are requesting that you provide

Kelly Decl. Ex. Y

your appraiser, the following:

1. A set of original plans and specifications. The physical inspection and appraisal process can be greatly facilitated through our review of these documents. As we do not have copies, we would appreciate it if you would furnish our office with copies, if available;

2. Last three years of audited financial statements;

3. 100 Centre Plaza is subject to a Disposition Agreement which places restrictions on use of the development. Please provide a copy of the agreement to the appraiser.

In addition, please provide both appraisers access to the project to the extent needed to complete the appraisals.

There will be a physical inspection of your property to determine the Capital Needs for your project (required repairs and replacement reserve analysis) followed by an exit conference to discuss the findings with all interested parties. The required repairs will bring the property up to good condition and meet local codes and the Housing Quality Standards as outlined in 24 CFR 886.113. Those present at this inspection should be HUD's Architectural and Engineering staff or contractor, you or your representative, both appraisers or their representatives, any local code enforcement officials and tenant representatives who wish to attend, and HUD Loan Management staff. All these people in addition to any tenants and representatives of State and local government who wish to attend are invited to the exit conference. We will be in contact with you and the concerned parties as to the time and exact meeting place for both the physical inspection and exit conference. Your are encouraged to submit at this inspection any studies, reports on the physical condition of your property, etc. to the HUD inspector / contractor. Comments from tenants and State and Local officials may also be provided to the inspector / contractor up to the time of the exit conference. The exit conference will be used to discuss the results of the inspection. You must post the date and time when advised of it.

HUD will provide you and your appraiser a preliminary list of the repairs and their cost (See Appraisal Guidelines for further explanation.) Only those repairs required to bring the property up to good condition, exclusive of HUD regulatory requirements that are not a requirement of the local governing body or local appraisal custom, will be furnished the appraisers for their consideration in their value estimates. Within 120 days of receipt of the NOI, HUD will provide you with the total results of the Capital Needs Assessment.

When the appraisals are completed they will be exchanged for

review by HUD and yourself. Once the appraisals have been found acceptable (adheres to the appraisal guidelines, proper support for conclusions, and etc.), we will attempt to come to an agreement with you on the preservation values. If agreement cannot be reached on the values, a third appraiser will be hired by you from HUD's pool of independent appraisers. You may not give the appraiser any of the data from either of the two previous appraisals. HUD will reimburse you for half the cost of the third appraisal. The appraiser will have two months to complete the assignment. Once reviewed by HUD and yourself and found to be acceptable with respect to the appraisal guidelines and adequate documentation, the values as set by this appraisal will be binding. Subsequent to setting the values, we will provide you with further information.

Attached is a Tenant Notice which must be posted in all occupied buildings of the project. Copies of the Tenant Notice, along with this letter, should be given to any known tenant representative.

If you have any questions regarding this matter, please contact Christopher Cline at (617)565-5499.

Very sincerely yours,

Maureen Fahey
Chief
Loan Management Branch

Enclosure:
Appraisal Guidelines
Notice to Tenants

cc:
Mary Padula, Director
Executive Office of Communities and Development
100 Cambridge Street
Boston, MA 02202

Richard T. Leary, Town Administrator
Board of Selectmen's Office
Brookline Town Hall
333 Washington Street
Brookline, MA 02146

U.S. Department of Housing and Urban Development

Boston Regional Office, Region I
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street
Boston, Massachusetts 02222-1092

NOTICE TO TENANTS

As you were previously notified, there will be an inspection of 100 Centre Plaza to determine what repairs need to be made by the owner or purchaser. If there are repairs you would like to have considered, please submit your list to the Housing and Urban Development (HUD) Office whose address is shown below. You will only be given a few day's notice of the date on which the inspection is to be held and you will have to submit your list by that date, so you may want to be sure to complete it now. You may also submit your list to any tenant representative whose name and address are shown on the next page of this letter and ask that representative to help to see that your request is taken into account.

At the time you are told the date of the inspection, you will also be told the date and time for a meeting following the inspection. The purpose of this meeting will be to discuss the repairs which need to be done. The tenant representatives listed on the next page, as well as any other tenant representatives, are all invited to attend the inspection and the meeting. While you are also invited to attend the meeting, it is not necessary for you to do so if you have submitted your list to either HUD or a tenant representative.

HUD intends to give incentives to the owners or purchasers of 100 Centre Plaza in order to keep the housing affordable for you. You will be advised of the steps taken and decisions made during the lengthy process and will be given further opportunity to comment.

The address for the HUD Office is:

U. S. Department of Housing and
Urban Development
Attention: Chief, Loan Management Branch
Boston Regional Office, Region I
Thomas P. O'Neill, Jr., Federal Building
10 Causeway Street
Boston, MA 02222-1092

Telephone Number: (617)565-5447

The tenant representatives that we have contacted are:

(1) Name: NONE
Address:
City and State:
Telephone Number:

(2) Name:
Address:
City and State:
Telephone Number:

THA CELEBRATING 60 YEARS 1934 1994 OF AFFORDABLE HOUSING

U.S. Department of Housing and Urban Development

Massachusetts State Office
Office of Housing
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street
Boston, Massachusetts 02222-1092

New England

SEP 27 1995

Roger W. Stern
C.W. Associates
c/o Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
Attn: Pamela Goodman
One Financial Center
Boston, MA 02111

Dear Ms. Goodman:

Subject: <u>Plan of Action - Conditional Final Approval</u>
Project Name: 100 Centre Plaza
Project No. : 023-035NI
Location : Brookline, MA

This is to advise you that the Plan of Action (POA) submitted pursuant to Title VI of the Low Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPHRA) is conditionally approved, subject to execution and recordation of the Use Agreement. Upon recordation, the terms and conditions described in this approval letter will take effect. This conditional approval is to be considered final approval for purposes of Sections 224 and 225 of LIHPRHA.

It should be noted that 100 Centre Plaza is a 216 unit mixed-income, non-insured development which receives Section 236 mortgage subsidy on behalf of 71 of the units. For the purposes of this Conditional Final Approval Letter, the Project shall refer only to the 71 Section 236-assisted units (except if explicitly stated otherwise).

The Department currently does not have funds available to fund incentives for your Plan of Action for 100 Centre Plaza. The Low Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA) statute provides that if we do not provide funding for these incentives within certain timeframes you may prepay without the Secretary's consent.

You may prepay your mortgage and terminate low income affordability restrictions if we are unable to fund within 15 months of final approval of the Plan of Action.

Be advised that if we are unable to fund your incentives within the statutory timeframes and you decide to prepay your mortgage and terminate the low-income affordability restrictions for your property, you will be responsible for providing relocation assistance to any tenant displaced as a result of such prepayment. You shall pay fifty percent of the relocation expenses of each family relocated, except that the percentage may be higher depending on State or local laws (in the event that the preservation laws are changed in such a manner that relocation assistance is not required, owner need not comply with this provision).

You may also be required to allow current tenants who resided in the property on the date you filed your Initial Notice of Intent to remain in the property for a period of three years, commencing on the date of prepayment. These tenants will pay the same rents existing at the time of prepayment, except for rent increases made necessary due to increased operating costs. This continued occupancy provision applies to all elderly and disabled tenants and to all other tenants if the project is located in a low-vacancy area, as determined by HUD.

The Department will work with the Brookline Housing Authority to find suitable units for each displaced family. Further, to the extent funds are available, eligible low and very low income families displaced as a result of a prepayment shall receive Section 8 Certificates.

Under the POA, the existing mortgage will remain in place and you as owner accept HUD's offer of incentives in exchange for extending the low-income affordability restrictions. The low income affordability restrictions will remain in place for the remaining useful life of the property. The incentives granted (subject to funds availability) are rent increases, a Section 241(f) loan, consisting of the equity and rehabilitation costs, an LMSA Section 8 contract for 71 units, revalued owner's equity, and revised authorized annual return.

**I. CONTINUATION OF AFFORDABILITY**

The owner will maintain, to the maximum extent practicable, the tenant income profile in effect as of January 1, 1987. The following is the approved tenant profile:

| Income Category | Number of Units |
|---|---|
| Very Low | 71 |
| Lower | 0 |
| Moderate | 0 |
| Employee (non-revenue) | 0 |
| **Total** | 71 |

No current tenant will be displaced to achieve this profile; it will be maintained over time as vacancies are filled in the normal course of turnover. Tenants residing at the project at POA approval will not be involuntarily displaced except for "good cause." However, there shall be no prohibition on the owner from increasing the number of very low-income residents above 71. While any such additional very low-income tenants will not receive Section 8 assistance pursuant to the Plan of Action, they may receive other Section 8 assistance or be subsidized by the owner/purchaser.

## II. RENT DETERMINATION FOR EXISTING TENANTS

### A. Initial Rents

1. Very Low and Lower Income Tenants

Very low and lower income tenants will be assisted by 71 units of Section 8 subsidy.

a. **Very Low-Income Tenants.** Current very low-income tenants shall make a Total Tenant Payment that does not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or (2) 90 percent of the Project Specific Rent.

b. **Low-Income Tenants.** Current low-income tenants shall make a Total Tenant Payment that does not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or 90 percent of the Project Specific Rent but may not be less than the lesser of 30 percent of 45 percent of the median income for that area (as determined by HUD and adjusted for family size) or 90 percent of the Project Specific Rent.

The initial HUD-approved Section 8 contract rents are as follows:

| | Contract Rent | PBE | Monthly Rent |
|---|---|---|---|
| 0 Bedroom | $ 760 | $52 | $ 812 |
| 1 Bedroom | $ 863 | $69 | $ 932 |
| 2 Bedroom | $1,077 | $84 | $1,161 |

The initial Project Specific Rents are as follows:

| | PSR | 90% PSR | PBE |
|---|---|---|---|
| 0 Bedroom | $ 825 | $ 743 | $52 |
| 1 Bedroom | $1,160 | $1,044 | $69 |
| 2 Bedroom | $1,350 | $1,215 | $84 |

2. Moderate Income Tenants

a. Moderate Income Tenants. Current tenants classified as occupying Moderate-Income units shall make Total Tenant Payments that do not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or (2) 90 percent of the Project Specific Rent. However, no current moderate-income tenant's rent will be reduced as a result of POA approval. Please note that there are no moderate income tenants at 100 Centre Plaza.

B. Rent Phase-In for Existing Tenants

Any increase in Total Tenant Payment for Current Tenants caused by this POA shall be phased-in equally over a three-year period if such increase is 30% or more, and shall be limited to 10% per year if such increase is more than 10% but less than 30%. The Owner shall use form HUD 90010 to calculate the annual phase-in of the tenant's payment. During the 3 year phase-in period the Section 8 Housing Assistance Payments will pay the difference between the contract rent and the tenant's phase-in portion.

Increases in rent levels made necessary by increased operating expenses during the phase in period will not be passed on to the tenant. Rather, Section 8 Contract Rent Levels will be adjusted by MHFA (with HUD approval) to ensure sufficient revenue is generated to provide the funds necessary to pay for the increased operating expenses.

C. Increases in PSR's

Upon request from the owner, the Project Specific Rents will be adjusted annually on the anniversary date the Use Agreement is signed by HUD. The owner will provide MHFA with a market rent analysis to document the PSR's.

D. Rent Increases for Existing Tenants

Recertifications shall be conducted annually. Any tenant who refuses to certify or recertify income shall make a Total Tenant Payment that is equal to 90 percent of the Project Specific Rent. At the time of general project rent increase during the phase-in period, the owner will submit a rent increase request to MHFA for their approval in accordance with HUD Handbook 4350.6; HUD Asset Management Branch will review and approve the request in accordance with the provisions set forth

in HUD Handbook 4350.6. Future project rent increases, based on a operating cost adjustment factor determined by HUD, and applied to the operating cost portion of your project budget, will be approved only after MHFA has determined that the property is being properly maintained and that the reserve accounts are being properly funded. Section 8 contract rents will be determined annually to meet the approved project income, after subtracting rents projected to be paid by moderate-income tenants.

Any savings from reductions in operating expenses due to management efficiencies shall be deposited in project reserve for replacement account.

III. RENT DETERMINATIONS FOR NEW TENANTS

For the remaining useful life of the property (from the date of the execution of the Use Agreement), vacant units at the property will be re-rented so as to achieve and then maintain the January 1, 1987 tenant profile to the maximum extent practicable.

A. Initial Rents for New tenants

a. Very Low Income Tenants

New very low-income tenants shall make a Total Tenant Payment that does not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or (2) 90 percent of the Project Specific Rent.

b. Low-Income Tenants

New low-income tenants shall make a Total Tenant Payment that does not exceed the lesser of 30 percent of the tenant's monthly Adjusted Income or 90 percent of the Project Specific Rent but may not be less than the lesser of 30 percent of 45 percent of median income for that area (as determined by HUD and adjusted for family size) or 90 percent of the Project Specific Rent.

c. Moderate Income Tenants

New moderate income tenants shall make a Total Tenant Payment that does not exceed the lesser of (1) 30 percent of the tenant's monthly Adjusted Income or (2) 90 percent of the Project Specific Rent.

IV. **SECTION 8 FUNDING**

The Year 1 Preservation Project Rent is $788,424, of which $ 0 is projected to be paid by moderate-income tenants.

A new five year Section 8 LMSA contract for 71 units will be executed under the POA (subject to funds availability). The Boston HUD office has requested annual contract authority for these units in the amount of $788,424 and $3,942,120 in Budget Authority from HUD Headquarters.

| Unit Type | No. | Contract Rent | PBE | Monthly Rent | Gross Revenue |
|---|---|---|---|---|---|
| 0 BR | 23 | $760 | $52 | $812 | $18,676 |
| 1 BR | 38 | $863 | $69 | $932 | $35,416 |
| 2 BR | 10 | $1077 | $84 | $1161 | $11,610 |
| | 71 units | | | | $65,702 |
| | | | Total Gross Revenue | | $788,424 |

HUD agrees that the owners will be released from the use restrictions under the Plan of Action if sufficient funds are not reserved to cover the projected needs based upon POA rents, or if Section 8 assistance or a comparable program ceases to be available during the term of the Use Agreement which implements the Plan of Action.

V. **SECTION 241(F) LOAN**

The prospective maximum 241(f) loan is $3,223,815 This loan is comprised of an equity component in the amount of $1,601,636, which is attributable to the Section 236 assisted units and $1,161,872 to the non-assisted units, and rehabilitation component in the amount of $460,307 to finance the rehabilitation costs and related charges on the Section 236 assisted units required by the Plan of Action.

VI. **CAPITAL IMPROVEMENTS**

The owner has agreed to undertake the capital improvements described in Exhibit A. Improvements will be funded through the 241(f) loan.

VII. **AUTHORIZED ANNUAL RETURN**

The owner's total Authorized Annual Return is $603,877, which is equal to 8% of the established preservation equity of $7,548,464 for the entire project. However, the owner's authorized annual return attributable to the Section 236 assisted

units is $201,272, which is equal to 8% of preservation equity of $2,515,904 attributable to the Section 236 assisted units. All or a portion of the $201,272 authorized annual return associated with the Section 236 units may be used to fund the debt service on the equity component of the 241(f) loan associated with the Section 236 units. Any surplus cash, in excess of the authorized annual return associated with the Section 236 units ($201,272) will be placed in the excess income escrow held by HUD. Withdrawal of surplus cash will require prior MHFA/HUD approval, which approval shall not be reasonably withheld or delayed.

## VIII. REPLACEMENT RESERVE ACCOUNT

The annual funding level of the Replacement Reserve Account will be $96,000, of which $31,968 is attributable to the Section 236 assisted units. In addition, we are requiring an initial deposit to the replacement reserve account in the amount of $1,137,694 which will be added to the outstanding balance in the account. This deposit will be funded from the Section 241 (f) loan proceeds. MHFA will not approve the release of funds from the Reserve for Replacement account if doing so would reduce the balance below an amount equivalent to two-years annual deposits, except in emergencies.

## IX. TENANT NOTICE REQUIREMENTS

The Owner is required to post this notice to advise tenants of the approval of the POA. The Owner is also required to write to each affected tenant explaining how the POA approval will personally affect the tenant. The letter must explain the phase-in provisions. All additional requirements for rent increases, contained in Chapter 7 of HUD Handbook 4350.1, Insured Project Servicing Handbook, must be followed. The Owner must post a notification of the rent increase, describing its affect on the tenants, after POA approval, prior to the effective date of any rent increase.

## X. LEASE AMENDMENTS

The lease you are presently using must be amended. In addition to the provisions of HUD Handbook 4350.3 and the regulations at 24 CFR 247.1 the new lease language must include:

1. A statement that the tenant will always pay the lower 30 percent of AMI or 90 percent of the Project Specific rents;

2. A statement that if the tenant is designated as very low- or low-income at POA approval or upon initially occupying the project, the tenant will always be eligible for Section 8 rental assistance if Section 8

gross rent exceeds 30 percent of its AMI and will receive Section 8 assistance when it is available;

3. A statement that if moderate-income tenant refuses to certify income, the tenant will be charged 90 percent of the Project Specific Rent;

4. A description of the rent phase-in process;

5. A statement that security deposits for in-place tenants will not be increased due to POA approval; and,

6. Any other provisions required by Asset Management staff.

XI. **Excess Rents**

The method for projecting moderate-income TTP may lead to receipt of excess rents for the project. The method presented in HUD Handbook 4350.6-Chg.1 reflects the calculation of excess rent that is remitted to HUD. Any amount, over that remitted to HUD, will be deposited annually to the residual receipts account. These funds may be used to pay shortfalls in the annual authorized return on investment and any future shortfalls in operating expenses.

XII. **DURATION OF PLAN**

The Plan of Action shall be effective upon the execution and recordation of the Use Agreement, and shall remain in effect for the remaining useful life of the property, thereafter.

XIII. **CONDITIONAL APPROVAL**

This Plan of Action is conditioned on the following:

1. Complete processing of the Section 241(f) loan. The ability to apply for a Section 241(f) loan is conditioned on the availability of additional appropriations for the Preservation program. Final POA incentives are based upon information received from Section 241(f) processing.

2. Reassessment of repair needs due to the time lag between approval and funding of POA incentives.

3. Reprocessing of rents.

4. Owner adherence to modified tenant and State or local government notification requirements. The notification should include:

a. A clear statement that the Plan of Action is conditional, and that if additional funds become available certain parts of the POA will be reviewed including.

1. Rents
2. Repair needs
3. Equity loan amounts

b. A statement that tenants and State and local government agencies will be re-notified of final approval of POA, rents and repairs.

c. Estimated rents and proposed repairs.

d. Information on the statutory time frames when an owner can prepay (see page 1 & 2 of this letter).

e. Protection for current tenants (see page 2 of this letter).

f. Future availability of LIHPRHA appropriations.

g. The unsubsidized appraised value (repair value) for the property is good for 30 months from the time the 9607 was issued. However, the preservation value listed on the 9607 would have to be recalculated based on repair needs and outstanding debt at the time of the Section 241(f) loan commitment.

Should you have any questions concerning this transmittal, please contact Maurice Barry at 565-5352.

Very sincerely yours,

Jeanne McHallam
Director
Multifamily Housing Division

Enclosure

FHA CELEBRATING 60 YEARS 1934 1994 OF AFFORDABLE HOUSING

U.S. Department of Housing and Urban Development
Office of Housing
Boston Office
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street
Boston, Massachusetts 02222-1092

SEP 28 1995

MEMORANDUM FOR: Kerry Mulholland, Acting Chief, Affordable Housing Branch, HMPP

FROM: Jeanne M. McHallam, Director, Multifamily Housing Division, 1AHM

SUBJECT: **Plan of Action - Funding Request**
Project Name: 100 Centre Plaza
Project No. : 023-035NI
Location : Brookline, MA

This is written to obtain funding for incentives provided pursuant to our Plan of Action (POA) Final Approval letter dated September 27, 1995 (attached) for the above captioned subject project.

Our Approval of the Plan of Action provided Section 8 Assistance for 71 units, for which we request funding of $788,424 in Contract Authority and $3,942,120 in Budget Authority and is comprised of the following unit configuration resulting from the tenant profile of very-low and lower income tenants residing in the project as of January, 1987.

| Unit Type | # of Units | Contract Rents | PBE | Gross Rents | Total |
|---|---|---|---|---|---|
| 0 BR | 23 | $760 | $52 | $812 | $18,676 |
| 2 BR | 38 | $863 | $69 | $932 | $35,416 |
| 3 BR | 10 | $1077 | $84 | $1161 | $11,610 |
| | 71 units | | | Monthly | $65,702 |
| | | | | Annual | $788,424 |

Thus, we are requesting Contract Authority in the amount of **$788,424** and Budget Authority in the amount of **$3,942,120** ($788,424 X 5 years).

Also, we are requesting a Contract Administration fee for the Massachusetts Housing Finance Agency calculated as follows:

71 (Section 8 units) X 12 (months) X 2BR FMR (Brookline) $968 X 3% = $24,742 per annum. $24,742 X 5 = $123,710.

<u>Total Funding Request</u> - <u>including Admin Fee</u>

Contract Authority = $788,424 + $24,742 = **$813,166**
Budget Authority = $3,942,120 + $123,710 = **$4,065,830**

Any questions concerning this matter may be directed to Maurice Barry at (617) 565-5352.

Attachment