# In the United States Court of Federal Claims

No. 93-655 C
(Filed: September 26, 2012)

*************************************
                                    *
**ANAHEIM GARDENS, et al.,**        *
                                    *
                  Plaintiffs,       *
                                    *
        v.                          *
                                    *
**THE UNITED STATES,**              *
                                    *
                  Defendant.        *
                                    *
*************************************

*Harry J. Kelly*, Nixon Peabody LLP, Washington, D.C., for Plaintiffs.

*David A. Harrington*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## OPINION

**DAMICH**, Judge:

Plaintiffs are a number of owners and developers of low-income housing projects who claim a taking of their contractual right to prepay government-insured mortgages on their respective projects and thus to terminate certain governmental restrictions on rents and other aspects of the properties' use. These "affordability restrictions" were part of their bargain to provide below-market rate rents to low-income tenants in exchange for mortgage guarantees and interest subsidies from the federal government.

Plaintiffs allege that Congress's enactment of the Low Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"), like its predecessor, the Emergency Low Income Housing Preservation Act ("ELIHPA"),[1] was intended as a matter of public policy to burden and, in most instances, deter prepayment in order to avoid what loomed as a potentially significant reduction in the stock of affordable housing. LIHPRHA "was consciously known by Congress to constitute a taking of the Owners' original prepayment rights." Plaintiffs' Fifth Amended Complaint 1.

---
[1] ELIPHA and LIHPRHA are jointly referred to as the "Preservation Statutes."

The issue before the court presently is whether the Plaintiffs' claims for damages are ripe. Defendant argues that the Plaintiffs' as-applied regulatory takings claims are not ripe because they failed to exhaust their administrative remedies, that is, they failed to seek prepayment approval from the United States Department of Housing and Urban Development ("HUD") pursuant to the administrative process established by the Preservations Statutes. The Plaintiffs assert the futility exception to the administration exhaustion requirement. Pending before the court are the parties' cross-motions for summary judgment on ripeness.

For the reasons stated herein, Defendant's motion for summary judgment is granted in part and denied in part. Plaintiffs' motion for summary judgment is denied.

I.      Background

        A.  The Preservation Statutes

Plaintiffs here constructed housing for low-income renters in exchange for mortgage insurance and interest subsidies from the government under two federal programs (known as the section 221(d)(3) and section 236 programs). *Anaheim Gardens v. United States*, 444 F.3d 1309, 1313 (Fed. Cir. 2006).[2]  Under the programs, an owner would obtain financing by executing a deed of trust note to a private lender.  Def.'s Restated Mot. Summ. J. 5 ("Def.'s Mot.).  The repayment period was 40 years.  *Id.*  The owner would also enter into a regulatory agreement with HUD establishing certain restrictions on tenant income, allowable rental rates, and return on investment.  *Id.* at 6.  Prior to the enactment of the Preservation Statutes – ELIPHA in 1988; LIHPRHA in 1990 – "investors could pay off their mortgages and convert to market-rate housing after twenty years, without seeking permission from HUD to pay off their mortgages."  *Anaheim Gardens*, 444 F.3d at 1313.   Congress enacted the statutes out of concern that the owners' prerogative to prepay and be free of the affordability restrictions, thus enabling them to offer their rental housing at market rates, would result in an abrupt diminution of the supply of affordable housing.  Both statutes thus required HUD approval for mortgage prepayment.

Furthermore,

> the Acts set very high the statutory conditions for HUD approval of a mortgage prepayment plan.  As a result, because investors could not prepay mortgages and turn their properties into better investments, many felt they had effectively lost the use of their property.

*Id.*

---

[2]  For further background on the Preservation Statutes and the course of litigation regarding the statutes in this Court and in the United States Court of Appeals for the Federal Circuit, see the *Cienega Gardens* line of cases, in particular *Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir. 2001) ("*Cienega VI*"), *Cienega Gardens v. United States*, 67 Fed. Cl. 434 (2005) ("*Cienega IX*"), *Greenbrier v. United States*, 193 F.3d 1348 (Fed. Cir. 1999), and *Chancellor Manor v. United States*, 331 F.3d 891 (Fed. Cir. 2003).

Under ELIHPA, an owner could prepay only in accordance with a plan of action ("POA") approved by the Secretary of HUD. ELIPHA, Sec. 221(a), 12 U.S.C. § 1715*l*. This administrative process would begin in the first instance with the owner's filing of a notice of intent ("NOI") with HUD indicating a desire to eliminate or change the restrictions on the properties. *Id*. § 222. Upon receipt, HUD would provide the owner with certain market area and demographic information for the owner's preparation and submission of the POA. *Id*. § 223. The owner's options, other than acceding to the status quo, included continuing to seek approval to prepay according to further criteria set out in the statute, extending the affordability restrictions in exchange for certain financial incentives, or selling the property to a qualified purchaser.

The POA was to be a much more detailed document. It had to describe the proposed changes in the mortgage or regulatory agreement, assistance that could be offered by state or local government agencies, proposed changes in the low income affordability restrictions, any change in ownership related to prepayment, the effect on existing tenants, and the effect on the supply of affordable housing. *Id*. § 223(b). Furthermore, HUD's approval of a POA was contingent on a written finding "that the prepayment would have minimal effects on the existing tenants, the local low-income housing market in general, and the local housing market for minorities." *Cienega Gardens v. United States*, 265 F.3d 1237, 1241 (Fed. Cir. 2001) ("*Cienega VI*").

Specifically, ELIPHA provided:

The Secretary may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that –

(1) Implementation of the plan will not materially increase economic hardship for current tenants (and will not in any event result in (A) a monthly rental payment by a current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or (B) in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 1 percent (whichever is lower )) or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2) (A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect –

(i)    the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

     (ii)     the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

     (iii)    the housing opportunities of minorities in the community within which the housing is located; or

(B) the plan has been approved by the appropriate State agency and any appropriate local government agency for the jurisdiction within which the housing is located as being in accordance with a State strategy approved by the Secretary under section 226.

ELIPHA § 225(a).  Alternatively, ELIPHA authorized HUD to offer owners certain financial incentives to forego the prepayment option and maintain the affordability restrictions.  *Id.* § 225(b); *Cienega VI*, 265 F.3d at 1241.

LIHPRHA superseded ELIHPA in 1990.  It also required HUD approval before owners could prepay.  The first step was the owner's filing of a notice of intent.  The property would then be appraised by two independent appraisers in order to determine its "preservation value," which would then serve as the basis for any incentives offered by HUD to the owner to maintain the affordability restrictions in lieu of prepayment and termination of the restrictions.  Like ELIHPA, LIHPRHA provided that HUD could approve a POA for prepayment and termination of restrictions "*only* upon its making a written finding that implementing the plan will not materially increase 'economic hardships' on existing tenants, involuntarily displace such tenants, or decrease the availability of decent, safe, sanitary low-income housing."  *Cienega VI*, 265 F.3d at 1241.

Specifically, HUD was required to find that:

(1) implementation of the plan of action will not –

    (A) materially increase economic hardship for current tenants, and will not in any event result in (i) a monthly rental payment by any current tenant that exceeds 30 percent of the monthly adjusted income of the tenant or an increase in the monthly rental payment in any year that exceeds 10 percent (whichever is lower), or (ii) in the case of a current tenant who already pays more than such percentage, an increase in the monthly rental payment in any year that exceeds the increase in the Consumer Price Index or 10 percent (whichever is lower); or

    (B) involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available determined without regard to the availability of Federal housing assistance that would address such hardship or involuntary displacement; and

(2) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect –

    (A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

    (B) the ability of low-income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

    (C) the housing opportunities of minorities in the community within which the housing is located.

LIHPRHA, 12 U.S.C. § 4108.

None of the owners at issue here proposed POAs,  Def.'s App. 51, 61-62, or otherwise sought HUD permission to make prepayment and terminate affordability restrictions.

    B.  Procedural Background

The failure of the owners here to have pursued the administrative procedures for prepayment approval is the basis for the government's assertion that Plaintiffs' claims are unripe. It is helpful, then, to review the procedural posture of the ripeness issue in this case.

Based on a trial court decision in *Cienega Gardens*, *see Cienega Gardens v. United States*, 46 Fed. Cl. 506 (2000) ("*Cienega V*"), and on a decision of the Federal Circuit in *Greenbrier v. United States*, 193 F.3d 1348 (Fed. Cir. 1999), the trial court in this case, in August 2000,[3] issued an order of dismissal on the grounds that the claims were not ripe because the plaintiffs had not obtained a "final decision" from HUD.  The parties were granted a stay of the appellate proceedings regarding the dismissal pending a determination of the Federal Circuit over the issues of administration exhaustion and finality in *Cienega*.

In *Greenbrier*, the Federal Circuit in 1999 had affirmed the trial court's dismissal of the takings claims of the owners of 249 low-income properties on ripeness grounds.  The issue was "whether their claim that the legislation deprived them of their property is ripe for adjudication when they never sought HUD's approval to prepay their mortgage loans or were denied the right to do so." *Greenbrier*, 193 F.3d at 1356.  First, the *Greenbrier* court determined that the mere assertion by ELIPHA and LIHPRHA of regulatory jurisdiction over the owners' ability to make prepayment was not a taking because prepayment was not flatly denied by the Preservation Statutes but rather was subject to HUD permission, "albeit only in accordance with a plan of action approved by the Secretary." *Id.* at 1358.

The appellate court then reviewed Supreme Court precedent that "for an 'as applied' takings challenge to become ripe, the government entity charged with implementing the statute,

---

[3]  This case was transferred to the undersigned in June 2012.

regulation, or ordinance at issue must have reached a 'final decision' regarding its application to the property at issue." *Id*. It explained that "where a government entity provides procedures for obtaining such a final decision, a takings claim will not be ripe until the property Owner complies with those procedures." *Id*. at 1359. The court recognized, however, that "[t]he failure to follow all applicable administrative procedures can only be excused in the limited circumstances in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement." *Id*.

The court noted the rationale for the "no discretion" exception to the requirement of administration exhaustion: "in such circumstances, no uncertainty remains regarding the impact of the regulation, certainty being the basis for the ripeness requirement." *Id*. (internal citations omitted).

Because the owners in that case had not sought HUD permission to prepay (much less obtained final decisions denying such permission), because the statutes themselves did not constitute final decisions, and because as a matter of fact HUD had granted prepayment permission in three instances (at the time of that decision) where permission had been sought, the *Greenbrier* court affirmed the trial court's finding that their takings claims were not ripe and its grant of summary judgment against the owners. *Id*. at 359-60.

As noted, the trial court in *Cienega* had granted the government's motion for summary judgment on ripeness. *Cienega V*, 46 Fed. Cl. 509 (2000). It observed that its facts were practically identical to those in *Greenbrier* and the claims "likewise not ripe for review." *Id*. at 509. It found that the futility exception was inapplicable because "HUD expressly was given discretion to deny or accept the owners' applications to prepay their mortgage loans." *Id*.

On appeal, however, the Federal Circuit held, "This case falls squarely into the futility exception." *Cienega VI*, 265 F.3d at 1239. The court reasoned,

> Because the trial court's findings during the damages trial of the breach of contract action, as well as the United States' own housing date, conclusively establish that HUD would have had no discretion under the statutory requirements of ELIHPA and LIHPRHA to permit the owners to prepay their mortgages, we conclude that it would have been futile for the Owners to file prepayment requests with HUD.

*Id*.

The holding in *Cienega VI* was based on the "undisputed facts" demonstrated as to four "Model Plaintiffs." The Model Plaintiffs had submitted POAs for financial incentives and, in the process of offering incentives, HUD had calculated the market rental rates for the apartments at the properties in question. Comparing market rates to the "HUD-restricted Monthly Rate," the court found it "undisputed" that the market rate rents "would uniformly cause the monthly rent of those owners' tenants to increase by more than 10%." *Id*. at 1243. In addition, a former HUD official had stated that the properties in question "would not even arguably have been able to

meet the statutory and regulatory requirements for approval of prepayment under ELIPHA or LIHPRHA." *Id.*

The court found that LIHPRHA "sets forth strict numerical criteria that must be met before HUD may exercise any discretion it has to approve prepayment requests," citing LIHPRHA § 4108. *Id.* at 1246. There was no discretion to approve prepayment unless 1) the termination of affordability restrictions would "not materially increase economic hardship for current tenants"; *and* 2) the supply of low-income housing would be sufficient "to ensure that prepayment will not materially affect the availability of decent, safe, and sanitary housing affordable to low-income persons in the area." *Id.* The first condition could not be met in light of the data showing the greater-than-10% effect of market rental rate increases and, as to the second condition, "the Owners have submitted uncontroverted affidavits attesting" that termination of the restrictions would materially affect the low-income housing supply. Accordingly, it held that "the four Model Plaintiffs have set forth a compelling case of administrative futility."

The owners other than the Model Plaintiffs, however, had to demonstrate "on a case-by-case basis in future proceedings that it would have been futile to submit prepayment requests to HUD." *Id.* at 1248. The *Cienega VI* court thus reversed the ripeness-based summary judgment against the Model Plaintiffs only. "If the factual circumstances of any or all of the remaining Owners present a similarly compelling case of administrative futility, then the trial court should adjudicate their takings claims, as well." *Id.*

In 2006, the Federal Circuit reversed the trial court's dismissal of this case on ripeness grounds. *Anaheim Gardens v. United States*, 444 F.3d 1309 (Fed. Cir. 2006). The court found that "*Greenbrier* does not control the outcome of this case." *Id.* at 1314. Based on the Federal Circuit's decision in *Cienega VI*,[4] the court ruled that, because the owners here "have not had the opportunity to develop facts relative to futility and ripeness . . . this court remands to permit development of the requisite facts." *Id.* "[T]he *Greenbrier* plaintiffs," it pointed out, "had fully developed the facts of their cases and still failed to show futility." *Id.* at 1316. "The current appeal," however, "falls under" the guidance of *Cienega VI*, "specifically under the subset of appellants who did not have the opportunity to develop a factual record." *Id.*

Thus, the issue is back before the trial court here to determine whether Plaintiffs have developed facts to sustain a futility exception to the general requirement to exhaust administrative remedies before filing suit.

II.     Legal Standards

        A.  Summary Judgment

---

[4]  The appellate panel in this *Anaheim Gardens* decision referred to the relevant *Cienega Gardens* decision in question, 265 F.3d 1237 (Fed. Cir. 2001), as "*Cienega II*." All of the other Federal Circuit decisions citing to the 265 F.3d 1237 decision, however, have referred to that decision as "*Cienega VI*." This court is adhering to the consensus denomination of that decision.

Summary judgment is a "salutary method" of procedure under the Rules of the Court of Federal Claims ("RCFC") to dispose of actions, where warranted, in a just, speedy, and inexpensive manner. *See Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987). A motion for summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." RCFC 56 (c )(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering a summary judgment motion, the court's proper role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it "might affect the outcome of the suit"; a dispute is genuine if the evidence is such that a reasonable trier of fact could find for the nonmoving party. *Id*. at 248.

The party moving for summary judgment may prevail by demonstrating the absence of any genuine issues of material fact or by showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322-23. If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that there is a genuine issue of material fact. *Id*. at 324. Any inferences that may be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Similarly, "[i]n cases in which there is doubt as to the existence of a genuine issue of material fact, that doubt must be resolved in favor of the nonmovant." *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984). "The movant also must demonstrate its entitlement to judgment as a matter of law." *Id*.

Where, as here, the parties have cross-moved for summary judgment, the court reviews the motions under the same standards. *First Annapolis Bancorp., Inc. v. United States*, 75 Fed. Cl. 263, 275 (2007). "The fact that both parties have moved for summary judgment," however, "does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*.

B. Futility

"A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur." *Systems Application & Technologies, Inc. v. United States*, 2012 WL 3631249 at *7 (Fed. Cir. Aug. 24, 2012) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985).

> The purpose of the doctrine is to prevent the courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977)).

In other words, the requirement of ripeness ensures that a controversy is not presented for judicial resolution until it is in "clean-cut and concrete form." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)).

The *Greenbrier* court explained that, "[i]n order to successfully assert a regulatory takings claim, the Owners must establish two components: that the regulation has in substance 'taken' their property by going 'too far,' and that any preferred compensation is not 'just.'" *Greenbrier*, 193 F.3d at 1357 (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986). "[A] court cannot determine," however, "whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald*, 477 U.S. at 348. Accordingly, enforcement of a statute, regulation, or ordinance is required "before one can determine the extent of any deprivation of the property." *Greenbrier*, 193 F.3d at 1358. With respect to an as-applied takings claim, ripeness is generally obtained once the governmental entity charged with enforcing the regulation has reached a "final decision" applicable to the property in question. *Id.*

Ordinarily, where the government entity establishes procedures for obtaining a final decision on the regulatory application, the claim is not considered ripe until the procedures have been pursued. *Id.* at 1359. "As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established." *Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001) (citing *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736, and n.10). Futility is the exception to the general rule. "The failure to follow all applicable administrative procedures can only be excused in the limited circumstances in which the administrative entity has no discretion regarding the regulation's applicability and its only option is enforcement." *Greenbrier*, 193 F.3d at 1359. The reason for the exception, focusing on the issue of discretion, is that "in such circumstances, no uncertainty remains regarding the impact of the regulation, certainty being the basis for the ripeness requirement." *Id.* (internal citation omitted). The foundation, then, of the inquiry "is whether 'the permissible uses of the property are known to a reasonable certainty.'" *Seiber v. United States*, 364 F.3d 1356, 1365 (Fed. Cir. 2004) (quoting *Palazzolo*, 533 U.S. at 620).

The *Greenbrier* court explained that, while the Preservation Statutes may have set a "high hurdle by imposing stringent requirements for granting" prepayment approval, the requirements did not excuse failure to seek HUD permission. *Id.*

The subsequent Federal Circuit decision in *Cienega VI* amplified the certainty/discretion link. "Where agencies have discretion in administering regulations, the requirement that complainants pursue administrative solutions promotes the possibility that a 'mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions.'" *Cienega VI*, 265 F.3d at 1245 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn.*, 452 U.S. 264, 297 (1981). "[W]here an agency has no discretion," however, "in the application of a contested regulation, an aggrieved party does not need to obtain a final decision from the agency determining the scope of the regulation." *Id.* at 1246.

In the context of the Preservation Statutes, the *Cienega VI* court found that HUD did possess limited discretion, but lacked the "'high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer.'" *Id.* (quoting *Palazzolo*, 533 U.S. at 620). In particular, it found that the LIHPRHA statute set specific boundaries on HUD's authority to grant prepayment requests: "Rather, section 4108 sets forth strict numerical criteria that must be met before HUD may exercise any discretion it has to approve prepayment requests." *Id.* at 1246.

The *Cienega VI* court had acknowledged the view of commentators that the requirements for HUD approval of prepayment requests "would be met in only the rarest of circumstances." *Id.* at 1242. Despite that general observation, in remanding to the trial court the question of ripeness of the non-Model Plaintiffs, the court focused on the necessary case-by-case factual inquiry and placed the burden on the plaintiffs: "the trial court will have to determine, under the applicable facts, whether each plaintiff has demonstrated that it would have been futile to apply to HUD for prepayment." *Id.* at 1248.

Based on the *Cienega VI* decision, the Federal Circuit subsequently reversed the dismissal of this case and remanded it for the development of a factual record. *Anaheim Gardens*, 444 F.3d at 1317. Its review of the futility exception corroborated the burden on Plaintiffs: "A claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process." *Id.* at 1315.

III.    Discussion

A.  The Thetford Plaintiffs

As an initial matter, Defendant argues that one of the plaintiffs here, Thetford Properties IV, LP ("Thetford"), is barred by the doctrine of issue preclusion from re-litigating its futility argument. Thetford had filed suit in United States District Court on a due process-based challenge to the prepayment restrictions established by ELIPHA. The District Court dismissed the suit for failure to exhaust its administrative remedies. On appeal to the Fourth Circuit,[5] Thetford made several arguments, including that of futility, in support of its exception from the requirement of administrative exhaustion. As the appellate court observed, "Lastly, they maintain that their submission to the Act's administrative procedures would be futile because, under the existing regulations, they cannot qualify for prepayment." *Thetford Properties IV, Ltd. P'ship v. United States*, 907 F.2d 445, 448 (4th Cir. 1990).

The court found, however, that "both the statute and the implementing regulations make clear that, under certain circumstances, HUD has the authority to grant them the ultimate economic relief that they seek – prepayment and withdrawal from the program." *Id.*   It further found "unsupported" Thetford's allegation of futility. *Id.* at 450. "Absent a clear showing that an administrative agency has taken a hard and fast position that makes an adverse ruling a

---

[5] As the court noted, the case was filed as a class action, but the class was never certified. Accordingly, "the only property owners directly affected by the outcome of this case" were Thetford and the single other plaintiff. *Thetford Properties IV, Ltd. P'ship v. United States*, 907 F.2d 445, 447 n.1.

certainty, a litigant's prognostication that he is likely to fail before an agency is not a sufficient reason to excuse the lack of exhaustion." *Id.* Thus it affirmed the district court's dismissal.

Accordingly, Defendant argues for summary judgment against Thetford as a preliminary matter on the basis of issue preclusion. The doctrine of issue preclusion, also known as collateral estoppel, is "grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again." *Warthen v. United States*, 157 Ct. Cl. 798, 798 (1962). The prior decision need not have been issued by the same judicial forum. *See, e.g.*, *Simmons v. Small Business Admin.*, 475 F.3d 1372, 1373-74 (Fed. Cir. 2007). As the Supreme Court has explained,

> To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation of attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States*, 440 U.S. 147, 153-54 (1979).

The Federal Circuit has affirmed the point of issue preclusion. "Under the doctrine of issue preclusion, . . . a judgment on the merits in a first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit." *In Re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994). The test is "whether an issue of law or fact has been previously litigated," *id.*, and the rationale is that "a party who has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again." *Id.*

Thus, the predicate elements of the inquiry are: 1) if the issue is identical to one decided in the first action; 2) if identical, whether the issue was actually litigated in that action; 3) whether resolution of the issue was essential to a final judgment in the earlier action; and 4) whether the plaintiff was afforded a full and fair opportunity to litigate the issue in the earlier action. *Id.*; *see also Shell Petroleum, Inc. v. United States*, 319 F.3d 1334, 1338 (Fed. Cir. 2003).

While Plaintiffs are correct in observing that the circumstances of the *Thetford* case in the Fourth Circuit were notably different, it cannot be denied that the same issue of futility was raised, actually litigated fully and fairly, and essential to the decision in that court.[6] It was not dicta but rather one of several bases for affirming the district court's dismissal. The circuit court found that the appellants had failed to demonstrate a "clear showing" that made certain an adverse ruling by HUD on a prepayment application. *Thetford*, 907 F.2d at 450.

---

[6]  Plaintiffs' objection that the issues are not identical in the two actions because the Fourth Circuit decision was based on ELIPHA, rather than LIHPRHA, is not convincing. The standards governing prepayment are the same in every material respect. As Plaintiffs have noted, "LIHPRHA included prepayment criteria that were *identical* to the prepayment criteria contained in ELIPHA." Pls.' Mot. for Partial Summ. J. on the Subject of Ripeness 6 ("Pls.' Mot.) (emphasis added).

Accordingly, this court finds that Plaintiff Thetford IV is barred from relitigating the same issue in this action.

Defendant, however, overreaches in seeking to apply the same issue preclusion to Plaintiff Thetford III on the argument that it was "adequately represented" in the Fourth Circuit case "by someone with the same interests." Def.'s Mot. 16.

Generally, a person not a party to an earlier suit on an issue cannot be said to have had the opportunity to fully and fairly litigate the issue. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Id.* at 892-93(quoting *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)). One exception to the rule against nonparty preclusion is in the limited circumstances where the nonparty "may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." *Id.* at 894 (quoting *Richards, id.*). An example would be suits brought by "trustees, guardians, and other fiduciaries." *Id.* Defendant thus argues that, because Thetford IV and Thetford III were both represented by the same fiduciary, general partner Richard Urban, Thetford III's interests in the futility issue in the Fourth Circuit litigation were adequately and fully represented. "Thetford III and Thetford IV had identical interests in the lawsuit's outcome and, in his fiduciary capacity as controlling partner, Mr. Urban was required to ensure that the interest of both partnerships was represented." Def.'s Mot. 17.

As Plaintiffs point out, although *Thetford* was filed as a class action, the class was never certified and the decision itself noted that "the only property owners directly affected by the outcome of this case" were the two named plaintiffs. *Thetford*, 907 F.2d at 447 n.1. The relevant party in the *Thetford* litigation was "Thetford Properties IV Limited Partnership." Despite the position of Mr. Urban, however, as a fiduciary common to both Thetford IV and Thetford III, neither entity itself is or was a fiduciary of the other.

As this court persuasively noted in *Bartels Trust for the Benefit of Cornell Univ. ex. rel. Bartels v. United States*, 88 Fed. Cl. 105, 113 (2009), "Shared motivation alone is insufficient to qualify for this 'same interests' requirement; rather, the earlier party must have had some legal obligation to vindicate the rights of the nonparty later precluded." In *Bartels*, the court refused to apply the fiduciary exception to bind a second trust, "Bartels-UNH," to the outcome of an issue decided in litigation brought by a similar trust, "Bartels-Cornell," despite the presence of a controlling majority of trustees common to both entities. "Here, neither trust is a fiduciary of the other; thus, applying the 'fiduciary exception' to the facts at bar far exceeds the specific 'limited circumstances' that the *Taylor* Court elaborated." *Id.* at 114.

Because the *party* in the *Thetford* litigation in the Fourth Circuit was not acting "as a fiduciary representative *for* the beneficial interest of" the non-party Thetford III, the doctrine of issue preclusion does not bar the latter from pursuing the issue of administrative futility in this litigation. *See Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 593 (1974).

B.  The Extent of HUD's Discretion

It is important properly to frame the inquiry pending before this court.  In *Cienega VI*, the Federal Circuit spelled out the two-prong test that had to be met before HUD could approve a request for prepayment.  A plan of action had to meet both tests; that is, if it failed either test, HUD had no discretion to allow prepayment.  The tests were: 1) that "implementation of the plan will not materially increase economic hardship for current tenants"; *and* 2) that "the supply of vacant, comparable housing is sufficient to ensure that prepayment will not materially affect the availability of decent, safe, and sanitary housing affordable to low-income persons in the area." *Cienega VI*, 265 F.3d at 1246.  The *Cienega VI* court described these conditions as "prerequisites . . . set forth by statute." *Id.*  As to these prerequisites, the matter of HUD's discretion was clear: "[T]here is no allegation that HUD has any discretion to depart from these statutory requirements.  Rather, section 4108 [of LIHPRHA] sets forth strict numerical criteria that must be met before HUD may exercise any discretion it has to approve prepayment requests." *Id.*

The "material increase in economic hardship for current tenants," for example, was defined in the Preservation Statutes as either an increase in the post-prepayment rent for current tenants that exceeded 30% of their monthly adjusted income or an increase in rent greater than 10%, whichever is lower.  LIHPRHA, § 4108(a)(1)(A).  If the Secretary of HUD could not make a written finding that prepayment would not result in such an increase in rent, prepayment was barred statutorily.

Thus, it is somewhat disingenuous of Defendant to maintain that "LIHPRHA afforded HUD discretion to determine whether a proposed plan to prepay would be approved."  Def.'s Mot. 8.  HUD was clearly statutorily barred from approving the POA of any property that did not meet the criteria of § 4108.

This case was remanded by the Federal Circuit to allow Plaintiffs, like the non-model plaintiffs in *Cienega VI*, to develop a "compelling" factual record on administrative futility.  Such a factual record would then allow the trial court to resolve the ripeness issue, that is, whether it should proceed with the adjudication of Plaintiffs' takings claims. *Anaheim Gardens*, 444 F.3d at 1317.

The inquiry, accordingly, is not whether the Preservation Statutes set a "high hurdle" for prepayment approval, *Greenbrier*, 193 F.3d at 1359, or "a very difficult test," Pls.' App. 444 (Dep. of Thomas Vitek, Nov. 15, 2007, at 112:6), but rather whether Plaintiffs have developed facts, like the Model Plaintiffs in *Cienega VI*, showing, to a reasonable certainty, that they could not have met either or both of the conditions for prepayment approval.  The interplay of the *Greenbrier* and the *Cienega VI* decisions clearly demonstrate that owners have to do more than merely assert the illogic of their perceived quandary (that is, that the only projects that would have satisfied the prepayment criteria were those "where prepayment would not be a smart thing to do" (Pls.' Mot. 5 n.5, citing deposition of HUD California preservation officer Thomas Vitek, Pls.'s App. 444 (Vitek Dep. 112:9-13))).

In *Cienega VI*, the Model Plaintiffs demonstrated undisputed evidence, derived from HUD's own data, that the market rents would have exceeded the HUD-restricted rents by more than 10%, in most cases much more, and provided affidavits – uncontroverted by the Government – that the termination of affordability restrictions would materially have affected the

supply of low-income housing in those communities.  In addition, the record included a declaration from a former HUD official that the low-income properties in question "would not even arguably have been able to meet the statutory and regulatory requirements for approval of prepayment under ELIPHA or LIHPRHA."  *Cienega VI*, 265 F.3d at 1243.

Here, it is not disputed that no project owner submitted a plan of action to prepay.  Def.'s App. 51, 61-62.  Rather, Plaintiffs contend that their requests to prepay would have been futile because they knew that they could not have met the prepayment conditions.  Plaintiffs acknowledge that the Preservation Statutes gave HUD authority to approve a prepayment request, but that the conditions attached to such approval were "insurmountable."  Pls.' Mot. for Partial Summ. J. on the Subject of Ripeness 2 ("Pls.' Mot.").  Defendant counters, however, that HUD gave approval to four out of nine plans of action by other owners that proposed prepayment and termination of affordability restrictions.  Def.'s App. 15, 116-22, 128-41, 143-47, 156-62.  It is unsatisfactory for Plaintiffs to dismiss those four prepayment approvals by the observation that they were "utterly unique" and "presented idiosyncratic circumstances."  Pls.' Opp'n to Def.'s Mot. 25 ("Pls.' Opp'n").  The Federal Circuit has charged Plaintiffs on remand with developing their own case-by-case factual records.  Thus, the focus for this court is the specific facts that Plaintiffs bring to bear regarding the reasonable certainty of their claimed inability to meet the tests for prepayment approval, not, as in Defendant's words, "the ethereal character" of Plaintiffs' claims.[7]

### C.  Plaintiffs' Case for Futility

Many of the Plaintiffs have testified in depositions, or have submitted declarations attesting, to their conclusions that it was futile to have expended time and resources seeking prepayment approval.  They averred that HUD could not have granted prepayment approval "because the properties could not have satisfied the statutory criteria required."  Pls.' Opp'n 17.  But, as Defendant points out, "Conclusory assertions regarding the ultimate issue do not raise genuine issues of material fact."  Def.'s Reply 14 (citing *Sweats Fashions*, 833 F.2d at 1564.  In their statements, Plaintiffs' fact witnesses based their conclusions regarding futility on their experience in the low-income housing markets, their familiarity with the supply of such housing in their areas, and statements of HUD officials advising that prepayment approval would not have been allowed.  Pls.' Reply 13-14.  Such attestations seem more than merely conclusory and raise credible issues of fact.

In addition, moreover, Plaintiffs' case regarding futility focuses on what it describes as "objective criteria – developed by HUD in its so-called Windfall Profits Test – that demonstrate that HUD lacked discretion to allow Plaintiffs to prepay because the Plaintiffs could never satisfy the prepayment criteria contained in the Preservation Statutes."  Pls.' Mot. 23.

---

[7]  Plaintiffs refer to what they describe as "the Preservation Paradox – under the Preservation Statutes, those who were allowed to prepay would have no economic reason to do so."  Pls.' Opp'n 13.  Plaintiffs' formulation may capture an essential truth behind the intent of Congress in passing the two statutes, but it also inherently acknowledges that at least some owners theoretically could have been granted prepayment approval.  In any event, the Preservation Paradox concept does not contribute to Plaintiffs' fact burden.

Plaintiffs retained an expert, David A. Smith, founder and Chief Executive Officer of Recap Associates, a consulting firm based in Boston that "recapitalizes and preserves existing affordable housing via innovative financial transactions," to substantiate their conclusions as to the futility of applying for prepayment approval.  Report on Prepayment Ineligibility Under the Emergency Low Income Housing Preservation Act of 1987 and the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("Smith Report"), Pls.' App. 397.  Mr. Smith principally evaluated a one-time test, the "Windfall Profits Test" ("WPT"), implemented by HUD under LIHPRHA to determine whether a property under the low-income housing program would be eligible for financial incentives in return for remaining under the affordability regulations.  *See Preservation of Multifamily Assisted Rental Housing: Interim Guidelines for the Section 222(e) Windfall Profits Test: Notice of interim guidelines and request for public comment*, 57 Fed. Reg. 12064 (Apr. 8, 1992) (Pls.' App. 314).  According to Plaintiffs, "the result of Mr. Smith's evaluation is that all of the subject properties would have been eligible to receive incentives under ELIHPA and LIHPRHA, which in turn means that HUD would not have been able to approve the prepayment of the mortgage on any of the subject properties under the statutes."  Pls.' Mot. 24.

Defendant, however, disputes Mr. Smith's qualifications to offer an opinion regarding prepayment as well as the propriety of the court's entertaining expert testimony with respect to ripeness, but more particularly argues that: 1) evaluating the WPT regarding financial incentives as a mirror-image of the prepayment criteria is "fundamentally flawed," Def.'s Response to Pls.' Refiled Mot. for Summ. J. on Ripeness 19 ("Def.'s Resp."), and 2) Mr. Smith did not properly apply the WPT actually promulgated by HUD.

Under the circumstances in which this case has been returned to the trial court on remand from the Federal Circuit, the count is disinclined to disregard Mr. Smith's expert report in its entirety.  *See, e.g., City Line Joint Venture v. United States*, 71 Fed. Cl. 486, 490-91 (2006) (allowing testimony regarding futility by an appraisal expert); *CCA Assocs. v. United States*, 75 Fed. Cl. 170, 184 (2007), *aff'd in relevant part*, 2008 WL 2796396 (Fed. Cir. July 21, 2008) (unpublished opinion).  In addition, Rule 702 of the Federal Rules of Evidence ("FRE 702") provides that "scientific, technical, or other specialized knowledge" may be admissible through expert opinion testimony if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Plaintiffs further point to precedent in the First Circuit that a court should be "cautious . . . not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility."  *Cortes-Irizarry v. Corp. Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997).  Accordingly, the court will thus examine Mr. Smith's report to determine the extent to which it is based on facts and logical correlations that may serve as a foundation for Plaintiffs' burden to demonstrate futility to a reasonable certainty.  It is necessary, therefore, first to review the WPT in order then to assess whether it can be considered a useful "proxy for HUD's analysis of a plan of action to prepay."  *Id*.

1.  Windfall Profits Test

The WPT was a short-lived test promulgated as an interim guideline in April 1992, then abrogated by Congress in October 1992, and used when an owner applied for financial incentives

in return for continuing affordability restrictions as an alternative to prepayment and release from program restrictions.  *Id.* at 20.  As noted comprehensively by the trial court in the *Cienega* litigation, under ELIPHA for example, rather than submit a plan of action for prepayment,

> [A] property owner could also agree to extend the restrictions for the remainder of the mortgage in exchange for certain incentives. To receive such incentives, owners needed to agree to (1) retain the housing as low-income, very low-income, and moderate-income housing for the remaining term of the mortgage, (2) ensure that adequate expenditures were made for maintenance and operations of the properties, (3) not displace current tenants except for good cause, (5) not increase rent higher than 30  percent of a tenant's adjusted income, or market rate, whichever might be lower, (6) phase in rent increases, and (6) charge rents for newly available apartments at HUD-approved rates and to HUD-approved tenants. In exchange, the Secretary was authorized to agree to provide owners one or more of the following benefits: an increase in the permissible distribution or other measures to increase the rate of return on the investment, a change in the method for calculating equity, increased access to residual receipts accounts or excess replacement reserves, a limited increase in the rents, financing of capital improvements, or other measures.

*Cienega Gardens v. United States*, 67 Fed. Cl. 434, 442 (2005) ("*Cienega IX*") (internal citations omitted).

The option of seeking financial incentives and accompanying restrictions were stricter under LIHPRHA.  For example, rather than lasting for the remainder of the mortgage, the restrictions were to adhere for the useful life of the housing.

Furthermore, section 222(e) of LIHPRHA  provided, in part:

> To prevent payment of windfall profits, the Secretary may make available incentive payments under section 219 or 220 *only* to owners in those rental markets where there is an inadequate supply of decent, affordable housing, if the Secretary determines that adequate data can be obtained to permit objective and fair implementation or where necessary to accomplish the other public policy objectives under this subtitle.

*See* Pls.' App. 315.

As HUD noted in its notice of interim guidelines, to carry out the WPT required under § 222(e), "The statute reflects the concern that 'the preservation solution should not be used to provide incentives to owners who would not have prepaid given local market conditions.'"  57 Fed. Reg. 12064 at 2 (Pls.' App. at 315) (quoting House Conf. Report to Cranston-Gonzalez

National Affordable Housing Act, Conf. Rep. No. 101-943, 101st Cong., 2nd Sess. p. 469).  The "mechanisms" of the WPT, HUD noted, were "integrally related to the prepayment process."  *Id.* at 3.

HUD's notice then laid out the context of LIHPRHA and the WPT.  The goal of LIHPRHA is "to preserve privately-owned low income housing projects while not unduly restricting the owner's mortgage prepayment rights." *Id.* at 4.  Prepayment would not be approved where it would materially increase economic hardship for current tenants or diminish the availability of affordable housing.  The purpose of offering incentives as an alternative would be to maintain the affordability restrictions over the remaining useful life of the projects or to transfer the properties to other owners agreeable to continuing the restrictions.  *Id.*  The WPT, however, was developed to assuage certain Congressional concerns: 1) that such financial incentives might be extended to housing units in "soft" markets where the pre-existing supply of market rate rental housing was abundant, the profitability of conversion of rent-restricted units to market rentals would therefore be questionable, and thus where "incentives would not be needed" to dissuade prepayment in order to preserve such units; and 2) that incentives might be offered where the supply of affordable housing was already such that low-income housing was inexpensive relative to income and therefore such incentives were not needed for the tenants' protection.  *Id.*  In addition, the HUD notice noted that, "regardless of the adequacy or accessibility of the supply of housing," financial incentives might still be offered "where necessary to accomplish the other public policy objectives" of LIHPRHA.  *Id.*  As HUD explained,

> A market may also have a supply of housing that is both abundant and accessible, but because of the special circumstances of a particular project, incentives are justified in order to preserve the housing, e.g., the project is the only source of low-income rental housing in the immediate area or there is a shortage of the particular type of rental housing provided by the project such as units suitable for the elderly, disabled, or for large families.

*Id.* at 4-5.

HUD thus developed a "three-part test."  *Id.* at 5.  The first two parts dealt with the "market area wide factors of affordability and availability."  *Id.*  The first test established a ratio of Fair Market Rent ("FMR") to the rent affordable according to "the federal definition of very low income for families seeking admission to assisted housing."  *Id.*  By ranking localities according to the ratio, HUD could produce a list of "places where housing is more affordable."  *Id.*  "This process will produce a relative ranking of localities with respect to the affordability of housing."  *Id.* at 6.  HUD cautioned, however, that "there is no agreed-upon definition of what constitutes 'affordable housing' for a market perspective."  *Id.*  Furthermore, "[b]eing on the list means only that rental housing in that particular area is relatively more affordable and therefore potentially more accessible, in relation to other areas in the country.  The fact that an area is not on the list does not mean that rental housing is not affordable."  *Id.*  Nevertheless, the list would help HUD to identify areas in which "tenants affected by prepayment would, with the use of

certificates and vouchers, be able to find affordable housing units without adversely raising the overall rents of units available to low income renters." *Id.*

The second part of the WPT looked at "the adequacy of the overall supply of rental housing." This test was necessary because, "even in communities where housing is relatively affordable, a large change relative to the inventory of housing available may adversely affect the supply of units currently available to and occupied by the unassisted low income renters." *Id.* This test "involves determining whether there is an excess of supply over demand for rental housing in the housing market area. The purpose of this part of the test is to identify those market areas on the above list of places with affordable housing where, given local market conditions, owners would probably not prepay if allowed." *Id.* at 7.

The test "requires analysis of the current conditions of the individual market" and "has to take into consideration such factors as current and anticipated future employment growth and changes in population and households." *Id.* The test thus would use a "combination of census and other federally produced data and local data. Determinations will be made on a case-by-case basis by field staff familiar with local market conditions." *Id.*

In view of the purpose, nature, and mechanics of the WPT, Plaintiffs reason that, because financial incentives could only be offered to owners in rental markets where there was a demonstrated inadequate supply of decent, affordable housing, therefore the test for incentives "was directly tied to whether or not a property was eligible under the objective statutory criteria to prepay its mortgage and terminate the affordability restrictions." Pls.' Mot. 26. The financial incentives criteria were in effect the mirror image of the prepayment criteria. Accordingly, "when HUD made a determination that a property was eligible for incentives under the WPT, it implicitly and necessarily made a determination that the property could not meet the statutory criteria for prepayment." *Id.*

As a result of the first part of the WPT, HUD published a list "of all of the affordable areas across the United States." *Id.* at 28. A property was deemed eligible to receive incentives if it was *not* on the list. Plaintiffs argue, "Necessarily, however, it also meant that there was not an adequate supply of affordable housing in that area. If so, under the standards contained in LIHPRHA, HUD could not have allowed an owner to prepay." *Id.* at 29.

If the property was on the affordable market list, it still might be eligible for incentives if the local supply of rental housing was tight, that is, not "soft" or surplus. Incentives would be warranted in such a market because conversion of affordable housing to market rental housing due to prepayment would result in a shortage of affordable housing. Plaintiffs assert that the ten factors under part two of the WPT to evaluate whether the market was soft "are exactly the same ten factors set forth in HUD's guidance – specifically, in HUD's LIHPRHA processing handbook – that were used to determine whether a property was eligible to prepay its mortgage under LIHPRHA." *Id.* at 29-30.

   2. Smith Methodology

Mr. Smith's methodology, therefore, is founded on the premise that the WPT, although developed as a test for eligibility for financial incentives, is "tantamount" to a test of the criteria for prepayment. *Id.* at 32. Accordingly, he avers he replicated the WPT "test one" calculations of the ratio of FMR to the amount of funds available to a low income family for rent and "then verified whether the subject property was located in a market that was on HUD's list of affordable areas." *Id.* at 33. In most instances, he found that his calculations yielded an identical result. *Id.* Where the ratio was greater than 1.0, it meant that the property was located in a non-affordable area, and so, he concludes, prepayment was precluded statutorily. Where the ratio was less than 1.0, Mr. Smith then applied the second part of the WPT to evaluate whether there was an excess supply of affordable housing in the relevant market.

To test whether demand exceeded supply (or conversely, whether a given market was a soft market), Mr. Smith compared market rents, "as determined by appraisals performed in connection with the Plaintiffs' preservation processing," to regulated affordable rents (as distinct from comparing market rent to income-based affordability under WPT test one). Where market rents exceeded affordable rents by more than 10%, Mr. Smith concluded that supply did not exceed demand. *Id.* at 34. In such a case, Mr. Smith extrapolated, "[i]f in a particular relevant market, demand exceeded supply, any subject property located in that market would be unable to obtain HUD's approval of a [plan of action] seeking prepayment and termination of affordability restrictions." *Id.* With respect to the ten factors identified by HUD as evidencing a soft market, Smith opined that, "In general, none of these 'local market' factors would occur in a market where market rents were significantly higher than the subject property's affordable rents." Pls.' App. 388 (Smith Report 11). Therefore, "[a]ny property that yielded a 'market premium ratio' in excess of 110% was deemed to 'pass' Test Two," demonstrating a scarcity of affordable housing. Pls.' Mot. 35. Plaintiffs note that, "[w]here relevant, Mr. Smith made reasonable assumptions to trend the data used in his calculation of Test Two." Pls.' Mot. 35. For example, in some instances, Mr. Smith extrapolated ("trended forward") affordable rents to correspond to the year of market rent data, based on average historical rent increases or 2% if such data was not available.

Mr. Smith also performed a third test, one he created. This test was based on his premise that "due to the extensive staff time and resources required to process an application under the Preservation Statutes, including the cost of obtaining appraisals, HUD would only have processed those applications after it made a determination that prepayment was not an option for that property." Pls.' Mot. 36. Based on his experience in advising and overseeing preservation processing for various owners, he believed that HUD would not have proceeded "too far" into the preservation process, with respect to applications for financial incentives or sale to third parties, unless it had first effectively determined that the property could not meet the statutory criteria for prepayment. *Id.* This would be because proceeding would have involved the cost of "substantial staff time and resources as well as funds for third party appraisals and capital needs assessments." Pls.' App. 391 (Smith Report 14). Accordingly, he examined such documents as a filed POA, the approval of a POA, the preparation of a Form 9607 (which reflected the negotiated preservation values developed under the appraisal process of the Preservation Statutes), and, if done, the record of a WPT by HUD. Pls.' App. 391-393 (Smith Report 14-16). From this examination, he compiled a list of properties that he determined were "prepayment ineligible." Pls.' App. 392 (Smith Report 15).

19

Smith concluded that, by virtue of the results of one or more of the three tests that he performed, all of the properties at issue here would not have met the criteria for prepayment approval. Pls.' App. 380 (Smith Report 3).

        D. Analysis

Defendant notes that the WPT was promulgated in April 1992, but abrogated by Congress in October 1992. Def.'s Supp. App. 3. Furthermore, Defendant notes, the WPT was employed – and only during that interval – when an owner applied for financial incentives in conjunction with maintaining the low-income affordability restrictions, in lieu of seeing prepayment and their termination. *Id*. at 4, 8. It was never intended nor employed as a test of the prepayment criteria. Defendant argues not only that the outcome of the WPT does "not indicate whether HUD would have permitted prepayment," but also that Plaintiffs' expert, Mr. Smith, did not employ the actual WPT that HUD had promulgated.

The affordable areas list that was developed pursuant to test one of the WPT was published only once, in 1992. *Id*. at 4, 9. Moreover, not being on the list of affordable list did not equate to the subject property's inability to meet the test for prepayment. As the WPT notice itself emphasized, "The fact that an area is not on the list does not mean that rental housing is not affordable." Pls.' App. 319. Mr. Smith did not use HUD's 1992 list; rather he "replicated the calculation of the ratio of FMR to affordable rent at median income using data from the year that the subject property submitted a Notice of Intent under ELIHPA or LIHPRHA," and further noted that "[i]f FMR data for the eligibility year were not available, the closest available year of data are used." Pls.' App. 384 (Smith Report 7 n.10).

With respect to test two of the WPT, Defendant faults Mr. Smith for not having performed the multi-factor analysis prescribed in the HUD regulations. Mr. Smith, instead, solely compared a project's regulated rents to market rents, based on appraisals derived during the preservation process, and concluded that a market was "soft" if the difference exceeded 10 percent.

Finally, Defendant accurately notes that Mr. Smith's analysis sidesteps the third part of the WPT, in which financial incentives might still be offered even in a financially accessible, adequately supplied market for low income housing if the incentives were "necessary for other public policy objectives." Pls.' App. 321. In place of that analysis, Mr. Smith developed his own third test founded on a conclusory premise, to wit, that HUD would not have proceeded "too far" into the processing of an application for incentives or third-party sale if it had not already made, or effectively made, a determination that the property could not have met the criteria for prepayment. Because the premise of Mr. Smith's third test is unproven, the court finds it lacking the indicia of facts of the kind that led the Federal Circuit to remand this inquiry to the trial court.

In assessing the evidence that Plaintiffs offer in support of their claim of futility and Defendant's rebuttal thereto, it is worth summarizing the purpose of the WPT and its relationship to the issue of prepayment approval. The Congress was evidently concerned about the burden on the public fisc of expending funds for financial incentives where they were not really necessary.

Financial incentives were intended as a means to induce owners of eligible projects to forego prepayment and thus continue the affordability restrictions on their properties, thus advancing public policy goals relating to the housing needs of low income residents. But if an owner would not likely have sought prepayment in the first place because the economics of the local market would not have been favorable, then financial incentives would merely have meant a "windfall" to the owner. Thus, section 222(e) restricted incentive payments "only to owners in those rental markets where there is an inadequate supply of decent, affordable housing." Pls.' App. 317.

The three sub-part tests of the WPT were designed to help identify the markets where financial incentives were warranted. The first test helped to measure for "markets where housing is inexpensive relative to income." *Id*. Test two tested for the supply of affordable housing. *Id*. The reason for employing both tests was that "[a] market may have an abundant supply of market-rate housing of the type the project would compete with (i.e., be a soft market), but have a limited supply of housing affordable to low-income families." *Id*. Furthermore, even where the market is "both abundant and accessible," special circumstances might still justify financial incentives. *Id*. at 317-18.

While it may be supposed that the markets which met the tests of the WPT as eligible for incentives would be ones in which the criteria for prepayment would not have been met, nevertheless it is far from definitive that eligibility for incentives and prepayment were mutually exclusive. A property might have been determined eligible for incentives for public policy reasons that otherwise might have passed muster for prepayment approval. If Plaintiffs' case depended wholly on Plaintiffs' self-described "elegant and compelling" rationale for using the WPT as an exact proxy for the prepayment criteria, Plaintiffs' case for futility would otherwise fail.

Defendant furthermore is correct in noting that Mr. Smith disregarded the ten factors of test two of the WPT that would be indicative of a soft rental market, i.e., one in which supply exceeds demand. In such a market, incentives might not be warranted because an owner might not find it economical to prepay (but in which prepayment approval might have been granted if sought). These factors were: 1) "Upward trends in the number of defaults and foreclosures in rental projects and the existence of a large inventory of HUD acquired properties."; 2) "Unusually low rents being asked for new units or widespread use of concessions for both new and existing unites. Widespread use of short-term leases."; 3) "Increases in overall rental vacancy rates and increases in vacancies in existing rental projects which had previously had a history of high occupancy."; 4) "Excessive number of vacant rentals (particularly apartments) of particular size, age, project or unit type, or other common characteristic."; 5) "Rental vacancy rates of greater than 10 percent overall and 12 percent or more in multifamily rental projects for a sustained period (24 months)."; 6) "Flat or stable rents in existing projects or rent increases smaller than what could be expected from normal increases in property taxes, utilities, maintenance costs or inflation."; 7) "Newly built rental units are being absorbed at a slower rate than in previous periods, vacancies in existing projects are on the market for a longer period, or new units are being absorbed at the expense of existing units."; 8) "Significant declines in waiting lists and increases in the size and frequency of advertising."; 9) "Construction or proposed construction of a substantial number of rental units."; and 10) "Downturns in the local economy, as indicated by declining employment growth, reductions by major employers or

increased unemployment or evidence that future growth will not be sufficient to increase demand to levels needed to absorb the supply."  Pls.' App. 324.

Finally, as an overall objection to Plaintiffs' evidence of futility, Defendant highlights that the "material affect" criteria under LIHPRHA applied to the availability of low income housing in the area that the property could "reasonably" be expected to serve.  12 U.S.C § 4108(a)(2).  Plaintiffs did not define the respective areas of the properties at issue here nor establish how HUD would have made that determination in response to a POA seeking prepayment approval.  Thus, Defendant argues that HUD "had discretion to determine the area a project 'could reasonably be expected to serve' and what would 'materially affect' the availability of low-income housing in that area."  Def.'s Resp. 18.

Nevertheless, despite these critiques of Mr. Smith's expert analysis, and despite the court's agreement that the WPT tests for financial incentives and the criteria for prepayment approval were not precisely equivalent, the issue is whether Plaintiffs here have approximated the facts regarding futility that passed muster in *Cienega VI*.

Here, Plaintiffs have presented declarations or deposition testimony that the owners' conclusions that it would have been futile to have applied for prepayment were based on their familiarity with their own projects and the supply of low income housing in the markets they served, what they learned from seminars and the counsel of others in the field about the prepayment criteria, and, in some cases, representations by HUD officials that prepayment would not have been allowed  They also present the data compiled by Mr. Smith in reaching his conclusion regarding futility.

Admittedly, in *Cienega VI*, the owners presented uncontested data, compiled from HUD's own determinations, showing that the market rents exceeded the HUD-restricted monthly rent by over 10%, a strict numerical threshold precluding prepayment approval which HUD had no discretion to override.  265 F.3d at 1242, 1246.  Here, while Mr. Smith's data is not derived from joint stipulations of fact, as in *Cienega VI*, or admissions, or the like, it has not been specifically controverted by the Government.  Rather, Defendant has challenged Plaintiffs' equating of the WPT and prepayment criteria tests, Mr. Smith's "replication" of the WPT tests, and the relevance of Mr. Smith's self-created third test, but it has not disputed the accuracy of either the ratio per project of FMR to income in test one of Mr. Smith's analysis or the ratio of market rent to (trended) affordable rent in test two of his analysis.  In these tests, Mr. Smith calculated that, for a number of the properties, the FMR would have exceeded more than 30% of the monthly adjusted income of the low-income tenants or that the FMR would have exceeded more than 10% of the "trended affordable rents."  This data, although presented in the context of the WPT rather than directly as evidence regarding the prepayment criteria, is strikingly akin to the data that was found by the Federal Circuit sufficient to demonstrate futility in *Cienega VI*.  By these criteria, such properties could not have been granted approval for prepayment and release from the affordability restrictions.

As noted, Defendant has not specifically controverted these figures.  On the other hand, Plaintiffs did not proffer these calculations themselves in their proposed findings of uncontroverted fact.  Accordingly, Defendant has not fully been called upon to dispute them via

responses to proposed findings of uncontroverted fact.  Just as the court should be cautious not to exclude Mr. Smith's calculations without affording the Plaintiffs the opportunity to defend their admissibility, so must it afford Defendant a further opportunity to contest them.  The court therefore finds that these calculations raise genuine issues of material fact precluding summary judgment.  The only properties as to which the court grants summary judgment to Defendant are those, if any, which fail to meet either of Mr. Smith's calculations, as to his conclusion of "prepayment ineligible," according to these two tests (that is, not counting his third test at all).[8]

IV.    Conclusion

For the reasons stated above, the court grants Defendant's motion for summary judgment with respect to Plaintiff Thetford IV and any of the Plaintiff properties that do not meet either of the first two tests of Mr. Smith's calculations.  Defendant's motion for summary judgment is denied as to any remaining properties.  Plaintiffs' motion for summary judgment is denied.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

---

[8]  The court will review the status of the properties surviving these and related motions for summary judgment in a subsequent status report to be ordered from the parties.