# In the United States Court of Federal Claims

No. 93-655C

(E-Filed:  February 4, 2016)

|  |  |  |
|---|---|---|
| | ) | |
| ANAHEIM GARDENS, et al., | ) | |
| | ) | Deposition Discovery; Protective |
| Plaintiffs, | ) | Order; RCFC 26(b); RCFC |
| | ) | 26(c)(1); RCFC 30(b)(6) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Harry J. Kelly, III, Washington, D.C., for plaintiffs.

David A. Harrington, Senior Trial Counsel, with whom were Joyce R. Branda, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This is a temporary regulatory takings case.  Plaintiffs are owners of low-income housing who claim a taking of their contractual right to prepay government-insured mortgages on their respective housing projects, and thus to terminate certain governmental restrictions on rents and other aspects of the properties' use.  Defendant is the United States Department of Housing and Urban Development (HUD, the government, or defendant).

Presently before the court is defendant's motion for a protective order in connection with six Rule 30(b)(6) notices issued by plaintiffs.  Def.'s Mot., ECF No. 353; see also Def.'s Reply, ECF No. 362.  Plaintiffs oppose defendant's motion, defending their requests as necessary to satisfy their burden of proof under Penn Central Transp. Co.

v. City of New York, 438 U.S. 104 (1978).  Pls.' Resp., ECF No. 358.  Each party filed an appendix in support of their briefs.  Def.'s App. (DA), ECF No. 353-1; Def.'s Supp. App. (DSA), ECF No. 362-1; Pls.' App. (PA), ECF No. 358-1.  Defendant's motion is ripe for decision.

For the reasons explained below, defendant's motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

I.      Background

       A.      Preservation Statutes

Plaintiffs allege that the enactment of two federal statutes, the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, § 202, 101 Stat. 1877 (1988) (ELIHPA), and the Low-Income Housing Preservation and Resident Homeownership Act of 1990, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (LIHPRHA), collectively known as the Preservation Statutes, prevented them from exercising their contractual right to repay their mortgages upon the twentieth anniversary of the issuance of the mortgage.  Plaintiffs' prepayment rights were later restored by a third federal statute, the Housing Opportunity Program Extension Act of 1996 (Hope Act), Pub. L. No. 104-120, 110 Stat. 834 (1996).

The history and purpose of the Preservation Statutes have been set forth in detail in prior decisions by both the Federal Circuit and this court.  See Cienega Gardens v. United States (Cienega X), 503 F.3d 1266, 1270-73 (Fed. Cir. 2007); Cienega Gardens v. United States (Cienega VIII), 331 F.3d 1319, 1324-28 (Fed. Cir. 2003); Cienega Gardens v. United States (Cienega IV), 194 F.3d 1231, 1234-35 (Fed. Cir. 1998); Anaheim Gardens v. United States, 107 Fed. Cl. 404, 406-08 (2012), recons. granted-in-part, 109 Fed. Cl. 33 (2013), aff'd in part, rev'd in part & remanded sub nom. Biafora v. United States, 773 F.3d 1326 (Fed. Cir. 2014)).

While a review of the entire history is unnecessary here, the court provides the following brief relevant history for ease of reference:

       In 1961, Congress amended the National Housing Act to allow private developers to meet the needs of moderate income families.  Cienega X, 503 F.3d at 1270. Among other things, the amendment provided financial incentives to private developers to build low income housing.  Id. These incentives included below-market mortgages, which permitted the owners to borrow 90% of the cost of the project.  Id.  While the term of the mortgage was 40 years, the contracts allowed the developer to prepay the mortgage

after 20 years.  Id.  Congress also protected the lenders against default by authorizing the Federal Housing Administration [FHA] to insure the mortgages.  Id. at 1270–71.  The tax laws at the time provided a number of tax incentives, which allowed general and limited partners to take large deductions in the earlier years of the investment.  Id. at 1271.  The highly leveraged nature of the investment made the tax benefits large in comparison to the small up-front investment.  Id.

These development programs were regulated by the Department of Housing and Urban Development (HUD), and the developers were required to sign a regulatory agreement binding them to get approval from HUD for certain relevant decisions, for example increases in rent.  Id. The developer also signed a secured note and a mortgage.  HUD, in turn, provided mortgage insurance for the investment.  Id. The restrictions in the regulatory agreement were in effect as long as HUD insured the mortgage on the property; for practical purposes this meant the developers were subject to HUD regulation until the mortgage was paid off.  Id.  The twenty year prepayment option in the mortgage therefore gave the developers an opportunity to cast off the regulatory burden and convert their development to market rate housing.

While this plan induced developers to provide low income housing, Congress ultimately grew worried that participants would prepay their mortgages and exit the program en mass.  Id. at 1272.  In order to avoid the resulting shortage of low income housing, Congress enacted ELIHPA and LIHPRHA.  Id.  The exact restrictions placed on the developers are detailed in, e.g., Cienega X, but the salient issue in this case is that an owner was no longer free to prepay the mortgage after twenty years.

CCA Assocs. v. United States, 667 F.3d 1239, 1242-43 (Fed. Cir. 2011).

B.      Plaintiffs

On April 30, 2013, the previously assigned judge consolidated Anaheim Gardens v. United States, No. 93-655, and Algonquin Heights Assocs., L.P. v. United States, No. 97-582, and designated Anaheim Gardens as the lead plaintiff.  Order, ECF No. 327. Fifty-one plaintiffs are currently litigating their claims in this consolidated matter.

By agreement of the parties, plaintiffs are proceeding to trial in subsets known as waves.  See Joint Status Report 1, ECF No. 330; Discovery Order, ECF No. 331.  The parties jointly designated six plaintiffs as the First Wave plaintiffs, and only these six

plaintiffs are now conducting fact and expert discovery.[1]  Scheduling Order, ECF No. 378.  The six First Wave plaintiffs are <u>Algonquin Heights</u> plaintiffs Buckman Gardens, L.P. and Chauncy House Company, and <u>Anaheim Gardens</u> plaintiffs Cedar Gardens Associates, Rock Creek Terrace L.P., 620 Su Casa Por Cortez, and 3740 Silverlake Village, L.P.  Joint Status Report, ECF No. 330; Notice, ECF No. 332.

C.    Instant Discovery Dispute

Each First Wave plaintiff issued defendant a separate Rule 30(b)(6) notice seeking testimony on essentially the same eight requests.[2]  <u>See</u> DA001-017.

Defendant moved for a protective order, arguing that plaintiffs' requests were vague, overly broad, and sought testimony about irrelevant subjects and time periods.[3] Def.'s Mot. 6-14.  Defendant made specific objections to each of plaintiffs' eight requests, in some cases seeking to limit the request (first, seventh and eighth requests), and in other cases seeking to strike the request in its entirety (second, third, fourth, fifth, and sixth requests).

Defendant also moved for a protective order seeking to limit the six First Wave plaintiffs to deposing its Rule 30(b)(6) witness over only one seven-hour day, rather than the six days plaintiffs sought through their six separate notices.  Def.'s Mot. 5-6.  The court previously ruled on this portion of defendant's motion, deciding that plaintiffs could depose defendant's Rule 30(b)(6) witness for up to three seven-hour days.

---

[1]    There may be limited exceptions in which a non-First Wave plaintiff is involved in discovery to preserve witness testimony for trial.  <u>See</u> Order, ECF No. 327.

[2]    Three requests sought testimony specific to the city in which each plaintiff's property was located (second, sixth and eighth requests), and three requests sought testimony for slightly different time periods, which varied with the dates of each plaintiff's investment and alleged taking (sixth, seventh and eighth requests).  <u>See</u> DA001-017.  In the second, sixth and eighth requests, plaintiffs seek testimony about the rental markets in (1) Boston, Massachusetts, (2) Encinitas, California, (3) Rockville, Maryland, (4) Los Angeles, California, (5) Fairfax County, Virginia, and Alexandria, Virginia, and (6) Fresno, California.  DA002, DA005, DA008, DA011, DA014 & DA017.

[3]    In compliance with Rule 26(c)(1), of the Rules of the United States Court of Federal Claims (RCFC), defendant stated it "conferred in good faith to attempt to resolve this dispute without Court action, but such efforts have been unsuccessful."  Def.'s Mot. 1, ECF No. 353.

4

Anaheim Gardens v. United States, No. 93-655, 2014 WL 4401529, at *3-6 (Fed. Cl. Sept. 5, 2014).

Finally, defendant asked this court to quash the deposition notice issued by First Wave plaintiff 3740 Silverlake Village, L.P. (Silverlake Village).  Def.'s Mot. 6 n.4. Defendant argued that Silverlake Village was not a plaintiff in this matter, as explained in its then-pending motion for summary judgment seeking the dismissal of Silverlake Village.  Id.  The court denied defendant's motion, Anaheim Gardens v. United States, 118 Fed. Cl. 669 (2014), thus mooting defendant's request to quash the notice issued by Silverlake Village.

II.     Legal Standard

        A.      Rule 30(b)(6) Discovery

        Either party may take discovery that is "relevant to any party's claim or defense." RCFC 26(b)(1).  With regard to Rule 30(b)(6) discovery,

> [i]n its notice or subpoena, a party may name as the deponent . . . a governmental agency . . . and must describe with reasonable particularity the matters for examination.  The named organization must then designate one or more . . . persons who consent to testify on its behalf[.] . . . The persons designated must testify about information known or reasonably available to the organization.

RCFC 30(b)(6).  The government agency then

> has "an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are 'known or reasonably available' to the corporation."  King v. Pratt & Whitney, 161 F.R.D. 475, 476 (S.D. Fla. 1995) (quoting FRCP 30(b)(6)), aff'd, 213 F.3d 646 (11th Cir. 2000). . . . Thus, RCFC 30(b)(6) "implicitly requires the designated representative to review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent . . . a half-hearted inquiry. . . ."  Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc., No. 05–2164–MLB–DWB, 2007 WL 1054279, at *3 (D. Kan. Apr. 9, 2007).

A-G Innovations, Inc. v. United States, 82 Fed. Cl. 69, 80 (2008).[4]

However, "there exists no obligation to produce [Rule 30(b)(6)] witnesses who know every single fact surrounding a matter, only those that bear relevance or are material to events directly underlying a dispute." Dairyland Power Coop. v. United States, 79 Fed. Cl. 709, 715 (2007) (citing Banks v. Office of the Senate Sergeant–at–Arms, 241 F.R.D. 370, 373 (D.D.C. 2007); Wilson v. Lakner, 228 F.R.D. 524, 529 n.7 (D. Md. 2005)). "[T]he designated deponent must be prepared 'to the extent that matters are reasonably available.'" Banks, 241 F.R.D. at 373 (quoting Wilson, 228 F.R.D. at 528).

B.      Rule 26 Protective Order

"A party or any person from whom discovery is sought may move for a protective order."  RCFC 26(c)(1).  If "good cause" exists, "[t]he court may . . . issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Id.

"[T]he party seeking the protective order bears the burden of showing good cause." Forest Prods. Nw., Inc. v. United States, 62 Fed. Cl. 109, 114 (2004), aff'd, 453 F.3d 1355 (Fed. Cir. 2006).  "Good cause requires a showing that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden." Forest Prods. Nw., Inc., 453 F.3d at 1361.  "[B]road allegations of harm, unsubstantiated by specific examples, are insufficient to justify issuance of a protective order."  Lakeland Ptnrs, L.L.C. v. United States, 88 Fed. Cl. 124, 133 (2009).  As this court has explained, to prevail on an objection to allegedly burdensome discovery:

> [T]he objecting party must do more than "simply intone [the] familiar litany
> that the [discovery sought is] burdensome, oppressive or overly broad."  The

---

[4]      "[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure."  RCFC rules committee's note to 2002 amendment, at 1.  RCFC 26(b)(2)(C), RCFC 26(c)(1) and RCFC 30(b)(6), all relevant to this motion, are identical to their counterparts in the Federal Rules of Civil Procedure.  The court therefore relies on cases interpreting each of these federal rules, as well as cases interpreting this court's rules.  With regard to RCFC 26(b)(1), also relevant to this motion, the court is aware that the Advisory Committee on Civil Rules significantly amended Fed. R. Civ. P. 26(b)(1) as of December 1, 2015.  Prior to this amendment, however, RCFC 26(b)(1) was identical to its federal counterpart. With regard to Fed. R. Civ. P. 26(b)(1), the court relies only on cases issued prior to December 1, 2015.

> objecting party bears the burden of demonstrating "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, [unduly] burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden."

Id. at 133 n.6 (some alterations in original) (quoting Lamoureux v. Genesis Pharmacy Servs., Inc., 226 F.R.D. 154, 158-59 (D. Conn. 2004)).

In deciding whether to limit discovery, a trial court should "consider 'the totality of the circumstances, weighing the value of the material sought against the burden of providing it,' and taking into account society's interest in furthering 'the truth seeking function' in the particular case before the court." Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002) (quoting Rowlin v. Alabama, 200 F.R.D. 459, 461 (M.D. Ala. 2001)). Rule 26(b)(2)(C) authorizes the court to impose limits if:

> the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

RCFC 26(b)(2)(C)(iii).

The Supreme Court has further opined that "discovery, like all matters of procedure, has ultimate and necessary boundaries. . . . [A]s Rule 26(b) provides, . . . limitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege. Hickman v. Taylor, 329 U.S. 495, 507-08 (1947). Ultimately, whether to issue a protective order is subject to the broad discretion of the trial court. Florsheim Shoe Co. v. United States, 744 F.2d 787, 797 (Fed. Cir. 1984) ("Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court."). The court has a variety of options should it find a motion for protective order is warranted, including "forbidding the disclosure or discovery" or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." RCFC 26(c)(1)(A), (D).

III.    Discussion

The court considers defendant's objections to each of First Wave plaintiffs' eight requests in turn.

A.              Plaintiffs' First Request

Plaintiffs seek testimony about studies prepared or commissioned by HUD, or any other government agency, between 1970 and 1996, regarding the effects of any action—including, but not limited to, the Preservation Statutes—by the United States to restrict the ability of owners of HUD-financed housing properties to prepay their HUD-insured mortgages.[5] DA001, DA004, DA007, DA010, DA013 & DA016 (No. 1).

Defendant states it knows of only three reports that satisfy this request, as below, and will prepare its witness to answer appropriate questions about each report.  See Def.'s Mot. 8; Def.'s Reply 9.

> (1) U.S. General Accounting Office,[6] GAO/RCED-94-177FS, Multifamily Housing, Information on Projects Eligible for Preservation Assistance (1994);
> (2) HUD Office of Inspector General, 95-BO-114-0001, Evaluation Report – HUD Multifamily Preservation Program (1995); and
> (3) Congressional Budget Office Staff Memorandum, Implications of the Prepayment Provisions in the Cranston-Gonzalez Act (1992).

Def.'s Mot. 8; Def.'s Reply 7-8, 19.

Defendant otherwise asserts plaintiffs' first request is "vague and breathtaking in scope," and is "not stated with 'reasonable particularity.'"  Def.'s Mot. 7 (quoting RCFC 30(b)(6)).  Defendant points out that the request concerns a time period of twenty-six years, seeks information from every federal government agency, and extends beyond the Preservation Statutes.  Id.  Accordingly, defendant seeks a protective order to preclude

---

[5]      Any analysis, study, summary, investigation, evaluation, or examination, conducted, prepared or commissioned by HUD or any other Government agency, at any time between 1970 and 1996, whether formal or informal, and whether complete or incomplete, related to or regarding the impact(s), effect(s) and/or consequence(s) of any action by the United States to restrict the ability of the owners of Section 221(d)(3) or Section 236 housing properties to prepay the HUD-insured mortgages on their properties, including without limitation, the provisions and terms of the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA") and/or the Low Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"). DA001, DA004, DA007, DA010, DA013 & DA016 (No. 1).

[6]      The United States General Accounting Office (GAO) is now known as the Government Accountability Office.

plaintiffs from inquiring about any report other than the three identified reports.  Def.'s Mot. 8; Def.'s Reply 9.

1.     Twenty-Six Year Period

Plaintiffs defend the twenty-six year period for their request by pointing out that defendant's own discovery requests cover the same period, Pls.' Resp. 2-3, and that "the entire twenty-six year period is relevant because it is directly tethered to the facts and events at issue, and as a result, it is not unnecessarily broad or 'breathtaking' in scope." Id. at 3.

That a time period is relevant for some requests, however, does not necessarily mean that it is relevant for all requests.  In determining a relevant time period for plaintiffs' first request, the task is to identify the earliest date the concerns that led to the enactment of ELIHPA, on February 5, 1988, could have resulted in the type of study contemplated by plaintiffs.  The legislative history for ELIHPA shows that Congress became concerned about the impact of owners exercising their prepayment rights on the low-income housing stock as early as the mid-1980s.

> Over the past year, the Committee has had several hearings on the potential loss of units from the subsidized housing stock due to the prepayment of insured multifamily mortgages. The potential loss of units to low and moderate income families over the next several years could be anywhere from 500,000 to 1 million units.

H.R. Rep. No. 100-122(I), at 35 (1987), as reprinted in 1987 U.S.C.C.A.N. 3317, 3351; see also CCA Assocs. v. United States, 91 Fed. Cl. 580, 587 (2010) ("In the mid-1980s, Congress became concerned that owners of housing insured under Section 221(d)(3) would begin to exercise their prepayment rights, thereby reducing the total number of low-income housing units."), aff'd in part, rev'd in part & remanded, 667 F.3d 1239 (Fed. Cir. 2011).

Plaintiffs provide no information to support a finding that information responsive to their first request existed prior to the mid-1980s, and the court is aware of none.  The court finds that plaintiffs' request is overbroad, and defendant is granted a protective order for plaintiffs' first request for information prior to 1982.

2.     Every Federal Government Agency

Plaintiffs take the position that a "common sense" interpretation of their request would mean "the only federal agencies the Government needs to seek information from

are those that are reasonably likely to possess relevant responsive information, and that is most certainly not 'every agency in the entire Federal government.'" Pls.' Resp. 4. Plaintiffs claim this is not the first time the government has argued that one of their deposition topics is overly broad, relying on an unreasonable interpretation of their deposition notice. "[T]he Government has already been admonished in this case that discovery requests are not to be read in a vacuum and interpreted in an unreasonable manner just so that they can be objected to as overly broad." Pls.' Resp. 3 (citing Algonquin Heights v. United States, No. 97-582, 2008 WL 2019025, at *4 (Fed. Cl. Feb. 29, 2008) (order granting plaintiffs' motion to compel additional Rule 30(b)(6) testimony)).

Plaintiffs misstate the issue in the Algonquin Heights ruling, which was not whether plaintiffs' deposition request was overly broad. In Algonquin Heights, plaintiffs noticed a Rule 30(b)(6) deposition to include testimony about the "document retention policies of HUD." Algonquin Heights, 2008 WL 2019025, at *2. After defendant's witness, according to plaintiffs, was unprepared to answer its questions "concerning how HUD managed the actual files of the Plaintiffs in this case, including what would be included in those files and where they would be kept," id., plaintiffs moved to compel additional testimony "about [HUD's] document retention practices and policies," id. at *1. In its opposition, defendant argued that plaintiffs' attempt to compel testimony about HUD's document retention "practices and policies" went beyond the scope of their deposition notice, in which they sought testimony about HUD's document retention "policies." Id. at *3.

The court was unpersuaded by defendant's attempt to draw a distinction between the terms practice and policy, finding that to do so "would write into RCFC 30(b)(6) a much more stringent standard than what the rule requires," which is "reasonable particularity." Id. at *4.

> Common sense dictates that it would be both counterproductive and wasteful for plaintiffs to inquire solely into HUD's document retention policy without also intending to place that inquiry within a relevant litigation context, i.e., how HUD effectuated, or did not effectuate, that policy in this case. See Pls.' Mot. 5 ("The fact that HUD had a policy, however, does not explain how HUD followed-or did not follow-that policy in practice.").

Id. Thus the Algonquin Heights court refused to permit defendant to rely on its narrow interpretation of plaintiffs' notice, an interpretation the court found at odds with common sense.

In this matter, plaintiffs argue that defendant is <u>required</u> to use its common sense to narrow the boundaries of their first request, as "the outer limits of the First subject matter are clear if common sense is used." Pls.' Resp. 4. The <u>Algonquin Heights</u> ruling provides plaintiffs with no support, as nothing in that ruling suggests that the testifying party (defendant) has the burden of using its "common sense" to determine the "outer limits" of the examining party's (plaintiffs) notice.

Rather, the burden of defining its deposition topics with reasonable particularity rests with plaintiffs, not defendant. <u>See, e.g.</u>, 8A Charles Alan Wright et al., <u>Federal Practice & Procedure</u> § 2103, Westlaw (database updated Apr. 2015) (footnote omitted) (stating that if "the party seeking [Rule 30(b)(6) deposition] discovery has [failed to] adequately designate[] the subjects on which it wants information . . ., the corporate party may seek relief from the court."); <u>see also</u> <u>Whiting v. Hogan</u>, No. 12-cv-8039, 2013 WL 1047012, at *11 (D. Ariz. Mar. 14, 2013) ("The burden is on . . . the party requesting the deposition[] to satisfy the 'reasonable particularity' standard of Rule 30(b)(6).")

Defendant's obligation is to prepare its witness to "testify about information known or <u>reasonably available</u> to the organization." RCFC 30(b)(6) (emphasis added). In effect, plaintiffs have acknowledged their first request goes beyond this standard, and is overbroad, as they have indicated their willingness to eliminate a few federal agencies from their first request.

> Fundamentally, the only federal agencies the Government needs to seek information from are those that are reasonably likely to possess relevant responsive information, and that is most certainly not "every agency in the entire Federal government." If the Government requires assistance to figure it out, the First Wave Plaintiffs are comfortable concluding that it is unlikely that the Department of Transportation, Department of Defense, Department of Health and Human Services, or other like agencies will possess any relevant responsive information, and so those agencies are not captured by the scope of the subject matter.

Pls.' Resp. 4.

The court finds that plaintiffs' notice for testimony about reports from "any other Government agency" is overbroad. Defendant's request for a protective order as to the federal agencies from which it must seek information is granted-in-part. Defendant may limit its search to the U.S. Department of Housing and Urban Development, and any of its predecessors, the U.S. Government Accountability Office, and any of its predecessors, and the Congressional Budget Office.

11

3.      Preservation Statutes

Plaintiffs posit that the ideas resulting in the Preservation Statutes preceded their enactment, and that such information, if it exists, is relevant.  Pls.' Resp. 5.  "If in fact the Government did study, analyze, investigate or evaluate another means of taking away the First Wave Plaintiffs' prepayment rights other than by having Congress enact ELIHPA and LIHPRHA, then that information is encompassed within the scope of the First subject matter."  Id.  Defendant offered no reply to plaintiffs' explanation.

The court finds that plaintiffs are correct, that such information would be relevant to plaintiffs' first request, and this part of plaintiffs' first request is not overbroad. Defendant's request for a protective order is denied to the extent it seeks to limit its inquiry to the Preservation Statutes.

Defendant's motion for a protective order for plaintiffs' first request is **GRANTED-IN-PART and DENIED-IN-PART**.  Defendant may limit its search to information from 1982 to 1996 from the U.S. Department of Housing and Urban Development, and any of its predecessors, the U.S. Government Accountability Office, and any of its predecessors, and the Congressional Budget Office.  Defendant's motion is otherwise denied.

B.             Plaintiffs' Second Request

Plaintiffs seek testimony about studies prepared by HUD, or any other government agency, between 1970 and 1996, regarding the effects of ELIHPA or LIHPRHA on the rental market in which the property of each First Wave plaintiff is located.[7]  DA001-002, DA004-5, DA007-8, DA010-11, DA013-14 & DA016-17.

Defendant states that plaintiffs have not specified any report, Def.'s Mot. 12, and that it "is unaware of any such report," Def.'s Reply 14.  Defendant "seeks a protective order stating that it need not designate a witness to address the second matter for examination;" defendant reasons that when an organization possesses no knowledge as to

---

[7]      "Any analysis, study, summary, investigation, evaluation, or examination, conducted, prepared or commissioned by HUD or any other Government agency, at any time between 1970 and 1996, whether formal or informal, and whether complete or incomplete, related to or regarding the impact(s), effect(s) and/or consequence(s) of the provisions and terms of ELIHPA and/or LIHPRHA on the rental markets in Boston, Massachusetts."  DA001-002, DA004-5, DA007-8, DA010-11, DA013-14 & DA016-17. (No. 2).

matters listed in the notice and is unable to prepare a witness, it has no duty to proffer a witness.[8]  Def.'s Mot. 13 (citing <u>Barron v. Caterpillar, Inc.</u>, 168 F.R.D. 175, 177-78 (E.D. Pa. 1996); 7 <u>Moore's Federal Practice</u> § 30.25[3] (2014)).

Plaintiffs respond that they expect the government's witness to testify "about the existence or lack thereof of the requested reports, analyses, studies, etc."  Pls.' Resp. 8.

Rule 26(b) provides that any party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including <u>the existence</u>, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."  RCFC 26(b) (emphasis added).  "A witness ordinarily cannot escape examination by denying knowledge of any relevant facts, since the party seeking to take the deposition is entitled to test the witness's lack of knowledge." 8A Charles Alan Wright et al., <u>Federal Practice & Procedure</u> § 2037, Westlaw (database updated Apr. 2015); <u>cf.</u> <u>Iris Corp. Berhad v. United States</u>, 84 Fed. Cl. 489, 494 (2008) (declining to issue protective order for a Rule 30(b)(6) deposition, despite the testifying party's argument that it had already produced all available evidence, as "[p]arties to litigation do not have to accept their opponent's statement that all relevant evidence has been produced[,] . . . they are entitled to test this assertion in questioning witnesses during depositions.")

Nor does defendant's cited authority provide it with support, as the court in <u>Barron</u> addressed an inapposite point—that is, whether a testifying party must provide a <u>second</u> Rule 30(b)(6) witness when the examining party found the testimony of the <u>first</u> witness to be deficient.  <u>See</u> <u>Barron</u>, 168 F.R.D. at 177.  While the cited portion of <u>Moore's Federal Practice</u> does state that "if an organization truly does not possess knowledge as to matters listed in the notice, and is unable to prepare a designee, it has no duty to make a designation under Rule 30(b)(6),'" the case law in support of this statement shows that this treatise similarly considers the testifying party's duty when the examining party is dissatisfied with its Rule 30(b)(6) witness's testimony.  7 <u>Moore's Federal Practice</u> § 30.25[3] n.15 (2014) (citing <u>Barron</u>, 168 F.R.D. at 177-78; <u>Dravo Corp. v. Liberty Mut. Ins. Co.</u>, 164 F.R.D. 70, 75-76 (D. Neb. 1995) (considering whether a testifying party must designate a second Rule 30(b)(6) witness for additional testimony when the examining party was dissatisfied)).

---

[8]      Defendant also notes that four of the six First Wave plaintiffs did not allege a taking claim under ELIHPA; thus it argues these four plaintiffs are not entitled to discovery on ELIHPA.  <u>See</u> Def.'s Mot. 12 n.10.  As discussed later, this argument is unpersuasive.  <u>See</u> <u>infra</u> Part III.D.2 (fourth and fifth requests).

At this point, the court would ordinarily deny defendant's request for a protective order for plaintiffs' second request.  But, the court observes that plaintiffs' second request includes the same two parameters for which the court granted defendant a protective order as to plaintiffs' first request—the time period (1970 to 1996) and the information source (any other Government agency).  Notwithstanding defendant's position that it is aware of no responsive reports, there is no purpose served in protecting defendant from these overbroad parameters in one request, but not in another.  And "[i]t is 'axiomatic that a trial court has broad discretion to fashion discovery orders[.]'" <u>AG-Innovations, Inc.</u>, 82 Fed. Cl. at 76 (quoting <u>White Mountain Apache Tribe of Ariz. v. United States</u>, 4 Cl. Ct. 575, 583 (1984)).

As plaintiffs seek studies about the "impact(s), effect(s) and/or consequence(s) of the provisions and terms of ELIHPA and/or LIHPRHA," <u>see</u> <u>supra</u> note 7, the enactment of ELIHPA on February 5, 1988 would be the earliest possible date of such a study.  For the reasons discussed in plaintiffs' first request, <u>see</u> <u>supra</u> Part III.A.2, plaintiffs' second request is limited to the U.S. Department of Housing and Urban Development, and any of its predecessors, the U.S. Government Accountability Office, and any of its predecessors, and the Congressional Budget Office.

Defendant's motion for a protective order for plaintiffs' second request is **GRANTED-IN-PART and DENIED-IN-PART**.  Defendant may limit its search to information from 1988 to 1996 from the U.S. Department of Housing and Urban Development, and any of its predecessors, the U.S. Government Accountability Office, and any of its predecessors, and the Congressional Budget Office.  Defendant's motion is otherwise denied.

C.      Plaintiffs' Third Request

Plaintiffs seek testimony regarding any oral or written communication, between HUD and the owners of each property, directly or indirectly related to the development or construction of their property.[9]  DA002, DA005, DA008, DA011, DA014 & DA017.

---

[9]      "Any communications, oral or written, between HUD (or its predecessor agency the Federal Housing Administration ("FHA")) and the owner(s) (or the owner's representative(s) or agent(s)) of [the property], directly or indirectly, related to the development and/or construction of the property."  DA002, DA005, DA008, DA011, DA014 & DA017.

1.     Oral Communications

Defendant states that it is "unaware of any particular verbal communications between HUD and plaintiffs regarding the development or construction of the plaintiffs' respective multi-family housing projects." Def.'s Mot. 9 n.7.  Defendant takes the position that it is not obligated to "designate a witness to testify about information that is not reasonably available," which would include "verbal discussions that took place . . . more than forty years ago," if at all, with employees who "retired long ago." Def.'s Mot. 9 (citing Barron, 168 F.R.D. at 177-78).  As previously discussed in the second request, Barron provides defendant with no support for this position.  See supra Part III.B.

Plaintiffs respond that defendant's inability to identify particular verbal communications is "not a sufficient basis" for a protective order, and that defendant has a duty to contact its former employees. Pls.' Resp. 10 (citing QBE Ins. Corp. v. Jorda Enters., 277 F.R.D. 676, 689 (S.D. Fla. 2012) ("[A] corporation with no current knowledgeable employees must prepare its designees by [conducting] . . . if necessary, interviews of former employees or others with knowledge.")).

Defendant replies that the "[f]ederal employees involved during the development phase retired decades ago and are unavailable." Def.'s Reply 9.  Defendant repeats that it is unaware of any particular verbal communications and points to an interrogatory response in which it stated as much. Def.'s Reply 9 (citing DSA12 (Def.'s Resp. Interrog. No. 12)).

Defendant's interrogatory response notwithstanding, plaintiff is entitled to question defendant's witness about any matter "relevant to any party's claim or defense—including . . . the identity and location of persons who know of any discoverable matter." RCFC 26(b)(1).  Plaintiffs correctly rely on QBE Insurance for defendant's duty to prepare its 30(b)(6) witness by attempting, if necessary, to interview knowledgeable former employees.  See Pls.' Resp. 10.  However, the court in QBE Insurance also said that a corporation "must perform a reasonable inquiry for information that is reasonably available to it," QBE Ins. Corp., 277 F.R.D. at 689, and that a "corporation cannot be faulted for not interviewing individuals who refuse to speak with it," id. at 691.

Defendant's motion for a protective order for the third request is denied with respect to oral communications.

15

2.      Written Communications

The dispute regarding written communications centers on a set of documents defendant produced to each First Wave plaintiff—known as the Washington Docket—that relates to the construction and development of each project.  Def.'s Mot. 9. Defendant acknowledges that the documents contained therein are relevant, as they "could conceivably relate to the investment-backed expectations prong of <u>Penn Central</u>." <u>Id.</u>  Defendant describes each of the six Washington Dockets as "voluminous," and because of this, it wants plaintiffs to identify those documents about which plaintiffs seek to question defendant's Rule 30(b)(6) witness.  <u>Id.</u>

Plaintiffs agree that the relevant documents are voluminous.  "[T]here are six First Wave plaintiffs, which means that, collectively, there is a large volume of documents required to prepare a witness for each individual Plaintiff's case . . . ."  Pls.' Resp. 12. Plaintiffs nonetheless refuse to identify specific documents within each Washington Docket, leading defendant to argue that plaintiffs have "failed to provide reasonable specificity about the matters for examination."  Def.'s Mot. 10.

Plaintiffs suggest that if they are forced to specify particular documents in each Washington Docket, they will be unable to ask defendant about the existence of relevant written communications <u>other</u> than those included in each Washington Docket.

> First Wave Plaintiffs should be allowed to confirm under oath what communications took place.  If under oath, the Government's deponent identifies other communications beyond what is in the Washington Dockets, those other communications are also relevant subject matters for discussions. The wrong approach would be to grant a protective order to prevent the First Wave Plaintiffs from confirming the extent of those communications, or [to] require them, as a precondition, to identify a specific list of documents.

Pls.' Resp. 12 n.3.

Plaintiffs are correct that they are entitled to ask defendant about the existence of written communications.  <u>See</u> RCFC 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the <u>existence</u>, description, nature, custody, condition, and location of any documents . . . .") (emphasis added).  Plaintiffs do not explain, however, how identifying documents within each Washington Docket would prevent them from asking defendant's witness about the existence of other written communications, and the court is aware of no reason why this would be so.

16

Plaintiffs rely on <u>Magnesium Corporation of America</u> for the proposition that a protective order is not justified merely because a Rule 30(b)(6) witness is called upon to testify about a large volume of documents, as defendant's witness will be in this case. Pls.' Resp. 12 (citing <u>United States v. Magnesium Corp. of Am.</u>, No. 2:01-cv-40, 2006 WL 6924985, at *4 (D. Utah Nov. 27, 2006) (order granting Magnesium's motion to compel designation of Rule 30(b)(6) witnesses)).

Magnesium Corporation sought to depose the United States Environmental Protection Agency (EPA) about three subject matters, including the "EPA's evaluation of ecological and human risk at the Rowley[, Utah] facility and similar sites elsewhere, and facts pertaining to EPA's practices regarding remediation and corrective action at the Rowley facility and similar <u>other sites</u>." <u>Magnesium Corp.</u>, 2006 WL 6924985, at *1 (emphasis added). The EPA refused to designate a witness, claiming that the notices were not stated with reasonable particularity, as the EPA had thousands of environmental sites nationwide, and it was unable to designate a witness unless Magnesium Corporation specified the sites for which it sought information. <u>Id.</u> at *2.

The district court found the EPA's objection unpersuasive, pointing both to the plain text of the notices and a limitation to which Magnesium Corporation agreed during briefing. <u>Id.</u> at *3. As the court saw it, "more than half of the subjects upon which [Magnesium] seeks information pertain only to the Rowley, Utah facility" and with regard to information for "other sites," Magnesium sought only "those risk assessments that were relied upon as a substantial factor in corrective or remedial action decisions," for which the court found the EPA should be able to identify a witness. <u>Id.</u> As neither the text of the First Wave plaintiffs' notice—nor plaintiffs' briefing on the motion for protective order—provides the particularity found in the <u>Magnesium Corporation</u> notice, this case does not support plaintiffs' position.

The court finds more persuasive here the reasoning of a different district court called upon to decide whether Rule 30(b)(6) deposition topics were stated with reasonable particularity.

> <u>Some of the requested categories cover a large amount of information that may be irrelevant to Plaintiffs' [the examining party's] claims.</u> The categories "company policies and procedures," "company employee retention process," "employer handbooks", "employment manuals" are overbroad as they are not limited to areas relevant to this personal injury matter. Although the categories of "employee specific employment file" and "any file materials" are limited to Defendant Dana Hogan, there may be numerous records contained therein. The inquiry into Hogan's employment file should be further limited to the relevant topics in this case. The burden

17

> is on Plaintiffs, as the party requesting the deposition, to satisfy the "reasonable particularity" standard of Rule 30(b)(6). Without further clarification, Defendants cannot reasonably designate and prepare a corporate representative to testify on their behalf regarding these broad lines of inquiry.

Whiting, 2013 WL 1047012, at *11 (emphasis added) (order amending plaintiff's Rule 30(b)(6) deposition notice and granting motion to compel deposition). Similarly, the documents at issue in First Wave plaintiffs' deposition of defendant are "voluminous," and as they "relate[] to the construction and development of each project," they will cover numerous topics that are not relevant to plaintiffs' investment-backed expectations.

The court also considers the recommendation of the Advisory Committee on Civil Rules on the factors that weigh in favor of permitting extended time for a deposition. The court previously granted plaintiffs an extended period in which to depose defendant's Rule 30(b)(6) witness, over the objection of defendant. See Anaheim Gardens, 2014 WL 4401529, at *7. According to the Advisory Committee,

> [p]arties considering extending the time for a deposition--and courts asked to order an extension--might consider a variety of factors. . . . If the examination will cover events occurring over a long period of time, that may justify allowing additional time. In cases in which the witness will be questioned about numerous or lengthy documents, it is often desirable for the interrogating party to send copies of the documents to the witness sufficiently in advance of the deposition so that the witness can become familiar with them.

Fed. R. Civ. P. 30(d) advisory committee's note to 2000 amendment (emphasis added).

The court finds it would be an undue burden, in terms of time and expense, for defendant to prepare a witness about a large number of documents that will be of no interest to plaintiffs. Defendant's motion for a protective order for plaintiffs' third request is **GRANTED-IN-PART and DENIED-IN-PART**. Plaintiffs are directed to identify those documents within each of the six Washington Dockets about which it wishes to question defendant's Rule 30(b)(6) witness. Defendant's motion is otherwise denied.

The court notes that defendant attempts to take the position that it will limit preparation of its witness to "authenticat[ing] documents in the Washington Dockets and to answer[ing] basic questions about those documents." Def.'s Mot. 9. Plaintiffs are

correct that defendant may not limit itself solely to authenticating documents.  Pls.' Resp. 12-13 (citing Wilson, 228 F.R.D. at 528).

     D.          Plaintiffs' Fourth and Fifth Requests

     Plaintiffs seek testimony regarding any oral or written communication, between HUD and the owners of the property, related to the mortgage—including, but not limited to—the right to prepay the mortgage without HUD's consent (fourth request[10]), and the impact on plaintiffs of the provisions in the Preservation Statutes that restricted each plaintiff's ability to prepay the mortgage without HUD's consent (fifth request[11]). DA002, DA005, DA008, DA011, DA014 & DA017.

     Defendant seeks a protective order "precluding the fourth and fifth matters for examination" for two reasons.  Def.'s Mot. 13-14.  First, defendant objects that "plaintiffs seek testimony about the effect of the Preservation Statutes on the contractual right to prepay their respective mortgages," a question settled in February 2013 when the judge previously assigned to this case ruled that plaintiffs' claims were ripe, because it was futile for plaintiffs to seek permission to prepay their mortgages.  Id. at 13 (citing Anaheim Gardens v. United States, 109 Fed. Cl. 33 (2013).  Defendant argues that re-litigation of a settled issue is precluded under the law of the case doctrine, and any discovery on this issue would be unduly burdensome.  Def.'s Reply 15.

     Second, defendant points out that the four Anaheim Gardens First Wave plaintiffs brought their claims under LIHPRHA only.  Def.'s Mot. 13-14.  Thus defendant seeks a protective order to preclude those plaintiffs from seeking testimony about the effect of ELIHPA on them.  Id.

---

[10]     "Any communications, oral or written, between HUD (or its predecessor agency FHA) and the owner(s) ((or the owner's representative(s) or agent(s)) of [the property] related to the terms of the mortgage and mortgage note, including but not limited to, the right to prepay the mortgage without HUD's consent after [the date of the alleged taking]."  DA002, DA005, DA008, DA011, DA014 & DA017 (No. 4).

[11]     "The impact(s), effect(s) or consequence(s) on the Plaintiff of the provisions and terms of ELIHPA and/or LIHPRHA that restricted the ability of the Plaintiff to prepay the mortgage on [the property] without HUD's consent after [the date of the alleged taking]."  DA002, DA005, DA008, DA011, DA014 & DA017 (No. 5).

1.      Plaintiffs' Right to Prepay Their Mortgages

Plaintiffs acknowledge that both requests "involve" their prepayment rights, but dispute "that the subject matter [of either request] is solely and exclusively related to ripeness."  Pls.' Resp. 13-14.

Defendant replies that "[p]laintiffs' discovery is not objectionable because it relates to ripeness; it is objectionable because the viability of a request to prepay under the Preservation Statues was determined by the Court during the ripeness phase."  Def.'s Reply 15 (citing Anaheim Gardens, 109 Fed. Cl. 33).

Defendant is correct that neither party could re-litigate previously settled issues, including the ripeness of plaintiffs' claims.  "The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  Sacramento Mun. Utility Dist. v. United States, 566 F. App'x 985, 995 (Fed. Cir. 2014) (citing Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16 (1988)).  The court agrees that testimony about the viability of a request to prepay under the Preservation Statues is unnecessary in the merits phase of this litigation, and thus is unduly burdensome.

Defendant's objection, however, assumes that whether plaintiffs could prepay their mortgages is the only question that falls within their fourth and fifth requests.  Considering the text of plaintiffs' requests, it is not apparent to the court that plaintiffs seek such testimony.  Nor is it clear why plaintiffs would do so, as they were the prevailing party on the ripeness issue.  See Anaheim Gardens, 109 Fed. Cl. at 39 ("Plaintiffs' motion for summary judgment on ripeness is granted . . . .").

The court does not read plaintiffs' requests as narrowly as defendant.

2.      ELIHPA Discovery for Four First Wave Plaintiffs

Defendant objects to discovery about ELIHPA as irrelevant, because plaintiffs have no ELIHPA claim.  Def.'s Mot. 13.  By so objecting, defendant effectively takes the position that it is impossible for discovery about ELIHPA to be relevant to plaintiffs' LIHPRHA claims.

Plaintiffs disagree, characterizing LIHPRHA as the "successor statute to ELIHPA, and not a separate, unrelated replacement statute."  Pls.' Resp. 18.  Further, plaintiffs point out that their discovery rights are not limited by defendant's view of a legal argument or theory, and defendant may not "use its theory of a legal issue to block relevant discovery."  Id. at 20.

In reply, defendant emphasizes that "ELIHPA and LIHPRHA are distinct statutes[, and] taking claims based on ELIHPA and LIHPRHA are distinct." Def.'s Reply 18 (citing Cienega X, 503 F.3d at 1279). The portion of Cienega X on which defendant relies is provided below.

>    [W]e consider whether ELIHPA constituted a taking. The owners do not separately argue that ELIHPA constitutes a taking, and there is no basis for treating ELIHPA and LIHPRHA the same. ELIHPA was a temporary restriction that was enacted on February 5, 1988, and was only in effect until LIHPRHA was enacted on November 28, 1990. None of the owners' twenty-year prepayment deadlines expired during the period that ELIHPA was in effect, and the owners that entered into use agreements all signed the agreements well after LIHPRHA was enacted. There has been no showing that ELIHPA restricted the plaintiff owners' freedom of action in any meaningful way. . . . Accordingly, we find that ELIHPA did not effectuate a taking with respect to these owners.

Cienega X, 503 F.3d at 1279 (emphasis added) (footnote omitted). The court does not read the Cienega X decision that no taking occurred to limit discovery in the way defendant urges.

It is not the case that "a fact must be alleged in a pleading for a party to be entitled to discovery of information concerning that fact. [Rather,] that . . . fact must be germane to a specific claim or defense asserted in the pleadings for information concerning it to be a proper subject of discovery." AG-Innovations, Inc., 82 Fed. Cl. at 77 (quoting 6 James Wm. Moore et al., Moore's Federal Practice ¶ 26.41 (3d ed. 2008)[12]). Nothing in defendant's argument supports a finding that discovery about ELIHPA is irrelevant to plaintiffs' LIHPRHA claims.

Defendant has failed to show good cause for a protective order. Defendant's motion for a protective order for the fourth and fifth requests is **DENIED**.

---

[12]    The quoted material now appears in 6 James Wm. Moore et al., Moore's Federal Practice ¶ 26.42[1] (3d ed. 2015).

E.      Plaintiffs' Sixth Request

Plaintiffs seek testimony about eleven identified categories of information about the rental market[13] in which each property is located, for a time period ranging from twenty-three to twenty-six years.[14]  DA002, DA005, DA008, DA011, DA014 & DA017.

For both the low to moderate income rental housing and conventional market rental housing markets, plaintiffs seek testimony about:

(1)      supply and demand;
(2)      vacancy rates;
(3)      quality of the rental units;
(4)      forecasted, planned, expected or actual development of rental units;
(5)      the market value of rental housing units;
(6)      the type and mix of available residential rental housing.
(7)      forecasted, planned, expected or actual growth of businesses;
(8)      market trends, including economic, population, employment, and development trends;
(9)      unemployment rates;
(10)     proximity of retail stores and businesses within 10 miles of the property; and

---

[13]      The terms rental housing market, geographic area, geographic location or geographic market are used interchangeably.

[14]      Plaintiffs' request for Chauncy House, owned by First Wave plaintiff Chauncy House Company, is included below in its entirety.

The low to moderate income housing rental market and the conventional rental market in Boston, Massachusetts from 1973 through 1996, including but not limited to, the following types of information: the supply of and demand for low to moderate income housing and conventional market rental units, vacancy rates for and the quality of both types of rentals, all forecasted, planned, expected, or actual development of low to moderate income housing and conventional units, the market value of residential rental housing units, the type and mix of available residential rental housing, all forecasted, planned, expected or actual growth of business(es), market trends (economic, population, employment, and development), unemployment rates, the proximity of retail stores and businesses within 10 miles of Chauncy House, and access to public transportation.

DA002 (No. 6) (emphasis added).

(11)   access to public transportation.

Id.

Defendant objects that the sixth request is excessively broad, to the point of being "staggering and unbounded." Def.'s Mot. 10-11. No part of plaintiffs' request, argues defendant, bears on the economic impact of either Preservation Statute "on plaintiffs' properties at the time of the alleged takings in the 1990s, or on any other issue relevant to the first wave plaintiffs' claims." Id. at 11. Defendant seeks a protective order striking the sixth request from plaintiffs' deposition notices. Id.

Plaintiffs argue that the testimony they seek is relevant to the Penn Central investment-backed expectations prong, which requires them to show that their expectations were "objectively reasonable." Pls.' Resp. 15. To satisfy this burden, plaintiffs assert they must provide the court with

> [d]etailed facts about the geographic market where the properties were located when they were developed or purchased, as compared to the markets years later, when prepayment would have been possible but for ELIHPA and LIHPRHA, [because such facts] are necessary to meet the Plaintiffs' burden under Penn Central. Specifically, facts such as the rents charged, the actual and potential for growth in the area, increases in population, the local job market, surrounding commercial development, and the desirability of living in the area, as evidenced in part by vacancy rates, all directly bear on the reasonableness of the Plaintiffs' expectations related to their investments.

Id. (emphasis added).

In effect, plaintiffs take the position that satisfying the Penn Central investment-backed expectations prong requires a showing that as reexamined at the time of the alleged taking, their early investment-backed expectations were accurate. Stated another way, if plaintiffs based their investment on an expectation that the geographic location of their property would prosper and result in an increase in property value, then plaintiffs must show that the expected growth did occur.[15] Plaintiffs, however, provide no authority for this position, and the court is aware of none.

---

[15]   As discussed later, this was the investment strategy pursued by the plaintiff in CCA Associates. See CCA Assocs. v. United States, 91 Fed. Cl. 580, 609-10 (2010), aff'd in part, rev'd in part & remanded, 667 F.3d 1239 (Fed. Cir. 2011).

While plaintiffs are correct that certain evidence about the location and character[16] of a property may be relevant to proving that their expectations at the time of investment were objectively reasonable, it is clear that evidence collected years after plaintiffs' investment—even if it shows that plaintiffs' expectations turned out to be correct—does not satisfy plaintiffs' legal burden.  As the Federal Circuit has observed:

> The Court of Federal Claims explained that "factors associated with the location and character of projects strongly influenced the reasonable expectation of the owners, judged on an objective and not a subjective basis." CCA, 91 Fed. Cl. at 609.  While this may be true, the only objective evidence of the industry's investment backed expectations is a quote from a 1972 guide[17] which indicated that a project located "in a growing suburban or exurban area, . . . may increase in value over the years, [and create] substantial residual profits to the investors upon sale or other disposition." Id. (quotations and citations omitted, emphasis added).

CCA Assocs., 667 F.3d at 1247-48 (emphasis added).

In accepting only the 1972 guide as objective evidence of the industry's investment-backed expectations,[18] the Federal Circuit necessarily rejected the remainder of the evidence on which the trial court relied in its finding that CCA Associates carried its burden for the investment-backed expectations prong.  In relevant part, the trial court's consideration of the evidence is included below.

> [I]n the instance of Chateau Cleary, the potential returns very much depended on its geographical location.  "[T]he Norman Brothers chose . . . to invest in a property in West Metairie, [Louisiana] then considered to be in the path of future development in the New Orleans area and an emerging middle-class neighborhood." CCA Assocs., 75 Fed. Cl. at 192.  The reasonableness of

---

16      Location has been defined as the property's development area, and its character as including the quality of construction and type of amenities provided.  See CCA Assocs., 91 Fed. Cl. at 608 (citing testimony of the government's tax accounting expert).

17      Charles L. Edson & Bruce S. Lane, Bureau of National Affairs, Inc., A Practical Guide to Low– and Moderate–Income Housing 11:8 (student ed. 1972) ("1972 guide").

18      While the Federal Circuit did find that the 1972 guide provided objective evidence, it also found that this evidence was insufficient to carry plaintiff's burden, as the discussion was hypothetical, rather than specific to the location of CCA Associates' property.  See CCA Assocs. v. United States, 667 F.3d 1239, 1247-48 (Fed. Cir. 2011).

this projection was confirmed by the development of West Metairie, as evident from a site visit in 2006.  Id. at 193. . . .

. . . In short, factors associated with the location and character of projects strongly influenced the reasonable expectations of the owners, judged on an objective and not a subjective basis.

     . . . .

[A] 1972 guide to low– and moderate-income housing stated that "[o]ne of the principal benefits of ownership of a federally assisted housing project is the tax shelter that it generates."  Edson & Lane, at 11:6.  Yet, in a section summarizing the advantages of obtaining a limited partnership interest in federally assisted projects, the guide also states, "[w]here a project is located in a growing suburban or exurban area, it may increase in value over the years, thus creating substantial residual profits to the investors upon sale or other disposition."  Id. at 11:8.  CCA's Chateau Cleary project falls into this latter category where the prospect of long-term appreciation was the chief incentive and thus the prepayment right was critically important.

     . . . .

. . . CCA had a long-term strategy based on Chateau Cleary's location.  CCA invested in a property they considered to be "located in a growing suburban or exurban area" that they hoped would "increase in value over the years" and "creat[e] substantial residual profits . . . upon sale or other disposition."  Edson & Lane, at 11:8.  Subsequent events have born[e] out CCA's investment strategy, as growth has come to the area.  Chateau Cleary was recently appraised at approximately $5 million.  2009 Tr. 46:1–12 (Norman).

CCA Assocs., 91 Fed. Cl. at 609-10 (emphasis added).

The trial court concluded that "CCA had an objectively reasonable, investment-backed expectation with respect to the right to prepay."  Id. at 610.  The Federal Circuit found that the trial court "erred by holding [that] this factor weighed in favor of a taking," as the evidence "fail[ed] to demonstrate that CCA's investment-backed expectations were objectively reasonable in light of industry practice as a whole, as required by Cienega X."  CCA Associates, 667 F.3d at 1248.  The Federal Circuit thus rejected as objective evidence of the industry's investment-backed expectations both the confirmed development in the West Metairie area and the value of Chateau Cleary at the time of the trial.

The Federal Circuit's rejection of evidence that was available in 2006, long after CCA Associates' initial investment in 1971, is consistent with the settled authority that plaintiffs must establish that their expectations were reasonable at the time of investment. "As with the other [Penn Central] factors, the burden is on the owners to establish a reasonable investment-backed expectation in the property at the time it made the investment." Cienega X, 503 F.3d at 1288 (emphasis added) (citing Forest Props., Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999)). "The point in time when the [reasonable investment-backed expectations] analysis is conducted is the time at which the complaining party entered into the activity that triggered the obligation, Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1350 (Fed. Cir. 2001) (en banc)), specifically when the [owners] entered the [HUD] programs." Chancellor Manor v. United States, 331 F.3d 891, 904 (Fed. Cir. 2003). "Cienega X indicates that contemporaneous documents, such as prospectuses, may help prove the existence of objectively reasonable investment strategies. Cienega X, however, does not require the use of prospectuses, and other kinds of evidence may be equally enlightening." CCA Associates, 667 F.3d at 1248 n.4 (emphasis added) (citing Cienega X, 503 F.3d at 1290-91).

Having closely reviewed the governing authority, the court concludes that with regard to the investment-backed expectations prong, plaintiffs' position that they must provide information about the geographic market in which their properties are located at the time of the alleged taking—rather than at the time of the initial investment—is based on a misreading of the pertinent cases.

With regard to the economic impact prong of the Penn Central test, plaintiffs assert, without further discussion, that "testimony about the markets where the properties are located affects . . . th[is] . . . prong." Pls.' Resp. 14. The Federal Circuit, however, has identified at least two ways to evaluate economic impact.

> First, a comparison could be made between the market value of the property with and without the restrictions on the date that the restriction began (the change in value approach). The other approach is to compare the lost net income due to the restriction (discounted to present value at the date the restriction was imposed) with the total net income without the restriction over the entire useful life of the property (again discounted to present value). Neither approach appears to be inherently better than the other, and on remand the Court of Federal Claims should consider both as well as any other possible approaches that determine the economic impact of the regulation on the value of the property as a whole.

<u>Cienega X</u>, 503 F.3d at 1282.

The relevance of plaintiffs' sixth request to the economic impact prong is not apparent on its face, and the party seeking discovery bears the burden of explanation. <u>See, e.g.</u>, <u>In re Jemsek Clinic, P.A.</u>, Nos. 06-31766, 06-31986, 2013 WL 3994666 (Bankr. W.D.N.C. Aug. 2, 2013) ("[W]hen a request for discovery is overly broad on its face or when relevancy is not readily apparent, the <u>party seeking discovery</u> has the burden to show the relevancy of the request." (quoting <u>Cunningham v. Std. Fire Ins. Co.</u>, No. 07-02538, 2008 WL 2668301, at *4 (D. Colo. Jul. 1, 2008))).

Moreover, as defendant points out, plaintiffs have failed to limit their sixth request to the eleven identified categories of information. Instead, plaintiffs seek information "<u>including but not limited to</u>" the identified categories. <u>See</u> Def.'s Mot. 10 (emphasis added) (quoting Pls.' Sixth Request). Defendant is correct that the plain text of plaintiffs' sixth request is unbounded, and courts have found such language to be overbroad because the testifying party is unable to prepare its witness to respond to such a request. For example, in <u>Reed v. Bennett</u>, the court found:

> [P]laintiff's Rule 30(b)(6) notice to be overbroad. Although plaintiff ha[d] specifically listed the areas of inquiry for which a 30(b)(6) designation [was] sought, she [also] indicated that the listed areas [were] not exclusive. <u>Plaintiff broadens the scope of the designated topics by indicating that the areas of inquiry will "includ[e], but not [be] limited to" the areas specifically enumerated.</u> An overbroad Rule 30(b)(6) notice subjects the noticed party to an impossible task. . . . Where, as here, the defendant cannot identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible.

<u>Reed v. Bennett</u>, 193 F.R.D. 689, 692 (D. Kan. 2000) (emphasis added) (order, inter alia, granting motion to quash Rule 30(b)(6) deposition notice, pending modification); <u>accord</u> 8A Charles Alan Wright et al., <u>Federal Practice & Procedure</u> § 2103 n.11, Westlaw (database updated Apr. 2015) (quoting <u>Reed</u>, 193 F.R.D. 689); <u>see also</u> <u>Tri-State Hosp. Supply Corp. v. United States</u>, 226 F.R.D. 118, 125 (D.C.D.C. 2005) (adopting <u>Reed v. Bennett</u> reasoning to find an individual topic incorporating the phrase "including but not limited to" to be overbroad).

Accordingly, defendant's motion is **GRANTED** as to plaintiffs' sixth request.

Plaintiffs, however, may revise and reissue their request. Plaintiffs are cautioned to carefully review their request and take care to avoid reissuing an overbroad request. For example, the court notes that plaintiffs requested information about "the proximity of

retail stores and businesses" within 10 miles of each property. Using simple geometry—with each property sitting at the center of a circle with a 10 mile radius—the court concludes that plaintiffs requested information for an area comprising approximately 314 square miles. On its face, such a request is overbroad. Plaintiffs are cautioned that should defendant again seek a protective order for plaintiffs' revised sixth request, the court will require plaintiffs to clearly explain the relevance of each category of requested information under Penn Central.

F.      Plaintiffs' Seventh and Eighth Requests

In their seventh request, plaintiffs seek testimony about the physical condition of each property for a period of time ranging from twenty to twenty-four years, beginning with the year in which each plaintiff developed or purchased the property, and ending with the year in which the alleged taking of each property occurred.[19] DA002, DA005, DA008, DA011, DA014 & DA017.

In their eighth request, plaintiffs seek testimony about both the rents received by each property, and the actual market rents for the market in which each property is located, for the same twenty to twenty-four year period of time.[20] Id.

For the seventh request, and for the portion of the eighth request that seeks testimony about rents received by each property, defendant objects on the ground that the time period for which plaintiffs seek information is overly broad and abusive. Def.'s Mot. 14. While defendant acknowledges that testimony on both topics is relevant to the economic impact prong, it asserts that "[u]nder Penn Central, the pertinent inquiry is the economic effect of the Government regulation on [the] parcel as a whole at the time of the alleged taking." Id. (emphasis added) (citing Cienega X, 503 F.3d at 1280-82). Thus defendant seeks a protective order narrowing the time period for both the "seventh and eighth requests to the period beginning five years before the alleged takings." Id.

---

[19]      "The physical condition of [the property] from [the year of the property development or purchase] through [the year of the alleged taking]." DA002, DA005, DA008, DA011, DA014 & DA017 (No. 7). The year of property development or purchase ranged from 1970 to 1973, and the year of the alleged taking ranged from 1991 to 1995.

[20]      "The rents received by the property from [the year of the property development or purchase] through [the year of the alleged taking], and the actual market rents for the same period in the market in which [the property] was located." Id. (No. 8).

Additionally, for the portion of the eighth request that seeks testimony about the actual market rents for the market in which each property is located, defendant interprets this request as seeking opinion testimony about hypothetical market rents for the First Wave plaintiffs' properties, which it contends plaintiffs must seek from a qualified expert, not its Rule 30(b)(6) witness. Id. at 11-12.  Accordingly, defendant seeks a protective order to prevent plaintiffs from questioning its witness about this portion of the eighth request.

1.      Seventh Request – Physical Condition

Plaintiffs argue that the testimony they seek is relevant to their investment-backed expectations, and that defendant's proposed five-year limitation would hinder their ability to obtain relevant testimony.  See Pls.' Resp. 16.  In opposing defendant's motion, plaintiffs take the position that "HUD's views about the physical condition of the properties from development through the prepayment date . . . are highly relevant."  Id. (emphasis added).  In support of this position, plaintiffs provide an example pertaining to First Wave plaintiff Cedar Gardens and its owner, Mr. James Bancroft.  Mr. Bancroft testified that at the time he was developing Cedar Gardens, FHA representatives noted that he appeared to be spending more money to build his property than was necessary; in turn, Mr. Bancroft replied that he was doing so knowingly, as he wanted the property to be easily convertible into a conventional market rent property at the expiration of the twenty year prepayment restriction.  See id. (citing PA063).

But plaintiffs' mere description of Mr. Bancroft's conversation with a FHA representative fails to explain how the FHA representative's opinion about the physical condition of his property is relevant to plaintiffs' burden of proving their investment-backed expectations.  Nor have plaintiffs provided either an explanation or any authority that would help explain their position.  As defendant correctly has observed, plaintiffs simply "provide no cogent support" for their position.  Def.'s Reply 16.

The Federal Circuit has stated that it is the owners' expectations that are relevant in the Penn Central analysis, not those of the United States.  "In considering any requests for further discovery, the court must recognize that the pertinent reasonable expectations are those of the project owners, not of the United States."  Chancellor Manor, 331 F.3d at 906 n.8.  Given this authority, the court is unable to find that the testimony of defendant's representative is relevant to plaintiffs' investment-backed expectations.

As to the economic impact prong, plaintiffs have offered no objection to defendant's proposed five-year limitation.  Accordingly, the court concludes that five years' worth of information is sufficient for the purpose of the economic impact prong.

Defendant's motion for a protective order for the seventh request is **GRANTED** for the period beginning five years prior to the date of the alleged taking for the property of each First Wave plaintiff.

2.      Eighth Request – Rents Received

Regarding the portion of the eighth request in which plaintiffs seek testimony about the rents received by each property, plaintiffs assert that their request "directly relate[s] to the economic impact and investment-backed expectations prongs of the Penn Central test, as well as to damages," and defendant's attempt to limit this request to five years prior to the date of the alleged taking is "unfair because it unreasonably constrains exploration of a subject that is essential to the First Wave Plaintiffs' claims." Pls.' Resp. 18. Plaintiffs, however, provide neither argument nor authority to support their conclusory assertion.

As an initial matter, damages discovery is premature at this stage of the proceedings. The parties are now conducting fact and expert discovery. See Scheduling Order, ECF No. 378. The court will not consider whether the information plaintiffs seek is relevant to their possible damages.

Regarding economic impact, the Federal Circuit has provided two possible, but not exclusive, methods to determine economic impact, neither of which requires information about rent payments dating back twenty years from the date of the alleged taking.

> First, a comparison could be made between the market value of the property with and without the restrictions on the date that the restriction began (the change in value approach). The other approach is to compare the lost net income due to the restriction (discounted to present value at the date the restriction was imposed) with the total net income without the restriction over the entire useful life of the property (again discounted to present value). Neither approach appears to be inherently better than the other, and on remand the Court of Federal Claims should consider both as well as any other possible approaches that determine the economic impact of the regulation on the value of the property as a whole.

Cienega X, 503 F.3d at 1282 (footnote omitted) (internal citation omitted).

While plaintiffs are correct that the relevant time for evaluating their investment-backed expectations is the time of their investment, which in the case of the First Wave plaintiffs is sometime between 1970 to 1973, plaintiffs provide no explanation as to how

information on rents received by their properties in the early years of their investment is relevant to their proof of their investment-backed expectations.  Nor is this apparent in the relevant authority.  As the Federal Circuit has explained,

> [t]he first step of the [investment-backed expectations] analysis is to determine the actual investment that the general and limited partners made in the property.  The second step is to determine the benefits that the owners reasonably could have expected at the time they entered into the investment.  The third step is to determine what expected benefits were denied or restricted by the government action. . . . In other words, it is impossible to determine whether the owners' expectations were reasonable without knowing the total value of the investment; its relationship to the benefits available to the owners, including any tax benefits; and the anticipated benefits that were denied or restricted by the government action.  Finally, the claimant must establish that it made the investment because of its reasonable expectation of receiving the benefits denied or restricted by the government action, rather than the remaining benefits.

Id. at 1289 (footnote omitted).

Plaintiffs have provided the court with nothing on which it could base a finding that they need twenty years' worth of information about rents received to prove either economic impact or their investment-backed expectations.  The court concludes that plaintiffs' request is overly broad.

> 3.  Eighth Request – Actual Market Rents in the Market in Which Each Property Was Located

Plaintiffs clarified the portion of their eighth request in which they seek testimony about the "actual market rents . . . in the market in which [the property] was located."  Plaintiffs seek "information about the market rents charged for comparable multi-family properties in the same market in which . . . [each] Plaintiff's property is located."  Pls.' Resp. 17.

The clarification notwithstanding, defendant continues to seek a protective order precluding plaintiffs from seeking testimony about this portion of their eighth request, as "HUD did not develop comparable rents," therefore testimony about such rents must be "obtained from a qualified expert—not from a Rule 30(b)(6) deposition of the United States."  Def.'s Reply 13.

That defendant may have no responsive information does not provide good cause for a protective order. See supra Part III.B (second request). Defendant is only responsible for designating a witness to "testify about information known or reasonably available to the organization," RCFC 30(b)(6), however plaintiffs are not obliged to accept defendant's word for this. See, e.g., 8A Charles Alan Wright et al., Federal Practice & Procedure § 2037, Westlaw (database updated Apr. 2015) ("A witness ordinarily cannot escape examination by denying knowledge of any relevant facts, since the party seeking to take the deposition is entitled to test the witness's lack of knowledge.").

Defendant's motion for a protective order for the eighth request is **GRANTED** for the period beginning five years prior to the date of the alleged taking for the property of each First Wave plaintiff, but is otherwise denied.

IV.    Conclusion

As discussed above, and summarized below, defendant's motion for a protective order is **GRANTED-IN-PART** and **DENIED-IN-PART**.

| Request | Ruling |
|---------|--------|
| First Request | Defendant may limit its search to information from 1982 to 1996 from the U.S. Department of Housing and Urban Development, and any of its predecessors, the U.S. Government Accountability Office, and any of its predecessors, and the Congressional Budget Office. Defendant's motion is otherwise denied. |
| Second Request | Defendant may limit its search to information from 1988 to 1996 from the U.S. Department of Housing and Urban Development, and any of its predecessors, the U.S. Government Accountability Office, and any of its predecessors, and the Congressional Budget Office. Defendant's motion is otherwise denied. |
| Third Request | Plaintiffs are directed to identify those documents within each of the six Washington Dockets about which it wishes to question defendant's Rule 30(b)(6) witness. Defendant's motion is otherwise denied. |
| Fourth Request | Denied. |
| Fifth Request | Denied. |
| Sixth Request | Granted. Plaintiffs may revise and reissue their request. |
| Seventh Request | Granted. |
| Eighth Request | Defendant's motion is granted for the period beginning five years prior to the date of the alleged taking for the property of each First Wave plaintiff. Defendant's motion is otherwise denied. |

This order triggers the due dates set in the current scheduling order, ECF No. 378. The schedule for fact and expert discovery for the First Wave plaintiffs is set as follows:

| Event | Date |
|---|---|
| Fact discovery closes | **March 7, 2016** |
| Affirmative expert reports due | **March 28, 2016** |
| Rebuttal expert reports due | **May 12, 2016** |
| Expert discovery closes | **June 13, 2016** |

The parties shall file a joint status report respecting discovery in non-First Wave plaintiffs no later than **April 25, 2016**.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge