# In the United States Court of Federal Claims

Nos. 93-655C, 93-6568, 93-6578, 93-6582, 97-5837, 97-5845[1]

Filed: September 5, 2025

| | |
|---|---|
| **ANAHEIM GARDENS, et al.,** | |
| *Plaintiffs*, | |
| v. | |
| **THE UNITED STATES,** | |
| *Defendant.* | |

*Harry J. Kelly*, *III*, Nixon Peabody LLP, Washington, DC, for the Plaintiffs.

*Amanda L. Tantum*, Senior Litigation Counsel, *A. Bondurant Eley*, Senior Litigation Counsel, *Emma E. Bond*, *Tate N. Walker*, *Brittney M. Welch*, and *Joshua W. Moore*, Trial Attorneys, *Franklin E. White*, *Jr.* Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for the Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

In the realm of government regulation of property, how far is too far? Since 1922, regulatory takings have balanced the right to privately own property against the public need for regulation, providing a distinct cause of action pursuant to the Fifth Amendment. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922). Justice Oliver Wendell Holmes articulated: "[t]he general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415. More than fifty years passed after *Pennsylvania Coal* before the Court endeavored to articulate a test responsive to the query posed above. *See Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978). Now,

---

[1] This case has been combined under Case No. 93-655. The corresponding case numbers are: 93-6568 (*Cedar Gardens Associates*); 93-6578 (*Rock Creek Terrace, L.P.*); 93-6582 (*3740 Silverlake Village, L.P.*); 97-5837 (*Buckman Gardens, L.P., et al.*); and 97-5845 (*Chauncy House Company*). Buckman Gardens, L.P. filed along with its individual general and limited partners and thus Case No. 97-5837 contains additional named Plaintiffs. For purposes of efficiency, this Opinion refers to Buckman Gardens, L.P. and its individual general and limited partners as "Buckman Gardens, L.P."

another fifty years later, courts consistently struggle to apply the *Penn Central* test to determine just what constitutes "too far" in regulatory takings.[2]

The First Wave Plaintiffs ("FWPs")[3] filed a Motion for Reconsideration, (FWPs' Mot. for Recon., ECF No. 818), of this Court's Post-Trial Opinion (FWPs' Op., ECF No. 809). FWPs take issue with nearly every component of the Court's decision, from its interpretation of the *Penn Central* factors to the credibility determinations about FWPs' economic experts. (*See* FWPs' Mot. for Recon.). The Court finds no instances of "manifest injustice" as claimed by FWPs, nor any other reason to reconsider its Opinion. Therefore, the Court **DENIES** the FWPs' Motion. The Court will, however, reissue its Memorandum Opinion and Order to correct a scrivener's error in the investment-backed expectations section of the analysis.

### I.  The FWPs' Motion for Reconsideration

The FWPs offer four core arguments in their Motion for Reconsideration. First, they argue that Buckman Gardens, Chauncy House, and Rock Creek *did* establish reasonable investment-backed expectations to prepay their mortgages after twenty years, contrary to the Court's finding. (FWPs' Mot. for Recon. at 2–21). Second, the FWPs argue that the Court's credibility determinations about both the FWPs' expert and the United States' expert were incorrect. (*Id.* at 23–34). Third, the FWPs maintain that the Court's prohibition against use of demonstratives in the Rule 63 Hearing unfairly prejudiced the FWPs. (*Id.* at 34–37). And fourth, the FWPs insist that the Court incorrectly balanced the *Penn Central* factors. (*Id.* at 37–38).

None of the FWPs' purported grounds merit reconsideration. The Court previously determined that the FWPs' experts were not credible. (FWPs' Op. at 34–44). That credibility determination, made against the backdrop of extensive discovery and trial, coupled with Federal Circuit case law regarding the degree of interference and loss required for compensation under the Fifth Amendment, bars the FWPs' recovery. (*Id.* at 43–44). While the FWPs attack both the Court's comparative assessment of their experts and the Court's interpretation of case law, the FWPs' criticisms are not convincing. (FWPs' Mot. for Recon. at 2–38). Even if the Court *were* to reverse course on the FWPs' other grievances, none would alter the result. The FWPs did not demonstrate enough economic loss, such that it would interfere with their investment-backed

---

[2] Plaintiff successes in regulatory takings cases are rare. Of the 366 federal regulatory takings considered by the federal circuit courts (excluding the Federal Circuit), only twenty-four have been met with some degree of success. Ramsey Thrasher, Comment, *Daunting Odds: Regulatory Takings Claims in the United States Circuit Courts of Appeals*, 94 Miss. L.J. 637, 646 (2025). Consideration of the three *Penn Central* factors—economic harm, interference with investment-backed expectations, and character of the governmental action—presents plaintiffs with substantial obstacles to recovery. *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).

[3] The FWPs are Buckman Gardens, L.P., Chauncy House Company, Cedar Gardens Associates, Rock Creek Terrace L.P., and 3740 Silverlake Village, L.P.

expectations to the point that approximated a physical taking. For these reasons, the FWPs regulatory takings claims fail.

## II. Analysis

The standard for reconsideration is high. A moving party must demonstrate one of three circumstances. First, that an intervening change in the controlling law occurred. *Maehr v. United States*, 767 F. App'x 914, 916 (Fed. Cir. 2019) (citing RCFC 59(a)(1); *Heritage of Am. v. United States*, 77 Fed. Cl. 81, 82 (2007)). Second, that previously unavailable evidence has become available. *Maehr*, 767 F. App'x at 916. Or third, the catchall—that the motion is necessary to prevent "manifest injustice." (*Id.*). A "manifest injustice" is an "injustice that is apparent to the point of almost being indisputable." *Lone Star Indus., Inc. v. United States*, 111 Fed. Cl. 257, 259 (2013) (citations omitted). Reconsideration under the manifest injustice standard applies only where "the [c]ourt has patently misunderstood a party, or has made a decision outside of the adversarial issues presented to the [c]ourt by the parties, or has made an error not of reasoning, but of apprehension." *Wakefield v. Blackboard Inc.*, No. 2024-2030, 2025 WL 1177811 *4 (Fed. Cir. Apr. 23, 2025) (citing *Johnson v. Diamond State Port Corp.*, 50 F. App'x 554, 560 (3d Cir. 2002); *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1241 (D. Del. 1990)).

Sufficient grounds warranting reconsideration are rare, and properly raised motions equally so. *IAP Worldwide Servs., Inc. v. United States,* 141 Fed. Cl. 788, 801 (2019). However, the FWPs contentions are not unusual—they are disappointed litigants. "Reconsideration is not an opportunity for an unhappy litigant to have an additional chance to sway the court." *Boston Edison Co. v. United States*, 156 Fed. Cl. 632, 637 (2021) (quoting *110 West Ewing Assoc., LLC v. United States*, 139 Fed. Cl. 24, 25 (2018) (citation modified)); *see also Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995) ("A motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court 'could have done it better' the first time."). Yet that is what the FWPs seek to do—tell the Court that every finding against them was wrong, that their experts *were* persuasive, and the Court's analysis of the Federal Circuit's case law was incomplete. The Court "will *not* grant a motion for reconsideration if the movant 'merely reasserts . . . arguments previously made . . . all of which were carefully considered by the Court.'" *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002) (quoting *Principal Mutual Life Ins. Co. v. United States*, 29 Fed. Cl. 157, 164 (1993) (citation omitted)); *see Lee v. United States*, 130 Fed. Cl. 243, 252–53 (2017), *aff'd*, 895 F.3d 1363 (Fed. Cir. 2018).

Litigants often conflate grounds for a motion for reconsideration with those for an appeal. Absent new law or newly discovered evidence, reconsideration is appropriate only where the Court has committed a clear error of law or fact, or where necessary to prevent manifest injustice. *IAP Worldwide*, 141 Fed. Cl. at 801; *see Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.,* 228 F.3d 1338, 1350 (Fed. Cir. 2000) (discussing the correlative Federal Rule of Civil Procedure and applicable standard). Disagreement with the Court's credibility determinations or its interpretation of the law generally falls within the scope of appellate review. In this matter, the Court will evaluate only the contentions that it misstated the law or facts; arguments regarding the Court's assessment or weighing of the evidence are not grounds for reconsideration and are more properly addressed on appeal.

Most of the grounds proffered by the FWPs are recycled and have been the subject of extensive briefing and hearings. Further, the FWPs do not allege that the Court's prior decision rested upon a manifest error of law or mistake of fact, let alone allege that such error was patently obvious. Rather, the allegations are based on the same facts as the FWPs' previously adjudicated complaint, couched in a different legal framework. *See also Lee*, 130 Fed. Cl. at 253 (2017) (holding that pre-trial allegations couched in a different legal framework do not present a manifest error). FWPs' belabored arguments fail. They must look elsewhere for relief.

   *A. The FWPs urge use of a nonexistent standard to analyze investment-backed expectations.*

The FWPs argue that the Court applied the wrong legal standard to analyze investment-backed expectations under *Penn Central*. (FWPs' Mot. for Recon. at 3–6). Instead of applying a "primary reason" standard, the FWPs assert that the Court should have applied a "but for" standard, which would have granted the FWPs a lower burden of proof to demonstrate that they had reasonable investment-backed expectations. (*Id.*; FWPs' Reply at 1–2, ECF No. 836 (contending that the "primary reason" standard imposed a "heightened evidentiary burden on plaintiffs[,]" which was legal error, and "adds to the muddle" of law in this area); Mot. for Recon. Hearing Transcript ("Hr'g Tr."), FWPs' Counsel, 5:15–19, Apr. 24, 2025, ECF No. 838). The FWPs cite *CCA Associates v. United States*, 667 F.3d 1239, 1247 (2011) for the proposition "that *Cienega X* . . . does not suggest that there can be only one objectively reasonable investment strategy for the industry, and we hold [that] there . . . can potentially be multiple objectively reasonable investment strategies." (Mot. for Recon. Hr'g Tr., FWPs' Counsel, 6:5–11, Apr. 24, 2025); *Cienega Gardens v. United States*, 503 F.3d 1266 (Fed. Cir. 2007) ("*Cienega X*"). The FWPs argue simultaneously that the Court should have applied a standard with a lower evidentiary burden, and that because the Court found the FWPs had established objectively reasonable expectations, the FWPs have therefore succeeded on the investment-backed expectations prong of the *Penn Central* test entirely. Neither proposition is correct.

The FWPs ignore that the test for investment backed expectations contains both an objective *and* subjective prong. First, while the Court has found that it was *objectively* reasonable for the FWPs to anticipate the expectation to prepay considering industry practice as a whole, the FWPs failed on the *subjective* prong of that test. (FWPs' Op. at 34 ("Ultimately, the Court determines the FWPs had objectively reasonable expectations to prepay their mortgages . . . . However, only Silverlake and Cedar Gardens were also able to sufficiently demonstrate that their investors had subjective expectations to prepay.")). The FWPs now urge use of an over-simplification of the investment-backed expectations analysis detailed in *Cienega X* and applied in *CCA Associates*.[4] *See Cienega X*, 503 F.3d at 1288; *CCA Assocs.*, 667 F.3d at 1247–48. During the hearing, the FWPs essentially argued that the Court should disregard the subjective expectations component of the investment-backed expectations test. (Mot. for Recon. Hr'g Tr., FWPs' Counsel, 6:13–7:2, Apr. 24, 2025). This is a novel and unsupported argument. To the

---

[4] The applicable test is detailed on pages 24 and 25 of the Court's Opinion, and the Court will not reproduce it here. (*See* FWPs' Op. at 24–25, ECF No. 809); *Anaheim Gardens v. United States*, 174 Fed. Cl. 700, 722–23 (2025).

extent that the FWPs are asking this Court to discard the subjective component of the test, the Court declines to do so.

     Second, the FWPs argue that if the Court had correctly applied a "but for" standard instead of a "primary reason" standard, Chauncy, Buckman, and Rock Creek would have successfully met their burdens to demonstrate subjective investment-backed expectations. (*Id.*, 7:3–7).[5] In *Cienega X*, the Court held that "we need not determine at this stage in the proceeding whether the reason for the investment must be the 'primary' expectation or simply that reasonable owners would have not invested 'but for' the expectation . . . ." *Cienega X*, 503 F.3d at 1290. The Court in *CCA Associates* also used both terms: "[the plaintiff] has the burden to present sufficient evidence of these other strategies to establish that it was objectively reasonable for it to view the 20 year prepayment clause as the primary or 'but for' reason for investment." *CCA Assocs.*, 667 F.3d at 1247. *CCA Associates* went even further by using the phrases "but for or primary reason for investment[,]" and "principle or but for cause of investment" to describe the necessary condition to find reasonable investment-backed expectations.[6] *Id.* at 1248. The *CCA Associates* Court did not apply these terms separately, only finding that the plaintiffs had not sufficiently demonstrated that prepayment was the "*the* but for or primary reason for investment." *See id.* (emphasis added).

     This Court is not convinced that the "but for" and "primary reason" standards are exclusive or would produce a different outcome. While *Cienega X* clearly found a difference between the two, it did so without analysis. The later decision in *CCA Associates* did not bifurcate the "primary" or "but for" phrases, nor did it analyze them separately. *See CCA Assocs.*, 667 F.3d at 1247–48. If the *CCA Associates* Court had intended for there to be multiple reasonable investment-backed expectations weighted the same, it presumably would have used "a" instead of "the" to qualify the "but for" reason. *Id.* Reading the sentence as a whole and in the context, "but for" and "primary reason" are the same standard. Even if the Court were to find that a "but for" standard exists wholly separate and apart from the "primary reason" standard, the FWPs offer no clear articulation of how the Court should apply a "but for" standard to the facts of their case. Instead, the FWPs ask this Court to rely on dicta in *Cienega X* to find that there are in fact two standards for assessing investment-backed expectations. Then, the FWPs ask the Court to ignore both the plain phrasing *and* application of these standards in *CCA Associates*. As the FWPs readily note, "neither primary nor but for are currently the law . . . ." (Mot. for Recon. Hr'g Tr., FWPs' Counsel, 8:4–5, Apr. 24, 2025). The Court analyzed this issue applying the most recent binding case law; it will not reconsider based on the FWPs' unsubstantiated proclamations.

---

[5] The Court struggles to justify this argument with FWPs' assertion that there *is* no subjective-backed expectation prong of the investment-backed expectations test. Nevertheless, the Court finds that FWPs argument here can be mitigated in part by correcting a scrivener's error in the Opinion.

[6] The Court finds no difference between the words "primary" and "principle" as used in the *CCA Associates* opinion. *See CCA Associates v. United States*, 667 F.3d 1239, 1247–48 (Fed. Cir. 2011).

Even if the FWPs are indeed correct about the existence of two separate tests, this Court substantively—if not facially—found that Buckman Gardens, Chancy House, and Rock Creek failed to establish *both* the but for *and* primary reason standard. For Buckman Gardens, the Court held that "[testimony fell] short to establish that the prepayment and conversion to market rate rentals was *the* primary reason, or even *a* primary reason for the investment in Buckman." (FWPs' Op. at 27 (emphasis in original)). While the Opinion does not literally use the words "but for" to describe Buckman's lack of reasonable investment-backed expectations, the analysis shows that Buckman failed to demonstrate even the lowest level of expectation in the right to prepay. Omitting the words "but for" is a scrivener's error. (*See* Mot. for Recon. Hr'g Tr., Court, 7:8–25, Apr. 24, 2025). The FWPs seem to be disproportionately concerned with the surface, of the Court's analysis rather than the substance. However, to be consistent with the analyses of Chauncy House and Rock Creek, and to dispel the FWPs' disquietude, the Court revises its Opinion to include the words "but for" in the analysis of Buckman Gardens's investment backed expectations.[7]

For Chauncy House, the Court found that "investors did not view prepayment as the primary or 'but for' reason for investment in Chauncy House." (FWPs' Op. at 29). Similarly, for Rock Creek, the Court held that "[b]ased on the evidence provided, the Court cannot find that the expectation to prepay was the 'primary' or 'but for' reason for investment in Rock Creek." (*Id.* at 30). For both findings, the Court addressed both the primary and but for angles of analysis, *and* incorporated the FWPs preferred verbiage. (FWPs' Op. at 29, 30; *see* Mot. for Recon. Hr'g Tr., FWPs' Counsel, 6:13–7:2, Apr. 24, 2025). The Court can find no reasonable basis for the FWPs' argument that it held Chauncy House or Rock Creek investors to a higher evidentiary burden.

### B. *Reconsideration of the FWPs' subjective investment-backed expectations is improper.*

The FWPs also argue that Buckman Gardens, Rock Creek, and Chauncy House met their burdens to prove that they relied on the right to prepay when they invested in their respective properties. (FWPs' Mot. for Recon. at 6–21). The United States calls these arguments a "bare 'disagreement'" with how the Court weighed the facts. (Def.'s Resp. at 25, ECF No. 823 (quoting *Horizon Lines, LLC v. United States*, 429 F. Supp. 2d 92, 97 (D.D.C. 2006)). The Court agrees.

First, the FWPs disagree with the Court's analysis of Buckman Gardens's investment-backed expectations. The FWPs dispute how the Court used testimony from Barry Gosnell, Murray Haber, and John Wall, (FWPs' Mot. for Recon. at 6–9); in doing so, the FWPs rely on testimony excluded as hearsay, (*id.* at 8 (citing B. Gosnell Dep. 48:17–49:2, JX 202); Order Denying in Part at 13–14, 20, ECF No. 716). The FWPs do not address their reliance on this inadmissible testimony in their Reply. (*See* FWPs' Reply). As for the substance of their argument, the FWPs disagree with the Court's analysis of the testimony provided by each of the three Buckman Gardens witnesses but do not demonstrate legal error by the Court. (FWPs' Mot. for Recon. at 6–9). For example, FWPs criticize the Court's conclusion regarding Mr. Haber's

---

[7] The revision is on page 27 of the Court's reissued Opinion.

"deci[sion] whether to 'syndicate' a property," but the testimony cited by FWPs suggests only that the right to prepay was described in the documentation provided to potential investors. (FWPs' Mot. for Recon. at 7 (citing FWPs' Op. at 27; Haber Dep. 36:5–22, 37:5–9, JX 186)). Mr. Haber had "[n]o specific . . . discussions with any of the investor limited partners that ultimately joined the Buckman Gardens partnership about the ability to prepay after [twenty] years." (Haber Dep. 36:23–37:4).[8] The testimony states nothing about Mr. Haber's determination about whether to invest.

      Second, for Rock Creek, the FWPs rely on a newly conceived argument. Mid-City and the National Corporation of Housing Partnerships ("NCHP") formed a partnership ("RCTLP") in September 1970 and developed Rock Creek as a Section 236 property shortly thereafter. (Joint Stipulations of Facts ("JSOF") at ¶¶ 82–87, ECF No. 546; *see* FWPs' Op. at 11). The National Housing Project ("NHP") acquired a limited partnership interest in RCTLP from NCHP in 1971. (FWPs' Mot. for Recon. at 10 (citing Wall Dep. at 8:1–9, JX 198; First Amendment to Certificate of Rock Creek Terrace Limited Partnership at IRH 0224865–69, JX 89)). Viers Mill Limited Partnership ("Viers Mill") acquired NCHP's interest in RCTLP in 1984, thereby obtaining a 25% ownership interest in the overall partnership. (*See* FWPs' Mot. for Recon. at 11–12).[9] The new argument? The Court should rely on Viers Mill's expectations as evidence that RCTLP intended to prepay Rock Creek's mortgage and exit the program, rather than the expectations of NCHP and NHP. (*See* FWPs' Mot. for Recon. at 11–12). Not only is this novel, and therefore inappropriate to raise for the first time in a motion for reconsideration, it also contravenes common sense and case law.

      The FWPs cite *no* instance within their own pre-trial briefing where they squarely make this argument. The FWPs *mention* Viers Mill in their Post-Trial Brief, but only in a section titled "[FWPs'] Post-Trial Proposed Statement of Facts[,]" not in any substantive argument. (ECF No. 753-1 at 17–18). "Judges are not expected to be mind[ ]readers. Consequently, a [party] has an

---

[8] Much of the FWPs' arguments regarding subjective investment-backed expectations of FWP investors involves asking the Court to take a holistic, birds-eye view of the evidence presented, while in the next breath demanding that the Court weigh certain words and specific phrases more heavily than others. (*Compare* FWPs' Mot. for Recon. at 7 (FWPs' emphasizing specific words in Mr. Haber's testimony) *with* FWPs' Reply at 2 ("The United States twists itself in knots parsing fragments of testimony by Haber and Wall, but the contortions are nonsensical when witness's testimony and related documentary evidence are considered together."), ECF No. 836). The Court has examined and reexamined the testimony regarding subjective investment-backed expectations at all levels, combing through years of lay witness and expert testimony to encapsulating them in a forty-five-page analysis. (*See* FWPs' Op., ECF No. 809). Simply because the Court did not directly cite to certain lines of testimony does not mean that it was not factored into its analysis.

[9] The Preservation Statutes were enacted in 1988 and 1990, respectively. Emergency Low-Income Housing Preservation Act ("ELIHPA"), Pub. L. No. 100–242, 101 Stat. 1877 (1988); The Low-Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"), Pub. L. No. 101–625, 104 Stat. 4249 (1990), 12 U.S.C. §§ 4101–4147.

obligation 'to spell out its arguments squarely and distinctly,'. . . or else forever hold its peace." *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) (quoting *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988)). The Court will not reconsider an issue post-trial that was not raised previously by the movant. *See Ammex, Inc.*, 52 Fed. Cl. at 557.

Even if this argument had been properly raised, it is nonsensical for the Court to examine expectations of an investor who entered the partnership more than a decade *after* the initial investment in the property as "evidence" as it has no relevance to the original investors' expectations. (FWPs' Mot. for Recon. at 9–13; FWPs' Reply at 3–5). Under that logic, the analysis of investment-backed expectations would reset with each new investor, contrary to the Federal Circuit's approach. *Chancellor Manor v. United States*, 331 F.3d 891, 904 (Fed. Cir. 2003) (investment-backed expectations are rooted in the "position" of plaintiff partnerships at "the time at which the complaining party entered into the activity that triggered the obligation, . . . specifically when the [plaintiffs] entered the programs."). Viers Mill's involvement came fourteen years after RCTLP invested in Rock Creek and developed it as a Section 236 property. (*See* FWPs' Post-Trial Proposed Findings of Fact at 17). The Court examined testimony from the original investors regarding their reasonable, investment backed expectations. (FWPs' Op. at 30). They had none.

Third, for Chauncy House, the FWPs argue that the Court improperly relied on the regulatory agreement ("121A Agreement") between Chauncy House Company ("CHC"), and the Boston Redevelopment Authority ("BRA"), and a Private Placement Memorandum ("PPM") issued by CHC to prospective investors. (FWPs' Mot. for Recon. at 13–17). The Court found that the forty-year 121A Agreement "expressly prohibited" the CHC investors from prepaying and converting to market-rate housing, therefore frustrating their ability to form any reasonable investment-backed expectations. (FWPs' Op. at 29). The FWPs' complaints that the Court's consideration of the 121A Agreement was inappropriate fail.

Sharply contrasting to the preceding Viers Mill argument, where the FWPs claim that evidence of investor intent fourteen years after the development of Rock Creek should have been persuasive, the FWPs inexplicably challenge the Court's consideration of the 121A Agreement that was submitted only *two days* following the execution of the Chauncy House partnership agreement. (FWPs' Mot. for Recon. at 17; *see* Def.'s Resp. at 30). This contemporaneous evidence of the investors' intent to operate the project under Chapter 121A is probative and convincing. While the 121A Agreement did not prevent prepayment after twenty years, its restriction on annual returns had a forty-year term. (DX 85; FWPs' Mot. for Recon. at 20–21; Def.'s Resp. at 30–31); s*ee* Mass. Gen. Laws Ann. ch. 121A, § 13 (1945) (West).[10] The Court

---

[10] FWPs also argue that "the term of the 121A Agreement would not have affected CHC's plans" and "BRA rules did not bar prepayment and conversion to market rentals." (FWPs' Mot. for Recon. at 17–20). The Court addressed many of the FWPs' arguments in its Opinion and will not repeat them again here. (*See* FWPs' Op. at 28–29). The Court simply used the 121A Agreement as "evidence" of the original CHC investors' investment expectations (or lack thereof) in the

8

will not make the illogical leap that that a reasonable investor would convert the property to market-rate rentals after twenty years when no additional yield above the already guaranteed annual cap of six percent existed from operation as low and moderate-income housing. (*See* JSOF at ¶ 4).

Lacking a persuasive substantive argument, the FWPs also advance a procedural claim— that the Court cannot rely on evidence of the 121A Agreement because the United States did not disclose any contentions of fact or law related to the 121A Agreement prior to trial, thereby violating this Court's rules. [11] (FWPs' Mot. for Recon. at 14–17 (citing RCFC 13(c)(3), Appendix A)). The time to raise this issue was at trial. The FWPs did not. (Trial Tr. vol. 3, 609:12–16, Jan. 11, 2023, ECF No. 645; Trial Tr. vol. 11, 2141:18–2142:13, Jan. 24, 2023, ECF No. 674).[12] Only now—after over thirty years of litigation and the 121A Agreement being executed and testified to by Chauncy House's own representative on two occasions—do the FWPs level charges of "trial by ambush." (FWPs' Reply at 6). The FWPs concede that they were made aware at Mr. Reagan's 30(b)(6) deposition by 2007 at the latest—more than a decade prior to trial. (Mot. for Recon. Hr'g Tr., 23:18–21, Apr. 24, 2025; FWPs' Mot. for Recon at 14; *See* Reagan 2007 Dep., 88:4–12, JX 193). Moreover, CHC was presumably aware of the existence of the agreement even prior to that—seeing as the 121A Agreement was *theirs*. (Mot. for Recon. Hr'g Tr., 23:22–25, Apr. 24, 2025 (The Court: "[Y]our client was aware the entire time, right, of the existence of that agreement?" FWPs' Counsel: "Presumably, yes.")). Nevertheless, the FWPs argue that there was no "disclosure" of the 121A Agreement until Mr. Maurice Barry testified at

---

same manner that FWPs asked the Court to rely on the investment expectations of Viers Mill, above. The only difference being that the 121A Agreement was entered into significantly closer in time after the partnership was formed, and therefore significantly more relevant than the expectations of Viers Mill's investors.

[11] FWPs cite to Appendix A, Parts IV and VI of RCFC 13(c)(3) for the rule that counsel "disclose to opposing counsel all contentions as to applicable facts and law unless previously disclosed." (FWPs' Mot. for Recon. at 14). Appendix A, Part VI, requires that there be disclosure of "all contentions as to applicable facts and law." RCFC 13(c)(3). This language refers to the facts and legal theories that a party relies on to make their case. Essentially, it is the foundation upon which a party's legal argument is built. The purpose of this rule is to promote transparency and avoid trial by ambush by ensuring that opposing counsel is aware of the primary arguments that will be advanced at trial. However, evidence used to impeach a witness at trial would not count as a contention. A contention, by definition, is "a point advanced or maintained in a debate or argument." *Contention*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2003). By contrast, evidence used to impeach at trial is primarily used to challenge the credibility of a witness—it is not typically used to present a substantive legal argument. Therefore, an argument made at trial for impeachment purposes would not constitute a contention requiring pretrial disclosure under Rule 13(c)(3).

[12] Notably, FWPs' objections to the 121A Agreement during Mr. Barry Gosnell's testimony were overruled by the predecessor Judge. (Mot. for Recon. Hr'g Tr., 25:7–26:20, Apr. 24, 2025, ECF No. 838).

trial. (*Id.*, 24:18–19). Even if some unfair prejudice existed from use of CHC's own document at trial, the FWPs raised no proper objection related to its tardy disclosure. (*Id.*, 25:7–26:20).

The FWPs also take issue with the Court's use of CHC's Private Placement Memorandum ("PPM"), arguing that the document was executed after the investment decision was made and is therefore not probative of the investors' reasonable expectations. (FWPs' Mot. for Recon. at 22–23). CHC was formed in 1973, and the final endorsement date between CHC and the Department of Housing and Urban Development ("HUD") was in 1975. (JSOF at ¶¶ 66–67, 70; CHC's PPM at IRH0048502, 48508, JX 65). The PPM was issued in February 1974. (*See* CHC's PPM at IRH0048502). The FWPs claim "the investment decision was made well before the PPM." (FWPs' Mot. for Recon. at 22). Logic dictates otherwise. Less than three months passed between the November 1973 mortgage and the February 1974 PPM. (*Compare* JSOF ¶ 70 *with* CHC's PPM). The FWPs have not convincingly demonstrated that any partners' interests changed during that time, and a three-month gap between the time of original investment and the issuance of the PPM is not independently sufficient to render the PPM outdated. This claim of error also starkly contrasts with the FWPs' position that new investor expectations *fourteen years* after the original investment was made should have been considered.

The FWPs would also have the Court find that the PPM only represents the limited partners' views rather than both the general and limited partners' views. (FWPs' Mot. for Recon. at 22–23). This is a nonstarter. The Federal Circuit previously rejected a similar argument. *Cienega X*, 503 F.3d at 1291 (explaining that a PPM is "the most reliable indication of the relative importance of the anticipated benefits" of "both the limited and general partners[.]"). The Court sees no reason to divert from this precedent, as the case here is indistinguishable on this front. The PPM is evidence of CHC investors' reasonable investment backed expectations, or lack thereof. The FWPs offer no explanation as to why the limited partners' exit from the partnership before the prepayment date is relevant to the partnership's investment-backed expectations at the time of the original investment. Reconsideration is unwarranted.

### C. *The FWPs simply disagree with the Court's credibility determinations.*

The FWPs argue that they successfully proved severe economic loss, and the Court's finding to the contrary "miss[es] the forest for small trees." (FWPs' Mot. for Recon. at 24). The Federal Circuit tasked this Court with answering "questions [that] remain as to whether Dr. Wade's methodology was consistent with principles of economics and whether his explanation for using that approach is credible[,]" which was subject to this Court's evaluation of Dr. Wade's "credibility and persuasiveness." (FWPs' Op. at 42 (citing *Anaheim Gardens, L.P.*, 953 F.3d 1344, 1355 (Fed. Cir. 2020)). The Court did so. Stated plainly, the FWPs' experts' conclusions regarding the severity of economic loss were not convincing, while the United States' expert's calculations of economic impact were well supported and persuasive.

The FWPs contend that Dr. Wade's economic loss methodology was reasonably explained and properly supported. (FWPs' Mot. for Recon. at 24–34). They argue that Dr. Wade's calculations were previously reviewed by the Federal Circuit, and that specific choices— such as excluding TPE from the denominator, adjusting debt treatment to reflect LIHPRHA, and comparing actual versus but-for outcomes—were appropriate. (*Id.* at 24–28). The FWPs further

assert that Dr. Wade's use of both ex-ante and ex-post data, his application of two discount rates to reflect changing economic conditions, and the omission in Chart SL.9B did not undermine the reliability of the results. (*Id.* at 28–34).

Dr. Trout, FWPs' testifying expert, and Dr. Wade's deposition testimony were not persuasive in isolation or when collectively weighed against the competing testimony of Dr. Riddiough, the United States' expert. The FWPs' post-trial efforts to bolster the testimony of its experts are unavailing, relying on bare disagreement with the Court's credibility findings or on mere re-characterization of arguments previously raised.[13] Here, the FWPs simply disagree with the Court's analysis of their original arguments or repeat their original claims. There are no errors of law or fact in the Court's previous finding on credibility, and the FWPs' individual arguments to the contrary will not be specifically addressed. Ultimately, no reconsideration is warranted.

   D. *The Court did not prohibit the FWPs from using their demonstrative exhibits.*

As a component of the FWPs' argument that the Court should reconsider its economic impact analysis, the FWPs also assert that the Court prohibited the FWPs from using certain charts and tables as demonstratives in the Rule 63 Hearing. (FWPs' Mot. for Recon. at 34–37; Rule 63 Hr'g Tr. vol. 1, July 8, 2024, ECF No. 777; Rule 63 Hr'g Tr. vol. 2, July 9, 2024, ECF No. 779; *see also* Hr'g Tr., 24:3–12, May 21, 2024, ECF No. 773 (the Court admonishing the FWPs)). Once again, not so.

The FWPs ask the Court to reconsider three findings:

> [I]n which it (1) identified the demonstratives, (2) said that it "finds" that even if the demonstratives were admitted it would not affect the Court's

---

[13] For example, the FWPs argue anew that the "missing column" of discount factors in Chart SL.9B did not impact FWPs' economic losses, and those numbers are easily calculated based on the numbers in that table, that the Court misunderstands "basic algebra" and that the discount factors were "easily calculated[.]" (FWPs' Mot. for Recon. at 33–34, 39; FWPs' Reply at 20). FWPs miss the point:

> Even if the Court determined that Dr. Trout's explanation of the deficiency in this exhibit was candid, that is not the issue. The issue critical to the resolution of damages is Dr. Wade's methodology as illuminated by his deposition testimony, and exhibits utilized by FWPs at trial. When the secondary expert, Dr. Trout, cannot understand or explain the primary expert's calculations, the Court's apprehension is validated.

(FWPs' Op. at 42). This is a credibility determination. FWPs' continued attempts to browbeat the Court over the arithmetic contained within exhibits utilized by Dr. Trout are misplaced. The relevant issue here is the assessment of the reliability of their expert. This single issue was one of many that collectively undermined Dr. Trout's credibility.

11

> credibility determination, and (3) determined that the "Court did not preclude their use as *demonstrative* aids" during the Rule 63 hearing and FWPs' failure to do so "undercuts any claim of prejudice arising from their exclusion from evidence."

(FWPs' Mot. for Recon. at 35 (citing FWPs' Op. at 5 n.5)).

The FWPs call these findings "clear legal and factual error[]" and "manifest injustice[,]" but in doing so misconstrue the Federal Rules of Evidence and the Court's application of them. (FWPs' Mot. for Recon. at 35). It is the FWPs' own failure to distinguish between *evidence* and *demonstratives* that forms the basis of their confusion. (*See* Hr'g Tr., 24:3–12, May 21, 2024). The Court held months of discussion regarding these demonstratives excluded from evidence by Judge Campbell-Smith. Even so, the Court reiterated: "you may not introduce evidence which was not previously introduced" and as for "[t]he exhibits or the demonstratives which were excluded before, this is not an opportunity for you to try to yet again get those into the record" during the May 2024 Hearing. (*Id.*; *see also* FWPs' Mot. for Recon. at 35 ("The charts and demonstratives were the subject of much discussion in hearings beginning in the fall of 2023 . . . .")).[14]

Using demonstrative aids does not mean that the demonstrative itself is admitted as "substantive evidence." *See Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 380 F. Supp. 3d 692, 699 (N.D. Ohio 2019); *United States v. James*, 955 F.3d 336, 344 n.6 (3d Cir. 2020) (citing, FED. R. EVID. 611(a) and Advisory Committee's note explaining that the disputed chart "was not admitted into evidence," but rather "was used as a demonstrative aid."). Judge Campbell-Smith excluded the charts and tables as evidence, (Revised Trial Mgmt. Order, ECF No. 632; Evidentiary Rulings & Status Report Order, ECF No. 709; Order Denying Admis., ECF No. 750), and this Court's statements at the commencement of the Rule 63 Hearing reminded the FWPs that the demonstrative charts and tables could not be relied upon as *evidence*. (Rule 63 Hr'g Tr. vol. 1, 31:21–32:3, 33:15–34:13, July 8, 2024). The FWPs' disregard for Judge Campbell-Smith's evidentiary ruling, and their increasingly obstinate refusal to accept this Court's decision to *not* vacate Judge Campbell-Smith's previous decision on this exact matter provoked the Court's cautionary reminders.[15]

---

[14] The Court's admonishments were well-deserved: at the Rule 63 Hearing, and despite prior unequivocal direction, FWPs attempted to include a previously excluded demonstrative. (*See generally* Mot. for Recon. Hr'g Tr., 39:9–13, Apr. 24, 2025 (The Court: "If you'll remember on the morning of [the Rule 63 Hearing], you were talking about how my prior warnings were so emphatic. You guys showed up with a package of documents you intended to introduce, and guess what was in there? Hmm, the excluded demonstrative.")).

[15] Recent changes to the Federal Rules of Evidence highlight the distinction between demonstratives and substantive evidence. The new FRE 107 provides that a court may allow a party to present what is now known as an "illustrative aid" to aid in understanding the evidence or argument "if the aid's utility in assisting comprehension is not substantially outweighed by the

12

The FWPs offered their charts as demonstratives at trial, and Judge Campbell-Smith accepted them as such. Upon reassignment, the undersigned repeatedly emphasized that the Court would not revisit pre-existing evidentiary rulings, including post-trial reevaluation of Judge Campbell-Smith's decisions. The Court did not preclude the FWPs' continued use of them as originally offered. The FWPs simply did not so. Moreover, as the Court previously concluded, upon review of those demonstratives post-trial and in preparation for the Rule 63 Hearing, their use would not impact the Court's credibility determinations about Drs. Trout and Wade. (FWPs' Op. at 5 n.5). The FWPs have not never convincingly articulated prejudice at their exclusion as evidence. In fact, while hurling claims of indiscriminate prejudice, the FWPs do not identify any content within the excluded demonstratives essential to comprehension of their experts. In a footnote, the FWPs' state only that the demonstratives "would have helped the Court understand." (FWPs' Mot. for Recon. at 33 n.12). The Court will not reconsider the decision made by Judge Campbell-Smith unless directed to do so otherwise by the Circuit.

E. *The Court correctly balanced the Penn Central factors.*

The FWPs final dual-pronged argument is that the Court incorrectly balanced the three *Penn Central* factors. The FWPs contend that satisfying two out of three should be sufficient—and that the Court's implication that "no regulatory taking can be proven 'where the economic impact was less than fifty percent'. . . is incompatible with controlling law." (FWPs' Mot. for Recon. at 37 (citing FWPs' Op. at 43)). Neither of these arguments are compatible with the precedent set forth by the Federal Circuit.

The Court found that Plaintiffs Cedar Gardens and Silverlake satisfied two out of three components of the *Penn Central* test—investment-backed expectations and character of the government action. (FWPs' Op. at 23–25). Where both Plaintiffs failed (along with all the

---

danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or wasting time." FED. R. EVID. 107(a). Importantly, an "illustrative aid is not evidence." FED. R. EVID. 107(b). These changes to the evidentiary rules are consistent with Judge Campbell-Smith's treatment of FWPs' proffered demonstratives at trial in January 2023. (*See* Order Denying Admis. at 1–3, ECF No. 750; Trial Tr., vol. 7, 1290:24–1300:24, Jan. 18, 2023, ECF No. 658). As the commentary to the rule explains, this type of aid is:

> [I]nformation offered for the narrow purpose of helping the trier of fact to understand what is being communicated to them by the witness or party presenting evidence or argument. Examples may include drawings, photos, diagrams, video depictions, charts, graphs, and computer simulations. These kinds of presentations, referred to in this rule as "illustrative aids," have also been described as "pedagogical devices" and sometimes (and less helpfully) "demonstrative presentations"—that latter term being unhelpful because the purpose for presenting the information is not to "demonstrate" how an event occurred but rather to help the trier of fact understand evidence or argument that is being or has been presented.

FED. R. EVID. 107 (Advisory Committee Note (2024 Amendment)).

others) is demonstrating sufficient economic impact. The Court explained in its Opinion that it "would award Cedar Gardens and Silverlake damages in accordance with Dr. Riddiough's economic loss figures . . . . However, try as it might, the Court cannot logically avoid using the economic impact element of *Penn Central* as a threshold inquiry as applied in *CCA Associates*." (FWPs' Op. at 25 n.21 (citations omitted)).

The balance of the three *Penn Central* factors is fact—and case—specific. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (confirming "that the test for how far was 'too far' required an 'ad hoc' factual inquiry.") (citation omitted). Ultimately, "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *McDonald, Sommer, & Frates v. Yolo Cnty.*, 477 U.S. 340, 348 (1986). That answer is now known, answering the uncertainty expressed in Justice Holmes's original formulation of regulatory takings law.

> As Justice Holmes emphasized throughout his opinion for the Court in *Pennsylvania Coal Co. v. Mahon*, . . . "this is a question of degree—and therefore cannot be disposed of by general propositions." To this day we have no "set formula to determine where regulation ends and taking begins." Instead, we rely "as much [on] the exercise of judgment as [on] the application of logic." Our cases have accordingly "examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action—that have particular significance."

*Id.* 348–49 (cleaned up).

The FWPs also argue that there are no cases "that hold[] that a Plaintiff has to show economic injury . . . greater than [fifty] percent in order to prevail on a takings case." (Hr'g Tr., FWPs' Counsel, 41:4–6, Apr. 24, 2025). However, at no point in the thirty years of this proceeding have the FWPs been able to provide the Court with any case that holds that a smaller percentage of economic impact is acceptable. (*See* Hr'g Tr., 41:7–21, Apr. 24, 2025; FWPs' Op. at 44). In fact, contrary case law is plentiful.[16] We now know, after over thirty years of litigation, including extensive discovery, trial, and an evidentiary rehearing of the parties' experts, that the FWPs' economic injuries range from 5.9% to 27.4%. (FWPs' Op. at 35 (citing Trial Tr. vol. 11, Riddiough, 2296:24–2297:9, Jan. 24, 2023)). The Court's judgment largely rests on this basis—

---

[16] *See Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Trust for S. California,* 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384 (1926) (approximately 75% diminution insufficient)); *CCA Assocs.*, 667 F.3d at 1246 (18% economic impact insufficient); *MHC Financing Ltd. Partnership v. City of San Rafael*, 714 F.3d 1118, 1127–28 (9th Cir. 2013) (81% diminution insufficient); *Clayland Farm Enterprises, LLC v. Talbot Cnty., Maryland*, 987 F.3d 346, 354 (4th Cir. 2021) (approximately 40% diminution insufficient); *Pulte Home Corp. v. Montgomery Cnty., Maryland*, 909 F.3d 685, 696 (4th Cir. 2018) (83% diminution insufficient).

the FWPs did not shoulder their burden of proving a significant economic loss. And, as the Court noted, examples of a compensatory taking involving less than fifty percent loss are notably absent from regulatory takings jurisprudence. The FWPs' claim that there are no cases holding "that a Plaintiff has to show economic injury . . . greater than [fifty] percent in order to prevail on a takings case" is a distortion of precedent. (Hr'g Tr., FWPs' Counsel, 41:4–6, Apr. 24, 2025).

The FWPs have repeatedly had their chance to convince the Court to weigh the *Penn Central* factors in a manner more conducive to their recovery and did not do so.[17] The Court will not now diverge from its holding that given the precedent set forth in *Cienega X* and *CCA Associates*; the FWPs must demonstrate a greater economic impact for the Court to find a taking has occurred. The time has long since passed for the FWPs to propose an entirely different theory of law to the Court.

### III.    Conclusion

When a property owner participates in a highly regulated market, like the low-income housing market, subsequent regulations that may reduce the value of the property or the expectation of profit may sometimes result in a taking. *See Bowles v. Willingham*, 321 U.S. 503, 517–18 (1944). Whether a cognizable taking actually occurs depends on multiple factors, including the degree of economic loss. Returning to Justice Holmes, and perhaps forecasting what he wrote only a year later in *Pennsylvania Coal*:

> [T]he notion that [property is] exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay.
>
> [ . . . ]
>
> [A] public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation.

*Block v. Hirsh*, 256 U.S. 135, 155–56 (1921).

---

[17] In their Reply, FWPs cite *Hodel v. Irving*, 481 U.S. 704 (1987), for the holding that claimants can establish a regulatory taking irrespective of the magnitude of economic impact *and* where there likely were no investment-backed expectations. (FWPs' Reply at 13). *Hodel* involves a regulatory taking of tribal lands where the Court relied primarily on the fact that the regulation completely abrogated the right to pass on property to one's heirs. *Hodel*, 481 U.S. at 705. However, at the Motion for Reconsideration Hearing, FWPs admitted that *Hodel* represented a "100 percent taking[,]" which is not the situation here. (Hr'g Tr., FWPs' Counsel, 43:1–4, Apr. 24, 2025). The Court remains unpersuaded by FWPs' arguments.

Which brings us back again to the beginning, "how far is too far?" Applying the entirety of the *Penn Central* framework, the financial impact of Congressional elimination of the twenty-year pre-payment option for investors participating in the low-income housing market on FWPs is insufficient.

There is no basis for reconsidering the Court's Opinion in this matter. The FWPs' arguments amount to disagreement with applicable law or the Court's credibility determinations. Neither instance is a ground for reconsideration. Therefore, the FWPs' Motion for Reconsideration, (ECF No. 818), is **DENIED**. The Court will reissue its Opinion contemporaneously to correct scrivener's errors in the investment-backed expectations section of its analysis.

**IT IS SO ORDERED.**



s/ David A. Tapp
DAVID A. TAPP, Judge