# In the United States Court of Federal Claims

No. 93-655C, 93-6583, 93-6573, 93-6569, 93-6571[1]

Filed: December 19, 2025

|  |
|---|
| **ANAHEIM GARDENS, et al.,**<br><br>   *Plaintiffs*,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>   *Defendant*. |

*Harry J. Kelly, III*, Nixon Peabody LLP, Washington, DC, for Plaintiffs.

*Amanda L. Tantum*, Senior Litigation Counsel, *Emma E. Bond*, Senior Trial Counsel, *A. Bondurant Eley*, Senior Litigation Counsel, *Joshua W. Moore, Tate N. Walker*, and *Brittney M. Welch*, Trial Attorneys, *Franklin E. White*, *Jr.* Assistant Director, *Patricia M. McCarthy*, Director, and *Yaakov M. Roth*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

  In the latest chapter of this litigation, the United States seeks to dispense with the claims of four of the remaining Plaintiffs via summary judgment. It succeeds with two. The Court finds that Plaintiffs 5324 Foothill Apartments, G.P. and Metro West Limited, L.P. failed to demonstrate a dispute of any material facts. As such, the United States' Motion for Summary Judgment pertaining to their claims, (ECF No. 834), is **GRANTED**. However, Plaintiffs Glenview Gardens, L.P. and Indian Head Manor, L.P. I, have sufficiently disputed the material facts underlying the conditions of their respective loans with the Maryland Community Development Administration—the particulars of which are more appropriately resolved at trial. Therefore, the United States' Motion for Summary Judgment on their claims, (ECF No. 833), is **DENIED**. Because Mr. Wall's disputed testimony did not factor into this decision, the United States' Motion to Strike Inadmissible Evidence, (ECF No. 844), is **DENIED** as **MOOT**.

---

[1] This case has been combined under Case No. 93-655. The corresponding case numbers are: 93-6583 (*5324 Foothill Apartments, G.P.*); 93-6573 (*Metro West Limited, L.P.*); 93-6569 (*Glenview Gardens, L.P.*); and 93-6571 (*Indian Head Manor, L.P. I*).

## I. Background

The core issues and relevant background in this matter remain unchanged. The foundational context of this case, particularly regarding the enactment of the Emergency Low Income Housing Preservation Act ("ELIHPA") and the Low-Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"), has been previously elaborated in the Court's Post-Trial Opinion involving five First-Wave Plaintiffs ("FWPs"), and by the Federal Circuit in a factually related appeal. *Anaheim Gardens v. United States* 178 Fed. Cl. 155, 160–166 (2025) (citing Pub. L. No. 100–242, 101 Stat. 1877 (1988) (ELIHPA) and Pub. L. No. 101–625, 104 Stat. 4249 (1990), 12 U.S.C. §§ 4101–4147 (LIHPRHA) (collectively "the Preservation Statutes")); *see Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1347–48 (Fed Cir. 2020) ("*Anaheim Gardens, L.P.*"). Well-acquainted with the dog-eared chapters of this litigation's procedural history, the Court expounds on necessary background information within the analysis below.

## II. Analysis

The United States seeks summary judgment as to the regulatory takings claims raised by Plaintiffs 5324 Foothill Apartments, G.P. ("5324 Foothill"), Metro West Limited, L.P. ("West 110th Street")[2], Glenview Gardens, L.P., and Indian Head Manor, L.P. I ("Indian Head Manor, L.P.").[3] (ECF Nos. 833, 834). The United States also seeks to strike certain evidence it claims to be inadmissible that Plaintiffs used in their Response. (Def.'s Mot. to Strike, ECF No. 844). Each issue is disposed of here.

*A. Standard*

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute exists if there is sufficient evidence for the nonmoving party to win at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986) (Finding a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party seeking to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." RCFC 56(c)(1)(A). Facts are material if they "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248.

---

[2] Metro West Limited, L.P. is listed in the case caption, but both parties agree that the actual party in interest is West 110th Street Apartments, G.P. (*See* Def.'s Mot. at 1 n.1, ECF No. 834; Pls.' Resp., at 1 n.1, ECF No. 840).

[3] The Court will use "Plaintiffs" when referring collectively to the four Plaintiffs in these matters, rather than allocating them as either First-Wave Plaintiffs or Second-Wave Plaintiffs.

While "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion[,]" *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 249–50 (citations omitted). "Due to the nature of the proceeding, courts do not make findings of fact on summary judgment." *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed. Cir. 1998) (citing *Anderson*, 477 U.S. at 249). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." *Matsushita Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986). "A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a full hearing." *United States v. Certain Real & Personal Prop. Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991).

  B. *Glenview Gardens, L.P. and Indian Head Manor, L.P.*

Both Glenview Gardens, L.P. and Indian Head Manor, L.P. have raised genuine issues of material fact sufficient to preclude summary judgment. Glenview Gardens Apartments was initially developed by Glen Burnie Associates Limited Partnership in 1970 as low-income housing through the same United States Department of Housing and Urban Development ("HUD") program as the FWPs' properties. (Def.'s App. at A5–8[4] (1970 Deed of Trust Note), A9–18 (1970 Regulatory Agreement), (ECF No. 833-1); Pls.' App. at 002–003[5] (1970 Limited Partnership Agreement), ECF No. 839-1). In 1984, Mid-City Development, Inc. ("Mid-City") and another entity formed Glenview Gardens, L.P. and assumed ownership. (Def.'s App. at A19–44 (1984 Limited Partnership Agreement)). Approximately two years later, Glenview Gardens L.P. obtained a rehabilitation loan from the Maryland Community Development

---

[4] The Defendant filed its exhibits as four paginated appendices to their Motion for Summary Judgment on Glenview Gardens, L.P. and Indian Head Manor, L.P. I. For consistency, the Court also uses the Defendant's page numbers, which contain the letter "A" and the page number (i.e., "A__"). (ECF Nos. 833-1, 833-2, 833-3, 833-4). One exhibit, titled "Agreement and Declaration of Covenants and Restrictions for Indian Head Manor Apartments, January 8, 1987" is not labeled with discernable page numbers, and spans both ECF Nos. 833-3 and 833-4. Defendant's "Index to Appendix" (ECF No. 833-1 at *i–ii*), states that this document begins on A193, and the subsequent document begins on A203, (*see id.*). As far as the Court can tell, the January 8, 1987 Agreement is only fourteen (14) pages long, which would mean that all of Defendant's page numbers in Part 4 of its Appendix, (ECF No. 833-4), are incorrect. The Court refers to ECF No. 833-4 by the incorrect printed page numbers, and will cite to the January 8, 1987 Agreement separately, without page numbers. The Court requests that the United States file all future appendices as one consecutively paginated document, to maximize efficiency and minimize opportunities for error.

[5] Plaintiffs filed their exhibits as one consecutively paginated Appendix to their Response, (ECF No. 839-1). Plaintiffs' page numbers consist of their abbreviation of "Plaintiffs' Appendix" and a page number with leading zeros (i.e., "PA001"). The Court will refer to Plaintiffs' Appendix as "Pls.' App." using the same pagination format, e.g. "Pls.' App. at 001".

Administration ("Maryland CDA"). (*Id.* at A62–101 (1986 Deed of Trust), ECF Nos. 833-1, 833-2). According to the United States, Maryland CDA loans were "generally" for 20-year terms, and as a condition of receiving the loan, the Maryland CDA required borrowers to execute regulatory agreements requiring the property to remain low-income housing throughout the loan period. (Def.'s Mot. at 3 (citing Def.'s App. at A50–52 (Nancy Rase Deposition ("Rase Dep."), 24:17–26:3))). For Glenview Gardens Apartments, the regulatory agreement stated that at least 51% of the units had to be maintained as low-income housing units. (Pls.' Resp. at 5–6, citing Def.'s App. at A108–23 (Maryland CDA Regulatory Agreement for Glenview Gardens), A125, A128 (Agreement and Declaration of Covenants and Restrictions for Glenview Gardens)). The Agreement and Declaration of Covenants and Restrictions stated that "20% of the dwelling units in the Project (or 15% of the dwelling units if the Project is or subsequently becomes, a 'target area project') shall be occupied by 'Individuals of Low or Moderate Income[.]'" (Def.'s App. at A125).

Like Glenview Gardens Apartments, Indian Head Manor Apartments was developed as low-income housing through HUD programs in 1970. (*See* Pls.' Resp. at 7 (citing Def.'s App. at A139–50 (Regulatory Agreement for Indian Head Manor Apartments, July 1, 1968)). The mortgage did not contain any restrictions on prepayment. (Pls.' Resp. at 7 (citing Def.'s App. at A137); Def.'s Mot. at 5 (noting that there is a strike through the paragraph limiting prepayment in time to twenty years after the date of final endorsement)). In January 1987, Indian Head Manor, L.P. executed a regulatory agreement with the Maryland CDA, along with a declaration of covenants and restrictions to maintain the apartments as low-income housing. (Def.'s App. at A178–192 (Maryland CDA Agreement); Pls.' Resp. at 8 (citing Def.'s App. at A178, A179, A185 (noting that the agreement is "difficult to read[.]")). As with Glenview Gardens Apartments, the regulatory agreement stated that Indian Head Manor Apartments could prepay, and that 51% of the units had to be maintained as low-income housing. (Pls.' Resp. at 8–10 (citing Def.'s App. at A181–182)). The Declaration of Covenants and Restrictions also stated that "20% of the dwelling units in the Project (or 15% of the dwelling units if the Project is or subsequently becomes, a 'targeted area project') shall be occupied by 'Individuals of Low or Moderate Income[.]'" (Pls.' Resp. at 9–10 (citing Def.'s App. January 8, 1987 Agreement)).

The United States argues that Glenview Gardens, L.P. and Indian Head Manor, L.P. cannot prove that the Preservation Statutes caused their economic loss because their agreements with the Maryland CDA independently restricted the use of the properties and prevented the sale and conversion to market rate housing. (Def.'s Mot. at 1; Oral Argument Transcript ("OA Tr."), 4:14–6:13, ECF No. 851). In response, Plaintiffs argue that genuine issues of material fact exist as to whether Glenview Gardens, L.P. and Indian Head Manor, L.P. could have prepaid their Maryland CDA loans, and that the amount and severity of economic injuries is the subject of ongoing expert discovery. (Pls.' Resp. at 24–27). The Court agrees. There are genuine issues of material fact related to what extent the Maryland CDA agreements would have precluded prepayment, if at all. (OA Tr., 8:23–25 (The Court: So [Glenview Gardens and Indian Head Manor] could have converted [forty-nine] percent of their units to market rate housing, correct?" Def.'s Counsel: "Theoretically, yes."), 14:7–9, (Pls.' Counsel: "So, at worst, Plaintiffs could have prepaid and converted [forty-nine] percent.")). In particular, Plaintiffs raise plausible—and opposing—interpretations of key pieces of evidence, and significant concerns related to the credibility of the United States' key witness.

4

For example, in 1990, Indian Head Manor, L.P. notified HUD of its intent to prepay the HUD-insured mortgage on the property pursuant to ELIPHA. (Def.'s App. at A217–23 (December 21, 1990 Letter), ECF No. 833-4). The Maryland CDA wrote a letter to the partnership as follows:

> This letter is to inform you that if you pursue prepayment under the 1987 ELIPHA, you will be subject to the provisions of the Maryland Assisted Housing Preservation Act, which became effective July 1, 1989. The Maryland law is not preempted by the federal law when owners filed under the 1987 ELIHPA, but is preempted if they elect to proceed under the 1990 LIHPRHA . . . . Full compliance with all provisions of the State law would be required if you have filed or elect to file under the 1987 ELIHPA.

(*Id.* at A224–25 (March 22, 1991 Letter)). The United States claims that this is evidence of the fact that Indian Head Manor, L.P. would remain bound by the Maryland CDA loans regardless of whether their obligations under ELIHPA ended. (Def.'s Mot. at 17–18). Plaintiffs argue that the purpose of this letter was not to deny prepayment of any CDA loans, but to make the partnership aware of the application of Maryland state law. (Pls.' Resp. at 14). The Court finds the Plaintiffs' explanation of the context of the March 22, 1991 letter reasonable. Given that this matter is before the Court on summary judgment, all inferences derived from the underlying facts must be drawn in a light most favorable to the Plaintiffs. *See Diebold*, 369 U.S. at 655. As such, given that at this stage the Court will not resolve concerns regarding credibility, this rises to a dispute of material fact.

The United States also relies on testimony from Ms. Nancy Rase, (Def.'s Mot. at 3, 7–8, 10, 12, 17), Mr. Eugene Ford, (*id.* at 9–10), and Mr. John Wall, (*id.* at 10–11, 14–15), to bolster its Motion. Plaintiffs reasonably question the credibility of Ms. Rase. (Pls.' Resp. at 10–12, 14, 16, 24–26; OA Tr., 16:17–18:2). Specifically, Plaintiffs note Ms. Rase's unfamiliarity with both Indian Head Manor and the partnership that that initially developed Glenview Gardens Apartments. (Pls.' Resp. at 11 (citing Pls.' App. at 069 (Rase Dep. Tr., 16:21–17:5), 073 (Rase Dep. Tr., 32:5–9))). Ms. Rase also gave conflicting testimony about the impact of the Preservation Statutes on prepayment requests for Maryland CDA loans. (Pls.' Resp. at 11 (comparing Pls.' App. 073 (Rase Dep. Tr., 31:16–21) with Pls.' App. 075 (Rase Dep. Tr., 40:19–41:5) and Pls.' App. 077 (Rase Dep. Tr., 47:9–16))). In response, the United States argues that plaintiffs do not raise any disputes of material fact related to Ms. Rase's "testimony about the Maryland CDA's *general* policies and practices toward prepayment . . . ." (Def.'s Reply at 5 (emphasis added), ECF No. 843). The parties' characterizations of Ms. Rase's testimony are diametrically opposed. To resolve this requires making a credibility determination of Ms. Rase—an adjudication not appropriate at this summary judgment stage. *See EFC Servs., Inc. v. United States*, 172 Fed. Cl. 694, 700 (2024) (citing *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004)). That resolution must await trial.

Plaintiffs also present conflicting interpretations of statements made by Mr. Ford and Mr. Wall. (*See* Pls.' Resp. at 14–19, 22–23; OA Tr., 20:17–20). While not necessarily an issue of credibility—as is the case with Ms. Rase—the Court believes these fact-intensive disputes are ill-

5

suited for resolution at this stage.[6] *See Certain Real & Personal Prop. Belonging to Hayes*, 943 F.2d at 1292. Therefore, not only have Plaintiffs sufficiently carried their burden to demonstrate disputes of material fact regarding Ms. Rase's credibility, the Court declines to adjudicate the opposing interpretations of the evidence at this stage. The United States' Motion for Summary Judgment on Glenview Gardens, L.P. and Indian Head Manor, L.P. is denied.

### C. United States' Motion to Strike Inadmissible Evidence

In connection with its briefing on Glenview Gardens, L.P. and Indian Head Manor, L.P., the United States moved to strike testimony of Mr. Wall used by Plaintiffs in their Response. (Def.'s Mot. to Strike at 1, ECF No. 844). The United States claims that this testimony, contained in Plaintiffs' Response and the attached Appendix, is inadmissible due to Mr. Wall's lack of personal knowledge of the matters asserted. (*Id.* at 2 (citing RCFC 56(c)(4), which states: "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")). The United States claims that Mr. Wall had no direct involvement in Glenview Gardens, L.P. during his time working at Mid-City in the 1970s. (Def.'s Mot. to Strike at 5). When asked during his deposition whether he "work[ed] on any tasks related to Glenview Gardens[,]" Mr. Wall responded:

> Glenview Gardens was initiated as a development activity prior to my arrival in '71. As I recall, construction may have started in early '71 and completion in '73, I think may have been the dates for that. I was not -- this was not one that I was involved in specifically in the development process nor financing process upon joining Mid-City.

---

[6] The Court would be remiss if it did not address a particularly perplexing argument: despite claiming that Plaintiffs' Response contains an "absence" of fact, the United States cites to Plaintiffs' "facts" throughout its Reply. (Def.'s Reply at 1, 5 (citing Pls.' Resp. at 25) ("[P]laintiffs point to the **fact** that the CDA loan documents permitted prepayment with the consent of the Maryland CDA, and that the regulatory agreements restricted property use.") (emphasis added), ECF No. 843); (*Id.* at 5–6 (citing Pls.' Resp. at 25) ("[P]laintiffs then speculate that the **fact** that property owners did not typically request to prepay their CDA loans 'may have been tied to the existence and application of the Preservation Statutes.'") (emphasis added)); (*Id.* at 6 (citing Pls.' Resp. at 26) ("[P]laintiffs highlight the **fact** that 'sometime in or about September 1991, [Ms.] Rase informed [Glenview Gardens L.P.] and [Indian Head Manor L.P.] that CDA loans could be prepaid' subject to the bond prepayment restrictions that existed at that time, and which Ms. Rase 'said would be in 1993.'") (emphasis added)). While these may be merely drafting errors, the United States cannot have its cake and eat it too.

(*Id.* (citing Def.'s App. at A13–14[7] (January 9, 2025 John Wall Deposition), ECF No. 844-1)). Similarly, when asked whether he "personally ha[d] any role in developing Indian Head Manor Apartments," Mr. Wall responded "[n]o. It preceded my joining the company, the early development phase." (Def.'s Mot. at 5 (citing Def's' App. at A19–20)).

      Plaintiffs characterize the United States' Motion to Strike as "a rabbit hole[,]" "at best, a procedurally improper motion that is also a waste of party and judicial resources[,]" and "a thinly veiled attempt to disparage John Wall[,]" among other accusations. (Pls.' Resp. to Def.'s Mot. to Strike at 1 n.1, ECF No. 847). Plaintiffs argue that the Motion is procedurally improper because their brief is not a "pleading" according to RCFC 7[8] and 12(f)[9]. (*Id.* at 1–2). Plaintiffs also cite *Jackson v. United States*, for the proposition that "[i]n adjudicating a motion for summary judgment, the Court may not make credibility determinations or weigh the evidence." (*Id.* at 3 (citing 122 Fed. Cl. 376, 380 (2015)). The disputed content has no bearing whatsoever on the Court's determination that the Plaintiffs have raised disputes of material fact sufficient to overcome the United States' Motion for Summary Judgment. Therefore, the Court declines to reach the merits of the United States' Motion and denies it as moot.

      D.  *5324 Foothill Apartments, G.P. and West 110th Street Apartments, G.P.*

      Plaintiffs 5324 Foothill and West 110th Street have not produced evidence from which a reasonable trier of fact could find a material issue. The Plaintiffs purchased these properties after the Preservation Statutes had already been enacted—an issue previously addressed by the Federal Circuit in *Anaheim Gardens, L.P.*, 953 F.3d at 1348–51 (affirming summary judgment against Plaintiff 620 Su Casa Por Cortez ("Su Casa") which purchased its property after the enactment of LIHPRHA).[10] Plaintiffs have presented no facts that materially distinguish their claims from the Circuit's Su Casa decision. With no material factual dispute to resolve, despite Plaintiffs' counsel's argument otherwise, the Court is obliged to grant the United States' Motion for Summary Judgment.

---

[7] As with the Appendix filed in conjunction with Defendant's Motion for Summary Judgment on Glenview Gardens, L.P. and Indian Head Manor, L.P. I, (*see supra*, n.4), Defendant filed a two-part Appendix in support of its Motion to Strike. (ECF Nos. 844-1, 844-2). All references to "Def.'s App." in this section are to the Appendix filed with the Defendant's Motion to Strike.

[8] RCFC 7 defines "pleading" as "a complaint[,]" "an answer to a complaint[,]" "an answer to a counterclaim[,]" "a third-party pleading permitted under RCFC 14[,]" and, if ordered, "a reply to an answer."

[9] RCFC 12(f) states that a "Motion to Strike" is appropriate only for "a pleading" when it contains an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

[10] Mr. Tod Spieker was a general partner in 620 Su Casa Por Cortez. (Def.'s Mot. at 25, ECF No. 834 (citing Def.'s App. at 436 (Su Casa RCFC 30(b)(6) Dep. Tr., 40:11–41:24), ECF No. 834-3); *See also* ECF No. 479 at 4 ("Todd Spieker, a general partner in 620 Su Casa Por Cortez . . . .")).

7

In the 1970s, Foothill Plaza Apartments and Metro West Apartments were developed as Section 236 properties. (Def.'s Mot. at 3 (citing Def.'s App. at 67[11] (March 1, 1972 Agreement of Limited Partnership of Foothill Plaza Apartments)), 6 (citing Def.'s App. at 176 (Jan. 1, 1972 Limited Partnership Agreement of Metro West Limited))). Foothill Plaza Apartments, L.P. executed a deed of trust note and entered into a regulatory agreement with HUD on April 1, 1972, and the note was endorsed by the Federal Housing Commissioner's ("FHC") on January 24, 1973. (Def.'s App. at 92–95 (Deed of Trust Note), 96–103 (1983 Regulatory Agreement Between Foothill Plaza Apartments and HUD)). Foothill Plaza Apartments, L.P. transferred the property to Foothill Plaza Company, L.P. in 1983. (Def.'s App. at 111–112 (Application of Transfer of Physical Assets), 113–114 (Assumption Agreement)). Mr. Spieker and his wife, Catherine R. Spieker ("Mrs. Spieker") executed a "General Partnership Agreement of 5324 Foothill Apartments" on January 14, 1991. (Def.'s App. at 124, 138). 5324 Foothill Apartments, G.P. purchased Foothill Plaza Apartments at some point in 1991, and executed a regulatory agreement with HUD on January 17, 1991. (Def.'s App. at 141–147 (1991 Regulatory Agreement), 152–154 (May 1, 1991 Grant Deed), 361–62 (Pls. Responses to Def. Request for Admission Nos. 39, 40)).

In January 1972, Subsidized Housing Corporation of America and Thomas Mercurio entered into a limited partnership agreement to develop Metro West Apartments as a Section 236 property. (Def.'s App. at 176–96 (Jan. 1, 1972 Limited Partnership Agreement), 197–203 (Deed of Trust Between Metro West and Security Title Insurance Company)). That same year, Metro West, L.P. executed a regulatory agreement with HUD, and a deed of trust note which the FHC endorsed. (Def.'s App. at 176, 204–205 (Jan. 1, 1972 Deed of Trust Note), 209–17 (Jan. 1, 1972 Regulatory Agreement between Metro West, L.P. and HUD)). On December 28, 1990, Mr. Spieker executed an agreement to purchase Metro West Apartments. (Def.'s App. 218–30 (Real Estate Purchase Agreement); Pls.' Resp. at 9). On May 20, 1991, Mr. and Mrs. Spieker executed a general partnership agreement to form West 110th Street Apartments, G.P. (Def.'s App. at 235–50 (General Partnership Agreement of West 110th Street)). West 110th Street executed a regulatory agreement with HUD on May 28, 1991. (Def.'s App. at 257–68 (Regulatory Agreement between West 110th Street and HUD)). The sale of Metro West Apartments to West 110th Street closed on August 21, 1992. (Def.'s App. at 276 (Buyer's Final Closing Statement)).

The United States argues that 5324 Foothill and West 110th Street were sophisticated property owners that purchased their properties after the enactment of the Preservation Statutes and with knowledge of the regulatory restraints imposed by the statutes on their use of the properties. (Def.'s Mot. at 1–2). In other words, the United States maintains that Mr. and Mrs. Spieker could not have held any reasonable investment-backed expectations to prepay their mortgages. (*Id.*). Plaintiffs, on the other hand, contend that "sophistication does not imply

---

[11] As with its other appendices, the Defendant filed the Appendix for the Motion for Summary Judgment on 5324 Foothill Apartments, G.P. and West 110th Street Apartments, G.P. in three parts, (ECF Nos. 834-1, 834-2, 834-3). The pagination uses the format "Appx" with the page number, e.g., "Appx1[.]" All references to "Def.'s App." in this section are to the Appendix filed with the Defendant's Motion for Summary Judgment for 5324 Foothill Apartments and West 110th Street Apartments.

8

clairvoyance, and Mr. Spieker should not be faulted for not knowing how the convoluted history of the Preservation Statutes would, at some future point, ultimately dash his objectives." (Pls.' Resp. at 14).

The standard, however, is not clairvoyance. Plaintiffs themselves acknowledge that Mr. Spieker is a sophisticated investor. (OA Tr., 57:7 (Pls.' Counsel: "[H]e's a sophisticated investor . . . .")). In fact, a significant portion of the FWPs' original arguments were premised on the understanding that Mr. Spieker was a particularly savvy investor in affordable housing. (*See* FWPs' Post-Trial Br. at 13 ("FWPs' fact witnesses are sophisticated and 'have broad experience in the real estate market . . . .'") (citing *Anaheim Gardens*, 140 Fed. Cl. 72, 88 (2013); *accord CCA Assocs.*, 667 F.3d 1239, 1248 (Fed. Cir. 2011)), ECF No. 753; FWPs' Post-Trial Proposed Findings of Fact at 25–26 ("[Mr. Spieker] has been active in the sale, development and management of multifamily rental housing, including both market-rate and affordable housing participating in the 221(d)(3) and 236 programs, since 1972."), ECF No. 753-1)); *see also Anaheim Gardens*, 178 Fed. Cl. at 182 (discussing Mr. Spieker's significant experience investing in multifamily rental housing). Even the Federal Circuit deemed Mr. and Mrs. Spieker sophisticated investors when they "bought [Su Casa] knowing that the Preservation Statutes had already eliminated the prepayment option." *Anaheim Gardens L.P.*, 953 F.3d at 1349. The timing of the purchases of Su Casa, Foothill Plaza Apartments, and Metro West Apartments is contemporaneous. For the Court to somehow find that *despite* Mr. Spieker's undisputed sophistication and experience, he had no concept of how the Preservation Statutes would affect his properties—is nonsense.

The United States appropriately draws a parallel between 5324 Foothill and West 110th Street and Plaintiff Su Casa in *Anaheim Gardens, L.P.*, 953 F.3d at 1349–51. (*See* Def.'s Mot. at 31–37). In *Anaheim Gardens, L.P.*, the Federal Circuit affirmed this Court's grant of summary judgment against Su Casa on the grounds that the investors had not developed reasonable investment-backed expectations because the investors purchased the properties after the Preservation Statutes had been enacted. 953 F.3d at 1348 ("Su Casa purchased its property from the original owner in July 1991, which was after the enactment of LIHPRHA but before HUD promulgated its regulations for implementing the Preservation Statutes."). The Circuit found that the trial court "properly relied on the undisputed fact that Su Casa was a sophisticated investor that bought its property knowing that the Preservation Statutes had already eliminated the prepayment option." *Id.* at 1349. Therefore, "Su Casa lacked sufficient evidence to prevail at trial" and summary judgment was affirmed. *Id.* at 1350. As with Plaintiffs here, Mr. and Mrs. Spieker were the only general partners in Su Casa. (Def.'s App. at 436–37 (Su Casa 30(b)(6) Dep. Tr., 40:11–41:24, 43:12–44:14); *see also id.* at 308 (General Partnership Agreement of Su Casa)).

Thus, in evaluating the summary judgment issue, the following facts are undisputed. Mr. Spieker is a founding partner of both 5324 Foothill and West 110th Street, and obtained an ownership interest in Foothill Plaza Apartments and Metro West Apartments in 1991 and 1992, respectively. (Def.'s App. 120 (Modification to Management Agency Agreement related to Foothill Plaza Apartments), 124–40 (General Partnership Agreement of 5324 Foothill), 141–47 (Foothill Plaza Apartments Regulatory Agreement), 152–54 (May 1, 1991 Grant Deed for Foothill Plaza Apartments), 218–30 (Dec. 28, 1990 Metro West Apartments Purchase Agreement), 235–51 (General Partnership of West 110th Street)). The limited partnership

9

agreement that founded Foothill Apartments was executed in 1972, and expressly adopted Section 236 of the National Housing Act, and its rules and regulations. (Def.'s App. at 64–74). Foothill Plaza Apartments also executed its regulatory agreement with HUD that same year. (*Id.* at 96–103). Mr. Spieker doing business as 5324 Foothill purchased Foothill Plaza Apartments in 1991. (*Id.* at 152–54). Mr. Spieker, doing business as West 110th Street purchased Metro West Apartments in August 1992. (*Id.* at 231–34 (First Amend. to Real Estate Purchase Agreement), 235–51 (General Partnership Agreement of West 110th Street Apartments), 276 (Buyer's Final Closing Statement)). At the time of Mr. Spieker's purchases, ELIHPA and LIHPRHA had passed. *See* Pub. L. No. 100–242, 101 Stat. 1877 (1988); Pub. L. No. 101–625, 104 Stat. 4249 (1990).

Attempting to generate a dispute of material fact, Plaintiffs return to a well-worn contention—that questions remain as to whether Mr. Spieker's investment-backed expectations were reasonable, despite the fact that he had purchased both properties *after* the Preservation Statutes had been enacted. (Pls.' Resp. at 1). Plaintiffs cite the Federal Circuit's *Anaheim Gardens, L.P.* decision for the assertion that:

> What emerges from the case law is a flexible principle that, while "a valid takings claim will not evaporate just because a purchaser took title after the law was enacted, the timing of the purchase and knowledge of the purchaser are relevant considerations in determining whether a purchaser had reasonable investment backed expectations with which the government's regulatory action interfered.

(Pls.' Resp. at 1–2 (citing *Anaheim Gardens, L.P.*, 953 F.3d at 1350) (citations omitted)). Plaintiffs argue that therefore, a "factual determination" is "required" as to the "reasonableness" of Mr. Spieker's investment-backed expectations. (*Id.* at 2). The other relevant considerations Plaintiffs ask the Court to examine are uncontroverted facts about Mr. Spieker's purchase timelines. First, for Foothill Plaza Apartments, Plaintiffs argue that because Mr. Spieker made "initial contact about acquiring the property in 1989" and "nonrefundable deposits . . . in 1990[,]" the Court should consider those dates instead of the date Mr. Spieker purchased the property in 1991. (OA Tr., 53:5–25). Similarly, Plaintiffs also ask the Court to consider nonrefundable deposits made on Metro West Apartments in "the early part of 1990" rather than the date the sale closed in August 1992. (*Id.*, 55:9–23). According to Plaintiffs, these "deposits go to and contribute to the evidence that's out there that because he's a sophisticated investor . . . this demonstrates further that he was committed to this project." (*Id.*, 57:4–12). The Court agrees that Mr. Spieker is a sophisticated investor, but does not agree that the well-established purchase timeline presents any kind of material factual dispute.[12] Nor are Plaintiffs' claims here different from those of Su Casa.

---

[12] *See* OA Tr., 68:7–20 (The Court: "So what credibility determination would I have to make that would . . . be in play at trial other than the things we've talked about and we agree on?" Pls.' Counsel: "Ultimately, whether or not the Court agrees based on . . . the evidence presented by the Plaintiff that Mr. Spieker's testimony that he had a expectation to prepay was reasonable.

Plaintiffs' interpretation of the Federal Circuit's decision relies on selective reading rather than interpreting the text as a whole. With regards to Su Casa, the Federal Circuit also cites *Norman v. United States*, 429 F.3d 1081, 1092–93 (Fed. Cir. 2005), for the holding that "'it is particularly difficult to establish a reasonable investment-backed expectation' if the property was acquired after the alleged regulatory restriction[.]" *Anaheim Gardens, L.P.*, 953 F.3d at 1350–51 (also citing *Loveladies Harbor v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994) "noting that the investment-backed expectations factor of the *Penn Central* test is 'a way of limiting takings recoveries to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime'") (*abrogated on other grounds by Bass Enterprises Prod. Co. v. United States*, 381 F.3d 1360, 1369–70 (Fed. Cir. 2004)). Plaintiffs ask the Court to interpret the Federal Circuit's holding to mean that the sophistication of the investor and the date of purchase are "relevant, not determinative" as to whether reasonable investment-backed expectations exist. (OA Tr., 66:7). In doing so, Plaintiffs claim a factual issue but do not actually point to any disputed facts. Mr. Spieker was certainly engaged in the processes of purchasing both Foothill Plaza Apartments and Metro West Apartments prior to the enactment of LIHPRHA, but both the timing of the purchases and the well-established sophistication of Mr. Spieker himself are not controverted.[13] Timing and sophistication are indeed relevant to Mr. Spieker's claims, and because they are not controverted, they are also determinative in this summary judgment analysis.

Alternatively, Plaintiffs contend that while Mr. Spieker did purchase his properties after the enactment of the Preservation Statutes, the contents of LIHPRHA were too difficult to parse until after the sales of Foothill Plaza Apartments and Metro West Apartments had finalized. (Pls.' Resp. at 5 ("Owners had no idea what the regulations for those sections would say until May of 1992 when the regulations were finally published."); Pls.' App. at 117 (Spieker Dep. Tr., 124:14–17) ("[Y]ou asked me what the significance of [LIHPRHA regulations] were. They were everything. We didn't know they were going to put a 50-year restriction and keep the returns static."), ECF No. 840-1; *Id.* at A006 (Spieker Decl. ¶ 8)). However, Mr. Spieker purchased Metro West Apartments in August 1992, three months after the HUD regulations came into effect. (Def.'s App. at 231–34 (First Amend. to Real Estate Purchase Agreement), 235–51 (General Partnership Agreement of West 110th Street Apartments), 276 (Buyer's Final Closing Statement)). LIHPRHA was enacted on November 28, 1990, and the final regulations were not published by HUD until May 1992. (Pls.' Resp. at 5 (citing the Housing and Community Development Act, Pub. L. No. 102-550, § 332, 106 Stat. 3773 (Oct. 28, 1992))); Final

---

That's the ultimate decision." The Court: "At what point? At the time he made his deposit? At the time he concluded the purchase?" Pls.' Counsel: "Well, no later than the time he made the deposits." The Court: "And that's a legal question[.]"), ECF No. 851.

[13] Plaintiffs attempt to blur the purchase timeline of both these properties with little success—particularly with regards to Metro West Apartments. The final HUD regulations were issued on May 8, 1992, and the sale of Metro West to West 110th Street closed on August 21, 1992. Final Guidelines for Determining Appraisals of Preservation Value under LIHPRHA, 57 Fed. Reg. 19970 (May 8, 1992); (Def.'s App. at 276 (Buyer's Final Closing Statement)).

11

Guidelines for Determining Appraisals of Preservation Value under LIHPRHA, 57 Fed. Reg. 19970 (May 8, 1992). The statute that enacted LIHPRHA specifically provided that HUD was to issue interim and then final regulations "implementing this title" all of which were subject to public comment. *See* Hous. and Cmty. Dev. Act, Pub. L. No. 102-550, § 332, 106 Stat. 3773 (Oct. 28, 1992), 12 U.S.C. § 4101 Note. According to Plaintiffs, "owners had no idea" what the LIHPRHA regulations would say until May 1992. (Pls.' Resp. at 5; Pls.' App. at 006, 117). Conveniently, this would mean that Mr. Spieker was in the dark about the future of his investments until that time. Plaintiffs also argue that ELIHPA was a temporary measure, and "[a]t most, a prospective investor after the enactment of ELIHPA would know that the ability to prepay was temporarily paused, but it was not eliminated or terminated, as LIHPRHA would accomplish years later." (Pls.' Resp. at 4).

Plaintiffs here are essentially arguing that Mr. Spieker was not bound by LIHPRHA until he understood the law. This itself is a question of law—not fact. Statutes become law when enacted. *Gibbons v. Ogden*, 22 U.S. 1, 71 (1824). However, some laws cannot operate until agencies issue regulations that fill in statutory gaps, and Congress sometimes expressly requires such rulemaking before a provision can take effect. *See Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024); *Natl. Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) ("Legislative rules have the 'force and effect of law' and may be promulgated only after public notice and comment.") (citation omitted). At the time, LIHPRHA did include language requiring HUD to issue regulations, but this directive did not render the statute inoperative.

The Federal Circuit has already held that, "[w]hile the HUD regulations" implementing the statutes "had not yet gone into effect at the time of the transaction, the Preservation Statutes themselves were sufficiently detailed to remove any reasonable expectation that [Plaintiff] could have had that it would have the option to prepay its mortgage . . . ." *Anaheim Gardens, L.P.*, 953 F.3d at 1350; *see also Cienega Gardens v. United* States, 331 F.3d 1319, 1327 (Fed. Cir. 2003) ("The *immediate* effect of ELIHPA and LIHPRHA was to nullify the Owners' option to prepay their mortgages.") (emphasis added). Plaintiffs ask the Court to not only diverge from precedent, but to adopt the assumption that legislation passed by Congress is not law until an agency says so. Plaintiffs do not provide sufficient evidence to support this argument. The May 20, 1992 memorandum cited by Plaintiffs does not negate the fact that LIHPRHA immediately revoked the right to prepay. (*See* Pls.' App. at 100–101). Despite decades of litigation from every conceivable angle and theory, no Court has found that LIHPRHA was unenforceable simply because the relevant regulations had not yet been promulgated by HUD. The Court finds that LIHPRHA imposed immediate substantive obligations and prohibitions on investors like Mr. Spieker.

Even if the Plaintiffs' contention that investors had reasonable investment-backed expectations up until HUD's promulgation of the LIHPRHA regulations held any water, the existence of ELIHPA, well before Mr. Spieker began the purchasing process of Foothill Plaza Apartments or Metro West Apartments, shoots holes in the bucket. Plaintiffs address this issue by arguing that an owner that "would have been able to process under ELIHPA . . . would be free of the restrictions on distributions and be able to charge market or near market rents" and that "if a property was eligible to process under ELIHPA, it would be permitted to operate with no

12

limitations on distributions and would be able to increase its rents to market or near market rates." (Pls.' Resp. at 11; Pls.' App. at 006 (Spieker Decl. ¶ 7)). However, neither ELIHPA nor LIHPRHA contain such language. Plaintiffs' "speculative hopes—dependent on receiving a government service to which the plaintiff has no entitlement—are not the reasonable investment backed expectations relevant to the *Penn Central* analysis." *Quinn v. Bd. of Cnty. Commissioners for Queen Anne's Cnty., Maryland*, 862 F.3d 433, 442–43 (4th Cir. 2017). In fact, Plaintiffs' Counsel noted that Mr. Spieker purchased Metro West Apartments at a discounted price due to the restrictions from the Preservation Statutes. (OA Tr, 34:1–3; Def.'s App. at A460–62 (Spieker Dep. Tr., 44:6–14, 47:9–48:4, 104:7–17), ECF No. 834-3). Either way, Mr. Spieker was aware that he was entering a highly regulated market, and it perplexes the Court that Plaintiffs continue to maintain the opposite.

It is inconceivable to the Court that Mr. Spieker had no knowledge of the Preservation Statutes prior to the May 1992 issuance of the HUD regulations—Plaintiffs have not shouldered their burden to raise any disputes of material fact. There have been no questions raised as to the authenticity of the documents presented, or the timelines—there have merely been protests as to Mr. Spieker's state of mind at the time he purchased his apartments. (*See* Pls.' Resp. at 2 ("The possibility that something was 'brewing' in the future did not mean that Mr. Spieker knew his goose would soon be cooked."); OA Tr., 65:2–5 (The Court: "Other than saying, uh-uh, that's not what happened, how is it actually controverted? We've gone through the timeline. How is it actually controverted, a genuine issue of material fact?")). There is no issue of fact to resolve.[14] No reasonable Court could find that Mr. Spieker purchased Foothill Plaza Apartments or Metro West Apartments with any expectation of prepayment—let alone one that was reasonable. Plaintiffs have failed to distinguish these facts from those relevant to Su Casa, and this Court grants summary judgment for similar reasons—Mr. Spieker purchased his properties after the Preservation Statutes were enacted, and Plaintiffs have not presented any relevant considerations to outweigh the unequivocal evidence at hand. Therefore, the United States' Motion for Summary Judgment on the Claims of 5324 Foothill Apartments, G.P. and Metro West, L.P., is granted.

---

[14] Plaintiffs also accuse the United States of including inadmissible and irrelevant allegations in their Motion. (Pls.' Resp. at 3, ECF No. 840). The United States included a section called "Extension to ELIHPA's Prepayment Restrictions, Congress's Consideration of Additional Restrictions Through New Legislation and Passage of LIHPRHA" which was legislation introduced, but not actually enacted. (*Id.* (citing Def.'s Mot. at 15–17, ECF No. 834)). Plaintiffs also object that this section contains inadmissible hearsay statements from Congress. (*Id.*). The United States does not directly address this. However, in its Reply, the United States does ask the Court to disregard a paragraph in Mr. Levy's declaration because his statements are "plainly based" on what Mr. Spieker told him, amounting to inadmissible hearsay. (Def.'s Reply at 14–15, ECF No. 845). The Court has not relied on any of these disputed pieces of evidence in this Opinion. Therefore, it declines to reach the merits of these arguments.

### III. Conclusion

For Plaintiffs 5324 Foothill and West 110th Street, the story—as told by the evidence—is unambiguous. There is no genuine dispute of material fact. These Plaintiffs have not identified any evidence in the record that would lead a rational trier of fact to find in their favor. Nor do these Plaintiffs meaningfully distinguish the circumstances here from those in *Anaheim Gardens, L.P.* affecting Plaintiff Su Casa. 953 F.3d at 1348–51. The law is clear that investors cannot plead ignorance of the Preservation Statutes that were in effect in advance of their purchase. To find otherwise would contravene both precedent and common sense. On the other hand, the evidence offered to support Plaintiffs Glenview Gardens, L.P. and Indian Head Manor, L.P. is far from a singular narrative—dueling plausible interpretations of the same facts create a tension that cannot be resolved at this summary judgment stage. The Court therefore:

(1) **DENIES** the United States' Motion for Summary Judgment on Plaintiffs Glenview Gardens, L.P. (Case No. 93-6569) and Indian Head Manor, L.P. (Case No. 93-6571), (ECF No. 833).

(2) **DENIES AS MOOT** the United States' Motion to Strike Inadmissible Evidence, (ECF No. 844).

(3) **GRANTS** the United States' Motion for Summary Judgment pertaining to Plaintiffs 5324 Foothill Apartments, GP (Case No. 93-6583) and Metro West Limited, L.P. (Case No. 93-6573), (ECF No. 834).

Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk is **DIRECTED** to **ENTER** judgment accordingly.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge